**FILED**

7/30/2013

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LUZMARIA ARROYO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  1:12-CV-06859 |
| vs. | ) | |
| | ) | Honorable John Z. Lee, |
| VOLVO GROUP NORTH AMERICA, | ) | Judge Presiding |
| LLC, d/b/a VOLVO PARTS NORTH | ) | |
| AMERICA, | ) | Honorable Jeffrey Cole, |
| | ) | Magistrate Judge |
| | ) | |
| Defendant. | ) | JURY DEMANDED |

## THIRD AMENDED COMPLAINT

NOW COMES the Plaintiff, LUZMARIA ARROYO, by and through her attorneys, John

P. DeRose & Associates, and as and for her Third Amended Complaint against Defendant,

VOLVO GROUP NORTH AMERICA, LLC, d/b/a VOLVO PARTS NORTH AMERICA states

as follows:

### JURISDICTION

1.      This action is brought pursuant to 29 U.S.C. § 794; and the jurisdiction of this court is

invoked pursuant to 29 U.S.C. § 794(a)(1).

2.      This is an action seeking redress for violations of rights guaranteed to the Plaintiff , under

the Uniformed Service Members Employment and Reemployment  Act (USERRA), 38 U.S.C.A.

§ 4301 *et seq.*, 29 U.S.C.A. § 215(a)(3), under the Americans with Disabilities Act (ADA) of

1990, § 2 *et seq.*, 42 U.S.C. § 12101 *et seq.*, under Title VII of the Civil Rights Act of

1964("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, as amended, under the Rehabilitation Act of 1973

("Rehab Act"), 29 U.S.C. § 791 *et. seq.*, and under the Family Medical Leave Act (FMLA), 29

U.S.C.A. § 2615(a)(1) when she was subjected to a hostile work environment and was ultimately

1

terminated because of interference and retaliation by her employer as she sought to exercise her rights under these Acts. Plaintiff seeks mandatory injunctive relief and damages to redress Defendant's discriminatory employment practices.

3.      Venue lies in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §§ 1331, 1343, and 1391(b) because the events giving rise to this claim occurred in this judicial district and Plaintiff and Defendant and its employees reside in this District.

## PARTIES

4.      At all times herein mentioned, Plaintiff, LuzMaria Arroyo (hereinafter "Ms. Arroyo" or "Plaintiff"), was employed by the Defendant Volvo Group North America, LLC d/b/a Volvo Parts North America (hereinafter "Volvo" or "Defendant").

5.      At all times herein mentioned, Defendant Volvo was and is believed and alleged hereon to be a corporation duly organized, existing, and operating within the jurisdiction of this Court.

6.      Volvo is also an employer subject to suit under the Title VII and the ADA in that Defendant is in an industry affecting commerce and had 15 or more employees in each of 20 or more weeks in the current or preceding calendar year.

## FACTUAL ALLEGATIONS

7.      Defendant is a transportation company in the business of producing, servicing and distributing heavy-duty truck parts. Defendant is a government contractor and/or subcontractor with contracts greater than $10,000.

8.      Plaintiff is a disabled veteran of the United States Army Reserve who was deployed on three separate occasions to combat zones.

9.      Plaintiff has been deployed to Kuwait City, Kuwait and Baghdad, Iraq and Basrah, Iraq-- the last two deployments to Iraq of which were while in the employ of Defendant.

10.	Plaintiff is a qualified person with respect to her employment in that, with or without a reasonable accommodation, she can perform the essential functions of her job.

11.	Within 6 months after her release from active duty with the United States Army in Kuwait, Plaintiff began her employment with Defendant at its plant located in Joliet, Illinois on or about June 13, 2005.

12.	On her application for employment with Defendant, Plaintiff fully disclosed and Defendant was fully aware that she was a member of the United States Army Reserve, subject to call up to active duty and training pursuant to military orders.

13.	At all relevant times described herein, Plaintiff was employed in the position of material handler for Defendant.

14.	At all material times, Plaintiff performed her job according to her employer's legitimate expectations.

15.	Within 10 months after the commencement of her employment with Defendant, on April 15, 2006 Plaintiff was called to active duty in support of Operation Iraqi Freedom, was sent to Baghdad, Iraq, and went on military leave from her employment at the Defendant's Joliet plant.

16.	On or about May 7, 2007, Plaintiff was released from active duty in Baghdad, Iraq and reported back to work for the Defendant at its Joliet plant.

17.	At all times relevant, the Regional Manager at the Defendant's Joliet, Illinois location was Keith Schroeder (hereinafter sometimes referred to as "Schroeder").

18.	At various relevant times, Plaintiff had three immediate supervisors, Michael Temko, Sherrie Jankowski, and Patrick Dunn.

19.     At various relevant times, Defendant's supervisors (who were not even the immediate supervisor of Plaintiff) interacted with or were involved in the secret discussions and recommendations concerning the treatment of her, included, but was not limited to, Bill Balsis, Bernard Bomba, Christopher Humann, David Miller, and Jason Mussatto.

20.     At various of the relevant times, members of the Human Resources Team and the Management Team of Defendant with which plaintiff interacted or who were involved in the discussions and recommendations concerning the treatment of her, included, but were not limited to, Dennis Scholl, Bruce Olin, Regina Williams, Maureen Somerset.

21.     Almost from the inception of her return to work, Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management began to consult with each other concerning the requirements and dictates of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §4301 et seq.,  in order to grudgingly grant only minimal compliance with USERRA and deprive Plaintiff of the rights and benefits to which she is entitled in order to avoid allegations of discrimination and retaliation.

22.     After Plaintiff's return from Iraq in 2007, Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management complained about and agreed among themselves that Plaintiff's travel to Fort Benning, Georgia for her training imposed too great a burden on Defendant because Plaintiff needed and had to be granted an extra day of travel to and from Fort Benning in compliance with her military orders.

23.     Plaintiff was told by Keith Schroeder after he consulted with other of Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management to transfer from Fort Benning, Georgia to a local United States Army Reserve unit.

24.     Plaintiff advised Schroeder that as a soldier, she could only request a transfer and did not have the authority to demand a transfer.

25.     In December 2007 at the insistence of Schroeder, Plaintiff requested a transfer from her unit at Fort Benning, Georgia to a local drill site in Darien, Illinois for the convenience of Defendant.

26.     The team of soldiers with which Plaintiff had drilled, trained, and reported for duty at Fort Benning, Georgia were members of the unit with which Plaintiff had been deployed into combat zones in Iraq on the earlier occasion.

27.     The transfer to the unit at the local site in Darien, Illinois at the insistence of Defendant deprived Plaintiff of the camaraderie, society, and confidence she developed in her fellow soldiers, with whom she shared her experiences in harm's way.

28.     That transfer to the unit at the local site in Darien, Illinois also accelerated Plaintiff's Redeployment Schedule since there was normally a two to three-year period between deployments of particular units.

29.     In March, 2008, the United States Army placed Plaintiff on Active Duty for Training ("ADT") and Plaintiff went again on military leave status from her employment with Defendant.

30.     On or about October 1, 2008, Plaintiff returned to work at Defendant's Joliet plant from ADT.

31.     Upon Plaintiff's return to work, Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management continued to debate the requirements and dictates of USERRA in order to grudgingly grant only minimal compliance, deprive Plaintiff of the rights and benefits to which she is entitled under USERRA, and avoid allegations of discrimination.

32.    Spreadsheets were created and emails were exchanged among Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management concerning Plaintiff's absence from employment at Defendant's plant for drills and training, her obligation to follow orders, and Defendant's legal obligation to cooperate with those orders.

33.    On or about April 15, 2009, Plaintiff was activated for service in Operation Iraqi Freedom a second time while employed with Defendant.

34.    Although originally scheduled to be released from active duty on April 15, 2010. Plaintiff tour of duty was extended until August 15, 2010.

35.    Questioning the obligation of Plaintiff to remain on extended active duty, Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management demanded production of military orders that had not yet been produced in violation of USERRA.

36.    Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management continued to remind each other that they must not appear to be discriminatory of Plaintiff and her rights.

37.    On or about August 15, 2010, Plaintiff was released a third time from active duty with the United States Army in a combat zone.

38.    Pursuant to USERRA Plaintiff was allowed to return to her position at the Defendant up to ninety (90) days after release from active duty on August 15, 2010.

39.    Plaintiff returned to work at the Defendant's Joliet plant on or about September 27, 2010.

40.    Upon her return, Defendant failed to provide the Plaintiff with updated employment policies, failed to provide training and re-training on the essential functions of her job, and failed to provide the appropriate amount of earned time off ("ETO") Plaintiff had accrued.

41.     Throughout her employment with Defendant, as Plaintiff was experiencing concerns and problems in the workplace as a result of her quest to fulfill her military duty and obligations, she brought her questions, complaints, and problems, both verbally and in writing, to her supervisor first, then to the local Human Resources Manager, then to the next level of Regional Management, then to Regional Human Resources personnel, and finally to Defendant's upper management at the Headquarters level.

42.     As Plaintiff sought rights guaranteed to her under the Uniformed Service Members Employment and Reemployment Act (USERRA), under the Americans with Disabilities Act (ADA) of 1990, under Title VII of the Civil Rights Act of 1964 ("Title VII"), under the Rehabilitation Act of 1973 ("Rehab Act"), and under the Family Medical Leave Act (FMLA), the company retaliated against her, disciplined her, and ultimately terminated her employment.

43.     On September 28, 2010 the first day after her return to work, Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management tendered a Voluntary Severance Package to Plaintiff with the hopes that she would voluntarily terminate her employment with Defendant.

44.     Plaintiff did not accept the severance offer and continued to work for Defendant.

45.     On or about October 19, 2010, less than one month after Plaintiff's return to work from active duty, Schroeder gave Plaintiff a "verbal warning" for two "occurrence" absences between October 1, 2010 and October 19, 2010, despite the fact that Plaintiff had never been provided with any protocol promulgated by Defendant concerning absences upon a reemployment and had been, in fact, excused for one of the absences.

46.     On or about October 27, 2010, Plaintiff submitted a request to take military leave on the Friday before a drill and training weekend set to take place on November 5, 2010 in order to properly rest and make preparation for her drills and training.

47.     Schroeder denied the Plaintiff's request for military leave because of what Schroeder alleged, but failed to specify was an "undue hardship".

48.     Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management knew that USERRA required that Plaintiff be afforded travel time plus an eight hour rest period following her drill before having to report to work.

49.     After Schroeder denied Plaintiff's request for military leave, Plaintiff reluctantly agreed to report to work two hours prior to the start of her shift and leave two hours prior to the end of her shift on the Friday before her drill and training weekend.

50.     On or about October 29, 2010, Schroeder gave Plaintiff write-ups for the two absences of October 1, 2010 and October 19, 2010, which were originally "verbal warnings".

51.     This action taken by Schroeder against Plaintiff violated the Defendant's protocols for progressive discipline and corrective disciplinary action.

52.     On or about November 1, 2010, Schroeder disciplined Plaintiff for being one (1) minute late to work.

53.     Plaintiff refused to sign the Disciplinary Notice because the Defendant's policy allowed her to punch in up to two minutes after the start of the shift.

54.     From on or about November 10, 2010 through November 12, 2010, plaintiff's need for a leave day became apparent when she required hospitalization and medical treatment directly following drill weekend.

55.    On or about November 27, 2010, Plaintiff requested military leave on December 3, 2010 to allow her to attend a Military Reserve Training Weekend scheduled for December 4 and 5, 2010.

56.    Schroeder denied the Plaintiff's request for military leave from her employment with Defendant in order to attend the Military Reserve Training Weekend and be sufficiently rested before and after that training.

57.    On December 2, 2010, Plaintiff was instructed that a decision concerning any request for military or medical leave would only be made after she provided military or medical documentation in accordance with Defendant's attendance policy in violation of USSERA.

58.    On or about December 7, 2010, Plaintiff requested assistance from Employer Support of the Guard and Reserve (ESGR) in mediating her USERRA rights.

59.    On December 13, 2010, Schroeder offered to adjust the Plaintiff's work schedule on training weekends so that she would begin at 10:00 a.m. and end at 6:00 p.m.

60.    Schroeder's proposed schedule did not allow Plaintiff to meet the eight (8) hours of sleep plus travel time requirement as set forth in USERRA.

61.    When plaintiff did not accept his proposed schedule, Schroeder curtly denied Plaintiff's request to have a military leave day on the Friday before training weekends for the stated reason that it would be an "undue hardship" to Defendant.

62.    On or about December 23, 2010, Plaintiff self-admitted to the emergency room of the Adventist LaGrange Memorial Hospital, as she sought medical treatment for depression and anxiety.

63.    Plaintiff was diagnosed with anxiety and was provided with a note excusing her from work through December 30. 2010 which doctor's note was provided by Plaintiff to Defendant.

64.     Plaintiff was examined and treated at the Veterans Administration hospital for depression, anxiety and paranoia on January 8, 2011.

65.     Plaintiff was admitted to the Veterans Administration Hospital between January 10, 2011 and January 14, 2011 for depression, anxiety and paranoia.

66.     On or about January 18, 2011, Dr. Arvind Yekanath diagnosed Plaintiff with service-related Post-Traumatic Stress Disorder ("PTSD").

67.     Plaintiff applied for Short-Term Disability ("STD") with the Defendant, which Defendant approved on January 21, 2011 retroactive to December 27, 2010.

68.     On or about March 19, 2011, after mediation among the Plaintiff, Defendant, and the Employer Support of the Guard and Reserve ("ESGR"), Plaintiff was granted a partial military leave day in advance of drill weekends and pay for military leave for Annual Training attendance in accordance with company policy.

69.     On March 22, 2011 Dr. Arvind Yekanath wrote Defendant that "Arroyo is fit to work without restrictions".

70.     On or about March 23, 2011, Plaintiff returned to work from Short-Term Disability.

71.     On or about April 14, 2011, after the Defendant raised concerns about the impact of her PTSD symptoms on her ability to operate a forklift, Plaintiff saw the Defendant's physician for an Independent Medical Evaluation.

72.     As a result of the Independent Medical Evaluation, Defendant's physician restricted Plaintiff from operating a forklift.

73.     On or about April 26, 2011, Plaintiff requested to use two (2) hours of Earned Time off (ETO) each time she had to attend group therapy sessions required for her PTSD treatment.

74.     Schroeder and HR Representative Maureen Somerset denied Plaintiff's request and indicated that if Plaintiff wished to use ETO she would have to take a whole day off "pursuant to company policy".

75.     On or about May 2, 2011, after Plaintiff called company policy to its attention allowing employees to take ETO in one hour increments if they so desire and have available unused ETO, Defendant's Human Resources Department overruled Schroeder and allowed Plaintiff to use two hours of ETO on her PTSD group therapy session days.

76.     On or about May 20, 2011 Plaintiff requested to work overtime on Saturdays.

77.     After consultation with Schroeder, Local Human Resources Business Partner Regina Williams (hereinafter sometimes referred to simply as "Regina Williams") confirmed in writing that the only Saturday work available at Defendant's Joliet plant entailed operating the forklift.

78.     Plaintiff advised Regina Williams that she had been in the plant on Saturday and observed work being performed by another employee that she was fully able to do while on light-duty.

79.     Defendant was fully aware that the language of its policies contained no prohibition with regard to overtime while on restricted duty nor did it have any documentation placing Plaintiff on restrictive duty.

80.     Plaintiff complained that she was being discriminated against based on her disability when she was prevented from working overtime on Saturdays despite the fact that she had the ability to perform the job for Defendant.

81.     In her email to Regina Williams on May 20, 2013, Plaintiff concludes:

        Perhaps I have been discriminated against his whole time.

82.     On or about May 31, 2011, Plaintiff took military leave from her employment with Defendant in response to orders from her unit.

83.     Although Arroyo was released from active duty on July 5, 2011, she was required to report for drill training on July 8, 2011.

84.     Because she had no time off between active duty and her drill training, Plaintiff requested additional days off (without pay from Defendant) before reporting back to work at Volvo.

85.     Plaintiff's request for additional time off before reporting back to Defendant's plant was denied by Keith Schroeder and Regina Williams.

86.     As directed by Defendant, Plaintiff returned to work from military leave on July 11, 2011.

87.     In a letter dated the same July 11, 2011, Defendant's physician, Dr. John J. Koehler reevaluated Plaintiff and indicated that "Arroyo is released back to full duty without restriction", including the previous limitation on her driving a forklift.

88.     Schroeder had established a new system at the Joliet plant entitled "Volvo LMS Lite" to allow supervisors and management to monitor the work and gaps in work of employees.

89.     Employees were advised that "supervisors will monitor daily LMS-Lite files", "excessive gaps of unaccounted for time will be documented and communicated", "upper management will do random audits of LMS Lite files and audit log", and "an employee will receive a Red Flag after a supervisor reviews the LMS lite file if there is an accumulation of gaps of unaccounted for time meeting the listed thresholds each day".

90.     When Supervisor David Miller accused Plaintiff of an LMS Lite policy violation on August 4, 2011, Plaintiff wrote to HR Representative Regina Williams:

> Being accused of an LMS Lite policy violation by Mr. Miller, not
> my supervisor.  The alleged infraction occurred on the Tuesday

when I begin work at a later time. This correlates with time off to attend my appointments as an accommodation allowed by the company.

I am requesting intervention before I seek legal assistance.

91.     On or about August 26. I, 2011, Plaintiff wrote an email to Defendant to complain about

harassment relating to her PTSD diagnosis and to request a number of reasonable

accommodations for her PTSD based upon standards published by the Department of Labor

("DOL").

92.     In that email, Plaintiff wrote:

America's Heroes at Work is a U.S. Department of Labor (DOL) project that addresses the employment challenges of returning Service Members living with Traumatic Brain Injury (TBI) and/or Posttraumatic Stress Disorder (PTSD)-an important focus of the President's Veterans agenda.

93.     Plaintiff went on to report harassment she experienced at the hand of Schroeder:

On 8/23 I experienced an incident which brought about a major anxiety episode. I tried various relaxation techniques, but could not ignore the event; I have a call to action, for I no longer felt safe/protected. After careful consideration of courses of action, I decided to speak with my supervisor, Patrick Dunn (who I feel safe to approach and confirm with). The anxiety episode lasted approximately 20 minutes. After speaking with Mr. Dunn, I felt more calm and composed and was able to continue working. Mr. Dunn said he would need to speak with you [Keith Schroeder] regarding the event brought about the anxiety.

On 8/24 you requested to speak with me and Mr. Dunn at which time you threatened to fire me for my behavior. Your demeanor was aggressive and hostile and I felt intimidated/threatened. Additionally, you stated that the time that I used in order to reduce my anxiety and consider courses of action was not authorized and I would be held accountable under the LMS Lite policy. You also stated that continued breaks for managing anxiety will result in termination. When I requested this information in writing, you refused to provide it to me and still have not provided it to date.

> On 8/25 you again requested to speak with me; this time cornering
> me in a small office with 2 other supervisors and Ms. Maureen
> Somerset behind the closed door in a room with no windows and
> no way to escape. You provided me with the workplace violence
> policy and the harassment policy and then allowed me to leave.
> ….

94.     On or about August 31, 2011 Schroeder and Williams suspended Plaintiff for violation of

the company attendance policy.

95.     That suspension was in violation of Defendant's own progressive discipline and

disciplinary protocol since Plaintiff had not received any written warnings for attendance

violations in the previous six (6) months.

96.     On or about September 13, 2011, Plaintiff filed an EEOC Complaint alleging

discrimination in violation of the Americans with Disabilities Act ("ADA").

97.     On or about September 19, 2011, Williams requested to interview the Plaintiff in relation

to her PTSD harassment claims.

98.     Plaintiff indicated that she wanted to obtain legal representation before speaking with

Regina Williams about the harassment.

99.     In the meanwhile, Regina Williams and Plaintiff came to an understanding regarding

some of the accommodations Plaintiff had requested in August, one of which was to allow her

the use of the supervisor's office at the back of the plant so that she could meditate and compose

herself before starting work each morning.

100.    On or about November 1, 2011, Schroeder informed Plaintiff that he could not agree to a

later start time on the dates during which she had her PTSD treatments without a call-in and a

doctor's note.

101. Schroeder further clarified that Plaintiff was expected to have her personal protective equipment on prior to the start of her shift at 4:30 p.m. and was expected to be walking towards her forklift at the start of the shift.

102. Plaintiff indicated that she would put on her safety equipment before going to the meditation room, but requested to be paid by Defendant for doing so, which request Schroeder denied.

103. When Plaintiff asked if this was official policy, Schroeder indicated that he had not communicated these requirements to any other employee and that this was not the policy for any employee other than the Plaintiff.

104. On or about November 2, 2011, Plaintiff arrived at Defendant's Joliet plant and punched in 20 minutes early in order that she could use the meditation room before starting work as agreed.

105. On or about November 3, 2011, Schroeder provided Plaintiff with a written Disciplinary Action Form for violation of the Defendant's alleged "Shift Start Rule Policy", contending that Plaintiff had been late 3 minutes on November 2, 2011 because she was not on her forklift when the bell rang.

106. Plaintiff refused to sign this false write-up and informed Schroeder that Plaintiff's attorney was going to be engaging in mediation with the Defendant at the EEOC on November 18, 2011 to resolve all ADA issues.

107. Schroeder also advised Plaintiff that there was a parking restriction that prohibited her from parking in the back of the plant at the entrance nearest to the meditation room; and when questioned by Plaintiff about it, Schroeder admitted that the parking restriction was just for her, it was not a parking policy, and he had never before promulgated it.

108.    Only because Plaintiff questioned him on the parking restriction, Schroeder posted a "parking policy" for all employees 2 days later.

109.    The new parking policy now necessitated that Plaintiff would have to leave the meditation room and take the approximately 10 minute walk to the front of the plant and put on her safety equipment and harness in order to be prepared for the start of work.

110.    On or about November 4, 2011, Plaintiff left work early pursuant to her agreement with the Defendant to use military leave on military drill weekends.

111.    On or about November 8, 2011, Schroeder disciplined the Plaintiff for alleged tardiness on November 4, 2011 and terminated the Plaintiff for her alleged absences over the past (6) months.

112.    Defendant's reason for Plaintiff's termination is false and merely pretext for illegal retaliation against her for reporting Schroeder's harassment and discrimination of her and to further deprive Plaintiff of the rights and benefits to which she is entitled under USERRA by Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management.

113.    On or about November 30, 2011, Plaintiff filed an amended charge with the EEOC adding a claim for retaliation.

114.    Plaintiff was terminated because of her disability, PTSD and in retaliation for her EEOC complaint for violation of the ADA filed on September 13, 2011 and in retaliation for her attempt to secure reasonable accommodations and working conditions under USERRA.

115.    As a result of the aforesaid acts of the Defendant, Plaintiff has lost her employment, income and benefits in an amount to be proven at the time of trial and claims such damages together with prejudgment interest as permitted by law.

116. The aforementioned acts of the Defendant were reckless, willful, wanton, malicious, oppressive, and in callous disregard to and indifference to Plaintiff's rights.

## COUNT I
## DISCRIMINATION ON THE BASIS OF PLAINTIFF'S DISABILITY
## VIOLATION OF USERRA, TITLE VII, THE ADA, AND THE REHAB ACT

117. Plaintiff realleges and incorporates the foregoing paragraphs 1 through paragraph 116 of this Second Amended Complaint as though fully set forth at this place.

118. Plaintiff is disabled in that she was diagnosed with PTSD and is substantially limited in the major life activity of brain function.

119. Defendant also treated Plaintiff as a person with a disability by granting some of the accommodations she requested.

120. Plaintiff was qualified for the job she held with Defendant and performed all job functions to Defendant's legitimate employment expectations.

121. Despite Plaintiff's qualifications and job performance, Defendant discriminated and retaliated against her because of her disability and active military service.

122. Defendant's discrimination and retaliation against Plaintiff and denial of her rights under USERRA was intentional.

123. Defendant discriminated against Plaintiff in the terms and conditions of her employment.

124. Similarly situated non-disabled employees and employees who were not in the United States military service were not subjected to the same terms and conditions of employment as the Plaintiff.

125. Defendant's reason for Plaintiff's termination was false and merely pretext for illegal discrimination.

126.   Defendant's actions, as described above, are in violation of USERRA, the ADA and Rehab Act in that Defendant acted to discriminate and retaliate against Plaintiff in the terms and conditions of her employment because of her disability and in a studied attempt to deprive her of rights, benefits and protection under those statutes.

127.   As a direct and proximate result of said unlawful employment practices and in disregard of the Plaintiff's rights and sensibilities, Plaintiff has suffered lost wages, the indignity of discrimination, which has manifested in emotional distress and further has negatively impacted her future ability to support herself, harmed her earning capacity, disrupted her personal life, and caused loss of enjoyment of the ordinary pleasures of life.

WHEREFORE, Plaintiff, LuzMaria Arroyo requests the following relief:

A.   That Plaintiff be granted general and compensatory damages in an amount to be determined at trial;

B.   That Plaintiff be granted punitive or liquidated damages in an amount to be determined at trial;

C.   That the Court grant to Plaintiff her reasonably incurred attorneys' fees, costs, litigation expenses, and pre-judgment interest; and

D.   That the Court grant such other and further relief as the Court may deem just or equitable.

## COUNT II
## RETALIATION IN VIOLATION OF USERRA,
## TITLE VII, THE REHAB ACT, AND THE ADA

128.   Plaintiff realleges and incorporates the foregoing paragraphs 1 through 127 of this Second Amended Complaint as though fully set forth at this place.

129.   Plaintiff met her employer's legitimate employment expectations.

130. Plaintiff engaged in protected activity when she reported the harassment and violations of USERRA, and the ADA to the Defendant on May 20, 2011 and August 21, 2011.

131. On September 13, 2011, Plaintiff filed a Charge of Discrimination against Defendant with the EEOC.

132. After engaging in said protected activity, Defendant has engaged in many acts of retaliatory actions which include, but are not limited to, conspiring among its Supervisors, Managers, Human Resources Representatives, and Upper Management to deprive plaintiff of rights, benefits and protections guaranteed to her under the law, continually refusing to provide Plaintiff with a reasonable accommodation in her working conditions although Plaintiff is a qualified employee, terminating Plaintiff although she was performing to her employer's legitimate expectations and could continue to perform her job, and otherwise harassing Plaintiff in various ways designed to deprive her of those rights, benefits, and protections to which she was entitled and to impede her ability to work for Defendant.

133. There is a causal connection between Plaintiff's protected activity and Defendant's retaliatory actions.

134. Similarly situated employees who did not engage in protected activity were treated more favorably than Plaintiff.

135. Defendant's reason for Plaintiff's termination is false and merely pretext for illegal retaliation.

136. Defendant's actions, as described above, are in violation of USERRA, the ADA and Title VII as the Defendant has engaged in acts of retaliation because of Plaintiff's engagement in protected activities.

137.    As a direct and proximate result of said unlawful employment practices and in disregard of the Plaintiff's rights and sensibilities, Plaintiff has suffered lost wages, the indignity of discrimination, which has manifested in emotional distress and further has negatively impacted her future ability to support herself, harmed her earning capacity, disrupted her personal life, and caused loss of enjoyment of the ordinary pleasures of life.

WHEREFORE, Plaintiff, LuzMaria Arroyo requests the following relief:

A.    That Plaintiff be granted general and compensatory damages in an amount to be determined at trial;

B.    That Plaintiff be granted punitive or liquidated damages in an amount to be determined at trial;

C.    That the Court grant to Plaintiff her reasonably incurred attorneys' fees, costs, litigation expenses, and pre-judgment interest; and

D.    That the Court grant such other and further relief as the Court may deem just or equitable.

### COUNT III
### FAILURE TO PROVIDE A REASONABLE ACCOMMODATION
### IN VIOLATION OF USERRA, THE ADA, AND THE REHAB ACT

138.    Plaintiff realleges and incorporates the foregoing paragraphs 1 through paragraph 137 of this Second Amended Complaint as though fully set forth at this place.

139.    Plaintiff is an active member of the United States Army Reserve and is disabled in that she is substantially limited in major life activity of brain function.

140.    Plaintiff is a qualified person with a disability in that Plaintiff can perform the essential functions of her job, or a job, with a reasonable accommodation.

141.    Defendant was able to provide a reasonable accommodation to Plaintiff in the form of actions such as allowing plaintiff sufficient time-off from work so that she could safely travel to and from and adequately perform for military duties, allowing her time to attend her PTSD therapy sessions, allowing Plaintiff to work overtime on a machine other than the forklift, and allowing Plaintiff time to put on her protective gear prior to starting her shift.

142.    Such reasonable accommodations would not cause an undue hardship on Defendant.

143.    Defendant refused to provide Plaintiff with these reasonable accommodations.

144.    Defendant failed to engage in the required interactive process to determine what it could do to provide Plaintiff with a reasonable accommodation.

145.    Defendant's actions, as described above, are in violation of USERRA, the ADA, and Rehabilitation Act, as Defendant did not offer Plaintiff, a qualified individual with a disability, an available reasonable accommodation.

146.    As a direct and proximate result of said unlawful employment practices and in disregard of the Plaintiff's rights and sensibilities, Plaintiff has suffered lost wages, the indignity of discrimination, which has manifested in emotional distress and further has negatively impacted her future ability to support herself, harmed her earning capacity, disrupted her personal life, and caused loss of enjoyment of the ordinary pleasures of life.

WHEREFORE, Plaintiff, LuzMaria Arroyo requests the following relief:

A.    That Plaintiff be granted general and compensatory damages in an amount to be determined at trial;

B.    That Plaintiff be granted punitive or liquidated damages in an amount to be determined at trial;

C.     That the Court grant to Plaintiff her reasonably incurred attorneys' fees, costs, litigation expenses, and pre-judgment interest; and

D.     That the Court grant such other and further relief as the Court may deem just or equitable.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

147.  The Plaintiff repeat and re-allege paragraphs 1 through 146 of this Complaint as paragraphs 1 through 146 of Count IV as though fully set forth herein.

148.  Having been repeatedly advised of the rights of Plaintiff and knowing full well of her PTSD and the need for understanding and accommodation, the actions of Defendant, its supervisors, its Human Resources Department, and its high management employees were extreme and outrageous.

149.  The actions of the Defendant, its supervisors, its Human Resources Department, and its high management employees were done intentionally and maliciously to cause severe emotional distress to Plaintiff.

150.  Defendant, its supervisors, its Human Resources Department, and its high management employees knew or reasonably should have known that their actions had a high probability of causing severe emotional distress to Plaintiff.

151.  The actions of Defendant, its supervisors, its Human Resources Department, and its high management employees were intentional and malicious and demonstrated a willful and wanton disregard for the rights of Plaintiff and had a high probability of causing severe emotional distress to her.

152.  Plaintiff has suffered and continues to suffer from severe emotional distress.

153.  From the very inception of her employment with Defendant and her absence from the workplace pursuant to military orders and obligations that Plaintiff was required to follow and fulfill, Defendant's management, supervisors, and Human Resources leadership plotted and planned illegal and inappropriate discipline and obstruction of her even though she was not an indispensable employee and her absence was not an undue hardship to Defendant and its business needs.

154.  From the very inception of her employment with Defendant, and because of the refusal of Defendant's management, supervisors, and Human Resources personnel to provide Plaintiff with rights guaranteed her under USERRA, Plaintiff furnished Defendant's supervisors and managers with publications setting forth those rights and requested that they be forwarded to upper management and Defendant's Human Resources Department for their review and understanding, all of which requests met with ridicule from Defendant.

155.  When Defendant found Plaintiff's absence from work to travel to and from Fort Benning, Georgia for drills and training to be too inconvenient for its work schedule, Plaintiff was compelled by Defendant's management to transfer to a local Army Reserve site in the State of Illinois, an improper order which Plaintiff followed. Counselor redeployment on the Penguin and 25 okay.

156.  On August 25, 2005, only 2 months after her commencement of employment with Defendant, supervisor Michael Temko wrote Keith Schroeder:

> Tuesday night LuzMaria was a no call, no show. Wednesday morning I tried to contact her through her Army unit and at home. I was unable to get a hold of her, but left a message to call me back. Wednesday night, she shows up with a document from her unit that said she worked there on Monday. I questioned her as to why she returned to work Wednesday night if she only had to work Monday. She said she drove back from her unit which is Georgia. I informed her that we had no problem with her military service, but

that she still has to keep us informed as to what is going on. She said next time she will call and let us know.

What do you advise I do in response to her 3 days no call, no show?

157. Keith Schroeder responded:

I have numerous questions we must clarify before we take any disciplinary action.
…
4. Does she have any attendance disciplinary actions in her file? If so, what level of action?
5. What is her performance, attitude and interaction with peers? I overheard a conversation this week that indicated that she was a problem employee. I don't recall discussing this with you.

… If attendance action is in order we must do so expeditiously.

158. On August 26, 2005, Michael Temko responds to Keith Schroeder's questions:

…
4. She has no disciplinary actions for attendance. …

5. … Attitude and interaction with peers-Nothing really negative or positive to say here. Not a lot of interaction. She, for the most part, keeps to herself. In my opinion, LuzMaria's biggest problem is she is "burning the candle on both ends". She works here full-time, works as a part-time supervisor at UPS, and she is in the Army Reserves. By the time she gets here, she doesn't appear to have "much in the tank".

159. On October 19, 2005, Michael Temko wrote to Keith Schroeder:

I don't know [if] she plans on making it to work from Georgia when she has to drill on Sunday. I guess the question is, since she travels out of state for drill, are we required to give her the day before and the day after for travel? As a probationary employee, is she entitled to all the same military benefits as a nonprobationary employee?

160. Schroeder sought assistance in the answering the questions from Defendant's

Human Resources Department:

…

> LuzMaria continued to work for UPS while working for us and it impacted her performance in absenteeism, tardiness. She has since quit UPS in September and her performance has improved.
>
> Now I find myself with a dilemma if I were to discipline a person for taking too much time off for military reserve duty when taking into consideration the current state of our country. Apparently her military reserve unit is in Georgia and she needs added time to drive to and from Georgia. Not sure if our policy addresses that….
>
> I certainly give her credit for serving our country. But of course I am also responsible for our business needs.

161.    Bruce Olin, one of the highest ranking members of the Defendant's Human Resources hierarchy responded with an answer that is clearly in violation of the law:

> In reviewing the dates she has taken off, most were during the week. First, we do not have to grant time off for her travel time. Her legal obligation is 2 weeks per year, [for] which we do give off, and 1 weekend per month. The drills she attended were most likely extra training, [for] which we do not have to grant the time. We do not have to give extra time for her travel to and from her weekend duty.
>
> She does have the option to transfer to a closer unit,….

162.    Thereafter, at the insistence of Keith Schroeder, Plaintiff transferred to a local Army Reserve unit, severing her ties with the soldiers with whom she had been deployed to Iraq, had developed camaraderie, and had shared experiences in harm's way.

163.    On December 5, 2005, Michael Temko wrote to Celia Jarvis from Defendant's Human Resources Department:

> LuzMaria has requested to speak with you in regards to her military service. She believes that she is entitled to a travel day to return to work following drill weekends and other training. I explained to her (per our discussion) that she is not entitled to a travel day, just the days that are on her orders or her drill schedule. I explained that any day that she takes for travel outside of this, from here on out, will be under our attendance policy.

164. Of course, that information "discussed" among Defendant's supervisors, management, and Human Resources representatives was completely wrong and violative of the law and Plaintiff's rights.

165. Because of her transfer to the local Army Reserve unit, Plaintiff's redeployment was hastened and pursuant to military orders she returned to Iraq in April 2006.

166. In April 2007, Michael Temko wrote to Bruce Olin and Keith Schroeder:

> LuzMaria Arroyo deployed to Iraq last April and according to her orders she is due back. She contacted me one time since her deployment (approximately 6 months ago) and I have not heard from her since, our conversation was very brief, and we got disconnected. For our planning/scheduling purposes, it would be beneficial for us to know her status. Would it be appropriate to contact her unit to inquire about her deployment status? If not, what are our rights and her responsibility in keeping us informed of her deployment status?

167. Bruce Olin responded:

> Unfortunately, there isn't a lot we can do. We can contact the unit if they have any information. All she has to do is to inform us within 6 months of her release. According to the law we have to wait for her. Sorry, it isn't what you wanted to hear.

168. On May 14, 2007, Michael Temko wrote:

> All, LuzMaria called me last night and would like to return to work. She will return to work on Tuesday night.

169. In her Post Deployment Health Reassessment in August 2007, Plaintiff answered among other questions, as follows:

> Health since Most Recent Deployment: Much Worse Now Than before I Deployed
>
> …
> I have nightmares
> I am Constantly on Guard, Watchful and Easily Startled
> …

I am interested in receiving assistance for stress and emotional
concern.

170. With each deployment and/or extended training of Plaintiff pursuant to military

orders, Defendant's management ordered its supervisory personnel to document and create

spreadsheets of her absence from the workplace in contemplation of her termination from its

employment.

171. On November 7, 2008, Keith Schroeder forwarded to Bruce Olin a spreadsheet

detailing all of Plaintiff's military orders since the commencement of her employment with

Defendant in June 2005.

172. On November 17, 2008, Bruce Olin advised Keith Schroeder:

… Under the law she is within her rights to volunteer for
assignments which cause her to use military leave. The only real
restriction is when she uses five years of leave, not including
weekends and her annual 2 week required duty. Sorry, but nothing
we can do.

173. The following day Michael Temko wrote of his plan to discipline and terminate

Plaintiff because of her absence from Defendant's place of employment while she was fulfilling

her military duty:

This is a follow-up to our previous discussions about LuzMaria
Arroyo's military leave and her attendance. Since our discussion
with Bruce Olin last week we have had more issues with
LuzMaria's attendance. Please review the following timeline:

Sat and Sun, 11/1 and 11/2-- Reserve Drill Weekend (schedule
attached)
Mon, 11/3 to Mon, 11/10-- AT Training for 8 duty days (order
attached)
Tues. 11/11-- absent from work. Acceptable due to travel from
Fort McCoy, Wisc. She is allowed her travel time plus an 8 hour
rest period.

LuzMaria has a verbal warning waiting for her when she finally
comes back. If we were to give her occurrences for Thursday,

November 13 and Tuesday, November 18 this would put her at a 3 day suspension for attendance. If we were too, also, give her an occurrence for Wednesday, November 12 this would bring her to termination for her attendance.

174.  On November 19, 2008, having repeatedly discussed with Defendant's supervisors and managers at the Joliet facility their desire to terminate LuzMaria Arroyo, Bruce Olin forwarded to Keith Schroeder a document discussing discrimination under USERRA claiming:

Keith, just an FYI. This is part of the law which allows her to take the military leave. The last paragraph is our "out" to hold her to our policies.

175.  The last paragraph of "the law" Bruce Olin had forwarded to Keith Schroeder and contended gave defendant in an "out" reads:

Employees, including past, present or future service members, are subject to all employment policies affecting employees' performance and working conditions as long as these policies do not penalize a person for service in the uniformed services. All employees must follow an employer's policies and procedures established specifically to address non-USERRA related employment issues and grievances. ***Policies or procedures that contain provisions infringing on a service member's rights under USERRA may be a violation of USERRA.*** (Emphasis in bold and italics not in original).

176.  On November 19, 2008, Keith Schroeder wrote:

To All: I left a voice message at LuzMaria Arroyo's phone, and a short time ago, I received the attached communication from LuzMaria Arroyo's local army unit, which states that she has orders for November 12 to November 26, issued November 14. One would have thought that if LuzMaria had received these orders on November 14, she would have either called or faxed us the orders. While I have issues with her lack of communications, we likely have no recourse due to her military service.

177.  Once again, Keith Schroeder expressed his frustration because Defendant was without recourse or reason to terminate Plaintiff's employment as she answered the call to duty pursuant to military orders.

178.  On April 6, 2009, Plaintiff received orders indicating that she was being mobilized to support Operation Iraqi Freedom for 400 days, which was later extended until September 2, 2010.

179.  In a Post Deployment Health Assessment completed by Plaintiff on March 17, 2010, among other answers, she indicated she sought a " Referral for: Neurological Problems" because she experienced the following during her most recent deployment:

>Ringing in Ears, Lost Consciousness and Got Knocked out;
>Dazed, confused, and saw stars; constantly on guard, watchful, and easily startled;

180. Although the Separation Date from her most recent deployment was August 15, 2010 and, by law, Plaintiff had up to 90 days thereafter to notify Defendant either orally or in writing of her desire to return to her former employment and she did return to work well within the allotted time, Defendant's highest management discussed methods and offers to terminate Plaintiff's employment.

181.  Keith Schroeder wrote to Bruce Olin:

>Bruce, LuzMaria Arroyo returned to active work on September 27, 2010. Mike and I reviewing her military records and we need to clarify some things before we speak to her regarding company activity during her absence in the military. Additionally, it appears we may have misunderstood what the military orders and discharge documents tell us regarding her required date to return to work.
>
>Questions
>1) reported to active duty April 15, 2009 for 400 days
>2) Discharge record indicates separation date of August 15, 2010;
>• assume she had 90 days from above date August 15, 2010 to report to work;
>• 400 days from April 15, 2009 is May 20, 2010, so does this August 15, 2010 date [mean] the date she should have returned to work?
>3) Need to confirm Volvo policy on ETO [Earned Time off] days.

4) Need to confirm whether LuzMaria is eligible for the April 2010
Voluntary Severance package.

182.  Keith Schroeder advised Dennis Scholl, the second highest ranking employee of

Defendant in North America:

> Bruce, Mike and I reviewed the military records and our Volvo
> policy for this case. 1) After military records review we believe
> that LuzMaria should have returned to work on August 15, 2010. I
> believe she knew this and now has been out an additional 6 weeks
> yet. 2) Bruce, Mike and I support that we offer the Voluntary
> Severance package to LuzMaria pending your approval. …

183.  Also desirous of terminating Plaintiff's employment with Defendant and its

obligations under the law to secure reemployment for their only Army Reservist returning from

duty, Dennis Scholl responded:

> Yes I am ok with offering the package. Do you think she will
> accept?

184.  Michael Temko, Plaintiff's supervisor who had previously given Plaintiff the

second highest grades possible, all "VGs", in reviewing performance for Joliet PDC Employee

Evaluation/Updates, answered the question:

> Depending on how much time we give her to make her decision, I
> think it is possible. LuzMaria has always been a below average
> performer. When she sees how she measures up against the LMS, I
> think she will strongly consider it.

185.  Defendant's management and supervisors commenced heightened scrutiny and

discipline of Plaintiff in hopes that "she will strongly consider" their offer to terminate her

employment.

186.  In November 2010, Keith Schroeder advised Bruce Olin of personal issues of

depression that Plaintiff was experiencing and attempted to discipline her for being 1 minute

tardy:

Bruce, LuzMaria is now at step 2 corrective action plan in accordance with our attendance policy. Below is a summary of events and communications with LuzMaria since her return from military duties on September 27, 2010

- October 29, 2010
- o    Issued step one of attendance policy, exceeded 2 occurrences in one month (approved by Bruce Olin HR)
- o    Reference attached attendance record
- November 2, 2010
- o    I met with LuzMaria at her request to discuss her attendance CAP [Corrective Action Plan]

LuzMaria stated to me that she is having personal issues of depression since her return from active military duty. She stated that her absence on October 29, 2010 should be considered excused as she was seeking support from the military for her medical issues. I stated to LuzMaria that in accordance with our attendance policy she is required to provide written documentation to support her absence.
…

187.  Bruce Olin responded to Keith Schroeder:

The only issue I have concerns the late tardy of one minute. Yes, she signed the form, but has been away from work for some time. Were the policies reviewed with her when she returned? I understand we enforce the rules completely and non-discriminatory, but I can see some outsider having a different view of this.

188.  Because of the frustration Plaintiff was experiencing in the workplace, she provided

further documentation to Sherrie Jankowski, her supervisor and requested that it be forwarded to

Defendant's management.

189.  On December 2, 2010 Sherrie Jankowski wrote to Keith Schroeder:

LuzMaria just came in and asked me to forward you the following document. It is the LAW posted on the ESRG website pertaining to employees of the military. She is really becoming a pain with all this. She wanted me to read this, but I told her I did not have the time right now!

Enjoy the reading....it's only 24 pages!!!!!

190. On Christmas Eve 2010, Plaintiff wrote Keith Schroeder that the doctor had ordered her not to return to work for the next 7 days, and advised:

> Self-admitted to the emergency room yesterday. Doctor gave me a note of no work through December 30, 2010. Between the stress at work and the stress of reliving the events of my deployment through writing my story, I have been having panic attacks. I have been waking up feeling scared. Not able to get more than 4 hours of sleep a day.

191. Notwithstanding the written notice to him within 24 hours of her hospitalization, Keith Schroeder again plotted and planned discipline leading to termination of Plaintiff's employment with Defendant:

> HR issues to be resolved before I give formal discipline
>
> Bruce attached to this email is a communication from LuzMaria advising she will be off a total of 5 days beginning 12.23 to 12.30. In accordance with our corporate "Volvo Salary Continuation and Long Term Disability Plan" LuzMaria would need to be off more than 5 days to be considered STD so these absences fall under our ETO - local attendance policy. Assuming LuzMaria provides a medical document when she returns to work 12.23 and 12.27 would be excused days and is then at our cap of 5 excused days. 12.28, 12.29, and 12.30 would be occurrences so under our attendance policy on 12.29 LuzMaria would be issued Step 2 Formal Written CAP and on 12.30 Step 3, 3 day suspension.
>
> At this time I am not aware of any rule or guideline in our corporate "military" policy that would excuse these days. Additionally, LuzMaria is awaiting our decision on the ESGR - military federal policy ruling.
>
> These two outstanding issues with this employee require HR review before I administer the attendance CAP disciplinary action when she returns on January 3rd 2011.

192. On December 29, 2010 Sherrie Jankowski advised, Keith Schroeder:

> Last night I was hearing some rumors about LuzMaria, all to which I did not comment, but I thought you might like to know about. There are several rumors for her not being here. 1. She fell and hurt herself and is on A&S 2. She's on workers comp 3. She's on

vacation in Hawaii (this sounded far-fetched until I realized that
she is on vacation next week too!) just thought I'd let you know.

193.  On January 14, 2011, Dr. Wendy Yin wrote to Defendant regarding Arroyo's stay at

the Hines VA Hospital from January 10-14, 2011:

Arroyo has a follow-up appointment on January 18, 2011
Should not return to work at this time.

194.  On January 18, 2011, Dr. Arvind Yekanath of the Hines Veterans Administration

Hospital wrote to Defendant concerning Plaintiff:

Diagnosis: PTSD
Prognosis: I expect her to resume full work related activities soon.
Ms. Arroyo should continue to see me on an outpatient basis once
monthly for medication management. I recommend she continue
seeing her therapist Brian Fask at Orland Park Vet Center weekly.
She will soon be enrolled in a group psychotherapy  program at
Hines VA Hospital for PTSD victims.

195.  On April 5, 2011, J. Richard Monroe, PhD completed a U.S. Department of Labor

Certification of Health Care Provider and forwarded it to Defendant indicating:

Ms. Arroyo has a diagnosis of posttraumatic stress disorder
(PTSD) secondary to military service. The symptoms include, but
are not limited to, intrusive memories, emotional distress,
interpersonal detachment, hyper vigilance, ease of startle response,
and concentration problems. Symptoms may be persistent, but can
respond well to ongoing psychological therapies and/or medication
management. Clinical outcomes studies support both these
treatment options.

It is possible that symptoms could increase, particularly in
response to stress, making it more difficult to fulfill job duties.

196.  On April 21, 2011 Keith Schroeder wrote to Defendant's high management and

Human Resources Personnel:

On Thursday, April 21, 2011, Patrick Dunn and I met with
LuzMaria Arroyo regarding medical documents she provided to us.
LuzMaria presented to us a list of questions regarding Volvo's
policies.

> During this conversation, LuzMaria's stated that her case is leading
> to an EEOC complaint. In this case there are 2 pending issues; one
> is the safety concern as documented in the IME report, the other is
> her work and medical treatment for PTSD.
>
> This military veteran's case is very difficult as at every turn when
> we try to work with her, she rejects all local offers of support,
> resulting in outside mediation, i.e ESGR.

197.   On May 21, 2011, two of Plaintiff's supervisors reported to Keith Schroeder that she announced that she was considering filing a complaint of discrimination because of the treatment she was receiving during her employment with Defendant. Michael Temko wrote:

> …
> She told me that she was going to call HRSC and go above Keith
> and Regina Williams….

Sherrie Jankowski wrote:

> Just an FYI, but I heard that Luz is going around the warehouse
> telling people that she is being discriminated against….

198.   Two days later, Keith Schroeder wrote an email to every supervisor in Defendant's plant, which stated in capital letters across the top "READ AND DELETE—DO NOT PRINT":

> To All: Due to the ongoing job issues and concerns with LuzMaria
> Arroyo, I strongly urge you to have a witness whenever you have a
> conversation with this employee.

199.   In the first week of July 2011, Keith Schroeder and Regina Williams discussed Defendant's obligation to release Plaintiff to attend Mindfulness Meditation in Trauma Services group therapy sessions every Tuesday night for 13 weeks from 4:00-5:30 PM as ordered by her doctors at the Veterans Administration Hospital.

200.   Keith Schroeder inquired of the Veterans Administration whether this was merely "elective medical services" and whether it could be "rescheduled to another time" because Plaintiff worked the second shift from 4:30 PM to 12:30 AM.

201.  Because the Veterans Administration had scheduled the mandated group therapy for the benefit of several veterans, Schroeder was told "no", the group therapy sessions could not be rescheduled to accommodate Defendant's 2nd shift needs.

202.  On August 26, 2011, Plaintiff wrote to Keith Schroeder and Regina Williams:

> …
> On 8/23 I experienced an incident which brought about a major anxiety episode. I tried various relaxation techniques, but could not ignore the event; I had a call to action, for I no longer felt safe/protected. After careful consideration of courses of action, I decided to speak with my supervisor, Patrick Dunn (who I feel safe to approach and confer with). The anxiety episode lasted approximately 20 minutes.  After speaking with Mr. Dunn, I felt more calm and composed and was able to continue working. Mr. Dunn said he would need to speak with you regarding the event that brought about the anxiety.
>
> On 8/24 you requested to speak with me and Mr. Dunn at which time you threatened to fire me for my behavior. Your demeanor was aggressive and hostile and I felt intimidated/threatened. Additionally, you stated that the time that I used in order to reduce my anxiety and consider courses of action was not authorized and I would be held accountable under the LMS Lite policy. You also stated that continued breaks for managing anxiety will result in termination. When I requested this information in writing, you refused to provide it to me and still have not provided it to date.
>
> On 8/25 you again requested to speak with me; this time cornering me in a small office with 2 other supervisors and Ms. Maureen Somerset behind the closed door in a room with no windows and no way to escape. You provided me with the workplace violence policy and the harassment policy and then allowed me to leave.
>
> Based on the information in the attachment, I feel my actions were reasonable.
>
> However I feel that you are making it difficult (hostile) for me to deal with my condition, as opposed to being cooperative and supportive. Because I feel unsafe when speaking with you, I request that human resources on the phone AND ONLY Mr. Patrick Dunn OR Ms. Maureen Somerset present during any further discussions with you. Additionally, I request human resources to provide reasonable accommodation with providing

YOU, the supervisors and my coworkers with disability awareness training. Additionally, I request a quiet space be provided for me to be able to meditate/utilize relaxation techniques (usually done at breaks and before work begins). Finally, as was the case on 8/23, I request empathy in realizing that sometimes I may not use words to request a "reasonable accommodation", however, I will act with the skills and techniques that I am learning in counseling will mitigate my anxiety and PTSD symptoms, and request a cooperative relationship from you as my employer in helping me to do so.

203.  At the time of writing her report to Keith Schroeder and Regina Williams, Plaintiff's

Human Resources Business Partner at the Joliet facility, the Volvo Human Resources U.S.

Policies & Procedures regarding Harassment, Workplace Violence provided in pertinent part:

…. Accordingly, harassment of any employee… by any individual because of that employee's… disability, veteran status, or for any other reason, will not be tolerated on the job, on company property, or in any company-sponsored activity.  Therefore, the company expects that all relationships among persons in the workplace will be business-like and free of bias, prejudice, or harassment.

Procedures for Reporting Harassment:
Employees who have experienced conduct they believe is contrary to this policy have an obligation to take advantage of this complaint procedure. An employee's failure to satisfy this obligation could affect his or her legal rights in pursuing subsequent legal action.

Any employee or business associate who feels he/she has been harassed should immediately report such incidents to his/her Human Resources Business Partner at the facility in which they are employed or to another senior manager/executive within the company before the conduct becomes more severe and pervasive.

Employees should not feel hesitant or embarrassed about reporting harassment. The company is dedicated to making sure that the workplace is productive and free from harassing conduct. The company can only achieve this goal if employees report and cooperate in investigation of all possible violations of this policy.

204.  On August 28, 2011 Keith Schroeder wrote to Regina Williams and Dennis Scholl:

36

> I will need HR guidance on the attached to determine what
> accommodations we must comply with for this employee.
> LuzMaria personal physician and our IME released her to work yet
> in my opinion this employee has severe mental issues which must
> be addressed by HR....The case of LuzMaria Arroyo has caused
> significant stress to my staff.

205.  Each of the accommodations requested by Plaintiff were set forth in a publication given by her to Defendant and entitled *America's Heroes at Work*, a US Department of Labor project that addresses the employment challenges of returning Service Members living with Traumatic Brain Injury (TBI) and/or Posttraumatic Stress Disorder (PTSD).

206.  After providing an office at the back of the plant where Plaintiff could "meditate/utilize relaxation techniques prior to work start and then break for lunch" as an accommodation, Defendant's supervisors and management began to document when, in their opinion, Plaintiff was "late 1 minute" in getting to her workstation.

207.  No such hyper vigilance, scrutiny, or record keeping was exercised with respect to any other of Defendant's employees.

208.  On September 3, 2011, Plaintiff wrote for the first time to Dennis Scholl seeking his assistance:

> Sir,
> My name is LuzMaria Arroyo and I am one of your employees at
> the Joliet PDC. I am writing you based on the instructions in our
> companies, Conflict/Problem Resolution Process, Policy Number
> WP- 04.
>
> My conflict is disability-based harassment. According to our
> companies Equal Employment Opportunity/Affirmative Action
> Policy Number CR-02, our company is aware of this responsibility
> under the Americans with Disabilities Act (ADA). However,
> because I wish to engage the company in a cooperative relationship
> and not seem hostile in nature, I am providing excerpts from the
> US Employment Equal Opportunity Commission EEOC Notice
> Number 915.002 (please read the attached document). My intent is

to inform my company of my rights and its responsibilities to me so that we can engage in a cooperative relationship.

In November 2010, I began to seek medical assistance with mental health issues as a result of my post deployment activities. As information regarding my condition was made available to me, I provided our company (specifically, Keith Schroeder) with it. In January 2011, I was diagnosed with a qualifying disability (while on short term disability approved by our company). In March 2011, I returned to full duty at Joliet PDC only to have my duties restricted by Mr. Schroeder, following a medical evaluation in January 2011, I requested reevaluation and restrictions were lifted. Mr. Schroeder has suspended me from work for a period of 3 days, using the local BA/BU Attendance Policy as justification.

The first and main issue I would like to address to you is notification of my disability to Mr. Schroeder and his continued harassment with regards to such. I have worked in conjunction with our local business partner, Ms. Regina Williams, with no resolution. According to the guidelines related within the EEOC notice, "an employer should initiate the reasonable accommodation, interactive process without being asked if the employer: (1) knows that the employee has a disability, (2) knows, or has reason to know, that the employee is experiencing workplace problems because of the disability, and (3) knows, or has reason to know that the disability prevents the employee from requesting a reasonable accommodation….

… Where was the opportunity afforded if both the written warning, and suspension are delivered on the same day?

Which brings me to my second issue, Mr. Schroeder's blatant disrespect for our company's policies and the laws of our state and federal government. Mr. Schroeder has engaged in behavior that is in violation of company's harassment policy number WP06-03-0, by creating an intimidating and hostile work environment with relation to me and my disability. He has violated our company's Code of Conduct with regard to Equal Employment Opportunity Harassment, and Accuracy of Books and Records. Ms. Regina Williams has also violated our company's Code of Conduct with regard to employee privacy. I am making a formal complaint to you here and now and requesting an investigation of these actions.

… With regards to violation of Accuracy of Books and Records, Mr. Schroeder, provided me with a document of attendance infractions and recorded disciplinary action to justify my

suspension. On this document, Mr. Schroeder indicates a no call, no show on 23, December 2010. This is a false statement as my sister-in-law made the phone call to indicate she was driving me to the hospital and I would not be able to come into work. I can provide phone records, as well as the hospital discharge paperwork to prove such. Additionally, 19 August 2011 indicates disciplinary action had been in taken on that date with regards to my being given a written warning. However, if you look at the date of the written warning that I was actually given, it states 31 August 2011. The same is said of the 3 day suspension with the date of 20 August 2011 on the document he provided, but a date of 31 August 2011 on the actual letter of suspension. I can only guess the reason for his actions, and in my opinion, Mr. Schroeder has targeted me for termination and is doing everything within his power to achieve such.

…

I wish our company will take my complaints seriously, and I expect feedback regarding my request for accommodation and my allegations. I will give you until Close of Business 13 September to respond to my requests. After some time, I will be filing a complaint with the EEOC and seeking legal assistant. I will let legal assistance speak with the VP of HR. Thank you for your time, patience and understanding.


209. In an undated response by Dennis Scholl attached to an email sent to Plaintiff on

September 13, 2011, Defendant's Vice President wrote:

Ms. Arroyo:

I am writing to acknowledge receipt of your September 3 and September 6, 2011 emails. From your correspondence, I have identified 3 issues requiring attention. 1st, nor your request for accommodations. 2nd, you cite to concerns regarding Mr. Schroeder's behavior. 3rd, state your concerns regarding Ms. Williams not allowing you to view your personnel records. I want to address all Volvo parts North America will address each of these issues you present.

…. Ms. Williams will continue the interactive process and will respond to your remaining requests in writing as expeditiously as possible.

Regarding Mr. Schroeder's behavior, Ms. Regina Williams, as a human resources representative for the Chicago parts distribution

center, has been assigned to investigate the alleged harassment in accordance with Volvo's harassment policy. She will also explore your concerns regarding potential code of conduct violations regarding equal opportunity and accuracy of records and records by Mr. Schroeder….

210. Within less than an hour after assuring Plaintiff that there would be an investigation of her allegations which he has admitted under oath are "most serious allegations", Dennis Scholl wrote to Keith Schroeder:

Keith, as you read the response to LuzMaria please do not be concerned about the investigation Regina will perform. It is the only response we could make as we have an employee who has filed a complaint so as you know we are obligated to investigate.

If you wish to talk tomorrow call my cell.

211. No investigation of the "most serious allegations" has ever been undertaken and no discipline of Keith Schroeder has ever been contemplated.

212. Instead, on November 8, 2011 Plaintiff's employment was terminated by Keith Schroeder, with the concurrence of Regina Williams after Defendant's on-site management and/or supervisors allegedly observed Plaintiff arrive at her workstation 1 to 3 minutes after the start bell, although they knew that she had arrived at work and had been present 20 to 30 minutes early each day in order to use the meditation room.

WHEREFORE, Plaintiff respectfully prays this Honorable Court to grant the following relief:

A.    Compensatory damages against Defendant in the amount of $1,000,000.00;

B.    Punitive damages against Defendant in the amount of $1,000,000.00;

C.    Reasonable attorney's fees and costs of this suit; and

D.    Such other relief as this Honorable Court deems just and appropriate.

Respectfully submitted,


S/ John P. DeRose
John P. DeRose
One of Plaintiff's Lawyers

John P. DeRose & Associates
15 Spinning Wheel Road
Suite 428
Hinsdale, Illinois  60521
(630) 920-1111 Office
(630) 920-1170 Fax
john@johnderoselaw.com