# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| LUZMARIA ARROYO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12-cv-6859 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| VOLVO GROUP NORTH AMERICA, LLC, | ) | |
| d/b/a VOLVO PARTS NORTH AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff LuzMaria Arroyo worked at Defendant Volvo Group North America, LLC (d/b/a Volvo Parts North America) from June 2005 until November 2011. In Plaintiff's third amended complaint, she alleges discrimination, retaliation, and failure to provide reasonable accommodations under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*, and Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 *et seq.* ("USERRA"), along with a state law claim for intentional infliction of emotional distress. Defendant has moved for summary judgment [75] on all counts. For the reasons stated below, the Court grants Defendant's motion for summary judgment [75].

## I. Background

### A. Statement of Facts

The Court has taken the relevant facts from the parties' Local Rule ("L.R.") 56.1 statements. Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles

the movant to judgment as a matter of law.  As the Seventh Circuit has stressed, facts are to be set forth in Rule 56.1 statements, and it is not the role of the Court to parse the parties' exhibits to construct the facts.  Judges are not "like pigs, hunting for truffles buried in briefs."  *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991).  "Nor are they archaeologists searching for treasure."  *Jeralds ex rel. Jeralds v. Astrue*, 2010 WL 4942161, at *7 (N.D. Ill. Dec. 8, 2010) (citing *DiLeonardi,* 181 F.3d 865, 867 (7th Cir. 1999)).  It simply is not the court's job to sift through the record to find evidence to support a party's claim.  *Davis v. Carter,* 452 F.3d 686, 692 (7th Cir. 2006).  Rather, it is "[a]n advocate's job * * * to make it easy for the court to rule in [her] client's favor * * *."  *Dal Pozzo v. Basic Machinery Co., Inc.,* 463 F.3d 609, 613 (7th Cir. 2006).

It is the function of the Court to review carefully statements of material facts and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement.  See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 920 n.1 (N.D. Ind. 2004).  Merely including facts in a responsive memorandum is insufficient to put issues before the Court.  *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir. 1995); *Malec v. Sanford*, 191 F.R.D. 581, 594 (N.D. Ill. 2000).  In addition, Local Rule 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000).  Where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted.

In this case, some of Plaintiff's fact statements and responses to Defendant's fact statements contain legal conclusions or are irrelevant to the issues at hand. For instance, Plaintiff's first fact statement posits:

> Within 2 months of the commencement of her employment and throughout her employment thereafter, Volvo * * * violated the terms of USERRA and the Americans with Disabilities Act, failed to take affirmative action to advance in employment LuzMaria Arroyo who was suffering from posttraumatic stress syndrome (PTSD), subjected plaintiff to a hostile work environment and heightened scrutiny, considered terminating her during and after each deployment, leveled unwarranted discipline against her, and ultimately terminated her.

This one fact statement alone contains numerous legal conclusions and argument. The Court's role is to decide if there is a question of fact as to whether Defendant violated USERRA, the ADA, Title VII, or state law; the parties' role is to present the Court with facts (not legal conclusions) that support their position on the law. To the extent that either party's statements or responses contain legal conclusions or argument, are evasive, are irrelevant, or are not supported by evidence in the record, they will not be considered by the Court in ruling on the summary judgment motion.

### B. Facts

Plaintiff LuzMaria Arroyo was employed as a material handler for Volvo at its Chicago Parts Distribution Center (the "Distribution Center") in Joliet, Illinois, from June 13, 2005 until she was fired on November 8, 2011. In Arroyo's employment application, she stated that she was a member of the U.S. Army Reserve, and Volvo hired her as a material handler with that knowledge. Arroyo interviewed with Director of Distribution Keith Schroeder and Material Handling Supervisors Michael Temko and Patrick Dunn. As a material handler, Arroyo was responsible for retrieving ordered vehicle parts with a forklift and then packing those items to

ship to the customer on a timely basis. Beginning in January 2009, Arroyo worked the second shift, from 4:30 p.m. to 12:30 a.m.

During Arroyo's employment, no other employees at the Distribution Center were on active duty and subject to military orders. Throughout her employment, Volvo granted Arroyo leave for military activities, including military drills, training, and Yellow Ribbon events, as well as for two extended periods of deployment: April 17, 2006 to May 7, 2007, and April 15, 2009 to August 15, 2010. When Arroyo returned from her latest deployment to Iraq in April 2010, she used some accrued military vacation time and was released from active duty on August 15, 2010. Arroyo then took some additional time off before returning to work on September 27, 2010.[1] Upon her return, Volvo offered Arroyo a voluntary severance package, which Volvo had previously offered to other material handlers while Arroyo was on leave in 2009.[2] Arroyo declined the offer. In sum, Arroyo received more than 900 days of military leave during six and a half years of employment at Volvo.

Arroyo also took leave for weekend drills. Volvo modified Arroyo's work schedule to allow her to arrive to her shift two hours early and leave two hours early on Fridays prior to a weekend drill. Although Arroyo initially agreed to the modified work schedule, she later claimed that the arrangement was unsatisfactory because it did not give her enough time to get ready to drill. Through a mediation conducted by Colonel Tom Gorski of ESGR throughout March and April 2011, Volvo accommodated Arroyo's request by changing her Friday schedule

---

[1] Arroyo nominated Schroeder for a Patriotic Employer Award through the Employer Support of the Guard and Reserve ("ESGR"). Arroyo and ESGR Ombudsman Colonel Tom Gorski presented the award to Schroeder at the Distribution Center in October 2010. Arroyo also arranged for the public affairs officer from her unit to photograph the event. Arroyo had previously nominated Temko and Dunn for a Patriotic Employer Award after returning from an earlier deployment.

[2] The record reflects that in 2009, during Arroyo's second deployment, Volvo terminated six material handlers.

to 4:30 to 7:00 and allowed Arroyo to take 5.5 hours of excused military leave. Through the mediation, Volvo also resolved issues concerning Arroyo's health insurance coverage upon her return to work, catch-up 401(k) contributions, and paid military leave for Yellow Ribbon events.

Throughout these multiple tours of duty, weekend drills, and annual training, Keith Schroeder was able to find a replacement for Arroyo when she was otherwise engaged in service for her country. However, both Schroeder and Arroyo's supervisor, Michael Temko, questioned human resources and management about how to handle Arroyo's various leave requests, what rights (such as leave, travel, and rest time) were provided under USERRA, and what information Arroyo was required to provide to Volvo prior to or during requested leave time. Temko kept track of Arroyo's military schedule and her excused and unexcused absences.

All material handlers at the Distribution Center are subject to the Volvo's attendance policy. Pursuant to the policy, employees receive "occurrences"—either whole or fractional—for inexcusable absences or tardiness. For each occurrence, Volvo looks back both four weeks and six months from the date of the most recent occurrence to see if an employee has accrued enough occurrences to warrant a step in the progressive disciplinary process. Corrective action will be taken if an employee has two occurrences within a four week period or five occurrences within a six month period, calculated on a rolling fiscal year. The disciplinary steps under the attendance policy are: verbal warning, formal written warning, three-day suspension, and termination. Depending on how near an employee's occurrences are to one another, an employee may receive more than one disciplinary step at the same time, as the same occurrence can count for purposes of multiple disciplinary steps, given the look-back periods discussed above. If an employee has a six-month period with no occurrences, the employee's disciplinary "level" is reduced by one step.

The attendance policy has undergone periodic revision. In January 2008, the unwritten grace period that allowed employees to punch in up to two minutes after the beginning of their shifts was eliminated due to employee abuse. In January 2009, absences other than earned time off ("ETO")/vacation weeks and scheduled holidays no longer counted towards the rolling time period. Arroyo was present for and signed for receipt of an "Employee Infosession" in January 2009 concerning policy changes.

The attendance policy is administered jointly by Temko and Schroeder.[3] Temko is responsible for documenting any occurrences for each employee on an Excel spreadsheet after reviewing the time punch records. Temko and Schroeder are then responsible for administering disciplinary steps under the policy. Arroyo was subject to the policy since the beginning of her employment with Volvo. Although Volvo kept tabs on Arroyo's military leave requests, the record is undisputed that she never received any occurrences under the Volvo's attendance policy for days on which she took military leave. For instance, on November 19, 2008, Schroeder received communication from Arroyo's local army unit stating that she had orders from November 12 to November 26, which were not issued until November 14. Schroeder expressed his frustration that if she had received these orders on November 14, then she should have either called or faxed the orders; however, in an email to Temko, he noted that "[w]hile I have issues with her lack of communication, we likely have no recourse due to her military service."

In 2009, Arroyo received a verbal warning for earning two occurrences as a result of two no call, no shows within a four week period from October 13, 2008 to October 24, 2008. On October 1, 2010, Arroyo punched in 22 minutes after the beginning of her shift and earned a one-

---

[3] According to Schroeder, following Volvo's decision to eliminate the grace period policy, if a person is late, it is documented as late regardless of whether it is one minute or one hour late. Temko believes that being even one minute late could throw an employee's shift off track.

half (0.5) occurrence under the attendance policy.[4]  On October 11, 2010, Arroyo punched in 20 minutes after the beginning of her shift and earned a one-half (0.5) occurrence under the attendance policy.  On October 19, 2010, Arroyo called-in absent for work and earned one (1) occurrence under the attendance policy.  Following Arroyo's October 19, 2010 absence, Schroeder met with Arroyo and told her the absence would be excused if she provided a doctor's note. Arroyo explained that she had an upcoming health assessment on October 25, 2010, and could ask her doctor for a note excusing the October 19th absence then. However, Arroyo never provided such a note.

On October 29, 2010, Schroeder presented Arroyo with a Corrective Action Plan ("CAP") in the form of a verbal warning—the first step in the progressive disciplinary process under the attendance policy—for the two occurrences she earned within a one-month period from October 1, 2010 to October 19, 2010.  On October 29, 2010, Arroyo punched in one minute after the beginning of her shift.  Because Arroyo had two occurrences within a one-month period, she received a written warning, which is the second step in the disciplinary process. Arroyo challenged this occurrence and any disciplinary action stemming from October 29, 2010, contending that she was unaware of the change to the attendance policy that eliminated the previous unwritten rule of the two-minute grace period.  Although Schroeder verified that Arroyo was present for the January 2009 "Employee Infosession" mentioned above, Schroeder made an exception and did not give Arroyo an occurrence or the second step in progressive discipline under the attendance policy based on her one-minute transgression on October 29.  On November 4, 2010, Arroyo was provided with copies of various Volvo policies, including the

---

[4]  A late punch of one hour or less results in a one-half (0.5) occurrence.

attendance policy.  On November 23, 2010, Arroyo punched in two minutes after the beginning of her shift and earned a one-half (0.5) occurrence under the policy.

Arroyo was treated for service-related post-traumatic stress disorder ("PTSD") in December 2010 and formally diagnosed in January 2011.  Arroyo went to the Adventist LaGrange Memorial Hospital on December 23, 2010.  She provided a note and discharge paperwork excusing her from work for the period of December 23, 2010 through December 30, 2010.  Arroyo was subsequently approved for and took concurrent FMLA and short-term disability ("STD") leave from December 23, 2010 to March 22, 2011.  She returned to work from FMLA/STD leave on March 23, 2011.

In April 2011, Arroyo filled out an indirect report (a document that material handlers use to document any time not spent picking or packing orders) and indicated that she "zoned out" for an unknown period of time during her shift.  Arroyo provided these reports on a daily basis to Dunn—her direct supervisor at the time.  Based on this comment, Volvo had safety concerns for Arroyo and her co-workers, given that much a material handler's job entails picking items with a forklift up to 20 feet off the ground.  Accordingly, and at Volvo's request, John J. Koehler, M.D., conducted an independent medical exam ("IME") of Arroyo on April 14, 2011.[5]  Based on his evaluation of Arroyo, Dr. Koehler recommended that Arroyo be removed from all safety sensitive work, including operation of a forklift.  Based on that recommendation, Volvo removed Arroyo from forklift duties.

Arroyo began therapy for her PTSD.  Volvo, through Regina Williams (Human Resources Business Partner), allowed Arroyo to use partial ETO days (in two hour increments)

---

[5]  Also on April 14, 2011, Arroyo punched in ten minutes after the beginning of her shift and earned a one-half (0.5) occurrence under the attendance policy.  On both May 10 and 12, 2011, Arroyo punched in one minute after the beginning of her shift and each time earned one-half (0.5) occurrences under the policy.  On May 27, 2011, Arroyo punched in five minutes after the beginning of her shift and earned a one-half (0.5) occurrence under the policy.

to leave her shift early on Tuesday nights to attend her first set of VA therapy appointments on Wednesday mornings from 9:00 to 11:00 a.m.; these appointments ran from April through July 2011.

On May 19, 2011, Arroyo attempted to sign up to work overtime for that upcoming Saturday, May 21, 2011. Dunn, Schroeder, and Williams explained that Arroyo was not eligible to work overtime on Saturdays due to her then-existing restrictions from Dr. Koehler, as the Saturday work involved use of a forklift.[6] In response, Arroyo complained via email to Williams on May 20, 2011, that she felt discriminated against under the ADA. Arroyo arrived at the warehouse on Saturday, May 21, 2011, even though she was not scheduled to work, and observed employees packing boxes and strapping containers. Arroyo stayed there "[m]aybe ten minutes max" and testified in her deposition that she does not know how long employees perform packing duties on Saturdays. Arroyo sent a follow-up email to Williams on May 21, 2011, describing her observations and reiterating her perception that she was being discriminated against under the ADA. Following Arroyo's complaints of discrimination, Schroeder sent the following email to his supervisors: "Due to the ongoing job issues and concerns with LuzMaria Arroyo I strongly urge you to have a witness whenever you have a conversation with this employee." Schroeder testified that he made this recommendation due to recent communications with Arroyo and a desire to make sure that supervisors got support before answering her requests.

Arroyo took military leave from May 31, 2011 through July 8, 2011, and returned to work on July 11, 2011. Shortly after her return, Dr. Koehler conducted a follow-up evaluation of Arroyo, and, contingent upon receipt of a letter from Arroyo's counselor, Koehler released

---

[6] While Arroyo was on work restrictions, she worked weekday overtime.

Arroyo back to full-duty without restrictions. After Dr. Koehler released her to full-duty, Arroyo periodically worked overtime, including weekend overtime.

Arroyo's second set of PTSD therapy appointments were on Tuesday evenings from 4:00 to 5:30 p.m. and ran from July 19, 2011 through October 11, 2011. Due to rush hour traffic, Arroyo told Schroeder that she would not be at work before 6:30 p.m. on those days. Although Arroyo punched in after 6:30 p.m. on 11 of those Tuesdays, she did not earn any occurrences under the Attendance Policy with respect to those dates.

On July 29, 2011, Arroyo punched in one minute after the beginning of her shift and earned a one-half (0.5) occurrence under the policy. On August 19, 2011, Arroyo punched in five minutes after the beginning of her shift and earned a one-half (0.5) occurrence under the policy; the following day, she punched in one minute after the beginning of her shift and received a one-half (0.5) occurrence under the policy.

According to Arroyo, on or about Tuesday, August 23, 2011, her co-worker, Brian Accidentale, informed her that another co-worker (who at the time Arroyo believed to be Tracey Adams, but subsequently learned was actually someone else) had called the police on Saturday, August 20, 2011, because Arroyo had parked her motorcycle in a handicap spot at the Distribution Center. Arroyo met with Dunn that same day to complain. Dunn informed Schroeder that Arroyo had commented that Adams is "the enemy" and "her target" and that she could have gone to Adams and punched her in the face or cursed her out. Arroyo denies saying anything violent related to Adams.

Schroeder and Dunn met with Arroyo on August 24, 2011, and informed her that Volvo would not be addressing any rumors related to the motorcycle parking incident and reminded her that threats against a colleague are against company policy and she would be subject to

termination if her behavior continued. The next day, Schroeder spoke with Williams and Arroyo was provided with copies of the Workplace Violence and Harassment policies. In response, on August 26, Arroyo sent Schroeder an email, copying Williams. In her email, Arroyo provided a link to the Department of Labor's ("DOL") "America's Heroes at Work" website that addresses challenges facing service members returning to work with PTSD. Arroyo also requested numerous accommodations. Specifically, Arroyo requested the presence of human resources via phone and either Dunn or Maureen Somersett (Schroeder's administrative assistant) during all discussions with Schroeder; disability awareness training for Schroeder, the Material Handler Supervisors, and her co-workers; and a quiet place to meditate/utilize relaxation techniques during breaks and prior to work.

On August 31, 2011, pursuant to the attendance policy, Schroeder presented Arroyo with CAPs in the form of a formal written warning and three-day suspension—the second and third steps in the progressive disciplinary process under the attendance policy—for earning five occurrences within the six month period from October 19, 2010 to August 19, 2011, and for earning five occurrences within the six month period from October 19, 2010 to August 20, 2011, respectively. Per the revision in 2009 to the rolling period under the attendant policy, the time that Arroyo was out on A&S, FMLA, and Military Leave was excluded in measuring the six month periods for these CAPs.[7]

On September 1, 2011, Schroeder responded to Arroyo's requests for accommodations (copying Williams) and granted Arroyo's request for a quiet space to meditate/utilize relaxation

---

[7] On September 6, 2011, Temko emailed Schroeder to tell him that, in the course of Temko's audit of the time records in connection with the written warning and three-day suspension CAPs, he changed Arroyo's attendance record on her Excel sheet to reflect an excused absence for December 23, 2010. Accordingly, Volvo removed Arroyo's occurrence for that day. Temko explained that the adjustment only impacted the dates of the occurrences making up Arroyo's formal written warning (which, after the adjustment, ran from October 11, 2010 to August 19, 2011 instead of October 19, 2010 to August 19, 2011). Since Arroyo still had five occurrences within a six-month period, the written warning CAP stood.

techniques prior to the beginning of her shift and during breaks. Schroeder explained that Volvo was providing Arroyo with a private space in the warehouse operations office. Later that same day, Arroyo emailed Williams with several additional accommodation requests: (1) a flexible work schedule to allow her to "make up time" in case of tardiness; (2) the ability to use noise dampening devices (such as earplugs or headphones); (3) the ability to listen to audio relaxation devices; (4) a place to meditate or relax (which Arroyo noted had already been provided); (5) a mentor (whom Arroyo identified as Patrick Dunn, someone she felt comfortable approaching); (6) time off for counseling (which Arroyo noted had already been provided); (7) day-to-day guidance and feedback; (8) the ability to use the company's wellness program (which Arroyo noted had already been provided); (9) the ability to take breaks during panic/anxiety attacks; (10) disability awareness training (as noted previously); (11) all communications given to Arroyo in writing; and (12) the ability to call a support person during panic/anxiety attacks.

In making her requests, Arroyo relied upon on a document prepared by the DOL, which identified certain potential accommodations for employees with PTSD. Williams responded on September 1, 2011, that Arroyo's requests had been received and that Volvo would be back in touch to discuss her requests after it reviewed them. On September 3, 2011, while Volvo was considering Arroyo's requests for accommodation, Arroyo sent an email to Dennis Sholl, Director of the Central, West, and Mexico Regions for AB Volvo, requesting an investigation of Schroeder for disability-based harassment. Sholl responded by email memorandum on September 13, 2013, explaining that Williams would be in touch with her to begin the harassment investigation. Arroyo filed a charge of discrimination with the EEOC (Charge No. 440-2011-05756) on September 13, 2011, alleging discrimination and retaliation under the ADA.

After Williams and Arroyo discussed Arroyo's accommodation requests, Williams sent Arroyo a memo on September 16, 2011, explaining that Volvo had granted several of Arroyo's requested accommodations and that other accommodations were still under review. Specifically, Volvo granted Arroyo's requests for a place to meditate; a mentor; time off for counseling; access to the company's wellness program; breaks during panic/anxiety attacks; and the ability to call a support person during panic/anxiety attacks. Requests still under review included a flexible schedule to allow make up time in case of tardiness, the ability to use earplugs or headphones in both ears (one ear was allowed), the ability to listen to audio relaxation devices in both ears (one ear was allowed), day-to-day guidance and feedback, disability awareness training, and the request for all communications to be in writing.[8]

On September 19, 2011, Williams notified Arroyo via email that she had been assigned to investigate Arroyo's harassment complaint, that she would be at the Distribution Center on September 20, 2011, and that she would like to meet with Arroyo to begin the investigation. That same day, Arroyo replied back and stated that it was in her "best interest to obtain legal counsel before proceeding any further with the company." Williams responded by email later that day and explained that she had traveled from Atlanta to Chicago to conduct the investigation for three days. She asked Arroyo to let her know once she obtained legal counsel and was prepared to meet. Arroyo replied that she would be willing to answer questions by email in the interim. On September 21, Williams emailed Arroyo some questions "to understand more specifics about your concerns so that I can begin the investigation." In response, Arroyo refused to answer any questions and claimed that she had been "advised to refrain from answering any

---

[8] On September 21, 2011, Williams sent a follow-up email to Arroyo stating which breaks would be paid and unpaid.

questions until after * * * my lawyer has been given the opportunity to review my case and advise me of my rights."

On September 20, 2011 and September 21, 2011, Arroyo reported to work with headphones on both ears. Due to safety concerns relating to whether she would be able to hear forklift activity, and consistent with Volvo's Local Music, Radio I-Pod MP3 Policy, Dunn asked Arroyo to remove one of her headphones. When Arroyo refused, she was sent home from work. On September 22, Williams emailed Arroyo regarding her request to wear ear plugs or noise dampening devices in both ears and a flexible work schedule to allow make up time in case of tardiness. Williams explained that Volvo had safety concerns about Arroyo wearing ear plugs in both of her ears and that Volvo needed additional medical information as to whether tardiness and the need for a flexible work schedule was related to Arroyo's condition. Williams requested that Arroyo obtain an IME with Dr. Koehler with respect to her dual ear plug request and provide documentation from her own psychiatrist concerning her request for a flexible work schedule. Williams explained that Arroyo would receive paid time off from work until this medical documentation could be obtained

Arroyo sent Williams an email on September 26, 2011, requesting to return to work, to be provided the accommodations she requested, and to be protected from harassment from her coworkers and management. Arroyo did not provide any documentation from her psychiatrist and did not attend the IME with Dr. Koehler that Volvo had scheduled. On September 27, 2011, Williams emailed Arroyo a memo addressing her three areas of concern. First, Williams explained that she did not have enough information to proceed with a harassment investigation because Arroyo refused to answer the questions she provided. Williams attached a simplified form for Arroyo to fill out. Second, Williams explained that Volvo had not denied any of

Arroyo's accommodation requests and sought to continue the interactive process in good faith, reiterating her requests for additional medical information. Finally, Williams stated that Arroyo was allowed to return to work and use one ear plug/head phone in the interim. Later that same day, Arroyo sent Williams an email asserting a claim for harassment against Williams because she requested the aforementioned IME and medical documentation from Arroyo's treating psychiatrist. Arroyo did not complete the questionnaires that Williams provided regarding Arroyo's harassment allegations against Schroeder; however, on October 3, 2011, she returned to work without wearing any headphones.

On October 10, 2011, Arroyo punched in one minute after the beginning of her shift and earned a one-half (0.5) occurrence under the Attendance Policy. Also in October 2011, Arroyo requested time off for her third set of PTSD therapy appointments that were scheduled on Tuesdays from 4:00 to 5:30. Williams emailed Arroyo and explained that Volvo would accommodate her request by allowing her to use ETO in four-hour increments and once that time was exhausted she could attend the remainder of her therapy appointments using unpaid leave.

When Volvo provided Arroyo an accommodation of an office to use as a meditation room prior to the beginning of her shift and during breaks, Arroyo initially parked in the employee lot in the front of the Distribution Center and walked through the warehouse to the office, which was located in the rear of the Distribution Center. On October 18, 2011, Arroyo received a memo from Schroeder reminding her of Volvo's safety shoe policy and how she would need to wear safety shoes when walking through the facility. Thereafter, Arroyo started to park in the rear of the Distribution Center immediately adjacent to the dock area. Rather than put on her safety shoes and walk through the warehouse, Arroyo punched in early in the front of the Distribution Center, exited the building, and then drove her car to park in the rear of the

Distribution Center to use the meditation room prior to the beginning of her shift. Arroyo then waited until the shift start bell rang before she exited the warehouse, got back in her car, drove it around the building to park it in the front employee lot, and then reentered the warehouse. In taking this extra time after the shift start bell, Volvo considered Arroyo to be in violation of its attendance policy (despite the fact that she would punch in approximately 30 minutes prior to her shift), which required all employees to be "in the building and ready to work at the scheduled start time and continue to work until the scheduled hours of work are completed." Arroyo testified in her deposition that it "never entered [her] mind" to leave the meditation room five minutes earlier, but admitted that there was no one preventing her from leaving the room earlier.

After Arroyo started her shift late on October 31, 2011, Schroeder met with Arroyo on November 1, 2011, to discuss her use of the meditation room and failure to begin working at her shift start time. During that meeting, Schroeder presented a memo to Arroyo, explaining that the use of the meditation room does not negate the need for her to be prepared to begin work when the bell rings. Schroeder also explained that Arroyo must access the meditation room by walking inside the warehouse, because parking in the rear of the Distribution Center posed safety concerns.[9] Prior to her meeting with Schroeder on November 1, Arroyo did not receive any occurrences under the attendance policy for her routine of clocking in early, but not being in the building and ready to work. On November 2, 2011, Schroeder posted a reminder notice for all employees.

After her meeting with Schroeder, Arroyo was observed by management starting her shift late again on November 2, 2011. Accordingly, on November 3, Schroeder gave Arroyo a CAP in the form of a verbal warning for this incident. The CAP also provided that Arroyo would be

---

[9] On October 24, 2011 and October 28, 2011, Schroeder sent emails to the Material Handler Supervisors reminding them that employees should only park in the employee lot and not in the rear of the Distribution Center next to the dock area.

charged a one-half (0.5) occurrence for violation of the start rule under the attendance policy. Arroyo did not read the CAP, refused to sign the CAP, and refused to speak to the company without her attorney present.

Arroyo was observed by management starting her shift late again on November 4, 2011, and Schroeder presented Arroyo with a CAP in the form of a formal written warning. The CAP also provided that Arroyo would be charged a one-half occurrence (0.5) for violation of the start rule under the attendance policy. After preparing the November 4, 2011 CAP, Temko and Schroeder audited Arroyo's attendance records and determined that she had incurred five occurrences within a six month period from April 14, 2011 to November 4, 2011. Volvo determined that Arroyo had reached the fourth step in the progressive disciplinary process and terminated her from her employment for violation of the attendance policy. Schroeder testified that Arroyo was not terminated due to her on-the-job work or for insubordination.

## II.     Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson,* 477 U.S. at 252.

No heightened standard of summary judgment exists in employment discrimination cases, nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wisconsin Dept. of Health and Family Servs.,* 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility frequently are critical issues in employment cases that in many instances are genuinely contestable and not appropriate for a court to decide on summary judgment. See *id.* The Court must resolve all evidentiary conflicts in Plaintiff's favor and accord her the benefit of all reasonable inferences that may be drawn from the record. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2013). "It is not for the courts at summary judgment to weigh evidence or determine credibility of [a witness's] testimony." *Id.* (quoting *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). Nevertheless, summary judgment in favor of the defendant "is hardly unknown or, for that matter rare, in employment discrimination cases." *Wallace*, 103 F.3d at 1396.

### III. Discussion

In Plaintiff's third amended complaint, she alleges discrimination, retaliation, and failure to provide reasonable accommodations under Title VII, the ADA, the Rehabilitation Act of 1973,

and USERRA, along with a state law claim for intentional infliction of emotional distress.[10]

However, as pointed out by Defendant in its memorandum in support of summary judgment,

Plaintiff alleged no facts supporting a Title VII discrimination or retaliation claim in her

complaint, nor did Plaintiff pursue a Title VII administrative charge of discrimination before the

EEOC.[11] Because Title VII requires plaintiffs seeking to pursue claims in federal court to first

file a charge with the EEOC (see *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 920 (7th Cir.

2000)), any Title VII claim, to the extent actually asserted, is not cognizable. The Court turns to

Plaintiff's remaining claims.

### A. Discrimination Claims

#### 1. *Discrimination under the ADA[12]*

The Americans with Disabilities Act prohibits employers from taking adverse

employment actions against their employees because of a disability. *Fleishman v. Cont'l Cas.*

*Co.*, 698 F.3d 598, 606 (7th Cir. 2012); see 42 U.S.C. § 12112(a). To establish a violation of the

ADA, an employee must show "1) that she is disabled; 2) that she is otherwise qualified to

perform the essential functions of the job with or without reasonable accommodation; and 3) that

the employer took an adverse job action against her because of her disability or failed to make a

---

[10] Plaintiff also references the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, in the jurisdiction section of her third amended complaint, but does not assert a claim for relief under the FMLA.

[11] Plaintiff does not respond to Defendant's arguments arguing Title VII and the FMLA. Thus, Plaintiff has waived any argument that she has cognizable claims under Title VII or the FMLA. See, *e.g., C & N Corp. v. Kane,* 756 F.3d 1024, 1027 (7th Cir. 2014) (failure to make argument in response to summary judgment motion constituted waiver; "we will not find that an argument was adequately preserved solely because a party's opponent defended against the argument"); *Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument * * * results in waiver.").

[12] Complaints alleging employment discrimination under the Rehabilitation Act are governed by the ADA standard. See 29 U.S.C. § 794(d); *Scott v. Kaneland Community Unit School District # 302*, 898 F. Supp. 2d 1001 (N.D. Ill. 2012). Accordingly, the analysis with respect to Arroyo's ADA claims applies equally to her Rehabilitation Act claims.

reasonable accommodation." *Winsley v. Cook Cnty.*, 563 F.3d 598, 603 (7th Cir. 2009) (quoting *Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000)). Essentially the same elements must be proven to establish a violation of the Rehabilitation Act, which additionally requires plaintiffs to prove that they were "involved in programs receiving federal financial assistance." *Silk v. City of Chi.*, 194 F.3d 788, 798 nn. 6 & 7 (7th Cir. 1999). Plaintiff has come forward with sufficient evidence to demonstrate that she was diagnosed with PSTD and suffers from an ADA-recognized disability.[13]

In an ADA discrimination case, a plaintiff may prove discrimination in one of two ways. First, a plaintiff can put forth "direct evidence" of discrimination. See *DeLuca v. Winer Industries, Inc.*, 53 F.3d 793, 797 (7th Cir. 1995). Alternatively, a plaintiff can submit "indirect evidence" of unlawful ADA discrimination by way of the *McDonnell Douglas* burden-shifting rubric, originally established for Title VII cases. *Id.*; *Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012) ("[W]e have continued to apply the *McDonnell Douglas* burden-shifting framework in summary judgment cases that proceed under the indirect method of proof * * * ."). The burden-shifting test applies only if Arroyo relies on the indirect method of proof in establishing her discrimination claim. See *id.*; see also *Antonetti v. Abbott Laboratories*, 563 F.3d 587, 591 (7th Cir. 2009) ("Under [the indirect] approach * * * * If Plaintiffs can demonstrate [a prima facie case of discrimination], the burden shifts to the employer to articulate

---

[13] Plaintiff also contends in one sentence in her response brief that she suffers from depression. See Pl.'s Resp. at 3. It is not clear from Plaintiff's brief whether she contends that depression is a symptom of her PTSD or whether she is claiming that depression constitutes a separate disability. To the extent that Plaintiff is claiming that depression is a symptom or subset of her PSTD, the Court acknowledges that Plaintiff has demonstrated that she suffers from PTSD. However, Plaintiff has not come forward with evidence (or even allegations) in her statement of facts that she was diagnosed with depression (apart from any depression related to her PTSD). Merely including facts in a responsive memorandum is insufficient to put the issue before the Court. See *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir. 1995); *Malec v. Sanford*, 191 F.R.D. 581, 594 (N.D.Ill.2000). Thus, while Plaintiff has demonstrated that she suffered from PTSD, she has not come forward with sufficient evidence to show that she also suffered from depression apart from her diagnosis of PTSD.

some legitimate, nondiscriminatory reason for the adverse action. If [the employer] satisfies this burden of production, Plaintiffs must then establish that there is an issue of material fact as to whether the employer's proffered reasons are merely pretext for unlawful discrimination * * * in order to survive summary judgment.") (internal quotations and citations omitted). But if Arroyo submits direct evidence of discrimination such that a jury could properly find a verdict in her favor—that is, that genuine issues of material fact exist with respect to each element that she will be required to prove at trial—that's the end of the inquiry, and Defendant's summary judgment motion must be denied. See *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 683-84 (7th Cir. 2014).

With respect to her direct method argument, Arroyo's one-sentence argument states: "Plaintiff has countless emails sent among Volvo management and staff that illustrate[] a convincing mosaic that they were intentionally discriminating against her because of her disability." See Pl.'s Resp. at 7-8. First, Arroyo does not cite to any specific emails in support of her argument. In response to Defendant's argument that she does not have any direct evidence of discrimination, it is Plaintiff's obligation to come forward with sufficient evidence to support a claim (see *Modrowski v. Pigatto,* 712 F.3d 1166, 1167–68, 1170–71 (7th Cir. 2013) (explaining that district court must grant summary judgment for moving party if, after moving party points to absence of evidence supporting opponent's case, opponent fails to produce evidence from which jury reasonably could find in her favor on material issues for which she bears burden of persuasion)), not the Court's job to sift through the record to find the evidence (see *Davis v. Carter,* 452 F.3d 686, 692 (7th Cir. 2006)). Simply referring to countless emails, but not identifying a single one, does not satisfy Plaintiff's obligation.

Further, the emails referenced in the parties' fact statements demonstrate an awareness of Plaintiff's rights as an active service member, as well as discussions about the company's rights and obligations in relation to Arroyo's military leave and PSTD, not discrimination. The emails evince efforts on the part of Volvo to ensure that its employees were aware of Arroyo's rights and sensitive to her military leave requests; to work with Arroyo to make sure that she was providing her military orders and that her excused absences were properly considered as such; to allow her to attend her therapy appointments for her PTSD; and also to provide several requested accommodations while Arroyo worked at the Distribution Center. At best, the emails reveal Volvo's interest in keeping abreast of Arroyo's military status and not running afoul of USERRA and the ADA, while holding Arroyo accountable for company policies when she was not on leave. Moreover, these emails affirmatively show that Volvo took no adverse employment action against Arroyo as a result of these discussions. *Cf. Breneisen v. Motorola, Inc.*, 512 F.3d 972, 981-82 (7th Cir. 2008) (concluding that a supervisor's comments that expressed frustration with employees' taking medical leave, but that resulted in no loss of job benefits, were not materially adverse). In short, Plaintiff has not come forward with "near-admissions" of discrimination by the employer or a convincing mosaic of circumstantial evidence that disability discrimination motivated Defendant's decision to terminate Plaintiff's employment. *See also Abuelyaman v. Ill. State Univ.,*667 F.3d 800, 809 (7th Cir. 2011).

Turning to the indirect method, Plaintiff preliminarily argues that she was meeting Volvo's legitimate expectations because "the only reason for her termination was because Volvo management had determined that she had violated the Absenteeism Attendance Policy."[14] See

---

[14] The Seventh Circuit has counseled that where a plaintiff has not met her burden of showing that a defendant's explanations are merely a pretext for discrimination, it is not necessary for a court to decide whether the plaintiff also established a prima facie case. See *Holmberg v. Baxter Healthcare Corp.,* 901 F.2d 1387, 1391 (7th Cir. 1990); see also *Box v. A & P Tea Co.,* 772 F.2d 1372, 1378 (7th Cir.

Pl.'s Resp. at 8. But Plaintiff's argument misses the point. Attendance at a job site is a basic requirement of most jobs, and the Seventh Circuit has held that an individual with "erratic, unexplained absences" is not a qualified individual with a disability for purposes of the ADA. See *Waggoner v. Olin Corporation*, 169 F.3d 481, 484-85 (7th Cir. 1999).[15] Not meeting an employer's attendance guidelines equates to not meeting the employer's legitimate expectations. See, *e.g., Contreras v. Suncast Corp.*, 237 F.3d 756, 760-61 (7th Cir. 2001) (holding that an employee failed to meet his employer's legitimate expectations by, among other things, incurring eight attendance violations). Arroyo argues that she was meeting Volvo's legitimate expectations because she "had not punched in late and was not tardy when she was terminated for violating Volvo's attendance policy." See Pl.'s Resp. at 9. Arroyo relies on this distinction without addressing the undisputed evidence that Volvo determined that she started her shift late on November 4, 2011, *despite having punched in timely*. This is because Arroyo would punch in prior to going to the meditation room (provided to her as an accommodation), stay in the mediation room until the shift start bell rang, then leave the room, walk to her car, drive around the side of the building to re-park her car, and then reenter the warehouse. Under any definition of being "in the building and ready to work at the scheduled start time," this would not suffice. It was not unreasonable for Volvo to expect Plaintiff to leave the meditation room in sufficient

---

1985) (moving directly to third step of *McDonnell Douglas* approach where defendant articulated and offered proof of a legitimate, nondiscriminatory reason for adverse employment action).

[15]  It is unclear from the operative complaint whether Arroyo is asserting a separate discrimination claim with regard to her request to work overtime on May 21, 2011. She appears to predominantly rely upon this incident as the basis of her protected activity for her retaliation claim. However, to the extent that Plaintiff is asserting a discrimination claim based on this request, her claim fails. The record is clear that Plaintiff was on work restrictions at the time that she requested weekend overtime and could not use a forklift. Thus, she was not a qualified individual with respect to her request to work overtime on May 21, 2011, as using a forklift was a requirement for the weekend position.

time to be ready to work at her start time.  In taking advantage of the accommodation provided to her, Plaintiff was not meeting her employer's legitimate expectations.

Arroyo's argument that she was a qualified individual with a disability—pointing out that she had "substantial documentation from doctors, emergency room visits and military orders for her absences"—similarly misses the mark.  Arroyo was not disciplined for those excused absences—in fact, she was never disciplined or given an occurrence for any time she missed due to counseling, treatment for her PSTD, or her service in the military; rather, she was disciplined for her unexcused tardies and absences.  See *Lewis v. Caterpillar, Inc.*, 367 Fed. Appx. 683, at *2 (7th Cir. Mar. 8, 2010) ("Failure to arrive for work on time—or at all—is not satisfactory performance * * * therefore [plaintiff] was not meeting the employer's legitimate expectations.").

Plaintiff also contends that she "can prove that similarly situated employees without a disability were treated more favorably," but she has not identified any other employees who were not disciplined for tardiness or unexcused absences.  While it is undisputed that Volvo management did not have any charts or spreadsheets to keep track of military orders for other employees at the Distribution Center, Arroyo was the only active duty reservist employed at the time.  Given that Plaintiff was provided with more than 900 days of military leave during her time at Volvo, it was not unreasonable for Volvo to keep track of her leave requests.  Also, it is undisputed that Volvo maintains spreadsheets for all material handlers in monitoring tardiness and absences generally under the attendance policy.[16]  Volvo has come forward with undisputed evidence that numerous employees, aside from Arroyo, have received occurrences and steps in the disciplinary process for punching in two minutes or less after the beginning of their shifts.

---

[16]    The record also reflects that Volvo terminated six material handlers during Plaintiff's second deployment in 2009.

See Schroeder Aff. ¶ 9, Ex. 7 (Corrective Action Plans for all material handlers other than Arroyo who received any disciplinary action under the attendance policy from 2008 through 2012). In short, Plaintiff has not shown that similarly-situated, nondisabled employees were treated more favorably than her.

Volvo has articulated a legitimate non-discriminatory reason for Arroyo's termination (violation of the attendance policy). Additionally, Volvo has come forward with evidence that it would have taken the same action even if Arroyo did not have PSTD or was not in the military. Since Defendant has put forth a non-discriminatory explanation for its termination of Plaintiff, the burden now shifts to Plaintiff to prove that the bias-neutral reason proffered by Defendant was a pretext or an explanation designed to obscure the unlawful discriminatory employment action. *Emmel v. Coca–Cola Bottling Co. of Chicago,* 95 F.3d 627, 629 (7th Cir. 1996). In order to avoid summary judgment, a plaintiff must show that the reason given is unworthy of credence. See *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000). To accomplish this requirement, a plaintiff must provide evidence to prove that the defendant's reasons were either factually baseless, were not the actual motivation for the action, or were insufficient to motivate the action. *Gordon v. United Airlines, Inc.,*246 F.3d 878, 888–89 (7th Cir. 2001). A plaintiff shows that a reason is pretextual "directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Blise v. Antaramian,* 409 F.3d 861, 867 (7th Cir. 2005) (citing *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981)). Plaintiff must "*specifically* refute facts which allegedly support the employer's proffered reasons"; conclusory statements about an employer's prejudice are insufficient to establish pretext.

*Alexander v. CIT Tech. Fin. Servs., Inc.,* 217 F. Supp. 2d 867, 890 (N.D. Ill. 2002) (emphasis in original).

In an attempt to show pretext, Plaintiff points to a number of different incidents. Arroyo first cites to a series of emails exchanged in November 2008 when there was a delay with Arroyo providing her military orders to Volvo. Next, she cites to portions of her affidavit detailing her hospitalization in December 2010, when Schroeder was seeking guidance from HR on how to handle any discipline for her absences, given that Arroyo was going to exceed the cap of five excused days. As Arroyo concedes (but omits from her response brief), no such discipline ever occurred, because once Volvo was aware of the reason for her hospitalization and was given documentation, she was subsequently approved for FMLA and short-term disability leave retroactive to December 23, 2010. And, as noted previously, Plaintiff was never disciplined or given an occurrence for any time she missed due to counseling, treatment for PSTD, or her service in the military. That Volvo required her to provide documentation to support her leave time prior to excusing her leave can hardly be considered a pretext for discrimination.

Next, she claims that when she requested accommodation, "Schroeder and Williams consistently rejected her attempts to discuss what would help minimize her affects from PTSD." As detailed in the fact section, Plaintiff's argument does not find support in the record. Instead, the record is replete with instances in which Volvo provided requested accommodations: (1) use of a meditation room prior to her shift; (2) a mentor; (3) time off for counseling; (4) access to the company's wellness program; (5) breaks during panic/anxiety attacks; and (6) the ability to call a support person during panic/anxiety attacks. They also told her that the following requests were still under review: flexible schedule to allow make up time in case of tardiness, the ability to use earplugs or headphones in both ears (one ear was allowed), the ability to listen to audio

relaxation devices in both ears (one ear was allowed), day-to-day guidance and feedback, disability awareness training, and the request for all communications to be in writing. In response to multiple efforts to engage Plaintiff in dialogue about those requests, Plaintiff declined to speak with the company and notified them that she was seeking the assistance of counsel. She also refused to provide medical documentation to support certain of those requests. In light of the record, Plaintiff's contention that her supervisors failed to minimize the effects of her PSTD does not withstand scrutiny.

The record also reflects that, to the extent that Volvo exercised subjective judgment in applying its attendance policy, its discretion in many instances benefitted Arroyo. Specifically, the evidence demonstrates that: (1) Schroeder allowed Arroyo to bring in a doctor's note to excuse her October 19, 2010 absence (although Arroyo never provided such a note); (2) Schroeder deviated from the attendance policy in Arroyo's favor when he excused Arroyo's late punch on October 29, 2010, giving her the benefit of the doubt in response to her argument that she was unaware of the elimination of the two-minute grace period; (3) Arroyo's attendance record was updated in September 2011 to excuse her absence on December 23, 2010; and (4) Arroyo, who already was provided with a revised schedule to account for her counseling sessions, still punched in after 6:30 p.m. on 11 different Tuesday evenings on which she had VA therapy appointments, but earned no occurrences with respect to those days. Further, in November 2011, Schroeder met with Arroyo to discuss the need to begin work at the shift start bell and that her use of the meditation room prior to her shift did not negate her responsibility. It was only after Arroyo ignored his instructions that she earned the final two one-half (0.5) occurrences that ultimately resulted in her termination.

In sum, Plaintiff has not come forward with sufficient evidence to establish that Volvo's reason for terminating her was a pretext for disability discrimination. Rather, the facts described above indicate that Volvo had a legitimate business reason—multiple attendance policy violations—to terminate Arroyo's employment, and that it was Arroyo's tardiness, not her military service, that led to her termination.

### 2. *Under USERRA*

Enacted in 1994, USERRA is the latest in a series of veterans' employment rights laws, replacing its most immediate predecessor, the Veterans' Reemployment Rights Act ("VRRA") of 1974. 20 C.F.R. § 1002.2. The purposes of USERRA are: "(1) to encourage noncareer service in the uniformed services * * *; (2) to minimize the disruption to the lives of persons performing service in the uniformed services * * * by providing for the prompt reemployment of such persons upon their completion of such service; and (3) to prohibit discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301(a). "In enacting USERRA, Congress emphasized USERRA's continuity with the VRRA * * * and that the large body of case law that had developed under [earlier] statutes remained in full force and effect, to the extent it is consistent with USERRA." 20 C.F.R. § 1002.2.

USERRA affords broad protections to service members against employment discrimination, providing that members "shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership * * *." 38 U.S.C. 4311(a). A "benefit of employment" means "any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes * * * * the opportunity to select work hours or location of

employment." *Id.* § 4303(2). In order to allege a violation of USERRA, a plaintiff must establish that she was subject to an adverse employment action and that her military service was a motivating factor in that action. *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 (2011). That Plaintiff in this case was subject to an adverse employment action—termination—is undisputed. Under the burden-shifting framework of § 4311, a plaintiff makes out a prima facie case of discrimination by showing that his service membership was "a motivating factor in the employer's action." *Crews v. City of Mt. Vernon*, 567 F.3d 860, 864-65 (7th Cir. 2009). The employer must then "prove that the action would have been taken in the absence of such membership." *Id.*

Plaintiff's USERRA discrimination theory is that her termination for violation of Volvo's attendance policy in November 2011 was a pretext that Volvo seized upon after spending over six years "looking for a way" to terminate her. In support of her argument, she cites to numerous internal email communications between Volvo management and human resources over the years, which discuss the company's rights and obligations in relation to Arroyo's military leave. Arroyo contends that these emails equate to military animus. She also claims that Volvo selectively enforced certain company rules against her and did not provide her with requested accommodations.

As discussed above, the emails referenced by Arroyo reveal both Volvo's interest in keeping apprised of Arroyo's military status and in holding Arroyo accountable for company policies when not on leave. Had Volvo penalized Plaintiff for taking military leave, these emails may take on a more negative connotation. But they did not. Moreover, these emails affirmatively show that Volvo took no adverse employment action against Arroyo as a result of these discussions. *Cf. Breneisen v. Motorola, Inc.*, 512 F.3d 972, 981-82 (7th Cir. 2008)

(concluding that a supervisor's comments that expressed frustration with employees' taking medical leave, but that resulted in no loss of job benefits, were not materially adverse). Arroyo does not dispute (i) that Volvo gave her more than 900 days of military leave during her six and a half year period of employment; (ii) that after her return from her second overseas deployment, Volvo accommodated her request for a modified Friday work schedule prior to drill weekends; and (iii) that she did not receive any occurrences under the Attendance Policy for days on which she took military leave. The record also reflects that in 2009, during her second deployment while employed at Volvo, Volvo was forced to terminate six material handlers. What Volvo refused to do was accommodate her recurrent tardiness. Again, if Volvo had penalized Plaintiff and not others for being late, then Volvo's actions might evince a discriminatory animus. But Volvo has come forward with undisputed evidence that it similarly penalized other employees for being minutes late to work. Volvo's decision to hold employees to a strict start time is within its discretion and cannot serve as the basis for Plaintiff's USERRA discrimination claim. For these reasons, as well as reasons stated in analyzing Plaintiff's ADA discrimination claim, Plaintiff's claim of discrimination under USERRA fails.

### B. Retaliation Claims

The ADA prohibits employers from retaliating against employees who assert their right under the Act to be free from discrimination. 42 U.S.C. § 12203(a). Employers are forbidden from retaliating against employees who raise ADA claims regardless of whether the initial claims of discrimination are meritless. *Squibb v. Mem'l Med. Ctr.,* 497 F.3d 775, 786 (7th Cir. 2007). As in the discrimination context, a plaintiff can establish a valid case of retaliation using either the direct or indirect method of proof. *Kersting v. Wal–Mart Stores, Inc.,* 250 F.3d 1109, 1117 (7th Cir. 2001). To establish a case of retaliation under the direct method of proof, a

plaintiff must show that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse action; and (3) a causal connection between the two exists. *Dickerson v. Board of Trustees of Comm. College Dist. No. 522,* 657 F.3d 595, 601 (7th Cir. 2011). Under the indirect, burden-shifting method for retaliation claims, a plaintiff must demonstrate that she (1) engaged in protected activity; (2) was performing her job satisfactorily; and (3) was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer. *Id.* Once a plaintiff satisfies her initial burden, the burden then shifts to the defendant to present a non-invidious reason for the adverse employment action. If the defendant meets this burden, the plaintiff must then demonstrate that the defendant's proffered reason was pretextual. See *id.*; *Jasmantas v. Subaru–Isuzu Auto., Inc.,* 139 F.3d 1155, 1157 (7th Cir. 1998).

As a threshold matter, Defendant points out that Arroyo does not allege that she engaged in any protected activity under USERRA. In her third amended complaint, Arroyo identifies three dates on which she engaged in protected activity: May 20, 2011, August 21, 2011, and September 13, 2011. May 20, 2011, was around the time that Arroyo attempted to sign up to work voluntary Saturday overtime on May 21, 2011. There is no evidence of any protected activity on August 21, 2011; however, Arroyo requested accommodations for her disability on August 26, 2011 and September 1, 2011. Finally, Arroyo filed a charge of discrimination with the EEOC on September 13, 2011, alleging discrimination and retaliation under the ADA. Thus, it appears as if all of her alleged protected activity arises under the ADA rather than USERRA. Arroyo does not rebut Volvo's argument that she did not allege that she engaged in any distinct protected activity under USERRA. Instead, she contends that "Volvo's management was consistently seeking ways to terminate or discipline Arroyo for exercising her military rights and

obligations." See Pl.'s Resp. at 10-11.  This is essentially Arroyo's USERRA discrimination claim with no further factual explanation.  Thus, the same standard as discussed with respect to Arroyo's USERRA discrimination claim applies and the Court's analysis of her USERRA discrimination claim applies to her retaliation claim.  There simply is insufficient evidence that Volvo sought to terminate Arroyo for exercising her military rights and obligations.

Turning to her claim under the ADA, for purposes of summary judgment, Volvo does not dispute that Arroyo engaged in protected activity and that she suffered an adverse employment action (her termination). Instead, Volvo contends that her retaliation claim fails because she cannot show a causal link between the two.  As previously set forth, the Court has already concluded that (i) Plaintiff's recurrent tardiness prevented her from performing her job satisfactorily and (ii) there is no evidence that she was singled out for an adverse employment action that similarly situated employees did not suffer.  Thus, Plaintiff must show a causal connection between her protected activity and her termination in order to proceed with her retaliation claim.

Volvo began to discipline Plaintiff under the attendance policy in October 2010—prior to any allegation of protected activity.  That Volvo continued to consistently discipline her for tardiness after her protected activity does not create an inference of a causal link between the protected activity and her discipline; rather, it demonstrates that Volvo continued to implement its attendance policy, which it had the right to do.  See, *e.g., Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 16 (1st Cir. 1997) (before plaintiff requested disability accommodation, plaintiff had been disciplined and warned of discharge if his performance did not improve; although discharge followed soon after his accommodation request, temporal proximity alone was not enough to sustain inference of retaliation).  Additionally, Arroyo's protected activity does not

insulate her from continued discipline under the attendance policy. See, *e.g., Hall v. Bodine Elec. Co.*, 276 F.3d 345, 359 (7th Cir. 2002) ("[A]n employee's complaint of harassment does not immunize her from being subsequently disciplined or terminated for inappropriate workplace behavior.") (overruled on other grounds). Again, if Plaintiff had been selectively disciplined for tardiness after engaging in protected activity, this would be a different case. But she was not, and in fact, the record clearly shows that other employees were similarly disciplined for attendance infractions.

In her response brief, Plaintiff contends that her protected activity is both that "she made it clear to Schroeder that she thought she was being discriminated against because of her disability" and that she complained to Sholl that Schroeder was harassing her. See Pl.'s Resp. at 11. Arroyo's complaint to Sholl occurred on September 3, 2011, when Arroyo sent an email to Sholl. The temporal distance between this complaint and her termination more than two months later is likely too remote to sustain any inference of a causal link. See, *e.g., EEOC v. Yellow Freight System, Inc.*, 253 F.3d 943, 952-53 (7th Cir. 2011) (holding that six weeks between filing ADA charge and plaintiff's termination is insufficient to establish retaliation). However, during that time, Arroyo also incurred several more attendance infractions and thus Volvo had a legitimate basis for its termination decision; Arroyo's protected activity does not change that fact.

Arroyo also cites a quote from Williams to Schroeder that "we could be violating the ADA." See Pl.'s Resp. at 11. The content of the quote shows that Williams emailed Schroeder on July 11, 2011, and clarified that Arroyo was allowed to work overtime during the week if there was work for her to do, distinguishing that scenario from when Arroyo was previously ineligible to work Saturday overtime due to no work being available in light of her job

restrictions at the time. Arroyo has conceded that she periodically worked overtime after her job restrictions were lifted. Putting Williams's quote in context shows that Williams was advising Schroeder of Plaintiff's rights, not seeking to retaliate against her. Additionally, Schoeder's inquiry into Plaintiff's overtime request is too remote in time to her termination to establish any causal link. See, *e.g., Yellow Freight System, Inc*., 253 F.3d at 952-53.

Finally, Plaintiff alleges that Volvo retaliated against her by "continually refusing" to provide reasonable accommodations and "otherwise harassing" her. See Compl. at ¶ 132. However, as discussed above, the record reflects that Volvo provided various accommodations to Arroyo and attempted to engage in an interactive process with respect to further requests even after Arroyo filed an the EEOC Charge. When Williams attempted to engage Arroyo in the process, Arroyo noted in writing that it was in her "best interest to obtain legal counsel before proceeding any further with the company." Williams then asked Arroyo to let her know once she obtained legal counsel and was prepared to meet. Although Arroyo replied that she would be willing to answer questions by email in the interim, when Williams emailed Arroyo some questions on September 21, 2011, "to understand more specifics about your concerns so that I can begin the investigation," Arroyo refused to answer any questions and claimed that she had been "advised to refrain from answering any questions until after * * * my lawyer has been given the opportunity to review my case and advise me of my rights." Additionally, Arroyo's claim that Schroeder harassed her when he gave her a copy of the Workplace Violence and Harassment policies in response to the Tracey Adams incident occurred before her accommodation requests on August 26, 2011 and September 1, 2011. Thereafter, as set forth above, Volvo requested information from Arroyo to begin its investigation—information that Arroyo refused to provide. In short, the evidence demonstrates that Volvo went through the proper channels upon receiving

Plaintiff's EEOC claim and requests for accommodation and did not retaliate against Plaintiff for her complaints.

### C. Failure to Accommodate[17]

In her third amended complaint, Arroyo identifies four accommodations that she contends were denied: (1) time-off from work so that she could safety travel to and from military obligations and adequately perform for military duties; (2) allowing her time to attend her PTSD therapy sessions; (3) allowing her to work overtime on a machine other than the forklift; and (4) allowing her time to put on her protective gear prior to starting her shift.[18]  In her response brief, Arroyo does not rebut the fact that numerous accommodations were given to her nor does she address Volvo's arguments with respect to these four accommodations.  Instead, she points to other incidents over the course of her employment—including that she provided information about USERRA to Volvo, that she underwent an IME at Volvo's request, that she requested an investigation into Schroeder's alleged disability-based harassment, and that she filed a charge of discrimination with the EEOC—as a basis for her failure-to-accommodate claim.  In the interest of completeness, the Court addresses the initial four accommodations (despite Plaintiff's failure to rebut Defendant's arguments) as well as the contentions in her response brief.

Time off from work to travel to and from military duties is a right protected by USERRA, rather than an accommodation.  See *Sandoval v. City of Chicago*, 560 F.3d 703 (7th Cir. 2009)

---

[17]  The Court has previously discussed aspects of Volvo's alleged failure to accommodate in analyzing Plaintiff's discrimination and retaliation claims and incorporates that analysis here.

[18] Arroyo does not point to Volvo's refusal to allow her to make up time in case of tardiness as part of her claim—nor would the case law support such a claim.  See, *e.g., Waggoner*, 169 F.3d at 485 (7th Cir. 1999) (employer is not required to tolerate erratic, unreliable attendance); *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) (flexible schedule that would allow employee to clock in at whatever time she wanted and make up time at end of shift was not reasonable accommodation).

(noting that 38 U.S.C. § 4311(a) does not require an accommodation but only prohibits discrimination). In any event, the record reflects that Volvo always provided Arroyo the statutorily-required time to report back to work after her military service. See 38 U.S.C. § 4312. After her last deployment, Arroyo and Volvo also discussed the time that she needed off from work prior to her weekend drills. USERRA is silent on this issue and requires an employer to "reasonably accommodate" an employee on a case-by-case basis. The record reflects that Volvo first discussed the issue with Arroyo one-on-one and then mediated with Colonial Gorski of the ESGR. In any event, after the parties mediated the issue, it is undisputed that Plaintiff received the necessary time off to travel to and meet her obligations with respect to her weekend drills.

Second, Arroyo's contention that Volvo did not allow her time to attend her PTSD therapy sessions is belied by the record. Volvo allowed Arroyo to use ETO in two-hour increments on the Tuesdays before her Wednesday morning sessions that ran from April through July 2011; allowed her time off from work to attend another set of therapy appointments that ran from July through October 2011 (and did not credit her with attendance occurrences on numerous evenings that she was late reporting to work); and allowed her to use ETO (or unpaid leave once exhausted) for further therapy appointments that were scheduled for Tuesday evenings starting in October 2011.

Third, Volvo had no obligation to accommodate Arroyo's request to work voluntary Saturday overtime on May 21, 2011, due to her then-existing work restrictions and the unavailability of work that did not involve use of a forklift. See, e.g., Hansen v. Henderson, 233 F.3d 521, 523 (7th Cir. 2000) (noting that there is no duty to manufacture a job that will enable a disabled worker to work despite his disability). It is undisputed that Arroyo worked weekday

overtime while the restrictions were in place and worked weekend overtime after her restrictions were lifted.

Arroyo also contends that Volvo did not allow her time to put on her protective gear prior to starting her shift. She has repeatedly claimed that she was disciplined when she attempted to use the meditation room that Volvo granted her as an accommodation, but in doing so, she ignores both the scope of the accommodation itself and the fact that she was disciplined for starting her shift late in violation of the attendance policy—not for use of the mediation room. Volvo granted Arroyo use of a space in the warehouse operations office for her to meditate prior to the start of her shift and during breaks. When Arroyo refused to put on her safety shoes to access the space by walking through the warehouse, she began to punch in early in the front of the Distribution Center, exit the building, and then drive her car to park in the rear of the Distribution Center to use the mediation room prior to the beginning of her shift. She then waited until the shift start bell rang before she exited the warehouse, got back in her car, drove it around the building to park it in the front employee lot, and then reentered the warehouse. Yet she was not disciplined for this behavior (which caused her to start her shift late) until after she was warned verbally and in writing that such behavior was in violation of company policy. In fact, Schroeder explained that the use of the meditation room did not negate the need to be prepared to work when the bell rang and that parking in the rear of the Distribution Center posed safety concerns. Arroyo—just like any other material hander—had to make time to put on her safety shoes prior to her shift and to arrive at her shift on time. Her failure to do so is not a failure on the part of Volvo to accommodate her. See *Brunker v. Schwan's Home Serv.*, 583 F.3d 1004, 1009 (7th Cir. 2009) (employer did not have to provide plaintiff's "ideal" accommodation).

Plaintiff contends that "Volvo halted all attempts to determine reasonable accommodations for Arroyo's disability." See Pl.'s Resp. at 14. First, as set forth above, Volvo made numerous accommodations for Plaintiff. In regard to accommodation requests that were still under consideration when she was terminated, the record reflects that Plaintiff in fact halted attempts to resolve the outstanding accommodation issues. The evidence includes numerous emails exchanged between Arroyo, Schroeder, and Williams addressing Arroyo's requests and providing updates on which requests were granted and which were still under consideration. Then, when Williams asked Plaintiff to undergo an IME to support her dual ear plug request and requested that Plaintiff provide medical documentation from her treating psychiatrist relating to her request to make up time in case of tardiness, Plaintiff refused to do either and asserted a harassment claim against Williams. While this was going on, Volvo paid Arroyo for seven days that she did not work while Volvo awaited her decision as to whether she would attend an IME for her own requested accommodation. Patricia Dunford, Vice President of Human Resources, also responded to Plaintiff's inquires about why she needed to submit to an IME and provide medical documentation for certain requests and told Plaintiff that she could wear one earphone while the issues were being resolved. After Dunford's response, Plaintiff returned to work without wearing any headphones. Based on the foregoing, the record is clear that Volvo did not halt attempt to determine reasonable accommodations and in fact attempted to engage Plaintiff in an interactive process regarding those requests. See, *e.g.*, *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1136 (7th Cir. 1996) (holding that plaintiff's failure to sign release granting employer ability to investigate her alleged need for accommodation resulted in breakdown of interactive process and precluded her failure to accommodate claim).

In sum, Volvo provided numerous accommodations to Plaintiff, including a modified Friday work schedule for those weeks she had weekend drill duty, time off to attend VA therapy appointments using ETO in fractional day increments or having the time excused (including not giving Arroyo any occurrences on evenings she arrived to work late), an office in which to meditate prior to her shift and during breaks, a mentor, access to the company's wellness program, breaks during panic/anxiety attacks, the ability call a support person during panic/anxiety attacks, and use of ear plugs or noise dampening devices in one ear. Volvo also was in the process of reviewing several additional requests when Plaintiff declined to meet with Williams and instead filed a harassment claim against Williams and refused to provide requested documentation and submit to an IME. These facts simply do not give rise to a failure to accommodate claim.

### D. Intentional Infliction of Emotional Distress[19]

Arroyo's final claim is for intentional infliction of emotional distress ("IIED"). To establish a claim for intentional infliction of emotional distress under Illinois state law, a plaintiff must show: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew that there was a high probability that its conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress."

---

[19] Ordinarily, the Court would relinquish jurisdiction over any remaining state law claims under 28 U.S.C. § 1367(c)(3), having dismissed all of the federal claims short of trial. However, the Seventh Circuit has identified several exceptions to the presumption of the relinquishment of state claims, including where the record has rendered it obvious how those claims should be decided. See *Williams Electronics Games, Inc. v. Garrity,* 479 F.3d 904, 907 (7th Cir. 2007); *Sellars v. City of Gary,* 453 F.3d 848, 852 (7th Cir. 2006); see also *Young-Smith v. Holt,* 2014 WL 4699479, at *3 (7th Cir. 2014). Here, the record reflects that disposition of Plaintiff's IIED claim is not a close call. Additionally, considerations of judicial efficiency counsel toward retention of jurisdiction. See *Miller Aviation v. Milwaukee Cnty. Bd. of Supervisors,* 273 F.3d 722, 731 (7th Cir. 2001). This case has been pending since 2012. To fragment the state law claim off from this case to begin anew in state court would not be an efficient use of resources, given the obvious lack of evidence to support Plaintiff's claim. Therefore, the Court will exercise its discretion to retain jurisdiction over Plaintiff's IIED claim.

*Shamim v. Siemens Industry, Inc*., 854 F.Supp.2d 496, 511 (N.D. Ill. 2012) (quoting *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 866 (Ill. App. Ct. 1st Dist. 2000)). "Whether conduct is extreme and outrageous is judged on an objective standard, based on all the facts and circumstances of the particular case." *Shamim*, 854 F.Supp.2d at 511 (citing *Graham*, 742 N.E.2d at 866). "To be considered extreme and outrageous, 'a defendant's conduct must be so extreme as to go beyond all possible bounds of decency' and must be 'regarded as intolerable in a civilized community.'" *Id.* (quoting *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80-81 (2003)). Courts are particularly reluctant to find extreme and outrageous conduct in the employment context in the absence of "conduct calculated to coerce an employee to do something illegal." *Welsh v. Commonwealth Edison Co*., 713 N.E.2d 679, 684 (Ill. App. Ct. 1st Dist. 1999). "This reluctance seems to be grounded in a fear that, if the anxiety and stress resulting from discipline, job transfers, or even terminations could form the basis of an action for emotional distress, virtually every employee would have a cause of action." *Id.*

Plaintiff's IIED claim consists of many of the same allegations that make up her ADA and USERRA claims. Aside from the reasons discussed above as to why Plaintiff cannot proceed with her ADA and USERRA claims, there are no allegations, nor is there any evidence, that Volvo engaged in extreme and outrageous behavior. Arroyo's evidence consists of internal communications among Volvo employees attempting to determine the company's obligations under USERRA and the ADA. Much more egregious cases have failed to rise to the level of extreme and outrageous. See, *e.g., Stoecklein v. Illinois Tool Works, Inc.,* 589 F.Supp. 139, 146 (N.D. Ill. 1984) (an employer's conduct in demoting and forcing an employee into retirement because of his age, then reneging on a promise of severance pay and job counseling, was not extreme and outrageous); *Balark v. Ethicon, Inc*., 575 F.Supp. 1227, 1230-32 (N.D. Ill. 1983) (an

employer's refusal to reinstate an employee despite an arbitration award in the employee's favor, together with a baseless referral of the employee's name to the FBI for investigation, was not extreme and outrageous); *Witkowski v. St. Anne's Hosp. of Chicago, Inc.*, 447 N.E.2d 1016, 1022-23 (Ill. App. Ct. 1983) (an alleged wrongful discharge to prevent a plaintiff from securing long-term disability benefits was not extreme and outrageous).

In her response brief, Plaintiff merely states that "[t]here is no dispute that Volvo management was aware of Arroyo's PTSD diagnosis and her susceptibility to emotional distress" and Volvo "either intended to inflict severe emotional distress, or knew that there was a high probability that is conduct would do so." Arroyo fails to provide any citations to the record to support her argument, nor does she attempt to rebut the cases cited by Volvo rejecting an IIED claim in the employment context. Arroyo's speculation, which she has not supported with any facts or law, is not sufficient to withstand summary judgment, and her IIED claim, like her other claims, will be dismissed.

## IV.    Conclusion

For the reasons stated above, the Court grants Defendant's motion for summary judgment [75]. Judgment will be entered in favor of Defendant Defendant Volvo Group North America, LLC and against Plaintiff LuzMaria Arroyo on all claims.


Dated:  September 30, 2014                    _____
                                             Robert M. Dow, Jr.
                                             United States District Judge