# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LUZMARIA ARROYO,           )
                                       )
        Plaintiff,          )
                                       )
        v.                 )         Case No. 12-cv-6859
                                       )
VOLVO GROUP NORTH AMERICA, LLC,  )        Judge Robert M. Dow, Jr.
d/b/a VOLVO PARTS NORTH AMERICA,  )
                                       )
        Defendant.      )

## MEMORANDUM OPINION AND ORDER

Plaintiff LuzMaria Arroyo sued Defendant Volvo Group North America, LLC, d/b/a Volvo Parts North America ("Volvo") for discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 *et seq.* ("USERRA"). On August 23, 2016, a jury returned a verdict in favor of Plaintiff, awarding $2.6 million in compensatory damages and $5.2 million in punitive damages on Plaintiff's ADA claim. The jury also found Defendant liable for willfully violating USERRA when it terminated Plaintiff's employment. Now before the Court is Plaintiff's request for equitable relief [167].

For the reasons set forth below, Plaintiff's request [167] is granted in part and denied in part. Upon review of the parties' presentation at trial and the parties' post-trial briefing, the Court awards Plaintiff $141,388.53 in back pay, $84,131.92 in front pay, $41,348.61 in other employment-related compensation, $8,546.10 in prejudgment interest, and $275,415.16 in liquidated damages. Pursuant to 42 U.S.C. § 1981a(b)(3), the Court also reduces the jury's $2.6 million compensatory damages award to $300,000 and vacates the jury's $5.2 million punitive damages award. All other forms of equitable relief are denied. With these matters decided, final

judgment will be entered in favor of Plaintiff. The parties will have until August 10, 2017 to file any motions pursuant to Federal Rules of Civil Procedure 50 and 59, responses are due September 7, 2017, and replies are due September 21, 2017.

## I. Background

Plaintiff LuzMaria Arroyo worked as a material handler for Defendant at its Chicago Parts Distribution Center in Joliet, Illinois from June 13, 2005, until she was fired on November 8, 2011. Plaintiff was a member of the U.S. Army Reserve, and Volvo hired her with that knowledge. Plaintiff received more than 900 days of military leave over six and half years of employment at Volvo. Plaintiff was treated for service-related post-traumatic stress disorder in December 2010 and formally diagnosed in January 2011. After her termination, Plaintiff filed a lawsuit against Defendant under the ADA and USERRA, alleging that she was discriminated against because of her military service and her PTSD. Plaintiff sought compensatory and punitive damages as well as equitable relief in the form of back pay, front pay, prejudgment interest, reemployment, benefit reinstatement, notification to the Office of Federal Contracting Compliance Program ("OFCCP") of Defendant's violations, and tax compensation. The Court bifurcated the trial such that Phase I would be a jury trial covering liability on Plaintiff's ADA and USERRA claims, damages on Plaintiff's ADA claim, and a finding of whether Defendant's USERRA violation was willful. In Phase II, the Court would decide any equitable relief.

On August 23, 2016, following a seven-day jury trial, the jury returned a verdict for Plaintiff on all counts. Under Section I, titled "Liability for Plaintiff's ADA Discrimination Claim," the jury marked the box for Plaintiff. [161, at 1.] Section II is titled, "Damages for Plaintiff's ADA Discrimination Claim." *Id.* at 2. Part A of this section is titled "Compensatory Damages," and the jury awarded $2.6 million. *Id.* Part B of this section is titled "Punitive

Damages," and the jury awarded $5.2 million. *Id.* In total, the jury awarded $7.8 million on Plaintiff's ADA claim. Section III is titled, "Liability for Plaintiff's USERRA Discrimination Claim." *Id.* at 3. The jury found that Plaintiff proved that her military service was the motivating factor that prompted Defendant to terminate her, Defendant failed to prove that it would have terminated her even if it had not taken her military service into account, and that Plaintiff proved that Defendant had "willfully" violated USSERA when it terminated her employment. *Id.* Now before the Court are Plaintiff's requests for equitable relief.

## II.    Legal Standard

If an employer has been found to have intentionally engaged in an unlawful employment practice, a district court may order back pay, reinstatement, and "any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g)(1). Back pay "represents the wages the plaintiff would have earned had she not been fired between the time of the firing and the date of judgment." *Gracia v. Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1255 (N.D. Ill. 2015) (citing Seventh Circuit Pattern Civil Jury Instruction 3.11). If reinstatement is not appropriate, a court can award front pay in lieu of reinstatement. *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001); accord *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 614 (7th Cir. 2002). "Front pay represents the wages the plaintiff would have earned had she not been fired measured from the date of the judgment to some reasonable point in the future." *Gracia*, 130 F. Supp. 3d at 1255. "Back pay and front pay are not considered 'compensatory damages' under Section 1981a, and thus are not subject to any statutory caps or limitations." *Parker v. Madison Cty. Reg'l Office of Educ.*, 2013 WL 4600625, at *1 (S.D. Ill. Aug. 29, 2013); accord *Pollard*, 532 U.S. at 848. Moreover, "the granting of prejudgment interest is left to the sound discretion of the district court." *United States v. Bd. of Educ. of Consol. High Sch. Dist. 230, Palos Hills, Ill.*, 983 F.2d 790, 799 (7th Cir. 1993). "The court has broad discretion under 42 U.S.C.

§ 2000e–5(g) to craft equitable relief necessary to make [a prevailing plaintiff] whole." *Pickett v. Sheridan Health Care Ctr.*, 2009 WL 2407736, at *6 (N.D. Ill. Aug. 4, 2009).

## III. Analysis

Before discussing Plaintiff's entitlement to equitable relief, both parties put the jury's verdict on Plaintiff's ADA claim front and center. The Court addresses that issue first.

### A. Jury's ADA Compensatory and Punitive Damages Award

ADA claims are subject to the statutory damages caps of 42 U.S.C. § 1981a(b)(3). See *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 831 (7th Cir. 2013) (applying Section 1981a(b)(3) to ADA claims). Section 1981a(b)(3)(D) provides that "[t]he sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed * * * in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000." Backpay, interest on backpay, and front pay are excluded from the definition of "compensatory damages." 42 U.S.C. § 1981a(b)(2). Because Volvo has more than 500 employees [170, at 5], this statutory command requires the Court to reduce the jury's $7.8 million ADA award to $300,000, at most.

To avoid this result, Plaintiff advances two arguments. First, she points to the party's "Joint Statement on Division of Responsibility Between Judge and Jury" regarding Plaintiff's damages claims. [See 141.] In that Joint Statement, the parties itemized four categories of damages and whether the judge or jury had responsibility for awarding those damages: (1) "Lost wages through March 4, 2016 (Judge)"; (2) "Punitive and Liquidated damages for Volvo's intentional violation of USERRA and the ADA (Jury)"; (3) "Attorney's Fees (Judge)"; and "Case Costs to Date (Judge)." *Id.* at 1–2. Plaintiff characterizes this document as a "definitive

pretrial agreement in an action at law for damages" that "should be binding on all parties after trial." [167, at 5.] As a result, Plaintiff contends that "the parties have stipulated and agreed that the *jury* was to determine liquidated damages under USERRA if an intentional violation was found" (*id.* at 8 (emphasis added)) and Defendant "has forfeited any benefit of compensatory, punitive, or liquidated damages caps on the amounts awarded by the jury" [172, at 18–19].

Plaintiff's argument must overcome the fact that the verdict form in this case was clear. It included on one page a section for "damages for Plaintiff's ADA discrimination claim" with a subsection for "compensatory damages" and another for "punitive damages." [161, at 2.] The following page is titled "liability for Plaintiff's USERRA discrimination claim" and does not include any damages subsections. *Id.* at 3. The jury was expressly directed not to award damages on the USERRA claim [156, at 28] and there are no blank spaces where the jury could have written a damages figure. Indeed, the jury did not write in any numbers on this section of the verdict form. Thus, nothing on the verdict form or in the Court's instructions suggests that the jury awarded any damages for Plaintiff's USERRA claim.

Plaintiff essentially argues that the Court should rewrite the verdict form in light of the parties' Joint Statement to mean that the jury did award uncapped "liquidated" USERRA damages as part of its ADA award. The Court is unaware of any authority by which it could do that, and Plaintiff cites none. The Court also cannot see how Defendant forfeited the statutory caps based on the Joint Statement. The parties never expressly waived Section 1981a(b)(3)'s damages caps (assuming that parties could consent to that) and Plaintiff offers no basis to think that the parties agreed to that result *sub silentio*. In fact, were the Court to agree with Plaintiff that this "binding" Joint Statement modifies the jury's verdict, the Court would be required to eliminate the $2.6 million compensatory damages award entirely because the Joint Statement

only says the jury would decide "Punitive and Liquidated damages." [141.] In reality, the Joint Statement memorializes the fact that the jury would decide compensatory and punitive damages for Plaintiff's ADA claim (as is ordinarily true) and the factual issues required for imposition of "liquidated" damages under 38 U.S.C. § 4323(d)(1)(C) (*i.e.*, whether Defendant's violation of USERRA was "willful"). See *DeLee v. City of Plymouth, Ind.*, 773 F.3d 172, 174 n.1 (7th Cir. 2014) ("A plaintiff is entitled to a jury trial on a liquidated damages claim under USERRA," meaning that it will up to the jury to decide wither a defendant's violation of USERRA was "willful."). That is exactly how the issues were presented to the jury here.

Second, Plaintiff invokes *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495 (7th Cir. 2000), and argues that the questions presented to the jury regarding compensatory damages were ambiguous and the "jury was not instructed that they were only being asked to render a verdict on the value of discrimination that [she] experienced under the ADA." [167, at 7; 172, at 9–10, 18–19.] In *Pals*, the jury was provided a general verdict form and asked to determine "compensatory damages" under the ADA without specifying whether the jury would also determine "back and front pay." 220 F.3d at 499–500. The Seventh Circuit held that "[n]either back nor front pay counts against a maximum award of compensatory damages under § 1981a(b)(3)." *Id.* at 499. Because the jury in *Pals* "did not separate compensatory damages *under* § 1981a from other monetary relief [such as front or back pay], it is impossible to know whether the verdict includes more than $100,000 in" the specific types of compensatory damages capped by Section 1981a(b)(3). *Id.* at 500. The Seventh Circuit explained that defendant could have raised this issue regarding the jury instructions or verdict form but failed to do so, which meant it had "forfeited any benefit of § 1981a(b)(3)(B)." *Id.*. The Seventh Circuit further noted that although issues of front and back pay under the ADA were equitable issues, the parties could

6

consent to have a jury decide back and front pay and had impliedly done so in this case. *Id.* at

501.

Unlike *Pals*, the jury in this case received the following compensatory damages

instruction on Plaintiff's ADA claim:

> In calculating damages, you should <u>not</u> consider the issue of lost wages and
> benefits. The court will calculate and determine any damages for past or future
> lost wages and benefits. You should consider the following types of
> compensatory damages, and no others:
>
>> 1. The physical, mental, and emotional pain and suffering that
>> Plaintiff LuzMaria Arroyo has experienced. No evidence of the
>> dollar value of physical, mental, or emotional pain and suffering
>> has been or needs to be introduced. There is no exact standard for
>> setting the damages to be awarded on account of pain and
>> suffering. You are to determine an amount that will fairly
>> compensate Plaintiff LuzMaria Arroyo for the injury she has
>> sustained.
>
>> 2. The reasonable value of medical care that Plaintiff LuzMaria
>> Arroyo reasonably needed and actually received.

[156, at 22.] The jury received a separate instruction about how to calculate punitive damages.

See *id.* at 23–24. Consistent with the requirements of 42 U.S.C. § 1981a(c)(2), the Court did not

inform the jury of the statutory damages caps. The jury was also instructed

> If you find that Plaintiff LuzMaria Arroyo has proved her USERRA
> discrimination claim against Defendant Volvo Trucks, you will *not* consider the
> question of damages as to that claim. Damages for violations of USERRA are
> determined by the Court. Your only job with respect to Plaintiff's USERRA
> discrimination claim is to determine the issue of liability.

[156, at 28.]

Nothing about these instructions suggests that (1) the jury should have been confused

about whether they were calculating back pay or front pay as part of a compensatory damages

award under the ADA; (2) it is ambiguous whether the jury thought that were awarding damages

under USERRA and the ADA; or (3) the statutory caps under ADA no longer applied to this

case. The instructions removed front and back pay from the jury's compensatory damages consideration and distinguished who was responsible for awarding damages for Plaintiff's ADA and USERRA claims. *Pals* cannot be relied upon to avoid Section 1981a(b)(3)(B)'s statutory damages caps for Plaintiff's ADA claim, and the jury's compensatory and punitive damages award here must be reduced to no greater than $300,000 total.

Section 1981a(b)(3) "contains no command as to how a district court is to conform a jury award to the statutory cap." *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 441 (7th Cir. 1997). The Seventh Circuit has "upheld a decision that took the entire cut out of the award of punitive damages and another that took the entire cut out of the award of compensatory damages." *Lust v. Sealy, Inc.*, 383 F.3d 580, 589 (7th Cir. 2004). It has also noted that "in a normal suit punitive damages are something added on by the jury after it determines the plaintiff's compensatory damages," so it is "probably the sensible thing for the judge * * * not to make a pro rata reduction * * * but instead to determine the maximum reasonable award of compensatory damages, subtract that from $300,000, and denote the difference punitive damages." *Id.* Compensation is the primary purpose of Section 1981(a)'s remedies, and "[t]he more common approach is to take the entire cut from punitive damages." *Alford v. Aaron's Rents, Inc.*, 2011 WL 2669626, at *1 (S.D. Ill. July 7, 2011); accord *Tart v. Elementis Pigments, Inc.*, 191 F. Supp. 2d 1019, 1024 (S.D. Ill. 2001); *Williams v. Pharmacia Opthalmics, Inc.*, 926 F. Supp. 791, 794 (N.D. Ind. 1996).

Here, the jury found that Plaintiff required a significant damages award to compensate her for Defendant's ADA violations. Consistent with that judgment, the Court will first apply the jury's compensatory award toward the statutory cap. That award exhausts the entire

$300,000 limit, leaving no room for additional punitive damages under the ADA.[1]  The Court, therefore, reduces the $2.6 million compensatory damages award to $300,000 and vacates the jury's $5.2 million punitive damages award.[2]

## B.      Back Pay

Employees who prove employment discrimination are presumptively entitled to back pay.  See *David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003); *Gracia*, 130 F. Supp. 3d at 1256.  The prevailing plaintiff bears the initial burden of establishing the amount of back pay, and then the burden "shifts to the defendant to show that the plaintiff failed to mitigate damages or that damages were in fact less than the plaintiff asserts." *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994); see also *Taylor v. Philips Indus., Inc.*, 593 F.2d 783, 787 (7th Cir. 1979) ("Not until the plaintiff establishes what she contends are her damages does the burden of going forward to rebut the damage claim or to show plaintiff's failure to mitigate damages, fall on defendant.").   "When assessing back pay, or awarding front pay in lieu of reinstatement, the judge must respect the findings implied by the jury's verdict." *Pals*, 220 F.3d at 501.  "But whatever discretion the facts allow with respect to back pay and front pay belongs to the judge rather than the jury." *Id.*

### 1.      Plaintiff's Burden

Plaintiff was terminated from Volvo on November 8, 2011, and the jury returned its verdict on August 23, 2016.  The relevant question is what Plaintiff would have earned in this more than four year period between November 8, 2011, and August 23, 2016, had she remained

---

[1] The jury's retributive and deterrent objectives in awarding punitive damages will be accomplished, at least in part, through the liquidated damages award under USERRA.

[2] Defendant indicates that it plans to file motions under Federal Rules of Civil Procedure ("Rule") 50 and 59, on whether Plaintiff presented any evidence of compensatory damages at trial.  [See 170, at 4–7.]  The Court expresses no opinion on that claim and nothing in this opinion should be construed as foreclosing Defendant from arguing that additional reductions in Plaintiff's ADA award are required.

employed by Volvo. [172, at 25.] Plaintiff's opening brief omits any discussion of her back pay calculations. While she attaches a document that includes various calculations [167-1], she provides very little explanation of those figures and no supporting evidence. Based on documents and amounts corroborated by Defendant [1701-1] and supplemented by Plaintiff on reply, Plaintiff's proposed estimated lost earnings are represented in the following chart:

| Year | Base Pay | Shift Differential[3] | Overtime Hours[4] | Overtime Rate[5] | Overtime Pay | Total Pay |
|------|----------|----------------------|-------------------|------------------|--------------|-----------|
| 2011 | $56,014.40 | $5,601.44 | 390 | $40.40 | $15,756.00 | $77,371.84 |
| 2012 | $57,699.20 | $5,769.92 | 0 | $41.61 | $0.00 | $63,469.12 |
| 2013 | $59,425.60 | $5,942.56 | 0 | $42.86 | $0.00 | $65,368.16 |
| 2014 | $61,193.60 | $6,119.36 | 0 | $44.13 | $0.00 | $67,312.96 |
| 2015 | $63,044.80 | $6,304.48 | 858 | $45.47 | $39,013.26 | $108,362.54 |
| 2016 | $64,937.60 | $6,493.76 | 819 | $46.83 | $38,353.77 | $109,785.13 |
| **Total** | $362,315.20 | $36,231.52 | 2,067 | N/A | $93,123.03 | $491,669.75 |

There are two obvious problems with these estimates. First, Plaintiff does not prorate her pay for 2011 or 2016 notwithstanding the fact that she worked until November 2011 and could only receive back pay through August 23, 2016.[6] Second, Plaintiff offers no support for her projected overtime hours beyond saying that "she never refused overtime pay opportunities whenever offered and, in fact, actively pursued those overtime opportunities" [172, at 31], which is evidenced by an email in which she claims to have been "denied the ability to perform Saturday overtime as offered to all employees" [172-24]. Plaintiff worked fewer than 20 overtime hours most years, and the most that she ever worked was about 78 hours in 2005. [170,

---

[3] This figure represents 10% of Defendant's annual pay. [167-1, at 3; 170-1.]

[4] Plaintiff states that Defendant failed to produce overtime information for 2012 through 2014, although Plaintiff identifies no explanation for the figures from 2011, 2015, or 2016. [167-1, at 3.]

[5] This figure represents each year's hourly rate multiplied by 1.5. [167-1, at 3; 170-1.]

[6] In her offset calculations described below, Plaintiff deducts her $40,803.04 in net pay from her 2011 earnings. [167-1, at 4; 172-23, at 2.] However, she uses her gross pay for estimating her base pay amount. To simplify matters and avoid improperly inflating her back pay, the Court simply prorates her base pay for the seven weeks of 2011 after she was terminated.

at 12–13.] She offers no evidence that she would have worked eleven times that amount in 2015. Moreover, for the first 10 months of 2011, Plaintiff worked fewer than 75 hours of overtime. *Id.* at 13. If Plaintiff has a reason that she would have worked an additional 315 overtime hours in the next seven weeks to reach a yearly total of 390, she does not disclose it.

Plaintiff worked on average 34.7 hours of overtime per year in her seven years of employment with Volvo. *Id.* Based on this information, the Court sets Plaintiff's overtime hours at this average for the relevant back pay time period. Plaintiff's estimated lost earnings must be revised as follows:

| Year | Base Pay | Shift Differential | Overtime Hours | Overtime Rate | Overtime Pay | Total Pay |
|---|---|---|---|---|---|---|
| 2011 | $7,540.40 | $754.04 | 0[7] | $40.40 | $0.00 | $8,294.44 |
| 2012 | $57,699.20 | $5,769.92 | 34.7 | $41.61 | $1,443.87 | $64,912.99 |
| 2013 | $59,425.60 | $5,942.56 | 34.7 | $42.86 | $1,487.24 | $66,855.40 |
| 2014 | $61,193.60 | $6,119.36 | 34.7 | $44.13 | $1,531.31 | $68,844.27 |
| 2015 | $63,044.80 | $6,304.48 | 34.7 | $45.47 | $1,577.81 | $70,927.09 |
| 2016[8] | $41,696.43 | $4,169.64 | 22.3 | $46.83 | $1,043.41 | $46,909.48 |
| **Total** | $290,600.03 | $29,060.00 | 161.1 | N/A | $7,083.64 | $326,743.67 |

The next issue for Plaintiff is how much these amounts must be offset by her other sources of income between 2011 and 2016. See 42 U.S.C. § 2000e-5(g)(1) ("Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."). In May 2012, Plaintiff began her employment with Schneider Trucks as a Team Over the Road Driver, which involves driving distances greater than 500 miles in teams. [170-7, at 6.] That employment ended in May 2014. [174, at 2.] Plaintiff then started work for Bear Cartage & Intermodal, Inc. within that same month (*id.*), but was terminated on May 20, 2015 [170-2]. Plaintiff also received unemployment

---

[7] Plaintiff worked 74.89 hours of overtime in 2011, which is close the maximum amount she ever worked and more than double her average. Plaintiff fails to satisfy her burden to show that she would have worked any more overtime in the remainder of 2011.

[8] These amounts are prorated for the 64.21 percent of 2016 that Plaintiff would have worked at Volvo.

benefits in 2012, 2013 and 2014, and she deducts these amounts from her own calculations. See *Smith v. Farmstand*, 2016 WL 5912886, at *22 (N.D. Ill. Oct. 11, 2016) ("Whether to deduct unemployment compensation from an award of back pay is within the discretion of the trial court."). In 2016, Plaintiff was hired by the Department of Veterans Affairs at the Edward Hines, Jr. VA Hospital [174-1, at 14]. Plaintiff's sources of income between 2011 and 2016 are reflected in the following chart:

| Year | Unemployment | Schneider | Bear | VA | Total Other Compensation |
|------|-------------|-----------|------|-----|--------------------------|
| 2011 | $0.00 | $0.00 | $0.00 | $0.00 | $0 |
| 2012 | $11,748.00 | $10,782.84 | $0.00 | $0.00 | $22,530.84 |
| 2013 | $257.00 | $15,264.80 | $0.00 | $0.00 | $15,521.80 |
| 2014 | $0.00 | $10,443.18 | $29,001.63 | $0.00 | $39,444.81 |
| 2015 | $9,931.00 | $0.00 | $13,187.95 | $6,930.00[9] | $30,048.95 |
| 2016 | $0.00 | $0.00 | $0.00 | $20,522.00[10] | $20,522.00 |
| **Total** | $21,936.00 | $36,490.82 | $42,189.58 | $27,452.00 | $128,068.40 |

Taking these charts and totals together, Plaintiff's initially showing is that she is entitled to $198,675.27 in back pay.[11]

## 2. Failure to Mitigate

Generally, "a discharged employee must mitigate damages by using reasonable diligence in finding other suitable employment." *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1202 (7th Cir. 1989) (internal quotation marks and emphasis omitted). Because Section 2000e–5(g)(1) requires subtracting amounts "earnable with reasonable diligence" from any back pay award, a plaintiff "cannot just leave the labor force after being wrongfully discharged in the hope of

---

[9] Plaintiff's resume states that she was receiving VA benefits from August 2015 through January 2016 at $8.25 per hour for 40 hours a week [174-1, at 23]. Plaintiff's calculations [167-1] omit these payments.

[10] Plaintiff originally deducted $28,683.20 from her backpay calculations [167-1, at 4], but her 2016 W-2s show that she earned $31,960.75 in 2016 [174-1, at 1]. The Court has prorated that amount for 2016.

[11] Plaintiff seeks an additional $48,865.30 in "Army pay" related to her weekend drills for 2011 through 2016. [167-1, at 4.] She never discusses this request in her briefs and fails to justify it with any evidence or law suggesting that Defendant bears responsibility for this pay. Her request for Army pay is denied.

someday being made whole by a judgment." *Hutchison*, 42 F.3d at 1044. Likewise, a lack of job-seeking success will not excuse a plaintiff from the duty to mitigate. See *Payne v. Security Savings & Loan Assoc.*, 924 F.2d 109, 111 (7th Cir. 1991). Although the duty to mitigate falls on the plaintiff, see *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982), it is the employer's burden to establish that the plaintiff failed to mitigate her damages, see *Hutchison*, 42 F.3d at 1044. "To establish the affirmative defense of a plaintiff's failure to mitigate damages, the defendant [ ] must show that: (1) the plaintiff failed to exercise reasonable diligence to mitigate her damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence." *Hutchison*, 42 F.3d at 1044 (citation omitted); see also *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1234 (7th Cir. 1986). Defendant argues that Plaintiff's back pay calculations should be reduced for three reasons.

First, Defendant contends that Plaintiff's back pay cut-off is May 2015—the date that she was terminated from Bear Cartage. According to Plaintiff's termination letter, Bear Cartage ended her employment because she "failed to report to work and ha[d] not answered or returned [its] phone calls," which left Bear Cartage "no choice but to assume [she] no longer want[s] to work." [170-2.] Plaintiff does not dispute that account, admitting that this job was "too physically demanding" and required her to "seek therapy." [172, at 27.] Plaintiff then applied for work at Hines as part of the Department of Veterans Affairs' Compensated Work Therapy ("CWT") program. As described by the Social Security Administration, the VA "administers the * * * CWT program[] that provide[s] therapeutic and rehabilitative services to eligible veterans with mental illness who are unable to work and support themselves." Soc. Sec. Admin. Program Operations Manual Sys. SI 00830.311, https://secure.ssa.gov/apps10/poms.nsf/lnx/0500830311 (last visited July 13, 2017). Plaintiff agrees that CWT "is specifically designed for employees

who were unable to function in the customary job market." [172, at 27.] She also describes CWT as a program that helps former service members "iron out the 'issues' that keep them from being productive members of society." [170-4, at 3.] Plaintiff states that she is "presently employed in Environmental Management Services as a House Keeping Aide at" Hines. [172, at 27; 174 at 2; 174-1, at 14.] Based on this work history, Defendant argues that "this Court should not consider any time period after [Plaintiff] left the job market in May 2015" for purposes of calculating backpay. [170, at 11.]

Plaintiff responds that she "did not voluntarily abandon jobs or voluntarily remove herself from the workforce." [172, at 27.] In light of her Bear Cartage termination letter and her enrollment in the CWT program, that assertion is insufficient. See, *e.g.*, *Flowers v. Komatsu Min. Sys., Inc.*, 165 F.3d 554, 557 (7th Cir. 1999) ("[W]e find that to award back pay to Flowers for the entire period from his termination to the trial was an abuse of discretion. Clearly, there are times when Flowers could not work, with or without an accommodation."). Both of those events indicate that Plaintiff either did not want (or was incapable of continuing) to work as a material handler. Plaintiff attempts to support her claim that she did not stop looking for similar work by attaching "a list of the various places where [she] sought gainful employment after her termination from Volvo" (*id.* at 26). [See 172-20.] That "list" is a collection of job seeking correspondence that Plaintiff sent. It also includes a list of companies to which it was recommended that she apply. *Id.* at 6. None of this correspondence post-dates May 2015, and thus does not show that Plaintiff was looking for comparable work after this date. *Payne*, 924 F.2d at 111 (affirming reduction in backpay after plaintiff's "job search had slowed to a trickle").

Plaintiff's transition from working as a housekeeping aide at Hines through the CWT program to working as a housekeeping aide at Hines as a VA employee does not alter this conclusion. In July 2015, Plaintiff described why she entered the CWT program:

> in my case, i can do ANY job. but i have no clue what job i WANT to do. where would i find my purpose and passion and thus be happy the job that i am doing? i chose truck driving as a knee jerk reaction and it served its purpose well at that time. i was able to earn a living, run away from people and my problems and just focus on working, my lawsuit, what did i want in my life and so on. but i am now at a different level in my development and thus need a different type of job and living environment. this therapy is helping me to figure all that out. how to balance work/money, with spending time with friends/family/self care, all while finding the job in what I am doing/instead of fighting for everything * * *.

[170-4, at 3.] Plaintiff's decision to pursue full-time employment as a housekeeping aide at Hines at the conclusion of her CWT program is consistent with the sentiment that she wanted a "different type of job" than a truck driver. Plaintiff does not suggest that she looked for any other job when her CWT enrollment ended or describe her job seeking efforts, if any. In short, her decision to pursue full-time housekeeping work at Hines reinforces the conclusion that she was not diligently searching for jobs similar to her old material handler job in 2016. See, *e.g.*, *Hutton v. Sally Beauty Co.*, 2004 WL 2397606, at *4 (S.D. Ind. Oct. 22, 2004) (Plaintiff "has introduced no evidence in support of a good faith effort to secure *comparable* employment.").

Plaintiff contends that she simply could not find "comparable employment," which is defined as a position that affords the prevailing party "virtually identical promotional opportunities, compensation, job responsibilities, working conditions and status as the position from which she was discharged." *Hutchison*, 42 F.3d at 1044. Specifically, Plaintiff contends that "comparable $90,000 jobs are not readily available to [Plaintiff] in the Chicagoland community without a college degree." [172, at 28.] Plaintiff's briefs never articulate how she arrived at the $90,000 figure, which is significantly higher than Plaintiff's own backpay calculations (excluding overtime) for every year between 2011 and 2016 [167-1]. In response to

the Court's supplemental order requesting that Plaintiff substantiate that figure [173], Plaintiff submitted earnings statements from other self-described "comparator" employees who work at Volvo [174, at 3]. Even putting aside that Plaintiff never explained how she is similarly situated to those employees, none of these comparators earned $90,000 for *any* year between 2011 and 2016 [174-1, at 35–50]. Plaintiff's contention that the only comparable job for her is one that provides a $90,000 annual salary is not based in fact.

Based on the evidence in the record and evidence readily available to the Court, see Fed. R. Evid. 201, the Court concludes that there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence. Defendants offer evidence from a job search website showing fulltime material handler jobs within 25 miles of Joliet result in 809 hits, and submit job postings for fifteen of these positions. [175, at 2; 175-1.] Plaintiff does not explain why, for example, the jobs that she took at Schneider Trucks or Bear Cartage, the other jobs for which she applied [170-20, at 18], or any of the other jobs for which it was recommended that she apply (*id.* at 6) were not comparable employment.[12] Furthermore, Plaintiff does not offer any evidence to support her claim about the kind of jobs that are readily available in Chicago for someone of her education and skill level. These unsubstantiated arguments are insufficient to defeat Defendant's affirmative defense.

Plaintiff separately argues that her backpay award should not be reduced after 2015 because she "enrolled at Lewis University in Romeoville, Illinois" to secure a college degree "to increase her chances of securing a $90,000 job." [172, at 28–29.] She also "reports that she has not had very much success in college the past 2 semesters and fears that she might not be able to finish her college degree." *Id.* at 29. It is not clear when exactly Plaintiff enrolled in school

---

[12] The website for at least one of those jobs, Roehl Transport, Inc., states that drivers make "$50,000 - $82,500 a year." See https://www.roehl.jobs/ (last visited July 13, 2017). Those amounts are in line with the wages earned by most of Plaintiff's self-selected "comparators" for most years. [174-1, at 35–50.]

(despite the Court's request that she provide this information [173]) and Plaintiff does not elaborate further on her decision to go to college. However, the Seventh Circuit has affirmed a district court's order concluding that a plaintiff was entitled to back pay while attending school. *Hanna v. Am. Motors Corp.*, 724 F.2d 1300 (7th Cir. 1984). In *Hanna*, the plaintiff was unemployed when he enrolled in school, which he did not attend to "reap greater future earnings" but because he "didn't have a job * * * and it was a means of getting some money" in the form of veterans' benefits that he received for enrolling. *Id.* at 1308; see also *Dailey v. Societe Generale*, 108 F.3d 451, 457 (2d Cir. 1997) ("We believe that a fact-finder may, under certain circumstances, conclude that 'one who chooses to attend school only when diligent efforts to find work prove fruitless,' satisfies his or her duty to mitigate." (citations omitted)); *Miller v. AT&T Corp.*, 250 F.3d 820, 839 (4th Cir. 2001) ("[T]he central question a court must consider when deciding whether a student-claimant has mitigated [his] damages is whether an individual's furtherance of [his] education is inconsistent with [his] responsibility to use reasonable diligence in finding other suitable employment." (citation omitted)).

Unlike in *Hanna*, Plaintiff states that she enrolled in college "to increase her chances of" earning a higher salary. [172, at 28–29.] Her major is listed as "Human Resource Management, Psychology" and most of the courses she has taken to date involve accounting, management, and economics. [174-1, at 33; 174, Ex. 12.] Moreover, she told medical counselors at the VA that she "would like to return to school in order to pursue a degree in law." [170-3, at 11.] This evidence stands in contrast to the plaintiff in *Hanna*, who testified that "that while attending [college] he applied for and was at all times ready, willing, and available to accept employment comparable to that of [defendant]." *Id.* at 1308. Plaintiff does not offer any representation of the sort, including whether her commitment to college would have precluded her from accepting

employment equivalent to her material handling job at Volvo. See *Miller v. Marsh*, 766 F.2d 490, 492 (11th Cir. 1985) (Plaintiff's "time commitment as a first-year law student would necessarily preclude her from accepting employment equivalent to her former position."). The more likely conclusion is Plaintiff enrolled in college to "reap greater future earnings" and "an award of lost wages for the period in which one attends school, and thereby curtails [her] present earning capacity in order to reap greater future earnings, constitutes a double benefit." *Id.* Accordingly, Plaintiff's actions show that that she effectively stopped looking for comparable work as of May 2015, and any backpay must be prorated to the first 21 weeks of 2015.

Second, Defendant contends that Plaintiff's back pay award must be further offset because she received GI Bill benefits while working at Schneider Trucks. [170, at 14.] Plaintiff acknowledges that she received GI Bill benefits [167, at 17] and does not otherwise dispute that these benefits should offset her backpay award. However, despite the Court's supplemental order directing Plaintiff to file evidence showing "the amount of GI Benefits that Plaintiff received from 2011 through 2016" [173], she did not provide any such information.[13] Because Plaintiff has repeatedly failed to submit this evidence and it would be inequitable for Plaintiff to receive a backpay award that does not deduct job-training VA benefits, the Court will estimate these benefits for Plaintiff.

The GI bill offers apprenticeship and on-the-job-training benefits of 100 percent of the service member's monthly housing allowance for the first six months of the job, decreasing by 20 percent every six months thereafter, and a $1,000 books and supplies stipend. See

---

[13] Instead, Plaintiff filed documentation of her disability rating [174-1, at 3–5]; a letter summarizing her disability status and entitlement to VA benefits in June 2017 (*id.* at 9); a form showing the amount of her VA employer-provided healthcare for 2016 (that is, an employment benefit provided by virtue of her work at Hines) (*id.* at 10), and her civilian leave and earnings statement from June 2017 (*id.* at 13). None of this information provides any insight into the dollar amount of the GI benefits that Plaintiff received between 2011 and 2016.

http://www.benefits.va.gov/gibill/resources/benefits_resources/rates/ch33/Ch33rates080112.asp#MHA (last visited July 13, 2017). Because the monthly housing benefit in Hickory Hills, Illinois is $1,956 and Plaintiff was with Schneider for roughly two years, the Court estimates that Plaintiff received total $5,476.80 in undisclosed GI benefits, which is deduced from Plaintiff's back pay award.

Third, Defendant argues that Plaintiff "was not working full time at all times during her employment," and her backpay award should be reduced even further. [170, at 14.] Defendant's claim is based on the fact that Plaintiff earned less than the wages advertised on Schneider Trucks' website [170, at 15–16] and her VA medical progress notes refer to the fact that she missed three weeks of work due to a suspended license, had ongoing reserve duty obligations, and had "asked for more limited hours" at Bear Cartage after she experienced some increased depression (*id.*; 170-3, at 8). The Court is not persuaded by these arguments. The fact that Plaintiff earned less than Schneider's advertised wages does not show that she was not trying hard enough to be fully employed. Nor does the fact that Plaintiff had ongoing reservist obligations mean that she was not exercising "reasonable diligence" in seeking to maintain sufficient earnings from Schneider—a finding that would be difficult to square with the jury's verdict in this case. *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 790 F. Supp. 2d 708, 722 (N.D. Ill. 2011) ("[T]he Court must take care not to contradict factual determinations that the jury impliedly made."). Defendant does not explain how the Court could quantify the impact of Plaintiff's vague request to scale back her hours at Bear Cartage, even assuming that this request was ever honored. Thus, Defendant fails to sustain its burden to show that Plaintiff failed to mitigate her damages by working with sufficient diligence in her post-Volvo employment.

In short, the Court concludes that Defendant has successfully established, in part, that Plaintiff failed to mitigate her damages. Taking all of this information together and as represented in the chart below, Plaintiff's total back pay award is $141,388.53.

| Year | Base Pay | Shift Differential | Overtime Hours | Overtime Pay | Total Other Compensation | Total Pay |
|------|----------|--------------------|----------------|--------------|--------------------------|-----------|
| 2011 | $7,540.40 | $754.04 | 0 | $0.00 | $0.00 | $8,294.44 |
| 2012 | $57,699.20 | $5,769.92 | 34.7 | $1,443.87 | -$22,530.84 | $42,382.15 |
| 2013 | $59,425.60 | $5,942.56 | 34.7 | $1,487.24 | -$15,521.80 | $51,333.60 |
| 2014 | $61,193.60 | $6,119.36 | 34.7 | $1,531.31 | -$39,444.81 | $29,399.46 |
| 2015 | $25,460.40 | $2,546.04 | 14.1 | $637.19 | -$13,187.95[14] | $15,455.68 |
| **Total** | $211,319.20 | $21,131.92 | 118.2 | $5,099.61 | -$96,162.20[15] | $141,388.53 |

### 3. Pre-Judgment Interest

Plaintiff requests prejudgment interest as part of her back pay award. Prejudgment interest is presumptively available. See *Shott v. Rush–Presbyterian–St. Luke's Med. Ctr.*, 338 F.3d 736, 745 (7th Cir. 2003). However, "the decision whether or not to award such interest is within the discretion of the trial court." *Taylor*, 593 F.2d at 787. The decision "turns upon whether the amount of damages is easily ascertainable." *E.E.O.C. v. Gurnee Inn Corp.,* 914 F.2d 815, 820 (7th Cir. 1990) (quoting *Donnelly v. Yellow Freight Sys.*, 874 F.2d 402, 411 (7th Cir. 1989)). Plaintiff is entitled to prejudgment interest on her back pay award notwithstanding any other damages she receives. See, *e.g.*, *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 282 (2d Cir. 1987) ("It follows, therefore, that prejudgment interest does not provide a double recovery to victims of age discrimination who have proven their entitlement to liquidated damages as well as back pay." (citation and internal quotation marks omitted)).

When calculating prejudgment interest, courts should use the prime rate. *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002). Although Plaintiff originally urged

---

[14] Because Plaintiff effectively stopped looking for work after May 2015, the Court does not use the unemployment benefits or CWT benefits that she received after this date as an offset.

[15] This total adds in Plaintiff's estimated $5,476.80 in undisclosed GI benefits.

the Court to calculate interest quarterly [167, at 19], both sides now agree that prejudgment interest should be compounded monthly [170, at 18; 172, at 29]. The Court awards prejudgment interest on the $141,388.53 back pay award at a rate of 3.25 percent,[16] compounded monthly for the approximately 42-month period spanning from November 8, 2011 to May 20, 2015, or $8,546.10 in interest.[17]

### 4.     Other Employment Benefits

Plaintiff also seeks equitable relief for several other employment benefits, including health care benefits, 401(k) contributions, pension benefits, vacation time, bonuses, profit-sharing benefits, and stock options.[18] The Court addresses most of these benefits separately.

Plaintiff's computation of health care benefits covers her medical, dental, vision, accident death and dismemberment insurance, and long-term disability insurance. [167-1, at 5.] The parties largely agree on these calculations, although Defendant (more generously) includes basic life insurance among these benefits and (less generously) prorates these amounts for 2011 and 2015. [170-5.] Because the Court concludes that Plaintiff's back pay should be prorated and seeks to make Plaintiff whole, the Court includes the amount for basic life insurance and prorates these benefits. For owed health care benefits, the Court awards $474.75 for 2011, $5,879.49 for 2012, $6,417.93 for 2013, $6,230.54 for 2014, and $2,621.40 for 2015, or a total of $21,624.11.

---

[16] This is the average prime rate between November 2011 and May 2015. See Board of Governors, Federal Reserve System, *Data Download Program,* https://www.federalreserve.gov/datadownload/Choos e.aspx?rel=H15 (last visited July 13, 2017) (download spreadsheet for "Bank prime loan" and "monthly" and format package to include relevant dates).

[17] Defendant does not attempt to calculate prejudgment interest, and Plaintiff does not sufficiently explain how she arrived at her estimate of $157,812.83. [167-1, at 4.] The Court averages Plaintiff's total earnings of $141,388.53 over this 42 month period, which comes to $3,366.39 per month and the Court calculates the interest payment based on the earnings as they accrued.

[18] Plaintiff's calculations do not apply prejudgment interest to these other benefits. [167, at 24; 167-1.] The Court follows Plaintiff's lead and excludes these benefits from its prejudgment interest calculation.

Nevertheless, Defendant argues that this entire health care benefit award should be eliminated, however, because "upon information and belief, Plaintiff receives full medical care and treatment free of charge from the VA due to her service." [170-1, at 1 n.2.] Allegations based on information and belief are insufficient to sustain Defendant's burden at this stage. Defendant presumably has records showing whether Plaintiff received medical benefits from Volvo during her employment or whether she opted to receive her medical care from the VA. In addition, Defendant offers no evidence about the amount of these VA benefits based on Plaintiff's disability rating or whether all of these benefits (including AD&D, LTD, and Basic Life insurance) are provided at the same rate as Volvo. To the extent Defendant contends that Plaintiff had "similar benefits through Schneider" [170, at 1], it does not provide any evidence of those benefits or elaborate further. The Court declines to reduce Plaintiff's health care benefits award on these unsubstantiated arguments.

Plaintiff also seeks $61,762.00 in 401(k) contributions [167, at 24], although these calculations are difficult follow. As best the Court can tell, this total is based on taking 10 percent of her total Volvo earnings per year (base pay plus shift differential plus overtime) adding a figure that she claims is 75 percent of the first 6 percent of her contribution (representing Volvo's employer match) plus an unknown interest rate. [167-1, at 5.] Defendant acknowledges that it matches 75 percent of an employee's first 6 percent of income contributed to a 401(k) account, but argues that any additional award beyond this employer-match would be improper since Plaintiff could only have availed herself of these 401(k) benefits by contributing those amounts to her 401(k) from her annual wages. [170, at 10.] Plaintiff does not respond to that argument. The Court agrees that Plaintiff is not entitled to receive an additional 10 percent of her wages as if she was not required to contribute a portion of her earnings to a 401(k)

account.  Although Plaintiff uses the total earnings figure to calculate Volvo's 401(k) match [167-1, at 5], Volvo's program matches only base pay, excluding shift differentials, overtime, and bonuses [175, at 1].  Using Plaintiff's base pay figures, Plaintiff is entitled to $339.32 in 2011, $2,596.46 in 2012, $2,674.15 in 2013, $2,753.71 in 2014, and $1,145.72 in 2015.  Her total 401(k) employer match is $9,509.36.[19]

Plaintiff seeks $12,901.41 in pension benefits for 2011 through 2016 [167, at 24], but does not offer supporting evidence or any underlying calculations.  Defendant includes pension benefits in its backpay calculations [170, at 21–21] and breaks down this benefit by year [170-1], but arrives at a total of $13,082.69.  Neither side explains this discrepancy.  Because the Court must prorate these benefits for 2011 and 2015 too, the Court awards $181.33 in 2011, $2,307.93 in 2012, $2,377.02 in 2013, $2,447.74 in 2014, and $1,018.42 in 2015 [170-5], for a total of $8,332.44.

Plaintiff requests "vacation time, bonuses, profit sharing, and stock options" under the heading "other nonmonetary relief."  [167, at 22.]  She offers no further information about these benefits or a specific proposal for what "nonmonetary" relief the Court could award here.[20]  Defendant ignores all of these requests except profit sharing.  Defendant concedes that Plaintiff could have received $1,348.73 in 2011 and $533.97 in 2012, but no other amounts.  Because

---

[19] Defendant asks the Court to further reduce this amount based on the contention that Schneider offers a 401(k) match of up to 4% of "an employee's earnings."  [170, at 16.]  Defendant does not submit any documentation regarding this program or explain how the match is calculated (such as whether the program varies based on length of employment or whether total earnings are used for the calculation).  Because this argument is underdeveloped, the Court declines to reduce Plaintiff's 401(k) employer match.

[20] Plaintiff's opening brief notes that she is "still awaiting information" about computation of bonuses or incentives paid by Volvo between 2011 and 2016.  [167-1, at 3.]  In lieu of that information, Plaintiff could have provided historical information about bonuses and incentive that she received from Defendant.  Instead, she left that information blank.  Defendant asserts in response that "there has been no Christmas/holiday bonus program for the material handlers at the Joliet facility."  [170, at 22.]  Although neither side provides any information about whether there were bonus or incentive programs available other than the holiday bonus program, Plaintiff ignores this issue in its reply.  On this record, the Court cannot award Plaintiff any bonuses as equitable relief.

Defendant concedes that these amounts should be awarded, the Court awards $1,882.70 in profit sharing. Otherwise, the Court denies this request as unsupported.

Totaling these amounts, the Court awards $41,348.61 in equitable relief for this other employment-related compensation.

### C. Reinstatement

Plaintiff ostensibly seeks reinstatement to her old employment as a material handler at Volvo's Joliet facility. [167, at 12–13.] She also requests that the Court order Defendant to provide her with eleven accommodations. *Id.* at 13–14. Some of those accommodations relate to changes in her work schedule, including time-off for counseling "as needed," the ability to take breaks during panic attacks, and a flexible work schedule when she is tardy. *Id.* She requests both the ability to use noise damping devices and audio relaxation devices. *Id.* She asks for a place to meditate and relax before shifts, daily feedback from a supervisor, and "an assigned mentor agreeable to [her]." *Id.* at 14. Two of her requested accommodations are that the Court order "companywide" education regarding USERRA and "Disability Awareness" and specific disability awareness training for all "persons who interact with [her]."

In the alternative, Plaintiff posits that "perhaps she could be transferred to an office location to perform the work as a Human Resources Partner for Volvo" [167, at 14]—a job she has never held at Volvo and, according to Defendant, "does not exist at the Joliet facility" [170, at 19]. Plaintiff suggests the HR job "[t]o avoid the sudden load noises and banging that occur as a picker/packer" and "the deleterious effects that [her old job would] have on [her] PTSD." [167, at 14.] According to Plaintiff, "[o]bviously, hostility and disagreement has existed among [Plaintiff] and high Management, Human Resources Personnel, and Supervisors at [Volvo] for years" and "[f]rustration and hostility [have] increased" over time. *Id.* at 15–16. Because

"[r]einstatement of her employment * * * might cause difficulties in many quarters" at Volvo, Plaintiff contends that the Court could award front pay in lieu of reinstatement. *Id.* at 16–17.

"Reinstatement generally is favored over front pay." *Wescher v. Chem–Tech Int'l*, 2016 WL 7441655, at *1 (E.D. Wis. Dec. 27, 2016). Despite its "preferred" status, this "discretionary" remedy "is not always appropriate" and "should not be used where the result would be undue friction and controversy." *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1141 (7th Cir. 1994); *McKnight v. Gen. Motors Corp.*, 908 F.2d 104, 115 (7th Cir. 1990). In some circumstances, "the employer does not want the employee back" and "probably the employee does not want to be working for this employer, and hopes to be bought out." *McKnight,* 908 F.2d at 115. "Each party will want to make life as miserable as possible for the other party" and "[c]ourts do not want to involve themselves in the industrial equivalent of matrimonial squabbling * * * that may last for many years." *Id.* Courts may consider a "number of factors" in exercising their discretion, "including hostility in the employment relationship and the lack of an available position to which to reinstate the plaintiff." *Downes*, 41 F.3d at 1141.

Based on these factors, Plaintiff's reinstatement is not appropriate. First, Plaintiff readily acknowledges the extensive acrimony between her and Defendant. [167, at 16–17.] Indeed, she requests an alternative position as a Human Resources Partner notwithstanding the "hostility" between her and Volvo's HR staff. It is difficult to see how her reinstatement at Volvo would result in anything other than the Court's indefinite mediation of the parties' inevitable employment disputes. Tellingly, Plaintiff does not attempt to explain how her relationship with Volvo is reparable. It plainly is not.

Second, the number of accommodations she requests (some of which, such as the mandatory company-wide education or an assigned mentor subject to her approval, are (at best)

atypical accommodations under 42 U.S.C § 12111(9)), her proposal to be moved to HR to avoid the "deleterious effects" of her old job, her decision to enroll in college, her HR major, and her statements to VA medical counselors that she plans to pursue a law degree [170-3, at 11] all cast doubt on whether Plaintiff genuinely seeks reinstatement to her old position at Volvo. Indeed, Plaintiff does not dispute *any* of Defendant's claims that she pursues reinstatement strategically. *McKnight*, 908 F.2d at 116 ("If the employee desires reinstatement for strategic purposes, that is a valid basis for denial."). "Equity does not engage in idle gestures" and the Court will not order Plaintiff to work as a material handler at Volvo without it being unambiguously clear that she still wants this job. *Shango v. Jurich*, 681 F.2d 1091, 1105 (7th Cir. 1982).

Third, Plaintiff offers no evidence that her old job is available at the Joliet facility. See *Sheils v. Gatehouse Media, Inc.*, 2015 WL 6501203, at *11 (N.D. Ill. Oct. 27, 2015) (denying reinstatement where Plaintiff "offered no evidence that [her old] position * * * is currently available at [her former employer] or that an innocent employee would not be harmed by [plaintiff's] reinstatement"). Likewise, she provides no support for her argument that she could be assigned an HR position at Volvo. For example, she does not explain whether such a position is "equivalent in seniority, status, and pay" or the "nearest approximation" to her old job. 38 U.S.C. § 4313(a)(3). Nor does she respond to Defendant's argument that she is unqualified for this position and, in fact, no such job exists at the Joliet facility [170, at 19]. *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1370–71 (7th Cir. 1992) (affirming trial court's conclusion that reinstatement was inappropriate where plaintiff "asked for a 'completely different job and to be relocated in a new city'"). Accordingly, the Court declines to award reinstatement.

## D.    Front Pay

As a substitute for reinstatement, Plaintiff requests front pay.  As noted, front pay "represents the wages the plaintiff would have earned had she not been fired measured from the date of the judgment to some reasonable point in the future."  *Gracia*, 130 F. Supp. 3d at 1255. Said differently, front pay is "the discounted present value of the difference between the earnings an employee would have received in his old employment and the earnings he can be expected to receive in his present and future, and by hypothesis, inferior employment."  *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 953 (7th Cir. 1998) (internal alterations omitted).  The award "must be grounded in available facts, acceptable to a reasonable person and not highly speculative."  *Downes*, 41 F.3d at 1142.  Front pay awards often are limited in duration, and are awarded for "a reasonable period of time, until a date by which the plaintiff, using reasonable diligence, should have found comparable employment."  *Williams*, 137 F.3d at 954 (quotation omitted); see also *Biondo v. City of Chi.*, 382 F.3d 680, 691 (7th Cir. 2004) ("Front pay cannot extend past the time a reasonable person needs to achieve the same or an equivalent position in the absence of discrimination").  "The familiar common law duty of mitigating damages is imposed:  the employee must make a diligent search for comparable employment."  *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 771 (7th Cir. 2006).

Plaintiff proposes that she should receive a front pay award representing a $90,000 annual salary for four years—$360,000 total—because she "will not achieve the same or an equivalent position that she had prior to the termination of her employment until she acquires her college degree which, with diligence, will take 4 years."  [172, at 30.]  As discussed, this $90,000 figure is unjustifiable.  In addition, Plaintiff does not offset this award based on her Hines earnings or provide a discount rate.  *Williams*, 137 F.3d at 954 ("Giving the employee the

earnings from her old job without taking account of her earnings from her new (or expected) job would result in overcompensation."). Based on these deficiencies and the fact that Plaintiff failed to mitigate her damages by continuing to look for comparable work in connection with her backpay award, Defendant urges the Court to deny Plaintiff any front pay.

The Court chooses a middle path in light of the jury's findings. Had Plaintiff been employed at the end of 2016, she could have received $73,056.36 in compensation.[21] Based on Plaintiff's earnings history, her base salary and overtime rate increased by about 3 percent each year. The Court concludes that it "should" take roughly two years of diligent searching for Plaintiff to find and secure comparable employment.[22] See *Williams*, 137 F.3d at 954. Had Plaintiff been employed by Volvo those years, she would have received about $75,248.05[23] in 2017 and $77,505.32[24] in 2018. The Court also assumes that each year she would have earned $31,960.75—the amount she received from Hines in 2016 (and the only year for which there is any information). [174-1, at 1.] Subtracting those earnings, the Court estimates that Plaintiff would have received an additional $43,287.30 in 2017 and $45,544.57 in 2018 had she remained employed with Volvo. Using a discount rate of 3.67 (the average of the interest rates between August 2016 and the present), the Court estimates that Plaintiff should receive the present value of $41,754.90 for 2017 and $42,377.02 for 2018, or a total of $84,131.92 in front pay.

---

[21] $64,937.60 in base pay, $6,493.76 in shift differential, and $1,625 in overtime.

[22] In light of the six months between when Plaintiff applied to and started her employment with Schneider, the gaps in her resume based on CWT treatment, and the efforts needed to find comparable $70,000 a year work, the Court does not consider this relatively brief period of time *unduly* speculative. See *Mehringer v. Vill. of Bloomingdale*, 2003 WL 21506856, at *15 (N.D. Ill. June 27, 2003) ("Although [a front pay award is] speculative in nature, the longer the period of time for which a front pay award is sought, the more speculative it becomes.").

[23] $66,885.73 in base pay, $6,688.57 in shift differential, and $1,673.75 in overtime (34.7 hours at $48.23 per hour).

[24] $68,892.30 in base pay, $6,889.23 in shift differential, and $1,723.79 in overtime (34.7 hours at $49.68 per hour).

38 U.S.C. § 4323(d)(1)(B) provides that a court "may require the employer to compensate the person for any loss of wages or benefits suffered by reason of such employer's failure to comply with" USERRA.  Moreover, a court "may require the employer to pay the person an amount equal to the amount referred to in subparagraph (B) as liquidated damages, if the court determines that the employer's failure to comply with the provisions of this chapter was willful."  *Id.* § 4323(d)(1)(C).  Here, the jury found Defendant's violation of USERRA was willful [161, at 3], making a liquidated damages award pursuant to Section 4323(d)(1)(C) proper.

Plaintiff argues that "should the court determine that the full amount of punitive damages reflected in the jury's verdict ought not be sustained, [she] requests that the Court assess liquidated damages under USERRA by doubling the amount of any *equitable relief*."  [172, at 21 (emphasis added).]  Defendant argues that USERRA "does not allow for the recovery of compensatory damages" and, indeed, the Court should not award *any* liquidated damages under USERRA.  [170, at 8–9.]  Thus, neither side contends that the Court should count the jury's damages award for emotional distress and medical costs under the ADA in any liquidated damages calculation.[25]  See *Bello v. Vill. of Skokie*, 2014 WL 4344391, at *6 (N.D. Ill. Sept. 2, 2014) (USERRA "does not authorize damages for emotional distress, but it permits recovery for lost pay and benefits.").  Defendant also argues that any decision to award "both punitive damages under the ADA and liquidated damages under USERRA would be duplicative" and

---

[25] Plaintiff's opening brief argues that "the jury award of $2,600,000 for compensatory damages is not violative of USERRA in any way and accomplishes its goal of compensating a service member" for USERRA violations.  [167, at 9.]  The jury's ADA compensatory damages award was for "physical, mental, and emotional pain and suffering" and the "reasonable value of medical care" [156, at 22], whereas USERRA provides damages for "loss of wages or benefits," 38 U.S.C. § 4323(d)(1)(B).  In other words, these ADA-damages do not overlap with damages that could be awarded under USERRA.  And (as noted) the jury was instructed *not* to award USERRA damages.  Plaintiff cannot simply borrow this amount for her USERRA damages when it has nothing to do with lost wages or benefits.

result in a double recovery. Because the compensatory damages award maxes out Section 1981a(b)(3)'s statutory cap and the Court vacates the jury's punitive damages award, there is no concern (to the extent this argument has merit) regarding the possibility of Plaintiff's double recovery for punitive damages under the ADA and liquidated damages under USERRA. See *Tomao v. Abbott Labs., Inc.*, 2007 WL 2225905, at *14–15 (N.D. Ill. July 31, 2007).

Therefore, the Court awards an amount equal to Plaintiff's total equitable relief (that is, her awards for back pay, front pay, other employment benefits, and prejudgment interest) as liquidated damages under USERRA, which comes to $275,415.16. See also *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1232 (7th Cir. 1995) ("Since reinstatement and double damages are normally awarded in the same case, and front pay is a substitute for reinstatement, there is no rule against awarding both double damages and front pay in the same case.").

### F. Tax Component

Plaintiff requests that the Court fashion a tax component award to avoid the negative consequences from receiving this lump-sum damages award. [167, at 21.] As in *Smith*, Plaintiff cites *EEOC v. Northern Star Hospitality, Inc.*, 777 F.3d 898, 904 (7th Cir. 2015), where the Seventh Circuit held that district courts can issue a tax-component award to Title VII plaintiffs to compensate them for the negative consequences of receiving lump-sum back pay awards. *Smith* also explained that the Seventh Circuit cautioned "district courts to show their work if and when they adjudge similar tax-component awards in the future," which lead this district court to deny the plaintiff in *Smith* a tax award because he "provide[d] no guidance as to how the court might go about calculating an appropriate tax-component." *Smith*, 2016 WL 5912886, at *25 (internal quotation marks omitted).

Plaintiff does not do much better here.  She attaches to her brief a list of numbers that she claims represent her "employer tax liability," her "personal tax liability increase, with the increase in earnings at a regular tax rate[] (26.35%)," and her "personal tax liability increase * * * at the one-time taxation rates (40.35%)."  [167-1, at 6.]  There is no information about the formula or inputs she uses to derive these "computations."  *Id.*  She does not discuss these calculations in her opening brief and made no effort to clarify them on reply after Defendant suggested they were "utterly unclear."  [170, at 21.]  As Defendant notes, the top federal income tax bracket is 39.6 percent (*id.*), and Plaintiff does not indicate how she arrived at a "one-time taxation rate" of 40.35 percent.  The same is true for the 26.35 percent tax rate, which is not a readily identifiable tax bracket.  Moreover, Plaintiff does not discuss her current tax bracket (which would be necessary for calculating the increase from a lump-sum award), her deductions (if any), whether her "computations" reflect state and federal taxes, and which categories of damages she factors into her calculations.  Because Plaintiff does not provide the Court with anywhere close to sufficient information to calculate an appropriate tax-component award, Plaintiff's request for a tax component award is denied.

### G. Other Non-Monetary Relief

Plaintiff also seeks two forms of non-monetary equitable relief:  (1) an order enjoining Defendant "from any intentional violations of USERRA and affirmatively requiring the company to comply with all the terms of USERRA"; and (2) notice to OFCCP of the jury's verdict with the aim that Defendant's federal contractor status "should be in jeopardy now."  [167, at 22.]  Neither request is appropriate.

Plaintiff's "obey-the-law" injunction suffers from a host of problems.  First, "[a]n obey-the-law injunction departs from the traditional equitable principle that injunctions should prohibit

no more than the violation established in the litigation or similar conduct reasonably related to the violation." *AutoZone*, 707 F.3d at 841. Plaintiff's request is not tailored to any specific provisions of USERRA, types of conduct, personnel, geographic locations, or time periods. "[T]he mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if [it] shall at any time in the future commit some new violation unlike and unrelated to that with which [it] was originally charged." *N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435–36 (1941).

Second, Rule 65 requires injunctions to "state its terms specifically" and "describe in reasonable detail * * * the act or acts restrained." Fed. R. Civ. P. 65(d)(1). "An injunction simply requiring the defendant to obey the law is too vague to satisfy the specificity requirements of [Rule] 65(d)." *Shepard v. Rangel*, 2014 WL 7366662, at *20 (D. Colo. Dec. 24, 2014) (collecting cases). Plaintiff does not provide the Court with any specific language to draft an injunction—indeed, her request for this relief is limited to a single sentence [167, at 22]—and Plaintiff has not equipped this Court to fashion an injunction on its own. See *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 675 (7th Cir. 2008) ("A litigant has a feeble claim for a preliminary injunction when he can't articulate what he wants enjoined[.]"); accord *AutoZone*, 707 F.3d at 841–42 (collecting cases).

Third, while "the district court has broad statutory authority to fashion appropriate remedies, including injunctive relief, for proven violations of the anti-discrimination laws," the Court must "assess whether the proven discriminatory conduct could possibly persist in the future." *AutoZone*, 707 F.3d at 842 (citation and internal quotation marks omitted). Plaintiff offers no evidence "suggest[ing] that the proven illegal conduct may be resumed." *Id.*

Fourth, while a Court may "require the employer to comply with the provisions" of USERRA as a remedy, 38 U.S.C. § 4323, Volvo is no longer Plaintiff's "employer." Said differently, an order directing Volvo to comply with USERRA would not benefit her, raising redressability and standing concerns. See *Dees v. Hyundai Motor Mfg. Ala., LLC*, 605 F. Supp. 2d 1220, 1229 (M.D. Ala. 2009) (dismissing injunctive relief under USERRA); *Richards v. Canyon Cty.*, 2014 WL 1270665, at *4 (D. Idaho Mar. 26, 2014) (same); see also *Feit v. Ward*, 886 F.2d 848, 857 (7th Cir. 1989) ("[Plaintiff] seeks to bar the defendants from disciplining or discharging *employees* for exercising their first amendment rights. Because [plaintiff] is no longer an employee of the Forest Service, even if we were to grant the relief he requests, he would not benefit from this relief."). USERRA directs that courts should use their equity powers "to vindicate fully the rights or benefits of persons" injured under the statute. 38 U.S.C. § 4323(e). Requiring Volvo to comply with USERRA for all other employees prospectively does not accomplish this purpose. Her request to enjoin Volvo to comply with USERRA is denied.

Regarding the OFCCP notice request, Plaintiff fails to identify any court that has issued such a notice. She also does not explain how such an order makes her whole. This request appears to be little more than an attempt to exact retribution on Volvo. Defendant represents (and Plaintiff does not dispute) that OFCCP has already investigated Plaintiff and Volvo's dispute and "concluded that Volvo did not violate" the law governing federal contractor obligations with veterans. [170, at 22–22.] Neither equity nor law demands this notice.[26]

### H.    Attorney's Fees

A prevailing plaintiff under USERRA may receive "reasonable attorney fees, expert witness fees, and other litigation expenses" connected with that claim. 38 U.S.C. § 4323(h)(2).

---

[26] Plaintiff originally asked "the court to issue an injunction to Volvo, or any sub-agency, be barred from engaging in business with the United States Federal Government for not less than a period of 3 years" [1858, at 3], but that request does not appear in her briefs and the Court does not consider it.

The prevailing party in an ADA action may also receive "a reasonable attorney's fee, including litigation expenses, and costs" directly attributable to that claim. 42 U.S.C. § 12205. The parties have agreed to settle their attorney's fee dispute pursuant to Local Rule 54.3. [164, at 4.] Following resolution of any motions seeking relief under Rule 50 and 59, the Court will enter a briefing schedule on Plaintiff's request for reasonable fees and costs.

## IV.     Conclusion

For these reasons, Plaintiff's request for equitable relief [167] is granted in part and denied in part. The Court awards Plaintiff $141,388.53 in back pay, $84,131.92 in front pay, $41,348.61 in other employment-related compensation, $8,546.10 in prejudgment interest, and $275,415.16 in liquidated damages. Pursuant to 42 U.S.C. § 1981a(b)(3), the Court reduces the jury's $2.6 million compensatory damages award to $300,000 and vacates the jury's $5.2 million punitive damages award. All other forms of equitable relief are denied. Final judgment will be entered in favor of Plaintiff. The parties have until August 10, 2017 to file any Rule 50 or 59 motions, responses are due September 7, 2017, and replies are due September 21, 2017.


Dated: July 13, 2017

_____

Robert M. Dow, Jr.
United States District Judge