**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LUZMARIA ARROYO,       )
        )
       Plaintiff,      )
        )
     v.        )      Case No. 12-cv-6859
        )
VOLVO GROUP NORTH AMERICA, LLC,  )      Judge Robert M. Dow, Jr.
d/b/a VOLVO PARTS NORTH AMERICA,  )
        )
       Defendant.     )

**MEMORANDUM OPINION AND ORDER**

Plaintiff LuzMaria Arroyo sued Defendant Volvo Group North America, LLC, d/b/a Volvo Parts North America ("Volvo") for discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 *et seq.* ("USERRA"). Before the Court are (1) Defendant's motion for judgment as a matter of law, or, in the alternative, a new trial, or, in the alternative, remittitur and amendment of judgment [192] and (2) Plaintiff's motion to alter judgment [204]. For the reasons set forth below, Defendant's motion [192] is granted to the following extent: the Court will enter judgment as a matter of law in favor of Defendant on Plaintiff's ADA discrimination claim and grant a new trial on Plaintiff's USERRA claim. Defendant's remaining requests for relief are denied. In addition, the Court denies Plaintiff's motion to alter judgment [204] in its entirety as moot. This case is set for further status hearing on October 10, 2019 at 9:30 a.m.

## I.    Background

### A.    Procedural History

Plaintiff LuzMaria Arroyo worked at Defendant Volvo Group North America, LLC (d/b/a Volvo Parts North America) from June 2005 until November 2011. In Plaintiff's third amended

complaint, Plaintiff alleged discrimination, retaliation, and failure to provide reasonable accommodations under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq., and Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 et seq. ("USERRA"), along with a state law claim for intentional infliction of emotional distress.  [See 51.]  The Court granted summary judgment against Plaintiff and in favor of Defendant on all claims.  The Seventh Circuit affirmed the Court's ruling with respect to Plaintiff's claims for retaliation, failure to accommodate, intentional infliction of emotional distress, and with respect to the Court's analysis of Plaintiff's ADA discrimination claim under the now defunct "indirect method" of proof.  However, the Seventh Circuit reversed the Court's ruling with respect to Plaintiff's USERRA claim and Plaintiff's ADA discrimination claim under the "direct method" of proof.

After a trial on the merits of Plaintiff's remaining ADA and USERRA claims, a jury returned a verdict in favor of Plaintiff on both claims.  [See 161.]  The jury awarded Plaintiff $2,600,000.00 in compensatory damages and $5,200,000.00 in punitive damages on Plaintiff's ADA discrimination claim.  [*Id*. at 2.]  The jury concluded that Defendant did not prove its affirmative defense under USERRA by a preponderance of the evidence.  [*Id*. at 3.]  The jury further concluded that Defendant willfully violated the USERRA when it terminated Plaintiff's employment.  [*Id*.]  After post-trial briefing, the Court awarded Plaintiff $141,388.53 in back pay, $84,131.92 in front pay, $41,348.61 in other employment-related compensation, $8,546.10 in prejudgment interest, and $275,415.16 in liquidated damages.  [177, at 1.]  Pursuant to 42 U.S.C. § 1981a(b)(3), the applicable damages cap under the ADA, the Court also reduced the jury's $2.6 million compensatory damages award to $300,000 and vacated the jury's $5.2 million punitive

damages award. [*Id*.] The Court denied all other forms of equitable relief. [*Id*.] Defendant filed a motion for judgment as a matter of law, or, in the alternative, a new trial, or, in the alternative, remittitur and amendment of judgment [192]. Plaintiff filed a motion to alter judgment [204]. These motions currently are before the Court.

**B.    Plaintiff's Early Employment and Military Service**

The trial evidence established that Plaintiff was employed as a material handler at Defendant's facility in Joliet, Illinois from June 2005 until her employment was terminated in November 2011. When Plaintiff began her employment with Defendant, she was in the Army Reserves. [Tr. 1059.] Plaintiff informed Defendant of her status as an active reservist in the Army by noting it on her resume. [Tr. 492.] Throughout her employment, Plaintiff was subject to the facility's attendance policy (the "Attendance Policy"), which was administered by supervisors Keith Schroeder and Michael Temko. After Plaintiff was employed with Defendant for a couple months, she had a discussion with Schroeder and Human Resources Manager Celia Jarvis (who was present telephonically) about time off of work to travel to and from Fort Benning, Georgia for Plaintiff's Army Reserves duties. [Tr. 807.] During that discussion, Jarvis told Plaintiff that the extra time she needed to travel to and from Fort Benning was not authorized. [Tr. 807-08.] Plaintiff responded that the time should be authorized under USERRA. [Tr. 808.]

Plaintiff presented emails indicating that Plaintiff's supervisors were unhappy with Plaintiff taking time off to travel to and from her military service in Fort Benning, Georgia. [See, *e.g.*, 205-1 (Pl.'s Ex. 19); 205-2 (Pl.'s Ex. 20); 205-3 (Pl.'s Ex. 21); 205-4 (Pl.'s Ex. 22); 205-6 (Pl.'s Ex. 24); 205-7 (Pl.'s Ex. 25); 205-8 (Pl.'s Ex. 32); 205-9 (Pl.'s Ex. 50).] For example, Plaintiff presented an email in which Temko questioned Plaintiff about why she needed the additional travel time. [205-1 (Pl.'s Ex. 19), at 2.] Temko also emailed Schroeder to ask whether

Defendant was required to provide this time for travel.  [205-3 (Pl.'s Ex. 21), at 1-2.]  Schroeder forwarded the inquiry to Bruce Olin, stating "I find myself with a dilemma if I were to discipline a person for taking too much time off for military reserve duty * * * I certainly give her credit for serving our country but of course I am also responsible for our business needs."  [*Id*. at 1.]

On October 28, Olin responded to an earlier email from Schroeder discussing various legal authorities provided by Plaintiff, stating:

> First, we do not have to grant time off for [Plaintiff's] travel time.  Her legal obligation is 2 weeks per year, which we do give off, and 1 weekend per month. The drills she attended were most likely extra training, which we do not have to grant the time.  We do not have to give extra time for her travel to and from her weekend duty.  She does have the option to transfer to a closer unit, we cannot make her transfer.

[205-4 (Pl.'s Ex. 22), at 1.]  Schroeder forwarded the email to Temko, predicting "LuzMaria will challenge us."  [*Id*.]  As noted by the Seventh Circuit, the advice regarding travel time initially given by Defendant was wrong.  [110, at 4.]  Jarvis did additional research and concluded that the law treats voluntary and involuntary orders the same, and Plaintiff was entitled to travel time plus an eight-hour rest period following her drill before having to report to work.  [205-7 (Pl.'s Ex. 25), at 1.][1]  Plaintiff also presented emails in which supervisors complained about a lack of communication from Plaintiff regarding her military leave.  [205-1 (Pl.'s Ex. 19), at 2 (Temko); 205-9 (Pl.'s Ex. 50), at 1 (Schroeder).]  Temko sent an email to Schroeder and others discussing the benefits to Defendant of Plaintiff transferring to a local Reserve facility in Darien, Illinois so that she would not have to travel to Georgia anymore.  [225-1 (Pl.'s Ex. 40); Tr. 542-44.] According to Plaintiff, in 2007, after she returned from a tour of duty in Iraq, Schroeder told her

---

[1] Although this docket entry is difficult to read, a more legible version of the same document is on the docket.  [See 78-3.]

that her military service was becoming an undue hardship on the company and that it would greatly help the company if Plaintiff could move to a local unit. [Tr. 817-18.]

After Plaintiff forwarded to her supervisors materials regarding Defendant's obligations under USERRA, Plaintiff's supervisor Sherrie Jankowski stated that Plaintiff was "becoming a pain with all this." [211-3 (Pl.'s Ex. 107).] Jankowski testified that she simply meant that Plaintiff was being burdensome by forwarding materials relating to USERRA to Jankowski and not to Schroeder, as had been requested. [Tr. 333.] Plaintiff also asserts that Jankowski and Schroeder did nothing to curtail rumors in the workplace that Plaintiff was on vacation in Hawaii. In support of that assertion, Plaintiff cites to an email from Jankowski to Schroeder discussing these rumors and testimony in which Jankowski explained that she told employees to stop spreading rumors. [211-5 (Pl.'s Ex. 124); Tr. 338-344.]

Plaintiff was deployed twice during her time working for Defendant—these deployments were from April 17, 2006 through May 7, 2007 and from April 15, 2009 through August 15, 2010. [Tr. 210.] When Plaintiff came back from Iraq in 2010, Temko sent an email to Schroeder and Somersett discussing how Plaintiff could decide when she returned back to work. [225-5 (Pl.'s Ex. 62).][2] Upon her return, Temko and Schroeder took steps to offer her a severance package that had been offered to other employees while Plaintiff was on a tour of military duty. [225-6 (Pl.'s Ex. 69); Tr. 163-64.]

C.     Defendant's Attendance Policy

Under the Attendance Policy, when an employee was late or absent without providing the required documentation, the employee was issued a whole or fractional "occurrence." [Tr. 1012.]

---

[2] Plaintiff cited to Exhibit 61 in one of her submissions to the Court. [204, at 16.] However, as noted by Defendant [226], the exhibit was not introduced into evidence. The Court therefore did not consider Exhibit 61 or other exhibits not admitted into evidence.

Each time an employee received an occurrence, Defendant applied a four-week and six-month look-back period to determine whether the employee incurred enough occurrences during either of those periods to receive a step in the progressive disciplinary process. [Tr. 1014-15.] Corrective action would be taken if the employee had a total of two occurrence points within the four-week period or a total of five occurrences within the six-month period. [*Id*.] The disciplinary steps under the policy were (1) verbal warning, (2) formal written warning, (3) three-day suspension, and finally, (4) termination. [205-15 (Def.'s Ex. 11), at 4.] For the purposes of calculating time periods under the Attendance Policy, Defendant did not count absences other than ETO vacation and scheduled holidays. [Tr. 580-82.]

The evidence at trial established that the Attendance Policy changed during the course of Plaintiff's employment. When Plaintiff started working for Defendant in 2005, any unexcused absence from work (including tardies) ranging from three minutes to one hour would result in 0.25 occurrences. [Tr. 1026-27.] After the policy changed [Tr. 1027], any absence from work for an hour or less would result in a half occurrence. [205-15 (Def.'s Ex. 11).] Defendant also previously had an unwritten policy that effectively gave employees a two-minute grace period, meaning that the employee would not receive an occurrence for being less than three minutes late. [Tr. 587-88.] However, Defendant eliminated the policy in 2008 after employees were abusing it. [Tr. 210-11, 586.]

Schroeder testified that he may have had discretion to excuse Plaintiff from coming in one to three minutes late. [Tr. 649-51.] Although Schroeder testified that he had exercised his discretion to excuse tardies for other employees that purportedly resulted from car trouble or weather issues [*id*.], he did not say whether those employees provided documentation for any such

excused tardies. Schroeder did testify, however, that the Attendance Policy allows for tardies resulting from car trouble to be excused. [Tr. 650-51.]

### D. PTSD

On December 23, 2010, Plaintiff sent an email to Schroeder describing her serious medical issues relating to stress at work and her military service. [225-9 (Pl.'s Ex. 119); Tr. 593-98.] In that email, Plaintiff stated:

> The doctor gave me a note for no work through 12/30. * * * Between the stress at work and the stress of reliving the events of my deployment through writing my story, I have been having panic attacks. I have been waking up feeling scared. Not able to get more than 4 hours of sleep a day.

[*Id.*] After receiving the email, Schroeder discussed disciplining Plaintiff for her subsequent absences with Olin. [Tr. 593-98.] Although Plaintiff's December 23, 2010 absence initially was categorized as inexcused, on September 6, 2011, Temko retroactively changed Plaintiff's attendance record to reflect an excused absence for that date. [205-21 (Def.'s Ex. 24).] The parties stipulated that Plaintiff was treated for Post-Traumatic Stress Disorder ("PTSD") in December 2010 and formally diagnosed in January 2011. [Tr. 434.] Schroeder later learned of this diagnosis, but he could not remember exactly when. [Tr. 600-01.] The parties further stipulated that Plaintiff's PTSD was due to and caused by her military service. [Tr. 434.] PTSD is a mental disorder that can develop after a person is exposed to a traumatic event, such as warfare. [*Id.*] The symptoms of PTSD may include disturbing thoughts, feelings or dreams related to the events, mental or physical distress to trauma-related cues, attempt to avoid trauma-related cues, alterations in how a person thinks and feels, and increased arousal. [*Id.*] The term "posttraumatic stress disorder" came into use in the 1970s in large part due to the diagnoses of US military veterans of the Vietnam War. [*Id.* at 434-35.] It was officially recognized by the American Psychiatric

Association in 1980 in the third edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-III). [*Id*. at 435] PTSD is a disability under the ADA. [*Id*.]

As an accommodation for Plaintiff's PTSD, Plaintiff was allowed to use a meditation room for up to fifteen minutes before the start of her shift. [Tr. 871, 873.] Plaintiff also was given a revised schedule to allow her to attend PTSD therapy appointments. [Tr. 227-28.] When Plaintiff punched in late after those appointments, Plaintiff did not incur any occurrences. [Tr. 640, 958.]

### E.    Attendance Issues and Termination

After Plaintiff returned from her tour of duty in 2010, she was issued a corrective action plan for being one minute late on October 29, 2010. [Tr. 866.] However, Plaintiff explained that she was unaware that the grace period had been eliminated. [211-2 (Pl.'s Ex. 95), at 2.] At trial, Plaintiff presented an email from Olin to Schroeder expressing some concern about disciplining Plaintiff for this tardy, stating:

> The only issue I have concern is the last tardy of one minute. Yes, she signed the form, but has been away from work for some time. Were the policies reviewed with her when she returned? I understand we enforce the rules completely and non-discriminatory, but I can see some outsider having a different view of this.

[211-2 (Pl.'s Ex. 95), at 1.] Ultimately, Plaintiff was not assessed an occurrence for her October 29, 2010 tardy. [Tr. 867.] On November 4, 2010, Plaintiff was given a copy of the Attendance Policy. [Tr. 867.]

On August 31, 2011, Plaintiff received a three-day suspension for accumulating a total of five occurrences in a six-month period, from October 19, 2010 through August 20, 2011 (excluding A&S, FMLA, and military leave). [211-16 (Def.'s Ex. 22).] Specifically, Plaintiff incurred one occurrence for being absent on October 19, 2010 for an undocumented family issue. [205-17 (Def.'s Ex. 15), at 3; Tr. 573.] Plaintiff also incurred half of an occurrence for being two minutes late on November 23, 2010, half of an occurrence for being ten minutes late on April 14, 2011,

half of an occurrence for being one minute late on May 10, 2011, half of an occurrence for being one minute late on May 12, 2011, half of an occurrence for being five minutes late on May 27, 2011, half of an occurrence for being one minute later on July 29 2011, half of an occurrence for being five minutes late on August 19, 2011, and half of an occurrence for being one minute late on August 20, 2011. [*Id*. at 1, 3.] Plaintiff earlier had received a verbal warning (Step 1) in connection with her unexcused absence on October 19, 2010 and a written warning (Step 2) in connection with her tardy on August 19, 2011. [*Id*.] Although Defendant used a look-back period of more than six months in disciplining Plaintiff, this was pursuant to the Attendance Policy, which did not include absences other than ETO vacation or scheduled holidays in calculating time periods under the Attendance Policy. [Tr. 582.]

Around this time, tensions between Plaintiff and her supervisors increased. Plaintiff started telling Schroeder and others that they were not following the law. [Tr. 608.] Plaintiff told Schroeder that she was afraid of him. [Tr. 608-09.] Although Schroeder denies that it ever happened, Plaintiff claimed that Schroeder cornered her in a room with no windows in it. [Tr. 609.] At some point, Plaintiff started parking behind the warehouse of the Joliet facility to access the meditation room that she was allowed to use before work. [Tr. 871.] On October 24, 2011, Schroeder sent an email to management instructing them not to park in the rear of the building. [225-10 (Pl.'s Ex. 226A).] In that email, Schroeder stated:

> [T]o avoid a charge of retaliation[,] I must first review this with legal. We cannot afford a circumstance where it is perceived that I am singling out [Plaintiff] when others in this facility have on occasion been allowed to do this.

[*Id*.] The email was marked "Read and Delete" and instructed recipients not to print the email. [*Id*.; Tr. 622-23.] At trial, Schroeder could not explain why he included this language. [Tr. 623.]

On October 27, 2011, Jankowski sent Schroeder an email stating:

> I was just informed that today when [Plaintiff] got to work, she parked in the first parking spot by the door, punched in, sped around to the back of the building (nearly hitting John Sarpalious) and parked by Door 24. After the 4:30 bell rang, she left Bernie's office, went back to her car, drove to the front, THEN went to the locker room to get her shoes and other work gear. So once again she is doing whatever suits her.

[225-10 (Pl.'s Ex. 226A).] At trial, Jankowski testified that she did not believe that there was a prohibition against parking in the back at that time. [Tr. 382.] Temko testified that Schroeder several times had told Temko and others not to park in the back and Temko stopped once so directed. [Tr. 240.] Temko also explained that there were no parking spaces in the back and noted that it was dangerous to park back there because of the 18-wheeler trucks that were in that area. [*Id.*] Still, there was no evidence presented at trial indicating that Plaintiff previously had been told not to park in the back.

On November 1, 2011, Plaintiff had a meeting with Schroeder and Plaintiff's supervisor Patrick Dunn. At the meeting, Plaintiff was told that she could not park at that location because it was a safety issue. [Tr. 871.] Plaintiff also was told that her use of the meditation room did not negate Plaintiff's obligation to be prepared to start work when the bell rang. [Tr. 872; 205-22 (Def.'s Ex. 27).] After leaving the meeting, Plaintiff returned and asked Schroeder whether the rule applied to all employees or just to Plaintiff. [Tr. 852.] According to Plaintiff's testimony, Schroeder then stated that all of the supervisors knew of the rule, but that he hadn't yet communicated the rule to all employees.[3] [*Id.*] This testimony was corroborated by an email sent by Schroeder to management on November 3, 2011, stating:

> After the meeting [Plaintiff] returned to the office and made an inquiry "Are all the employees aware of the parking rule or am I singled out on this?["] My reply was that management is aware of this rule yet the hourly group is not yet[.] I plan to communicate this rule to all. Attached is the statement I plan to post.

---

[3] Plaintiff references Exhibit 227 in her briefing. Schroeder testified that the exhibit showed that a supervisor was parking in the rear of the building. However, it is not clear from the record when the photograph was taken.

[225-12 (Pl.'s Ex. 233), at 2.]

On November 2, 2011, Plaintiff again waited until the bell rang before leaving the meditation room. [Tr. 872.] Plaintiff then proceeded to her car parked in the south truck–trailer area of the facility property. [205-23 (Def.'s Ex. 31).] On November 3, 2011, Plaintiff was given a verbal warning for violating the start time rule on November 2, 2011. [*Id.*] At trial, Temko testified that the start time rule prohibits employees from being outside the building after the start bell rings. [Tr. 1048.] Plaintiff also was given half of an occurrence for her November 2, 2011 violation of the start time rule. [*Id.*] Plaintiff again left the building after the start bell on November 4, 2011. [205-24 (Def.'s Ex. 32).] This time, Plaintiff was given a written warning for violating the start time rule. [*Id.*] Plaintiff also was given another half of an occurrence for this violation. [*Id.*] The occurrence issued on November 4, 2011 resulted in Plaintiff having 5 occurrences over the preceding sixth-month period (as calculated under the Attendance Policy). [205-25 (Def.'s Ex. 35); 205-17 (Def.'s Ex. 15).] This resulted in Plaintiff's termination on November 8, 2011. [*Id.*]

On November 2, 2011, Plaintiff was in the meditation room for approximately 40 minutes when the start bell rang. [Tr. 873.] On November 4, 4011, Plaintiff was in the meditation room for approximately 25 minutes before the start bell rang. [Tr. 874.] Plaintiff testified that it never occurred to her to leave the meditation room five minutes earlier so that she could repark her car in the front of the building before the start bell rang. [Tr. 874.] Although Plaintiff punched in to work before going to the meditation room,[4] her attendance records were altered by Temko to reflect

---

[4] Plaintiff's opening brief in support of her motion to amend suggests a connection between Plaintiff's tardies and the bottleneck at the time clock. [204, at 17-19.] However, the testimony cited does not establish that Plaintiff ever received an occurrence because of any bottleneck. Nor does the testimony cited establish that other employees were violating the start time rule because of the bottleneck.

that she was three minutes late on November 2, 2011 and November 4, 2011 to account for the start rule violations. [Tr. 1080.] Temko acknowledged that Plaintiff punched in timely on November 2, 2011 and November 4, 2011. [Tr. 1080.] However, Plaintiff was marked tardy for violating the start time rule, which is independent of when an employee punches in. [*Id*.]

Plaintiff notes that she only was given a verbal warning and a written warning with respect to her start rule violations. [See 205-23 (Def.'s Ex. 31 (verbal warning)); 205-24 (Def.'s Ex. 32 (written warning)).] However, in those corrective action plans, Plaintiff was advised that she also was being assessed partial occurrences for each start rule violation. [*Id*.] Plaintiff already had been given a 3-day suspension—the third step in the disciplinary process—in relation to her attendance. [211-16 (Def.'s Ex. 22).]

Plaintiff also notes that other employees were allowed to punch in up to a half-hour early and then wait in the breakroom for the start bell. [Tr. 202.] However, because the employees were in the building ready to work, this would not be a violation of the start rule. Temko testified that the start rule requires employees to be in the building ready to work when the start bell rang. [Tr. 1048.]

It is undisputed that Plaintiff was not terminated for performance issues. Defendant contends that Plaintiff simply was terminated for violating the Attendance Policy. [205-25 (Def.'s Ex. 35; see also Tr. 499-500 (Schroeder testimony).]

## III.    Defendant's Motion for Judgment as a Matter of Law

Defendant moves for judgment as a matter of law, arguing that Plaintiff failed to present evidence at trial that would allow a reasonable jury to find that Defendant in fact discriminated against Plaintiff based on her disability or military status. Defendant also argues that Plaintiff failed to present evidence of compensatory damages, punitive damages, or a willful violation of the USERRA.

## A.    Legal Standard

Pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, the Court is authorized "to enter judgment against a party who has been fully heard on an issue during a jury trial if 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011) (quoting Fed. R. Civ. P. 50(a)).  "The law imposes a high standard for overturning a jury verdict." *Pierson v. HartleyEyeglasses*, 391 F.3d 898, 903 (7th Cir. 2004).  Under this "stringent standard," the Court "must construe the facts strictly in favor of the party that prevailed at trial." *Schandelmeier-Bartels*, 634 F.3d at 376.  "Although the court examines the evidence to determine whether the jury's verdict was based on that evidence, the court does not make credibility determinations or weigh the evidence." *Id*.  In sum, the Court inquires "only whether the evidence, viewed in the light most favorable to [Plaintiff], was sufficient for a jury to find" Defendant liable. *Pierson*, 391 F.3d at 903.

## B.    Liability under the USERRA

"USERRA prohibits employment discrimination against members of the armed services." *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 284 (7th Cir. 2015).  It provides:

> A person who is a member of * * * a uniformed service shall not be denied * * * retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership.

38 U.S.C. § 4311(a).  "The statute provides further that such discrimination exists where the employee's service membership was 'a motivating factor' in the employer's adverse action 'unless the employer can prove that the action would have been taken in the absence of such membership.'" *Arroyo*, 805 F.3d at 284 (quoting 38 U.S.C. § 4311(c)(1)).  "This provision creates a two-step burden-shifting scheme: (1) once a plaintiff makes out a *prima facie* case by showing

that his membership was 'a motivating factor,' (2) the burden shifts to the employer to prove that it would have taken the same action regardless." *Id.* (citing *Crews v. City of Mt. Vernon,* 567 F.3d 860, 864 (7th Cir. 2009)).

In this case, the jury found that Plaintiff proved by a preponderance of the evidence that her service was a motivating factor in her termination. [204-2, at 3.] The burden therefore shifted to Defendant to prove that they would have taken the same action regardless. On that issue, the jury concluded that Defendant failed to make such a showing by a preponderance of the evidence. [*Id.*] Defendant argues that the jury's decisions at both stages of the analysis were not supported by the evidence.

### 1. *Discriminatory Animus*

According to Defendant, the evidence presented at trial establishes as a matter of law that Defendant was not motivated by military service animus in terminating Plaintiff's employment. In order to establish her USERRA claim, Plaintiff had to present evidence sufficient to establish that her military service was a "motivating factor" in the adverse employment action at issue— here, Defendant's decision to terminate Plaintiff's employment in November 2011. See *Crews v. City of Mt. Vernon*, 567 F.3d 860, 864 (7th Cir. 2009).

The Seventh Circuit previously concluded that—based on the evidence identified at summary judgment—"a reasonable jury could infer that [Defendant] was motivated, at least in part, by anti-military animus toward [Plaintiff]." [110, at 11.] In reaching that conclusion, the Seventh Circuit noted that Plaintiff presented evidence indicating that "her supervisors disliked the burden her frequent military leave placed on the company" from "the beginning of her employment." [110, at 11.] Plaintiff presented the same and/or similar evidence to the jury. [See,

e.g., 205-1 (Pl.'s Ex. 19); 205-2 (Pl.'s Ex. 20); 205-3 (Pl.'s Ex. 21); 205-4 (Pl.'s Ex. 22); 205-6 (Pl.'s Ex. 24); 205-7 (Pl.'s Ex. 25); 205-8 (Pl.'s Ex. 32); 205-9 (Pl.'s Ex. 50).]

For example, Plaintiff presented emails indicating that Temko was frustrated by Plaintiff taking time off before and after military drills to travel to and from Fort Benning, Georgia, where Plaintiff's unit was based. Temko questioned Plaintiff about why she needed the additional travel time. [205-1 (Pl.'s Ex. 19), at 2.] Temko also emailed Schroeder to ask whether Defendant was required to provide this time for travel. [205-3 (Pl.'s Ex. 21), at 1-2.] Schroeder forwarded the inquiry to Olin, stating "I find myself with a dilemma if I were to discipline a person for taking too much time off for military reserve duty * * * I certainly give her credit for serving our country but of course I am also responsible for our business needs." [*Id*. at 1.]

On October 28, Olin responded to an earlier email from Schroeder discussing various legal authorities relating to USERRA provided by Plaintiff, stating:

> First, we do not have to grant time off for [Plaintiff's] travel time. Her legal obligation is 2 weeks per year, which we do give off, and 1 weekend per month. The drills she attended were most likely extra training, which we do not have to grant the time. We do not have to give extra time for her travel to and from her weekend duty. She does have the option to transfer to a closer unit, we cannot make her transfer.

[205-4 (Pl.'s Ex. 22), at 1.] Schroeder forwarded the email to Temko, predicting "[Plaintiff] will challenge us." [*Id*.] However, after doing additional research, Jarvis concluded that the law treats voluntary and involuntary orders the same, and Plaintiff was entitled to travel time plus an eight-hour rest period following her drill before having to report to work. [205-7 (Pl.'s Ex. 25), at 1.][5] Plaintiff also presented emails in which supervisors complained about a lack of communication from Plaintiff regarding her military leave. [205-1 (Pl.'s Ex. 19), at 2 (Temko); 205-9 (Pl.'s

---

[5] Although this docket entry is difficult to read, a more legible version of the same document is on the docket elsewhere. [See 78-3.]

Ex. 50), at 1 (Schroeder).]  Looking at this evidence on Plaintiff's motion for summary judgment, the Seventh Circuit concluded that "[a] jury could understandably detect in these communications animus toward [Plaintiff's] military service."  [110, at 11.]

Although the Seventh Circuit decision relied on the no longer applicable "convincing mosaic" standard, Defendant has not cited to any cases indicating that this means that the Seventh Circuit's substantive conclusion no longer applies.  In fact, although the Seventh Circuit abandoned the convincing mosaic legal standard in *Ortiz v. Warner Enterprises, Inc.*, the Seventh Circuit expressly stated that it was not holding that prior cases applying that standard were "wrongly decided."  834 F.3d 760, 765 (7th Cir. 2016).  Rather, the Seventh Circuit stated that "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself."  *Id*.  While courts in the Seventh Circuit now look at direct and indirect evidence of discrimination together, the Seventh Circuit previously concluded that Plaintiff identified sufficient evidence to establish that Defendant acted with a discriminatory animus under the direct method of proof.  [110, at 14-15.]  The Court sees no reason why such evidence also would not support a finding of discriminatory animus under the approach set forth in *Ortiz*.

Defendant argues that the emails presented at trial are insufficient to support an inference of discrimination under the USERRA because they were not made around the time of the decision.  Although many of the arguably discriminatory emails presented at trial were sent years before the adverse employment action at issue, Plaintiff's evidence was not limited to those emails.  Plaintiff presented an email from Schroeder dated November 8, 2011—the date Plaintiff was terminated— stating that Plaintiff "clearly shows her intent to do everything possible to delay and waste company time."  [211-10 (Pl.'s Ex. 245), at 1.]  In that email, Schroeder goes on to say:

> Also of importance is the fact that never once has [Plaintiff] cooperated or offered any compromise or leniency to the company in any situation unless we agree to her terms. The best example of this is the ESGR case.

[*Id*.] At trial, Schroeder admitted that "there was some level of frustration" with Plaintiff. [Tr. 762-65.] Furthermore, the jury may have taken Schroeder's efforts to stop vehicles from parking behind the facility once he learned that Plaintiff was parking behind the facility as evidence that his animus toward Plaintiff's military service continued.

Plaintiff also presented an email from Jankowski stating that Plaintiff was "becoming a pain" after Plaintiff forwarded Jankowski materials regarding Defendant's obligations under USERRA. [211-3 (Pl.'s Ex. 107).] Defendant argues that this email should be disregarded because Jankowski was not a decision maker. However, Jankowski was Plaintiff's supervisor. As the Court previously stated on the record, Jankowski's statements must be considered as evidence of animus under the law of the case. [See Tr. 1130-32 (discussing the Seventh Circuit's decision).] Accordingly, although Plaintiff's case is by no means overwhelming or even strong, the Court concludes that the jury did have a legally sufficient evidentiary basis to find animus toward Plaintiff's military service.

### 2. *Volvo's Affirmative Defense*

Defendant argues that it has established as a matter of law that it would have terminated Plaintiff regardless of her military service, which is an affirmative defense under the USERRA. 38 U.S.C.A. § 4311(c)(1). During her employment with Defendant, Plaintiff was subject to Defendant's Attendance Policy, which was administered by Schroeder and Temko. Under the Attendance Policy, when an employee was late or absent without providing the required documentation, the employee was issued an "occurrence." The value of the occurrence depended on the amount of time that the employee is not at work. During the time period when Plaintiff was

issued the occurrences that led to her termination, an employee would receive half of an occurrence for missing an hour or less of work. [Tr. 1012; 205-15 (Def.'s Ex. 11), at 3.] An employee would receive three-quarters of an occurrence for missing more than one hour but less than four hours of work. [*Id*.] Finally, an employee would receive a full occurrence for missing four hours or more of work. [*Id*.] The accrual of occurrences resulted in discipline. [*Id*. at 1013.] When an employee was issued an occurrence, Defendant looked back to see whether the employee had a total of two occurrences in one month or a total of five occurrences in six months. [*Id*. at 1014.] If so, the employee would be issued a disciplinary step. [*Id*. at 1015.] Pursuant to the Attendance Policy, corrective action would be taken if an employee had a total of two occurrences within a four-week period or a total of five occurrence points within a six-month period. [205-15 (Def.'s Ex. 11), at 3.] The four disciplinary steps under the Attendance Policy were: (1) Verbal Warning, (2) Formal Written Warning, (3) Three-Day Suspension, and (4) Termination. [*Id*. at 4.] If an employee went six months without an additional disciplinary step, the employee would go back a step. [Tr. 1015-16.]

Defendant argues that it established its affirmative defense as a matter of law by showing that the Attendance Policy uniformly was enforced. Defendant further notes that—to the extent any discretion was used in the enforcement of the Attendance Policy against Plaintiff—Defendant exercised its discretion to help Plaintiff avoid discipline. For example, Defendant gave Plaintiff the benefit of the doubt regarding her contention that she was unaware that the two-minute grace period had been eliminated and did not count her tardy on October 29, 2010 against her for that reason. [Tr. 709-12; 205-17 (Def.'s Ex. 15).] Defendant updated Plaintiff's attendance records in September 2011 to excuse her absence on December 23, 2010. [Tr. 1045-47; 205-21 (Def.'s Ex. 24).] Plaintiff did not receive occurrences for being tardy for days on which she had PTSD

therapy appointments. [Tr. 227-31, 639-42, 864, 958.] Finally, Defendant warned Plaintiff on November 1, 2011 that she was expected to be in the building and ready to begin work at the shift start bell and did not issue Plaintiff any occurrence for any start rule violations occurring before that warning. [Tr. 724-32, 964-66; 205-17 (Def.'s Ex. 15); 205-22 (Def.'s Ex. 27); 205-23 (Def.'s Ex. 31); 205-24 (Def.'s Ex. 32).]

Plaintiff responds that a reasonable jury could find that Defendant did not establish its affirmative defense because Defendant did not enforce its policy against Plaintiff evenly or at all before Plaintiff's military service. In support of that argument, Plaintiff cites to the fact that Plaintiff incurred seven attendance infractions as a probationary employee from June 2005 through August 2005 but did not received any disciplinary steps during that time. [209, 38-39.] Applying the policy that Defendant relied upon to discipline Plaintiff in 2010 and 2011, Plaintiff should have been given a disciplinary step. However, Defendant notes that—under the local attendance policy in effect in 2005—each instance of tardiness between three minutes and 59 minutes was worth less of a fractional occurrence than under the version of the policy in effect during 2010 and 2011. And, as discussed above, Defendant had a two-minute grace period that was eliminated in 2008. Thus, Plaintiff was not assessed a step for her seven attendance infractions as a probationary employee from June 2005 through August 2005. [Tr. 1026.]

Still, at the summary judgment stage, the Seventh Circuit concluded that Defendant had not presented sufficient evidence to establish as a matter of law that it necessarily would have terminated Plaintiff for her tardiness. [110, at 13-14.] Although Defendant argued that it was entitled to judgment as a matter of law based on the examples of other employees who were issued occurrences for minor tardiness, the Seventh Circuit found that kind of evidence insufficient for Defendant to satisfy its burden as a matter of law. The Court recognizes that the Seventh Circuit

only discussed a few of the comparators identified by Defendant, including only one comparator who was terminated because he was a few minutes late (in addition to other attendance infractions). However, many more comparators were in the record before the Seventh Circuit. Indeed, the two additional comparators discussed by Defendant—Scotty Senephimmachac and Sam Zweig—also were before the Seventh Circuit. [77-5, at 101-06, 111-122.] The Court assumes that the Seventh Circuit considered all of the evidence before it, given its detailed review of the record. Furthermore, Defendant does not identify any employee other than Plaintiff who was disciplined for a start rule violation. Accordingly, the Court concludes that Defendant has not established its affirmative defense as a matter of law.

### 3. *Damages - Willfulness*

Finally, Defendant argues that Plaintiff failed to show that Defendant's decision to terminate her employment was a willful violation of USERRA. In order to recover liquidated damages under USERRA, Plaintiff must show that her "employer's failure to comply with the provisions of this chapter was willful." 38 U.S.C. § 4323(d)(1)(C). Although there is limited authority on what the term "willful" means under USERRA, the Supreme Court has held that a violation of the ADEA "is 'willful' if 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.'" *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985) (citation omitted). Because Plaintiff has not identified an alternative standard for analyzing willfulness, the Court here will look to the standard for establishing willfulness under the ADEA. In order to establish willfulness, "[a] plaintiff does not need to show that the employer's conduct was 'outrageous,' nor does [s]he need to provide direct evidence of the employer's motives." *E.E.O.C. v. Bd. of Regents of Univ. of Wisconsin Sys.*, 288

F.3d 296, 304 (7th Cir. 2002) (quoting *Mathis v. Phillips Chevrolet, Inc.*, 269 F.3d 771 (7th Cir. 2001)).

Defendant notes that Plaintiff did not ask any questions at trial pertaining to Defendant's knowledge of USERRA with respect to its decision to terminate Plaintiff's employment. However, Plaintiff presented significant evidence showing that Defendant was on notice of the terms of USERRA and did investigate its obligations under USERRA. The Court recognizes that knowledge of the potential application of a statute alone is not sufficient to establish willfulness. See *Trans World Airlines, Inc.*, 469 U.S. at 127 ("We are unpersuaded by respondents' argument that a violation of the Act is 'willful' if the employer simply knew of the potential applicability of the ADEA."). However, Plaintiff's theory of the case is that her military service was a motivating factor in her termination. That theory was credited by the jury. Defendant's decision makers either knew this was a violation of USERRA or showed reckless disregard for the matter of whether its conduct was prohibited by USERRA. Accordingly, the Court denies Defendant's motion for judgment as a matter of law on Plaintiff's USERRA claim.

### C.    Liability under the ADA

"To establish a violation of the ADA, an employee must show '1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation.'" *Winsley v. Cook Cty.*,

563 F.3d 598, 603 (7th Cir. 2009) (quoting *Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000)).

### 1.    *Qualified Individual*

"The ADA proscribes discrimination against only 'qualified individual[s] with a disability.'" *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996) (citing 42 U.S.C. § 12112(a); 29 C.F.R. § 1630.4; 29 C.F.R. app. § 1630.9). "No matter the type of discrimination alleged-either disparate treatment or failure to provide a reasonable accommodation—a plaintiff must establish first that [she] was 'a qualified individual with a disability.'" *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir. 1997) (quoting *Bombard*, 92 F.3d at 563). An employee must "pass a two-step test" to be "a qualified individual." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996). "First, the individual must satisfy 'the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.'" *Id.* (quoting 29 C.F.R. app. § 1630.2(m)). "Second, the individual must be able to 'perform the essential functions of the position held or desired, with or without reasonable accommodation.'" *Id.* (quoting 29 C.F.R. app. § 1630.2(m)). "[T]he burden of proof on the issue of capability is not on the employer but on the plaintiff." *Miller v. Ill. Dept. of Corrs.*, 107 F.3d 483, 484 (7th Cir. 1997). To satisfy this burden, Plaintiff had to present evidence that she "was 'willing and able to demonstrate these skills by coming to work on a regular basis.'" *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1003 (7th Cir. 1998).

The Seventh Circuit has "repeatedly held that an employee who does not come to work cannot perform the essential functions of his job." *Fogle v. Ispat Inland, Inc.*, 32 Fed. App'x 155, 157-58 (7th Cir. 2002); accord *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003);

*Amadio v. Ford Motor Co.*, 238 F.3d 919, 927-28 (7th Cir. 2001); *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899-900 (7th Cir. 2000); *Waggoner v. Olin Corp.*, 169 F.3d 481, 483 (7th Cir. 1999). Consistent with these cases, this Court previously concluded that Plaintiff was not a qualified individual because of her unexcused tardies and absences. [88, at 22-24.] That part of the Court's decision was left undisturbed by the Seventh Circuit. [110, at 14 n. 2.]

The evidence presented at trial was consistent with the forecast of evidence at summary judgment on this point. The Attendance Policy required employees to be "in the building and ready to work at the scheduled start time and continue to work until the scheduled hours of work are completed." [205-15 (Def.'s Ex. 11), at 1.] Plaintiff was not complying with this policy. Plaintiff testified that she would punch in before going to the meditation room. She would stay in the meditation room until the shift start bell rang. It was only then that she would walk back to her car, drive around the side of the building to repark her car, and then reenter the facility. Plaintiff testified that it never occurred to her to leave the meditation room five minutes earlier to give herself enough time to complete these tasks before the start bell rang.

Plaintiff argues that the parties' stipulation that PTSD is a disability under the ADA establishes that Plaintiff—who suffered from PTSD—was a qualified individual. However, whether a person has a disability under the ADA and whether a person is a qualified individual under the ADA are different questions. Under the ADA, a person can have a disability yet not be a qualified individual. *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005) ("[T]he ADA does not shelter disabled individuals from adverse employment actions if the individual, *for reasons unrelated to his disability* (such as a poor work ethic, carelessness, bad attitude, insubordination or unprofessional demeanor), is *not qualified* for the job or is *unable to*

*perform* the job's essential functions or fulfill the requirements of the position as prescribed by the employer or "fails to meet his employer's expectations.'" (citations omitted)).

Plaintiff also argues that the evidence presented at trial supports the conclusion that she was a qualified individual under the ADA, citing evidence indicating that—putting aside her attendance issues—Defendant's management was satisfied with Plaintiff's performance. Schroeder indicated that Plaintiff was not terminated for performance issues, for disobedience, or for disrespecting authority; she was terminated only because of her attendance. [Tr. 499-500.] During the time period Temko supervised Plaintiff—from 2005 through 2008—Temko gave Plaintiff grades of "very good" and he meant that as a compliment. [Tr. 182-95.] Jankowski testified that "there were no issues" with Plaintiff's performance while Plaintiff was supervised by Jankowski. [*Id.* at 316.] Jankowski never told Plaintiff that she was not putting in enough work. However, "[a]n evaluation of the quality of [Plaintiff's] performance does not end [the] inquiry. In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis." *Waggoner*, 169 F.3d at 485 (quoting *Tyndall v. Nat'l Educ. Centers, Inc. of California*, 31 F.3d 209, 213 (4th Cir. 1994)) (internal quotation marks omitted). Plaintiff was not doing so here.

Plaintiff further contends that it was Defendant's duty to make Plaintiff a qualified employee under the USERRA. Section 4313(a)(3) of the USERRA provides:

> In the case of a person who has a disability incurred in, or aggravated during, such service, and who (after reasonable efforts by the employer to accommodate the disability) is not qualified due to such disability to be employed in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service— (A) in any other position which is equivalent in seniority, status, and pay, the duties of which the person is qualified to perform or would become qualified to perform with reasonable efforts by the employer; or (B) if not employed under subparagraph (A), in a position which is the nearest approximation to a position

referred to in subparagraph (A) in terms of seniority, status, and pay consistent with circumstances of such person's case.

Furthermore, Section 4313(a)(4) of the USERRA provides:

In the case of a person who (A) is not qualified to be employed in (i) the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or (ii) in the position of employment in which such person was employed on the date of the commencement of the service in the uniformed services for any reason (other than disability incurred in, or aggravated during, service in the uniformed services), and (B) cannot become qualified with reasonable efforts by the employer, in any other position which is the nearest approximation to a position referred to first in clause (A)(i) and then in clause (A)(ii) which such person is qualified to perform, with full seniority.

According to Plaintiff, under these two provisions, Defendant had a duty to place Plaintiff in another position or train Plaintiff to be qualified for the position she held. However, Plaintiff does not cite to any cases indicating that a violation of these provisions could serve as a basis for establishing the "qualified individual" element of an ADA claim.[6]

Finally, Plaintiff argues that she actually was complying with the Attendance Policy because whether an employee was tardy depended on the when the employee punched in. Because Plaintiff punched in early on November 2 and November 4, 2011, Plaintiff contends she was not tardy. [217, at 3.] However, the Attendance Policy required that employees be "in the building and ready to work at the scheduled start time and continue to work until the scheduled hours of work are completed." [205-15 (Def.'s Ex. 11), at 1.] Plaintiff does not explain how the evidence presented at trial could support the conclusion that she was complying with that requirement. As the Court noted in its previous decision:

_____

[6] Plaintiff asserts that Plaintiff's status as a qualified individual was never challenged before trial and that Plaintiff therefore should be permitted to invoke USERRA's reemployment provisions in her post-trial motions. [217, at 4-5.] However, Defendant did raise a challenge to Plaintiff's status as a qualified individual under the ADA on summary judgment. [76, at 5.] In any event, Plaintiff independently could have brought a reemployment claim under USERRA if the facts supported such a cause of action. Plaintiff did not do so and cannot now raise such a claim in her post-trial briefs.

> Arroyo relies on this distinction without addressing the undisputed evidence that Volvo determined that she started her shift late on November 4, 2011, *despite having punched in timely*. This is because Arroyo would punch in prior to going to the meditation room (provided to her as an accommodation), stay in the [meditation] room until the shift start bell rang, then leave the room, walk to her car, drive around the side of the building to re-park her car, and then reenter the warehouse. Under any definition of being "in the building and ready to work at the scheduled start time," this would not suffice.

[88, at 23.] This portion of the Court's decision was affirmed by the Seventh Circuit. [110, at 14 n.2.] Furthermore, even though Plaintiff punched in early on November 2 and November 4, 2011, and even though Plaintiff was in the building when the start bell rang, she does not contest that she subsequently left the building. In short, the evidence at trial undisputedly showed that Plaintiff was not a qualified individual at the time of her termination on November 4, 2011. See *Moore-Fotso v. Bd. of Educ. of the City of Chicago*, 211 F. Supp. 3d 1012, 1025-28 (N.D. Ill. 2016) (reasoning that plaintiff failed to show she was a "qualified individual" at the time of her termination based on her numerous absences and tardies). The Court therefore grants Defendant judgment as a matter of law on Plaintiff's ADA discrimination claim.

## 2. *Discriminatory Animus*

Defendant also argues that it is entitled to judgment as a matter of law on Plaintiff's ADA claim because—according to Defendant—the trial evidence showed that Defendant was not motivated by disability-based animus in terminating Plaintiff's employment. Because the Court concludes that Plaintiff failed to establish that she was a qualified individual with a disability, the Court need not reach the merits of her discrimination claim. *Moore-Fotso*, 211 F. Supp. 3d at 1028 ("Because Plaintiff fails to establish that she is a qualified individual within the meaning of the ADA, the Court need not address the merits of her failure to accommodate claim.").

## 3. *Compensatory Damages Under the ADA*

Defendant also moves for judgment as a matter of law on the issue of compensatory damages under the ADA. The Court instructed the jury that they "may award compensatory damages only for injuries that Plaintiff * * * has proved by a preponderance of the evidence were caused by Defendant Volvo Trucks' wrongful conduct." [156 (Jury Instructions), at 22.] The Court further instructed the jury that the award "must be based on evidence and not speculation or guesswork." However, the jury was instructed that it "should not consider the issue of lost wages and benefits," which the Court independently would calculate. [*Id*.] Thus, the jury was left to consider compensatory damages such as "the physical, mental, and emotional pain and suffering that Plaintiff" had experienced and "the reasonable value of medical care that Plaintiff" reasonably needed and actually received. [*Id*.]

The jury awarded Plaintiff $2.6 million in compensatory damages on her ADA discrimination claim. [161 (Verdict Form), at 2.] However, Defendant moves for judgment as a matter of law on compensatory damages under the ADA, arguing that Plaintiff failed to present any evidence of emotional stress or other compensatory damages *stemming from her termination*. Plaintiff argues that the following evidence supports the jury's award of compensatory damages:

- A December 2010 email sent by Plaintiff regarding her hospitalization.

- The parties' stipulation describing PTDS and advising that Plaintiff was treated for PTSD in December 2010 and was formally diagnosed with PTSD in January 2011.

- Plaintiff's email describing Schroeder's threatening behavior toward Plaintiff.

- Plaintiff's email begging Volvo BP Dennis Scholl to investigate her claim that Schroeder had threatened her and was plotting to terminate her employment.

- An email from Scholl to Plaintiff promising that an investigation would be done.

- Testimony by Schroeder that Plaintiff contends establishes that he never was investigated regarding Plaintiff's allegations.

However, because all of this occurred *before Plaintiff was terminated*, this evidence could not serve as a basis for compensatory damages resulting from the termination of Plaintiff's employment—which is the only adverse employment action upon which Plaintiff was allowed to proceed on her ADA.

This issue first surfaced during the trial. After Plaintiff rested on Friday afternoon, Defendant noted that Plaintiff failed to present any evidence of compensatory damages. After considering the evidence presented by Plaintiff, the Court sent the following email to the parties over the weekend:

> I do not think it unreasonable to allow Plaintiff to reopen her case-in-chief to briefly present her own testimony in support of what I think counsel called a routine or "garden-variety" claim of emotional pain and suffering on account of the termination. I don't perceive any substantial prejudice to the Defendant if such brief testimony were allowed. If the argument is that there may have been other causes for the Plaintiff's emotional state at the time of her termination, the Plaintiff's own testimony yesterday provided ample support for Defendant to make that point. In fact, the cross-examination on Friday already picked up on the point.

[155-1, at 15.] Counsel for Defendant strongly objected to this offer and asked to be heard in court first thing when Court resumed the following Monday. [*Id*. at 19.] The issue was rendered moot when counsel for Plaintiff sent the Court and Defendant the following response:

> I also do not believe that plaintiff has to re-open her case at all. I believe that the kinds of compensatory damages for physical pain and suffering and garden variety emotional distress have been sufficiently set forth in Plaintiff's Case in Chief before we rested. I am satisfied that we have sufficient evidence in the record for plaintiff to argue this issue.

[*Id*. at 35.] Although Plaintiff purported to identify evidence of compensatory damages, the evidence identified by Plaintiff all predated Plaintiff's termination. [*Id*. at 45.]

In response to the questions posed by the Court during the post-trial phase of the case, Plaintiff's counsel was again given the opportunity to identify what evidence of compensatory damages she presented at trial. At that time, Plaintiff noted that "the financial harm her termination caused dealt with wages" and that "wages were not an issue for the jury." [217, at 10.] Implicitly recognizing that she did not put in evidence of compensatory damages resulting from her termination, Plaintiff also asserts that the jury's compensatory damages award should nonetheless stand because "the jury reasonably could infer" that Plaintiff's termination "led to considerable injury." However, the jury's verdict cannot be based on pure speculation. *Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1176 (7th Cir. 2008) ("We agree with the district court that the jury's damages award must be set aside because it was based on nothing but speculation."). Thus, even if the Court were not granting Defendant judgment as a matter of law on Plaintiff's ADA discrimination claim, the Court would grant Defendant judgment as a matter of law on the issue of compensatory damages.[7]

## IV.     Defendant's Motion for a New Trial

### A.     Legal Standard

Rule 59(a)(1)(A) authorizes the Court to order a new trial as to some or all issues that were tried to a jury. See Fed. R. Civ. P. 59(a)(1)(A). "A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014). "A new trial should be granted, however, 'only when the record shows that the jury's verdict resulted in a miscarriage of justice

---

[7] The Court notes that—if it were not granting Defendant's motion for judgment as a matter of law on Plaintiff's entire ADA discrimination claim—it would be necessary to revisit the issue of punitive damages, which the Court vacated because of the ADA's statutory damages cap. [177, at 8-9.] Because the Court is granting Defendant judgment as a matter of law on Plaintiff's entire ADA discrimination claim, however, the Court need not do so here.

or where the verdict, on the record, cries out to be overturned or shocks our conscience.'" *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012) (quoting *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011)). In determining whether a new trial is warranted, the Court "view[s] the evidence in the light most favorable to the prevailing party, leaving issues of credibility and weight of evidence to the jury." *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 444-45 (7th Cir. 2009).

"The ruling on a motion for a new trial is a matter committed to the district court's discretion." *Galvan v. Norberg*, 678 F.3d 581, 588 (7th Cir. 2012). The appellate court reviews the district court's decision to grant or deny a new trial for an abuse of discretion, unless the district court's decision is based on a question of law, in which case it is reviewed *de novo*. See *Wright v. Illinois Dep't of Children and Family Services*, 798 F.3d 513, 527 (7th Cir. 2015). Still, "[t]he Seventh Circuit has cautioned that while the district court judge 'has a responsibility for the result [of the trial] no less than the jury, he should not set the verdict aside as against the weight of the evidence merely because, if he had acted as trier of the fact, he would have reached a different result; and in that sense he does not act as a 13th juror in approving or disapproving the verdict.'" *U.S. Data Corp. v. RealSource, Inc.*, 2014 WL 3639118, at *4 (N.D. Ill. July 23, 2014) (quoting *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995)).

### B. Product of Passion and Prejudice

Defendant moves for a new trial based on the jury's damages award on Plaintiff's ADA claim and the jury's finding of willfulness under USERRA. According to Defendant, these findings of the jury are wholly unsupported by the evidence—and with respect to the damages award, so monstrously excessive—that a new trial on both liability and damages is necessary. As noted above, a motion for a new trial is governed by Rule 59(a), which directs that "[a] new trial

is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014).

With respect to Defendant's argument regarding willfulness under USERRA, for the reasons discussed above, the Court concludes that jury's finding was supported by the evidence. That being said, the Court agrees that the jury's award of $2.6 million in compensatory damages was not at all supported by the evidence. For the reasons discussed above, the Court is granting Defendant's motion for judgment as a matter of law on Plaintiff's ADA claim. However, the jury's damages award on that claim raises significant concerns about the soundness of the jury's verdict. "In deciding whether a damages award is excessive" such that a new trial or remittitur is appropriate, three factors guide the Court's "analysis: 'whether (1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases.'" *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015) (quoting *G.G. v. Grindle*, 665 F.3d 795, 798 (7th Cir. 2011)). The Seventh Circuit has "observed that the 'monstrously excessive' standard and the 'rational connection' standard are really just two ways of describing the same inquiry: whether the jury verdict was irrational." *Id.* (citing *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 713-14 (7th Cir. 2004); *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285 n. 13 (7th Cir. 1995)). "In deference to the jury's role as the trier of fact, this Court reviews the record as a whole and takes the evidence in the light most favorable to the jury's verdict." *Id.* "In order to determine whether the jury's verdict was irrational, the [Court] must review the trial record as a whole in the light most favorable to the verdict." *Id.* In other words, the issue before the Court is whether the

jury's verdict was "rationally related" to the challenged conduct. *Id.* The Court cannot say so with respect to the jury's damages award on Plaintiff's ADA discrimination claim.

As discussed above, Plaintiff failed to present any evidence on compensatory damages supporting her ADA discrimination claim. Yet the jury awarded Plaintiff $2.6 million in compensatory damages alone.[8] This amount dwarfs the amount of compensatory damages awarded in cases in which the plaintiff actually presented evidence of compensatory damages. See *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 834 (7th Cir. 2013) (discussing compensatory damage awards ranging from $75,000 to $250,000 in more extreme cases). Plaintiff herself only asked that the jury to award her $1 million dollars total. Yet the jury awarded her nearly eight times that amount (and 2.6 times that amount in compensatory damages alone). Given the complete lack of evidence on compensatory damages and the much smaller compensatory damage awards in cases with actual evidence of harm, the Court concludes that the jury's verdict was not rationally related to the evidence presented at trial.

In fact, given both (1) the complete lack of evidence on the issue and (2) the size of the verdict on compensatory damages—having viewed all the evidence presented at trial—the Court concludes that the verdict was irrational. See *Dossett v. First State Bank*, 399 F.3d 940, 945 (8th Cir. 2005) (affirming decision granting a new trial *sua sponte* based on an award of $1.5 million in damages when the plaintiff's attorney only requested $500,000 in damages). The Court recognizes that the Seventh Circuit has expressed skepticism of the proposition that irrationality (or, put another way, passion and prejudice) may be inferred from the size of the award alone. *Dresser Indus., Inc., Waukesha Engine Div. v. Gradall Co.*, 965 F.2d 1442, 1448 (7th Cir. 1992).

---

[8] Although the Court reduced the $7.8 million award for Plaintiff's discrimination claim because of the statutory damages cap (42 U.S.C. § 1981a(b)(3)), the Court looks to the actual amount awarded by the jury when considering whether an award is either monstrous or irrational because it is that amount the provides the best indication of whether the jury acted with passion and prejudice.

But here, it is not just the size of the award the supports the inference of prejudice; it is the fact that the award of compensatory damages is not supported by any evidence. This—in conjunction with the size of the award—supports the conclusion that the jury's verdict was improper. "Unquestionably, a new trial, and not remittitur, is required when an award is the result of passion and prejudice, because the prejudice may have infected the verdict itself." *Dresser Indus., Inc., Waukesha Engine Div. v. Gradall Co.*, 965 F.2d 1442, 1448 (7th Cir. 1992) (citations omitted); see also *Dorin v. Equitable Life Assurance Society*, 382 F.2d 73, 77 (7th Cir. 1967) ("If a verdict is the result of appeals to passion and prejudice, the trial court must unconditionally order a new trial and cannot give the plaintiff an option to accept a lesser amount."); 11 Wright and Miller, FED. PRAC. & PROC. CIV. § 2815 (3d ed.) ("It is not proper to use [remittitur] if the verdict was the result of passion and prejudice, since prejudice may have infected the decision of the jury on liability, as well as on damages. In those instances a complete new trial is required."). However, as discussed above, the Court already is granting Defendant's motion for judgment as a matter of law on Plaintiff's ADA claim.

Still, the Court must determine whether the jury's passion and prejudice affected other aspects of the verdict that still stand. The Court may order a partial new trial only if "it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500 (1931). Where a jury's damages award is the product of passion and prejudice and/or is grossly excessive, a new trial should be granted on both liability and damages. *Ustrak v. Fairman*, 781 F.2d 573, 579-80 (7th Cir. 1986) (noting in dicta that "[t]he damages awarded by the jury * * * were so extraordinary as to suggest that not only the jury's assessment of damages but also its assessment of liability may have been tainted by 'passion and prejudice,' thereby requiring that

the entire verdict, and not merely the damages part of it, be set aside" (citations omitted)); *Cont'l Cas. Co. v. Howard*, 775 F.2d 876, 883 (7th Cir. 1985) ("When the question of damages 'is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty' granting a partial trial on the issue of damages would amount to a denial of a fair trial.") (quoting *Gasoline Products Co.*, 283 U.S. at 500-01 (1931)); *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 955 (7th Cir. 2018) (indicating that a new trial may be granted on both liability and damages if the jury's damages analysis was based on "passion or prejudice or otherwise disobeyed the district court's instructions"); *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1145 (7th Cir. 1985); *Benson v. Allphin*, 786 F.2d 268, 280 (7th Cir. 1986); see also *Dossett v. First State Bank*, 399 F.3d 940, 946-47 (8th Cir. 2005) ("It is 'generally inappropriate,' however, to order only a partial new trial on the issue of damages when the district court concludes the damages award was motivated by passion and prejudice." (quoting *Sanford v. Crittenden Mem'l Hosp.*, 141 F.3d 882, 885 (8th Cir. 1998))); *Sharkey v. J.P. Morgan Chase & Co.*, 2018 WL 1229831, at *7 (S.D.N.Y. Mar. 5, 2018) ("In the event the jury's verdict was the result of passion or prejudice, the whole matter must be retried, as the prejudice that infected one aspect of the verdict may have affected the remainder of the verdict as well." (citing *Wagenmann v. Adams*, 829 F.2d 196, 216-17 (1st Cir. 1987)).

Here, the question is whether a new trial on Plaintiff's USERRA claim is warranted because of the jury's grossly excessive and irrational verdict on Plaintiff's ADA claim. And, based on the foregoing discussion, the answer to that question is yes.[9]

---

[9] If the Court were not granting judgment as a matter of law on Plaintiff's ADA claim, the Court would order a new trial on Plaintiff's ADA claim on that basis. In that case, the Court would conclude that a new trial on Plaintiff's USERRA claim also is warranted, as it is not clear that the issues to be retried in the ADA claim are so distinct and separable that a trial on the ADA claim alone may be held without injustice. Plaintiff relies on much of the same evidence in support of both claims. Indeed, both claims are predicated on the termination of Plaintiff's employment and Defendant's actions leading up to that event. Where

## B.     Manifest Weight of the Evidence

Defendant also argues that the Court should grant its motion for a new trial because the jury's verdict was against the manifest weight of the evidence.  "When considering whether the verdict was against the manifest weight of the evidence, 'the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial.'"  *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012) (quoting *Mejia v. Cook Cty., Ill.*, 650 F.3d 631, 633 (7th Cir. 2011)).  "Additionally, the evidence must be weighed neutrally, rather than in a light favorable to the non-movant."  *Stragapede v. City of Evanston*, 2016 WL 278854, at *10 (N.D. Ill. Jan. 22, 2016), aff'd sub nom. *Stragapede v. City of Evanston, Ill.*, 865 F.3d 861 (7th Cir. 2017), as amended (Aug. 8, 2017).  "In conducting its own assessment of the evidence presented, the district court cannot remove a piece of evidence from the calculus merely because the court believes it was not credible and then, with that piece excluded, grant a motion for a new trial because the verdict is now against the weight."  *Mejia*, 650 F.3d at 633.  The Court is "bound by the same evidence the jury considered in ruling on the motion for new trial."  *Whitehead*, 680 F.3d at 928 (citing *Mejia*, 650 F.3d at 633).  "[A] court will set aside a verdict as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict."  *Marcus & Millichap Inv. Servs. of Chi., Inc. v. Sekulovski*, 639 F.3d 301, 313-14 (7th Cir. 2011) (quotations omitted); see also *Galvan v. Norberg*, 678 F.3d 581, 589 (7th Cir. 2012).  "The district court, however, cannot grant a new trial just because it believes the jury got it wrong."  *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012) (citation

---

claims are not distinct and separable, a new trial should not be granted as to some claims only.  See, *e.g.*, *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordination Pretrial Proceedings*, 2018 WL 3303269, at *10 (N.D. Ill. July 5, 2018) ("[T]he Court does not believe that it can appropriately order a new trial limited to the negligence and strict liability claims while keeping the misrepresentation verdicts intact.").

omitted).  "[S]ince the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict." *Latino v. Kaizer*, 58 F.3d 310, 317 (7th Cir. 1995) (quoting *Williams v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982)) (internal quotation marks omitted).  "A new trial should be granted * * * only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Whitehead*, 680 F.3d at 928 (citation and internal quotation marks omitted).  The verdict here satisfies that standard.

Assessing the evidence presented at trial, the Court concludes that no rational jury could have rendered the verdict reached by the jury here.  This is not a case where the evidence was sharply in conflict.  The testimony of Temko and Schroeder indicated that Defendant uniformly enforced its attendance policy against employees who were minutes late.  While that policy might be unfair, as it punishes those who are one minute late the same as those who are fifty-nine minutes late, it is not for the Court or the jury for that matter to assess the fairness of the policy.  *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) ("The federal courts are not a super-personnel department that second-guesses facially legitimate employer policies.  It is not the role of the court to determine whether an employer's expectations were fair, prudent, or reasonable." (internal citations omitted)).

Although only a few employees were terminated based on occurrences for being minutes late, Plaintiff did not identify any examples of employees (other than herself) not receiving occurrences for such minor attendance infractions.[10]  The evidence before the jury—including the testimony of Temko and Schroeder—indicated that the policy was enforced uniformly.  The Court

---

[10] The Court notes that the jury may have inferred that Defendant excused tardies where a justification was provided (*i.e.*, the employee had car trouble or was stuck in the snow), Plaintiff does not identify any instance in which Defendant excused a tardy where there was no excuse provided.

also notes that Defendant did not identify any examples of other employees who were disciplined for a start time infraction; still, there is nothing in the record to suggest that other employees were not following the Attendance Policy with respect to this issue. Although other employees may have waited in the breakroom for their shift to start after they punched in, they still were in the building in accordance with the Attendance Policy.

The Court may grant a motion for a new trial based on the jury verdict being against the manifest weight of the evidence "even if a motion for judgment as a matter of law must be denied." *Mejia*, 650 F.3d at 634 (citing *Smart Mktg. Grp. v. Publ'ns Int'l Ltd.*, 624 F.3d 824, 832 (7th Cir. 2010)). Although the Court concludes that Defendant is not entitled to judgment as a matter of law on Plaintiff's USERRA claim, the Court also concludes that the jury's verdict with respect to Plaintiff's USERRA claim was against the manifest weight of the evidence. The Court therefore grants Defendant's motion for a new trial on Plaintiff's USERRA claim.

Indeed, Plaintiff herself has a difficult time defending the jury's verdict, relying extensively (although not exclusively) on evidence relating to claims and/or issues not actually before the jury. For example, Plaintiff makes numerous arguments relating to alleged misconduct independent of her termination—the adverse employment action that serves as the basis of Plaintiff's claims. [110, at 17 ("Obviously, Arroyo suffered an adverse action—she lost her job.").] Plaintiff asserts that she was not privy to the many mocking and hostile emails shared among her supervisors and that the "jury had a right to compensate [Plaintiff] due to management's mocking ridicule of Plaintiff and its deliberate indifference to the government published documentation of her rights [that Plaintiff] was bringing to them, thereby further exacerbating her disability." [209, at 9-10.] However, contrary to Plaintiff's assertion, the jury would not act properly by compensating Plaintiff for being mocked by her supervisors unbeknownst to her. Plaintiff also argues that

Defendant violated USERRA by threatening to terminate Plaintiff's employment due to a lack of communication. [209, at 31.] Again, that was not an actionable adverse employment action before the jury. In fact, Plaintiff did not bring a failure to reemploy claim under USERRRA and certainly cannot raise such a claim in response to Defendant's post-trial motions.

## C.  Prejudicial Conduct by Plaintiff Relating to Failure to Accommodate and Retaliation Claims Dismissed Prior to Trial.

Plaintiff also makes numerous arguments relating to failure to accommodate and retaliation claims that were disposed of by the Court on summary judgment. For example, Plaintiff asserts that the jury's verdict on Plaintiff's USERRA claim was not against the manifest weight of the evidence because the emails between Defendant's management would allow a reasonable jury to conclude that Defendant "willfully circumvented the law as [Plaintiff] sought to claim her rights under USERRA as an active service member." [209, at 26.] Plaintiff goes on to assert that the actions by Defendant "became even more egregious" when Plaintiff was diagnosed with PTSD and quotes in a parenthetical language from a Supreme Court case regarding retaliation claims. [*Id.* (quoting *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).] However, there was no retaliation claim before the jury.

This leads to Defendant's final argument for granting a new trial on Plaintiff's USERRA claim—that Plaintiff's counsel engaged in prejudicial conduct warranting a new trial. Specifically, Defendant points to Plaintiff's repeated efforts to inject into the trial evidence relating to her failure to accommodate claim. The Court granted summary judgment on that claim, and that decision was affirmed by the Seventh Circuit. During trial, Plaintiff made numerous statements regarding requests for certain accommodations that were denied by Defendant. For example, During Plaintiff's examination of Temko, counsel for Plaintiff suggested that Defendant should have given someone with PTSD—like Plaintiff—more flexibility. [See Tr. 1084 (asking Temko whether he

would have excused someone with PTSD for being one to two minutes late); Tr. 1103 (asking Temko whether it occurred to him that Plaintiff might have PTSD when he issued a verbal warning to Plaintiff).]  During Plaintiff's examination of Schroeder, Plaintiff's counsel asked Schroeder about Plaintiff's offer to work later to make up for her tardiness.  [Tr. 771.]  Plaintiff also asked Schroeder whether he had authority to cut an employee " a little slack" because she had PTSD. [Tr. at 1001.]  During cross-examination of Plaintiff, the following exchange occurred:

> Q: You would agree with me that there's nothing wrong about an employer asking its employees to be at work on time?
>
> A: Nothing wrong?
>
> Q: Yes.
>
> A: If it violates the law, sure.
>
> Q: Ma'am, are you aware of a law that says an employer can't require their employees to be at work on time?
>
> A Well, gee, if there was an agreed upon accommodation, like flexible work schedule, and then the employer doesn't honor that, yeah, I would believe so.
>
> Q: But that is not the situation here, is it?
>
> A: It is actually.

[Tr. 861.]

The Court sustained some of Defendant's objections to this type of testimony on relevance grounds.  For example, it was not relevant whether it occurred to Temko that Plaintiff had PTSD when he issued her a warning for an attendance infraction.  [Tr. 1103.]  The Court also sustained objections on cumulativeness grounds for questions relating to how Plaintiff was treated differently under the attendance policy.

The Court allowed limited inquiry into Defendant's refusal to exercise its discretion to excuse Plaintiff's attendance infractions.  In allowing some questioning on the issue, the Court

noted that questions about excusing Plaintiff's attendance infractions could relate to Defendant denying accommodations (which would be irrelevant at trial) and they could relate to Defendant exercising its discretion to excuse attendance infractions in a discriminatory manner (which would be relevant).  Because the parties indicated that the latter category of questions would be at issue, the Court allowed such questions but reminded the jury throughout the trial that there was no failure to accommodate claim at issue in the case.  Still, Plaintiff pressed these questions so much that the Court began to sustain objections to questions on this issue on cumulativeness grounds.

Throughout the trial the Court carefully sought to walk the line between allowing Plaintiff to present evidence supporting Plaintiff's viable claims and barring Plaintiff from presenting evidence relating to claims already determined to be legally insufficient.  In aid of that goal, the Court repeatedly provided the jury with curative instructions noting that Plaintiff was not bringing a failure to accommodate claim.  In the instructions provided to the jury, the Court also instructed that Plaintiff was not bringing any claim that Defendant "failed to provide accommodations for her PTSD."  [156 (Jury Instructions), at 17.]  Courts "presume" that juries follow such instructions absent evidence to the contrary.  *Sanchez v. City of Chicago*, 700 F.3d 919, 932 (7th Cir. 2012).  Furthermore, "[a]s a general rule, errors in admitting evidence that is merely cumulative of properly admitted evidence are harmless."  *Jordan v. Binns*, 712 F.3d 1123, 1138 (7th Cir. 2013).  "Admission of cumulative evidence does not merit reversal absent a showing of prejudice."  *Holmes v. Elgin, Joliet & E. Ry. Co.*, 18 F.3d 1393, 1397 (7th Cir. 1994) (citing *Stutzman v. CRST Inc.*, 997 F.2d 291, 298 (7th Cir. 1993)).   To be sure, the Court has already concluded that the jury's verdict did not adhere to the Court's instructions in every respect.  Specifically, the jury awarded Plaintiff a sizable compensatory damages verdict—approximately 2.6 times the total damages requested by Plaintiff's counsel—despite the fact that Plaintiff did not present *any*

evidence on that issue. Nevertheless, in view of the sustained objections and limiting instructions referenced above, the Court would not order a new trial on the basis of Plaintiff's introduction of testimony and evidence relating to accommodations alone. But for the reasons explained above, other circumstances convince the Court a new trial on Plaintiff's USERRA claim is warranted.

## IV.    Conclusion

For the reasons stated above, Defendant's motion for judgment as a matter of law, or, in the alternative, a new trial, or, in the alternative, remittitur and amendment of judgment [192] is granted to the following extent: the Court will enter judgment as a matter of law in favor of Defendant on Plaintiff's ADA discrimination claim and grant a new trial on Plaintiff's USERRA claim. Defendant's remaining requests for relief are denied. Plaintiff's motion to alter judgment [204] is denied in its entirety as moot. This case is set for further status hearing on October 10, 2019 at 9:30 a.m.

Dated: September 30, 2019

_____
Robert M. Dow, Jr.
United States District Judge