1           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3
LUZMARIA ARROYO,                    )  Docket No. 12 C 06859
4                                   )
            Plaintiff,              )  Chicago, Illinois
5                                   )  August 17, 2016
        v.                          )  2:07 PM
6                                   )
VOLVO PARTS NORTH AMERICA, LLC,     )
7                                   )
            Defendant.              )
8                      VOLUME 3-B
9           TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
      BEFORE THE HONORABLE ROBERT M. DOW, JR., AND A JURY
10
APPEARANCES:
11

12  For the Plaintiff:      JOHN P. DeROSE AND ASSOCIATES, by
                            MR. JOHN P. DeROSE
13                          MS. CAITLYN DeROSE
                            15 Spinning Wheel Road
14                          Hinsdale, Illinois 60521
                            (630) 920-1111
15
For the Defendant:      CONSTAGNY, BROOKS & SMITH LLP, by
16                          MR. WILLIAM J. McMAHON IV
                            100 N. Cherry Street
17                          Suite 300
                            Winston Salem, North Carolina 27101
18                          (336) 721-6860

19                          CONSTAGNY, BROOKS & SMITH LLP, by
                            MS. SUSAN E. BASSFORD WILSON
20                          200 S. Wacker Drive
                            Suite 3100
21                          Chicago, Illinois 60606
                            (314) 925-7275
22
Court Reporter:         KRISTIN M. ASHENHURST, CSR, RDR, CRR
23                          Official Court Reporter
                            219 S. Dearborn Street, Room 1918
24                          Chicago, IL 60604
                            (312) 818-6549
25                          kristin_ashenhurst@ilnd.uscourts.gov

Jankowski - Direct by Mr. DeRose

1    (The following proceedings were had in open court:)

2    THE COURT:  Carolyn got an email from one of the

3    jurors asking if the trial would be over by the 28th, which is

4    11 days from now.

5    MR. DeROSE:  Tell us we're not sure.

6    THE COURT:  If I said that, they may all leave.  I

7    told her yes.  I feel comfortable in saying that.  There's no

8    way we are going to be here on the 28th.

9    MR. McMAHON:  We agree.

10   MR. DeROSE:  If you would stop cross-examining so

11   much.

12   (Laughter.)

13   (Jury in.)

14   THE COURT:  Good afternoon folks.  Ms. Jankowski is

15   still on the witness stand, and Mr. DeRose still has some

16   questions for her, so whenever you're ready, sir.

17   MR. DeROSE:  Thank you, Your Honor.

18   SHERRIE JANKOWSKI, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

19                 DIRECT EXAMINATION (RESUMED)

20   BY MR. DeROSE:

21   Q   Ms. Jankowski, of course, you realize you are still under

22   oath, correct?

23   A   Yes.

24   Q   All right.  Thank you.  When we left this morning, I had

25   asked you about your perception of morale among the staff.  And

Jankowski - Direct by Mr. DeRose

1    sometime after you left watching that shift, the shift that

2    Ms. Arroyo was on, you were still, I take it, on the same

3    shift.  You were on a different crew of people to watch?

4    A    Yes.

5    Q    So you're still working from 4:30 to 12:30 at night.  So

6    you folks would move around and get a different crew of people

7    just to get a new look on life or what was that?

8    A    No.  Yearly, we had a shift change.  So if somebody with

9    more seniority came to night shift for the year, we'd have to

10   rearrange everybody by seniority because that's how they went

11   on each supervisor's list.

12   Q    But you used to have the newer group of seniority people

13   earlier on I thought you said.

14   A    Yes.

15   Q    So now you moved over to do the people when she was no

16   longer on your shift, would that be she moved or you always

17   kept the middle group of seniority people?

18   A    I always kept the middle people.  So somehow she went

19   either to the higher group or somehow you got more older people

20   went on and she went down.  She would have to move up to the

21   next group, to the first group.

22   Q    Ah, so now she's -- if she is with Dunne at the time, she

23   is now in the group of highly qualified people.  Is that what

24   that amounts to?  I mean the most experienced group.

25   A    No, it was based on seniority.

Jankowski - Direct by Mr. DeRose

1  Q   Seniority.  That's what I meant.  She was getting longer in

2  the tooth on the job.  She had been there many more years -- or

3  more years?

4  A   Yes, she was.

5  Q   That's what I had to find out.  All right.

6       So on your shift, now, when we get to about October of

7  2011, by that time you knew that there was a room set aside for

8  Ms. Arroyo so that she could do something called meditate; is

9  that right?

10 A   Yes.

11 Q   What did they -- who told you about this room?

12 A   I believe it was Mr. Schroeder.

13 Q   Did he say what Ms. Arroyo could do in there?  I mean,

14 could she burn incense and cant, or what was she supposed to be

15 doing?

16 A   Meditating.  I don't know -- she had a half hour before the

17 start of a shift to go in there and get ready -- I don't

18 know -- to be able to work on her shift.

19 Q   Right.  And I don't mean to make fun of it, but you

20 couldn't hear incantations through the door, ya-yas and things

21 like -- because I don't really know what meditation is.

22 A   I don't either.  So while I was in the office, I didn't

23 hear anything.  But at the half hour before the start of my

24 shift I wasn't always in my office, so. . .

25 Q   As you say, what other people are doing, you don't care as

Jankowski - Direct by Mr. DeRose

1    long as they're not breaking the law and causing a danger to

2    you and the other people in the system, right?

3    A    As long as -- yes.

4    Q    All right.  That office where Ms. Arroyo was about to

5    meditate -- was allowed to meditate, it didn't have a sign on

6    the front of it or anything?  Did it have like a do not disturb

7    sign on it?

8    A    It had a sign.  But I can't remember what it said.

9    Q    And that, really, was somebody else's office.  Another

10   supervisor who wasn't around?

11   A    At that time I don't believe it was -- I don't believe it

12   was being used.  I'm not sure.

13   Q    So it was an empty office.

14   A    I believe it was.

15   Q    And the closest entrance from the outside to that office

16   was on the back side of the building, right?

17   A    Yes.  But it's not an employee entrance.  It's a truck

18   entrance.

19   Q    All right.  We're going to get into that.  Had you ever

20   parked back there?

21   A    I don't recall -- I may have.  I don't know.

22   Q    You knew that other supervisors parked back there, even

23   supervisors on the same shift you worked?

24   A    Yes, I think I did.

25   Q    You know what Patrick Dunn's car looks like?

Jankowski - Direct by Mr. DeRose

1    A    Honestly, no.

2    Q    So anyway, there came a time you wrote to Keith Schroeder

3    about the fact that Ms. Arroyo parked in the back of the

4    building, right?

5    A    I don't recall.

6    Q    Did Keith Schroeder ask you to keep him advised of your

7    observations of what Ms. Schroeder was doing while she was --

8            MR. McMAHON:  Objection.  He said Schroeder.

9            MR. DeROSE:  What did I say?

10           THE COURT:  I think you said Ms. Schroeder.  You

11   either meant Ms. Jankowski or Mr. Schroeder.  But I'm not sure

12   which.

13           MR. DeROSE:  Keep track of -- withdraw that question.

14           THE COURT:  We'll give you a new one.

15           MR. DeROSE:  I don't mean to confuse people.

16   BY MR. DeROSE:

17   Q    Did Mr. Schroeder tell you to keep him advised of what you

18   observed Ms. Arroyo doing on the 4:30 to 12:30 shift?

19   A    Not in so many words.  He said to just let him know if

20   there was anything that he needed to know.

21   Q    All right.  On October 27, 2011 -- this is a week before

22   she gets terminated -- do you remember writing Mr. Schroeder

23   telling him that Ms. Arroyo was parking in the back of the

24   building?

25   A    No, I don't recall.

Jankowski - Direct by Mr. DeRose

1  Q   When you read the emails within the last week, you saw

2  emails from you to Mr. Schroeder talking about the fact that

3  you were observing Ms. Arroyo parking in the rear of the

4  building, turning around the other side.  You don't remember

5  those emails?

6  A   I don't remember any emails pertaining to that.

7  Q   Who gave you the emails to look at last week?

8  A   Counsel.

9  Q   All right.  I want you to just look at -- without the jury

10 seeing it right now -- Exhibit 226A.

11         MR. DeROSE:  You've got her off?

12         THE CLERK:  Just the witness.  Mm-hmm.

13         THE COURT:  Yes.  There we go.

14         MR. DeROSE:  Oh, I'm sorry Judge.

15 BY MR. DeROSE:

16 Q   Now, this bottom email, or this email that you're looking

17 at now is from you to Keith Schroeder, right?

18 A   Yes.

19 Q   And you say you were informed that when she got to work,

20 and then you describe about her parking her car, right?

21 A   Okay.  Yes, I do recall seeing this.

22 Q   So you were shown this email?

23 A   Yes, I was.

24 Q   And who told you that she parked in the back of the

25 building?

Jankowski - Direct by Mr. DeRose

1   A   I don't recall who said it.

2   Q   And you mentioned a gentlemen in this email, John

3   Sarpalious, S-a-r-p-a-l-i-o-u-s, for the reporter.

4   Mr. Sarpalious, that's a new name to me.  Is he just a worker?

5   A   Yes.

6   Q   Was he parking in the back of the building also?

7   A   No.

8   Q   Where was he parking?

9   A   He was coming out of his car in the front of the building.

10  Q   I see.  So what you're reporting to Mr. Schroeder is

11  something that someone else told you about, that you did not

12  observe yourself?

13  A   Yes.  But if somebody almost gets hit, I don't think

14  they're going to lie about it.

15  Q   Ma'am, excuse me.  I didn't ask you about anybody getting

16  hit.  What you're reporting to Mr. Schroeder is something that

17  someone else told you about only, correct?  You didn't see it.

18  A   Yes.

19  Q   All right.  And you thought -- all right.  You know what,

20  Judge, since we have already gotten that out, maybe I will

21  publish this, please.

22      THE COURT:  I think this was subject to the ordinary

23  understanding, so, yes, you can publish this.  We will receive

24  into evidence 226A.  It can be published now.

25      (Plaintiff's Exhibit 226A was received in evidence.)

Jankowski - Direct by Mr. DeRose

1    MR. DeROSE:  Thank you, Judge.

2    THE COURT:  Thank you.

3    MR. DeROSE:  I was trying to avoid that, but that's

4  okay.

5  BY MR. DeROSE:

6  Q   You don't remember who told you the information you have in

7  your email, is that what you're saying?

8  A   John Sarpalious was the one who told me that she sped

9  around to the back.

10  Q   You do know who told you this?

11  A   He didn't tell me that she parked back there.  He told me

12  that she sped around to the back of the building, nearly

13  hitting him.

14  Q   The first parking spot by the door.  The door you're

15  talking about is the door that leads in from the back right

16  closest to the meditation room, am I correct?

17  A   No.  That first parking spot is a handicapped parking spot.

18  Q   Is it in the front of the building?

19  A   That's in the front of the building.

20  Q   All right.  Did he complain to you that Ms. Arroyo parked

21  in the handicapped spot?

22  A   He must have if it's in this email.

23  Q   Well, you don't say that he's complaining.

24  A   Well, maybe he's not complaining.  I only got this

25  information from him as he told it to me, the first part of it.

Jankowski - Direct by Mr. DeRose

1   Q    All right.  But as I understand what you're saying here,

2   she parked in the handicapped spot by the front door, obviously

3   had to go in, punched in, and then sped around to the back, you

4   think almost striking Mr. Sarpalious, who's just getting out of

5   his car?

6   A    I don't know when he got out of his car.  This is just what

7   he told me, that he was out there when it happened.

8   Q    Did you ask him if he was standing out there during all of

9   this time?

10  A    No, I didn't think I needed to.

11  Q    All right.  Was he angry?

12  A    No.  I think he was just reporting it as an incident.

13  Q    All right.  So why -- and then he says, "And she parked by

14  Door 24."  So if he is parked in the front, did he have to walk

15  around that building -- it is a block-long building, isn't it?

16  A    Probably, if not bigger.

17  Q    So if he's parked in the front, and that handicapped

18  parking spot at the front door is in the middle of the

19  building, he has to walk half the building, down the side, all

20  across the back and then look in the back to see that she's

21  parked in the back parking spot?

22  A    No.  What would happen with Mr. Sarpalious and many of our

23  other employees that were smokers, they would punch in, come to

24  the back of the building where they would have a picnic table

25  and they would have a cigarette before their shift started.

Jankowski - Direct by Mr. DeRose

1    And that's where he saw the car.

2    Q    So he saw the car parked by Door 24.  And as far as he knew

3    there was no prohibition against that, was there?

4    A    I don't know.

5    Q    As a matter of fact, on October 27th, there was no

6    prohibition against someone parking in the back, was there?

7              MR. McMAHON:  Objection.  Lack of foundation.

8              THE COURT:  I don't -- why couldn't he ask her that

9    question, whether there was a prohibition, yes or no?

10             MR. McMAHON:  I guess that's appropriate.  I will

11   withdraw the objection.

12             THE COURT:  You can go ahead and answer that question.

13             MR. DeROSE:  Thank you.

14             THE WITNESS:  I'm sorry.  What was the question?

15   BY MR. DeROSE:

16   Q    The question is, there was no prohibition against anybody

17   parking in the back?

18   A    Not at -- I don't believe at that time.

19   Q    So why are you telling Keith about this?

20   A    Because it's a safety hazard.  Again.

21   Q    What's the safety hazard?

22   A    That area in the back are dock doors that trucks pull in

23   and out of.  And where she was parked was right next to a dock

24   door.  The only entrance is for truck drivers.

25   Q    But wait a minute, you have supervisors who parked back

Jankowski - Direct by Mr. DeRose

1  there, don't you, right in that very spot?

2  A   No, not on a -- not on a full-time type thing.  They would

3  come and drop something off and would pull around to the front

4  if they had anything.

5  Q   Well, Ms. Arroyo wasn't parking back there on a full-time

6  thing.  She could only be back there for a half hour while she

7  was using the meditation room, right?

8  A   It wasn't an employee spot.  I don't know.

9  Q   Who told you it wasn't an employee spot?

10  A   Because it's not.  It's in the truck dock area.  No other

11  employee has ever parked there.

12  Q   Well, right after you sent that email to Mr. Schroeder, the

13  next -- and you did that at 10:59 in the evening -- the next

14  day Mr. Schroeder on October 28th put an email out to you guys,

15  didn't he?

16  A   I believe that's the one on here.

17      MR. DeROSE:  Well, can you put only for her the first

18  email?  Witness only.

19      THE CLERK:  Witness only.

20      THE COURT:  What number is this?

21      MR. DeROSE:  It's part of 226A, but I hadn't showed it

22  to her.

23      THE COURT:  Okay.

24  BY MR. DeROSE:

25  Q   Do you remember getting this email?

Jankowski - Direct by Mr. DeRose

1      THE COURT:  This is already in evidence?

2      MR. DeROSE:  Yeah, I think so.  Judge, can I publish

3  this?

4      THE COURT:  Yes, you can.

5  MR. DeROSE:

6  Q    All right.  So the following day, Keith Schroeder wrote an

7  email, not to all employees, just to all of you supervisors,

8  right?

9  A    Yes.

10  Q    And was that unusual for Keith to say, "Do not print.  Read

11  and delete," when he sent you folks emails?

12  A    On occasion we would get one or two of these.

13  Q    Did you ever ask him why he wanted you to delete it and you

14  couldn't print it?

15  A    No.

16  Q    Did you supervisors talk among yourselves why you couldn't

17  print it?

18  A    No.

19  Q    Well, Keith Schroeder says he knows that clerical staff and

20  supervisors park back there, didn't he?

21  A    On rare occasions.

22  Q    As a matter of fact, they weren't so rare.  They happened

23  pretty regularly, didn't they?

24  A    No.  No.

25  Q    And then in his last paragraph there he says, "Ms. Arroyo

Jankowski - Direct by Mr. DeRose

1  is likely well aware of this."  How would she be aware of it?

2  A   Because no other employee parked back there.

3  Q   But her.  Is that right?

4  A   No other hourly employee.

5  Q   But she did?

6  A   Yes.

7  Q   And that's what you were telling him about?

8  A   I could have.  I don't remember.

9  Q   All right.  And he said he wanted to avoid a charge of

10 retaliation and he must review this with legal.

11     Did you understand what he was telling you?

12 A   I don't know what Mr. Schroeder was, you know, saying in

13 this.  But I knew that it didn't really pertain to us.  It was

14 for him and legal and Ms. Arroyo.

15 Q   Well, when he wrote to you, "We have to avoid a

16 circumstance where it is perceived that I am singling out

17 Ms. Arroyo, when others in this facility have on occasion been

18 allowed to park back there," did you know what he was talking

19 about?

20 A   No.

21 Q   Thereafter did Schroeder tell you that he was going to post

22 a sign saying "no parking" back there, people?

23 A   No.

24 Q   Didn't tell you what he was planning to do?

25 A   Not that I recall.  I don't remember.

Jankowski - Direct by Mr. DeRose

1    MR. DeROSE:  All right.  Cait, would you put up 233

2    for the witness only?

3    MS. DeROSE:  233?

4    MR. DeROSE:  Well, I have it as 233, Caitlyn.  Oh,

5    wait.  Yeah, 233.

6    BY MR. DeROSE:

7    Q   Now, this is not an e-mail written by you.  But do you

8    remember -- it wasn't written by you, but would you tell

9    me -- were you reporting to Keith as management that you were

10   observing Ms. Arroyo go park back there on November 1st,

11   November 2nd, just within a couple of days before she got

12   terminated?

13   A   I don't recall that.

14   Q   Well, to your knowledge, did you have any group meetings

15   with all of the managers where you talked about parking back

16   there?

17   A   I don't remember.

18   Q   All right.  I want you to look at 227.

19   THE COURT:  Which is already in evidence.

20   MR. DeROSE:  Yes, Judge.

21   BY MR. DeROSE:

22   Q   Now, we just saw where Mr. Schroeder said he didn't want to

23   be accused of retaliation and single Ms. Arroyo out, correct,

24   about that back there?

25   A   Yes.

Jankowski - Direct by Mr. DeRose

1    Q    About that time, don't you remember a sign being posted

2    saying nobody's allowed to park in the back?

3    A    No, I can't recall that.

4    Q    Is that a picture -- as grainy as it might be -- of that

5    back entrance you're talking about?

6    A    Yes.

7    Q    Do you recognize those cars in the picture?

8    A    No, I don't.

9    Q    The other manager who worked with you, Dave Miller, do you

10   know what kind of car he drives?

11   A    No, I do not.

12   Q    Do you know what kind of car Ms. Arroyo drives?

13   A    No, I do not.

14   Q    Did Keith Schroeder ever tell you that Ms. Schroeder -- he

15   saw Ms. Schroeder go out and snap a picture of the cars in the

16   back?

17          THE COURT:  You mean Ms. Arroyo?

18          MR. DeROSE:  Judge, I'm sorry.  I don't know what I'm

19   saying.  Thank you for correcting me.  I know I am starting to

20   get a little silly here.

21   BY MR. DeROSE:

22   Q    Did Mr. Schroeder tell you that he saw Ms. Arroyo snap a

23   picture of cars parked at that door right after she asked him,

24   "Is this a rule for which I am being singled out on"?

25   A    I have no knowledge of it.

Jankowski - Direct by Mr. DeRose

1    Q    He didn't tell you what they were talking about?

2    A    No.

3    Q    Do you remember approximately how many days before

4    Ms. Arroyo got fired it was that you saw some sign posted about

5    no parking in the back?

6    A    I have no idea what day she got fired on.  I don't even

7    know what the date was.

8           MR. DeROSE:  With the Court's permission, can we look

9    just with the witness at 226A?

10          THE COURT:  226A is in evidence.

11          MR. DeROSE:  Wait a minute, Cait, I already looked at

12   that.  Just -- all right.  Just put it up.  Because I will ask

13   him about that.

14   BY MR. DeROSE:

15   Q    On that exhibit that you have already looked at, at the end

16   you say, "After the 4:30 bell rang she left Bernie's office."

17          Who's Bernie?

18   A    He was the day shift supervisor.  I didn't realize he was

19   already in that office at that time.

20   Q    So it wasn't an empty office?

21   A    No.  I just said I didn't realize he was already in that

22   office.

23   Q    And that's the office that we're calling the meditation

24   room?

25   A    Yes.

Jankowski - Direct by Mr. DeRose

1  Q   All right.  "She left Bernie's office, went back to her --

2  car, drove to the front."  Then you use in big letters -- "then

3  went to the locker room to get her shoes and other work gear.

4  So once again, she is doing whatever suits her."

5           What did you mean by that?

6  A   She wasn't ready to work at 4:30 when the bell rang.

7  Q   But what do you mean by "Once again she is doing

8  whatever --

9  A   Because she had done that several times.

10  Q   And you had been reporting right along to Keith, that at

11  4:30 she starts moving around and coming out here to work,

12  right?

13  A   No.

14  Q   How long were you watching that, because at 4:30, you've

15  got to be there watching to make sure they all start on time,

16  aren't you?

17  A   Because we have a shift meeting with our whole group.  So

18  you can easily glance and see who's there and who was not.  And

19  that was our way of seeing who was there and who was not.

20  Q   All right.  So at 4:30, how late -- how long did it take

21  her to get her shoes on and her gear on, and did she miss the

22  meeting?

23  A   Yes.  Because our meetings are very brief.  So I don't know

24  exactly how long it took her, but our meetings are less than

25  four minutes because we are a very time-oriented shift.  We

Jankowski - Direct by Mr. DeRose

1  don't have time to take long meetings at the beginning of our

2  shift.

3  Q   And were you getting a little angry about that?

4  A   No, not angry.  But others could see she was not at the

5  meeting like they all were.

6  Q   Who are the others?  The other workers?

7  A   The employees, the supervisors.

8  Q   Was that making morale problems for you on the shift?  She

9  is not showing up at our one-to-three minute meetings at the

10 beginning of the shift?

11 A   They could have been.

12 Q   As a matter of fact, ma'am, you didn't watch those clocks

13 that closely with regard to the 4:30 start, did you?

14 A   Yes, we did.

15 Q   Well, on days of -- did you ever work on days when it was

16 Super Bowl games -- not Super Bowl, but NFL games on the TV and

17 things like that?

18 A   Yes.

19 Q   And all of the guys on the 4:30 shift, they'd get there

20 early so they could watch the game in the lounge, right?

21 A   No.  Because no games started at 4:30.

22 Q   No.  But the game could be on at 4:30, wasn't it?

23 A   No.

24 Q   Or already in progress.

25 A   Not a football game.

Jankowski - Direct by Mr. DeRose

1  Q   All right.  But sporting events, 4:30 in the afternoon,

2  sporting events are going on from time to time, right?

3  A   And if we would see somebody not on the floor and in the

4  lounge -- lunch room, they would be spoken to, and if it

5  persisted, they would be written up.

6  Q   Miss, weren't their occasions when everybody piled out of

7  the lounge at 4:30 when the bell rang?

8  A   Yes.  At 4:30.

9  Q   And then they had to go and punch in the clock, right?

10 A   No, they all punched in before 4:30.

11 Q   In order to be able to use the lounge?

12 A   It was the lunch room where they gathered prior to the

13 shift starting.

14 Q   All right.  And we already heard yesterday that there would

15 be a lineup of people at 4:30 to use that punch-in clock,

16 people going home and people coming in, right?

17 A   Most of them were the people going home.  Very few came in

18 at exactly 4:30.

19 Q   All right.  But in any event, you would never have staff

20 meetings, guys and gals would go to their machines first and

21 check the machine before they got on it; isn't that fair to

22 say?

23 A   As far as I remember, we had our meetings -- and like I

24 said, sometimes they were very brief -- to let them know what

25 our work load was like for the day.  Then they would go -- most

Jankowski - Direct by Mr. DeRose

1    of them had their trucks prior to the start time.

2    Q    Ms. Jankowski, are you saying that you had a one-to-three

3    minute with your entire shift everyday?

4    A    I'm pretty sure we did.  I can't recall exactly.  But I'm

5    pretty sure we did.

6    Q    I know you're in clerical.  When did that stop?

7    A    When did what stop?

8    Q    You're having the one-to-three-to-four minute meetings

9    before anybody went to their machine to start working?

10   A    We do them still today.

11   Q    All of the time?

12   A    All of the time.

13   Q    And then when you're done telling them what you want them

14   to do for the day, did you expect them to walk to their machine

15   or run to their machine?

16   A    Walk to their machine.

17   Q    And then start picking and packing.  Just give us a for

18   instance of what would be -- what would you say in the

19   one-to-three minutes that was so important that you had to say

20   it every day?

21   A    We would give them what the work load was for the day.  If

22   there was any -- if there was bad weather and we had shuttles

23   or trucks that were leaving earlier, we needed to let them know

24   that this was a priority.  It was -- it didn't take very long,

25   but it was something that we did with them to let them know

Jankowski - Direct by Mr. DeRose

1  what was going on for the day.

2  Q   Would you give them their work for the day in writing?  Or

3  just tell them?

4  A   We never gave work in writing.

5  Q   So you would just say, "You'll have to pick and pack so

6  many truck orders today"?

7  A   We would say, "We have this many lines that printed out

8  today, you know, and UPS is pulling 15 minutes early.  We need

9  to make sure that UPS is done before Fed Ex."  And they knew by

10  having -- how many lines we had for the day, they knew how hard

11  the night was going to be or how, you know, if it was a lighter

12  night, they knew they had the time to get the stuff done to

13  meet those earlier deadlines.

14  Q   So the three or four minutes in that very beginning when

15  the supervisors are talking, that would not really impact how

16  much product that they got out.  It would only impact the

17  knowledge of how fast we have to work, am I right?

18  A   It's just a general update.  And it's actually something

19  the employees had asked about.  They wanted to know at the

20  beginning of the shift how much work was there.

21  Q   All right.  But that wouldn't slow down -- because you had

22  to have the meeting, that didn't slow down their production for

23  the day because they don't even start until three to four

24  minutes later, right?

25  A   Correct.

Jankowski - Direct by Mr. DeRose

1  Q   So if Ms. Arroyo arrived one minute after the bell to hear

2  you, she might have missed half of your production -- your

3  advice of what we have got to do today, but she would still be

4  able to fulfill all of the picking/packing orders that were

5  expected of her for the day, right?

6  A   Yes.  But she was still late to that meeting, which is the

7  start of our shift.

8  Q   And was that irritating you?

9  A   It didn't irritate me, it irritated everybody.

10  Q   By everybody, you mean who?

11  A   I don't know.  I don't have a list of people.  But people

12  she worked with, her co-workers.

13  Q   Her co-workers didn't like that, that she missed one minute

14  of your meeting?

15  A   No, they didn't like that she would come in late.

16  Q   You had no other employee walked in at 4:33 or 4:32 in the

17  afternoon?

18  A   Yes, and they would get an occurrence for that.

19  Q   No one else ever got fired by you for being one to three

20  minutes --

21  A   I didn't fire anybody, sir.

22  Q   Or ever written up so you know they got fired?

23  A   I never wrote up anybody for being -- I never had anything

24  to do with the attendance.

25  Q   So you never wrote Ms. Arroyo up for being one to three

Jankowski - Direct by Mr. DeRose

1  minutes late?

2  A   No, I did not.

3  Q   Would any of the other people on your shift write her up

4  for being one to three minutes late?

5  A   No, they would not.  Are you speaking supervisors?  No,

6  they wouldn't.

7  Q   So if she was getting written up for being one to three

8  minutes late, she was being written up by supervisors and

9  Mr. Schroeder for something that didn't even happen while they

10  were there; is that right?

11  A   They administered the attendance policy.

12  Q   So they had to take information from you if they got time

13  records that showed she checked in at 4 o'clock.  It had to be

14  something you were saying or Mr. Dunn or Mr. Miller was saying,

15  that told them that she should be written up?

16  A   No.  We would tell them if she was late.  We didn't tell

17  them to write her up.

18  Q   Who would you tell that she was late?  Mr. Schroeder or

19  Mr. Temko?

20  A   I didn't tell anybody that anybody was late.  We had a time

21  clock.  And you could tell on the time clock what time they

22  punched in.

23  Q   Well, you know she's punching in at 4 o'clock?

24  A   Not all of the time.  If the time clock says 4:31, the time

25  clock is right, not me.

Jankowski - Direct by Mr. DeRose

1  Q  That week of November 1st and the 4th, right after you sent

2  that email to Keith --

3  A  Which email?

4  Q  That email we looked at when you said she went around and

5  she parked the car and she's once again doing what she wants to

6  do.  Remember that email?

7  A  Yes.

8  Q  That whole week, was she punching in at 4:31 and 4:32 and

9  4:33?

10  A  I do not know.  I do not take care of that.

11  Q  You didn't report that you observed her come out of the

12  meditation room and do all of this?

13  A  At this time I was not her supervisor, so whoever -- if

14  Patrick was, then it was his job to report it, not mine.

15  Q  So you weren't reporting that she was missing meetings.

16  She wouldn't even be missing your meetings at that time?

17  A  Well, as supervisors we had them as a group because they

18  were all doing the same thing.  We didn't have individual

19  meetings.

20  Q  All right.  So the three supervisors would call everybody

21  on the shift together and have one meeting that should take

22  anywhere from one to four minutes?

23  A  One to three, yes.

24  Q  One to three minutes.  And when you guys -- as the people

25  would sign in, if they were checking in just at 4:30, check

Jankowski - Direct by Mr. DeRose

1   your watch against the time on the clock?

2   A   Nobody signed in.  When the bell rang, they were already

3   punched in, came to the meeting.

4   Q   They were to walk to the meeting?

5   A   They walked to the meeting and our meeting would start.

6   Q   And, thereafter, if Ms. Arroyo was less than four minutes

7   late, she would have picked and packed the amount that she was

8   expected to do that day.  She would have enough time to do it?

9   A   But you're not asking me about her work.  You're asking me

10  about her tardiness.

11  Q   No.  I'm asking you now after the meeting, if she started

12  picking, if she arrived there at 4:31 or 4:33, by 4:34 your

13  meeting is over and she could be picking the right amount, the

14  same amount of time as the guys who had attended your

15  one-to-three-minute meeting?

16  A   Yes.

17  Q   All right.

18          MR. DeROSE:  Judge, I'm getting close to the end here.

19  BY MR. DeROSE:

20  Q   Were you advised that Mr. Schroeder was administering

21  progressive discipline, giving CAPS to Ms. Arroyo for being

22  late on November 2nd and November 3rd, leading to her

23  termination?

24  A   I don't recall.

25  Q   Did you hear any word that the bosses were thinking of

Jankowski - Direct by Mr. DeRose

1    terminating her employment?

2    A   No, I did not.

3    Q   On the last couple of days that she worked for you, did

4    Ms. Arroyo accomplish all of the picking and packing she was

5    expected to do?

6    A   I couldn't tell you that.  I don't have the statistics in

7    front of me.

8    Q   Did you ever report to your bosses that she didn't fulfill

9    the job -- picking and packing requirements of the job in that

10   last week before she got fired?

11   A   Again, I wouldn't have because she was not my direct

12   report.

13   Q   That would be Mr. Dunn?

14   A   Yes.

15        MR. DeROSE:  Judge, one moment, I think.

16        THE COURT:  Okay.

17   BY MR. DeROSE:

18   Q   Ma'am, if on November 4th, the last day Ms. Arroyo worked

19   for the company, Mr. Schroeder tells her that she was observed

20   by management at 4:30 p.m. exiting the meditation office or the

21   operations office and proceeding to her car, which was parked

22   in the back, and go around to the front, that is not you that

23   would have reported that to him?

24   A   No.

25   Q   And none of the other two supervisors on the 4:30 shift

Jankowski - Direct by Mr. DeRose

1   told you that they were telling Keith that Ms. Arroyo at 4:30

2   would come out of that room, go out the back door, get in her

3   car, and go around to the front and go to work?

4   A   I don't recall.  They may have.  I don't recall.

5          MR. DeROSE:  I just have one more thing, Judge, and

6   then we're done.  Show her 237.  Just her.

7   BY MR. DeROSE:

8   Q   Do you recognize that, Miss?

9   A   A little bit.  Yeah.

10          MR. DeROSE:  Judge, may I publish?

11          THE COURT:  Any problem with this?

12          MR. McMAHON:  Same general --

13          THE COURT:  Same general rule.

14          MR. McMAHON:  Yes.

15          THE COURT:  So pursuant to the prior reason

16   articulated on the record, we will receive Plaintiff's Exhibit

17   237 and you can publish it for the jury.

18      (Plaintiff's Exhibit 237 was received in evidence).

19   BY MR. DeROSE:

20   Q   Now, this is dated November 2, 2011.  Do you see that?

21   A   Mm-huh.

22   Q   And if you remember, your email was -- the first one was

23   October 28th where you said, "We see her in the back and she's

24   going around doing what she wants to do."  Remember that?

25   A   Yes.

Jankowski - Cross by Mr. McMahon

1   Q   All right. So this is four or five days later than that.

2   And if I tell you as of November 4th she ain't ever going to be

3   working for your company again, you don't remember that do you?

4   A   I did not know when she was going to be terminated.

5   Q   It says on the bottom, "No one is allowed to park in this

6   area."

7           Did your fellow supervisors moan about this a little

8   bit because now they had to park in the front of the building?

9   A   I don't recall that.

10   Q   Did Ms. Arroyo say that this was one of the things that she

11   felt discriminated about?

12   A   I don't know.

13   Q   She didn't talk to you about this no parking in the rear?

14   A   No.

15   Q   Did you tell her that, in fact, you had been writing to

16   Keith about the fact that she was parking in the rear and doing

17   now whatever she wanted to do?

18   A   No.

19           MR. DeROSE: Thank you, Miss.

20           THE COURT: No further questions?

21           MR. DeROSE: No further questions.

22           THE COURT: Very good. Thank you.

23           MR. McMAHON: I have a few questions, your Honor.

24           THE COURT: Okay. Fire away.

25                       CROSS-EXAMINATION

Jankowski - Cross by Mr. McMahon

1   BY MR. MCMAHON:

2   Q   Ms. Jankowski, I have a few follow-up questions based on

3   your testimony. First of all, can you please remind us and

4   kind of clarify when did you stop becoming Ms. Arroyo's

5   supervisor?

6   A   January 29th.

7   Q   Okay. So by January of 2011, Ms. Arroyo was no longer your

8   direct report?

9   A   Exactly.

10   Q   Okay. Did you ever discipline Ms. Arroyo for attendance?

11   A   No, I did not.

12   Q   Did you ever monitor her attendance?

13   A   No, I did not.

14   Q   Did you ever monitor any of the employees' in the facility

15   attendance?

16   A   No, I did not.

17   Q   Were you in any way involved in the decision to actually

18   terminate Ms. Arroyo?

19   A   No, I was not.

20   Q   Could you put Plaintiff's Exhibit 226A up, please. And

21   that's already been published to the jury so we can all see

22   that.

23           MS. WILSON: Carolyn, can you switch it over to me?

24           THE COURT: It looked like the Olympic diving pool for

25   a minute there.

1    THE CLERK:  It should be coming up.  I have defense.

2  Let me try defense two to see if that works.

3    THE CLERK:  Go back to defense one.  I will turn the

4  monitors off and turn them on again to see if that will click.

5    I will stand up and see if it works.

6    THE COURT:  It was on for a second.  One of those you

7  clicked it --

8    MS. WILSON:  That is all my fault.

9    THE COURT:  Ah, nice.

10    THE COURT:  No worries.  There we go.  There are the

11  cute kids right there.

12    MR. McMAHON:  If you can blow that up, please.

13  BY MR. McMAHON:

14  Q    I want to direct your attention to the bottom email.  We

15  talked a lot about this today in your testimony.  But let me

16  just ask you this.  Did you think that Ms. Arroyo almost

17  running over another employee in her car would be something

18  that Mr. Schroeder would want to know about?

19  A    Yes, I did.

20  Q    Is that the type of thing you would report to Mr. Schroeder

21  if someone came to you with that information?

22  A    Yes, I would.

23  Q    If one of your employees was outside of the building after

24  the shift bell rang, would that be something that Mr. Schroeder

25  would want to know about?

Jankowski - Cross by Mr. McMahon

1    A    Yes.

2    Q    Were you aware of any other employees who were driving

3    around outside of the building after the shift bell rang?

4    A    No.

5    Q    During this time period?

6    A    No.

7    Q    Okay.  I want to direct your attention to an exhibit that's

8    been marked as our Exhibit -- Defendant's Exhibit 28, and ask

9    for permission to publish that to the jury.

10            THE COURT:  And are you taking that under the pretrial

11   order there's no objection?

12            MR. McMAHON:  No objection.

13            THE COURT:  Fantastic.  I see Mr. DeRose nodding, so

14   go right ahead.

15   BY MR. McMAHON:

16   Q    If I could direct your attention to this, Ms. Jankowski,

17   and just take a look at this for a second.  Okay?

18   A    Mm-hmm.

19   Q    Just take a second to read it.  And just let me know when

20   you're finished, okay?

21   A    Okay.

22   Q    Okay.  This is an email you received from Mr. Schroeder,

23   correct?

24   A    Yes.

25   Q    And this is a reminder it looks like you received along

1   with all of the other supervisors, correct?

2   A   Correct.

3   Q   And is this about parking in the back?

4   A   Yes.

5   Q   What is the date of this email, ma'am?

6   A   October 24, 2011.

7   Q   So Mr. Schroeder sent this email to all of the supervisors

8   before your observation in 226A, right, about Ms. Arroyo

9   parking back there?

10  A   Yes.

11  Q   And he sent this to all of the supervisors before his

12  reminder posting on November 2, 2011, right?

13  A   Yes.

14          MR. McMAHON:  Okay.  No further questions.

15          THE COURT:  Mr. DeRose, anything on the basis of those

16  few questions.

17          MR. DeROSE:  Yeah.  Sure, Judge.

18          THE COURT:  Go right ahead.

19                      REDIRECT EXAMINATION

20  BY MR. DeROSE:

21  Q   You tell the ladies and gentlemen of the jury that you were

22  not monitoring Ms. Arroyo's attendance after January 2011

23  because she wasn't on your shift anymore?

24  A   Yes.

25  Q   But that Exhibit 226A does indicate that you were

1  monitoring her use of the rear parking lot, doesn't it?

2  A    It was an observation.  It wasn't attendance.

3  Q    And were you also monitoring other of her behavior if she

4  was no longer responsible as your employee?

5  A    And I would do that with any other employee if I saw them

6  doing something that was unacceptable.

7  Q    So when you write at the end of the email, "So once again,

8  she is doing whatever suits her," what else did you have in

9  your mind when you said "whatever suits her she is doing once

10  again"?

11  A    I have no idea what I thought back then.

12  Q    By that time you didn't like her, did you?

13  A    I never said that.

14  Q    I know.  But I'm asking you.

15  A    I had no feelings whatsoever one way or another except as

16  an employee getting her work done.

17  Q    And you say, "almost hitting another employee," who is

18  somehow out in the parking lot, which you don't know the

19  circumstances of, is something you would want to tell Keith

20  Schroeder, right?

21  A    Well, an employee reported it to me so it's my job to

22  report it to my manager.

23  Q    Did that employee tell you he was not paying attention or

24  she was speeding right up so close to his car she was --

25  A    I do not recall.

Jankowski - Redirect by Mr. DeRose

1  Q    Did he tell you she almost hit him?

2  A    I believe that's what I said in the email, nearly hitting

3  him.

4  Q    Did he say how close she got to him?

5  A    No, he did not.

6  Q    Did he -- you get the impression she had to throw on her

7  brakes to avoid him.

8  A    I don't know.  I was not there.

9  Q    Did you know any more details about it than what you write

10 in here?

11 A    If I did, I would have wrote them in there.  That's all I

12 knew.

13 Q    You say Mr. Schroeder told you on four days before you

14 write this that you're not to park back there, right?

15 A    Yes.

16 Q    When the big boss tells you something like that on the 24th

17 of October, would you expect all of the rest of the supervisors

18 as high up as you to listen to him?

19 A    Yes.

20 Q    And if I tell you that picture that we just showed you,

21 with some two cars in it, was taken several days after that

22 email of 10/24, and one of the cars belongs to Dave Miller,

23 would you be surprised that he would still park back there

24 after Mr. Schroeder sent you an email saying, "Don't park back

25 there"?

Jankowski - Redirect by Mr. DeRose

1    MR. McMAHON:  Objection, lack of foundation.

2    THE COURT:  Sustained.

3  BY MR. DeROSE:

4  Q   Did Miller tell you that he had to park his car in the

5  back?

6  A   I don't know -- no, I don't know if he told me that.  We

7  all knew that you weren't supposed to park back there.

8  Q   So you knew that on the 24th because Mr. Schroeder told

9  you?

10  A   Yes.

11  Q   So then four days later, you reported to him, well,

12  Luzmaria Arroyo is parking back there?

13  A   Correct.

14  Q   And it wasn't until November 1st or 2nd that Schroeder told

15  Ms. Arroyo, who's not a supervisor, "You can't park back

16  there."  Isn't that right?

17  A   Correct.

18  Q   And is that why in that email, as you understood it, he

19  wanted to check with legal before he told her that because he

20  did not want to make it look like he was singling her out?

21  A   I don't know exactly what he was thinking before he did

22  that.

23    MR. DeROSE:  Thank you, your Honor.  I have no further

24  questions.

25    THE COURT:  Okay.  Anything else?

1    MR. McMAHON:  No further questions.

2    THE COURT:  Okay.  Very well.  Thank you very much.

3    (Witness excused.)

4    MS. DeROSE:  Your Honor, we call Ms. Maureen

5  Somersett.

6    THE COURT:  Okay.  Very well.  Thank you.

7    Just for planning purposes, at 3:25 we are going to

8  take our mid-afternoon break.  So you've got 25 minutes to

9  start and whatever you need on the other side.

10    MS. DeROSE:  And I am going to have to kind of move

11  some stuff around.

12    THE COURT:  Okay.

13    MR. DeROSE:  I will get out of the way and give her

14  lots of room, your Honor, with your permission.

15    THE COURT:  You can move any chairs you want there to

16  make -- however would be easiest for you, Ms. DeRose.

17    Ms. Somersett, you can come and remain standing.

18  Carolyn will give you the oath.

19    (Witness sworn.)

20    THE COURT:  Okay.  Ms. DeRose, whenever you're ready.

21    MAUREEN SOMERSETT, PLAINTIFF'S WITNESS, SWORN

22                    DIRECT EXAMINATION

23  by Ms. DeRose.

24  Q   Good afternoon.  Could you please state your name and spell

25  your name for the record, please?

Somersett - Direct by Ms. DeRose

1    A    Maureen Somersett.  S-o-m-e-r-s-e-t-t.

2    Q    Ms. Somersett, where do you work?

3    A    Volvo International.

4    Q    And how long have you been working there?

5    A    16 years.

6    Q    And what is your job title over at Volvo?

7    A    Office manager.

8    Q    Back in 2005 through 2007 --

9    A    Well, up through 2010 it was administrative assistant.  And

10   then from 2010 to 2013 it was manager, payroll and

11   administration.

12   Q    And you said administrative assistant.  Who were you the

13   administrative assistant to?

14   A    Keith Schroeder was my supervisor.

15   Q    And when you were manager of payroll, was Keith Schroeder

16   also your main supervisor at that time as well?

17   A    Yes, he was.

18   Q    So 2005 to 2011, was Mr. Schroeder your main supervisor?

19   A    Yes, he was.

20   Q    And back in -- from 2005 to 2010 when you were the

21   administrative assistant, what did your job duties consist of

22   at that time?

23   A    2005 -- I was -- I did payroll.  I managed payroll for the

24   warehouse workers.  I do support the supervisor, support Keith,

25   support any other supervisors.  I do daily reports that would

1   consist of a report that was given that I would send out to the

2   different CDCs that would have the different lines that were

3   shipped and the hours that were worked and that.  I would do

4   purchase orders in our system and do invoicing.  Take care of

5   invoicing.

6   Q   Okay.  Go ahead.

7   A   And I would be liaison for any of the material handlers who

8   needed any -- I would support them for if they wanted different

9   kind of policies or if they needed to have their address

10  changed and have it sent over, you know, stuff like that.

11  Q   Okay.  So you say you were a liaison for the material

12  handlers for policies.  What do you exactly mean by that?

13  A   If they wanted a copy of a policy that Volvo had, or if

14  they needed to have -- send an address change in to HRSE for an

15  address change, or, you know, change their exemptions or

16  something like that.

17  Q   And then in 2010 to 2011, were you still doing this payroll

18  daily reports and things like that?

19  A   Yes.  Yes, I was.

20  Q   Okay.  Was anybody else, during that time, in charge of

21  payroll or was it solely you from 2005 to 2011?

22  A   I was doing -- it was solely me.

23  Q   And did you work with anybody else on these payroll duties?

24  A   I don't understand your question.

25  Q   What exactly did you do in terms of payroll?

Somersett - Direct by Ms. DeRose

1    A    I made sure that they had a 40-hour week.  And if they
2    didn't have a 40-hour week if it was because they had a
3    vacation day or they were tardy or --
4    Q    So you were monitoring people's tardies and absences, and
5    things like that?
6    A    I was just making sure they got paid for the time that they
7    worked.
8    Q    Okay.  And did you work with anybody else during that time
9    in order to look at other employees' payroll absences or
10   tardies or anything like that?
11   A    I don't understand your question, actually.
12   Q    Were you the only person in charge of monitoring any
13   attendance or tardies or absences at that time?
14   A    The only thing I would do is I would tell the supervisor if
15   somebody was tardy because I would note that in their punch.
16   So if they had a vacation day, they would fill out a sheet or
17   any other absence they would give that to their supervisor who
18   would give that to me and I would record it for payroll.
19   Q    All right.  So any tardies or absences that an employee
20   had, you would talk to their supervisor about it?
21   A    I would tell them if they weren't there, yes.
22   Q    And how often would you do this?
23   A    Weekly.  It was always done weekly.
24   Q    And then would you meet with every supervisor once a week?
25   A    Only if they had a tardy.

Somersett - Direct by Ms. DeRose

1  Q   Okay.  And how often were employees tardy at work?

2  A   There is no control over that.  I can't give an answer to

3  that.

4  Q   So were you meeting with supervisors every week to discuss

5  people's tardies?

6  A   If there was a tardy, I would tell them.  It varied.  It

7  was never the same thing every week.

8  Q   Okay.  So -- but anytime any employee had a tardy, you

9  would then go and tell their supervisor that this employee was

10  tardy on this day.

11  A   Yes.  Because they would put it on a payroll exception

12  sheet.

13  Q   And how often would you tell the supervisors?  Would it be

14  daily or would you meet with them weekly and discuss the

15  tardinesses?

16  A   I would tell them once a week.

17  Q   Okay.  And was that at some sort of meeting?

18  A   No.  It was just a -- I would call them.

19  Q   Okay.  What would the supervisors do, then, when you told

20  them about any certain employee's tardies?

21  A   I would tell them to put it on the payroll exception sheet.

22  It was their responsibility to do it at that point, not mine.

23  Q   So this payroll exception sheet, what exactly is this that

24  you're talking about?  Can you describe it to us?

25  A   It's a sheet with each employee and it shows that, you

1  know, they were -- just every day of the week that particular

2  work week if they were there, if they were on vacation, if they

3  were on bereavement, it would mark, like, if they had a tardy.

4  Q   Was it a spreadsheet for each employee?

5  A   Yeah.  It was a small, little Excel spreadsheet.

6  Q   And would you do any markings on the payroll exception

7  sheets?

8  A   No, I would not.

9  Q   Okay.  I want to draw your attention to what we have marked

10 as Exhibit 49.  And only for the witness, please.

11        THE CLERK:  Okay.  Witness only.

12 BY THE COURT:

13 Q   Counsel told us yesterday that you have a problem reading a

14 screen.  Are you able to see this?

15 A   It's not real clear to me.  Could I have a paper copy,

16 please?

17        THE CLERK:  Here, I'll do it.  I need the steps.

18        MR. DeROSE:  Oh, I was going to do it.  That was my

19 job.

20        THE COURT:  Okay.  Thanks, Carolyn.

21        THE CLERK:  There you go.

22        THE WITNESS:  May I read through this, please?

23 BY MS. DeROSE:

24 Q   Sure you may.

25 A   The bottom part of this email is all that I'm looking at?

Somersett - Direct by Ms. DeRose

1   Q   And that's pretty much all I'm going to ask you about.  Was

2   there a time where you were going through --

3          MR. DeROSE:  Did you want to publish it?

4          MS. DeROSE:  Not yet.

5   BY MS. DeROSE:

6   Q   Was there a time when you were going through Ms. Arroyo's

7   military orders and all of her time off?

8   A   Michael and I put together a spreadsheet by the request of

9   Keith that has all of her military records.

10  Q   And at this time you were only marking off her military

11  orders at that time?

12  A   Yes.  On this spreadsheet.  For this spreadsheet.

13         MS. DeROSE:  Okay.  Do I have permission to publish

14  this -- it's Exhibit 49 -- to the jury?

15  A   Yeah.  This is on the list, so this is subject to the

16  understanding we reached a few days ago.  And so you certainly

17  may publish Exhibit 49 to the jury and we'll receive it in

18  evidence.  It is 49?

19     (Exhibit 49 was received in evidence.)

20  BY MR. DeROSE:

21  Q   It is 49, and I'm going to draw your attention just to the

22  bottom email.

23         THE COURT:  Okay.  Very good.  Thank you.

24  BY MS. DeROSE:

25  Q   Okay.  And I want you to just read this.  It does say that

Somersett - Direct by Ms. DeRose

1  "Michael and I went through all of LuzMaria's orders this

2  morning and her time off.  Attached is a spreadsheet of these

3  days."  And it does say that "this does not include her weekend

4  drills."

5          Do you recall doing this with Mr. Temko?

6  A    Yes, I do.

7  Q    And Keith Schroeder told you to make the spreadsheet with

8  Mr. Temko; is that right?

9  A    At his request, yes.

10 Q    Did you ask him why he needed this spreadsheet?

11 A    No, ma'am, I did not.

12 Q    Did he explain to you why he needed all of this information

13 about when she was coming and going for her military orders?

14 A    No, ma'am.  It's -- when somebody was out of the office for

15 any length of period of time, whether it was short-term

16 disability, you know, just FMLA, whatever it is, we kept a

17 spreadsheet of those hours that those people were gone.

18 Q    But Ms. Arroyo was the only employee that was the only

19 active army reservist --

20 A    She was --

21 Q    Let me finish my question before you answer.

22 A    I am sorry.

23 Q    She was the only army reservist at your facility; isn't

24 that correct?

25 A    That is correct.

Somersett - Direct by Ms. DeRose

1    Q    And so she is the only employee that you had this

2    particular spreadsheet for concerning her military orders;

3    isn't that correct?

4    A    That's correct.

5    Q    And I want to draw your attention to that last sentence

6    that says, "I can scan and send the orders to Bruce if he needs

7    them."

8                Do you see that?

9    A    Yes, I do.

10   Q    What did you mean by that?

11   A    I didn't know if -- Bruce Olin was the HR representative at

12   that time and I didn't know if that was something that he would

13   want.  I didn't know.  I did not know.

14   Q    Why did you think Bruce might want them?

15   A    I can't recall at this time.  It was how many years ago?

16   It was eight years ago.  I don't recall why.

17   Q    Were you sending Ms. Arroyo's military orders to Bruce Olin

18   regularly as well?

19   A    I don't recall.

20   Q    And I just want to draw your attention -- just so we can

21   get a timeline -- to the email just above this.  And it says,

22   "Attached is Luzmaria Arroyo's military timeline since her hire

23   in June 2005."

24                This email is dated 2008.  How were you able to

25   compile this list with Mr. Temko going back three years

Somersett - Direct by Ms. DeRose

1    earlier?

2           MS. WILSON:  Objection, your Honor.  Ms. Somersett was

3    not copied on this.  I don't think foundation has been laid.

4           THE COURT:  Well, I think that -- I thought about that

5    very same thing.  But I think all they're trying to use here

6    is -- so what Ms. Somersett said is "Here's a pile of stuff,"

7    and I think what we're trying to establish here is how big is

8    that pile.  And it looks like the pile is June 2005 til 2008

9    when she sent this.  So I don't think there's any harm or any

10   foundation.  We're just -- I suppose the rest of the exhibit is

11   somewhere and I think we could get it.  But I think this will

12   help the jury -- this puts it in context.  I don't -- she's not

13   copied on that, obviously.  All this is doing is putting her

14   own words in context, right?

15          MS. WILSON:  We have no objection to the size of the

16   pile.

17          THE COURT:  All right.  The size of the pile looks

18   like it's June 2005 to whatever the date of that email is.  So

19   with understanding you can proceed.

20   BY MS. DeROSE:

21   Q   How were you able to compile this spreadsheet going all of

22   the way back to 2005, and this was dated 2008?  How were you

23   able to compile the list of all of those orders all of the way

24   back to 2005?

25   A   Ms. Arroyo would present the orders when they were given to

1   her and she would give them to her supervisors.

2   Q   Okay.  And then where did you keep all of her orders when

3   you received them?

4   A   In a file.  In her personnel file.

5   Q   Okay.  And as of 2008, anytime prior to that you hadn't had

6   a list running where you had marked off all of her military

7   orders; is that correct?

8   A   I honestly can't answer that question.  I really don't know

9   if it started before 2008 or not.

10  Q   Okay.  But as of 2008, this was the first time that you had

11  initially started compiling a list of Ms. Arroyo's military

12  leave time; is that correct?

13  A   I'm not sure.

14  Q   And I want to draw your attention to what I have marked as

15  Exhibit 88.  Only to the witness, if you can, please.

16          THE COURT:  Okay.  And this looks like there is no

17  objection by the pretrial order, so I will streamline this for

18  you.  You can show it to the jury.

19          MS. DeROSE:  I will publish it to jury.

20          THE COURT:  You can ask her if she's seen this and

21  understands it, I guess.  I didn't know what it was.  But now I

22  see it.

23          MS. DeROSE:  And let me just give her this.

24  BY MS. DeROSE:

25  Q   Is this a copy of these spreadsheets that you were making

1   for Ms. Arroyo?

2   A   No, this is not.

3   Q   Did you have anything to do with this particular

4   spreadsheet?

5   A   I had nothing to do with any of the attendance.  No.

6   Q   Okay.  Then I want to draw your attention to what was

7   marked as Defendant's 6, and unfortunately I do not have a

8   paper copy of it.  So unless you guys do. . .

9           MR. McMAHON:  Defendant's 6.

10          THE COURT:  Here you go.  Can I make this really -- I

11  will help you out here.  I am going to pass this over to the

12  witness if you like.

13          MS. DeROSE:  Thank you.

14          MR. DeROSE:  You are outside your job, Judge, and I

15  appreciate it.

16          THE COURT:  It is all about efficiency here.

17          Okay.  Defendant's 6 is what we handed the witness

18  here.

19          MS. DeROSE:  Thank you, your Honor.

20          THE COURT:  And that's in evidence.

21  BY MS. DeROSE:

22  Q   Is this an example of the spreadsheets you were making for

23  Ms. Arroyo?

24  A   Yes, it is.

25  Q   And how often were you updating this spreadsheet?

Somersett - Direct by Ms. DeRose

1   A   Weekend drills, if you look at the spreadsheet you can see

2   that it was done by year.  According to the spreadsheet, that's

3   how it was done.  I don't recall something that was exactly how

4   it was done years ago.

5   Q   And every time you would get an order, would you go back to

6   this particular spreadsheet and update it with a new military

7   order or military drill schedule?

8   A   I can't testify it was every single time that I got one.

9   It might have been a couple at a time.  But once I had them,

10  they were put on the spreadsheet.

11  Q   Okay.  And every time you would get a copy of Ms. Arroyo's

12  military orders, would you meet with Mr. Temko in order to talk

13  about the orders and put it on this spreadsheet?

14  A   Yes.

15  Q   Okay.

16  A   I, myself, personally, never received -- she never handed

17  me the orders.  It always went to her supervisor.

18  Q   So whenever Ms. Arroyo would get an order, she would give

19  it to her supervisor, and then would it be handed to you in

20  order to update this spreadsheet?

21  A   Yes.  Michael would give it to me.

22  Q   Okay.  And you never met with any other supervisors in

23  order to make any other spreadsheets for any other employees;

24  isn't that correct?

25  A   No, ma'am.

Somersett - Direct by Ms. DeRose

1   Q   And you only met with Mr. Temko in order to create and

2   compile and amend these particular spreadsheets, isn't that

3   correct?

4   A   If you are referring to the military spreadsheet, yes.

5   Q   Okay.  And then after you updated this spreadsheet -- after

6   each update, would you send this to Mr. Schroeder at that time?

7   A   Yes, I would.

8   Q   And what would he do with the spreadsheet at that time?

9   A   I have no idea.

10  Q   Did you ask him why he needed the spreadsheet?

11  A   No, I did not.

12          THE COURT:  We're just about due for the break.

13          MS. DeROSE:  Okay.  This is actually the perfect time

14  to stop.

15          THE COURT:  Beautiful.  We'll take the break.  If you

16  don't mind, I will take the exhibit back so I don't lose my

17  book.  Thank you so much.  We will take a 15-minute break and

18  we'll carry on til five and we will get you guys later.  Thank

19  you so much.

20          Whose No. 88 do I have here?

21          MR. DeROSE:  It is ours, sir.  This is the one Carolyn

22  gave up to the witness.

23          THE COURT:  Just so everybody has got what belongs to

24  them.

25          All right.  I will see you guys in 15.  We will go

Somersett - Direct by Ms. DeRose

1   till 5:00, and hopefully tomorrow you will have Mr. Schroeder.

2          MR. DeROSE:  I will even start him today, if we can

3   get this other lawyer to --

4          THE COURT:  I think she is doing quite well.  Okay.

5   Thanks, everybody.

6          MS. DeROSE:  Thank you.

7      (Jury out.)

8      (Recess taken.)

1   (The following proceedings were had in open court in the

2   presence and hearing of the jury:)

3         THE COURT:  Good afternoon, everybody.  Please be

4   seated.

5         Just a programming note for tomorrow.  I think it

6   will be a lot like today.  Today I ended up having a bond

7   hearing that I wasn't aware of.  So why don't you come at 9:30

8   tomorrow, and we'll start as close to 9:30 as we can.  Once

9   all of you guys are here, it will probably be more like 9:35

10  or 9:40 because I've got basically the same number of statuses

11  and motions tomorrow.  But thank you for your patience.  I

12  really appreciate it.

13        With that, Ms. DeRose, you can pick up where you left

14  off.

15        MS. DeROSE:  Thank you, your Honor.

16                            - - -

17       MAUREEN SOMERSETT, DIRECT EXAMINATION CONTINUED

18  BY MS. DeROSE:

19  Q.  Ms. Somersett, before we took the break, we were looking

20  at what they marked as Defendant's Exhibit 6.

21        MS. DeROSE:  Can I have that published to the jury as

22  well?  Thank you.

23  BY MS. DeROSE:

24  Q.  And, Ms. Somersett, you understand that you are still

25  under oath right now?

1  A.  Yes, I do.  Yes, I do.

2  Q.  Okay.  And I just want to draw your attention to the top

3  of this document.  It says, Updated September 16th, 2011.

4          Do you see that?

5  A.  Yes, I do.

6  Q.  Was this the last time you had gone in here and updated

7  the spreadsheet with any of Ms. Arroyo's most recent orders?

8  A.  Yes, it was.  According to the bottom, it says that the

9  last entry was 9/15 to 9/16/2011.

10  Q.  And that's because she had military orders for those

11  dates?

12  A.  I can't answer that.  According to the spreadsheet, yes,

13  it does.

14  Q.  Okay.  And on the bottom there, it says, Volvo military

15  policy, maximum military days, five years.

16          Do you see that?

17  A.  Yes, I do.

18  Q.  And who wrote that on there?

19  A.  I can't recall.

20  Q.  Did you put "Volvo military policy" on there?

21  A.  I can't recall.

22  Q.  Okay.  You are aware that that is not accurate; is that

23  correct?

24  A.  I -- I can't answer that question.

25  Q.  Okay.  Do you know why the Volvo military policy is even

1  on this document?

2  A.  I can't answer that question.  I don't recall.  That was

3  many years ago.

4  Q.  Okay.  And it says here that you -- that Ms. Arroyo had 3-

5  -- 931.5 days up until September 16th, 2011; isn't that

6  correct?

7  A.  According to the sheet, yes.

8  Q.  Okay.  And that's less than five years too, right?

9  A.  Five times 250 is 1250 days.  Yes.

10  Q.  And --

11  A.  That's less than that.

12  Q.  Are you -- do you know what Volvo's military policy is?

13  A.  No, I do not.

14  Q.  Okay.  I want to -- did there come a time when you became

15  aware that Ms. Arroyo was suffering from posttraumatic stress

16  disorder?

17  A.  At one particular time, yes.

18  Q.  When was it that that you discovered that?

19  A.  She was sent for an IME, but I don't have the documents in

20  front of me, so I can't testify exactly when.

21  Q.  In fact, Ms. Arroyo actually contacted you directly back

22  in 2010 around Christmastime, didn't she?

23  A.  I don't recall.

24  Q.  Do you recall --

25  A.  I think that there was an email, but I don't have it.  I

1  don't recall.  I can't answer that question.

2  Q.  Do you recall that Ms. Arroyo contacted you on Christmas

3  Eve 2010 and told you that she had to self-admit to the

4  emergency room?

5  A.  I believe that there was an email, but I don't have -- I

6  can't recall the exact date and when.

7  Q.  Okay.  And if I showed you what --

8          MS. DeROSE:  And I only want to show the witness this

9  at this point.

10  BY MS. DeROSE:

11  Q.  -- what we've marked as Exhibit 123.

12          THE COURT:  I don't have it on my list yet.  This

13  looks like it's going to be subject to the usual

14  understanding, right?

15          MR. McMAHON:  Yes, it is.

16          MS. WILSON:  Yes, your Honor.

17          THE COURT:  Okay.  And so since this is subject to

18  the usual understanding, is Ms. Somersett -- she's copied on

19  this.  I will go ahead and let you publish it now, and we will

20  admit it into evidence.

21    (Above-mentioned exhibit was received in evidence.)

22          MS. DeROSE:  Thank you, your Honor.

23          THE COURT:  Sure.

24  BY MS. DeROSE:

25  Q.  Do you recall receiving this email from Ms. Arroyo?

1  A.  I recall receiving this part, but I don't know about -- I
2  don't see the entire email, so I'm just seeing one section of
3  it.
4  Q.  And if I tell you I believe this is the only part that
5  you're actually copied on, so I don't want to show you the
6  rest, but do you recall this email being sent to you?
7  A.  Yes, but I'd really prefer to see the whole string.
8  Q.  Did you ever talk to Ms. Arroyo about what she was
9  experiencing after she came back from being deployed in Iraq,
10  in Kuwait?
11  A.  No, I did not.
12  Q.  Did you ever talk to her about this particular email and
13  how she had to go to the emergency room?
14  A.  No, I did not.
15  Q.  Did you ever talk to her about how things were affecting
16  her after her deployment?
17  A.  No, I did not.
18  Q.  What did you do when you read this email?
19  A.  If I could see the rest of the email, I would -- I
20  would --
21  Q.  Well, this is --
22  A.  Keith Schroeder was copied on it, so I know that he knew
23  about it.  I don't know if -- I can't recall if I did anything
24  else about it.  Since he was copied on it, he already said
25  what it says.

1  Q.  Okay.  Did you go and talk to Keith about this email?

2  A.  I can't recall if I did.  I really can't recall if I did.

3  Q.  Did you talk to Keith and say, you know, Ms. Arroyo is

4  having some issues, I sympathize with her at all?

5  A.  I can't recall if I did.  This was six years ago.

6  Q.  Did you ever talk to Ms. Arroyo about it at all and say,

7  I'm concerned about you, are you okay after your -- you were

8  in the emergency room?

9  A.  No, I don't believe so.

10  Q.  When you saw this email, did you think Ms. Arroyo was

11  being truthful about what was going on with her at that time?

12  A.  I have nothing to go by but what she has in the email.  I

13  don't know what she was thinking or what she was doing or

14  whatever, just what's in the email.

15  Q.  And you didn't think she was malingering when you saw this

16  email?  You didn't think she was faking it?

17  A.  I would have no idea on that.

18  Q.  Okay.  And just for future, I want to wait -- you have to

19  wait until I finish my question before you begin your answer.

20  A.  Sorry.

21  Q.  Thank you.

22         And when you saw this email, did you hear about

23  rumors going on at the Joliet plant about Ms. Arroyo being on

24  vacation in Hawaii?

25  A.  I do not recall that.

1  Q.  Did you hear any rumors going on about why she wasn't at
2  work?
3  A.  I do not recall that.
4  Q.  And you later found out that Ms. Arroyo did have
5  posttraumatic stress disorder; isn't that correct?
6  A.  I believe I answered that question earlier.  I did from an
7  independent medical exam.
8  Q.  Okay.  And that was the company's doctor who told you that
9  she had PTSD; isn't that correct?
10  A.  It was the physician's immediate care.
11  Q.  And that doctor was hired by the company for this
12  independent medical evaluation?
13  A.  Yes, it was.
14  Q.  Okay.  And do you recall when you found out about this
15  doctor confirming her diagnosis of PTSD?
16  A.  I was the individual that was requested from human
17  resources and Regina Williams to set up the medical exam, and
18  I did.  So since I set the medical exam up, they sent me the
19  results.
20  Q.  And they sent them directly to you; isn't that correct?
21  A.  Yes.
22  Q.  So you were actually the first person at the whole company
23  to find out, actually, that Ms. Arroyo was, in fact, suffering
24  from PTSD; isn't that correct?
25  A.  I can only answer for myself.  I can't answer for anybody

1   else.

2   Q.  Okay.  And I want to draw your attention to what we have

3   marked as Plaintiff's Exhibit 142.

4         By the way, do you recall the name of the doctor?

5   A.  No, ma'am, I don't.

6         MS. DeROSE:  And, your Honor, I would just like to

7   publish this just to the witness for now.

8         THE COURT:  Okay.

9         MS. DeROSE:  And if there isn't any objection, I'd

10  like to publish this to the jury as well.

11        MS. WILSON:  I think we'd like a sidebar on this

12  issue.

13        MR. DeROSE:  Okay.

14        THE COURT:  Sure.

15    (The following proceedings were had at sidebar outside the

16  hearing of the jury:)

17        THE COURT:  Is this the document?  Oh, I'm sorry.

18        Okay.  Here's my question about this.  And this is

19  the note I made in my -- what you guys gave me, all these

20  lists.  The note I made is so I thought at one of the

21  pretrials, we had this discussion of if we're stipulating to

22  the PTSD, why would we put documents in front of jury that

23  might make them question that?  And this probably is very

24  consistent, but it's still two pages of explanation about

25  something that if you stipulate to it, they have to accept it

1   as true.  And I wonder --

2        MR. DeROSE:  We want to get the date in that it all

3   started.

4        THE COURT:  Right.  Okay.  And so here's the way I

5   would suggest you do that.

6        MS. WILSON:  I thought the date was included in the

7   stipulation?

8        THE COURT:  Okay.  Here is a question.  Whether it is

9   or it isn't -- two questions for you.  One is would now be a

10  good time to read the stipulation to the jury?

11       MR. DeROSE:  I think I wanted to impeach --

12       THE COURT:  With her?

13       MR. DeROSE:  I will do it now.

14       THE COURT:  It doesn't matter.  Because for date, all

15  you can -- you can say to this witness, do you remember the

16  date.  And she will say no.  And you will say, can I refresh

17  your recollection?  Here it is.  That's the date.  We all

18  agree on that.  And then you can read the stipulation whenever

19  you want.

20       MR. DeROSE:  Why don't I read it now?

21       THE COURT:  If you'd like, you might as well, because

22  then every other PTSD document, we don't have to worry about

23  that.

24       MS. WILSON:  We did have one additional concern.  The

25  weekend overtime, we had agreed it's out of the case.  I just

1  wanted to make sure you weren't going into there.

2          MS. DeROSE:  I'm not going into the weekend overtime.

3  I simply want to talk about the dates.  So I will just refresh

4  her recollection on the date --

5          THE COURT:  Refresh her recollection.  Perfect.  And

6  then your dad can read the stipulation.  Bingo.  Beautiful.

7          Thanks, everybody.

8    (The following proceedings were had in open court in the

9  presence and hearing of the jury:)

10         MR. DeROSE:  Give me two minutes, Judge.

11         THE COURT:  No problem at all.

12         So, folks, the two minutes will save you a lot of

13 time because there is a stipulation they are about to read you

14 that would have taken some working of evidence to get to you.

15 And, instead, by the parties agreeing to it, it will simplify

16 this issue considerably.  So we will give Mr. DeRose two

17 minutes to find this on his computer.

18         MR. DeROSE:  Give me a minute.  They are not as fast

19 as your fancy computers.  I will get to it.

20         THE COURT:  Okay.

21         MR. DeROSE:  It's coming up Word now, it tells me.

22   (Brief pause.)

23         MS. DeROSE:  Do you have 142 right now?  I'm just

24 making sure.

25         MR. DeROSE:  Has your Honor already told the jurors

1  what a stip is?

2         THE COURT:  I have told them what a stipulation is,

3  but I will remind them.

4         And do you want to finish this one document with the

5  witness, and then we will do the stipulation?

6         MS. DeROSE:  Okay.  Thank you, your Honor.

7  BY MS. DeROSE:

8  Q.  And, Ms. Somersett, you have what is marked as Plaintiff's

9  Exhibit 142 in front of you?

10  A.  Yes, I do.

11  Q.  And do you recall when you received this letter?

12  A.  Yes, I recall when I received it.

13  Q.  And what's the date of this letter?

14  A.  April 14th, 2011.

15  Q.  And this is from the company doctor, Dr. John Koehler,

16  K-o-e-h-l-e-r; isn't that correct?

17  A.  Yes, it is.

18  Q.  Okay.  And it's concerning the independent medical

19  evaluation with Ms. Arroyo?

20  A.  Yes, ma'am.

21  Q.  And his diagnosis is posttraumatic stress disorder; isn't

22  that correct?

23  A.  Yes.  I see that.

24         MS. DeROSE:  Okay.

25         THE COURT:  Okay.  So at this point, we are going to

1  have -- Mr. DeRose will read a stipulation.  As I told you

2  guys either yesterday or the day before, a stipulation is an

3  agreement between the parties that certain facts are true or

4  that a certain witness would have testified in a certain way.

5  And so this is a series of stipulations between the parties

6  having to do with the posttraumatic stress disorder that will

7  avoid having to put a lot of testimony on about this.

8          Go ahead, Mr. DeRose.

9          MR. DeROSE:  Thank you, your Honor.

10         Ladies and gentlemen of the jury, it is stipulated

11  now between LuzMaria Arroyo, by and through her attorneys,

12  John P. DeRose and Kate Lynn F. DeRose, and William J.

13  McMahon, IV, and Susan Bassford Wilson as follows:

14         Plaintiff was treated for posttraumatic stress

15  disorder in December 2010 and formerly diagnosed in

16  January 2011.  Plaintiff's PTSD was due to and caused by her

17  military service.  PTSD is a mental disorder that can develop

18  after a person is exposed to a traumatic event, such as

19  warfare.

20         The symptoms of PTSD may include disturbing thoughts,

21  feelings or dreams related to the events, mental or physical

22  distress to trauma-related cues, attempts to avoid

23  trauma-related cues, alterations in how a person thinks and

24  feels, and increased arousal.  The term "posttraumatic stress

25  disorder" came into use in the 1970s in large part due to the

1  diagnosis of U.S. military veterans of the Vietnam War.  It

2  was officially diagnosed by the American Psychiatric

3  Association in 1980 in the third edition of the Diagnostic and

4  Statistical Manual of Mental Disorders, known as the DSM III.

5  PTSD is a disability under the Americans with Disabilities

6  Act, or the ADA.

7          So stipulated, Counsel?

8          MS. WILSON:  So stipulated.

9          THE COURT:  Okay.  My thanks to both counsel for

10  putting that together.

11          And with that, Ms. DeRose, you can go on to your next

12  question.

13          MS. DeROSE:  Thank you, your Honor.

14  BY MS. DeROSE:

15  Q.  This letter from Dr. Koehler, what did you do with this

16  letter once you received it?

17  A.  I gave it to Keith Schroeder.

18  Q.  Did you ask him what he was going to do with it?

19  A.  No, I did not.

20  Q.  Okay.  Did there come a time when you were told that you

21  would be a third-party witness to any conversations with

22  Ms. Arroyo?

23  A.  There were times that I was asked to be a witness for

24  conversations for Ms. Arroyo and other individuals.

25  Q.  Did you ever ask why you were going to be a third-party

1  witness for Ms. Arroyo?

2  A.  No, I did not.

3  Q.  And Ms. Arroyo told you that she felt like she was being

4  discriminated against, didn't she?

5  A.  She never told me that directly.  I can't recall that.

6  Q.  And were you ever told that Ms. Arroyo had said that she

7  felt threatened by Mr. Schroeder?

8  A.  There was some emails that had gone about that, but I

9  don't recall them right now, exactly what they said or

10  whatever.  It was a long time ago.

11  Q.  Did you ever talk to Ms. Arroyo about how she felt

12  threatened by Mr. Schroeder?

13  A.  No, ma'am, I did not.

14  Q.  Did you ever have to step in when she was looking like she

15  was feeling threatened by Mr. Schroeder during a meeting?

16  A.  No, I was never present.  No, I don't recall that at all.

17  Q.  I want to draw your attention to what I have marked as

18  Plaintiff's Exhibit 200.

19        Before I bring it to you, do you recall an incident

20  where Ms. Arroyo had come to work wearing large headphones?

21  A.  I didn't -- I never observed it, no.

22  Q.  You never observed her wearing the large headphones at

23  work?

24  A.  I didn't observe it myself, no, ma'am.

25  Q.  But you knew about this incident; isn't that correct?

1  A.  I was asked -- I was told about it, yes.

2  Q.  Who told you about that incident?

3  A.  I was asked by one of the supervisors to advise

4  Mr. Schroeder what had happened.

5  Q.  Who told you about the incident?

6  A.  Sherrie Jankowski.

7  Q.  And Ms. Jankowski told you to tell Mr. Schroeder about

8  this incident --

9  A.  He asked me if I would send an email and tell him about

10 the incident.

11 Q.  And you did send an email to Mr. Schroeder about the --

12 A.  Yes.

13 Q.  -- incident; isn't that correct?

14 A.  Yes, I did.

15 Q.  Do you recall when you sent the email to Mr. Schroeder?

16 A.  No, I do not.  I don't have it in front of me.  I don't --

17 I don't recall.

18 Q.  And when Ms. Jankowski told you but this incident, when

19 she told you, she was kind of mad about the whole incident,

20 wasn't she?

21 A.  I don't recall that.  She just asked me to relay something

22 to Mr. Schroeder, and I did.

23 Q.  Was she constantly telling you stories about Ms. Arroyo

24 and how frustrated she was with Ms. Arroyo?

25 A.  I don't recall any of that, no.

1  Q.  Okay.  I want to draw your attention to 200.

2        And is this the email you wrote to Mr. Schroeder?

3  A.  Okay.

4  Q.  Is this the email you sent to Mr. Schroeder?

5  A.  Yes, it is.  On the top, it says it's from me to Keith.

6  Q.  And you wrote this on September 14th, 2011?

7  A.  Yes, that's what it says.

8        MS. DeROSE:  Do I have permission to admit this into

9  evidence and publish it to the jury?

10        THE COURT:  Any objection?

11        MS. WILSON:  The same objections, your Honor --

12        THE COURT:  Okay.  So the usual applies, and with

13  that understanding, we will admit this in evidence,

14  Plaintiff's 200, and you can publish to the jury.

15    (Above-mentioned exhibit was received in evidence.)

16  BY MS. DeROSE:

17  Q.  Why did you write this email to Mr. Schroeder?

18  A.  Sherrie Jankowski asked me if I would.

19  Q.  And I want you to draw your attention to the last line,

20  the second to last sentence:  I just did not want this to go

21  unnoticed.

22        Do you see that?

23  A.  Yes, ma'am, I do.

24  Q.  Why were you worried about this going unnoticed to Keith

25  Schroeder?

1  A.  I can't recall exactly at this time.  Once again, it was

2  five years ago.

3  Q.  And above it says, I guess LuzMarie did not clock in until

4  about 7:44 last night.

5          Do you see that?

6  A.  Yes, I do.

7  Q.  Do you know what time she was scheduled to start her shift

8  that night?

9  A.  I don't know what the -- if there was a doctor scheduled

10 that day or any -- I don't recall.

11 Q.  By the way, do you know when Ms. Arroyo goes to -- strike

12 that.

13         You knew that Ms. Arroyo was going to therapy

14 sessions at the Veterans Administration Hospital; isn't that

15 correct?

16 A.  Yes, I did.

17 Q.  Do you know what days her therapy sessions were?

18 A.  There was a list that was given because she was given an

19 accommodation to come in late on those particular days, and I

20 had a copy of that list so I could monitor her payroll to make

21 sure she was paid correctly.

22 Q.  And the therapy sessions, those were on Tuesday nights;

23 isn't that correct?

24 A.  I don't have that in front of me, ma'am.  I don't recall

25 the exact day.

1  Q.  And we'll get to that in a minute.

2          But this particular day, this is Wednesday, so this

3  would have been -- if she typically went to Tuesday therapy

4  sessions, this would have been the next night; isn't that

5  correct?

6  A.  Wednesday comes after -- yes, after Tuesday.

7  Q.  And she showed up that night with large headphones on

8  claiming she had a bad day and needed to block out the noise?

9  A.  That's what Sherrie had said.  That's why I put it in

10 there.

11 Q.  So you didn't witness this at all?

12 A.  No, I did not.

13 Q.  So Sherrie told you this whole exchange?

14 A.  Yeah.  That's what I said up there, that -- just to note

15 some things going on last night that Sherrie told me.  I did

16 not witness that.

17 Q.  Okay.  And it says that, She wanted to go home because she

18 did not feel well enough to drive a vehicle, but Patrick told

19 her he would put her on the pack line.

20          Do you see that?

21 A.  Yes, I do.

22 Q.  And do you know whether or not she worked that night on

23 the pack line?

24 A.  Ma'am, I do not.  The only thing on there is she went to

25 the pack lines with the large headphones on and Sherrie told

1  Patrick.  It says it right under there that she did work on
2  the pack line.
3  Q.  Okay.  And it says, Sherrie told Patrick she needed to
4  take those off because she could not hear anything; isn't that
5  right?
6  A.  That's what it says, yes.
7  Q.  And then Patrick Dunn told her that she could leave them
8  on because she wasn't listening to anything anyway; isn't that
9  correct?
10  A.  It says there, And he told Sherrie to let her have them
11  on.  She was (sic) listening to anything anyway.
12  Q.  And it says, She was listening.  Do you think that was a
13  typo, that you meant to say that she was not?
14  A.  I'm not sure.  It could be.  I can't testify to that.
15  Q.  And then later in the night, she came into the office to
16  talk to Patrick and unplugged Sherrie's radio without asking
17  her permission.
18         Do you see that?
19  A.  Yes, I do.
20  Q.  But you weren't there at that time; is that right?
21  A.  No, I wasn't.
22  Q.  Okay.  And Sherrie told you she was unhappy that
23  Ms. Arroyo had come in and unplugged her radio without asking;
24  isn't that right?
25  A.  That's what it says in the email, yes.  That's what

1  Sherrie said.

2  Q. And did she also tell you that LuzMaria Arroyo had asked

3  whose radio it was in the back?

4  A. I don't recall that. Later, she came in the office,

5  talked to Patrick, and unplugged Sherrie's without asking

6  permission. And Sherrie asked her why she did that.

7      I -- could you rephrase your question for me?

8  Q. Did Sherrie Jankowski tell you that Ms. Arroyo asked whose

9  radio was playing in the back office?

10 A. It doesn't state that in here.

11 Q. I'm asking you if you remember?

12 A. No. All I remember is what is stated in this email.

13 Q. Okay. And it says, Sherrie asked her why she did that,

14 and she said that they could not stand the noise; is that

15 right?

16 A. That's what it says, yes.

17 Q. And did Sherrie tell you that Ms. Arroyo said that?

18 A. Yes.

19 Q. And it says, Needless to say, Sherrie was not happy?

20 A. I wouldn't be happy if somebody was messing with my stuff.

21 Q. Okay. But did Ms. Jankowski tell you that Ms. Arroyo

22 asked whose radio it was and Ms. Jankowski did not say, that's

23 my radio?

24 A. There was no -- nothing in here that says Ms. Arroyo asked

25 whose radio it was to anybody.

1  Q.  Okay.  And you weren't there, so you don't know whether or

2  not Ms. Arroyo asked whether or not it was anybody's radio?

3  A.  I was not present for any of this, no.

4  Q.  Okay.  And it says, Please verify this with Patrick and

5  Sherrie.

6        Do you see that?

7  A.  Yes, I do.

8  Q.  Do you know if he did verify it with Patrick or Sherrie?

9  A.  I don't recall.  I don't know.

10 Q.  Were you kind of keeping tabs on Ms. Arroyo at this time

11 and that's why you wanted to tell Mr. Schroeder about what was

12 going on with Sherrie?

13 A.  No, I was not.

14 Q.  And Ms. Jankowski had told you that she was really

15 frustrated with this whole incident, it made her very angry;

16 isn't that right?

17 A.  No, all she -- no, she didn't say that.  She said she

18 wasn't happy.  That was it.

19 Q.  And when she was telling you, she was very unhappy with

20 it, wasn't it -- wasn't she?

21 A.  She didn't say a thing about being very unhappy about it.

22 Q.  Well, you said she wasn't happy about it; isn't that

23 right?

24 A.  She said she wasn't happy, but not very unhappy.

25 Q.  Okay.  And why did you say you didn't want this to go

1  unnoticed?

2  A.  I don't -- I cannot recall why I made that statement.

3  Q.  I want to draw your attention to what we have marked as

4  Exhibit 203.

5      Do you recognize this document?

6  A.  Yes, I do.

7  Q.  And this is an email that you sent to Regina Williams and

8  Keith Schroeder; isn't that right?

9  A.  Yes, it is.

10 Q.  And it says, Subject:  Update punches, doctor appointments

11 Tuesdays; is that right?

12 A.  That's correct.

13 Q.  And this was approximately one week -- actually, it's

14 exactly one week after this previous email that we saw that

15 you wrote to Mr. Schroeder; isn't that right?

16 A.  I don't -- which -- this email --

17 Q.  Exhibit 200?  It's one week after Exhibit 200; isn't that

18 right?

19 A.  You are correct.

20 Q.  Okay.

21     MS. DeROSE:  Do I have permission to admit this into

22 evidence and publish it to the jury?

23     THE COURT:  You do.

24     It looks like there's no objection in the pretrial

25 order; is that right?

 1         MS. WILSON:  Correct, your Honor.  But if we could

 2  see it briefly before it's put on?

 3         THE COURT:  Sure.  Do you have an extra copy of 203?

 4         MS. DeROSE:  Yeah, I can put it up.

 5         THE COURT:  That's fine.

 6         MS. WILSON:  Great.  Thank you.

 7         THE COURT:  So that's right then?  So this is

 8  Plaintiff's Exhibit 203, and it is received in evidence and

 9  may be published to the jury.

10    (Above-mentioned exhibit was received in evidence.)

11  BY MS. DeROSE:

12  Q.  And this email, it's -- the attachments -- it looks like

13  you have an attachment that says, Punch times 2011.

14         Do you see that?

15  A.  Yes, ma'am.

16  Q.  I'm sorry?

17  A.  Yes, ma'am.

18  Q.  Okay.  And in the body, it says, I updated the list I gave

19  you last week to include yesterday.

20         Do you see that?

21  A.  Yes, I do.

22  Q.  And then you said, I will keep this log as long as needed.

23         Were you noting when Ms. Arroyo was coming and going

24  on days that she had therapy sessions?

25  A.  I noted those days to make sure that her payroll was going

1  to be correct.

2  Q.  And you did that on her punch sheets?  You would look at

3  her punch sheets, and then you would make an Excel spreadsheet

4  about it?

5  A.  I was asked to give the punch times that she punched in by

6  Ms. Regina Williams, and that's what this list is, the days --

7  times that she punched in on those particular days.

8  Q.  And why did Ms. Williams ask you to give her Ms. Arroyo's

9  punch times?

10  A.  I do not recall.

11  Q.  And did you have any other -- strike that.

12         You didn't make any other spreadsheets of anybody

13  else's punch-in times; isn't that right?

14  A.  For what particular reason?  I don't understand your

15  question.

16  Q.  Regina Williams never asked you to make any other

17  spreadsheets for any other employees in the entire Volvo

18  facility, any other record of their punch times; isn't that

19  right?

20  A.  I don't recall that.

21  Q.  And I want to draw your attention -- or strike that.

22         Did you update this list every week?

23  A.  Yes.

24  Q.  So --

25  A.  In the email, it says, I updated the list I gave you last

1   week.

2   Q.  Okay.  And so every week, you would go in and see when

3   Ms. Arroyo was coming in after her Tuesday therapy sessions;

4   isn't that right?

5   A.  That's correct.

6   Q.  And at this time, were you aware of any problems with

7   LuzMaria's attendance?

8   A.  I can't recall.  I don't have anything to do with the

9   attendance.  It's not -- that's not part of my job.

10  Q.  You do monitor every employee's attendance, though; isn't

11  that right?

12  A.  I don't monitor their attendance at all.  I monitor their

13  payroll.  I have nothing to do with attendance.

14  Q.  So any tardies or anything for any employees, you don't

15  monitor that?

16  A.  I put the tardies -- I tell the supervisor that there is a

17  tardy, and he puts it on the payroll acceptance sheet, and

18  Mike Temko updates the attendance sheets.  I have nothing to

19  do with that.

20  Q.  Okay.  But Ms. Arroyo's tardinesses or her punch-in times,

21  you were monitoring those; isn't that right?

22  A.  I monitored all their punch-in times.

23  Q.  Okay.  By the way, did you have to punch in to work?

24  A.  No, I did not.

25  Q.  Were you ever late coming in to work?

1   A.  No, ma'am, I was not.

2   Q.  But even if you were, we don't have any of your punch

3   times; isn't that right?

4   A.  That's correct.

5   Q.  Okay.  I want to draw your attention to the next page of

6   this exhibit.

7          MS. DeROSE:  And this is published.  It's the same

8   exhibit.

9   BY MS. DeROSE:

10  Q.  Okay.  And these are Ms. Arroyo's punch-in times for her

11  Tuesday appointments; isn't that right?

12  A.  You are correct.

13  Q.  And you took these times off of her actual punch sheets;

14  is that right?

15  A.  Yes, I did.

16  Q.  And then you would update them into this exact

17  spreadsheet; is that right?

18  A.  This was for the purpose of sending it to Ms. Williams,

19  yes.

20  Q.  And then you had a separate spreadsheet for all of

21  Ms. Arroyo's military orders; is that right?

22  A.  The one that Michael and I did, correct.  That was -- yes.

23  Q.  Okay.  I want to draw your attention to -- strike that.

24         Did there come a time when you became aware that

25  Ms. Arroyo was allowed to use a meditation room at work for

1  decompressing and de-stressing before the workday?

2  A.  Was I told that she was allowed to?  Yes.

3  Q.  Do you recall when that was?

4  A.  No, I do not.

5  Q.  Do you recall there being an issue that Ms. Arroyo was

6  parking on the back -- at the back of the warehouse in order

7  to access the meditation room easily?

8  A.  I don't recall that, no.

9  Q.  I want to show you what we marked as Exhibit 227.

10       Do you recognize this picture at all?

11  A.  No, I do not.

12  Q.  Do you recognize the area in this picture?

13  A.  I'm not -- I -- I believe it's the back of the warehouse,

14  but I can't -- I can't say that for positive.

15  Q.  Do you recognize either of the cars in this picture?

16  A.  No, I do not.

17  Q.  Do you know if either one of these cars belongs to either

18  Patrick Dunn or David Miller?

19  A.  I do not.

20  Q.  Okay.  You are aware that Ms. Arroyo was terminated for

21  tardiness on November 4th; is that right?

22  A.  I don't believe her termination -- I don't recall it was

23  November 4th.

24  Q.  Do you know when she was terminated?

25  A.  I believe it was November 8th.

1  Q.  Okay.  Do you know the -- the termination was based off of

2  a tardiness that happened on November 4th, 2011; is that

3  right?

4  A.  I have no -- any of those decisions, I have nothing to

5  absolutely do with.

6  Q.  Okay.  All right.  I am just going to show you what we've

7  marked as 265, and I'm going to give you Group 263, but I

8  actually have only a small section of 263.  So I'll draw your

9  attention to the specific Bates numbers.  Okay?

10        THE COURT:  Which Bates numbers were those?

11        MS. DeROSE:  Would it be easier for me to call the

12  attention while I ask the question or do you want me to tell

13  you which Bates numbers --

14        THE COURT:  No, that's fine.  As long as somewhere

15  it's identified, that's totally fine.

16        MS. DeROSE:  Yeah, I will do that, because I think --

17        THE COURT:  This is an exhibit as to which there is

18  no objection in the pretrial order, so I think you can use it

19  as you please, provided the witness can testify from personal

20  knowledge.

21        MS. DeROSE:  Okay.  Can we publish this to the jury?

22        THE COURT:  Yes, you may.

23  BY MS. DeROSE:

24  Q.  This is Exhibit 265.  Do you recognize this document?

25  A.  It's the attendance record that Michael Temko updates.

1   Q.  And these sections where he has specific references to

2   military leave for A and S, that's accident and sickness, does

3   he get those dates from you?

4   A.  They come off the payroll acceptance sheet.

5   Q.  And any of the -- strike that.

6          But these specific dates, the military leave dates,

7   did you guys -- do you know if he got these off the actual

8   spreadsheet that you guys made on her military orders?

9   A.  I have no control over this.  I have nothing to do with

10  this attendance record.  Michael Temko does it.  What he puts

11  on there, I have no...

12  Q.  Okay.  And if I can, I just want to draw your attention

13  to -- we'll start with page 3, which is Bates number 273.

14         Okay.  I want to draw your attention to October 29th

15  there.  Do you see here that Ms. Arroyo was marked -- it says,

16  Late one minute?

17  A.  I see where it says that, but I don't update this.

18  Q.  Okay.  And I want to draw your attention to Group 263, if

19  I can.  And it's going to be -- it's going to be Bates number

20  3765.

21  A.  Correct.

22  Q.  Okay.  Do you see there on October 29th, that's the bottom

23  entry there?

24  A.  Yes, I do.

25  Q.  And it says 4:31P?

1   A.  Yes, I do.

2   Q.  And do you know what Ms. Arroyo's start shift time was at

3   this time?

4   A.  4:30.

5   Q.  Okay.  So if she punched in at 4:31, that would be one

6   minute late?

7   A.  Yes, it would.

8   Q.  Okay.  Now I want to draw your attention back to

9   Exhibit 265.  And we'll go back to Bates 2783.  I'm going to

10  draw your attention to November 23rd.

11  A.  Excuse me?

12  Q.  Hold on one second.

13          Okay.  Do you see there on November 23rd -- I'm

14  looking at Bates number 2783.

15  A.  Yes.

16  Q.  And do you see on November 23rd, he has marked, Late two

17  minutes?

18  A.  Yes.

19  Q.  Okay.  Now I want to draw your attention to -- back to

20  Exhibit 263.  And I'd like to have you look at Bates

21  number 3800.

22          Okay.  Do you see LuzMaria on that page?

23  A.  Yes, I do.

24  Q.  And at the bottom there, it says, Add punch on 5/10

25  at 10:30.

1          Do you see that?

2  A.  Yes.  You asked me -- excuse me one moment.  You asked me

3  earlier on Bates number 2783 to look at November 23rd.

4  Q.  Oh, I'm sorry.  Hold on.

5          We can go back to that.

6          Sorry.  My tab must have fallen off there.  It's

7  Bates number 3772.  Sorry.  Hold on a second.

8  A.  I don't have a 3772.

9  Q.  Okay.  You know what?  Strike that.  We'll just skip that.

10         I'll draw your attention to back where I was just

11  now, back on Exhibit 265.  And I want to draw your attention

12  to this first page on 265, May 10th, 2011.

13  A.  May 10th, 2011.

14         So then that would be the Bates 3800?

15  Q.  Hold on one second.

16         Okay.  And do you see on page -- on Exhibit No. 265,

17  on May 10th there?

18  A.  Yes.

19  Q.  And it says, Late one minute.

20         Do you see that?

21  A.  Yes, I do.

22  Q.  And that's right there, May 10th, late one minute.

23         Do you see that?

24  A.  Yes, I do.

25  Q.  Okay.  And then I want to draw your attention back to

1 Group 263, and it's Bates number 3800.

2 A. Yes.

3 Q. Okay. Do you see on this particular section, it says, Add

4 punch on 5/10?

5 A. Yes, I do.

6 Q. And that's at 10:30. What is that?

7 A. I -- this was many years ago. I can't recall the exact

8 circumstances why this was done. I can only make a

9 presumption, and I don't want to do that.

10 Q. Okay. And this sheet, this exhibit, Group 263, this is

11 based off of Ms. Arroyo's punch times; isn't that right?

12 These are all her specific punch times?

13 A. On this?

14 Q. Yes.

15 A. Yes.

16 Q. So can anyone go in there and change punch times?

17 A. I could change the punch times, and the supervisors could

18 put one in if they forgot one.

19 Q. And is there any reason why someone would go in and change

20 any punch times for an employee?

21 A. If there was a grace period, a half-hour grace period

22 before their start time. And if they punched in before that,

23 then that would give them overtime, go in and correct that.

24 Q. Okay. And on May 10th, it says she checked in at 2:31

25 p.m. Do you see that?

1  A.  Yes, I do.

2  Q.  And that was the day that she was marked one minute late;

3  is that right?

4  A.  According to the records, you are correct.

5  Q.  Do you know what time she was scheduled to work that day?

6  A.  I don't recall at this time if there was anything

7  different for her hours for that day or whatever.  I don't --

8  that was too long ago.  I don't recall the circumstances.

9  Q.  Okay.  And do you see here too on 5/12, she checked in

10  at 2:31 p.m. as well?

11  A.  Yes, I do.

12  Q.  And I want to draw your attention back to Exhibit 265.

13  A.  I see that.

14  Q.  Hold on one second.

15      And that day, on May 12th, she's late one minute.  Do

16  you see that?

17  A.  Yes, I do.

18  Q.  And I want to draw your attention to that next date.  It's

19  May 27th.

20  A.  May...

21  Q.  And she is late five minutes that day, right?

22  A.  According to the attendance record.  I don't do this

23  attendance record.

24  Q.  Okay.  And I want to turn your attention to Bates

25  number 3802 on Group 263.  That was May 27th that we just

1  looked at?

2  A.  Yes.

3  Q.  And she was marked as five minutes late.  And do you see

4  here on May 27th, she's punched in at 4:35 p.m.?

5  A.  Yes, I see that.

6  Q.  Okay.  And do you see below this, there's quite a few

7  removed punches and add punches?

8  A.  Yes, I do.

9  Q.  Do you know who was removing and adding punches on this

10  day?

11  A.  I don't recall who the number was.  I do not recall.  I

12  can't answer that question.

13  Q.  Do you know who is able to remove and add punches?

14  A.  I would have been able to do that or the supervisors.

15  Q.  And then I want to draw your attention to July 29th.  It's

16  Bates 3811 in Group 263.

17          And that's July 29th.  Do you see that, and then the

18  word "tardy"?

19  A.  Yes, I do.

20  Q.  Did you write the words "tardy" there?

21  A.  No, I do not.

22  Q.  Do you know who did?

23  A.  That's Keith Schroeder's handwriting.

24  Q.  Okay.  And do you see what time she's punched in at?

25  A.  I -- it's too fuzzy.  I can't tell exactly what time.

1  Q.  Okay.  And then let's go back to Exhibit 265.  If you look

2  at that, and on July 29th, it does say she's marked late one

3  minute; isn't that right?

4  A.  That's correct.  That's what it says.

5  Q.  Okay.  So instead of going back, you'll vouch that it does

6  say, Late one minute, on July 29th, right?

7  A.  It says, Late one minute, July 29th, on the attendance

8  records.

9  Q.  Okay.

10  A.  That I don't have anything to do with.

11  Q.  Okay.  Now I'm going to go back to Exhibit 265.  And that

12  time we just looked at, July 29th, it's right at the top

13  there, it says, Late one minute; isn't that right?

14  A.  July 29th.  It says, Late one minute, yes.

15  Q.  And then below that on August 20th, it also says -- I'm

16  sorry, August 19th, it says, Late five minutes.

17       Do you see that?

18  A.  That's what it says, yes.

19  Q.  And she was given a written warning that day; isn't that

20  right?

21  A.  That's what it states on there.  I don't have anything to

22  do with any of that.

23  Q.  And then August 20th, it also notes that she's late one

24  minute, right?

25  A.  That's what it states on here, yes.

1   Q.  And it says, Three-day suspension, next to that?

2   A.  That's what it states.  I have nothing to do with any of

3   that.  It's not my responsibility.

4   Q.  Okay.  And I want to draw your attention back to Group

5   Exhibit 263, and that's Bates number 3815.

6          And do you see what time she's punched in on

7   August 19th?

8   A.  I can't make it out.  It's highlighted.  I can't be for

9   certain.  I can't give you an exact time.

10  Q.  Okay.  But she was late five minutes -- she was marked

11  late that -- five minutes that day, right?

12  A.  That's what it says on that attendance record.

13  Q.  And that's the day that she was given the written warning?

14  A.  According to the attendance record, yes.

15  Q.  Okay.  And then on August 20th, it says, Late one minute.

16         Do you see that?

17  A.  I see where it says that, yes.

18  Q.  Do you see what time she's -- she's punched in on

19  August 20th?

20  A.  I -- I can't tell that either.  They're -- they're

21  highlighted.  They were highlighted, so the copy of the

22  highlight, I can't --

23  Q.  Can you see the time next to August 20th?

24  A.  August 20th is 7:31.

25  Q.  Do you know if she was one minute late that day?

1  A.  That would have been -- she would have been tardy.

2  Q.  Do you know what time she was working that day?

3  A.  I don't know exactly what time.  I don't recall.

4  Q.  Okay.  And I want to draw your attention to Bates

5  number 3821 in Group 263.

6        Do you know whose handwriting this is on the right

7  side?

8  A.  That is mine.

9  Q.  And what does that say?

10 A.  It says, Fifteen minutes deducted for greater than 10

11 minutes in assigned room.

12 Q.  What does that mean?

13 A.  I don't -- I don't recall at the time.  I don't recall

14 exactly what the whole circumstance was behind something that

15 was five years ago.

16 Q.  Were you deducting 15 minutes of time because Ms. Arroyo

17 was in the meditation room?

18 A.  I don't recall.

19 Q.  And she was allowed to use that meditation room in order

20 to decompress before work; isn't that right?

21 A.  I was not part of that whole situation.

22 Q.  Okay.  I want to draw your attention to October 10th, and

23 it will be Bates number 3824.

24       By the way, who told you to deduct 15 minutes of time

25 from Ms. Arroyo's --

1   A.  I can't recall.

2   Q.  You wouldn't just do that on your own, though, without

3   anybody's permission, right?

4   A.  No, I would not.  I can't recall -- I don't know why it

5   was done.  I can't recall why.

6   Q.  And there on October 10th, do you see what time she's

7   punched in?

8   A.  4:32.

9          Or -- I can't read that -- I can't read if it's 4:32

10  or 4:31.  I'm not positive.

11  Q.  Okay.  Then I'm going to show you what we have marked as

12  265, and we'll see what time it says she's late.

13         And on October 10th, she's noted as being late one

14  minute.  Do you see that?

15  A.  Yes, I do.

16  Q.  Okay.  I want to also draw your attention to November 2nd

17  there at the bottom.  Do you see there, it says, Tardy three

18  minutes, start rule violation?

19  A.  Yes, I see where it says that.

20  Q.  Okay.  I want to draw your attention to that next page as

21  well.  And that's November 4th.  Do you see that?

22  A.  Where?  I'm sorry.

23  Q.  The next page on 265.

24  A.  Okay.

25  Q.  And it says Tardy three minutes, start rule violation.

1      Do you see that?

2  A.  Yes, I do.

3  Q.  And then on the right there, it says, Termination five and

4  six months.

5      Do you see that?

6  A.  Yes, I do.

7  Q.  Do you know that Ms. Arroyo was terminated for this tardy

8  of three minutes?

9  A.  I -- I can't recall.  I was not involved in anything

10  having to do with terminations, policies, attendance records,

11  nothing.

12  Q.  You do know that Ms. Arroyo was terminated on

13  November 8th, 2011, though, for tardiness; is that right?

14  A.  I don't recall.  I believe that was the date, but I'm

15  not -- I'm -- I don't want to agree to that.

16  Q.  Okay.  And I just want to go back to Bates number 3827 on

17  Group 263.

18      I want to draw your attention specifically to

19  November 2nd there.  Do you see what time she's punching it on

20  November 2nd?

21  A.  4:00 o'clock.

22  Q.  And, actually, below that, it says, Remove punch 11/2,

23  3:48 p.m.

24      Do you see that?

25  A.  Yes, I do.

1   Q.  And then a punch was added on November 2nd at 4:00 o'clock

2   p.m.  Do you see that?

3   A.  Yes, I do.

4   Q.  And Ms. Arroyo's shift doesn't start until 4:30; isn't

5   that right?

6   A.  That's correct.

7   Q.  So let me ask you, is Ms. Arroyo punching in late on

8   November 2nd?

9   A.  No, she is not.

10  Q.  In fact, she is punching in over a half an hour early on

11  that day; isn't that right?

12  A.  4:00 o'clock is a half hour early.

13  Q.  And, actually, she punched in at 3:48; isn't that right?

14  A.  I don't -- I don't recall.  I don't know why there was

15  anything removed or added or anything.  I can't -- I don't

16  recall.  I do not know why.

17  Q.  Okay.  And then I want to draw your attention to

18  November 4th there.  Do you see that?

19  A.  Yes, I do.

20  Q.  And it looks like she's either punching in at 4:01 or

21  4:04 p.m.  Do you see that?

22  A.  Yes, I do.

23  Q.  And, again, she's punching in about a half an hour early

24  before her start time; isn't that right?

25  A.  That's correct.

1  Q.  And so she's not, in fact, punching in late on either

2  November 2nd or November 4th; isn't that right?

3  A.  That's correct.

4  Q.  So this spreadsheet that's labeled Plaintiff's

5  Exhibit 265, these tardies of three minutes on November 2nd

6  and the tardy of three minutes on November 4th, those are not

7  accurately reflected in Ms. Arroyo's punch times, right?

8  A.  No.  The November 4th one, I recall that there was --

9  Q.  Listen to the question, though.

10  A.  Okay.  I'm sorry.

11  Q.  This exhibit, Plaintiff's Exhibit 265, on November 2nd, it

12  says, Tardy three minutes, and on November 4th, it says, Tardy

13  three minutes, and that is not what is reflected on

14  Ms. Arroyo's punch times; is that correct?

15  A.  That is correct.

16      MS. WILSON:  Objection, your Honor.  Misstating what

17  the exhibit does say.

18      THE COURT:  I think you can clean all that up in your

19  redirect or whatever you want to call this.

20  BY MS. DeROSE:

21  Q.  Ms. Somersett, during all your years of employment with

22  Volvo, can you recall any other employee who was disciplined

23  or terminated for being tardy one minute?

24  A.  I can't recall who.

25  Q.  In fact, there were no other employees that were ever

1  terminated for actually punching in early; is that right?

2  A.  Could you repeat that question?

3  Q.  In all your years at Volvo, you have never seen another

4  employee who was ever terminated for actually punching in

5  early; isn't that right?

6  A.  I don't -- I can't answer that question.  I don't --

7  nobody would -- no.

8  Q.  I'm going to ask you that one more time.

9          In all your years at Volvo, you have never seen

10  another employee who has ever been terminated for tardiness

11  when she, in fact, punched in early; is that right?

12  A.  That's correct.

13          MS. DeROSE:  I have nothing further.

14          THE COURT:  Okay.  You got eight minutes tonight, and

15  whatever you need tomorrow.

16          MS. WILSON:  I will only take half that, your Honor.

17          THE COURT:  Okay.  Fantastic.

18                          - - -

19          MAUREEN SOMERSETT, CROSS-EXAMINATION

20  BY MS. WILSON:

21  Q.  Good afternoon, Ms. Somersett.

22  A.  Good afternoon.

23  Q.  Over the past 16 years, you've had a couple of titles,

24  haven't you?

25  A.  Yes, I have.

1  Q.  Tell me again what those titles were?

2  A.  Administrative assistant, head manager of payroll and

3  administration, and office manager.

4  Q.  Over the 16-year period, has your job actually changed?

5  A.  No, it has not.

6  Q.  Are you a part of the company's human resources

7  department?

8  A.  I am not.

9  Q.  And just to be clear, you don't maintain the attendance

10 record, do you?

11 A.  No, I do not.

12 Q.  And you don't create the punch records, do you?

13 A.  No, I do not.

14 Q.  Earlier, I think Ms. DeRose might have cut you off.  Do

15 you know what a start rule violation is?

16 A.  It's for tardiness.  That's all I know.  It has something

17 to do with being tardy.  It's the same thing, start.

18 Q.  Okay.  So is a start rule violation covered by the

19 attendance policy?

20 A.  I don't -- I can't recall.  I don't have anything to do

21 with the attendance policy.

22 Q.  All right.  Earlier, you were asked about being in a

23 meeting with Ms. Arroyo and Mr. Schroeder.  Were you ever in a

24 meeting where Mr. Schroeder threatened the plaintiff?

25 A.  Never.  Never.

1   Q.  Did you ever see Mr. Schroeder yelling at the plaintiff?

2   A.  No, never.

3   Q.  Did you ever think that Mr. Schroeder was threatening

4   Ms. Arroyo?

5   A.  No, I did not.  Never.

6   Q.  Ms. Somersett, did you decide whether Ms. Arroyo would be

7   hired in 2005?

8   A.  No, I did not.  I had no control over that.

9   Q.  Did you decide what military leave she should be given?

10  A.  No, I did not.

11  Q.  Did you decide what time she needed to attend military

12  drills?

13  A.  No, I do not.

14  Q.  How about accommodations; did you have any involvement in

15  accommodations for Ms. Arroyo?

16  A.  No, I did not.

17  Q.  Did you decide whether Ms. Arroyo incurred any discipline

18  under the attendance policy?

19  A.  I did not.

20  Q.  Did you make the decision as to whether Ms. Arroyo should

21  be terminated?

22  A.  No, I did not.

23  Q.  Did you make any decision related to Ms. Arroyo's

24  employment?

25  A.  No, I did not.

1    MS. WILSON:  No further questions, your Honor.

2    THE COURT:  Okay.  Thank you.

3    Anything further on that?

4    MS. DeROSE:  I just have just a few.

5                          - - -

6    MAUREEN SOMERSETT, REDIRECT EXAMINATION

7  BY MS. DeROSE:

8  Q.  Did anyone ever tell you that Ms. Arroyo was feeling

9  threatened by Mr. Schroeder?

10  A.  No, I can't recall.

11  Q.  And you were never, ever a witness to any other meetings

12  with employees and Mr. Schroeder; is that right?

13  A.  If I was asked, I would be present.

14  Q.  And did Ms. Arroyo specifically tell you, I feel

15  threatened by Mr. Schroeder?

16  A.  No, she did not.

17  Q.  Did you ever ask Ms. Arroyo why you needed to be present

18  during these meetings with Mr. Schroeder and Ms. Arroyo?

19  A.  No, I did not.

20  Q.  Someone in Volvo headquarters had told you to be present

21  during meetings with Ms. Arroyo and Mr. Schroeder; is that

22  right?

23  A.  For -- yes.

24  Q.  Ms. Arroyo never specifically told you to be present for

25  those meetings; is that right?

1    A.  No, I -- no.

2    Q.  Did they tell you that Ms. Arroyo had specifically

3    requested someone else be present during those meetings?

4    A.  I don't understand the question.

5    Q.  Who told you from Volvo headquarters that you needed to be

6    present during those meetings with Ms. Arroyo and

7    Mr. Schroeder?

8    A.  Dennis Sholl had asked me to -- had requested that I be

9    present for meetings having to do with accommodations for

10   harassment and code of conduct.

11   Q.  And who is Dennis Sholl?

12   A.  Dennis Sholl was the vice president at the time.

13          MS. DeROSE:  Okay.  I have nothing further.

14          MS. WILSON:  No further questions, your Honor.

15          THE COURT:  Okay.  Perfect timing.

16          Ms. Somersett, thanks for coming in.  I appreciate

17   it.

18          THE WITNESS:  Thank you.

19          THE COURT:  Ladies and gentlemen, it's closing time

20   for today.  As I said, tomorrow if you could come around 9:30,

21   we will start as close to 9:30 as we can.

22          Again, thank you for your patience and your

23   punctuality, and we will see you in the morning.  Have a great

24   night, everybody.

25     (The jury leaves the courtroom.)

1    THE COURT:  Okay.  You're done.

2    THE WITNESS:  Thank you, sir.

3    (The trial was adjourned at 5:00 p.m. until August 18,

4    2017.)

```
1                C E R T I F I C A T E

2

3        We, Kristin M. Ashenhurst and Carolyn A. Cox, certify that

4    the foregoing is a correct transcript of the record of

5    proceedings in the above-entitled matter.

6    /s/Kristin M. Ashenhurst, CSR, RDR, CRR    February 28, 2018
     KRISTIN M. ASHENHURST, CSR, RDR, CRR       DATE
7

8    /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR     February 28, 2018
     CAROLYN R. COX, CSR, RPR, CRR, FCRR        DATE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```