1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3
     LUZMARIA ARROYO,                ) Docket No. 12 C 06859
4                                    )
                    Plaintiff,       ) Chicago, Illinois
5                                    ) August 18, 2016
              v.                     ) 9:47 A.M.
6                                    )
     VOLVO PARTS NORTH AMERICA, LLC, )
7                                    )
                    Defendant.       )
8
                         VOLUME 4-A
9          TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
        BEFORE THE HONORABLE ROBERT M. DOW, JR., AND A JURY
10
     APPEARANCES:
11

12   For the Plaintiff:       JOHN P. DeROSE AND ASSOCIATES, by
                              MR. JOHN P. DeROSE
13                            MS. CAITLYN DeROSE
                              15 Spinning Wheel Road
14                            Hinsdale, Illinois 60521
                              (630) 920-1111
15
     For the Defendant:       CONSTAGNY, BROOKS & SMITH LLP, by
16                            MR. WILLIAM J. McMAHON IV
                              100 N. Cherry Street
17                            Suite 300
                              Winston Salem, North Carolina 27101
18                            (336) 721-6860

19                            CONSTAGNY, BROOKS & SMITH LLP, by
                              MS. SUSAN E. BASSFORD WILSON
20                            200 S. Wacker Drive
                              Suite 3100
21                            Chicago, Illinois 60606
                              (314) 925-7275
22
     Court Reporter:          KRISTIN M. ASHENHURST, CSR, RDR, CRR
23                            Official Court Reporter
                              219 S. Dearborn Street, Room 1918
24                            Chicago, IL 60604
                              (312) 818-6549
25                            kristin_ashenhurst@ilnd.uscourts.gov

1     (The following proceedings were had in open court:)

2     (Jury in.)

3     THE CLERK:  It's 12 C 6659, Arroyo versus Volvo Parts

4 North America.  Jury trial continues.

5     THE COURT:  Okay.  So Mr. McMahon is going to tell us

6 a few issues he might have with the evidence that he's

7 anticipating today.  Is that right?

8     MR. McMAHON:  Yes, your Honor, that's correct.  This

9 is in an effort to front these issues and interrupt the actual

10 jury proceedings as little as possible.

11     THE COURT:  And I will say that my perspective, that

12 has worked like a dream so far this week.  So let's continue

13 that.

14     MR. McMAHON:  Thank you very much, your Honor.  Again,

15 I don't intend to beat a dead horse with this objection I'm

16 raising.  But we have taken a look, and we continue to take a

17 look, as your Honor does, at the Seventh Circuit panel's

18 opinion in this case.  So far I would say that the discussion

19 regarding certain things like the accommodation -- or about the

20 accommodations, specifically the meditation room, I think have

21 been appropriately addressed by way of background, by way of

22 kind of circumstance, if you will, in terms of some of the

23 events that are also at issue in the discrimination claims.

24     THE COURT:  Mm-hmm.

25     MR. McMAHON:  And I think that's been appropriate.

1      I think the issue that we have today is that there's a

2   possibility for a more direct discussion about some of the

3   accommodation requests.

4      THE COURT:  Mm-huh.

5      MR. McMAHON:  What accommodation requests were

6   granted.  What may have been either denied or delayed.  And,

7   additionally, I think there's at least the potential today to

8   get into a discussion about Ms. Arroyo's internal harassment

9   complaint against Mr. Schroeder.

10      The reason why we're kind of bringing those up today,

11   specifically, is in looking back at the panel's opinion, it's

12   our position that the panel was not focused as broadly as

13   Volvo's attitude towards Arroyo.  But it's her attitude towards

14   Arroyo with reference to her absences.  And I think that is the

15   piece they're really teasing out in their citation.  Specific

16   pieces of evidence that they identify on the ADA side of

17   things.

18      So what was noteworthy to us, and we're taking a

19   second look at this, they opine on Page 16 that in their view

20   there's actually less evidence towards PTSD than there is

21   towards the military service.

22      THE COURT:  Mm-hmm.  And there's a lot less period of

23   time there could have been because there was no knowledge of

24   PTSD until 2011.

25      MR. McMAHON:  Right.  And it didn't develop until

1    later.  That's correct.

2            THE COURT:  Right.

3            MR. McMAHON:  Notably they don't actually cite any

4    events from 2011.  And I'm well aware of your Honor saying

5    they're not obligated to lay out entirely what could possibly

6    be relevant.  But in looking back at their description of the

7    events they did include, to me it looks like they're talking

8    about attitude towards her absences.  In other words, being

9    these emails from Ms. Jankowski, which we looked at yesterday,

10   where Ms. Jankowski is forwarding some rumors about why

11   Ms. Arroyo was absent.  There is a situation where, at least

12   temporarily -- and then this may be brought up today as

13   well, where Mr. Schroeder was considering disciplining

14   Ms. Arroyo for her absence when she was in the ER.  Of course,

15   we all know that was excused.  And then additionally where they

16   also cite this email where Ms. Jankowski is complaining to

17   Mr. Schroeder that Arroyo was really becoming a pain with all

18   of this.

19           THE COURT:  Mm-hmm.

20           MR. McMAHON:  That was also in reference to leave.  If

21   we look at the context of that email, interestingly enough that

22   particular email was dealing with military leave.  I'm not so

23   sure why they cited it for PTSD animus, but it is what it is on

24   that front.  But I guess the point of it is that it appears it

25   is attitude toward the applicants.  In other words, it's not

just attitude kind of in a vacuum.  So for that reason we want
to clarify on the record that we do object to testimony about a
harassment complaint against Schroeder.  We don't think that is
within the scope of what the Seventh Circuit said is relevant.
And we don't believe that Ms. Arroyo should be able to testify
to accommodations that she did not receive from Volvo.  That
completely obliterates the distinction between the
discrimination and the failure to accommodate claims.  And the
Seventh Circuit made very clear that they are two different
frameworks, two different kind of ways to approach it.

THE COURT:  Okay.  And I -- I'll let the plaintiff's
Counsel say their piece on this, too, but --

MR. McMAHON:  Yeah.

THE COURT:  -- but this is what I said the other day,
and I still feel the same way.  If there are particular
exhibits or testimony --

MR. McMAHON:  Yes.

THE COURT:  -- that is focused on accommodations or
this retaliation claim, then I might be able to sift those out.

MR. McMAHON:  Sure.

THE COURT:  And I think I should sift those out.  What
I have -- I certainly have erred on the side of letting the
plaintiff tell more of the story than less of the story.  And I
know that's not what you guys wanted.  But you preserved your
record.  And I think that for purposes of trying to adhere to

1    the law of the case, I do need to do that.

2          On the other hand, the retaliation claim is dismissed

3    and affirmed.

4          MR. McMAHON:  Yes.

5          THE COURT:  And the failure to accommodate claim is

6    dismissed and affirmed.  And to the extent that there's going

7    to be a focus on aspects of this case -- whether it's

8    testimonial or exhibit --

9          MR. McMAHON:  Right.

10          THE COURT:  -- that would focus -- that would be

11    supportive of those claims with very little probative value on

12    the rest -- on the other claims, then I will exclude it.

13    Because I don't think it's -- it's not fair to make the

14    defendant defend claims that are no longer in the case.

15          MR. McMAHON:  Right.

16          THE COURT:  But it's equally not fair to not let the

17    plaintiff put on evidence that would support animus related to

18    military service or PTSD, and, obviously, they are going to

19    have to link that to an adverse employment decision, too.  So

20    I'm just trying to draw these lines, and all I'm telling you is

21    these are my parameters for doing so.

22          MR. McMAHON:  Understand.

23          THE COURT:  I have gone through this entire exhibit

24    list, and I have marked some of this exhibits which I think

25    will be excludable.

1           MR. McMAHON:  Right.

2           THE COURT:  Most of them haven't been offered,

3    actually, which is good --

4           MR. DeROSE:  Probably not going to be offered.

5           THE COURT:  You don't know -- you can't read what's

6    going on, and I --

7           MR. McMAHON:  That's exactly right.  And I'm with you.

8    I actually think to -- I actually think to date in the trial,

9    while we disagreed on some objections, and we still object to

10   those things, I think at this point, prior to today's

11   testimony, from our viewpoint it's at least somewhat

12   manageable.

13          THE COURT:  And that's what -- what I'm trying to do

14   here is just give you guys where I'm coming from so you -- and

15   I think everybody has been able to work pretty well with that.

16   And I think probably the plaintiff hasn't offered some exhibits

17   because they know where I'm headed with them.

18          MR. McMAHON:  Right.

19          THE COURT:  And that's good.  So I don't expected

20   today's focus to be about accommodations.  And what's gone on

21   so far, I think, is perfectly reasonable.  You have to paint

22   the picture of the plant.  And this meditation room is fine.

23          MR. McMAHON:  Yeah.

24          THE COURT:  And a lot of times the punches or the

25   actions or the motor -- or the car being in the back, that all

1   relates to something having to do with this meditation room.

2   That's all fine.  Nor do I expect the focus today to be on the

3   facts that support a retaliation claim because there isn't such

4   a claim.  And so if you go down that road, that's where I start

5   sustaining objections.  But if you guys stick with the next two

6   witnesses, the same path you've been on with the first three

7   witnesses, I think we're going to be good.  Because I think

8   everybody is adjusting to what I'm trying to do with this case.

9           I am trying to be 100 percent fair to both sides.

10          MR. McMAHON:  Right.

11          THE COURT:  And let you guys tell your story and try

12  the claims that we actually have.  And, you know, protect you

13  guys, at least somewhat, from the claims that you don't have to

14  defend against anymore.  Where there's overlap, I certainly

15  have erred on the side of giving the plaintiff more latitude to

16  put the facts in, but only where the facts support the claim.

17  And a lot of them -- as I said many times before, the sifter

18  isn't very efficient in this case.  But where the sifting needs

19  to be done, I will try my best to do it.  And your points are

20  well taken.

21          MR. McMAHON:  Okay.  Thank you.

22          THE COURT:  And I think so far your points have been

23  well taken by the plaintiffs, too, in the way they have

24  presented the evidence, and it's been really smooth.  I know it

25  takes time to get through six years of stuff.  It would be a

1  lot faster, I'm sure, too -- I mean, we have six years of stuff

2  that happened five or more years ago.

3          MR. McMAHON:  Right.

4          THE COURT:  And if this all happened last year --

5          MR. McMAHON:  Sure.

6          THE COURT:  -- all of the witnesses would be sharper

7  in their memories.  Some of that's on me because I screwed the

8  case up once, at least according to the Seventh Circuit.  So

9  we're just going to -- we have to deal with what we can and

10 that's part of what makes the length of the trial.  None of

11 these witnesses -- probably including Ms. Arroyo -- are going

12 to remember everything.  And that's life in the big city here.

13 We're doing the best we can with it.  Everybody has persevered

14 with good cheer.

15         MR. McMAHON:  Right.

16         THE COURT:  I get your point.  I thank you for making

17 it.  It's something we can all take into consideration.

18         Did you guys have anything you wanted to say on this

19 point?

20         MR. DeROSE:  Nothing, your Honor.

21         THE COURT:  Okay.  I hope I covered it okay for

22 everybody.

23         MR. McMAHON:  Thank you, Your Honor.

24         THE COURT:  We will take a break for a couple of

25 minutes here because Kris and I have been rocking for an hour

1    out here.  And, hopefully -- we will come out here and make

2    sure your client has gotten here.  Okay?

3            And then I will -- Carolyn, if you could just give the

4    jurors a heads up that we just finished the morning call and

5    we'll be around -- at least ten more minutes.

6            THE CLERK:  Okay.

7            THE COURT:  So five after I will come in and check and

8    see if Ms. Arroyo is here, and hopefully she is.  Thank you,

9    everybody.

10       (Recess taken.)

11           MR. DeROSE:  Judge, I apologize, my client hasn't

12   arrived yet.  And we texted her and she is not answering.

13           THE COURT:  Because she may also be in a building

14   where it is impenetrable.  This building is a hard building to

15   get a text in and out of.

16           MR. DeROSE:  She should be in a car or the building.

17           MS. DeROSE:  Well, she might be coming up here.

18           THE COURT:  She might be in a parking garage, though.

19   Okay.  Well see if you can track her down.  That would be fine.

20           Are you here just to visit?

21           UNIDENTIFIED ATTORNEY:  Just an old man observing.

22           THE COURT:  Can I say that for myself, too?

23           UNIDENTIFIED ATTORNEY:  In a few years.  In a few

24   years.

25           THE COURT:  In a few years.  Thank you.

1          MR. DeROSE:  Your Honor, he taught me all I know.

2     I've known Don about 25 years.  Our kids got born, boys and

3     girls, exactly the same time.  And we went camping together.

4          THE COURT:  Well, that's kind of fun.  So you enjoy

5     spending time with Mr. DeRose so much that you would like to

6     spend some of this trial with him?

7          UNIDENTIFIED ATTORNEY:  Absolutely.

8          THE COURT:  Okay.  Well, that's good.

9          Okay.  So I think we're ready to go here.

10          THE CLERK:  All rise.

11     (Jury in.)

12          THE COURT:  Good morning, everybody.  Did anybody get

13     wet this morning?  No?  You're lucky.  I got wet in Joliet,

14     which is where I live.  Well, thank you all for your patience

15     this morning.  I appreciate it.  We are going to resume with

16     the testimony this morning.  The plaintiffs will call their

17     next witness, please.

18          MR. DeROSE:  Thank you, your Honor.  We'll call

19     Mr. Schroeder, please.

20          THE COURT:  Okay.  Mr. Schroeder, you have seen the

21     drill.

22          THE WITNESS:  Yes.

23          THE COURT:  Come on up and remain standing and Carolyn

24     will give you the oath.

25          (Witness sworn.)

Schroeder - Direct by Mr. DeRose

1    THE COURT:  Okay.

2    THE CLERK:  Please have a seat, speak into the mike,

3    and there's cups if you need them.

4    THE COURT:  Okay.  Mr. DeRose, whenever you are ready,

5    sir.

6    KEITH SCHROEDER, PLAINTIFF'S WITNESS, SWORN

7    DIRECT EXAMINATION

8    BY MR. DeROSE:

9    Q    Sir, would you please state your name for the record?

10   A    My name is Keith Schroeder.

11   Q    Spell your last name, please?

12   A    S-c-h-r-o-e-d-e-r.

13   Q    Mr. Schroeder, I understand that you work for Volvo

14   Auto -- or Truck Parts; is that correct?

15   A    Yes.

16   Q    And Volvo Truck Parts also delivers parts for Mack trucks,

17   a different branded 18-wheeler?

18   A    Correct.  At our facility we're under the Volvo truck

19   operations logistics services division.  We distribute parts

20   for Volvo trucks and Mack trucks.

21   Q    And if any of us are driving down a six-lane divided

22   highway, as we all tend to do, and there's a whole series of

23   trucks coming at us, we would recognize a Volvo truck because

24   it has that distinguished diagonal thing across the front of

25   its grill, right?

1    A    That's correct.

2    Q    And that's a trademark for Volvo, correct?

3    A    It sure is.  It's the iron mark.

4    Q    Sometime when you're looking at that lineup with trucks,

5    you might see six trucks in a row with that particular emblem.

6    A    I hope that's most of the trucks you see.

7    Q    Well, you see a lot of them, don't you?

8    A    Yes.

9    Q    And now, if you were going to see a Mack truck, you'd see

10   that bulldog -- that silver bulldog standing proudly guard on

11   top of the hood of the truck, right?

12   A    That's correct, sir.

13   Q    And those are Mack trucks?

14   A    Yes, they are.

15   Q    And you guys work with both of them?

16   A    We do.

17   Q    And you're pickers and packers, when one of those

18   trucks -- and I'm sure it's very seldom -- happens to breakdown

19   and needs a part, they'll take it to one of the dealers and

20   they'll say, "We need a part to fix that truck and get it on

21   the road."  And your job would be to get it picked and packed

22   and get that part over to the dealer as quick as possible,

23   right?

24   A    That's our job every day.

25   Q    And you don't always know how many picks and packs you have

Schroeder - Direct by Mr. DeRose

1    to do on a particular day until you get to work, or you have a

2    pretty good handle on how often certain parts are going around?

3    Is it kind of even?

4    A    I mean, we look at historical data all of the time.  We

5    know what our order volumes will be.  It does vary day to day,

6    and we get the unexpected sometimes.

7    Q    And the facility where you work and where you have your

8    office is located in Joliet, Illinois, right?

9    A    That's correct.

10   Q    And that plant there, it covers at least a block under

11   roof, doesn't it?

12   A    I don't know that for certain.  Our facility is 325,000

13   square feet and we're on 14 acres.  If that's a block, I'm not

14   sure.

15   Q    All right.  But if you were walking out the back door of

16   the facility and had to walk around to the front door and

17   weren't running, that would take you three to five minutes,

18   wouldn't it?

19   A    I can't be certain.  But it would take a few minutes, yes.

20   Q    Because it's a pretty long walk around the building?

21   A    The building is 400 feet deep by 800 feet wide.

22   Q    Have you from time to time walked out the back of the

23   building and walked around to the front?

24   A    Not often.  But I think I have.

25   Q    Could you estimate how long it took you to do that?

Schroeder - Direct by Mr. DeRose

1  A   I never timed it, sir.  I don't know that I would know

2  that.  It talks a few minutes.

3  Q   About three or four?

4  A   I'd hate to speculate on that.

5  Q   Well, would you just give me an estimate of how many

6  minutes?

7  A   It would take a few minutes, yes.

8  Q   By a few you mean?

9  A   Two, three or four.  I don't know for certain, sir.

10 Q   All right.  We're not asking you for certitude on that

11 question.

12         Now, how many years have you been over there at that

13 Joliet facility?

14 A   This is my 39th year.  Not all at that facility, but. . .

15 Q   Oh, not all there.  That's kind of a newer building.  It's

16 not 39 years old, is it?

17 A   No, it's not.  We moved into building in 2000.

18 Q   So it's only about 16 years ago -- my math; is that right?

19 A   Sixteen years old, yeah.

20 Q   And prior to that were you in the Joliet community in a

21 different building?

22 A   No.  Our previous warehouse was located in Bridgeview,

23 Illinois.

24 Q   Oh, sure.  And was that a smaller location?

25 A   Yes.

1   Q    So you guys grew up and business got busier, you had to

2   have a bigger, fancier, newer building, the one you built in

3   Joliet?

4   A    Essentially through the growth of our business and change

5   and reorganization in the US.  The larger warehouse in New

6   Jersey was closed and our facility was expanded, so we needed a

7   bigger space.

8   Q    All right.  So when you moved to the new building, what was

9   your job title?

10  A    I was supervisor.

11  Q    So you weren't the top boss in 2000, when you got there?

12  A    No, I was not.

13  Q    Sometime after 2000 you got elevated above all of the

14  supervisors who were working there, didn't you?

15  A    Yes, I was promoted to manager, I believe -- I don't know

16  the exact date.  I can't recall.  In 2000.

17  Q    It was in 2000?

18  A    I believe it was 2000, maybe 2001.

19  Q    All right.  And by 2005, can you tell us how many employees

20  you had working in that facility?

21  A    Probably between 90 and 100.  I can't be certain of the

22  exact number.

23  Q    All right.  Of those 90 to 100 employees, were as many as 7

24  of them supervisors?

25  A    I believe that's the correct number.

Schroeder - Direct by Mr. DeRose

1    Q    And so you probably had about 87 to 93 pickers and packers

2    that they were supervising?

3    A    That's an approximate number, yes.

4    Q    And we learned the other day that each of those supervisors

5    would get a team of pickers and packers to supervise.  And you

6    would have as many as three supervisors per shift?

7    A    Not on all shifts.  But as many as three, yes.

8    Q    All right.  And then we also learned that you had to, from

9    time to time, hire more pickers and packers, and you would have

10   a kind of an interview process.  And you would lead the

11   interview process to hire these people, right?

12   A    Correct.

13   Q    And did you always have the same supervisors to help you do

14   the interview, or did you give them all a chance at being

15   involved in that?

16   A    Over the years I rotated the supervisors to give them that

17   experience.

18   Q    And that was the reason, just so they had the experience of

19   interviewing people?

20   A    Yes, of course.

21   Q    And give you the input of what they thought they needed,

22   what qualities they wanted to see in the people they would

23   supervise?

24   A    That's true.

25   Q    And I would take it you listened to your supervisors when

1  they would say this quality is a quality of a person that could

2  be an asset to my team if I were supervising them, correct?

3  A   Yes, of course.  I value their opinions.

4  Q   Okay.  All right.  And did you value -- did you have some

5  supervisors who you leaned on more than others because they

6  seemed to have more information that was helpful to -- for you

7  as you managed the facility?

8  A   I guess you could say yes.  But, I mean, it varies, because

9  of their experience.  I mean, a person that's been there more

10 than 25 years is going to have a lot more experience doing

11 inbound, outbound, inventory management, all kinds of things.

12 Of course I count on them a little bit more because of their

13 long-term experience.  Some of the newer supervisors are in the

14 learning phase.

15 Q   All right.  By 2005, if you had to name your two or three

16 supervisors you leaned on the most, would you say that

17 Mr. Temko would be numbered among those three?

18 A   That's possible, yes.

19 Q   And what kinds of things did you lean on Mr. Temko for?

20 A   I mean, Michael did various things.  He was supervisor of

21 the inbound shift.  He did some outbound supervision.  He

22 worked the night shift.  He did a variety of tasks.  He also

23 assisted me with the -- he was assigned the attendance

24 responsibility for monitoring the attendance records.

25 Q   And he would, as the supervising attendant, he was the

1  supervisor who was responsible for keeping track of the

2  attendance of all of the employees on all of the shifts even

3  though he only supervised the midnight shift, right?

4  A   That's correct.

5  Q   And so somehow part of his job at that midnight while the

6  pickers and packers were running around, would be he would go

7  into the office and look at the records to make records -- to

8  keep track of whose attendance is not keeping up to par?

9  A   I mean, he maintained the attendance record based on the

10  weekly payroll report.

11  Q   And you were always a day-shift manager?

12  A   Yes.

13  Q   And Michael, in 2005, was working that midnight shift, he

14  told us.  So I would take it he was doing those things at a

15  time when you were not in the facility.

16  A   That's right, at that time.

17  Q   Would you leave him messages of things you wanted him to

18  check on and keep track of?

19  A   Well, I would see him every morning, so we would talk in

20  the morning.

21  Q   The shift would overlap a little bit?

22  A   Well, I mean, I would typically come in -- I can't be

23  certain, you know, 6:00, 6:30, 7 o'clock in the morning.  And

24  Michael -- and the shift hours have changed.  I don't want to

25  get confused.  I think it was 12:30 to 8:30 at that time.  It's

1    different now.  So I would see him every morning.

2    Q    And we know that in 2005 you actually ran three shifts,

3    right?

4    A    We had three shifts at that time, yes.

5    Q    And now you're down to two shifts?

6    A    I believe we had two shifts, and currently now we have

7    three shifts.

8    Q    All right.  So did it go down during that period of time

9    when the whole country got a little slow around 2008 when

10   people were actually closing plants?

11   A    Yeah.  The shift structure changed when the recession hit

12   us in '09 and '10, and unfortunately, we lost quite a few

13   employees.

14   Q    But it came back, and now you're back to three full-time

15   shifts.

16   A    The company reorganized and we're doing some work outside

17   the norm, so in the last year our work volumes are a bit

18   heavier and we require more employees.  So to be more

19   efficient, we have three shifts.

20   Q    And we know that Mr. Temko doesn't work for you anymore.

21   Do you still have seven supervisors in the plant now?

22   A    Yes.

23   Q    Is there anyone else in the plant higher than you, or are

24   you the big boss over in that plant?

25   A    I wouldn't call myself the big boss, but I am the director,

Schroeder - Direct by Mr. DeRose

1   so I am responsible for the facility.

2   Q   So would that be no one else can boss you and you're the

3   one who bosses them?

4   A   I mean, I'm their leader.  I mean, I guide them.  I talk to

5   them.

6   Q   We call that a big boss where I come from.

7   A   Okay.

8   Q   So anyway, there in that facility, in 2005 Michael Temko

9   was the one who you leaned on to give you advice about how too

10  treat military service, wasn't he?

11  A   Well, Michael has in his background being a Reservist.  It

12  was a great help to me.  So he has some knowledge of military

13  documentation, different things.  So he was a good resource for

14  me, absolutely.

15  Q   And you relied on him for that?

16  A   I did.

17  Q   Well, you got other veterans working over there, people

18  from the Vietnam-era war and things like that.  Did you rely on

19  them when you were trying to take care of issues you had

20  concerning Luzmaria Arroyo?  Or was Michael your main man in

21  the plant?

22  A   I mean, I was well familiar with all of the veterans that

23  are in the facility.  Of course, I spoke to them from time to

24  time on different things.  But, I mean, as far as

25  administration of attendance and different things, Michael and

1  I worked together on that.

2  Q   All right.  Were you the kind -- or are you the kind of

3  manager who walks around the plant and talks to the employees

4  from time to time to ask them how they're doing?

5  A   Of course.

6  Q   You kind of like to think of your facility over there, I

7  suppose, as a team trying to get all of the products out for

8  Volvo and Mack trucks, right?

9  A   I am very proud of my facility.  We have outstanding

10  results.  It's a good facility.  A lot of good people.

11  Q   All right.  So we know that you interviewed Luzmaria Arroyo

12  and ultimately hired her, correct?

13  A   Correct.

14  Q   And as I understand it from Michael, there were probably a

15  thousand applicants for the positions when Arroyo was coming

16  on, probably five or six positions you were hiring for?

17  A   We did hiring at various times.  And, yes, there were high

18  numbers of resumes that came our way.

19  Q   So somebody would sift through the resumes first before you

20  would even cut it down to a manageable number to interview,

21  right?

22  A   Correct.  We used our job posting, the experience that we

23  were looking for in warehouse material and handling, education,

24  to go through the resumes, and then select those that we felt

25  were best qualified.

1  Q   And then you would get the printed resumes down to a

2  manageable number of people that you would call in and invite

3  them in for an interview?

4  A   Yes.  I mean, we wanted the maximum number of people.

5  Q   All right.  So in 2005, when you interviewed Luzmaria

6  Arroyo, you had a resume there that told you that she was an

7  active Army Reservist, right?

8  A   That's correct.

9  Q   So did you have Temko sit in on that interview of her

10  because of his military experience, or would he have just

11  interviewed her anyway?

12  A   I think at that period when we hired in '05, Michael was, I

13  believe, in the interview, as well as one or two other

14  supervisors.  That was likely just happenstance.

15  Q   Well, Patrick Dunne was in it, too, wasn't he?

16  A   Very likely, yes.

17  Q   You say very likely.  You know that he was in the interview

18  of Ms. Arroyo, don't you?

19  A   Sir, I rotated supervisors frequently over a short period

20  of years we did a lot of interviewing.  I can't remember

21  exactly who --

22  Q   You took a deposition in this case, did you got?

23  A   Sure, I did.  Yes.

24  Q   Did you read it before coming in today?

25  A   In the last week I did look at it.  Yes.

1   Q   Can you tell us how many times you read your own interview

2   in the last week?

3   A   Twice, probably.

4   Q   Didn't you tell us that Mr. Patrick Dunne was in on the

5   interview, too?

6   A   I may have said that.  Sir, it was a long time ago.  It was

7   11 years ago.

8   Q   We know it was 11 years ago.  But you've had the last

9   couple of weeks -- you've spent a lot of time refreshing your

10  memory on this case, haven't you?

11  A   I read through my deposition and the exhibits, yes.

12  Q   You also sat with all of the witnesses together and went

13  over all of your testimony that you were expecting to put out

14  in this case?

15  A   Yes.

16  Q   You met with Temko who came back up from Tennessee?

17  A   I spoke with Michael, yes.

18  Q   And how many times have you talked to Michael about the

19  case in the last two weeks?

20  A   I met with him last week at my facility and we talked.

21  Q   And Maureen Somersett, your administrative assistant, she

22  was right there beside you while you were talking to Michael

23  Temko?

24  A   No, she was not.

25  Q   But you talked to her about her testimony, too, haven't

Schroeder - Direct by Mr. DeRose

1    you?

2    A    Very briefly.

3    Q    And we saw Maureen Somersett -- I mean, excuse me,

4    Jankowski -- what's the other one -- Jankowski, Sherrie

5    Jankowski.  Were you in the meeting with her when she was going

6    over all of this stuff?

7    A    I was in a meeting with Sherrie, yes, a brief meeting.

8    Q    So you're in the meeting with all of these people.  Were

9    you trying to help them remember what you remembered about this

10   event?

11   A    I'm not sure I understand what you're asking, sir.

12   Q    I'm asking you were you trying to help her remember about

13   things that took place concerning Luzmaria Arroyo?

14   A    I think that was her responsibility to remember her -- any

15   interaction she may have had with Ms. Arroyo.

16   Q    But if she remembered something different than you did, did

17   you talk it over and say, "I think it was a little different."

18   A    I don't recall that specifically, sir.

19   Q    All right.  And not only your deposition, you also have

20   read that whole series of emails that we have been looking at,

21   and some of them having your names, haven't you?

22   A    I did look at the exhibits, the exhibits from my

23   depositions, yes.  Those emails.

24   Q    And you looked at not only the exhibits from your

25   deposition, but the whole series of emails that you have

1  written regarding Ms. Arroyo, have you not?

2  A   I did not read every email that you have, no.

3  Q   Well, all of the emails that we showed today -- the last

4  week to the jury, you recognized all of those emails that we've

5  already shown them, haven't you?

6  A   I believe so, yes.

7  Q   So you feel -- although it's from a long time ago -- you

8  have somewhat of a recollection of your interactions with

9  Ms. Arroyo?

10  A   Yes.

11  Q   All right.  So you remember that Ms. Arroyo told you that

12  not only was she an active Army Reservist -- and by the way, at

13  the time you hired her, you had nobody who was an active Army

14  Reservist, although you had some veterans, correct?

15  A   Correct.

16  Q   And you had nobody at Volvo who was subject to military

17  orders at that time, correct?

18  A   Are you referring to my location?

19  Q   Yes.

20  A   Just my location, she was the only active Reservist.

21  Q   Well, that's the only place you managed.

22  A   When you say Volvo, if you meant the entire company, I

23  wouldn't know that, sir.

24  Q   You know Mr. Scholl don't you?

25  A   Of course, I reported to him.

1 Q   He was your boss?

2 A   Correct.

3 Q   You were present at his deposition, weren't you?

4 A   Yes, I was.

5 Q   Mr. Scholl said, "We have no active Reservists in the

6 unit," didn't he, under oath?

7 A   I don't recall that specific statement, sir.  That was

8 quite some time ago.

9 Q   Well, having vets work for you is a little different and

10 puts a little different responsibility on the workplace than

11 having an active Army Reservist, doesn't it?

12 A   I suppose so.

13 Q   Why?

14 A   An active Reservist is going to have military drills.  He

15 or she is going to have obligations to the government.  When

16 she gets orders, there's going to be requirements on that

17 person that veterans that are not active are got going to have.

18 Q   All right.  So when you hired Ms. Arroyo, did you know that

19 you were going to have this extra burden?

20 A   Sir, it's not a burden.  It's her choice in life to support

21 our country and support our military.

22 Q   We know about her burdens.  I'm talking about the burden on

23 you guys when you plan your work.  That was a little bit of a

24 burden on you to know you would lose her if the government said

25 she had to go to duty, right?

1    A    Sir, it would be no burden on us.

2    Q    Didn't feel it was a burden at all?

3    A    Why would it be?

4    Q    Well, didn't you have to plan?

5    A    We have -- in our business, of course, we have to plan, and

6    I have to justify how many people that I need.  At the same

7    time, when we staff shifts, we know that we need X amount of

8    people to work there.  Based on historical data, we also know

9    that we are going to have X amount of absenteeism.  People are

10   human.  There is some absenteeism.  So we know at any given

11   time there's going to be some people out.  We account for that.

12   Q    All right.  When you hired her in 2005, did you realize

13   that she would be absent as often as she was for tours of duty

14   and drills?

15   A    Sir, I could not possibly have known that.  I knew there

16   would be tours of duty that she would be obligated to go to.

17   When and how long, I could not have known that.

18   Q    All right.  Between 2005 and when you hired her, and today,

19   2016, have you ever hired another Army active Reservist at your

20   facility?

21   A    No.

22   Q    Why not?

23   A    Well, one, there may have not been one in the pool of

24   people that we -- that we hired.

25   Q    But do you know what --

1   A   And beyond 2005 -- I would have to check our records.  I

2   don't believe there was any additional, like, large hirings

3   like we had done in the early 2000 to 2005.

4   Q   So between 2005 and today, when you went back up to three

5   shifts --

6   A   Mm-huh.

7   Q   -- you don't remember having any other active Army

8   Reservist who might be subject to orders, come to your company

9   and say, "I would like to get a job because it's a premier

10  company to get a job with in our area"?

11  A   Things are quite a bit different today.  In the last two to

12  three to four years, if we need extra labor, we have brought on

13  temporary consultants, not full-time hires.

14  Q   Why is that?

15  A   It's the company's decision.  There is a major

16  reorganization.  We built a -- where Michael now works we built

17  a very large facility in Mississippi.  And the facility I work

18  at is going to be downsized next year, so, unfortunately, quite

19  a few people are going to lose their jobs.  So I did not do any

20  full-time hires.  We have hired temporary people to assist us.

21  Q   But this reorganization that's in the works, that's only in

22  the last few years, right?  Last couple of years, maybe?

23  A   It's been in the planning for three, four, five years.

24  Q   All right.  Well, you also knew when Ms. Arroyo got hired

25  that -- well, strike that.  You looked at the military

1  experience she had as a positive, didn't you, when you hired

2  her?

3  A    Oh, yes, we did.  Of course.

4  Q    And that's because she was the kind of person you would

5  expect knew how to be obedient to orders, follow orders?

6  A    Yes.  Structure, organization, discipline, all of those

7  things.  Those are very positive traits.  I am sure it was a

8  great experience.

9  Q    And you thought, and Temko probably even told you, if she's

10  in the military, she's been trained how to follow orders and

11  that would be important to you, right?

12  A    I think that goes along with it, sure.

13  Q    Now, we know that at some point you had to terminate -- or

14  you did terminate Ms. Arroyo.  Let me put it that way.  But you

15  didn't terminate her for insubordination, did you?

16  A    No.

17  Q    She was never insubordinate to you?

18  A    No.

19  Q    You didn't terminate her for being disrespectful of your

20  authority?

21  A    No.  Ms. Arroyo was terminated for attendance.

22  Q    All right.  We'll get to that.

23        Ms. Arroyo was not terminated for being disrespectful

24  to any of your supervisors?

25  A    No.

Schroeder - Direct by Mr. DeRose

1  Q    And she was not terminated because she failed to perform

2  the job function of fulfilling like a heavy order to supply

3  material?  It wasn't a performance issue with her?

4  A    No.

5  Q    You always thought she was somehow able, even as a

6  probationary employee, she -- she met the expectations of job

7  performance?

8  A    Yes.

9  Q    It all came down to only attendance.  That was a problem,

10  correct?

11  A    Ms. Arroyo was terminated for her attendance, yes.

12  Q    All right.  Well, let's talk about this.  As early as 2005

13  you were already contemplating -- she'd only been with you two

14  months.  You were already contemplating disciplining her,

15  weren't you?

16  A    There was absenteeism that needed clarification.

17  Q    Absenteeism for what?  Where was she?

18  A    There was some -- there were some tardies.  There were some

19  absenteeism for military obligations.

20  Q    All right.  By that, what do you mean?  Absenteeism for

21  military obligations?

22  A    Well, I believe that she had some -- even early on in her

23  first year, there was time required by the government, by the

24  Army, for her to attend drills and different things.

25  Q    All right.  Let me see if I can get your understanding.  In

Schroeder - Direct by Mr. DeRose

1    2005, when you were presented with an order that Ms. Arroyo

2    gave to Temko, and it said, "Ms. Arroyo has to go off to Fort

3    Benning, Georgia, from X date to X date."  Once you got that

4    order, did you understand that you had no control over her from

5    the time she had to get over there until the time she could get

6    back?

7    A    Correct.  That was her obligation.  Of course.

8    Q    And she was off your radar at that point, correct?

9    A    I don't know if those are the right words.  But she would

10   not be at work.

11   Q    Not only not be at work, you didn't have -- you had no

12   right to question what she was doing during that time, correct?

13   A    Yes.

14   Q    I want you to look at Exhibit 19.

15        MR. DeROSE:  Caitlyn, can I have the paper copy so I

16   can see it.

17        THE WITNESS:  Sir, if you could please provide me with

18   a paper document.  I have been medically diagnosed by a retina

19   specialist with CRVO.  I can't see.  My left eye is a complete

20   blur.

21   Q    Okay.  That's enough.  I got it.

22        You know what I am going to do, I am going to ask the

23   Judge to help me here.  Judge, I don't have a paper copy.

24        THE COURT:  I have got it all, I think.  So which one?

25        MR. DeROSE:  19, Judge.

Schroeder - Direct by Mr. DeRose

1    THE COURT:  No, these are the defendant's.  I only

2  have defendant's.

3    MR. DeROSE:  You don't have my exhibits?

4    THE COURT:  You gave them to me on a flash drive so I

5  only have them electronically.

6    BY MR. DeROSE:  Oh, boy.

7  BY MR. DeROSE:

8  Q   Well, let's see if we can help you remember it.  We're

9  going to put it up and maybe you can see it or maybe not.  But

10  I will try to lead you through and ask you the questions.

11    Would you put Exhibit 19 up for the jury, please,

12  Kate, so they can follow it?

13    THE CLERK:  This goes to the jury?

14    THE COURT:  19 is in evidence.  I think the easiest

15  thing, Mr. DeRose, is to say, "It's already in evidence," and

16  then Carolyn will understand what that means.t

17    MR. DeROSE:  I see.

18    THE COURT:  The lovely diving pool water has came up

19  again.  We had the murky green for a second there.

20  BY MR. DeROSE:

21  Q   Now, on the second one, Schroeder's.  Mr. Schroeder, I

22  don't know how much of that you're able to see, and I

23  apologize.

24  A   It's very challenging to see it, sir.

25  Q   Well, I think we can help you through this.

Schroeder - Direct by Mr. DeRose

1    After Mr. Temko had advised you that Ms. Arroyo was

2 due back, you told him on October -- on August 25, 2005, by

3 then Ms. Arroyo would only have been with the company for two

4 months, right?

5 A    That's correct.

6 Q    All right.  And you said, "I have numerous questions we

7 must clarify before we take any disciplinary action."  She was

8 away on drills at the time.  What disciplinary action could you

9 take, or could you even be contemplating, if she's away on

10 military orders?

11 A    I'm having a real hard time reading this, sir.

12 Q    Don't read it, just talk to me.  How could you even

13 consider disciplinary action of her if she'd only been with you

14 two months and she's away at Fort Benning, Georgia.

15 A    If my memory serves me right, sir, there was some

16 absenteeism.  There may have been an absence of documents,

17 which has happened periodically.

18 Q    Sir, you had the orders.  You had the orders that she had

19 to be at Fort Benning, Georgia, and she went there.

20    MR. McMAHON:  Objection, your Honor.  I would like a

21 foundation.

22    THE COURT:  Sustained.  You have to establish what he

23 knew at the time before you ask him.

24 BY MR. DeROSE:

25 Q    All right.  Sir, did you know in August that Temko had

1  orders and had let her go, and she took off for Fort Benning,

2  Georgia?

3  A   Sir, I can't -- the date I don't know.  I could not

4  possibly remember that.  But I do know that she had training in

5  Georgia, yes.

6  Q   All right.  If she had training, why did you have any

7  questions to ask before you could impose discipline?

8  A   There -- we did not impose discipline.  Her time away was

9  excused, as it should be, for military.

10  Q   Sir, we know you didn't.  But begrudgingly you didn't.  You

11  wanted to impose discipline, didn't you?

12  A   Of course not, sir.

13  Q   All right.  Well, let's see.  You remember you asked Temko,

14  "I hear rumors she's not a very good employee."  You said that

15  in writing to him.

16      Do you remember that?  You all saw all of these

17  emails.  You were reading them at the table when we were

18  watching them, weren't you?

19  A   I was listening, sir.  I was here.

20  Q   Do you have a copy of them in paper that you were reading

21  over there?

22  A   I have a copy of my deposition.  A copy of the exhibits.

23  Q   You have a copy of all of these exhibits over at your

24  table?

25  A   I believe so.

Schroeder - Direct by Mr. DeRose

1    MR. DeROSE:  Well, maybe we could ask Counsel to give

2  you a copy of your exhibits so you could read them and you

3  won't feel like I'm putting you out to sea with all of this.

4    MR. McMAHON:  Your Honor, I think we need to clarify

5  what exhibits we're talking about here.

6    THE COURT:  Well, here's the question.  Let me see if

7  I can help you guys.  My understanding is that there may be

8  overlap between the exhibits that were used in the depositions

9  and the exhibits that are listed for trial exhibits.

10    MR. McMAHON:  That's right.

11    THE COURT:  But the only way this record is going to

12  make sense is if we refer to everything by their trial number.

13  So let me give you example.  If you guys have over at your

14  table Plaintiff's Exhibit 19, Trial Exhibit 19, it probably

15  would help the proceeding today.

16    Does anybody have a complete set of the written

17  exhibits?

18    MS. WILSON:  The exhibits we do.

19    THE COURT:  Plaintiff's exhibits in print.  Are they

20  printed anywhere?  Does anybody have them.

21    MR. McMAHON:  I do not.

22    THE COURT:  Right.

23    MR. DeROSE:  They are being made for the last two

24  days.  I will have them by tomorrow.

25    THE COURT:  Well, I think for the moment, then, we are

1    going to have to do the best we can with what we have got.

2          MR. DeROSE:  Maybe they can just give him his

3    exhibits.  I won't look at them.  And see if he has one in the

4    packet that will help him.

5          THE COURT:  Let me see this.  Do you have anywhere at

6    your table the -- this email from Mr. Schroeder to Mr. Temko,

7    August 25th of 4/19, which is -- it does look like -- no, it

8    just says Plaintiff's 19.

9          MS. DeROSE:  Your Honor, if I may help?

10          THE COURT:  Mm-hmm.

11          MS. DeROSE:  The exhibit numbers have remained the

12    same throughout the duration of this whole thing.

13          THE COURT:  So that would be Exhibit 19 to his

14    deposition, too?

15          MR. DeROSE:  They're all the same number.

16          MR. McMAHON:  Right.

17          THE COURT:  Maybe that would help.  I tell you what,

18    let me suggest this.  Why don't we take a 10-minute break here.

19    And let's see if we can figure out the best solution we can to

20    the exhibit situation.  We'll be as efficient as we can.  The

21    jury doesn't need to sit here and watch us sift through paper.

22    And we are going to have to take a mid-morning break anyway, so

23    we'll take it now.  So just for planning purposes, we'll be

24    back at probably five after 11:00.  We will have our lunch

25    break today at 12:30.  Okay.  Thanks, everybody.

Schroeder - Direct by Mr. DeRose

1       THE CLERK:  All rise.

2    (Jury out.)

3    (Recess.)

4       THE COURT:  Good morning again, everybody.  We will

5    pick up where we left off.  Go ahead, Mr. DeRose.

6       MR. DeROSE:  Thank you, your Honor.

7    BY MR. DeROSE:

8    Q   Mr. Schroeder, thanks to his Honor and his crack staff, you

9    now have copies of all of these emails that we're going to be

10   talking with you about today.  Okay?

11   A   Okay.  I do appreciate that.

12   Q   And you can see them clearly, right?

13   A   I'll do my best, sir.  It is a little challenging.

14   Q   All right.  That No. 19 that you got before you, that has

15   already been put into evidence?

16   A   Yes.

17   Q   And you say, "I have got numerous questions we must clarify

18   before we take any disciplinary action," right?

19   A   That's what's typed in there, yes.

20   Q   And you type your own emails, don't you?

21   A   Yes, I do.

22   Q   Because I have seen what's been going on here and now

23   having your memory refreshed from all of your meetings, when

24   you wrote that email, she was at Fort Benning, Georgia,

25   attending to Army drills?

1   A   Well, at the beginning of this email Michael stated --

2   Q   I don't know what Michael stated.  I just want you to

3   answer my questions.

4        You knew she was at Fort Benning, Georgia, right?

5   A   I believe that's true.

6   Q   All right.  And the questions you wanted answered before

7   you would impose discipline, one of them is "What has her

8   performance, her attitude and her interaction with her peers?"

9   Why would that be important before you decided to impose

10  discipline on her for not coming back to work?

11  A   Well, I wasn't making a decision to impose discipline on

12  her.  Anytime there are absences or people are away from work,

13  we need to know why.  Either they contact us, tell us, no

14  call/no show.  There must be a reason.  It is an absence,

15  regardless of the absence, or it was in this case.

16  Q   All right.  Sir --

17  A   So we didn't know anything about USERRA at that time.  We

18  were referring to our military policy.  We needed a lot of

19  guidance and clarification.

20  Q   Okay.  Sir, please.  Enough.  I have enough response to my

21  question.

22  A   Okay.

23  Q   Let's try another question with you.  Your next line says,

24  "I overheard a conversation this week that indicated she was a

25  problem employee"?

1  A  Mm-huh.

2  Q  Who were you listening to, supervisors or employees saying

3  she was a problem employee?

4  A  I can't recall exactly what the source of that was.  But I

5  did hear it.  It was just a question that I was asking Michael.

6  Q  And Michael told you she is burning the candle at both

7  ends.  She's a supervisor over at UPS, in the Army reserves and

8  working for us, right?

9  A  I do recall that, yes.

10  Q  You encouraged her later to leave UPS, didn't you?

11  A  No, sir.  I did not do that.

12  Q  You know she quit UPS shortly after she came back to work

13  for you, don't you?

14  A  I heard she had.  But that would be solely her choice.

15  Q  It would be solely her choice.  But you had meetings with

16  her about giving enough effort to the team over there at Volvo,

17  didn't you?

18  A  I am not quite sure I understand that question at all.

19  Q  You had meetings with her about whether she was burning the

20  candle at both ends?

21  A  I don't believe I had a direct conversation with her

22  regarding that.

23  Q  Well, we'll get into that in a minute.

24       Now, I want -- Caitlyn, I think it's the -- it's still

25  in that exhibit.  I don't want to see it.

1    THE WITNESS:  Can I just put this here?

2    THE COURT:  Sure.

3  BY MR. DeROSE:

4  Q   Oh, yeah.  Excuse me.  The bottom of that email in Exhibit

5  19, you say "If attendance action is in order, we must do it

6  expeditiously."

7    What do you mean by attendance action back there when

8  she had only been there two months with the company?

9  A   I'm sorry.  Where is this at, sir?  At the end?

10  Q   The very last sentence before your signature saying,

11  "Keith."

12  A   Well, it is our responsibility if there is an attendance

13  issue of any kind to do it in an appropriate time frame.  But I

14  also told Michael, you know, we need to get all of the facts.

15  We didn't have the fact.

16  Q   Sir, you had no right to take any attendance action in

17  August 2008, did you?  She was on military orders.

18    MR. McMAHON:  Objection, your Honor.  He mentioned

19  August of 2008.  We are talking about an August of 2005 email.

20    MR. DeROSE:  August 2005, excuse me.

21    THE COURT:  Okay.  With that clarification you can

22  answer the question.

23  A   Could you please rephrase that, please?  I'm not sure what

24  you asked me.

25  Q   Two months after she was in the company as she was called

Schroeder - Direct by Mr. DeRose

1    out on orders.  You have no right to even consider taking

2    attendance action expeditiously, do you?

3    A   I was not taking attendance action.

4    Q   But you said, "If it's in order, we must do it

5    expeditiously."

6    A   If it is determined that it is an unexcused absence, we

7    would have to follow the policy.  That's my job.

8    Q   Do you know how many times you said in writing, "We're

9    considering terminating Ms. Arroyo," over the six years she was

10   working for your company?

11   A   I don't recall.  I may have written some things where

12   attendance was a factor during her employment.

13   Q   It was always when she was on military duty, wasn't it?

14   A   I don't recall that, sir.  Ms. Arroyo, when she wasn't in

15   the military she had absences and there was attendance things

16   that we had to look at.

17   Q   Sir, she was never absent -- she was never absent days in a

18   row when she wasn't in the military, was she?  She was a good,

19   loyal employee?

20   A   Sir, I would have to see the attendance record to verify

21   that.

22   Q   How many times have you looked at the attendance record in

23   the last week even?

24   A   I have looked at it, sir.  But I can't remember every day

25   or every week or every month.

Schroeder - Direct by Mr. DeRose

1   Q   Let me ask you, every time you said in writing she's up to

2   the point of termination, it had to do with her responding to

3   military orders, wasn't it?

4   A   No, sir.  No, sir.

5   Q   All right.

6   A   The only time attendance would be considered is if there's

7   absenteeism that's not provided with documentation.

8   Q   I want you to look at Exhibit 21.  This is also already in

9   evidence, your Honor.

10          THE COURT:  I don't think so.  I don't think it is.

11  Not according to my sheet here.

12          MR. DeROSE:  Oh, it is not.  Then please do not show

13  it yet.

14          THE COURT:  No.

15  BY MR. DeROSE:

16  Q   I want you to look at it, sir.  Do you recognize this as an

17  email you sent?

18  A   Can I take a minute to read this, please?

19  Q   You don't have to read it all.  We will read it with you.

20          Do you recognize this as an email you wrote?

21  A   I haven't even read it yet, sir.  I have to read it to

22  understand what it says.

23  Q   Look at the top.  Do you recognize Schroeder to Bruce Olin.

24          MR. McMAHON:  Objection, your Honor.  He just needs a

25  second to look at the document.

Schroeder - Direct by Mr. DeRose

1      THE COURT:  Be patient with the witness, if you will.

2  It's helpful to focus him.  Say, "If you want to look at the

3  top.  Is that your name?"

4  A   Okay.  I have read it, sir.

5  Q   My question, sir, is that your email?

6  A   Yes it's a string of -- it's an email from Michael Temko

7  and my response to him.

8  Q   All right.

9      MR. DeROSE:  All right.  Your Honor, I ask for

10 permission to admit the email chain into evidence.

11     THE COURT:  Okay.  And this is subject to the previous

12 understanding.  We will admit this into evidence and you can

13 publish it for the jury.

14     (Plaintiff's Exhibit 21 was received in evidence).

15 BY MR. DeROSE:

16 Q   Mr. Schroeder, on October 21, 2005, Ms. Arroyo would have

17 been with the company about four months; is that right?

18 A   Yes.

19 Q   And you write over to Bruce Olin, who was the HR person in

20 Jacksonville, Florida, right?

21 A   Correct.  He was my HR business partner.

22 Q   And you write, you would appreciate his opinion on the

23 dilemma with a relatively new employee with regard to military

24 reserve duty.

25     What was your dilemma?

Schroeder - Direct by Mr. DeRose

1    A    Due to some uncertainties and some -- a lack of knowledge

2    on our part about our military policy, among other things, on

3    some absenteeism, it was likely I had to make some decisions

4    that maybe I didn't want to make.  I mean, Ms. Arroyo was in

5    the military.  She had some absences that we were trying to

6    define to do the right thing.

7    Q    All right.

8    A    And we had some challenges.  That was the dilemma, sir.  We

9    just wanted to do the right thing.

10   Q    All right.  You wanted to do the right thing.  Look at the

11   first sentence in the first paragraph.

12        You say, "Arroyo started with us on June 13, 2005.

13   Her interview was very positive.  Her employer at the time was

14   UPS and she was in the military Reservists.  Both were positive

15   personal traits."

16        Why was being in the UPS a positive trait?

17   A    Well, UPS is a highly respected company.  We believed at

18   the time that someone who worked for UPS, they also seemed to

19   be a very highly organized company, very structured, and

20   probably disciplined, too.  We took that as a positive.  I

21   think that was correct in doing that.

22   Q    All right.  I want you to look at the last two sentences of

23   the paragraph.  You say, "Luzmaria continued to work for UPS

24   while working for us and it impacted her performance and

25   absenteeism, tardy.  She has since quit UPS in September and

1  her performance has improved."

2        Did you tell her that working those two jobs was

3  causing her to arrive late to your place?

4  A   Well, my opinion at the time was is that working two jobs

5  is tough.  It appeared to be impacting her performance, as her

6  supervisor told me, and could have contributed to some

7  absenteeism.

8  Q   So when the supervisor said that, don't you remember

9  meeting with Ms. Arroyo and saying, "This working two jobs is

10 not working out well for you"?

11 A   No, I would have never done that.  That's her prerogative

12 where she works.

13 Q   You don't recall meeting with her and talking about that?

14 A   I don't recall.

15 Q   All right.  Now, I want you to look down another paragraph,

16 and I think you do say what your dilemma is.  "Now I might find

17 myself with a dilemma if I were to discipline a person for

18 taking too much time off for military reserve duty, when taking

19 into consideration the state of our country."

20       How can you discipline an employee for taking too much

21 time off for military reserve duties?  What right do you have

22 to do that?

23 A   Sir, at that time it was unclear to us at all in our

24 company military policy or any other information we had at the

25 time regarding travel time and things like that.  It was just

1  -- there was so much uncertainty.  We had -- it was hard to

2  determine what was right and what was wrong.

3  Q   Sir, by 2005, our country had been embroiled in war for

4  several years.  Didn't you have any other active Army

5  Reservists from 2001 all of the way to today in the company?

6  A   Well, prior to that the only active Reservist that I recall

7  is Mr. Temko.

8  Q   But he didn't get involved in orders to go overseas, did

9  he?

10  A   No, he did not.

11  Q   So you believed when you wrote this that your policy -- the

12  military policy of Volvo would allow you to discipline

13  Ms. Arroyo for taking too much time in compliance with military

14  duties?

15  A   No, sir, that's not what I was thinking.  We didn't know

16  what to do.  I mean, there was -- we didn't have any

17  understanding of what was required of us, what was an

18  obligation of us as a company or Ms. Arroyo as a Reservist.

19  Q   Well, you write to him, then, and tell him more.  You say,

20  "Apparently her military reserve unit is in Georgia and she

21  needs added time to drive to and from Georgia.  I am not sure

22  if our policy addresses that."

23        Were you unhappy that it took Ms. Arroyo too much time

24  to come back from Georgia and her reserve duty?

25  A   Certainly not, sir.

Schroeder - Direct by Mr. DeRose

1    Q    You know, do you not, as you sit here now, that she is

2    entitled to reasonable travel time back and forth from Fort

3    Benning, Georgia, and an eight-hour rest before she has to even

4    say a word to you guys about here I am.

5              Do you know that now?

6    A    Sir, from October of 2005 to 2011, I got a real education,

7    and I learned a lot about what is required and what we're

8    obligated to do.  And, again, all of her military time was

9    excused -- was approved time off.

10   Q    As you got this real education over the years, you found

11   out that Michael Temko and Bruce Olin were giving you a lot of

12   bad advice, didn't you?

13   A    I believe there were some misstatements from Mr. Olin.  But

14   I don't believe so from Michael Temko.

15   Q    You don't remember Mr. Temko giving you bad advice also?

16   A    I don't recall that, sir.

17   Q    Temko told you that he was questioning Arroyo about why she

18   didn't come back the very next day if she was done training on

19   Sunday evening; isn't that right?

20   A    I think there was a lot of questions about if a reserve day

21   was one day and it was local or wherever, if she didn't come

22   back the next day.  There were some cases like that or some

23   situations.  So we had to ask a lot of questions.

24   Q    Sir, didn't Temko report to you in writing, as we have seen

25   with the jury, "She was done working on Sunday night.  So why

1    is it she's not coming back here until Tuesday?"

2    A    I believe that to be true, yes.  I would have to find this

3    in this email or another one.

4    Q    You don't have to -- I've been trying to get your memory

5    from what you looked at the last couple of days with all of us.

6    A    Yeah.

7    Q    He said, "If you were done on Sunday, why are you coming

8    back to work on the Tuesday night shift?"

9    A    I believe that's correct, yes.

10   Q    And she told him, "I drove."  Remember him reporting that

11   to you?

12   A    Very possibly, yes.

13   Q    Have you ever driven from Georgia to Illinois?

14   A    No, I haven't, sir.

15   Q    All right.  So you don't know how long it takes?

16   A    I can only speculate.

17   Q    If you're all alone driving in a car, and you're reasonably

18   driving, it's going to take at least a full day, isn't it?

19   A    It's going to take quite some hours.  I don't know what the

20   mileage is.

21   Q    And then, according to what you know now, she doesn't have

22   to come right to work.  She is entitled to eight hours rest

23   period, isn't she?

24   A    That seems very fair, yes.

25   Q    But Bruce Olin didn't tell you that you were

1  required -- well, look at what Temko writes on the bottom of

2  the email.  Look at what Mike Temko wrote on the bottom email.

3  He's talking about her travel time.  He says that, "It appears

4  that Ms. Arroyo's request for Wednesday and Thursday night off

5  is warranted according to her drill schedule.  She has not

6  requested Sunday night off, though.  I don't know how she plans

7  on making it to work from Georgia when she has drill on Sunday.

8  I guess the question is, since she travels out of state for

9  drill, are we required to give her the day before and the day

10  after for travel?  And do we have different rules if she's only

11  a probationary officer?"

12          Do you remember that?

13  A   I see that here, sir.

14  Q   Do you remember it now, looking at it?  And you guys

15  decided we don't have to give her any travel time, didn't you?

16  A   That's not true, sir.  Her days off that she was off were

17  all approved.  We did not know what the rules were at the time.

18  We had no knowledge of any of this.  It was brand new to me.

19  But I think at the end, we did all of the right things.

20  Q   You write to Bruce Temko at the bottom of that paragraph.

21          THE COURT:  Which one -- you said Bruce Temko.  Do you

22  mean Olin or Temko?

23          MR. DeROSE:  Judge, I'm sorry.

24          THE COURT:  That's okay.  I'm just trying to clear it

25  up for everybody.

1    MR. DeROSE:  Judge, I get worked up and you calm me

2  down and I appreciate it.

3    Withdraw that question.

4  BY MR. DeROSE:

5  Q   In this email you write to Bruce Olin over in Jacksonville,

6  that last sentence in the third paragraph, you say, "I'm not

7  sure if our policy addresses that.  Michael stated, referencing

8  his military reserve experience that she could request a

9  transfer for an Illinois reserve unit.  But I'm not sure if we

10  can direct her to do that."

11    Why did you write that?

12  A   Pardon.

13  Q   Why did you write that?

14  A   It was just questions, sir.  I mean, it was just -- I

15  didn't have knowledge of how any of this worked, so it was just

16  some questions.

17  Q   So if Olin said to you, "Volvo policy allows you to direct

18  a service member to transfer from Fort Benning, Georgia, to a

19  local unit, you were prepared to do that, weren't you?

20    MR. McMAHON:  Objection.  Lack of foundation.

21    THE COURT:  Sustained.

22    THE WITNESS:  I don't know that that would have been

23  done, sir.

24    THE COURT:  When I sustain the objection, you don't

25  have to answer the question.

1    THE WITNESS:  Oh, okay.  I didn't know the rules.

2   BY MR. DeROSE:

3   Q    Sir, do you appreciate that soldiers who just came back

4   from buddies -- Army buddies over in Iraq have built a kind of

5   companionship, reliance, and friendship that they don't want to

6   change units?

7   A    That makes sense.

8   Q    I want you to -- you say in the closing sentence of that

9   exhibit, "I certainly give her credit for serving our

10  country -- our country, but, of course, I am also responsible

11  for our business needs."

12       Tell us why you wrote that sentence?

13  A    I don't recall exactly why I wrote it.  But, I mean, it

14  does state I give her a lot of credit for what she is doing.

15  But I am the person responsible for the business and any

16  actions or decisions I make, I want to make the right

17  decisions, and we lacked information at that time on how to do

18  that.

19  Q    Sir, don't you realize, according to the law, she does not

20  have to be part of your business needs when she's being

21  required to go to the military orders?

22       MR. McMAHON:  Objection, Your Honor.  Misstatement of

23  the law.

24       THE COURT:  Simplification of the law, I suppose.  I

25  mean, again, you always have to phrase this in terms of what

Schroeder - Direct by Mr. DeRose

1  his understanding is, too, and that's fine.

2          MR. DeROSE:  Judge, I will re-ask it.

3          THE COURT:  So why don't you try another question?

4  BY MR. DeROSE:

5  Q    Sir, your business needs were planning needs.  How we have

6  enough staff to make sure we get all of those picking and

7  packing done to send around the country, right?

8  A    That's correct, sir.

9  Q    And didn't you understand, without anybody telling you,

10 don't count on Luzmaria Arroyo for anything while our country

11 is counting on her for so much overseas and fighting for her

12 country or drilling?

13 A    Of course that makes sense.

14 Q    Did you know that?

15 A    Yes.

16 Q    So why are you writing Olin saying, "I've got to be

17 responsible for our business needs"?  How did that have

18 anything to do with Arroyo?

19 A    I mean that was my job.

20 Q    What did that have to do with Arroyo?

21 A    Well, I'm responsible for all of the employees in the

22 building and any activities that are going on at any time and

23 any absenteeism.

24 Q    She wasn't absent.  She wasn't in the building.

25 A    I understand.

1    Q    She was answering military orders to represent her -- part

2    of her country.

3    A    I understand that.

4    Q    So you had no control over her.

5    A    No, if she had a military obligation that's her

6    responsibility.  I fully understand that.

7    Q    We heard Michael Temko say yesterday in front of the jury

8    two days ago that he had to plan for the business needs of

9    Volvo.  Were you and he trying to consider Arroyo as part of

10   these needs?

11             MR. McMAHON:  Objection.  Vague.

12             MR. DeROSE:  Judge, let me withdraw it.  It wasn't

13   well -- because I will do it later anyway.

14   BY MR. DeROSE:

15   Q    You remember us talking with Mr. Temko a couple of days ago

16   and putting up that email from Celia Jarvis, the lady who put

17   you and Mr. Olin and you guys all straight about the travel

18   time for Ms. Arroyo?

19   A    I recall the email that we did have with Celia Jarvis, who

20   was our HR rep out of Columbus, Ohio.

21   Q    Did you know her personally?

22   A    No.  Never met her.

23   Q    But she said she sent you an email saying, "You guys are

24   wrong."  She's got to get her travel time in 8 hours, right?

25   A    She was of great assistance to us, as far as I can recall.

Schroeder - Direct by Mr. DeRose

1   I don't have that email in front of me to read that.  But she

2   was the company resource that was a good value to us to help us

3   better understand what our responsibility was.

4   Q   And she said she went all of the way to ESGR in Washington

5   to confirm you've got to give her eight hours off to rest after

6   she has her reasonable travel time, right?

7   A   I believe that to be true.  I don't have that document in

8   front of me.

9   Q   You don't need the document.  You remember?

10  A   I believe it to be true.

11  Q   When you say you believe it to be true, do you remember

12  that now it was your obligation, and in the future, she would

13  always be entitled from your under -- from your understanding,

14  after Jarvis wrote that in 2005, thence forward, Arroyo is not

15  to be bothered until she has had eight hours rest after

16  reasonable travel; is that correct?

17          MR. McMAHON:  Objection.  Asked and answered.

18          THE COURT:  I'm going to let him pin this down.  So I

19  will overrule that objection.

20  A   I understand that whenever she had military orders, drills,

21  or whatever she did, that whenever she would travel, she had

22  eight hours of rest.  I understand that.

23  Q   And you understand, also, as you got your education in

24  August, when Arroyo goes away to service for overseas

25  deployment or service of more than 31 days, she does not even

1    have to let you know whether she is coming back to work or not

2    for up to 90 days; is that right?

3            MR. McMAHON:  Objection.  Misstatement of the law.

4            THE COURT:  Well, all I'm going to say is, whether it

5    is the law or not, all he is asking is what his understanding

6    is.  If that's his understanding, that's his understanding.

7    And as I said before, ladies and gentlemen, the only source of

8    law in this case you're going to have to worry about as being

9    the actual law is the instructions I'll give you at the end of

10   the case.  So with that, the objection is overruled.  He can

11   state whether he agrees with that as his understanding or it's

12   not.  I don't know.

13           THE WITNESS:  Over the years, I learned some things.

14   I can't remember all of them, sir.  What I would have to do is

15   if there was a specific case of time that she was away in the

16   military, I would have to again go get support to reaffirm,

17   reread the rules to make sure that -- what our obligation is.

18   I can't say that I know it for certainty.

19   Q    All right.  Let's look at another email that you sent.  On

20   Exhibit 32.  Judge, I believe this is already in evidence?  If

21   not, I will show it to him first.

22           THE COURT:  It's not on my list.

23           MR. DeROSE:  You know what, maybe I didn't show them

24   to other people because they're his emails.

25

Schroeder - Direct by Mr. DeRose

1  BY MR. DeROSE:

2  Q   You look at that, sir, and tell us if that's your email.

3  Is that your email?

4  A   Sir, some of this appears to be incomplete.  I mean, I see

5  something two rows --

6  Q   Sir, do you recognize it, though?  Don't worry.  Some

7  things we don't always show you.

8          Do you recognize that as a writing you sent to Bruce

9  Olin?

10  A   This is very confusing, sir.  It looks like it was sent --

11  some of it was sent to Bruce but not from me.  I was copied.

12  Mike Temko --

13  Q   All right.

14  A   -- part of this is pieced together.  There's my name on the

15  second page.

16  Q   Do you recognize the emails that you have been shown in

17  depositions in this case and that you have looked at with other

18  employees?

19  A   I'm sorry.  Can you rephrase that, sir?

20  Q   Do you recognize it as emails in this case that you have

21  sent or received?

22  A   I read many emails, sir.  I can't remember each one

23  specifically.

24  Q   And the one that's in front of you, do you recognize it as

25  Mike Temko's email to Bruce Olin, with a copy to you?

Schroeder - Direct by Mr. DeRose

1    A    I see that, sir, on the first page, yes.

2    Q    All right.  Does it appear to you -- and look at the second

3    page.  Do you recognize that as an email from you?

4    A    Yes.  As part of this email, I sent something to Bruce Olin

5    and Mike Temko.

6              MR. DeROSE:  I would offer that into evidence.

7              THE COURT:  I am looking to see if this is on the

8    list.  Subject to the agreement we had a few days ago, we will

9    admit it into evidence and you can show it to the jury.

10   Plaintiff's Exhibit 32.

11       (Plaintiff's Exhibit 32 received in evidence.)

12             MR. DeROSE:  Thank you, Judge.

13   BY MR. DeROSE:

14   Q    Now we are two years later.  This is in April of 2007.  And

15   Michael Temko is writing to Bruce Olin and copying to you.

16   Before he writes an email to headquarters company or to HR

17   people, does he have to get your permission?

18   A    No.

19   Q    Would you expect him to talk to you first before he starts

20   posing questions to Bruce Olin?

21   A    Michael has the authority to do this, assisting -- now,

22   this is a company -- to send an email to Bruce Olin.

23   Q    All right.  And he's writing in April 2007, "Luz Arroyo

24   deployed to Iraq last April.  And, according to her orders, she

25   is due back.  She contacted me one time since her deployment

Schroeder - Direct by Mr. DeRose

1    six months ago, and I have not heard from her since."

2         Did Michael Temko tell you that he was kind of unhappy

3    that Arroyo wasn't keeping in contact with him?

4    A    I wouldn't say that he was unhappy.  He has a concern that

5    he doesn't have enough information, I guess.

6    Q    All right.  Were you kind of ticked off that Ms. Arroyo

7    wasn't letting you know what's going on while she is over there

8    in Iraq?

9    A    Well, I don't think there's much she can do if she's

10   overseas in Iraq.

11   Q    But you always had issues with her failure to keep in

12   contact with you, didn't you?

13   A    She is not required to keep in contact with me, sir.  I

14   believe she is just required to give us her orders when they're

15   available.  Tell us how long she is going to be gone.

16   Q    But you had issues with that?

17   A    I didn't have issues with any of that.

18   Q    You didn't?

19   A    It was her obligation.

20   Q    You had no issues ever with her failure to keep in contact

21   with you?

22   A    I've had questions over periods of time with the fact that

23   maybe we didn't have documentation timely; that's all.

24   Q    You never had any problems with the fact that she wasn't

25   telling you what her plans were?  Is that what you're saying

1    now?

2    A    Well, what do you mean by plans, sir?

3    Q    Sir, did you say in writing on more than one occasion, "I

4    have issues with the fact she's not keeping in contact with

5    us"?

6    A    I have -- I have written that I had concerns about -- about

7    documentation or clarity on exactly when she is leaving or

8    coming back.

9    Q    And you know now she doesn't have to give you any contact

10   information about when she is leaving or coming back, don't

11   you?

12        MR. McMAHON:  Objection.  Misstatement of the law.

13        THE COURT:  Again, it's all about his understanding,

14   whether that's the law or not.  That's my whole point.  My

15   whole point is that any question that Mr. DeRose says about the

16   law is not a statement of the law.  Anything the lawyers say is

17   not a statement from the law.  All of the law comes from me.

18   All of these questions are about people's understanding of the

19   law, which is relevant.  And, so, if the question again is,

20   "What's your understanding of the law?"  So I'm going to

21   overrule the objection with that explanation.  And then if you

22   could say the question again, that would be helpful.

23   BY MR. DeROSE:

24   Q    Sir, were you taught by your HR people or were you taught

25   by Mr. Temko as you guys looked at the law, that she doesn't

Schroeder - Direct by Mr. DeRose

1  have to tell you whether she's coming back to work for months

2  after she gets back to the United States?

3  A   I don't recall the exact time, sir.  But at some point I

4  did know that after her deployment, there was a -- I don't

5  remember the days -- but there was a specific time frame for

6  where she would have to tell the company that she wants to come

7  back and be employed by us.

8  Q   And Temko writes to Olin, "Would it be appropriate to

9  contact her unit to inquire about her deployment status?  If

10 not, what are our rights and her responsibility in keeping us

11 informed?"

12      Do you see where he is asking that question?

13 A   Yes, sir.

14 Q   Do you have any rights to be kept informed?

15 A   To a point, I would have to believe yes.  Would it not be

16 reasonable that we know when she's leaving?

17 Q   Sir, as you sit here now, you still think you have a right

18 to be informed when she is coming back while she's overseas?

19 A   No.  Coming back is a different story.

20 Q   Well, he said, "She's due back shortly."

21 A   Okay.

22 Q   As you sit here now, is it your understanding that you have

23 a right to be told when she is coming back?

24 A   No.

25 Q   You don't think you have that right?

1  A   No, I don't.  Coming back.

2  Q   And you know that she doesn't even have to say if she wants

3  to come back to you when she comes back to America for several

4  months yet once she gets back?

5  A   Over time I learned that; that's true.

6  Q   So when Temko wrote that -- I want you to go to the bottom

7  email, Kate, in the exhibit.

8       And Olin responds, "Michael, unfortunately, there

9  isn't a lot we can do.  We can contact the unit if they have

10 any information.  All she has to do is inform us within six

11 months of her release."  That's wrong, too, isn't it?

12 A   There's a -- I know after her deployment there's a period

13 of time.  I don't recall the exact number of days that she has

14 to inform the company if she is going to be reemployed.

15 Q   Olin is wrong again here when he says it's six months.

16 It's only three months, isn't it?

17 A   That could be true, sir.

18 Q   Well, what is your understanding today?

19 A   I don't know that for a fact, sir.  Again, if I ever had a

20 question or something I had to clarify, I would have to get

21 support to get an actual document that tells me what the rule

22 is.

23 Q   And you're supposed to -- and you're expecting Olin to give

24 you good advice.  He gave you bad advice on the travel time.

25 And now if he's telling you six months, and that's wrong, he's

1  giving you bad advice again, isn't he?

2  A   There were some misstatements, yes; we came to find that

3  out.

4  Q   And then he says, "Per the law, we have to wait for her."

5  That is right, isn't it?

6  A   Correct.

7  Q   And you have no argument with that now?

8  A   I don't believe I had an argument about that then.  I had

9  questions.

10  Q   Well, we'll see some of your writings.

11  A   Okay.

12  Q   Then he says, "Sorry it isn't what you wanted to hear."

13       What did Michael Temko tell you he wanted to hear?

14  A   Michael sent this to Bruce Olin.  I don't even know if we

15  discussed this.

16  Q   Well, you also got involved in the conversation.

17       Look at the higher email.  Because you write to Bruce,

18  "Does that mean that she could be home for up to six months

19  before she would be required to return to work?  Is this our

20  company policy or a federal law?"

21       Why did you write that?

22  A   Sir, I was looking for support and information.  And I said

23  right there, "Where can we get a copy of this information?"  I

24  needed facts.  I didn't know.

25  Q   Now, look, I want to ask you about this.  We heard from

1    Michael Temko the other day that no one of these picker or

2    packer people are indispensable.  That you can replace any one

3    of them that's not there.

4             Would you agree that as good of an employee as

5    Luzmaria Arroyo was, she was not indispensable to your company?

6    A   Sir, no one is us indispensable, including me.

7    Q   So if she -- if she wasn't back and you didn't know she

8    wasn't back, you could still get out all of those orders that

9    you have to, right?

10   A   Yes.

11   Q   Without her?

12   A   Correct.

13   Q   So what did you mean by the question, "Does this mean she

14   could be home for up to six months before she would be required

15   to work"?  What would that mean -- what's the problem for you

16   with that?

17   A   Sir, I believe I've already answered that.  I did not have

18   the experience or knowledge to know what the rules were.  I was

19   seeking out the rules.

20   Q   All right.

21             MR. DeROSE:  Caitlyn, can I see Exhibit 32, please?

22             Judge, would you see if 32 has been admitted?

23             THE COURT:  32 is the one you just did.

24             MR. DeROSE:  I did that?  Well, then, I'm all wrong.

25   Excuse me.

Schroeder - Direct by Mr. DeRose

1    THE COURT:  38.  According to the pretrial order,

2    there's no objection.  So it's received in evidence already and

3    you can use it with the jury immediately.

4    BY MR. DeROSE:

5    Q   And Judge, you beat me to that.  That's the next one I'm

6    going to ask to put up and question with.

7    THE COURT:  Okay.  Well, I can see that Mr. Schroeder

8    is listed on it.  So he is an appropriate witness to use it

9    with, so fire away.

10    MR. DeROSE:  Caitlyn, may I?

11    BY MR. DeROSE:

12    Q   Mr. Schroeder, the bottom email -- wait a minute.  Which

13    one first?  It goes from the bottom to the top, right?

14    A   Yes.

15    Q   Michael Temko wrote you an email on November 6, 2007.  Now,

16    Arroyo would have been back for -- from Iraq for a couple of

17    months by this point, right?

18    A   I believe that to be true.  I don't recall the exact

19    timeline.

20    Q   And the very bottom email, Patrick and Temko were

21    recommending that Luzmaria Arroyo be given a corrective action

22    plan because she hit three posts, right?

23    A   I see that, sir.

24    Q   And did you go out and look at those posts in the plant and

25    see how much damage was done?

1    A    No, I did not do that.

2    Q    And, by the way, those posts, those are crash-in posts that

3    are pretty darn sturdy, and the machine is more likely to get

4    damaged than the post is, isn't it?  They're to make sure you

5    don't crash and knock over the -- the racks of material?

6    A    I'm not sure I understood that.  But the machines are very

7    big, very heavy, and they can damage racking.

8    Q    But the posts that we're talking about, those are --

9    A    Right.

10   Q    -- protective posts that protect the materials in them,

11   right?

12   A    Correct.  They could also be knocked down by the vehicle.

13   Q    Well, were any of these posts knocked down or just hit?

14   A    I can only go by the email where it says she hit

15   racks/posts.

16   Q    Do you ever fire employees for hitting the racks?

17   A    Never.

18   Q    And he says, "I want to" -- "I want to know should we send

19   her to Crown for retraining."  You know, do you not, that under

20   the USERRA law, you're supposed to retrain the employees when

21   they come back so that they can qualify for the job you want

22   them to do, right?

23   A    I'm not familiar with that, sir.

24   Q    You didn't -- they -- but you say -- strike that.

25            When you talked to Olin, did he give you any kind of a

1  course in what this USERRA was requiring you guys to do?

2  A   I mean, it was mentioned in numerous emails, and from time

3  to time we referred to maybe something specific that we needed

4  at the time.  But there was no formal training of any kind on

5  it.

6  Q   All right.  So anyway, you said, "Yeah.  We should send her

7  to Crown for retraining."  For her own safety and the safety of

8  everybody else around there, right?

9  A   There was some lift truck driving issues where she hit

10  racks and posts.  A decision was made to give her what's called

11  a employee counseling corrective action plan.

12  Q   Well, now that's different.  I just want to talk about the

13  training at Crown.

14  A   Okay.

15  Q   That was to get her back up to speed and make sure she knew

16  how to handle the machines?

17  A   Right.  It's like a refresher course.

18  Q   But then you gave her this counseling, or what we call a

19  corrective action plan?

20  A   It's titled Employee Counseling Corrective Action Plan.

21  Q   And that's discipline under the policy of Volvo, isn't it?

22  A   It can be.  But it depends on what level of step.  I mean,

23  there's various steps and levels involved.  I mean, the first

24  step is primarily a verbal warning.  It's an awareness.  It

25  just raises the awareness of the importance.

1  Q   And you post those warnings into her personnel file?

2  A   That's correct.

3  Q   So that was a discipline that was posted into her file

4  before she had any retraining and came back -- having come

5  back.  So that if she hit some more posts again, the

6  progressive discipline would go up from the verbal warning to a

7  three-day suspension.

8  A   Well, that's the whole reason for the employee counseling

9  is to avoid that.

10  Q   I understand.  But if she was hitting more posts before you

11  gave her training, you would give her more counseling, and the

12  counseling goes up from a verbal warning to a three-day

13  suspension.  And it could even go all of the way up to

14  termination, couldn't it?

15  A   I'm not sure I understood everything you said.  You said

16  more before the training?

17  Q   Yeah.

18  A   No.  She had some incidents with hitting racks and posts.

19  We thought it was best to retrain her.

20  Q   Sir, once you put the verbal warning in her file --

21  A   Okay.

22  Q   If she hits another post again --

23  A   Is there --

24  Q   -- before or after the training, and you give her more

25  discipline, your next phase is after a verbal warning a

Schroeder - Direct by Mr. DeRose

1   three-day suspension?

2   A   Sir, that's pure speculation.  I mean, if there's repeated

3   issues with her driving the lift truck, we need to get to the

4   root cause of why that's happening.

5   Q   And did you ever go and talk to her?

6   A   I mean -- yes, if there was frequent activity if there was

7   knocking racks down or hitting things, we would have to do

8   something, sir, to protect the employee and others.

9   Q   Of course.

10  A   It would not be a preference to do discipline.

11  Q   Sir, let me ask you, after you send her to Crown, did you

12  have no more incidents of hitting racks or hitting posts by

13  her?

14  A   I mean, if there was no more, the problem that was there is

15  gone; that's great.  That's what we want.

16  Q   So it's gone, right?

17  A   Correct.  Of course.

18  Q   But let's go back to that counseling.  You said you had to

19  get to the root cause.  And you do that by talking to your

20  employee, right?

21  A   I didn't personally do that.  I'm assuming her supervisors

22  did.  They must have talked to her when that happened.

23  Q   You say said they must have.  You heard Michael Temko say

24  he doesn't remember talking to her about what caused -- whether

25  she was having some kind of issues or problems that had her

1  hitting posts.

2  A   I don't recall that very specifically, sir.  That may have

3  been stated and I wasn't in the room.

4  Q   You say you're the kind of a manager who goes around and

5  talks to the employees and asks about how things are going.

6  When did you talk to Ms. Arroyo about how things -- how she was

7  doing since she got back from that first deployment?

8  A   I don't recall specific conversations.  I am sure we spoke

9  at times.

10  Q   Do you remember ever talking to her about how she was doing

11  now that she got back?

12  A   I can't recall a specific day or a time.  I'm sure that we

13  talked at some point.

14  Q   Did you ask her how she was doing?

15  A   I don't recall specifically, sir.  I can't remember that

16  long ago.

17  Q   Did you ask her if she had been affected at all by that

18  last trip over to Iraq?

19  A   I don't recall any specific conversation, sir.

20  Q   Ms. Arroyo recommended you and Keith -- or excuse me -- you

21  and Michael Temko and Patrick Dunne for an award to be given to

22  you by the Army for supporting her, didn't she?

23  A   Sir, yes, that was the patriot award; that was awesome.

24  That was -- it made me feel pretty good that we, as a company,

25  supported her.

Schroeder - Direct by Mr. DeRose

1    Q    Can you put up the picture of that.  It's Defense Exhibit

2    40 -- I don't know -- 38, 37.

3           While they're doing this -- I guess it hadn't been

4    admitted, Judge.  Maybe we should show it to him first.  Don't

5    put it up please, Carolyn.

6           THE COURT:  This is a defense exhibit?

7           MR. DeROSE:  Yes, Judge, it's a picture.

8           MS. DeROSE:  I believe it's Defense Exhibit 8.

9           MR. DeROSE:  Just let the witness see it.

10          THE COURT:  I assume there isn't going to be any

11   objection to using this exhibit.

12          MR. McMAHON:  No objection.

13          MR. DeROSE:  All right.  Judge, can I do --

14          THE COURT:  Go ahead and do it.  Let's just cut to the

15   chase here.  I'm sure he is going to be able to recognize the

16   people in this exhibit.

17          THE WITNESS:  Yes, I do, your Honor.

18   BY MR. DeROSE:

19   Q    This particular exhibit, that shows Ms. Luzmaria Arroyo in

20   her Army uniform, doesn't it?

21   A    Correct.

22   Q    And there's two men, and they're holding a plaque.  One of

23   those gentlemen is you, isn't it?

24   A    That's correct, sir.  I'm right next to Ms. Arroyo.

25   Q    And the other gentlemen he's Colonel Gorski from the ESGR,

1  isn't he?

2  A    That's correct.

3  Q    You came to know him because he -- one, he gave you this

4  award.  And he gave a copy just like that, we've got another

5  photo that has got Mr. Temko in it, right?

6  A    I believe Mr. Temko along with other veterans in the

7  facility.  It was quite a nice event.

8  Q    And the one that nominated you for that award was

9  Ms. Arroyo, wasn't it?

10 A    Yes, Ms. Arroyo did that.

11 Q    And you were honored that this award was being given to

12 you, weren't you?

13 A    I was greatly honored that we received this.

14 Q    Did you tell Ms. Arroyo -- what year was this when this was

15 given to you?

16 A    I believe it was 2010.  I'm pretty sure.

17 Q    All right.  All of the emails that we're looking at with

18 the jury between 2005 and 2010, at the time that Ms. Arroyo

19 nominated you for this award, did you tell her about any of

20 these emails that you had been writing?

21 A    No, I don't believe so.

22 Q    Did you tell her that she was close to being terminated

23 three or four times by you before she gave you that award?

24            MR. McMAHON:  Objection.  Lack of foundation.

25            THE COURT:  The foundation is whatever the evidence

1    is.  The question, "Did you tell her that she was close to

2    being terminated," there's nothing wrong with that question.

3    Obviously, you can argue all of that.  The foundation is the

4    evidence.  That question, there's nothing objectionable about

5    it.  You can go ahead and answer it.

6    A    The answer is no.

7              MR. DeROSE:  All right.  Kate, I think I am done.

8              Can I see Exhibit 40, please, Judge?  Judge, I think

9    this is in evidence.

10             THE COURT:  40 is in evidence, yes.

11             MR. DeROSE:  Can we put up 40 then?

12             MS. DeROSE:  Yes.

13   BY MR. DeROSE:

14   Q    Now this is an email from Mr. Temko to Patrick Dunne.  By

15   the way, Patrick Dunne still works for the company, doesn't he?

16   A    Yes.

17   Q    And he is working out there in the Joliet facility?

18   A    Correct.

19   Q    All right.  Still under your supervision?

20   A    Correct.

21   Q    And he was Ms. Arroyo's supervisor by 2007.

22   A    I don't recall the exact timing.  I think it was 2011, I

23   believe.

24   Q    All right.  Well --

25   A    He may have supervised her multiple times.  I don't recall

Schroeder - Direct by Mr. DeRose

1    exactly.

2    Q    It looks like Temko is writing to Bruce Olin and to you and

3    to Pat Dunne and Ms. Somersett, and saying "Ms. Arroyo now

4    drills locally.  She's drilling in Darien, Illinois, Army

5    reserve unit so she won't have to travel to the State of

6    Georgia anymore."

7               Do you see that?

8    A    I see where he said that she is now drilling locally in

9    Darien and not in the State of Georgia.

10   Q    Do you remember about the time of this email how it came

11   about Ms. Arroyo transferred from Georgia to Darien, Illinois?

12   A    I don't recall why that happened.  It had to be her choice.

13   Q    Sure it had to be.  But you met with her before about it,

14   didn't you?

15   A    I don't recall a specific meeting about this.

16   Q    Now, the drilling of weekend drills, she could come in a

17   day earlier because she wouldn't have to drive back from the

18   State of Georgia, which would take her an extra day, right?

19   A    Yeah.  If there's no travel, that would be true, if it's

20   local.

21   Q    And that, of course, would help your planning needs over

22   there at Volvo, correct?

23   A    Sir, whatever her military obligation is we would assist

24   her with that and excuse her time, whether it was local or far

25   away.

1  Q  Do you remember earlier telling Bruce Olin that you didn't

2  think you could make her change to Darien, telling him that in

3  writing?  But it would be beneficial for your company if she

4  did transfer locally.

5  A  I kind of remember asking him something about where she

6  drilled at.  But I don't recall saying beneficial to us.  And

7  that was just because I didn't have an understanding of any of

8  that.

9  Q  Well, even before she started to transfer locally to

10  Darien, you had already discussed that with Bruce Olin, hadn't

11  you?

12  A  We had some discussions on her drill obligations out of

13  state with regard to travel time, yes.

14  Q  Why?

15  A  Just wanted to clarify what our responsibility -- what her

16  responsibility is and what our responsibility is.

17  Q  And when you told Bruce Olin you didn't think you could

18  make her transfer to a local unit, what did he say to you?

19  A  Without the email, I can't recall specifically what he

20  said.  Do I have that here?

21  Q  I don't know.

22  A  Okay.

23  Q  Exhibit 47, Kate.  Wait.

24        THE COURT:  47, no objection to the pretrial order.

25  It's admitted into evidence.

Schroeder - Direct by Mr. DeRose

1    (Plaintiff's Exhibit 47 was received in evidence.)

2        MR. DeROSE:  43 and 44, Kate.

3        Judge, 47.  47 makes no sense.

4        THE COURT:  Well, the witness does not have a copy of

5    43 or 44.

6        MR. DeROSE:  Judge, let me ask him.

7    BY MR. DeROSE:

8    Q   Sir, did you know that Luz Arroyo got orders for active

9    duty training in April of '08 for 62 days, and then another one

10   for 72 days?

11   A   I'm aware that there were multiple long periods of her

12   military obligations.  I can't remember specific days off the

13   top of my head.

14   Q   And I wouldn't expect you to do that.  But I want you to

15   now look, after she got those orders -- would you put up

16   Exhibit 47?

17       Ms. Arroyo wrote -- do you recognize this as an email

18   that was sent to you by Ms. Arroyo?

19   A   Yes.

20       MR. DeROSE:  Judge, I ask to have this admitted into

21   evidence.

22       THE COURT:  Right.  And by the pretrial order there is

23   no objection, so this is admitted into evidence and you can

24   publish it to the jury.

25       (Plaintiff's Exhibit 47 was received in evidence.)

1        MR. DeROSE:  Thank you, Judge.

2        THE COURT:  Thank you.

3   BY MR. DeROSE:

4   Q   And she writes to you -- she gives you her orders.  "Per

5   your request, attached are a copy of my orders that end in

6   October 1st, 2008."  And she is sending this to you on

7   June 25th.  So that means she's sending with this document

8   orders saying "I'm not going to be on your radar from June 25th

9   all of the way to October 1st," right?

10  A   Yes, that's what it says.

11  Q   And she says at the bottom of it, "Thank you for your

12  patience and understanding."

13       Did you think she appreciated the fact that it was a

14  little inconvenient for Volvo that she was being called away

15  for these various terms of service to her country?

16  A   I can't ascertain for certain what she was thinking, but

17  that makes sense.

18  Q   And you found out two years later that she wanted to award

19  her company, have you honored by the Army for being patient and

20  understanding of her service?

21  A   Correct.

22  Q   Did you think by this time she was still a problem employee

23  when you sent this email in 2008?

24       MR. McMAHON:  Objection.  Lack of foundation.

25       THE COURT:  Are you referring back to the email at the

1  beginning of the case?

2         MR. DeROSE:  Right.

3         THE COURT:  Okay.  I mean. . .

4         MR. McMAHON:  Mr. Schroeder never testified that he

5  thought she was an problem employee and the question states she

6  was a problem.

7         THE COURT:  I don't recall who testified to that.  It

8  might have been Mr. Temko for all I know.

9         MR. McMAHON:  It was in Mr. Schroeder's email.  He

10  said he overheard a question.  He never stated the --

11        THE COURT:  Okay.  Why don't you rephrase your

12  question and I will let you ask it?

13  BY MR. DeROSE:

14  Q   In light of your earlier inquiry about where someone said

15  she was a problem employee and we know the difficulties you had

16  in sorting out the travel time and her right to have travel

17  time and her time of reporting back from that first deployment,

18  did you think by the time you got this email in 2008 she was a

19  problem employee at all because of her military service?

20  A   No.  Not -- certainly not, not due to her military service.

21  Q   Was she a problem employee for other reasons?

22  A   Not that I was aware of at this time.

23  Q   So by the time she says thank you for your patience and

24  understanding, you considered her a good employee?

25  A   Yeah, I believe so.

Schroeder - Direct by Mr. DeRose

1    Q    All right.  I want you to look at Exhibit 48.  That we put

2    in front of him.  That hasn't been admitted.  But do I have it

3    for the witness?

4            Sir, do you have Exhibit 48 there in front of you?

5            THE COURT:  No, he won't.

6            MR. DeROSE:  Darn it.  All right.

7    BY MR. DeROSE:

8    Q    Let me just if ask if you remember this.  Do you remember

9    in November of 2008 getting an email from Bruce Olin, saying --

10   A    Excuse me, sir.  I missed what you just said.

11   Q    Do you remember getting an email from Mr. Olin on

12   November 7, 2008?

13           MR. DeROSE:  What's this?

14           MS. DeROSE:  Exhibit 49.  Judge, I ask that the

15   witness be shown Exhibit 49.

16           THE COURT:  Okay.  Now that exhibit is in evidence and

17   you can publish it to the jury, if you like.

18       (Plaintiff's Exhibit 49 was received in evidence.)

19   BY MR. DeROSE:

20   Q    And I think it goes from the bottom to the top.

21   A    Yes, it does.

22   Q    First of all, the bottom email.  It's an email from Maureen

23   Somersett in November of 2008 to you about the military records

24   of Arroyo.

25           Do you see that?

Schroeder - Direct by Mr. DeRose

1  A    Yes, I do.

2  Q    And she writes to you that "Michael" -- and I take that to

3  be Michael Temko, right?

4  A    Yes.

5  Q    "Michael and I went through all of Luzmaria's orders this

6  morning and her time off.  Attached is a spreadsheet of these

7  days."

8         And then she says at the bottom, "I can scan and send

9  it to Bruce," -- that would be Bruce Olin, right?

10  A    Correct.

11  Q    "-- if he needs them."

12         Why in the world were you keeping a spreadsheet on

13  Arroyo's military orders and her days off?

14  A    Sir, we keep documentation on any person in the building --

15  absenteeism, her time away from the building.

16  Q    Why on her, when she is on military orders and not even

17  responsible to you or for you for anything?

18  A    Sir, regardless of the reason outside the building, I'm

19  responsible to have records to record or manage any absenteeism

20  of any kind in the building.

21  Q    Sir, you've got that time sheet that Temko drew up at --

22  completed it on the day you terminated Luzmaria, and it was

23  talking about five years, and she used up 591 days.

24         Do you remember that exhibit?

25         MR. McMAHON:  Objection, your Honor.  That's

1    completely inaccurate.  The date of that document is not the

2    date Ms. Arroyo was terminated.

3           THE COURT:  Nor is the number of days -- the number of

4    days is in the 900s, I think.  But -- why don't you try another

5    question.

6    BY MR. DeROSE:

7    Q   All right.  That -- I guess you called it a spreadsheet --

8    what did he call it?

9           MR. McMAHON:  Excel spreadsheet.

10   BY MR. DeROSE:

11   Q   Excel spreadsheet that Temko did --

12   A   Mm-huh.

13   Q   -- he did in September 2011 before Arroyo got terminated,

14   right?

15   A   I believe that was an ongoing document from early on.  I

16   am not sure why --

17   Q   Why would you keep track of the days she would be away?

18   Were you trying to keep track of this five-year period?

19   A   I don't believe so, sir.  Again, it's just tracking -- we

20   do have evidence on this record that tracks simple things, you

21   know, whether it be bereavement or other things, and unexcused

22   absences.  But this was a little bit different because it was

23   different than most things that we track.  So it was just a

24   simple record of her military time away from the building, and

25   nothing more, I would think.

Schroeder - Direct by Mr. DeRose

1    MS. WILSON: And five years after he is mentioning
2  there, you have a right to not hire somebody who goes away for
3  five years voluntarily to work in the Army, and if they want to
4  come back after that time, you have a right to say, "We don't
5  want you back," don't you?
6  A    Sir, I'm not an expert on that policy. But that is, I'm
7  assuming, both a Volvo policy and a military policy and a
8  federal policy.
9  Q    All right, sir. But Luzmaria Arroyo was not voluntarily
10 going over to these drills and overseas to fight in Iraq. She
11 was going pursuant to orders. That would have nothing to do
12 with that five-year policy, would it?
13 A    I came to find that out, actually, I believe in my
14 deposition. You stated that to me. I wasn't aware of that at
15 the time.
16 Q    Well, did you look it up later to find out if I was right?
17 A    Pardon?
18 Q    Did you look it up later to find out if I was right? The
19 five years had nothing to do with her?
20 A    I don't believe I did that. I trusted what you said, sir.
21 Q    You did.
22    So you fellows were keeping this spreadsheet and she
23 says, "I will send it to Bruce Olin if he needs it." Why would
24 Bruce Olin need that in Jacksonville in 2007?
25 A    We had ongoing discussions with my HR business partner. I

1 keep him informed of all kind of things.  He was assisting us

2 and giving us guidance on how to understand our role for

3 military time off, so I was just keeping him informed; that's

4 all.

5 Q   And then you write -- Cait, the middle email -- after you

6 get that from Ms. Somersett, you write to Bruce Olin, "Attached

7 is her military timeline since her hire in June of 2005.  I did

8 not scan and copy all of her military orders, so if you want

9 them, please let me know."

10       Why are you sending all of this to Bruce then?

11 A   Again, I am just letting my HR business partner, whom I had

12 good communications with, let him know what was -- what is

13 going on; that's all.  It's as simple as that.

14 Q   All right.  Cait, go to the top email.

15       10 days later, Bruce writes you, "Keith, I didn't

16 want you to think I forgot about this.  Under the law, she is

17 within her rights to volunteer for assignments, which cause her

18 to use military leave.  The only real restriction is when she

19 uses five years of leave."  Right?

20 A   Correct.  That's what it says.

21 Q   But she wasn't using voluntary leave to go to those orders,

22 was she?

23 A   No.

24 Q   It had nothing to do with what he is writing you, did it?

25 A   I don't believe so.

Schroeder - Direct by Mr. DeRose

1  Q   Did you tell him she was volunteering to do all of these

2  things?

3  A   I don't recall specifically what we said.

4  Q   And then he writes on the bottom line to you, "Sorry, but

5  there's nothing we can do."

6          What did you think he meant by that?

7  A   I can't speak for what he was thinking, sir.

8  Q   Do you know why he was apologizing to you?

9  A   No.

10 Q   Did you ask him, "Is there a way we can hold her to task

11 for not being here?"

12 A   No.

13 Q   I want you to -- Cait, can we see Exhibit 50, please.

14         THE COURT:  50 is in evidence.

15         MR. DeROSE:  Thank you, Judge.

16         THE COURT:  This might be your last one before lunch.

17         MR. DeROSE:  I am going to go faster this afternoon.

18 BY MR. DeROSE:

19 Q   I want you to go to the bottom email.

20         THE CLERK:  Is this one admitted?

21         THE COURT:  This is in evidence, yes.

22 BY MR. DeROSE:

23 Q   Go to the last email.  And Temko's writing to you and to

24 David Miller, who I guess is a supervisor at the time.  "Since

25 our follow-up to our previous discussion about Arroyo's

1   military leave and her attendance, we've had more issues with

2   Arroyo's attendance."

3            Do you remember him telling you about that?

4   A   I seem to recall this email.  I would have to read it to

5   refresh myself on specific dates.

6   Q   He shows you that she's on military orders from the 11th

7   through the -- it looks like the '13th, and then she's a no

8   call/no show.  "And there should be no reason she should not

9   have reported to work today."

10  A   That's correct.  That's what it says.

11  Q   And then you write, if you go to the top email -- oh, wait

12  a minute.  The next email up, "Luzmaria was absent from work

13  again tonight.  No call/no show.  We need to contact her and

14  find out what's going on."

15           Now go to the top email, Cait.

16           And this is you.  Now she's been under your management

17  for three years and you know she's been subject to orders for

18  three years now.  And you write, "To all."  By "all," it says

19  on the top who you sent it to.  "I left a voice message at

20  Luzmaria's home.  And a short time ago I received a

21  communication from her local Army unit which states she's got

22  orders from November 12th to the 26th."  So all of this time

23  when you were wondering why she's not back, she's still on

24  duty, isn't she?

25  A   Correct.  That information did come to us.  But we didn't

1  have it early on.

2  Q   And then you write, "One would have thought that if

3  Luzmaria Arroyo had received these orders on November 14th, she

4  would have either called or faxed us the orders."

5        Why would one have thought that?

6  A   If she had actual orders, I would think it's reasonable

7  that she provide them to us so we know how long she is going to

8  be gone.

9  Q   She doesn't have to provide them to you, does she?

10       MR. McMAHON:  Objection, your Honor.  That is a

11 misstatement of the law.

12       THE COURT:  Again -- actually, this will be a good

13 place for us to talk at the sidebar, just for a second.

14 Because I do want to straighten one thing out here.

15    (Sidebar.)

16       THE COURT:  Okay.  I am not a USERRA expert, but my

17 understanding is that that time she was only gone for a period

18 of time that was less than 31 days, and, therefore, this

19 protection that she would otherwise have had for being gone

20 more than 31 days and not having to communicate with her

21 employer while she's on duty doesn't apply.  So it does seem

22 like this is a misleading question for the jury.

23       MR. DeROSE:  Judge, the orders weren't even cut yet.

24 The orders were not even cut yet.  And there is a USERRA

25 requirement that you cannot compel a service member to provide

1    orders that they do not have.  That's a direct --

2         THE COURT:  I understand that.  But this is what the

3    email had.  If she had the emails on the 14th, one would have

4    expected her to provide those.  Not clairvoyantly, before she

5    had the orders, but at the time she got the order.

6         MR. McMAHON:  Right.  On the 14th.

7         THE COURT:  And what I'm concerned about is there is

8    potential for jury confusion because it seems that everyone

9    agrees that after you've been overseas, if you have been in any

10   assignment for 31 or more days, there is not that --

11        MR. McMAHON:  There is -- let me clarify.  There is a

12   certain time she has to report that is on the back end of the

13   thing.  This is -- we're talking about orders.  There is a

14   USERRA requirement that she provides us orders, otherwise we

15   have no time.  So this question is she doesn't have a duty to

16   provide orders.

17        THE COURT:  Which I am going to sustain the objection

18   to this question.  Because we're mixing apples and oranges

19   here.

20        MR. DeROSE:  All right.  But I should be allowed to

21   say to him, "You found out later this order wasn't even drafted

22   yet.  She's going to be held until the 26th.  The orders will

23   be cut on the 24th."  He is writing this on the 19th.

24        MR. McMAHON:  But -- well, he received it on the 19th

25   per the email.  And he -- and he says he emailed the orders on

Schroeder - Direct by Mr. DeRose

1    the first.

2              MR. DeROSE:  They weren't cut yet.

3              THE COURT:  How could he have received it on the 19th?

4    When were they received?

5              MR. DeROSE:  They weren't cut yet.

6              THE COURT:  I don't understand how that's possible.

7    He said he got this from her unit.

8              MR. DeROSE:  He got a voicemail from her unit --

9              THE COURT:  So he said he got orders.

10             MR. DeROSE:  -- a communication which states that she

11   has orders.  But the orders are not cut, Judge, until the 24th,

12   five, six days later.

13             MR. McMAHON:  That is not true.

14             THE COURT:  How do we know that?

15             MR. DeROSE:  We know that because we got the orders.

16             THE COURT:  With a witness, are you going to put those

17   orders through?

18             MR. DeROSE:  I can put them on with her.

19             THE COURT:  Right.  I understand, but -- but how does

20   he know that?

21             MR. DeROSE:  Judge, when he gets the orders -- we have

22   got them.  He gets the orders later.  They have got --

23             THE COURT:  I am going to let the jury go for lunch

24   and then you guys can explain that.

25             MR. DeROSE:  Find the orders.

1     (Sidebar concluded.)

2         THE COURT:  Okay.  Folks, rather than us sorting out

3     this little issue, we'll sort it out with you guys having

4     lunch.

5         So we will start up again at 1:45, and our afternoon

6     schedule will be basically go to a little after 3:00.  And then

7     we will take a 15-minute break and go til 5:00, just like we

8     have been doing just about everyday.  We will see you guys

9     about 12:45.  Thank you for your patience.  Have a good lunch.

10    (Jury out.)

11        THE CLERK:  Okay.  You can go to lunch and anything we

12    need to put on the record, we can put on the record when you

13    come back.

14    (Proceedings concluded.)

15                    * * * * * * * * * *

16                    C E R T I F I C A T E

17    I certify that the foregoing is a correct transcript from

18    the record of proceedings in the above-entitled matter.

19

20    /s/Kristin M. Ashenhurst, CSR, RDR, CRR  December 15, 2016

21    Kristin M. Ashenhurst, CSR, RDR, CRR     Date
      Federal Official Court Reporter

22

23

24

25