IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LUZMARIA ARROYO, | ) Docket No. 12 C 06859 |
| | ) |
| Plaintiff, | ) Chicago, Illinois |
| | ) August 19, 2016 |
| v. | ) 9:44 A.M. |
| | ) |
| VOLVO PARTS NORTH AMERICA, LLC, | ) |
| | ) |
| Defendant. | ) |

VOLUME 5-A
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE ROBERT M. DOW, JR., AND A JURY

APPEARANCES:


For the Plaintiff:       JOHN P. DeROSE AND ASSOCIATES, by
                         MR. JOHN P. DeROSE
                         MS. CAITLYN DeROSE
                         15 Spinning Wheel Road
                         Hinsdale, Illinois 60521
                         (630) 920-1111

For the Defendant:       CONSTAGNY, BROOKS & SMITH LLP, by
                         MR. WILLIAM J. McMAHON IV
                         100 N. Cherry Street
                         Suite 300
                         Winston Salem, North Carolina 27101
                         (336) 721-6860

                         CONSTAGNY, BROOKS & SMITH LLP, by
                         MS. SUSAN E. BASSFORD WILSON
                         200 S. Wacker Drive
                         Suite 3100
                         Chicago, Illinois 60606
                         (314) 925-7275

Court Reporter:          KRISTIN M. ASHENHURST, CSR, RDR, CRR
                         Official Court Reporter
                         219 S. Dearborn Street, Room 1918
                         Chicago, IL 60604
                         (312) 818-6549
                         kristin_ashenhurst@ilnd.uscourts.gov

Schroeder - Direct by Mr. DeRose

1      (The following proceedings were had in open court:)

2          THE COURT:  Okay.  Happy Friday to everybody.  Please

3  be seated.  So we're going to pick up where we left off

4  yesterday.  Mr. Schroeder is still on the witness stand.  And I

5  think Mr. DeRose has a few more questions for him it sounds

6  like, so go right ahead, sir.

7          MR. DeROSE:  And Judge, I hope this will be rather

8  brief.

9          Judge, I'm going to show the witness Exhibit 246.

10 This has not been admitted yet.

11         THE COURT:  It's not.  But there is no objection in

12 the pretrial order, and it's an email from Mr. Schroeder, so

13 I'm going to cut to the chase here in a minute pursuant to the

14 pretrial order and you can publish it to the jury.

15     (Plaintiff's Exhibit 245 was received in evidence.)

16         THE COURT:  Okay.  Thank you, everybody.  So you guys

17 can see that now?

18         MR. DeROSE:  Yes.

19         THE COURT:  Okay.  Mr. DeRose.

20         MR. DeROSE:  Thank you your Honor.

21     KEITH SCHROEDER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN,

22                   DIRECT EXAMINATION (Resumed)

23 BY MR. DeROSE:

24 Q   Mr. Schroeder, at the very top of the email it looks like

25 you're sending this to Regina Williams.  And you've already

Schroeder - Direct by Mr. DeRose

1    told us she was the HR partner that you were working with in

2    2011.  And she was out of, I think you said --

3    A    Atlanta, Georgia.

4    Q    -- Atlanta, Georgia.

5         And she had been in Chicago about Ms. Arroyo just in

6    the last three weeks before that.  You even met with her,

7    hadn't you?

8    A    I believe we did.  I don't know the specific dates, sir.

9    Q    Well, you and Ms. Williams met with Ms. Arroyo several

10   times a couple of weeks before she got terminated, didn't you?

11   A    I would have to see a document that validates that.

12   Q    But don't you remember meeting with Ms. Williams without

13   looking at documents?

14   A    Sir, it's five years ago.  I can't be absolutely certain of

15   what meeting dates there were or who I met with.

16   Q    I didn't ask about dates.  I said, "Do you remember

17   meeting?  You and Regina Williams and Arroyo."

18              MR. McMAHON:  Objection.  Asked and answered.

19              THE COURT:  Well, not exactly.  I'll overrule the

20   objection.  See if you can ask just one last question.

21   Q    Well, can you tell us, do you remember meeting with her?

22   A    It's possible that we did.  I don't recall exactly, sir.

23   Whether it was a meeting at my facility or via telephone.  I

24   don't recall.

25   Q    But anyway, on November 8th, you send her something you

Schroeder - Direct by Mr. DeRose

1  label as "Arroyo termination communication."  What do those

2  words mean?  "Termination communication."

3  A    November 8th was the day that after we reviewed

4  Ms. Arroyo's attendance record -- I don't know if that was a

5  Tuesday or the prior week -- that based on her attendance that

6  there was to be a termination document.  I sent this to Regina

7  Williams as to what our intent was to do that day to meet and

8  communicate the termination with Ms. Arroyo.

9  Q    And you and Ms. Regina Williams had been talking for a

10  couple of three weeks about terminating Ms. Arroyo, hadn't you?

11  A    I would have to see documents.

12  Q    You can't remember talking to her before you sent her this

13  email?

14  A    I don't recall specifically, sir.

15  Q    The only thing you ever can remember is things you can see

16  in emails?

17  A    Well, that's not true, sir.  But this is five years ago.  I

18  can't remember everything I did five years ago.

19  Q    I didn't ask about everything.  I'm only asking you, sir,

20  didn't you and Regina Williams agree that you were going to try

21  to terminate her two or three weeks earlier?

22          MR. McMAHON:  Objection.  Lack of foundation.

23          THE COURT:  Overruled.  They either did or didn't.

24          THE WITNESS:  Sir, that can only be determined after a

25  review of the weekly payroll report and the attendance record

1  by Mr. Temko whether there's under the policy that the rules

2  were violated, and if we had -- there were sufficient

3  occurrences to do that.

4  Q   All right.  So you're telling Regina that you got a plan to

5  have Patrick Dunne and Maureen Somersett meet Ms. Arroyo at the

6  locker room to request a meeting in the front conference room.

7          Why did you have to make a plan?

8  A   A plan.  Well, Ms. Arroyo worked the second shift.  I

9  needed to meet with her at the start of the shift.  And I just

10  asked Patrick and Maureen to meet her at the locker room when

11  she arrived at the facility.

12  Q   But why had you set this all out in writing?  So you must

13  have talked to them beforehand, right?

14  A   I met with Patrick and Maureen, yes.

15  Q   And then you asked the question of Ms. Williams way down

16  there in Atlanta, "What if Ms. Arroyo sees me and refuses to

17  meet?"  Why did you ask that question?

18  A   Sir, as the email says, it was based on her statement to me

19  on a previous day that, I believe it was -- I can't verbatim

20  read it to you, but she wasn't going to talk with me without

21  legal counsel, I believe.

22  Q   And when did you and she have that conversation?

23  A   I don't recall, sir.

24  Q   Within just a couple of days before this?

25  A   I don't know the exact date, sir.

1  Q   Is that the day that she told you she felt like you were

2  harassing her?

3  A   I don't recall specifically, sir.

4  Q   Is that the day she told you that she was afraid of you?

5  A   I don't know that specifically.  I can't remember that far

6  back.

7  Q   Well, did you tell Regina Williams that Ms. Arroyo had told

8  you that in the future she would only talk to you with a lawyer

9  present?

10  A   I don't know if it's the exact words, but that sounds

11  familiar.

12  Q   But she said a little more.  She said, "I'll only talk with

13  you when you want to talk to me about discipline," didn't she?

14  A   That I'm not 100 percent sure, sir.

15  Q   She never said, "I won't take orders from you or go pick

16  and pack where you tell me to do it," did she?

17  A   Well, of course not.  And that's not my role.

18  Q   Were you a little put out when she said, "If I talk to you,

19  I have to have my lawyer present"?

20  A   That was her choice, sir.  I'm not put out.

21  Q   Were you a little angry when she said that to you?

22  A   Of course not.

23  Q   How many days, approximately, before this date of

24  termination was it that she told you, "From now on I'm only

25  going to talk to you when I have my lawyer present"?

1    A    Sir, I don't recall the exact date.  There was a day that

2    that that was said.  I don't know exactly what day.

3    Q    And then you say, "What if she refuses to meet with you?"

4         Had she ever in the past -- prior to November 8th of

5    2011, refused to meet with you?

6    A    No.

7    Q    She just said, "If you're to going to talk to me about

8    discipline, I have to have a lawyer present"?

9    A    I don't recall the exact words, sir.  I've already stated

10   that.

11   Q    Well, why did you think she would refuse to meet with you

12   on November 8th?

13   A    Because of her statement that she wanted to have legal

14   counsel.

15   Q    You knew that she had asked the big boss that anytime she

16   meets with you, she wanted to have Patrick Dunne present and

17   Maureen Somersett, right?

18   A    I don't recall the exact words.  But those two individuals

19   were with me.

20   Q    Sir, but the vice president told you that he agreed with

21   Ms. Arroyo that anytime she talked with you, she would either

22   have Patrick Dunne or Maureen Somersett present, right?

23        MR. McMAHON:  Objection.

24   A    I seem to remember that.

25        MR. McMAHON:  He can answer.

Schroeder - Direct by Mr. DeRose

1    THE COURT:  Okay.

2    BY MR. DeROSE:

3    Q   You seem to remember that or the vice president actually

4    told you that?

5    A   I don't remember the exact words, sir.  It's five years

6    ago.  If you show me a document that states that, I'll validate

7    that.

8    Q   Sir, we don't often have emails to show people.  I'm asking

9    you about your recollection.

10   A   Okay.

11   Q   Did you know that the vice president said anytime you were

12   going to meet with Ms. Arroyo, he had agreed that either

13   Patrick Dunn or Maureen Somersett would be present?

14   MR. McMAHON:  Objection.  Asked and answered.

15   THE COURT:  Sustained.

16   BY MR. DeROSE:

17   Q   Were you a little put out when the vice president told you

18   that was going to be a requirement?

19   A   No.

20   Q   How much before November 8th did he make that agreement

21   with Luzmaria Arroyo?

22   A   I don't know the specific date.  I don't recall.

23   Q   Is it fair to say by November 1, you and she were in kind

24   of a strained relationship because she had been telling the big

25   boss about what was going on between you?

Schroeder - Direct by Mr. DeRose

1    A    I knew that she raised a concern and a complaint.  What

2    could I do about it?  It is what it is.

3    Q    Well, did you tell the boss, "She's getting to be a pain

4    for me"?

5    A    No.  Never.

6    Q    You had written the boss that she had caused a morale

7    problem among your supervisors, hadn't you?

8    A    I don't recall that specifically.

9    Q    You did tell the boss that she was causing a morale problem

10   on the whole shift, didn't you?

11   A    Sir, I don't recall that.  If you would show me a document

12   to that, I will validate that.

13   Q    You don't remember words you wrote.  But you looked at all

14   of the emails in this case before coming here to testify,

15   correct?

16            MR. McMAHON:  Objection.  Vague.

17            THE COURT:  Overruled.

18            MR. DeROSE:  Caitlyn, can you find that one email?

19            Judge, it isn't worth the time.  I will save it for

20   later.

21   BY MR. DeROSE:

22   Q    But anyway, sir, you say, "I asked this based on her

23   statement to me on Friday," -- this is the following Tuesday, I

24   take it?  Would that be right?

25   A    That's what that says.

1  Q    All right.  So the Friday before would have been what,

2  about November 4th?  If this is Tuesday, November 8th?

3  A    That seems correct.

4  Q    All right.  "So last Friday on November 4th we know, of

5  course, it's untrue.  Can I make a statement that her legal

6  attorney" -- and I hope that's not what all of these things

7  are, but "her attorney confirmed to Volvo legal counsel that

8  she never instructed her client to make that statement?"

9           What statement are you talking about?

10 A    I must have talked to our legal counsel, where they

11 confirmed that her statement that she wouldn't meet with

12 -- that she would not meet with me without legal counsel.

13 Q    Your lawyer said she didn't make that statement?

14 A    That's what it states here, sir.

15 Q    So you were talking to your own lawyer --

16 A    That she ever instructed her --

17          THE COURT REPORTER:  Excuse me.  I didn't get the

18 answer.

19 BY MS. DeROSE:

20 Q    I take it you were talking to your own lawyer --

21          THE COURT REPORTER:  Just one moment.  I didn't get

22 the answer.

23          THE WITNESS:  The email states that Volvo legal

24 counsel -- that she never instructed her client to make that

25 statement.

Schroeder - Direct by Mr. DeRose

1    Q   So I take it in order to write this email, you weren't only

2    talking to Regina Williams, you were also talking to your legal

3    counsel about terminating Ms. Arroyo?

4    A   I don't know what the source of that was.

5    Q   Do you normally get that many people involved -- Mr. Dunn,

6    Ms. Somersett, legal counsel, the vice president and Regina

7    Williams involved -- when you're going to terminate an employee

8    for being one to three minute late?

9    A   Well, first of all, over a period of time in her

10   attendance, there was more than just one and three minutes.

11   And the answer is termination is very serious, sir.  I do need

12   to let my boss know what I'm doing.  And I do need to talk to

13   human resources.  And if they see -- if we determine that we

14   have to seek legal advice, yes, that is appropriate.

15   Q   Do you have authority to fire someone without going to the

16   vice president of the company?

17   A   It is my decision as director of that facility to make a

18   termination.

19   Q   That didn't answer my question.  Do you have authority to

20   fire someone at that facility where you've been manager for

21   many, many years without calling the vice president of the

22   company and checking with legal counsel?

23   A   It is normal protocol to communicate that to the person I

24   report to and human resources.

25   Q   Sir, could you answer my question?  Can you fire a person

1   on the spot if you want to?

2   A   I've never done that, sir.  I mean that's not something

3   that you do everyday.  I would consult with human resources.

4   Q   Is firing people something you rarely do?

5   A   Of course not, sir.

6   Q   Pardon.

7   A   You asked me if that's something I readily do?

8   Q   Rarely.

9   A   It does happen.

10  Q   In a given month, do you have the obligation to have to

11  fire at least one person per month or a couple of persons per

12  year?

13  A   Of course not.

14  Q   About how often do you fire someone over there?

15  A   I don't recall.  There have been some other terminations.

16  Q   Do you get legal counsel involved before you fired those

17  people?

18  A   I don't recall specifically.  I know that I communicate

19  with my human resource business partner.

20  Q   And you always have plans that you communicate that you're

21  going to bring one of your supervisors and Ms. Somersett in

22  when you want to fire the person?

23  A   Sir, it is -- the supervisor of the employee is asked to be

24  there.  They're a direct report.  And Ms. Somersett, as my

25  administrative assistant, is often at communications like that,

Schroeder - Direct by Mr. DeRose

1  yes.

2  Q   And then you ask -- you state, "We cannot afford to have a

3  scene."  What kind of scene were you expecting to occur?

4  A   Sir, based on what was told to me previously, I was not

5  100 percent certain that Ms. Arroyo would talk to me.

6  Q   And that you would consider a scene?

7  A   I did not want a scene to be created.

8  Q   Well, what did you envision -- had you any idea if she

9  wouldn't talk to you, how that would be a scene, if she just

10  said, "I don't want to talk to you"?

11  A   Surely you can understand that would be a difficult

12  situation that I wanted to avoid.

13  Q   And you said "or for her to attempt to go to work."

14          What, you think she was going to make a scene and say,

15  "You can't fire me.  I'm going to get on that picker-packer

16  machine and I'm going to go do the work"?

17  A   I don't know that for certain, sir.  It was based on her

18  statement that she wouldn't talk to me.  I didn't know what

19  would happen.

20  Q   Were you afraid of Ms. Arroyo?

21  A   Of course not.

22  Q   She never threatened to hurt you in any way, did she?

23  A   No.

24  Q   This kind of planning and getting people involved, do you

25  do this for every person you fire, or was she different?

Schroeder - Direct by Mr. DeRose

1    A    She was not different.  I mean, I have to speak to my human

2    resource business partner and tell her that I'm going to do

3    such a communication and keep her advised.

4    Q    Did you ever tell her that you were afraid of a scene being

5    done by these other employees when you terminate them, or the

6    employee insisting that they're going to go to work when you,

7    the big boss of the plant, says "You're fired"?

8    A    I don't recall that.  It is never, ever a pleasant thing to

9    do to have to terminate someone.

10   Q    I know.  But you're -- I'm asking you about involving this

11   plan and all of these people to be involved and asking

12   questions, "What if she says, 'I'm going to work anyway?'"  Are

13   you worried about that with every employee that you terminate?

14   A    No.

15   Q    Well, why were you worried about that with her?

16   A    I was just making a statement that there may be a concern

17   if Ms. Arroyo refuses to talk to me.

18   Q    Have you ever had any other employees in the building say,

19   "I will only talk to you about discipline with my lawyer

20   present"?

21   A    No.

22   Q    Did that tick you off a little bit?

23   A    No, sir.

24            MS. DeROSE:  Excuse me one moment, Judge.

25            Thank you, your Honor.  I'm finished.

1      THE COURT:  Mr. McMahon.

2      THE WITNESS:  Would you like this document back?

3      MR. DeROSE:  No, I have my own copy.

4      THE COURT:  If you want to collect all of the

5  documents you have there.  When you're on the stand we are

6  going to hand them back to the plaintiff, because I think

7  that's where you got them all.

8      MR. McMAHON:  You have to keep those there, I think,

9  for right now.  I was actually going to go ahead and give

10  Mr. Schroeder a copy of our Exhibit Book.

11      THE COURT:  Sure.

12      MR. McMAHON:  There will be a few of ours that we will

13  reference, if that's okay.

14      May I approach?

15      THE COURT:  Yes.  Sure.

16      MR. McMAHON:  Okay.  Thank you.

17                  CROSS-EXAMINATION

18  BY MR. McMAHON:

19  Q   Sir, I will give you this.  There will be a couple of

20  documents referenced in there as well.

21      Okay.  Now, Mr. Schroeder, it is Friday, right?

22  A   Yes, it is.

23  Q   You've been here all week, right, in this trial?

24  A   I have.

25  Q   How many hours would you say we've put in this trial

1    talking about emails from 2005, if you had to estimate?

2    A    25 to 30 hours.

3    Q    25 to 30 hours.  Did any of the emails we looked at

4    throughout this trial have anything to do with why Ms. Arroyo

5    was terminated in November of 2011?

6    A    No.

7    Q    How many hours would you say we looked at emails that were

8    in 2006?

9    A    Quite a few.

10   Q    Quite a few.  Did any of the email communications that were

11   exchanged in 2006 have anything to do with why Ms. Arroyo was

12   terminated in November 2011?

13   A    They did not.

14   Q    How about for 2007?

15   A    They did not.

16   Q    How about 2008?

17   A    I don't believe so.

18   Q    How about 2009?

19   A    I don't believe so.

20   Q    You testified earlier that Ms. Arroyo was terminated for

21   cumulative occurrences under the attendance policy?

22   A    Correct.

23   Q    What period of time did that cover?

24   A    2010 and 2011.

25   Q    Okay.  You mentioned that -- you were kind of discussing

1  absenteeism generally, and if you remember, you were talking

2  about the fact that there were several days that Volvo gave

3  Ms. Arroyo for military leave, right?

4  A   Yes.  There were many days.

5  Q   Okay.  You mentioned in some of the emails -- and we are

6  going to look at specifics -- but you mentioned in some of them

7  that there was often instances of absenteeism that needed

8  clarification; is that right?

9  A   Right.

10 Q   When an employee is drilling, right, they have military

11 drills, is that a relatively long-term or short-term military

12 engagement?

13 A   I believe it's typically short-term.

14 Q   Kind of like a weekend, right?

15 A   Right.

16 Q   So conceivably if someone is on military drills and they're

17 also absent from work close in time to the military drills, you

18 may or may not know if that's covered as military leave or not,

19 right?

20 A   I would not have known that.

21 Q   In comparison, if someone like Ms. Arroyo is deployed

22 overseas for a good chunk of time, right?  And we talked about

23 in this case how Ms. Arroyo was actually deployed twice while

24 she worked at Volvo, right?

25 A   Correct.

1  Q   You know that the entirety of that time is protective

2  military, right?

3  A   Of course.

4  Q   So there's not this ambiguity of trying to figure out if

5  certain days are covered with miliary leave or not during those

6  chunks, right?

7  A   That is correct.

8  Q   Now, can you know if a particular time of leave is actually

9  covered as military leave before you get orders for that?

10  A   I don't know that.

11  Q   All right.  In other words, you wouldn't have any reason to

12  know one way or another?

13  A   Right.

14  Q   So if you had an employee at your facility who was in

15  active duty reserves and they're absent from work, can you just

16  assume that they're absent from work because of their military

17  obligation?

18  A   No.

19  Q   You would need an order first, right?

20  A   That would seem appropriate, yes.

21  Q   And under USERRA, didn't Ms. Arroyo have a duty to provide

22  you with orders for her leave time?

23  A   I believe so.

24  Q   And if she didn't provide you with orders, you didn't have

25  a duty to provide her any leave, right?

Schroeder - Cross by Mr. McMahon

1    A    Correct.

2    Q    Now, Mr. DeRose spent a lot of time yesterday asking you

3    about certain statements you made in emails.

4            Do you remember that?

5    A    Correct.

6    Q    What I want to do today is look at some of these same

7    emails, but I want to ask you what actually happened as a

8    result of the communications.

9            Does that make sense?

10   A    Yes.

11           THE COURT:  All right.  So first what I want to do if

12   we can -- could you switch over to defendant, please?

13           I would like to put up Plaintiff's Exhibit 19?

14           THE COURT:  That's not it.

15           MR. McMAHON:  No, sir.  Those are our expert

16   witnesses.

17       (Laughter.)

18           THE WITNESS:  Where would I get that document at?

19   BY MR. McMAHON:

20   Q    It should be in your stack.  If you could take a look at

21   Exhibit 19.

22   A    Okay.

23   Q    Could you go ahead and look at the very top of Page 2 of

24   that?  That's the end of your email there, right?

25   A    That's correct.

Schroeder - Cross by Mr. McMahon

1   Q   What do you say in that first sentence?  Can you read that
2   to the jury please?
3   A   "We simply need to get all of the facts and take
4   appropriate action."
5   Q   And in this email chain we're talking about certain days
6   that Ms. Arroyo has for military duty, right?
7   A   Correct.
8   Q   And at the same time we're talking about other days where
9   you're not quite sure if it's military duty or not?
10  A   That's correct.
11  Q   All right.  Was Ms. Arroyo ever given an attendance
12  occurence or discipline for any of these days that we're
13  talking about here?
14  A   Absolutely not.
15  Q   So you eventually resolved the issue and found out if it
16  was military leave or not?
17  A   Correct.
18  Q   So -- and this goes for not just this email but for some of
19  these other emails.  At the time of these communications, did
20  you know the entirety of the body of USERRA law?
21  A   No, I did not.
22  Q   Okay.  And you were asking questions from time to
23  time -- and we will get some other examples -- about the law,
24  right?
25  A   I asked many, many questions to the different resources

Schroeder - Cross by Mr. McMahon

1    that I had.

2    Q    And to your knowledge, is it okay to ask questions about

3    USERRA to other folks?

4    A    Of course.

5    Q    To try to get the right answer, right?

6    A    Most important.

7    Q    And you having these communications about what USERRA

8    provides for, did those have anything to do with why Ms. Arroyo

9    was terminated in November of 2011?

10   A    Absolutely not.

11   Q    Now, I want to look at a specific example from October of

12   2005.

13            If we could put up Plaintiff's Exhibit 21?

14            THE COURT:  I assume every exhibit you are going to

15   use of the plaintiff is already in evidence.

16            MR. McMAHON:  I believe that's correct.

17            THE COURT:  If it's not, make sure you let Lynette

18   know.

19            MR. McMAHON:  I will.  Either that -- or we didn't

20   have on objection .

21            MR. DeROSE:  Your Honor, I have no objection to them

22   using any exhibit in this case in the universe of this case.

23            THE COURT:  Okay.  That will make it easy for Lynette

24   then.

25            MR. McMAHON:  Okay.  Thank you.

Schroeder - Cross by Mr. McMahon

1    THE COURT:  So it's Plaintiff's 21.

2    THE CLERK:  There it is.

3    THE COURT:  Okay.  Thank you.

4    MR. McMAHON:  And if we can go to the front page of

5  that document.

6  BY MR. McMAHON:

7  Q   Now, Mr. Schroeder, do you see that document in front of

8  you?

9    THE COURT:  Hold on one second.

10    MR. DeROSE:  Judge, I can't get close enough to see

11  the screen.  Okay.  So you're -- we're getting a copy.

12    THE COURT:  Your co-counsel is going to just hand you

13  copies as defense Counsel identifies them, then?

14    MR. DeROSE:  Yes, Judge.

15    THE COURT:  Okay.  That will work out really well.

16  Thank you.

17    Okay, Mr. McMahon.  I think we are good now.

18    MR. McMAHON:  Thank you.

19  BY MR. McMAHON:

20  Q   Now Mr. Schroeder, you remember being questioned about

21  this document yesterday, right?

22  A   I believe so.

23  Q   And, in fact, this was an email from you to Bruce Olin on

24  October 21st of 2005, correct?

25  A   Correct.

Schroeder - Cross by Mr. McMahon

1   Q   And you're trying to get Bruce Olin's advice on how to

2   handle this particular type of leave, right?

3   A   Yes.

4   Q   And one of the issues you were addressing here was whether

5   or not Volvo policy covered Ms. Arroyo's travel time for her

6   military obligations?

7   A   Correct.

8   Q   Okay.  Was she ultimately given the travel time as a result

9   of this communication?

10  A   Yes, of course.

11  Q   So that wasn't discussed yesterday, but ultimately nothing

12  happened to Ms. Arroyo as a result of this communication,

13  right?

14  A   No.

15  Q   Okay.  One question for you, Volvo has a military leave

16  policy.  We heard testimony about that yesterday, right?

17  A   Correct.

18  Q   Does Volvo pay and offer some pay to its employees who go

19  on military leave?

20  A   Yes, they do.

21  Q   Under USERRA is that even required?

22  A   No, I don't believe so.

23  Q   So under USERRA it's unpaid leave?

24  A   I believe so.

25  Q   So Volvo's military leave policy goes above and beyond what

Schroeder - Cross by Mr. McMahon

1  USERRA requires in that regard?

2  A   Yes.

3  Q   All right.  I would like to take -- or turn your attention

4  if I can, to Plaintiff's Exhibit 32.  If you could get that up

5  in front of you.  All right.

6  A   Two pages?

7  Q   I believe so.  I want to direct your attention to just that

8  front page right now if we can.  Do you see that?

9  A   Yes.

10 Q   And you were cc'd on this email, correct?

11 A   Yes, I was.

12 Q   And this is an email from Mr. Temko to Bruce Olin as well,

13 right?

14 A   Correct.

15 Q   Now, with respect to this, Mr. Temko is saying, "For our

16 planning/scheduling purposes, it would be beneficial for us to

17 know her status," right?

18 A   Right.

19 Q   And at the time Ms. Arroyo was deployed?

20 A   Right.

21 Q   Was Ms. Arroyo reinstated to her position after her

22 deployment ended at this time?

23 A   Yes.

24 Q   She came back to work at Volvo?

25 A   Yes, she did.

Schroeder - Cross by Mr. McMahon

1   Q   See was never terminated during that time period?

2   A   No.

3   Q   She wasn't suspended during that time period?

4   A   No.

5   Q   She wasn't disciplined for being on deployment?

6   A   No.

7   Q   She was brought back to work?

8   A   Of course, yes.

9   Q   Real quick question for you on Plaintiff's Exhibit 38, if

10  you could put that in front of you.  Okay.

11          And we looked at this exhibit I would say quite a bit

12  this week in connection with Mr. Temko and yourself, right sir?

13  A   Yes.

14  Q   Remember that?  Okay.  And this was in connection with

15  Ms. Arroyo hitting some racks out on the floor when she was

16  operating a forklift, right?

17  A   That's correct.

18  Q   Now this happened -- these incident happened, if you look

19  at the back page of this, back in, it looks like, October of

20  2007, correct?

21  A   Right.

22  Q   What does it say down here in terms of where these concerns

23  actually came from.  If you look at the very bottom paragraph,

24  right --

25  A   It says we have numerous concerns from her peers about her

1    driving and complaints of her often hitting racks.

2    Q    So these are fellow material handlers out on the floor?

3    A    Her co-workers.

4    Q    Okay.  And that's how this issue was brought to your guys'

5    attention?

6    A    Correct.

7    Q    All right.  Now this is back in 2007.  And we heard

8    testimony that Ms. Arroyo was retrained and also received a

9    corrective action plan with that?

10   A    Right.

11   Q    Did that corrective action plan have any bearing on why

12   Ms. Arroyo was terminated in November 2011?

13   A    Absolutely not.

14   Q    So it was a completely different type of discipline?

15   A    Of course, yes.

16   Q    And it had no bearing on her getting a further step in

17   discipline separately under the attendance policy?

18   A    No relationship.

19   Q    Okay.  You testified a little bit before -- you testified a

20   little bit yesterday regarding a patriotic employer award that

21   you received from Colonel Gorski.  Can you remind the jury who

22   Colonel Gorski is and where he worked?

23   A    Colonel Gorski was in the ESGR, Employer Support of the

24   Guard and Reserve.  I guess he's like our region

25   representative.

1  Q   Mm-hmm.

2  A   I came to know him through Ms. Arroyo.

3  Q   Mm-hmm.

4  A   He came to assist us to help educate us about some things.

5  And we had some questions and the things that we were uncertain

6  of, and he was of great assistance to us.  He helped us clear

7  up a lot of concerns that we couldn't resolve ourselves or

8  answer.

9  Q   Okay.  So just to be clear, the ESGR you mentioned Colonel

10  Gorski was a regional representative from there.  Does the ESGR

11  help employers and employees discuss employee military

12  rights --

13  A   Yes.

14  Q   And employer obligations?

15  A   Yes.

16  Q   So you not only met Colonel Gorski in connection with this

17  award you received, but you also worked with him in connection

18  with Ms. Arroyo, right?

19  A   Yes.

20  Q   Okay.  All right.  Do you know offhand, was Mr. Temko and

21  Patrick Dunn separately nominated for an award through

22  Ms. Arroyo?

23  A   Yes, they were, prior to the one that was given to me.

24  Q   You mentioned in your testimony that there were some other

25  individuals in attendance when you were nominated by Ms. Arroyo

1    for the patriotic employer award.

2    A    Yes.

3    Q    Could we put a picture of that up, please?

4              THE COURT:  And what's the exhibit number on this?  Is

5    this 28 or 6?

6              MR. DeROSE:  The exhibit number here is 8,

7    Defendant's 8.

8              THE COURT:  Yeah, this was used yesterday.

9              MR. McMAHON:  The front page was used yesterday, yes.

10   BY MR. McMAHON:

11   Q    And then if you could flip to the last one.

12             Okay.  Do you see that picture, Mr. Schroeder?

13   A    Yes, I do.

14   Q    Could you identify the individuals in this picture?  I know

15   a few of them have already been identified.  But just identify

16   them for the jury, please.

17   A    All right.  Going right to left it's Luzmaria Arroyo,

18   Colonel Gorski, myself.

19   Q    Yes.

20   A    To the left of the Mack bulldog is Marty Schwartz, who's a

21   veteran. Mike Temko, we all know him, and Jim Ran who is also a

22   veteran.  We invited them up to this event.  It was quite nice.

23   Q    Okay.  Nice.  And on this, I take it, going back to my

24   question from before and I kind of mixed this out of order.

25   It's my fault.

1    After Ms. Arroyo's first deployment -- and I think you

2  testified that this happened in the fall of 2010?

3  A   Right.

4  Q   After Ms. Arroyo's first deployment, did she also nominate

5  Mike Temko and Patrick Dunn similarly for an award?

6  A   Yes, she did.

7  Q   Could we put the certificates up there?  I believe that's 9

8  and 7.

9        Okay.  This is Defendant's Exhibit 7.  And

10  Mr. Schroeder, do you recognize this as a certificate that

11  Michael Temko and Patrick Dunn at the time of Mack Trucks, Inc.

12  received?

13  A   Yes.  Their name is on there.

14  Q   Okay.  And they received this as being a patriotic

15  employer, right?

16  A   Yes.

17  Q   For supporting Ms. Arroyo?

18  A   Yes.

19  Q   Could I show you the next page, please?  Is this the award

20  that you received from Colonel Gorski in the fall of 2010?

21  A   Yes, it is.

22  Q   Were you proud to receive these?

23  A   Of course.  It was awesome.

24  Q   Why is that?

25  A   I mean, as a company, I mean, you know -- and I represent

1  the company, it's not just me, but it's everybody in my

2  facility.  The ESGR came to us to essentially thank us for our

3  support for Ms. Arroyo.  It was awesome.

4  Q   Now, I want to show you Plaintiff's Exhibit 50.  Can you

5  get that in front of you?

6  A   I may have got some of these mixed up yesterday.  Is this

7  two pages?

8  Q   I believe it is.  It should be Bates No. -- if you look at

9  the very bottom corner.  Can you look at Exhibit 50.  It should

10 be 1813 and 1814.

11      Do you see that?

12 A   Yes.

13 Q   Now, if you go back to the front page.  We looked at this

14 email with Mr. Temko as well, right?  Do you remember when we

15 did that, Mr. Schroeder?

16 A   Yes.

17 Q   And Mr. Temko testified about this?

18 A   Yes.

19 Q   Now, yesterday, Mr. DeRose asked you some pretty misleading

20 questions about this.

21      MR. DeROSE:  Objection, your Honor.

22      THE COURT:  Sustained.  Save the characterizations for

23 your closing arguments.

24      MR. McMAHON:  I understand, your Honor.

25

Schroeder - Cross by Mr. McMahon

1  BY MR. McMAHON:

2  Q   Breaking it down, were you in the courtroom when Mr. Temko

3  explained that all of these days were excused as military

4  leave?

5  A   Yes, I was.

6  Q   And he stuck through that, right?

7  A   Yes.

8  Q   In fact, in this particular situation, if you refer to your

9  top email.

10        Do you see that up there?

11 A   Yes.

12 Q   It's your email that you sent on November 19th?

13 A   Correct.

14 Q   Isn't it true that you actually received Mrs. Arroyo's

15 orders on the 19th?

16 A   Yes, I believe so.

17 Q   And those orders covered the period of November 12th

18 through November 26th?

19 A   Correct.  Issued on the 14th.

20 Q   And they were issued on the 14th.  And by issued on the

21 14th, meaning that's when the orders apparently were cut by the

22 U.S. Army?

23 A   I have to believe that.

24 Q   But just because they're cut doesn't mean you have

25 knowledge of them right way?

1  A    That's correct.

2  Q    All right.  I would like to show you what I am going to

3  hand you as Defendant's Exhibit 43.  And provided a copy to

4  Counsel yesterday.

5          Okay.  I'm going to approach here if I can, sir.

6          THE COURT:  Sure.

7          MR. McMAHON:  Thank you.  Here's a paper copy for your

8  reference.

9          THE COURT:  Now, are you moving this into evidence?

10         MR. McMAHON:  Yes, your Honor.

11         THE COURT:  Okay.  Very well.  So we will receive into

12  evidence Defendant's Exhibit 43.

13     (Defendant's Exhibit 43 is received in evidence.)

14         THE COURT:  Do you want to publish it?

15         MR. McMAHON:  Yes.

16         THE COURT:  It's in front of everybody.

17  BY MR. McMAHON:

18  Q    Mr. Schroeder, can you step us through this faxed cover

19  sheet here in connection with Exhibit 43.

20  A    Yes.  This is a fax to Mack Trucks from the 416th Illinois

21  TDC.  It was sent on 11-19-2008, and it was regarding Sergeant

22  Arroyo.

23  Q    And this is regarding the same orders that you were looking

24  at in Exhibit 50, right?

25  A    Correct.

Schroeder - Cross by Mr. McMahon

1  Q   And, in fact, the date of this fax is November 19th, 2008,
2  right?
3  A   Correct.
4  Q   And that's the same day of your email?
5  A   Yes.
6  Q   Can you please read the fax to the jury?  What does it
7  actually say?
8  A   It says, "To whom it may concern:  Sergeant Arroyo will be
9  on orders from November 12th through November 26th.  Orders
10 were not published until November 14th.  Please excuse the
11 tardiness of the notification and Sergeant Arroyo's absence
12 from work."  And it's signed by -- it looks like Becky Isler.
13 Q   Now, the question is, were these days actually excused?
14 A   Yes.
15 Q   Did you excuse the tardiness of the notification of these
16 orders?
17 A   I'm sorry.  I didn't hear that, sir.
18 Q   It says here, "Excuse the tardiness of the notification."
19 A   Yes, it does.
20 Q   Did you excuse that?
21 A   Yes.
22 Q   And if we wanted to take a look at Defendant's Exhibit 6,
23 just to connect the dot?
24 A   Exhibit number?
25 Q   Yeah.  Defense Exhibit No. 6.  That will be the binder,

1   Mr. Schroeder.  It's okay.  We're switching back and forth a

2   little bit here.

3          But if you take a look at 2008, and this is Exhibit 6

4   on the tab.

5   A   Would that be in front of the tab or behind it?

6   Q   Take a look.  It should be behind it.  It should be the

7   chart of the military records that you were shown yesterday.

8   A   Okay.

9   Q   Do you see that?

10  A   Yes, I do.

11  Q   Now, if you look at the entry for 2008, you see an entry

12  there for 11/12/2008 to 11/26/2008?

13  A   Yes, I do.

14  Q   And all of those days were granted as military leave days,

15  weren't they?

16  A   Correct.  It says 11 days.

17  Q   Thank you.

18         Now, if we can, I want to clarify a little bit about

19  the timeframe of Ms. Arroyo's second deployment.  Okay?

20         If you take a look at Exhibit 57 that you were

21  provided yesterday.

22  A   The other ones?

23  Q   That would be Plaintiff's Exhibit 57.  Yes.  Sorry about

24  that.

25         Okay.  And specifically now I'm talking about the

1    deployment that went from -- it started with 2009.

2            Do you see that?

3    A    Yes.  At the top it's dated April 6th or 8th of 2009.

4    Q    Right.

5            Now, Mr. DeRose yesterday showed you Exhibit 59

6    regarding an extension order, right?

7    A    Yes.

8    Q    Can you take a look at that please, and let's put that up

9    on the screen.

10   A    Is that behind this or --

11   Q    It's a separate exhibit.  It's 59.

12   A    59?

13   Q    Yes.  59.

14   A    I don't have that.  I don't seem to have that.  The numbers

15   are going higher.

16   Q    Can you see it on the screen at all?

17   A    Can you make it bigger?

18           THE COURT:  Might the stipulation help here on the

19   dates?

20           MR. McMAHON:  There's a particular point, though, that

21   we need clarification on.

22           THE COURT:  That's fine.  I am just trying to --

23           MR. McMAHON:  I'm not beating a dead horse on the date

24   of the employment.  I'm trying to get something else here.

25

Schroeder - Cross by Mr. McMahon

1    BY MR. McMAHON:

2    Q    How is that, Mr. Schroeder?

3    A    It's better, of course.

4    Q    It's better.  Okay.

5              Okay.  First of all, can you scroll to the top of the

6    date of this?  Okay.  This was a memorandum that looks like it

7    had been issued on April 15th of 2010, right?

8    A    Correct.

9    Q    Do you know, is that approximately the time that Ms. Arroyo

10   actually returned to the United States from Iraq?

11   A    Yes, I believe that's true.

12   Q    Okay.  So it's your understanding in connection with the

13   second deployment that she was not in Iraq the entirety of the

14   time, right?

15   A    Right.

16   Q    So there was a period of time where she was in Iraq, she

17   came back to the United States?

18   A    Correct.

19   Q    Now, in or around April of 2010 we see this memorandum,

20   right?  It's the document you're looking at right now?

21   A    Yes.

22   Q    Exhibit 59.

23             Take a look at the first paragraph if I can direct

24   your attention there.  Where it starts with, "Your request."

25             Do you see that?

1   A    I see that.

2   Q    It says here, "Your request for extension on active duty

3   for the purpose of extending accrued leave, PBMRA, and out

4   processing for the soldiers listed below is proven.  The new

5   release date will be no later than September 2, 2010."

6        Do you see that?

7   A    Yes.

8   Q    So did it appear from this document that Ms. Arroyo was

9   taking some sort of accrued military leave after she came back

10  from Iraq, but before she came back to Volvo?

11  A    Correct.

12  Q    So when Mr. DeRose was questioning you yesterday about the

13  fact that we're giving Ms. Arroyo these attendance occurrences,

14  a month after she got back from Iraq, that's not accurate, is

15  it?

16  A    That's not accurate.

17  Q    In fact, Ms. Arroyo had been back in the United States for,

18  what, five months?

19  A    Correct.

20  Q    And ultimately, of course, we know that she came back to

21  work in September of 2010, right?

22  A    I believe so, yes.

23  Q    When Ms. Arroyo came back to work, she still knew what

24  shift she worked on, right?

25  A    Yes.

Schroeder - Cross by Mr. McMahon

1  Q   And I think you were questioned yesterday about the fact

2  that taking along the first full month she's back, October of

3  2010, most days during that month she punched in timely,

4  correct?

5  A   Correct.

6  Q   Could you put up Plaintiff's Exhibit 90, please?

7          And if we could take a look at the last page of this

8  document, please?

9  A   Page four?

10  Q   Yes.

11  A   And it's Bates No. 225 in the bottom corner there?

12  Q   225.

13  A   Yes.

14  Q   225 in the bottom right corner there.  Do you have that in

15  front of you now?

16  A   Yes.

17  Q   Okay.  Now you started to talk a little bit about this

18  yesterday, but I wanted to make sure the jury kind of

19  understands this.

20          You see there is an entry about the rollback period

21  and it hadn't changed.  Why did it change?  Can you explain

22  that please?

23  A   You mean the revision in 2009?

24  Q   Can you explain to the jury why it changed?  Not just what

25  it is, but why it changed?

Schroeder - Cross by Mr. McMahon

1    A    This is -- we wanted to just measure time worked and so --

2    but, of course, you do know that all employees are entitled to,

3    as an example I give, like, 39 vacation days a year, plus

4    holidays, seven holidays.

5    Q    Wait a minute.  You have got 39 vacation days a year?

6    A    Yes.  Most of our senior employees get that many.

7    Q    Okay.  Sorry to interrupt.

8    A    So it is anything other than vacations, ETO is earned time

9    off.  And it was changed sometime to be a combination of

10   vacation days were increased to give you, like, personal days,

11   and scheduled holidays.

12   Q    Okay.  So this only period here in terms of kind of the

13   elimination of the other periods that aren't counted as part of

14   the six-month look back --

15   A    Correct.

16   Q    -- you mentioned examples of FMLA leave, short-term

17   disability.

18   A    Yes.

19   Q    Military leave as well?

20   A    Yes.

21   Q    Is that because those are periods of time where the

22   employee is -- you know they're not there anyways?

23   A    Correct.  They're not there.  They're not at work.

24   Q    So accordingly, it is not representative to measure

25   attendance one way or another because you know they're not

1  going to be showing up.

2  A    That's correct.

3  Q    Now, Mr. DeRose questioned both you and Mr. Temko about

4  this change.  And do you remember he kept saying that it was

5  changed while Ms. Arroyo was deployed?

6  A    Yes.

7  Q    That's not accurate, is it?

8  A    No.

9  Q    When was it changed?

10  A    January of 2009.

11  Q    Was Ms. Arroyo present for that change?

12  A    Yes, she was.

13  Q    I would like to put up the sign-in sheet, if we can.

14  Again, I'm showing you -- Mr. Schroeder, if you can take a look

15  in the binder now, Defendant's Exhibit 12.

16  A    Yes, this is a document -- whoops, let me get this first.

17  Q    Do you have that in front of you?  The document in front of

18  you?

19  A    Yes.  Sorry.

20  Q    Can you explain what this document is?

21  A    I sure can.

22  Q    Thank you.

23  A    When we have communications for all employees at the

24  facility at Joliet, we always have what's called a

25  communication sign-up sheet.  And this is just a verification

1   that employees were there for the communication.  This one was

2   January 8th of 2009, and it was titled Employee Info Session.

3   And it lists everybody that was there.  And those that weren't

4   there there's follow-up meetings to make sure that was

5   communicated to them, too.

6   Q    Okay.  And was Ms. Arroyo in attendance at this meeting?

7   A    Yes, she was.  Her signature's on this document.

8   Q    All right.  And that's on Line 6 of that document on the

9   front page?

10  A    Right.

11  Q    Now, at these meetings, how do you kind of present the

12  material to the employees?  Does that make sense?

13  A    We have a very large conference room that's about half the

14  size of this room.

15  Q    Right.

16  A    And it's put up on a projector on the wall.

17  Q    Okay.  What's put on a projector on the wall?

18  A    All of the things that we're going to communicate to them.

19  The attendance policy would have been one of those.

20  Q    Okay.  Can we take a look at the exhibit.  And is this a

21  copy of the Power Point that would have been presented in

22  connection with the 2009 updates?

23  A    That's correct.

24  Q    And this, by the way, is in your binder, sir.  It's Exhibit

25  13, if you want to take a look at that.

Schroeder - Cross by Mr. McMahon

1    And specifically, if I can direct your attention to --

2    and it's several pages in -- I'm going to take a look.  Scroll

3    through it here.  Right there.  It would be Bates No. 2280.

4    And wait until you have that in front of you, okay?

5    A    Of course.  Okay.  I have that.

6    Q    And on the slide it's Bates labeled 2280.

7         Now, what's the title to that?

8    A    Updated HR Policies.

9    Q    And then what is the bullet there under Chicago Attendance

10   Policy Update?

11   A    Then "ETO/vacation weeks and scheduled holidays will not

12   count towards the rolling time period."

13   Q    And that's exactly the modification that was made to the

14   attendance policy we just looked at in Exhibit 90, correct?

15   A    Yes.

16   Q    Could we take a look, please, at Plaintiff's Exhibit 95.

17   A    Three pages?

18   Q    I believe that's right.  I'm just going to direct your

19   attention to the front page.  And specifically the email from

20   Bruce Olin to you, on November 8th, 2010.

21   A    Okay.

22   Q    Do you see that?

23   A    I see it in the middle, yes.

24   Q    Mr. Schroeder, were you present when plaintiff gave their

25   opening statement in this case?

1  A   Yes.

2  Q   You were in the courtroom, right?

3  A   Yes.

4  Q   Do you remember them blowing this exhibit up for the jury

5  during opening statement?

6  A   I believe so.

7  Q   Do you remember being questioned about this yesterday?

8  A   Yes.

9  Q   I want to talk to you about this.  You're talking about

10  here when Ms. Arroyo was tardy one minute in October of 2010,

11  right?

12  A   Correct.

13  Q   Was that tardy -- was she ever actually given an occurrence

14  for being tardy that minute?

15  A   No.

16  Q   So this email up here where Bruce Olin is giving you advice

17  not to give her an occurrence for that or a tardy for that?

18  You never gave her an occurrence for it?

19  A   I never did.

20  Q   And, in fact, if we can look at Defendant's Exhibit 15?

21  A   Where was that?

22  Q   Defendant's Exhibit 15 in the binder.  And just to make it

23  easier, you don't have to take the pages out of the binder if

24  you don't need to.

25  A   It's our attendance records.

1    Q    Yes.  If you could take a look at it.  I think it's Page 3

2    of that document?

3    A    Pardon.

4    Q    Page 3 of that document.

5    A    Yes.

6    Q    Do you see the entry there for 2010?

7    A    I see that.

8    Q    All right.  And do you see the entry there for October 29th

9    of 2010?

10   A    Yes.

11   Q    And you were questioned about this yesterday, I believe.

12   But what does it say there in the far right-hand column?

13   A    That she was late one minute.  And at the far right in the

14   comment section it says, "No occurrence, KS," which is me.

15   Q    So you're the one who made the decision to excuse that?

16   A    I made an exception to excuse that, yes.

17   Q    Why did you do that?

18   A    It was the right thing to do.

19   Q    Why was it the right thing to do.

20   A    I mean, it was a period -- I believe she had been away for

21   a while.

22   Q    Right.

23   A    And she requested this, and I didn't do it yet.  I didn't

24   yet, at that time, have a meeting with her to kind of refresh

25   on policies and things.  And we did that, I believe, shortly

1  thereafter.  But it was just the right thing to do.

2  Q    Okay.  And did she explain to you when you first were

3  talking with her about this one-minute late that she forgot

4  that grace periods had been eliminated?

5  A    I believe so, yes.

6  Q    But you decided to give her the benefit of the doubt anyway

7  and excuse this minute?

8  A    Correct.  Correct.

9  Q    I'd like to take a look at Plaintiff's Exhibit 107.  Wait

10  for a second, Mr. Schroeder.  If you can get that in front of

11  you.

12        Okay.  Is there a second page to this or just a front

13  page?  Just a front page, okay.

14        And Mr. Schroeder --

15  A    Is it two pages or one?  Maybe I have the same thing on two

16  copies of it.

17  Q    Okay.  If you can direct your attention to the page that is

18  Bates labeled 1743.

19        Do you see that?

20  A    Okay.  This is it.

21  Q    Okay.  Now both you and Ms. Jankowski had been asked

22  questions about the top email.

23        Do you see that?

24  A    Yes, I do.

25  Q    I want to talk about what's in the bottom email if we can.

1  A   Okay.

2  Q   Okay.  You send an email to Ms. Jankowski on December 2nd.

3      Do you see that?

4  A   Right.

5  Q   What are you talking about here when you're mentioning

6  change to Friday work agreement and weekend drills?  Can you

7  explain that to the jury, please?

8  A   I'm stating to her, "This communication is replying to the

9  request made by Luzmaria Arroyo.  Request to change our Friday

10  work agreement, which she scheduled for weekend drills."

11  Q   Mm-huh.

12  A   "Our current agreement that LuzMaria agreed to is 12:30 to

13  8:30.  She says she needs to end work at 7:00 p.m.on Friday.

14  After further review the company will alter the following work

15  schedule to support her local weekend drill schedule.

16  Depending on the weekend drill schedule start time, we will

17  allow 11 hours prior to the start time plus one hour travel

18  home.

19  Q   Okay.  So is it fair to say that throughout 2010, and even

20  a little bit of 2011, you were allowing Ms. Arroyo to modify

21  her work hours on Friday in order to get to these weekend

22  drills?

23  A   Yes.

24  Q   And, in fact, was that one of the issues that you worked

25  with Colonel Gorski on in resolving this for Ms. Arroyo?

1  A   Yes.

2  Q   And when Colonel Gorski had worked with you on those

3  issues, did he provide you some sort of documents that kind of

4  memorialized Volvo's understanding and Ms. Arroyo's

5  understanding of how that would be treated?

6  A   Yes, he did.

7  Q   Could you put that up, please?  It's Defendant's Exhibit 10

8  in the notebook.

9       First, I will just let you get that in front of you

10 here for a second.

11 A   I have that.

12 Q   Okay.  Can you identify the front page for me?

13 A   This email was from Colonel Gorski, Army, and it says he is

14 retired.

15 Q   Okay.

16 A   Final closing document.  I don't know why the unclassified

17 is there.  That must be some language he used.  It was dated

18 April 4th of 2011, and it was addressed to me as the final,

19 which incorporates the additional facts and position that he

20 provided to me earlier.  "Please review and provide concurrence

21 or recommendations.  I will provide a copy to Luz once I have

22 heard from you."

23 BY MR. McMAHON:

24 Q   Can we look at the second page of this, please?

25 A   Yes.

1  Q   All right.  So I take it here it looks like here there is a

2  list of four issues that were addressed.

3  A   That's correct.

4  Q   With Ms. Arroyo --

5  A   That's correct.

6  Q   -- after her last deployment, right?

7  A   Correct.

8  Q   Issue one says, "Time off prior to drill to provide an

9  adequate amount of arrest."

10 A   That's correct.

11 Q   And it looks like there is a discussion under issue one.

12 Do you see that?

13 A   Yes.

14 Q   Under conclusion, what was ultimately done to modify

15 Ms. Arroyo's Friday work hours?  Can you kind of explain that

16 to the jury?

17 A   If you look on there it says that, "Employee should be

18 afforded enough time off from the employer prior to start of

19 military duty in order to travel to the duty station and arrive

20 fit to perform military service."

21 Q   Right.

22 A   And then there's some guidance there, "Will adjust"-- I

23 don't know what "SM" means.

24 Q   Presumably that's referring to Ms. Arroyo?

25 A   Yes.

1    "For Friday shift, prior to working scheduled battle

2  assemblies that commence at 5:00 a.m. be from 4:30 p.m.to 7:00

3  p.m.  She will be charged with 2.5 hours of work and 5.5 hours

4  of excused military leave."

5  Q   All right.  So in other words, her normal shift, it ran

6  from 4:30 to 12:30?

7  A   Right.

8  Q   But those weekends when she drilled afterwards, she was

9  going to work for two and a half hours.  And the remainder of

10  that would be excused military duty?

11  A   Yes.

12  Q   And that's part of agreement you reached with Colonel

13  Gorski specifically?

14  A   Of course.

15  Q   If I could, could you take a look at Plaintiff's Exhibit

16  123?

17  A   Single page?

18  Q   I believe so.  Give me just one second here.

19    And we looked at this email exchange yesterday, right?

20  A   Yes, we did.

21  Q   And you were questioned about Ms. Arroyo's email to you o

22  Christmas Eve?

23  A   Right.

24  Q   And then your forward of that email to Bruce Olin?

25  A   Correct.

Schroeder - Cross by Mr. McMahon

1  Q   Were you trying to come up with a reason to terminate Ms.

2  Arroyo prior to this communication?

3  A   Well, of course not.  I always tried to get clarification

4  and support for some way of circumstances for how we could

5  cover this time so that she could be compensated for it.

6  Q   Okay.  And I think you mentioned yesterday there were

7  numerous policies kind of irrespective of this, right?

8  A   There is, yes.

9  Q   Can you explain that to the jury?

10 A   I mean, Volvo has a salary continuation policy.  I can give

11 an example.  I was out a couple years ago.  I got full pay.  I

12 got four to six weeks.  So Volvo has a salary continuation

13 policy.  Of course, it can be a short-term disability or a

14 long-term disability.  There's a number of things that can

15 happen here.

16 Q   Right.

17 A   Of course, in addition to your PT and earned time off days.

18 Q   Okay.

19 A   I mean, I wanted to know which would comply.  It was a

20 little bit complex.

21 Q   Right.

22 A   I mean, I just wanted to make sure that I had the right

23 information and the right things in front of me.  You know, I

24 didn't know if there was anything on the part of our military

25 policy, or anything with the federal regulation.

1    Q    Right.

2    A    I was looking for clarification and information so that we

3    could make a good decision.

4    Q    Okay.  So let's take a look at Exhibit 15 in terms of what

5    actually happened with those days.  Okay?

6    A    It's in the binder?

7    Q    Yes.  It's Defendant's Exhibit 15.

8    A    Okay.

9    Q    All right.  And specifically, if I could direct your

10   attention to, I believe it's again the third page, for 2010

11   entries.

12          Do you see that?

13   A    2783?

14   Q    2783, yes.

15   A    I have that.

16          Take a look at the entry there December 23rd.

17          Do you see that?

18   A    I see that, yes.

19   Q    What is A & S?

20   A    At that time it wasn't called short-term disability.  It

21   was called accident and sickness.

22   Q    Okay.

23   A    The terminology changed at some point.

24   Q    So Ms. Arroyo was given accident and sickness leave there?

25   A    Yes.

Schroeder - Cross by Mr. McMahon

1    Q    Starting on the 23rd?

2    A    Yes.

3    Q    Which is the day before she sent you this email on

4    Christmas Eve?

5    A    Right.

6    Q    How long did that end up going for?

7    A    Well, in 2010, that went through the end of the year.

8    Q    Yes, sir.  And let's take a look at 2011, if you can.

9    That's on the first page, I believe, of the document?

10   A    In 2011?

11   Q    Yes.

12   A    That continued from January 10th through March 22nd.

13   Q    Okay.  And Ms. Arroyo was on leave that entire period,

14   right?

15   A    Yes.

16   Q    And at the end of the period, what happened?

17   A    Well, on April 1st she was on military leave.

18   Q    Okay.  Did she come back to work after this?

19   A    Yes, she did.  She returned to work.

20   Q    Okay.  If I could take a look at -- if you could take a

21   look at, sir, Plaintiff's Exhibit 142.

22            Do you have that in front of you?

23   A    Two pages?

24   Q    I believe so, yes.

25            Okay.  Now, Mr. DeRose quizzed you a little bit

1    yesterday about independent medical examinations.

2         Do you remember that?

3    A    I do.

4    Q    Okay.  I take it you've ordered independent medical

5    examinations for your employees in the past, right?

6    A    I have in the past; not often.

7    Q    Do you know if the Americans with Disabilities Act allows

8    you to ask for or even order a medical examination for one of

9    your employees, if you have a business reason to do so?

10   A    I would have to believe that answer is yes.

11   Q    And in this particular case, what were the concerns

12   regarding Ms. Arroyo about what why she was asked to present

13   for an IME?

14   A    The reason that it came to our attention was when you work

15   in a warehouse, I mean, as a general rule, throughout your day

16   of work, you're just going about your business.  However, if

17   there's any time during the day where something unusual

18   happens, other than what normally happens in the course of

19   business, there's what we call an indirect report that we fill

20   out for those.  And on that day, Ms. Arroyo had put on there

21   something -- I won't use the exact words -- but she put on

22   something to the effect of "zoned out," which, of course, was a

23   red flag to us.  We need to find out what this is.  So we had

24   to have a follow-up meeting with her to determine what "zoned

25   out" meant.

Schroeder - Cross by Mr. McMahon

1  Q    And I take it, then, you had her present to Dr. Koehler for

2  an examination?

3  A    Yes.

4  Q    Now was the purpose for the medical visit to Dr. Koehler to

5  confirm that she had PTSD?

6  A    No.

7  Q    You guys already knew that at that time, right.

8  A    Yes.  Yep.

9  Q    And you weren't second guessing the medical evaluation, the

10  diagnoses of her doctor, were you?

11  A    No.

12  Q    So the purpose of this exam was just to see if she could

13  still perform her job, right?

14  A    That's correct.  It would be a major safety concern if a

15  person tells you they're zoned out for her safety while

16  operating material handling equipment, and of her co-workers.

17  Q    And, along those lines, do you see on the front page of

18  this document?

19        MR. DeROSE:  Judge, I thought we weren't going to go

20  into this whole document.  We were just to look at the

21  diagnosis.  I am a little concerned about some of the other

22  things mentioned in the document that I was told that I was not

23  to go into for my purposes.

24        THE COURT:  Well, my hope is that we're not going to

25  talk about diagnoses or anything of PTSD.  I don't know what

1    the next question is going to be.

2          MR. DeROSE:  Well, it's been published before the jury

3    and it continues up there.

4          THE COURT:  Well, we can take it down from the screen.

5    It was published yesterday for probably about the same amount

6    of time.  And that's what caught my attention was this document

7    was in front of the jury, I believe --

8          MR. DeROSE:  And then it was --

9          THE COURT:  Well, at the time, just so I can make this

10   clear for you all again.  I think right at this very moment

11   yesterday when the document was up, that's when I gave you the

12   explanation of I think we all ought to be grateful that you're

13   not getting a day's worth of testimony on PTSD and the inside

14   and outside of it.  And maybe it would be something good for us

15   to learn, but not during the course of this trial, because the

16   parties have stipulated that Ms. Arroyo has been diagnosed with

17   PTSD, and then they gave you maybe five more sentences about

18   what that means for this trial.

19         So I'm going to urge you not to pay any attention to

20   the PTSD parts of this document because all you need to know

21   about PTSD is contained in that stipulation.

22         Good enough?  Is that satisfactory for both counsel?

23         MR. DeROSE:  And with that, Judge, maybe we should

24   take it down because so many things in there I wouldn't want to

25   add there.

1    THE COURT:  Agreed.  And the questions we'll

2  understand are in reference to this circumstance of the IME.

3  Right?

4    MR. McMAHON:  Well, they're in reference to the IME,

5  but they're also in reference to --

6    MR. DeROSE:  Could we take the statement down?

7  Q   -- in terms of what actually happened in regards to how we

8  treated Ms. Arroyo afterward, and Mr. DeRose did question about

9  that.

10    THE COURT:  And that's fine.  But we don't need the

11  document on the screen.  It is gone.

12    MR. DeROSE:  It is not gone from you.  I see I have

13  got it, but you don't.

14    THE COURT:  It's gone from the jury.  As far as I can

15  tell what's in front of the jury is Exhibit 123, which is the

16  previous one.  So you can continue anything you want to ask.

17    MR. McMAHON:  Correct.  I'll move along.  I will move

18  along.

19    THE COURT:  Okay.  Perfect.

20    MR. McMAHON:  Thank you.

21    THE CLERK:  I have one question.  I have auto-publish

22  off, but the jury gallery is still on in front of the jury.  Do

23  you want to leave that off.

24    THE COURT:  You're good.

25    THE CLERK:  Thank you.

BY MR. McMAHON:

Q   Mr. Schroeder, you testified a little bit yesterday that
after this IME you began treating Ms. Arroyo a little
differently for awhile.  What happened as a result of this IME,
where she was treated differently?

A   She, based on the physician's recommendation, she was
placed on what we called restricted duty.  She could not drive
material handling equipment.

Q   Okay.

A   We did have work available.  She was working in the packing
area, which doesn't require the use of material handling
equipment, packing orders at a work station.

Q   Okay.  And did there come a time where those restricted
duties were lifted?

A   Yes.  She went back -- she returned to working regular
work.

Q   Do you know approximately when that was?

A   I don't recall what the date of this is.  It was probably a
short period.  I don't know how long.

Q   Now, I want -- we had a whole lot of talk yesterday about
parking in the back of the building.  Okay?  And I want to kind
of clarify some of the timeline to this discussion, if we can.

        Do you remember speaking with Ms. Arroyo about her
parking in the back of the building to access the meditation
room?

Schroeder - Cross by Mr. McMahon

1    A    Yes.

2    Q    All right.  And first of all, to kind of back up.  Before

3    we even dive into that.  We have heard of this meditation room

4    as kind of being discussed and thrown out there.

5          What was the meditation room?  Was this a room that

6    everyone accessed to meditate?

7    A    No.  This was an accommodation to Ms. Arroyo, at her

8    request, that she have a private place where she could spend

9    approximately 15 minutes a day, just to get herself prepared

10   for the work day.

11   Q    Okay.  So this was something Volvo gave her?

12   A    Yes, it was.  And the only suitable place for that where we

13   had a place with a closed door, a hard office, so to speak.

14   Q    Okay.

15   A    Because that's what was required, that would be available

16   for sure every day, was in the back of the building, inside of

17   the operations office.  There was a supervisor's office with a

18   closed door.

19   Q    Okay.  Now, I think yesterday Mr. DeRose started to show

20   you a memo that you had given to her.  But I don't think it

21   ever got published to the jury?

22   A    Correct.

23   Q    So I would like to publish that now, since that's in

24   evidence already, and ask you some questions about it.  If I

25   can remember first, this is November 1st, 2010.

Schroeder - Cross by Mr. McMahon

1    MS. WILSON:  What's the number?

2  BY MR. McMAHON:

3  Q    It's in the notebook.

4  A    Number?

5  Q    Exhibit 27.

6  A    I have it.

7  Q    Okay.  All right.  Can you kind of walk through with the

8  jury the purpose of this memo and what you're outlining here

9  for Ms. Arroyo?

10  A    I met with Ms. Arroyo on November 1st, with her supervisor

11  Patrick Dunn.  And this is just regarding meeting notes.  We

12  discussed a couple of topics.  First, was the start time for

13  shift start.  When the bell rings, and that would be at 4:30

14  p.m., you should be prepared to begin work.  A) walking to your

15  work station or to obtain a lift truck."  We call it a vehicle,

16  but it's a lift truck.  "Or attend the shift meeting and

17  wearing your PPE, personal protection equipment, safety

18  equipment, and tools, before the shift starts at 4:30.  Those

19  are the things that every employee needs to be doing.

20    "Arrival time following counseling sessions, agreed to

21  arrive at work following appointments at 6:30 p.m."

22  Q    And were those on those Tuesdays that we talked about

23  yesterday?

24  A    That's correct.  Her weekly counseling sessions, every

25  Tuesday.

Schroeder - Cross by Mr. McMahon

1  Q   All right.

2  A   Later arrival time requires a call-in or a

3  doctor's/counselor's document.

4  Q   Before we move on, and I know this is a side note, I think

5  we had testimony yesterday that there were times when she did

6  arrive to work after 6:30 on those Tuesdays, right?

7  A   That is correct.

8  Q   Was she ever given any attendance occurrences for those

9  days when she arrived late to work after 6:30?

10 A   Never.  All excused.

11 Q   And you go on to talk about it here, you refer to it as the

12 mediation room.  Is that a typo?

13 A   Yes.

14 Q   It's actually the meditation room.

15 A   Yes.

16 Q   What do you outline there?

17 A   This is just a note and reminder that the meditation room,

18 the available room is the supervisor's office, that's in the

19 warehouse in the operations office.  If not in that office --

20 if it's not available, because there are supervisors and other

21 people in there right adjacent to it, there's a first aid room

22 with a closed door.  She's welcome to use that.  There's a

23 place to sit in there.  That could also be an alternative in

24 the event that room is not available.

25 Q   All right.

Schroeder - Cross by Mr. McMahon

1  A    "Use of the room for meditation does not negate your need

2  to be prepared to start work when the bell rings."

3  Q    What did you mean by that?

4  A    I mean, we granted her -- the original agreement I believe

5  was she could have a quiet place to herself for 15 minutes

6  prior to the start of her shift.

7  Q    Yes.

8  A    However, her shift starts at 4:30 p.m.

9  Q    Yes.

10  A    And like every other employee on that shift, ready when the

11  shift starts.  You're getting paid, I mean, ready to go to

12  work.

13  Q    When that bell rings.

14  A    And move to your work station, your work assignment.

15  Q    When that bell rings you're paying your employees.

16  A    Yes, I am.

17  Q    Now, if you can take a look a little bit at the second page

18  of this document.  If I could draw your attention to that.

19  A    Yes.

20  Q    Up in C there, "Access to the room."

21  A    Yes.  We also noted, "Access to the operations office," the

22  meditation room that was assigned to her, "must be through the

23  warehouse and parking in the employee parking lot in the front

24  of the building.  Parking in the rear of the building is not

25  available because of safety concerns."

Schroeder - Cross by Mr. McMahon

1  Q   So just to kind of be clear, we heard some testimony about

2  this yesterday.  Around this time period, Ms. Arroyo was

3  parking in the back of the building to access the meditation

4  room that had been provided to her?

5  A   Right.

6  Q   When the bell rang -- when she was doing this, when the

7  bell rang, what was she doing?

8  A   She left the building to get into her car.

9  Q   And then what did she do?

10 A   To drive around the building.

11 Q   So she got into the car after the bell rang to drive back

12 around the building?

13 A   Drive back around the building.  She had to drive around

14 the side of the building up to the front parking lot, get out

15 of her car and then come in the everyday employee entrance to

16 go to her locker room and, you know, then go to her work

17 assignment area.

18 Q   And I think we looked at an email, I believe it was

19 yesterday, from Sherrie Jankowski, that Ms. Arroyo had kind of

20 done this routine, right?

21 A   Right.

22 Q   Where she nearly hit another employee while she was doing

23 it?

24 A   Right.  She made me aware of that.

25 Q   And that was back in October.

1  A   Right.

2  Q   And she was late to work that day, right, by doing this?

3  A   Right.

4  Q   She was not starting her shift on time?

5  A   No, she was not.

6  Q   On October 27th we saw that email from Ms. Jankowski.

7  A   Correct.

8  Q   Was she given an attendance occurrence for that?

9  A   No.

10 Q   This day when you met with her on this memo, November 1st,

11 had you witnessed her doing this same thing again?

12 A   After this meeting?

13 Q   No.  No, no. I'm talking about before this meeting, leading

14 up to this meeting, had she done the same thing again, in other

15 words on other days?

16 A   Yes.

17 Q   Did she receive attendance occurrences for that?

18 A   No.

19 Q   After this meeting with her on November 1st, did she listen

20 to the instructions that you had laid out for her in this memo?

21 A   No.

22 Q   What did she do?

23 A   The very next day she did the same thing.

24 Q   And on that particular day, November 2nd, did she -- did

25 she receive an occurrence on that day?

1    A    Yes.

2    Q    And if we can, I would like to take a look at Defendant's

3    Exhibit 15th.  And that's in the binder again, sir.  And it is

4    on the front page of this document?

5    A    Correct.

6    Q    Do you see the entry down there?

7    A    Yes.

8    Q    November 2nd.

9    A    Yes, it says tardy three minutes start rule violation and

10   she received it.

11   Q    And explain to the jury what a start rule violation means.

12   A    I meant that was -- it was clearly noted in the attendance

13   policy for all employees, at the start of your shift and the

14   bell rings, you must be ready to start work.  You must be in

15   the building, be prepared, have your whatever is required for

16   PPE, and ready to be en route to your work station, your work

17   assignment.

18   Q    You're saying PPE, I mean, are we talking, like, heavy-duty

19   equipment and, you know, hazmat suits and stuff we're putting

20   on.  What are we talking about?

21   A    No.  It's personal protective equipment.  The rule at that

22   time in the warehouse was that everybody, including myself, had

23   to have safety shoes to enter the warehouse.

24   Q    We're talking about a pair of shoes?

25   A    A pair of shoes.

Schroeder - Cross by Mr. McMahon

1  Q   Okay.  Anything else?

2  A   No.

3  Q   So PPE is a fancy term for shoes; is that right?

4  A   It's personal -- safety personal protective equipment.

5  Q   Now, note here that -- and we have covered, if you

6  remember, actually it was Mr. DeRose was asking -- or actually

7  it was Ms. DeRose, excuse me - was questioning Maureen

8  Somersett about this.

9       Do you remember that?

10 A   Yes.  Right.

11 Q   And we looked at Ms. Arroyo's time entries?

12 A   Yes.

13 Q   And on this day, November 2nd, she did punch-in timely,

14 right?

15 A   Yes.

16 Q   So why on the attendance record here is it indicated that

17 she is still considered tardy, according to Volvo?

18 A   Because she left the building.  When the bell rang at the

19 start of her shift she left the building and did not come back

20 into the building for three minutes.

21 Q   I see.  And under the attendance policy, you consider that

22 to be just as egregious as not punching in timely?

23 A   Correct.

24 Q   Okay.

25       THE COURT:  Mr. McMahon, sometime in the next five

1    minutes we are going to take a mid-morning break.  So whenever

2    is convenient to you.

3            MR. McMAHON:  Sure.  Sure.

4    BY MR. McMAHON:

5    Q    Mr. Schroeder, was November 1st the first time that

6    Ms. Arroyo received an attendance occurrence for leaving the

7    meditation room at the start bell?

8    A    Yes.

9    Q    And being outside the building?

10   A    Yes.

11   Q    Not before then, right?

12   A    Correct.

13   Q    Now, I think you started testifying about this, but did

14   there come a point where you posted a notice to other employees

15   to remind them not to park in the back of the building?

16   A    Yes, I did.

17   Q    I would like to show you Defendant's Exhibit 30.

18   A    30?

19   Q    Yes.  And that's in the binder?

20   A    I have that.

21   Q    All right.  Now, what are we looking at here in Exhibit 30?

22   Can you describe this, please.

23   A    Now, this is a communication to all employees from myself.

24   It was November 2nd, 2001 [sic] in regard to employee parking.

25   This communication is a reminder that all employee-designated

1    parking is in the north parking lot.  Due to the volume of

2    truck and trailer traffic at the south end dock areas of our

3    facility, which pose safety risk, no one is allowed to park in

4    this area.

5    Q    Okay.  And this was posted on November 2, 2011?

6    A    November 2nd.

7    Q    And to clarify, Ms.  Arroyo was not disciplined for any of

8    these start rule violations until November 2nd?

9    A    That's correct.

10         MR. McMAHON:  Your Honor, I think this is a good

11   stopping point for the mid-morning break.  I do have a little

12   bit of questioning left.

13         THE COURT:  Okay.  That's fine.  I think an hour and a

14   half is kind of the end of the rope for poor Kris here.  So we

15   will take a 15-minute, folks, and then it sounds like we're

16   going to get through Mr. Schroeder, and then we will be on to

17   the next witness after having Mr. DeRose having another shot at

18   Mr. Schroeder after that.  But we'll take a 15-minute break and

19   we'll see you then.  We'll break for lunch again at

20   12:45 today.

21         THE CLERK:  All right.

22    (Jury out.)

23    (Recess taken.)

24    THE CLERK:  All rise.

25    (Jury in.)

Schroeder - Cross by Mr. McMahon

1    THE CLERK:  Okay, folks.  Good morning again.  Please

2  be seated.

3    Mr. McMahon, wherever you left off you can pick up

4  again.

5    MR. McMAHON:  Thank you, Your Honor.

6  BY MR. McMAHON:

7  Q    Mr. Schroeder, if I could direct your attention up there,

8  please, to the exhibit that was shown to you yesterday.  It was

9  Plaintiff's Exhibit 227.  It's a photograph.

10  A    Yes, sir.

11  Q    Do you have that in front you?

12  A    Yes.

13  Q    Do you remember testifying about this yesterday?

14  A    Yes, I do.

15  Q    And you said that one of those vehicles was David Miller's

16  car?

17  A    Yes.

18  Q    Do you know when this photo was taken?

19  A    No, I have no idea.

20  Q    Is there any indication of a date on the photo?

21  A    I mean, I see some numbers up here, but not a date that I

22  can see.

23  Q    You see like a Bates number, right, for where it was

24  produced in the case?

25  A    It says 227, and then there's a 275 underneath there with a

1  bunch of zeroes.

2  Q   Right.  And there's no indication of a date on the photo,

3  right?

4  A   No, there isn't, sir.

5  Q   Do you even know when you first saw this?

6  A   As far as I can recall, here.

7  Q   In connection with this case?

8  A   Yes.

9  Q   So you don't think you saw it in real time back in --

10  A   Whenever, I don't know.  I don't recall seeing this.

11  Q   -- back in 2011.

12       Okay.  If I could direct your attention, please, to

13  Plaintiff's Exhibit 234.  Get that in front of you for just a

14  second?

15       THE COURT:  Has that been previously admitted?

16       MR. McMAHON:  Yesterday, your Honor.  Yes.

17       THE COURT:  Okay.  Thank you.

18  BY MR. McMAHON:

19  Q   Mr. Schroeder, do you remember Mr. DeRose questioning you

20  about this yesterday?

21  A   Yes, I believe so, yes.

22  Q   Do you remember him questioning you about the possibility

23  of you having never signed it?

24  A   Correct.  Yes.

25  Q   Is it in, in fact, true that you signed this?

1   A    I did sign this document.

2   Q    Okay.  And can I show you, please, Defendant's Exhibit 31.

3   That's in the notebooks you have there.

4   A    The same document.

5   Q    And that's your signature there, right?

6   A    Yes, it is.

7   Q    And you have an indication for Ms. Arroyo down below.  What

8   does it say there?

9   A    "Refused to sign."

10  Q    Now, this particular corrective action plan, it was a

11  verbal warning, correct?

12  A    That's correct.  Step one, verbal warning.

13  Q    Okay.  And you say there, "Your action violated the shift

14  start time," and I think you wrote mediation again -- but

15  meditation, right, it's supposed to be?

16  A    Oh, yeah.  I am so sorry.

17  Q    "Your action violated the shift start time and meditation

18  room guidelines communicated to you on November 1st, 2011."

19  A    That's correct.

20  Q    Was the only violation of that the fact that Ms. Arroyo was

21  parking in the back of the building?

22  A    Of course not.

23  Q    What was the issue?

24  A    She -- at the start of her shift she's supposed to be

25  walking to her job assignment.  However, she left the building.

1    She was outside the building, not ready to work.

2    Q    Okay.  So to clarify, let's say if Ms. Arroyo was parked in

3    the front employee lot, where all of the other employees park,

4    right?

5    A    Okay.

6    Q    But she's still outside the building when the shift bell

7    rings, is that a start violation?

8    A    Yes.

9    Q    So she would be disciplined the same way, regardless of

10   where she is parked?

11   A    Correct.

12   Q    Now, this particular one you give a verbal warning, but you

13   go on to sat something else, right?

14   A    "Additionally, you will be charged with .50 occurrence for

15   violation of the start rule policy, subject to our guidelines

16   in our attendance policy."

17   Q    Okay.  So not only have you given a verbal warning to her

18   in connection with the guidelines you provided.  But also under

19   the attendance policy it essentially counts as a tardy, right?

20   A    Correct.

21   Q    And I think we saw that on the attendance document that we

22   looked at just before break, right?

23   A    Yes.

24   Q    She had half of an occurrence.

25            Now, I think you testified before that she did the

1   same thing again on November 4th, 2011.  Can we take a look at

2   Defendant's Exhibit 32?  And this is the same sort of

3   situation, right?

4   A   Yes, it is.

5   Q   She is doing the same kind of routine, if you will, on

6   November 4th?

7   A   That's correct.  Except it's a formal written.

8   Q   Next step, right?

9   A   Yes.

10  Q   And from an attendance standpoint, she also got half an

11  occurrence for that day.

12  A   Yes, she did.

13  Q   All right.  Now, from the attendance record, do you know

14  whether this occurrence would be an occurrence that brought her

15  to termination after you audited the records?

16  A   I believe that's true.

17  Q   To clarify, if Ms. Arroyo's only attendance violations had

18  been these two instances, on November 2nd and November 4th,

19  would she have been terminated?

20  A   No.

21  Q   So why was she terminated?

22  A   Cumulative attendance -- everyone will occasionally be

23  tardy.  Everyone, a child will be sick and they will be absent.

24  They may even, on occasion, have two in a month, and they may

25  get a step one.

1  Q   Right.

2  A   That's where the employee counseling comes in.  The problem

3  is where there's cumulative occurrences over a one-month period

4  or a six-month period that exceed the policy.  Then action will

5  be -- the employee counseling corrective action plan will be

6  taken.

7  Q   And if you have four of those steps, right, you can get to

8  termination under the attendance policy?

9  A   It is possible, yes.

10  Q   Okay.  And that -- after auditing the records that's where

11  you determined Ms. Arroyo had gotten to, right?

12  A   Correct.

13  Q   Did you provide her a separate, I guess, CAP or document,

14  if you will, detailing the fact that she would be terminated?

15  A   Yes, I believe so.

16  Q   Can I show you what has been entered into evidence as

17  Defendant's Exhibit 35?

18  A   Okay.

19  Q   And is this the corrective action plan that you presented

20  Ms. Arroyo in connection with the termination?

21  A   For November 8th, correct.

22  Q   November 8th, yes.

23  A   Yes, it is.

24  Q   Okay.  And was that the date -- I think you testified

25  earlier, was that the date of Ms. Arroyo's termination from

Schroeder - Cross by Mr. McMahon

1  Volvo?

2  A    Yes, it is.

3          MS. DeROSE:  Could I direct your attention to

4  Defendant's Exhibit 6.  Now, we've seen this document a couple

5  of times throughout the trial.

6  A    One second please.

7  Q    Yes, sir.

8  A    What was that number?

9  Q    Defendant's Exhibit six?

10  A    Six?

11  Q    Six, yes.  And it's in the notebook.

12  A    Oh, it's in the book?

13  Q    Yes, sir.  Defendant's Exhibit 6.

14  A    I am looking at the wrong book.

15  Q    That's okay.

16          Yes.  I want to direct your attention to a question

17  Mr. DeRose was asking you yesterday.  There's a notation on the

18  policy where it says, "Volvo military policy - maximum military

19  policy five years.

20  A    I see that at the bottom.

21  Q    I believe Mr. DeRose was asking questions under USERRA

22  about whether there is a five-year limit.  Do you know if

23  there's exceptions to the five-year limit?

24  A    I believe there is, yes.

25  Q    Was this document designed to count up days so Volvo could

1    know the very day that Ms. Arroyo reached five years so we

2    could terminate her?

3    A    No, it wasn't.

4    Q    Why was it created?

5    A    It was just created to document -- it was created to

6    document her military -- when she was aware from the facility.

7    When people are not at the facility --

8    Q    Yes.

9    A    -- it's important to know they're away from the facility

10   for any length of time, whether it be short or long.  It is

11   simple as that.

12   Q    And in looking at this chart, and you talked a little about

13   Mr. Temko offered testimony about how he prepared this.  In

14   looking at this, setting aside Ms. Arroyo's first year of

15   employment, where she joined you guys midway through the year,

16   right?  In 2005.

17   A    I am sorry.  I didn't understand that question.

18   Q    Yes.  It was a bad question, asking you a question and

19   having you refer to the document at the same time.  It's my

20   fault.

21        Ms. Arroyo joined Volvo, was hired by Volvo, in

22   mid-June of 2005, right?

23   A    Correct.

24   Q    Setting that aside and looking at this chart, setting 2005

25   aside, is it fair to say that Ms. Arroyo had the least military

1    days in 2011?

2    A    Excluding 2005.

3    Q    Yes, sir.

4    A    Yes.

5    Q    So did Ms. Arroyo's military leave have anything to do with

6    why she was terminated in 2011?

7    A    No.

8    Q    Whose decision was it to terminate Ms. Arroyo's employment?

9    A    It was mine.

10   Q    You testified before about, you know, advising HR about the

11   decision.  You do that pretty routinely, right?

12   A    I would do that in all cases.

13   Q    But in terms of the decision in terms of whether or not to

14   let an employee go, that's ultimately your decision, correct?

15   A    Yes.

16   Q    There was some discussion on your examination from

17   yesterday about discretion to excuse absences.

18        Do you remember that?

19   A    Yes.

20   Q    And we already went over some instances of that with

21   Ms. Arroyo when we talked about group therapy day, things like

22   that.

23        I guess what I want to talk about a little bit, Mr.

24   Temko mentioned this as well, under the policy there is excused

25   days and there's also inexcused days, right?

Schroeder - Cross by Mr. McMahon

1   A   Yes.  It is defined in the policy.

2   Q   Okay.  Can you talk about the excused days, kind of the

3   days Mr. Temko referred to you get five days a year.  What are

4   instances that count for excused days?

5   A   Examples, as we have explained to our employees is -- and

6   we know that this happens -- there's five excused days a year.

7   If you car breaks down on the way to work, you take it to the

8   repair shop, just bring us the document and we will excuse the

9   day.

10  Q   Correct.

11  A   If one of your parents or children get ill and you have to

12  assist them or take them to the doctor, just bring a copy of

13  the document and we will excuse it.

14  Q   Or even if the employee gets sick, right?

15  A   Any circumstances like that.  We know that things happen.

16  Q   Right.

17  A   You know.  We thought it was a good policy.  I mean, you

18  know, in addition to the 36 vacation days and the seven

19  holidays and five excused days, I thought our policy was fairly

20  liberal and fair to everyone.

21  Q   Do you know if throughout her employment Ms. Arroyo ever

22  received any excused days?

23  A   I believe she did.  Yes.

24  Q   I'm going to take a look at that.

25          Defendant's Exhibit 15 in the notebook.  And I would

1   kind of like to start at the back of that document if we can

2   and work our way forward.

3   A    This is a number of pages.

4   Q    Yes, sir.

5          And I direct your attention to the very last page and

6   it has a Bates number of 2785.

7   A    Okay.

8   Q    Okay.  If we could take a look, please, at 2008 for some

9   examples here.

10         Do you see that?

11  A    Yes, I see that.

12  Q    Actually, let's start in 2005 and kind of work our way up.

13  There's a notation in kind of a narrow column there where

14  there's I's and E's and some M's.

15         Can you explain what those mean?

16  A    An E indicates it's an excused absence, an I indicates it's

17  inexcused, and M stands for military.

18  Q    Okay.  So for example, in looking at 2005 for Ms. Arroyo's

19  records there, it looks like on August 4th she left early

20  because she was sick.

21         Do you see that?

22  A    Correct.

23  Q    All right.  And because of that, that time was excused,

24  right?

25  A    Yes, it was.

Schroeder - Cross by Mr. McMahon

1  Q    Take a look at August 5th.  It says, "Sick Doc."  What does

2  that mean?

3  A    That means she provided a document to us and then was

4  excused that day.  And, of course, we tally up just to the

5  right of it how many excused days because there's a limit of

6  five.

7  Q    Right.  Right.  Okay.

8         And, in fact, taking a look at 2008 for some other

9  examples, it looks like there was a situation where her sister

10 was involved in an auto accident?

11        Do you see that.

12 A    Yes.  That was excused twice, both days.

13 Q    And then going to '09.  All right.

14        Take a look at January 16th of '09.

15        Do you see that?

16 A    I have to go to a different page?

17 Q    Yes.  Bates 2784.

18 A    Yes, I have that.

19 Q    Okay.  Take a look at the entry for January 16th.  What

20 does that say?

21 A    It says Ms. Arroyo called off that day and D-O-C is just an

22 abbreviation that it was documented and excused for one day.

23 Q    So again she was sick and she provided a document, right?

24 A    Correct.

25 Q    So it was excused?

1    A    Yes, it was.

2    Q    Take a look going forward into 2010.  All right.  2010 --

3    and this is actually right after she receives -- pretty close

4    to right after she received her step one verbal warning, right?

5    A    Correct.

6    Q    There is a date range there of 11-10 to 11-12.

7         Do you see that?

8    A    Yes.  It was noted that it was the 10th, 11th and 12th.

9    Q    Right.

10   A    She called in sick.  She provided a document to us.  She

11   was excused for three days.

12   Q    Okay.  I want to talk to you about why -- we talked a lot

13   about parking in the back of the building.

14   A    Mm-hmm.

15   Q    Was there a different way for Ms. Arroyo to access the room

16   you provided her as the meditation room besides parking in the

17   rear of the facility to access that room?

18   A    Yes.

19   Q    Okay.  What could she have done differently than park back

20   there?

21   A    She could have parked in the employee -- the designated

22   employee parking lot, entered the building at the employee

23   entrance where they enter, and then proceed through the

24   warehouse -- after going to the locker room or whatever she had

25   to do, and go through the warehouse.

1    Q    Okay.  I'm going to show you some photos of the facilities.

2    A    Okay.

3    Q    And I'm going to have you kind of walk us through what that

4    actually looks like.  Is that okay?

5            I'm going to show you first, Exhibit 39A.  And that is

6    in the binder.  And I think for the Exhibit 39 in the binder,

7    Mr. Schroeder, we combined these photos into kind of one

8    exhibit so that we will just start at the beginning.  I'll wait

9    until you have that in front of you here.

10           Okay.  Do you have that in front of you,

11   Mr. Schroeder?

12   A    Yes, I do.

13   Q    Okay.  So in looking at Exhibit 39, the photo that is on

14   the screen right now, can you kind of explain to us, and again,

15   that's that first photo, can you explain to us what we are

16   looking at here and where this is at the Joliet plant?

17   A    To the left of the door there is a hallway that is the

18   employee entrance from the exterior of the building.  So

19   whenever an employee comes in, that's the door to the

20   warehouse.  And immediately to the left of it as you enter --

21   the right in this picture -- is the employee time clock.

22   Q    Okay.  Is that that black box with the lit-up screen there?

23   A    Yes.

24   Q    Is that the clock?

25   A    Yes.

1    Q    So that's where employees punch-in when they arrive?

2    A    Correct.

3    Q    Now, in taking a look at this, we can kind of see some

4    racks there, and I'm going to go to 39B, the second photo to

5    try to orient folks here.

6         It looks like these racks span several rows, correct?

7    A    Correct.

8    Q    All right.  And there's kind of -- it looks like a pathway

9    here coming from the clock going right in this picture.

10        Do you see that?

11   A    That's what we call a warehouse aisle.

12   Q    Okay.  And can we take a look where that aisle takes us in

13   the next picture?

14   A    This picture is from the end of that aisle adjacent a few

15   feet from the time clock.  It shows you the rear of the

16   warehouse where the operations office is.  That's probably --

17   the building's 400 feet deep, so we're inside the building.

18   It's probably 275, 300 feet.

19   Q    And just to be clear, from where we're looking at in this

20   picture here, the third picture that's in front of the jury

21   right now, do you see where that American flag is hanging up

22   there?

23   A    Yes.

24   Q    Is the operations room there?

25   A    Yes.  Right at that point.

1  Q    And it that connected to -- was the meditation room

2  connected there?

3  A    It's inside that office.

4  Q    Part of it?

5  A    Part of it, yes.

6  Q    So when we're talking about accessing the meditation room,

7  we're talking about walking from the time-punch clock that we

8  just looked at, down this aisle to where the American flag is?

9  A    Yes.

10  Q    And that's it?

11  A    That's it.

12  Q    Okay.  Let's take a look at the operations office if we

13  can, the next photo.  This is a little bit closer to it, right?

14  A    Yes.

15  Q    And by the way, the dates of the these photos, July 8,

16  2016, do you know who took these photos?

17  A    I did.

18  Q    And why did you take the photos?

19  A    At your request.

20  Q    For purposes of this case, right?

21  A    Yes.

22  Q    Okay.  And can you explain to us what we're looking at here

23  before we go into the actual operations office?  Where is this

24  this in the --

25  A    Okay.  This is the rear of the building, and this is what

1    we call the operations office.

2    Q    Right.

3    A    On the left side by where the guard rail is open, there's

4    one entrance door on the left and there's one entrance door on

5    the right.  And just for reference, just to the right of the

6    right door is another door with a little sign above it and

7    that's the first aid room.

8    Q    Okay.

9    A    That was the alternate meditation room.  So you could enter

10   this operations office area from either the left door or the

11   right door.

12   Q    Okay.  I see.  And I'm going to take the next exhibit and

13   show what the actual inside of the operations office looks

14   like.

15   A    Yes.

16   Q    What are we looking at here in this photo?

17   A    This is a supervisor's office that's with inside the

18   operations office.  And as I said, it's a hard room with a

19   closed door.

20   Q    Was this a picture of what Ms. Arroyo used for the

21   meditation room?  There is a sign that says do not disturb?

22   A    That was the sign that was used.

23   Q    And she was provided that?

24   A    Yes.

25   Q    Can we take a look at the picture and what the inside of

1    the office looked like.  It looks like you have a Chicago

2    Blackhawk's fan.  Yes, that's Bernie.  A couple of them.  And

3    does this office look fairly similar to what it looked like

4    when Ms. Arroyo used it, in terms of the layout?

5    A    Yes.  I'm sure it's pretty much identical.

6    Q    Now, we kind of stepped through what it looks like walking

7    through the facility from the time-punch clock to get to this

8    room?

9    A    Mm-huh.

10   Q    Why wasn't Ms. Arroyo doing that?  In other words, why

11   wasn't she parking in the front where the employees were

12   parking and just stepping through it.

13            MR. DeROSE:  Objection to why someone else doesn't do

14   anything.

15            THE COURT:  I will sustain that objection.  You can

16   come up with another formulation.  I don't think he can tell

17   why she was doing it you unless she maybe told him.

18   BY MR. McMAHON:

19   Q    Okay.  Did you become aware of a time where -- well, I will

20   ask it this way.

21            When Ms. Arroyo first started using the meditation

22   room, was she accessing it the way we just looked at?

23   A    Yes.

24   Q    Did there come a time when she stopped doing that?

25   A    Yes.

Schroeder - Cross by Mr. McMahon

1    Q    Did she explain to you why she stopped doing that?

2    A    She stated to us after her supervisor discovered, in one of

3    her walks, we didn't see this at first, that she was not

4    wearing her safety shoes.

5    Q    And that was that same sort of pair of shoes that we talked

6    about earlier.

7              Are material handlers required to wear safety shoes?

8    A    There's signage at the door and the warehouse that says

9    "Safety shoes are required beyond this point."

10   Q    All right.  I want to take a couple of exhibits on that

11   with you, if we could.  And these are both from the binder?

12   A    Right.

13   Q    Defendant's Exhibit 25.

14   A    Put all of these pictures back?

15   Q    You can put the pictures back, sir.

16             Defendant's Exhibit 25.  I will wait until you can get

17   that in front of you?

18   A    Okay.

19   Q    Do you recognize this document, Mr. Schroeder.

20   A    Yes, I do.

21   Q    Okay.  Can you explain to the jury what this document is?

22   A    This is a document of -- to Ms. Arroyo, from myself, dated

23   October 18th of 2011, and it's a response to her inquiry about

24   our safety shoe policy.

25   Q    Okay.  And you started to describe an incident where you

1    said a supervisor had not seen her wearing her safety shoes.

2    A    It had not been observed before David Miller observed it.

3    Q    And there's a references to David Miller observing it here

4    in this email, right?

5    A    Yes.

6    Q    Okay.  Can you explain what that particular incident was as

7    you kind of outlined it here?

8    A    Of course we granted her accommodation request for a place

9    to meditate or relax before work or during breaks.

10   Q    Right.

11   A    So we told her that she can "use the assigned room for 15

12   minutes prior to the start of her shift and during your breaks.

13   It is the office and warehouse operations office."

14   Q    Okay.

15   A    On October 17th at the start of the shift, David Miller, a

16   warehouse supervisor observed that when you exited the assigned

17   room you were not wearing safety shoes, in violation of the

18   safety shoe policy.  Per the policy, all warehouse, management,

19   clerical and summer help are required in the warehouse area,

20   which include offices adjacent to the warehouse, to wear safety

21   shoes.  A copy of this policy was mailed to you on June 21 of

22   2011.

23   Q    All right.  And it looks like here in the memo you indicate

24   that Ms. Arroyo thought that the safety shoes were only

25   required on the job.

1  A    That was her statement.  So I gave her a reminder that

2  safety shoe policy for this facility -- "Your reply was a

3  request that we compensate you for your time to put on your

4  safety shoes or provide an alternative private room."

5  Q    So Ms. Arroyo told you she wanted to be paid for putting on

6  her shoes?

7  A    Yes.

8  Q    And you said you're not paying her for that?

9  A    Correct.  I would not pay her.

10  Q    After this memo, is that when Ms. Arroyo started parking in

11  the back of the building?

12  A    Yes.

13  Q    And regarding the safety shoes, you indicate here that you

14  had sent a copy of the safety policy to Ms. Arroyo.  Can we

15  take a look at Defendant's Exhibit 26 out of the binder.  I

16  will ask you to get that in front of you in just a second.

17  A    What number was that?

18  Q    Defendant's 26.

19        Do you have that in front you?

20  A    Yes, there's four pages.

21  Q    All right.  And what is this that we're looking at in 26?

22  A    This is a document to all employees, dated June 10th of

23  2011.  It's the safety shoe program.

24  Q    And the safety shoe program, was that something that Volvo

25  paid for its employees?

Schroeder - Cross by Mr. McMahon

1    A    Yes.  Annually, each employee is compensated and allowed to

2    purchase new -- replace their safety shoes.  The company pays

3    $100 toward the purchase of safety shoes annually.

4    Q    And did Ms. Arroyo receive a copy of this?

5    A    Yes, she did.

6    Q    And take a look at the last page of the exhibit, please.

7    And what are we looking at now on that last page?

8    A    This is a copy of the proof of delivery that this document

9    was mailed to her.

10   Q    Do you know why the document was being mailed to her?

11   A    Because she was not at work at that time.

12   Q    She had a general --

13   A    Yes.

14   Q    Okay.  To be clear then, with respect to the safety issue,

15   this is not going to cost Ms. Arroyo any money to comply with

16   it?

17   A    No.

18   Q    And she started parking in the back of the building because

19   she didn't want to put on a pair of shoes?

20   A    Correct.

21        I have no further questions right now.

22        THE COURT:  Okay.  Thank you.

23        MR. DeROSE:  What time have we got, Judge?

24        THE COURT:  It's 12:05, and I'm happy to say

25   Mr. McMahon delivered on his half hour.

Schroeder - Redirect by Mr. DeRose

1    MR. DeROSE:  Judge, I know you told the jurors 12:45,

2  so if I am not finished by 12:40, so that you can even be

3  better on your plan, would you tell be I have five minutes

4  more?

5    THE COURT:  I will be happy to do that.

6    MR. DeROSE:  I want to finish before lunch.

7    THE COURT:  Okay.  You've got it.  I will give you a

8  five-minute warning.  It's like in the NFL, only it will be

9  five minutes instead of two.

10                  REDIRECT EXAMINATION

11  BY MR. DEROSE:

12  Q   You tell us that I showed you a lot of emails in 2005 and

13  they didn't lead to the loss of her job or discipline of

14  Ms. Arroyo -- you looked at emails that I showed you from 2006,

15  2007, 2008, 2009, and 2010, and none of those led to discipline

16  or the termination of Ms. Arroyo; is that correct?

17  A   I don't believe it was 2010.  It was 2005 to 2009.

18  Q   Oh, is that all that he talked about.  And you said, none

19  of those communications you were having with the people, Mr.

20  Olin for the first few years and Ms. Regina Williams for the

21  last couple of years, none of those lead to the discipline of

22  my client, right?

23    MR. McMAHON:  Objection, assuming facts not in

24  evidence.  Timing of communications.

25    THE COURT:  Well --

1    MR. DeROSE:  Judge, I'm just trying to do a background

2  to his questions, so he knows what I'm asking.

3    THE COURT:  I understand.  And, you know, the jury

4  will have to remember what the timing is there.  You're just

5  trying orient him to your questions.

6  BY MR. DeROSE:

7  Q   Do you remember telling him, "Oh, yeah, he showed me all of

8  those emails and none of them lead to any discipline?"

9  A   For the time period that was stated, correct?

10 Q   Yes.

11 A   I just want to make sure I answer your question correctly,

12 sir.

13 Q   Right.  That's what I want to know about, the incident for

14 him, you said none of those led to any discipline, didn't you?

15 A   None of those --

16 Q   Emails.

17 A   -- led to her termination.

18 Q   And also, during that time you were asking if you could

19 discipline.  "If we follow our policies here at Volvo," you

20 said several times in those emails she had discipline, didn't

21 you?

22 A   Most of the emails were requests for support and help for

23 how to document absences that weren't clear to us, with a

24 notation that if they're not cleared, could lead to discipline.

25 Q   Sir, when you wrote the initial discipline for each of the

Schroeder - Redirect by Mr. DeRose

1    conversations, you say, "If I apply our Volvo discipline, she

2    is at termination."  Here in 2005, here in 2006, here in 2007,

3    did you not?

4    A    I don't believe that to be a true statement, sir.

5    Q    All right.  But you were getting responses from Bruce Olin

6    to both you and to Temko, "Sorry it's not what you want to

7    hear.  Sorry there's nothing you can do about it."

8          Do you remember that?

9    A    I recall those emails, yes.

10   Q    Did you ever ask him why he was apologizing because he

11   wasn't telling you what you wanted to hear when you said our

12   policy right now puts her at termination?

13   A    I have no idea why he wrote that on these emails.

14   Q    But he told you the law said she gets to do those things,

15   didn't he?

16   A    We did that and we excused all of that time.

17   Q    And there were a few times in your own email, where we saw

18   you say, "Well, she's not keeping in touch with us, but I guess

19   there's nothing we can do about it," right?

20   A    There were times when we did not have communications on her

21   absences.

22   Q    And you knew that the law said she did not have to

23   communicate with you, according to what HR was telling?

24   A    In regards to what, sir?  Her --

25   Q    Communicating with you, all of those times you wrote on

1    there, "I guess there's nothing we can do about this."

2    A    And you may by aware, there was a requirement for her to

3    tell us and share documents with us when she goes away on

4    drills.

5    Q    Sir, you knew she was on 72-day drill training, 90-day

6    drill training, and then long periods of time.  And you said,

7    "We thought she should come back at this date," and you said,

8    "And she's not back yet.  But I guess there's nothing we can do

9    about it."  What did you want to do about it?

10   A    I wanted to understand what her responsibility is when

11   she's to return to work.  Simple as that.

12   Q    And what -- also, it meant you had no authority and control

13   over her comings and goings when she was doing those orders;

14   isn't that true?

15   A    Why would I want control of her?  She is doing an

16   obligation to the military.  That's between her and military.

17   Q    Well, the people in your own company are telling you,

18   "Sorry it's not what you want to hear.  Sorry, you can't do

19   anything about it."  And you even say yourself, "I guess I

20   can't do anything about this."

21   A    Sir, in nearly all of my emails I was asking for support,

22   clarification what time would be excused under military.

23   Q    Caitlyn, can you put up Exhibit 32?  Counsel showed you an

24   Exhibit 32, and you indicated, "Yes, and we brought her back to

25   work."

Schroeder - Redirect by Mr. DeRose

1          MS. DeROSE:  Is that Plaintiff's Exhibit?

2          MR. DeROSE:  It's Exhibit 32.  Counsel, did you show

3     our 32 or was that yours?

4          MR. McMAHON:  I believe it was yours.

5          MR. DeROSE:  All right.  Put up our 32.

6          MS. DeROSE:  Do you want to publish them to the jury?

7          MR. DeROSE:  Yes.  No.  Because now we don't have

8     time.

9          THE COURT:  If this is in evidence, it's fine to go to

10    the jury.  In fact, you could do plaintiff's or defendant's

11    Exhibit 32.  They're both in evidence.

12    BY MR. DeROSE:

13    Q    This was the email that was sent by Michael Temko.  And he

14    wanted to know about your rights and her responsibilities in

15    keeping you guys informed.  And you told Counsel, "Yeah, we saw

16    those emails, but that was in 2007."  And you said, "But we

17    brought her back to work," after this exchange, right?

18    A    I'm not sure I understand your question, sir.

19    Q    You told Counsel that at this time, after you and Temko had

20    this email exchange with Bruce Olin on the second page, Cait.

21    You say you brought her back to work.  Olin tells you on the

22    bottom of the page, "Michael, unfortunately there isn't a lot

23    we can do.  We just have to wait for her.  Sorry it isn't what

24    you wanted to hear."

25          Do you see all of that?

1    And then you told Counsel after that email, "We

2   brought her back."  Mr. Schroeder, didn't you know you had no

3   choice in the law?  You had to bring her back?

4   A   Of course.

5        MR. DeROSE:  Caitlyn, take this back, please.

6   BY MR. DeROSE:

7   Q   We talked about Colonel Gorski of the ESGR, and how proud

8   you were when you guys all got that award, as a cooperative

9   employer understanding that these active army reservists have

10  to leave for a period.  That is a coveted award.  Do you know

11  who nominated you or they wouldn't even have known about you?

12  A   Yes, of course.  Luz Arroyo.

13  Q   Did you ever say thank you to her for that?

14  A   I am absolutely certain I did.

15  Q   What year was that?

16  A   It was 2010.

17  Q   She didn't know at the time about any of these emails, did

18  she?

19  A   No, I don't think so.

20  Q   And by the end of 2010, you and she were already starting

21  to have some troubles together, weren't you?

22  A   Ms. Arroyo and I had some misunderstandings.  We didn't

23  always agree on everything.  That's true.

24  Q   And she's the one who not only talked Gorski into giving

25  you that award, but also brought Gorski in to interplay with

Schroeder - Redirect by Mr. DeRose

1    you when she thought she wasn't getting her rights, didn't she?

2    A    That's correct.  That's the best thing that ever happened.

3    Q    And Gorski came in --

4    A    I was getting the answers that I needed to help support

5    what is our responsibility.

6    Q    But you were a little ticked that Gorski came in, weren't

7    you?

8    A    It was welcome.

9    Q    He was?  But you told your bosses that every time Arroyo

10   has a problem, she brings Colonel Gorski in, didn't you?

11   A    No.  I don't recall that.  I don't recall that ever.

12   Q    Well, let's see if I can help you remember something maybe.

13   Can you put up that 144?  Wait a minute, we have to give him a

14   copy.  Where is that?

15   A    Was that a 144?  I don't have that.

16   Q    Yeah, I know you don't.  We're going to give it to you.

17          MR. DeROSE:  Excuse me, Judge, I am in a flurry of

18   paper.

19          THE COURT:  You found it.  Okay.  And this is

20   Plaintiff's 144.

21          MR. DeROSE:  Yes, your Honor.  The first one.

22          THE COURT:  Okay.  Is there any objection to this

23   exhibit?

24          MR. McMAHON:  There is subject to our --

25          THE COURT:  The usual understanding.

1    MR. McMAHON:  The usual understanding, yes.

2    THE COURT:  Okay.  So receiving this into evidence

3  pursuant to the usual understanding.  And you can -- I am

4  sorry.  You can publish it to the jury if you like.

5    MR. DeROSE:  Well, all right, Judge.  Thank you.

6  Would you put up 144 first?

7  BY MR. DeROSE:

8  Q    This is an email that, sir, that you sent to Bruce Olin,

9  Regina Williams, both in HR, to the vice president of the

10  company and to Maureen Somersett about a meeting you had with

11  Colonel Gorski, right?

12  A    I'm trying to read this, sir.  I don't see a reference --

13  Q    You know what, you don't have to read it all.  I just want

14  to direct you to a particular section.

15  A    I don't see anything that says Colonel Gorski.

16  Q    Sir, would you wait a second, please.  Caitlyn, would you

17  go up to the last sentence before -- it's two sentences up from

18  the bottom.  Do you see it?  "This military veteran's case."

19    You wrote to all of those big wigs in the company in

20  April of 2011, some six to eight months or so after you got the

21  award from EGSR.  You wrote, "This military veteran's case is

22  very difficult, as at every turn when we try to work with her,

23  she rejects all local offers of support, resulting in outside

24  mediation, ESGR," and that was Colonel Gorski, wasn't it?

25  A    Ultimately when I met with the ESGR it was Colonel Gorski,

1  yes.

2  Q   So already back in April of 2011 you were telling Bruce

3  Olin and Regina Williams and the vice president of the company

4  that every time she thinks she needs her rights, she goes

5  running to get the Colonel to come in and tell me what her

6  rights were, right?

7  A   I told him that the case was difficult because each time

8  that we offered assistance and help and accommodations or time

9  or anything, she agrees and then she comes back and disagrees.

10 It was frustrating.

11 Q   So you were frustrated by it?

12 A   There was some level of frustration.

13 Q   Why?

14 A   We have an agreement and then we don't have an agreement.

15 Why did that happen?

16 Q   Well, sir, she had already given you what she thought was

17 the law, and she said you were not following it.  Did you have

18 a discussion with her when you saw the law in writing?

19 A   We were given some documents.  We offered her what we

20 thought was reasonable time when she requested it.  Frequently

21 she agreed and then came back and disagreed.

22 Q   So when you call the -- when you wrote the vice president

23 of the company that she was a very difficult case because she

24 injected the army into it, did you tell him that you were

25 getting frustrated?

Schroeder - Redirect by Mr. DeRose

1  A   I don't recall that exactly, sir.

2  Q   Well, what did he say to you when this call came in?

3  A   I don't recall, sir.

4  Q   Well, you remembered everything a little bit ago.

5          Do you remember anything that any of these people said

6  to you of after you sent them that email?

7  A   Sir, I can't -- if there's a document with a reply on it, I

8  would more than happy to read it.

9  Q   I understand that.  If I don't have a document to show you,

10 sir, I can't do that.

11 A   Okay.

12 Q   I'm asking you, did anybody respond to you when you tell

13 them, "This is getting frustrating.  She's a very difficult

14 case.  She's got the army breathing down my throat"?

15 A   Those are not my words, sir.  I didn't say that.

16 Q   I know.  But I'm asking you based on what you say about her

17 being a very difficult case, does anybody higher ups respond to

18 you or did they leave you all alone to handle it your own way?

19 A   I don't recall what replies I got, sir.  This is quite some

20 time ago.  Did we talk?  Did I get -- I don't know if I got a

21 reply or not.

22 Q   All right.  By this time, April of 2011, you were already

23 writing to Regina Williams.  We looked at that plan this

24 morning telling her what you were going to do about the date of

25 termination.  So for six months before that, all of the way

1   back in April, you're already telling her that this lady is a

2   problem, and six months later we know you terminate her.

3          Did you ever give anybody information in April, May,

4   June and July, "If I can find a way to get rid of her, I want

5   to do it"?

6   A   Of course not.

7   Q   Of course not.

8          Well, let's look and see what else you wrote.  On the

9   day that you terminated her, that was November 8th?

10  A   That's correct.  2011.

11  Q   You, again, on that very day, wrote to Regina Williams, and

12  Mr. Scholl and other people higher up in the HR chain,

13  complaining that Arroyo had been a problem and that brought

14  ESGR down on you, hadn't it?

15  A   What document are you referring to, sir?

16  Q   I'm asking do you remember complaining that she had caused

17  a lot of problems for you more than being one to three minutes

18  late?

19  A   I don't recall stating those in that way, sir.

20  Q   You looked at all of the important email before coming to

21  this trial, didn't you?

22         MR. McMAHON:  Objection, your Honor, as to what the

23  important emails are.

24         MR. DeROSE:  The ones you thought were important.

25         THE COURT:  I will sustain the objection.

Schroeder - Redirect by Mr. DeRose

1        MR. McMAHON:  Thank you.

2  BY MR. DeROSE:

3  Q  Sir?

4  A  Sir, I did look at my deposition, and I did look at the

5  exhibits that were in my deposition.  Am I going to remember

6  each one of them, no.

7  Q  Do you remember complaining about Arroyo bringing ESGR into

8  your life on the very day that you terminated her?

9  A  I don't recall that, sir.

10  Q  Will you look at Exhibit 245?

11        MR. McMAHON:  Your Honor, can we have a quick sidebar

12  in connection with this.

13        THE COURT:  Sure.  I've never seen this exhibit.  So

14  if someone can bring a copy of this to me that would be great.

15  I just need to take a -- give me one second here, and I'm going

16  to look at this.  So sorry.

17      (Sidebar.)

18        THE COURT:  Okay.  What's the objection?

19        MR. McMAHON:  It's a relevance objection, Judge.

20  Actually, in her deposition, and we included some deposition

21  transcript from Regina Williams to provide context to our

22  objection to this document.  She testified that Mr. Schroeder

23  was providing these indirect reports to her in connection with

24  her defense of an EEOC claim charge that Ms. Arroyo had already

25  filed.  The way it happened was Ms. Arroyo first filed her

Schroeder - Redirect by Mr. DeRose

1    first EEOC charge after she was suspended and then she filed a

2    second charge after her termination.  So while this happens it

3    happens to be -- the date of her termination, Mr. Schroeder was

4    providing these in connection with her requests to provide

5    these documents.

6            THE COURT:  Whose request?  Williams?

7            MR. McMAHON:  Yes.  Yes.  And she used it in

8    preparation for the EEOC questions.

9            THE COURT:  Let me ask you a question.  That sounds

10   like it's complicated.  Isn't the point of this document,

11   Mr. DeRose, only that he was referring to the ESGR case?

12           MR. DeROSE:  Well, we call it ESGR.

13           THE COURT:  Right.  But the point is this last

14   sentence.

15           MR. DeROSE:  Yes.

16           THE COURT:  So the rest of this email is complicated

17   and would bring in a bunch of stuff that nobody needs to know

18   about, including --

19           MR. McMAHON:  Right, that's our point.

20           THE COURT:  But here's my suggestion.  Why don't you

21   hand this to him and you will reference that he has --

22           MR. DeROSE:  Your Honor, I wonder --

23           THE COURT:  He's refreshed him.  I think that will

24   work.  But if it doesn't work, we will be back here.

25           MR. DeROSE:  I am not going into the EEOC.

Schroeder - Redirect by Mr. DeRose

1        THE COURT:  Understood.

2        MR. DeROSE:  And I'm not trying to bring it out.

3        THE COURT:  I think if we put this document in as

4    substantive evidence -- if you get him to admit that he

5    referenced to an email to Ms. Williams, that may be --

6        MR. McMAHON:  Judge, I referred to in the Seventh

7    Circuit arguments, because this is his statement on the day of

8    the termination.  Close in point of time.  This witness --

9        THE COURT:  I sustained -- your point is that last

10   sentence, though.

11       MR. DeROSE:  Yes.

12       THE COURT:  The rest of that is complicated to note

13   for record.

14       MR. McMAHON:  That email was not actually referenced

15   at all by the Seventh Circuit panel in its opinion.

16       THE COURT:  Whether it is or it isn't, the oral

17   arguments, I never listen to my own arguments.

18       MR. DeROSE:  Nor did Counsel.  He wasn't there.

19       MR. McMAHON:  I wasn't in court.  You have no idea

20   what I -- I haven't --

21       THE COURT:  Let's see if the recollection works, and

22   I'll get this later.  I don't need it right now.  Thank you.

23       (Sidebar concluded.)

24   BY MR. DeROSE:

25   Q   Mr. Schroeder, we gave you a document there dated on

1   November 8th, 2011, the date that you terminated Ms. Arroyo.

2          Do you see this at the top?

3   A   Yes, I sent this November 8, 2011.

4   Q   All right.  Now, I only want to refer you to the last

5   couple of sentences of that email.  So this would be an email

6   that you said after -- it's 11:09 -- 11:39 in the morning.  So

7   by now Arroyo's been given her termination papers and she's

8   gone out of the building; is that right?

9   A   No.

10  Q   Well, and you won't do that until later in the evening?

11  A   When she started her shift at 4:30.

12  Q   All right.  So this is about five hours before you

13  terminated her.

14         Now, I just want you to see a reference to the last

15  couple of sentences.

16         Did you tell those people that Arroyo was -- never

17  once cooperated with any offers of compromise or leniency that

18  you were suggesting?

19  A   I stated that.

20  Q   All right.  Did you tell them that Arroyo had offered to

21  stay five minutes later or twenty minutes later, if you wanted,

22  if she started two or three minutes later?

23         MR. McMAHON:  Objection, your Honor.  Relevance.  I

24  believe it goes to claims that are no longer before the jury.

25         THE COURT:  I will sustain that objection.

Schroeder - Redirect by Mr. DeRose

BY MR. DeROSE:

Q   And not only that, you said that she was not cooperative unless you agreed to her terms, correct?

A   That's what I stated.

Q   And you said the best example of that was the ESGR case. You mentioned the ESGR case on the very day that you're going to terminate her in five hours.

What did you mean by "the ESGR case"?

A   It was just used as an example.

Q   Example of what?

A   Something that -- and again, as I've already stated, sir, on numerous occasions through all of our offers of support, we would offer what we thought in good faith was good offers of accommodations or whatever the case was over time to her.  She would agree, typically agree, and then later disagree and want something different.  It was frustrating.  It was a bit frustrating.

Now, however when the ESGR came, when Colonel Gorski came to see us, he settled all of that.  And it was very good. It's not perceived as bad whatsoever at all.

Q   While she was frustrating to you, did anybody else bring ESGR to you to negotiate for them?

A   No, sir.

Q   She was the only one who could bring them to you because she was in the military?

Schroeder - Redirect by Mr. DeRose

1    A    Well, she was active.  I'm not 100 percent certain that I

2    have veterans today in the facility.  Could they have done

3    that?  I don't know that.  But she was our active reservist, of

4    course.

5    Q    And she was the only one?

6    A    That's correct.

7    Q    She was in a class by herself.  Had different issues than

8    anybody else you were dealing with?

9    A    I wouldn't say dealing with.  You mean working with?

10   Q    I mean negotiating with when she says, "I'm entitled to

11   this."  And you said, "Nobody else gets this.  Why are you?"

12   Right?

13   A    Those would not be my words, sir.

14   Q    Sir, but you had to make special allowances for her from

15   2005 until she got fired in November 2011, correct?

16   A    I did that all of the time.  Numerous occasions documented

17   throughout yesterday and today.

18   Q    And you found that frustrating because she had kept telling

19   you what her rights were and you had to go look them up and

20   learn them, right?

21   A    No, that wasn't it.  What the challenge was was that we

22   made good faith efforts to accommodate her when we thought it

23   was best, with a lack of knowledge about how everything worked

24   until we got clarification and support and better information

25   bought our way.  When we did that, she often balked at it and

1  said, no that doesn't work.

2  Q    And if someone else didn't keep in touch with you for four

3  days, and you didn't know where they were, when they came back

4  to work you could fire them, wouldn't you?

5  A    Every case is different, sir.  I wouldn't say that that's

6  the --

7  Q    Well, if someone came back and didn't have a good excuse

8  for being gone for five days, that would the end of their work

9  for a company where you had four or five thousand people

10  applying for a job.

11        Is that a fair statement?

12  A    Every absence, every case is different, sir.  And that

13  would have to be decided and discussed.

14  Q    Try the one I'm suggesting.  Somebody doesn't come back for

15  four or five days, doesn't keep in touch with you, which you

16  could have issues with, doesn't have any good reason for not

17  being there, that would be reason enough for you to say you can

18  keep on walking because you're not working here anymore.

19  A    Sir, I would immediately go to my human resource business

20  partner to get guidance and support how to manage that.

21  Q    Yeah, and if they didn't have a good reason, you would let

22  the person go, wouldn't you?  Part of this is not that -- I

23  think you're good manager, aren't you?

24  A    I think I'm a good manager.

25  Q    All right.  So if somebody doesn't show up for five days

1  and they had no good reason, you would fire them?

2  A   I would have to seek guidance from HR and look at Volvo's

3  policies on that.

4  Q   Now, you just said a few minutes ago that when Ms. Arroyo

5  didn't show up on the 19th, you got the order and then you

6  said, "Okay.  Everything's all right," didn't you?

7  A   What are you referring to, sir?

8  Q   On more -- November -- wait, I have it here.  Hold on.  Go

9  back to the exhibit, Defendant's Exhibit 43 they showed you a

10  little bit ago.

11         Caitlyn, will you put up the first page of Exhibit 43,

12  please?

13  A   Forty-three?

14  Q   Yes, sir.  Please.

15         THE COURT:  And this can go to the jury as well.

16         THE WITNESS:  This doesn't go to 43.

17         MR. McMAHON:  43 is loose.  We had to introduce it

18  separately.

19         THE COURT:  It's not in the binder then.

20         MS. DeROSE:  Do you want me to put it on the Elmo?

21         MR. DeROSE:  Could you please put up your 43?  You had

22  it up there.

23         THE COURT:  So we need to go to defense and then Ms.

24  Wilson will help us out there.  That's not it?  There it is.

25         THE WITNESS:  It says 43 on it.

Schroeder - Redirect by Mr. DeRose

1          THE COURT:  Okay.  We're all set now.

2          THE CLERK:  Could we keep them all on it?

3          THE COURT:  The jury can have it.

4          THE CLERK:  Okay.  There we go.

5  MR. DeROSE:

6  Q    Now, you got this on 11-19-2008, correct?

7  A    That's correct.

8  Q    And you read it to the jury?

9  A    Correct, I did.

10 Q    And the author of it, Sergeant Isler -- or excuse me,

11 Captain Isler.  I don't want to demote him.  He said, "Sergeant

12 Arroyo will be on order."  You didn't get an order on her on

13 the 19th, did you?  You told Counsel you did.

14 A    I believe it's attached to it, sir.

15 Q    All right.  Can you put that order up, please?

16         MS. WILSON:  I would be happy to.

17         MR. DeROSE:  Thank you.

18 BY MR. DeROSE:

19 Q    Now, you couldn't possibly have gotten this on the 19th,

20 could you?

21         Look at the bottom of it, sir.  The date that it's

22 signed by Luzmaria Arroyo.

23 A    That says 11-26.

24 Q    So you couldn't possibly have gotten it on the 19th like

25 you told us this morning, could you?

1    A    Well, I never looked at the second page.  I looked at the

2    first page.  And it says that she is going to be on orders.  I

3    assumed this was attached to it.

4    Q    Well, as a matter of fact, it's written on -- it's got the

5    date 11/26 in handwriting at the bottom in a couple of places.

6    And Captain Isler, who I believe is the captain on the first

7    page, he told you on the first page the orders will be issued,

8    and they haven't even been drafted yet.

9    A    Well, on the first page it says the orders weren't

10   published until the 14th.  I am just going by what I'm looking

11   at, sir.

12   Q    All right.  But you couldn't have gotten the document that

13   has handwriting on it dating it seven days later by the same

14   captain and Ms. Arroyo, correct?

15   A    I see her signature on November 26th.  It makes no sense.

16   I agree.

17   Q    So actually, you don't know when you got those orders; is

18   that a fair statement?

19   A    I can't be sure.  I do have the fax that says is 11-19,

20   clarifying that there were orders when we didn't know that

21   previous to that.

22   Q    And those are verbal orders that a military veteran has to

23   follow just like he or she has to follow written orders?

24   A    Correct.  Verbal orders are sufficient, of course.

25            THE COURT:  Caitlyn, take this back.

1    MR. DeROSE:  All right.  Five minutes, and you will

2  pull out the rug from under me, please.

3    THE COURT:  Only metaphorically, I promise.

4    MR. DeROSE:  All right.  Caitlyn, put up 265 for the

5  jury, please.

6    MS. DeROSE:  I am going to put up Defendant's Exhibit.

7    MR. DeROSE:  All right.  That would be 15.  Do you

8  have the ability to put it up?

9    MS. DeROSE:  Yes.

10    THE COURT:  So we're on to Defense 15?

11    MR. McMAHON:  Yes, Judge, it's the same as my 265.

12    THE WITNESS:  Where should I look, sir?

13    MR. DeROSE:  Hold on, you can look on the screen.

14    THE COURT:  The binder, Exhibit 16.

15  BY MR. DeROSE:

16  Q   All right.  Sir, you say this shows all of the excused

17  absences that you or someone that doesn't have it on your name,

18  someone in control over there excused an absence for Arroyo,

19  right?

20  A   Yes, this is her attendance records.

21  Q   Did Pat Dunn have the right to excuse tardiness or a whole

22  day absence if he wanted?

23  A   It would be, if the supervisor -- if there was

24  documentation provided a supervisor could excuse an absence.

25  Q   Or if he or she was satisfied for the reason for whatever

Schroeder - Redirect by Mr. DeRose

1    it was, 12 inches of snow on the ground and the person couldn't

2    make it in, they could excuse the person, right?

3    A    Extreme weather was always decided by the manager.

4    Q    And that would only be you?

5    A    That is correct.

6    Q    All right.  And -- excuse me, Judge.  If you look in the

7    year 2010, there were three excused absences for Ms. Arroyo in

8    2010 in November, I believe.

9         Do you see it?

10   A    I see that.  November 10 to November 12, call-in sick, it

11   was documented excused and there was three -- she used three

12   days.

13   Q    Why?

14   A    I have no idea, sir.  That would be in our archived payroll

15   records from 2010.

16   Q    It wouldn't reflect on there if she was calling in sick or

17   saying, I can't work today"?

18   A    I don't understand the question, sir.

19   Q    You don't have -- looking at that, you can't tell us why

20   three days were excused?

21   A    Because it was documented.  She provided a document.  It

22   says right there.  She called in sick and she provided a

23   document.

24   Q    Oh.  She did call in sick.  All right.  Because I can't see

25   that.

Schroeder - Redirect by Mr. DeRose

1   A   Oh, I am sorry.  It says "called in sick," and it was

2   documented and she was excused.

3   Q   Now, the next month, and by the way, that's an

4   inconvenience for you if you lose an employee to pick and pack

5   for a whole day, right?

6   A   Of course not, sir.  That happens frequently all of the

7   time when you have many employees.

8   Q   You've got the chart there in front of you.  Do you

9   remember at Christmas time, Christmas is a month later.  She

10  goes to the emergency room and then it takes about two months

11  for them to tell her she has got PTSD.

12          Do you remember how we went through all of that?

13  A   I see that that's when she was on accident/sickness as of

14  December 23.

15  Q   All right.  And then you'll notice, sir, thereafter that

16  she's asking for time for -- to go to therapy sessions, group

17  therapies with other vets with PTSD, and she is asking for a

18  meditation room.  Look from that day forward, from that last

19  excused absence in November of 2010, and now that you know she

20  has got PTSD, and needs all of this help from you, she never

21  gets an excused absence for the rest of her employment until

22  she gets fired the following year on November 8th.  Is that

23  correct?

24  A   Under the attendance policy for 2011, there was a long

25  period for months of accident and sickness.  There's multiple

Schroeder - Redirect by Mr. DeRose

1  military leave --

2  Q    But those were not excused absences.

3  A    There is no excused.

4  Q    You never had to use your own -- she had a reason for all

5  of those because she had doctors saying, "You've got to let her

6  go.  She's not fit for work."

7  A    Well, of course, under short-term disability act of

8  sickness, of course.

9  Q    And from the day forward when you knew that she was asking

10  for all of this extra help, never again did you excuse even her

11  being late one minute?

12  A    In accordance with the attendance policy, there's nothing

13  in 2011 that shows that she provided documented reasons for her

14  excused absences.

15           MR. DeROSE:  Judge.  I bet it's 2:45.

16           THE COURT:  Mmm, you're right on time.  I have 12:45.

17           MR. DeROSE:  I quit, Judge.

18           THE COURT:  Okay.  Wonderful.

19           Did you have a minute or less of redirect?  Because if

20  do I will give it to you now.  Otherwise I will give it to you

21  after lunch.

22           MR. McMAHON:  I will take it after lunch.

23           THE COURT:  After lunch.  You've got it.  Thank you

24  everybody.  We'll only do an hour for lunch to because I really

25  want to see if we can get the next witness through.  So I will

1  see you guys at 1:45.  It's the usual reminder.  It's always

2  please don't discuss this amongst yourselves or with yourself,

3  I suppose.  Thank you so much, everybody.  We will see you in

4  an hour.

5          THE CLERK:  All rise.  Court stands in recess.

6     (Jury out.)

7          THE COURT:  Have a good lunch, everybody.

8     (Proceedings concluded.)

9                    * * * * * * * * *

10                   C E R T I F I C A T E

11    I certify that the foregoing is a correct transcript from

12  the record of proceedings in the above-entitled matter.

13

14

    /s/Kristin M. Ashenhurst, CSR, RDR, CRR   January 23, 2018
15  Kristin M. Ashenhurst, CSR, RDR, CRR       Date
    Federal Official Court Reporter
16

17

18

19

20

21

22

23

24

25