IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LUZMARIA ARROYO, | ) Docket No. 12 C 06859 |
| | ) |
| Plaintiff, | ) Chicago, Illinois |
| | ) August 19, 2016 |
| v. | ) 1:49 P.M. |
| | ) |
| VOLVO PARTS NORTH AMERICA, LLC, | ) |
| | ) |
| Defendant. | ) |

VOLUME 5-B
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE ROBERT M. DOW, JR., AND A JURY

APPEARANCES:


For the Plaintiff:        JOHN P. DeROSE AND ASSOCIATES, by
                          MR. JOHN P. DeROSE
                          MS. CAITLYN DeROSE
                          15 Spinning Wheel Road
                          Hinsdale, Illinois 60521
                          (630) 920-1111

For the Defendant:        CONSTAGNY, BROOKS & SMITH LLP, by
                          MR. WILLIAM J. McMAHON IV
                          100 N. Cherry Street
                          Suite 300
                          Winston Salem, North Carolina 27101
                          (336) 721-6860

                          CONSTAGNY, BROOKS & SMITH LLP, by
                          MS. SUSAN E. BASSFORD WILSON
                          200 S. Wacker Drive
                          Suite 3100
                          Chicago, Illinois 60606
                          (314) 925-7275

Court Reporter:           KRISTIN M. ASHENHURST, CSR, RDR, CRR
                          Official Court Reporter
                          219 S. Dearborn Street, Room 1918
                          Chicago, IL 60604
                          (312) 818-6549
                          kristin_ashenhurst@ilnd.uscourts.gov

1    (The following proceedings were had in open court:)

2         THE COURT:  We are now at -- it's Mr. McMahon's turn.

3    Okay.  Go right ahead, sir.

4         MR. McMAHON:  Thank you.

5    KEITH SCHROEDER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

6                   RECROSS-EXAMINATION

7    BY MR. McMAHON:

8    Q    Mr. Schroeder, I have a couple of clarification questions

9    for you in light of Mr. DeRose's questions.

10   A    Okay.

11   Q    First, could I direct your attention, please, to

12   Exhibit 43?

13        THE COURT:  And this can go to the jury.

14        THE CLERK:  Okay.  It can.

15   BY MR. McMAHON:

16   Q    Mr. Schroeder, that's a loose one.  Sorry about that.

17   A    This one?

18   Q    Yes, sir.  Now, if we could go to the second page of that?

19   A    Yes.

20   Q    Do you remember when Mr. DeRose was asking you questions

21   about the day Ms. Arroyo signed this document?

22   A    Yes.

23   Q    Okay.  Taking a look, going back to the first page, just in

24   looking at this, who is this fax actually from?

25   A    I believe it's up in the center up there.  It's from HHC

1    416TH ENCON.

2    Q    Yeah.  And what do you see directly underneath that in a

3    big black box?

4    A    Department of the Army.  I don't know -- 38th or 88th

5    Regional Support Command in Fort McCoy, Wisconsin.

6    Q    Are you on the second page, sir?

7             Look at the first page, the fax cover page?

8    A    Oh, I'm sorry.

9    Q    That's okay.  Where is it from?

10   A    The same thing.

11   Q    Okay.  And then immediately underneath that in the big

12   black box, what does it say?

13   A    416th Theater Engineer Command.

14   Q    Was that Ms. Arroyo's military unit at the time?

15   A    I believe so, yes.

16   Q    And this fax came from that unit?

17   A    Yes.

18   Q    What is the date of the fax line on the document?

19   A    It looks like the upper left, 11/19/2008.

20   Q    Okay.  And that corresponds with the date that looks like

21   Captain Isler wrote here on the actual fax itself, right?

22   A    Yes, sir.  He wrote the date, 11/19/2008.

23   Q    Okay.  Regardless of when this document was received or

24   when Ms. Arroyo signed it, were these -- was this time period

25   11-12-08 to 11-26-08 excused as military leave?

1    A    Yes.

2    Q    And just to put the emphasis on that point, could you look

3    at Defendant's Exhibit 6?  And in looking at this exhibit

4    there's an entry for that time period in 2008, isn't there?

5    A    What was the timeline again?

6    Q    Yeah, 11-12-2008 to 11-26-2008?

7    A    Yes.  11 days.

8    Q    And that time was excused as military leave time, right?

9    A    Yes.

10   Q    Could I direct your attention, please, to Defendant's

11   Exhibit 15.  And I want to look at the third page of that

12   document with you, first.  Okay?  I will let you get that in

13   front of you.

14   A    The number, please.

15   Q    Yes.  The Bates number is 2783.

16        Do you see that in the corner?

17   A    2010?

18   Q    2010.  That's correct.

19        Now looking at this -- do you have that in front of

20   you, Mr. Schroeder?

21   A    Yes.  Yes for 2010.

22   Q    Now in looking at this document, do you remember Mr. DeRose

23   asking you whether there was any excused time after the

24   November 10th to November 12 timeframe?

25   A    Yes.

1  Q    Okay.  And you answered there was not any excused time,

2  right?

3  A    I believe I did, yes.

4  Q    What do you mean by that?

5  A    Well, excused -- I mean the way the codes are on here, if

6  you recall for a personal time off that's excused it has the

7  letter E.

8  Q    Okay.

9  A    Her military excused time is ML and ANS means absent as

10 sickness; that's also excused time off.

11 Q    Okay.  Let's take a look at the front page of this document

12 if we can for the 2011 time period.

13 A    Okay.

14       MR. DeROSE:  What's the Bates stamp, Counsel?

15       MR. McMAHON:  2781.

16 BY MR. McMAHON:

17 Q    In looking at the front page of this Mr. Schroeder, this is

18 primarily for all of 2011, right?

19 A    Correct.

20 Q    With the exception of November 4th?

21 A    Right.

22 Q    In looking at this, is it fair to say there is a

23 substantial amount of excused time on there.

24 A    Well, there's a whole bunch of excused on this.  There's

25 accident sickness, there's FMLA, there's military leave --

1    Q    Okay.

2    A    Throughout the year.

3    Q    And it looks like there is an entry that says HR approved

4    absence, which is also in blue.

5         Do you see that?

6    A    Yes, that was in September.

7    Q    And all of that under the attendance policy is excused

8    time?

9    A    Yes, it is.

10   Q    Okay.  I want to take a look at that real quick.  Can we

11   please put up Plaintiff's Exhibit 90?

12   A    What was that number?

13   Q    Plaintiff's Exhibit 90?

14   A    It is our attendance policy.

15   Q    Okay.  There we go.  Okay.  Specifically, what I would like

16   to do, Mr. Schroeder, is direct your attention to the second

17   page of the document.

18        Do you see that?

19   A    Yes, I do.

20   Q    Did the policy provide a list of excusable absence?

21   A    Yes, it does.

22   Q    And what are those?

23   A    There's a list of nine.  Scheduled vacation days, or in

24   other terminology, as it is called, ETO, earned time off; all

25   holidays; bereavement; jury duty; military duty; disciplinary

1   suspension; personal business approved by the appropriate

2   supervisor; sick leave supported by medical evidence

3   satisfactory to the company.  And there are just some examples.

4   Q    Right.

5   A    Accident; sickness; worker compensation; FMLA; absences for

6   personal illness; medical, dental or optical appointments,

7   which is supported with documented evidence satisfactory to the

8   company.  With a couple of notes under there, "Physician must

9   actually see the employee, and an original document from the

10  physician must be submitted, and no backdating by the physician

11  or his representative will be allowed."

12  Q    Okay.  Now, when we were looking at the attendance chart a

13  moment ago, you mentioned there were some absences there where

14  there was an E.

15  A    Right.

16  Q    What categories, looking at Exhibit 90 here, were covered

17  by E?

18  A    That would be No. 7, personal business approved by the

19  supervisor; no. 8, sick leave; and No. 9.

20  Q    And sick leave, if it was FMLA, you could have more than

21  five days, right?

22  A    That would be right.  It would No. 7 or No. 9.

23  Q    And, in fact, if we could then look at the third page of

24  this attendance policy, do you see under guidelines there at

25  the very top of the page, Page No. 224.

1  A    224?

2  Q    Yes, sir.

3  A    Okay.

4  Q    Do you see that?

5         What does that first paragraph or guideline say?

6  A    "Employees will be allowed an aggregate of five absences

7  per calendar year as described in items 7 and 9."

8  Q    Okay.

9  A    "Absences in excess of the five shall be considered

10 unauthorized."

11 Q    So when we talked about the cap of five days, or excused

12 days, we're talking about categories 7 and 9?

13 A    Correct.

14 Q    And, obviously, the other categories we looked at going

15 back to Page 2 could be longer than five days?

16 A    Yes, of course.

17 Q    As was the case with Ms. Arroyo?

18 A    Yes.

19         MR. McMAHON:  Okay.  No further questions.

20         MR. DeROSE:  Judge, could I just on that exhibit?  I

21 promise I'll be two minutes.

22         THE COURT:  Yeah.  Sure.  Go ahead.

23         MR. DeROSE:  I am so sorry.

24         THE COURT:  That's okay.

25                       REDIRECT EXAMINATION

Schroeder - Redirect by Mr. DeRose

BY MR. DEROSE:

Q   Sir, would you put up on the screen so we can get the categories?

A   Is this No. 90, sir?

MR. DeROSE:  Oh, yeah.  223, Cait, excusable absences. Put that up.

MS. DeROSE:  It's up there.

MR. DeROSE:  Oh, it's up there.

BY MR. DeROSE:

Q   So when you excuse them for jury duty and for military duty, you have no authority over that, do you?  That's required.  If a judge says, "I need one of your people to serve on a jury," you've got to let them go, don't you?

A   Right.  These are just examples --

Q   Examples.

A   -- that you see.

Q   And if our country says, "They've got military duty," you have no part in that.  You've got to excuse them, don't you?

A   Yes, of course.

Q   All right.  And if someone is sick and has doctor's letters that says they can't go to work, excuse them, you've got to excuse them, don't you?

A   Well, we would do that up to the five excusable absences.

Q   Put that 265, third page up.

MS. DeROSE:  Could we get the plaintiff's -- I am

1  going to put up Defendant's 15.

2          THE COURT:  You told me -- Defendant's 15?

3          MS. DeROSE:  Defendant's Exhibit 15.

4          THE COURT:  So that's in the binder.

5          THE CLERK:  Do you want that on the jury gallery also?

6          THE COURT:  Yes, please.  So all of the jury can see

7  that there.

8          MR. DeROSE:  You guys, this will be my last two or

9  three questions.

10          THE COURT:  So we will let the jury see it there.  All

11  right.  Very good.

12  BY MR. DeROSE:

13  Q    All right.  Sir, when I asked you about no excused absences

14  after November, and December she got sick and had to go to the

15  emergency room, the whole next year when she was asking for all

16  of those special treatments of time off, early -- coming in

17  later on Tuesdays because of group therapy, and the meditation

18  room, when we look at this third page, there's not an absence

19  on there that she wasn't entitled to, is there?

20  A    No, all these absences, sickness, military leave were all

21  excused absences.

22  Q    She had doctor's letters from every one of them.  She was

23  either in the hospital or under a doctor's care, right?

24  A    Yes, sir.

25  Q    For her PTSD?

1    A    I don't -- HRSC manages the documents.  I would never see

2    what the diagnosis is for that time period if she was off.

3    Q    So you're not responsible for any of those excused

4    absences, are you?

5    A    I'm sorry, sir.  What do you mean by responsible?

6    Q    You didn't have anything to do with authorizing them, the

7    law or something she gave to the company?

8    A    No.  Accident and sickness is a human resource approval.

9    Q    And the only thing on this third page, once she got

10   diagnosed with PTSD, was your written warnings and three-day

11   suspensions, am I correct?

12   A    I'm not quite sure I understand the question, sir.

13   Q    Look at the column over on the side.  You're the one who

14   gave her the written warning for being five minutes late and

15   being one minute late.

16   A    Yes.  The inexcused dates I did -- I issued her the

17   employee counseling document.

18   Q    And you gave her three suspensions, six in six months,

19   right?

20   A    It's five or six months.

21   Q    The six months is a rolling period?

22   A    Six --

23   Q    The rolling period, you go back six months.

24   A    Yes, within the policy we roll back, it's five or six

25   months.

Schroeder - Redirect by Mr. DeRose

1    Q    But you didn't.  You went back more than six months to come

2    up with the five in a six-month period.

3    A    Well, six months of working time we did, sir.

4    Q    Sir, you used the time frame from April 14th -- April 4th

5    to November 14th to give her discipline, didn't you?

6    A    I would have to have the actual disciplinary document to

7    references the dates.

8              MR. DeROSE:  Give me that document, Cait.

9              Judge, I promise.

10   BY MR. DeROSE:

11   Q    If you used more than a six-month rolling-time period, that

12   would be against your own policy that you drafted, wouldn't it?

13   A    Unless it fell under the revision that we did in 2009.

14   Q    Sir, the letter -- this is Defendant's 35.  Counsel showed

15   you this morning the termination absence of November 8th, 2011.

16   Can you get it up, Cait?

17             MS. DeROSE:  Yes.  One second.

18             THE WITNESS:  What document is that, please?

19             MR. DeROSE:  Hold on, and I will give it to you.  Just

20   one second.

21             MS. DeROSE:  I will put it up.  Can I use the Elmo?

22             THE COURT:  Sure.  Okay.  There's the Elmo.

23   BY MR. DeROSE:

24   Q    Look at what you write on November 8th regarding --

25   A    What document is that, sir?

Schroeder - Redirect by Mr. DeRose

1  Q    It's the document on -- you don't have it.

2            MS. DeROSE:  It's in the defendant's book.

3            THE COURT:  Try number 35 in your book, Mr. Schroeder.

4            MS. DeROSE:  It's actually -- yeah.

5  BY MR. DeROSE:

6  Q    Look at the very first line.  This is what you gave her on

7  the day that you terminated her.  And you tell her, "You have

8  accumulated a total of five occurrences in a six-month period

9  from April 14th 2011 to November 4th 2011.  That's more than

10  six months, isn't it, sir?

11  A    That time frame is more than six months.  But, again when

12  you look at the attendance policy, it excludes time off, other

13  than vacations and holidays.

14  Q    Sir, in Luzmaria Arroyo's case, did you exclude all of her

15  military time off so you could go back a whole year if you

16  wanted?

17  A    Didn't intentionally do that, sir.  We created a revision

18  of the policy to measure this against working time.

19  Q    She was the only military serviceman in your whole company,

20  and you created a rule saying military leave won't be included

21  to cut off the six-month period.

22  A    That's not true, sir.  Sir, it included other categories

23  that you are ignoring.  There was short-term disability.  It

24  could be workers' compensation.  There was multiple categories.

25  It could be jury duty.  It could be other categories.

Schroeder - Redirect by Mr. DeRose

1    Q    So you excluded all of those six days when she was in the

2    hospital with PTSD?

3    A    All days other than what was noted in the policy, which I

4    don't have in front of me.

5    Q    Why did you exclude that military service and sick days

6    that make -- so you could use more time for a rolling-time

7    period?

8    A    Because we wanted to just capture working time.

9             MR. DeROSE:  Thank you, your Honor.  I'm finished.

10            THE COURT:  Did you have anything else?

11            MR. McMAHON:  Absolutely not, Your Honor.

12            THE COURT:  Okay.  Mr. Schroeder, thank you.  You can

13   step down.

14            And why don't you take all -- why don't you give the

15   binder back to your counsel and all of the loose documents,

16   except 43, to Ms. DeRose, who's, I think, standing up to take

17   the pile from you there.  And then we'll clear the lecturn and

18   the next witness can get another pile of exhibits.

19            MR. DeROSE:  All right.

20            THE COURT:  Okay.  Thank you, sir.

21            MR. DeROSE:  I bet they all know who that's going to

22   be, Judge.

23            THE COURT:  They probably do.  But go ahead and tell

24   us.

25            MR. DeROSE:  Judge, could I have Ms. Arroyo get on the

# Arroyo - Direct by Mr. DeRose

1  witness stand?

2        THE COURT:  Okay.  Very good.  Ms. Arroyo, you've seen

3  the drill, too, and if you can just remain standing.  And

4  Lynette, do you want to give her the oath.

5        Okay.  Thank you very much.

6     (Witness sworn.)

7        THE COURT:  Okay.  Thank you and thank you.

8        Okay.  Mr. DeRose.

9        LUZMARIA ARROYO, PLAINTIFF'S WITNESS, SWORN

10  BY MR. DeROSE:

11  Q   Will you just state your name for all of us?

12  A   Luzmaria Arroyo, spelled A-r-r-o-y-o.

13  Q   Ms. Arroyo, you are the plaintiff in this case that the

14  jurors are sitting on?

15  A   Yes.

16  Q   We've heard that you're in the United States Army Reserves.

17  How in the world did it come about that you got into that

18  organization?

19  A   I have an older brother who was active duty infantry for 22

20  years.  He did a three-year period where he was a recruiter.

21  And I went down to visit him and he showed me what a recruiter

22  does.  And as he was showing me, he unknowingly was selling me

23  on the idea of joining the military.  When I returned home I

24  told him that I was interested and he walked me through how to

25  sign up.

1    Q    How old were you?

2    A    20.

3    Q    How far is your formal education in school?

4    A    High school.

5    Q    And when you were age 20 and your brother did that

6    recruiting job on you, were you working?

7    A    Yes, I was.

8    Q    Who were you working for?

9    A    I had already been hired and working for UPS.

10   Q    We learned that sometime you went over to work for Volvo

11   and you were still working at UPS then?

12   A    That's correct.

13   Q    Why did you go to work for Volvo?  I mean, why did you --

14   if you were working for UPS, why did you go over and interview

15   for Volvo?

16   A    Well, I wasn't -- I was -- in my position at UPS, as a hub

17   operational supervisor, there was only so much growth that was

18   allowed.  And in order to go to the next step, I would have

19   needed a bachelor's degree, and I was nowhere near a bachelor's

20   degree.  So I was opening my options to other opportunities.

21   Q    And when you say you were nowhere near it.  Had you started

22   taking some college courses?

23   A    Yes, I did.

24   Q    On the piecemeal plan while you worked and went to school?

25   A    That's correct.

Arroyo - Direct by Mr. DeRose

1   Q   When you interviewed for Volvo, who did you interview with?

2   A   I know Keith Schroeder was present.  Patrick Dunne, who

3   later became one of my supervisors, was present.  Michael Temko

4   was there as well.  Chris Human was another individual in

5   attendance.  And there was one more, but I can't remember who.

6   Q   And Chris Human, he's another supervisor there now?  We've

7   seen his name on these emails.

8   A   That's correct.

9   Q   And I said Chris -- it is got a girl.  Chris is a

10  gentlemen.

11  A   Christopher is his name.

12  Q   When you first were working for the company in 2005, we saw

13  an email that said you were burning the candle at both ends.

14  Did any of your supervisors tell you when you first were

15  working there that you didn't seem to have enough in the tank,

16  or you didn't have too much in the tank because you were

17  burning the candle at both ends?

18  A   Yes.  At the time Michael Temko was my immediate supervisor

19  whom I reported directly to, and he is the one who took me to

20  the side and said that if I didn't straighten up, I wouldn't

21  have a career anymore at Mack Truck.

22  Q   Did he tell you what you had to do to straighten up?

23  A   No.  But he indicated the fact that he noticed the fact

24  that I was exhausted all of the time.  It wasn't until later

25  when I spoke with Mr. Schroeder that it came up that if I

1  wanted to keep my job, I needed to choose my -- what's the

2  words he used -- my interests properly.

3  Q   Was there any -- we know that you left UPS sometime -- was

4  it in 2005?

5  A   Yes.

6  Q   Why did you leave UPS?

7  A   Well, based on the suggestion that Michael Temko had made

8  at the time, I realized that -- I was drilling at Fort Benning,

9  Georgia, when I applied at Volvo.  And so I told Volvo that one

10  weekend a month I would have to drive down to Fort Benning,

11  Georgia.  On a good day, with no breaks, it would take me 16

12  hours.  So on a Friday night, after working at Volvo, I would

13  start the drive.  And I would arrive there somewhere between --

14  Q   You said no brakes.  Your car had no brakes?

15  A   No.  I did not stop, except maybe the one time for gas.

16  Q   Yeah, because driving a car with no brakes you probably

17  could make it in less time, if you made it.

18        All right.  So what was your job for the army over

19  there in the reserves at Fort Benning?  What kind of assignment

20  did you have?

21  A   Well, originally, when I was assigned at Fort Benning, I

22  was a generator mechanic.  I came to Fort Benning, Georgia,

23  because I wanted to be human resources, and more specifically,

24  human resources for a drill sergeant unit.

25  Q   All right.  So by the time you came to work for Volvo, were

1   you getting experience in human resources for the army?

2   A   That's correct.  I was already trained and certified in

3   human resource management.

4   Q   And as a human resources manager in the United States Army,

5   would it be fair to say that you had a pretty good handle on

6   what the responsibilities and the rights were of the military

7   soldiers who worked in the U.S. Army Reserve?

8   A   Well, I think I had a better understanding than your

9   average soldier.

10  Q   All right.  When you came to work for Volvo, did there come

11  a time when there was an issue about whether they had to allow

12  you what you believed was sufficient time to get back to Volvo

13  after drilling?

14  A   Yes.  Almost immediately.

15  Q   All right.  We saw that email in 2009 -- by the way, you

16  were not privy to any of these e-mails that the jury has seen

17  until the discovery in the case; is that a fair statement?

18  A   That's correct.

19  Q   All right.  So back in 2009, how did the issue get raised

20  to you about your returning to work after drill training at

21  Fort Benning?

22  A   Well, in 2005 --

23          MR. DeROSE:  Did I say nine, Judge, I apologize?

24          THE COURT:  That's okay.  She picked it up.

25          MR. DeROSE:  All right.  Thank you.

Arroyo - Direct by Mr. DeRose

1    THE WITNESS:  In 2005, that's when Michael Temko came

2    to me and noted the fact that I was exhausted all of time.  And

3    as I was explaining, it was really a hard tour of duty to leave

4    from work Friday evening, after having worked an eight-hour

5    shift, then drive immediately 16 straight hours.  I would

6    arrive at my unit at about the time we were supposed to do PT,

7    so that's another 12 hours of work before I eve get my next

8    break.

9    Q   And then when you finished your tour of duty, you had to

10   drive back to Joliet?

11   A   Correct.

12   Q   With the car with brakes.

13       And did Michael Temko ask you at all, "Why didn't you

14   come back earlier?"

15   A   Yes.

16   Q   How did that go?  What was the conversation?

17   A   He told me that he noticed that I hadn't been at work when

18   I was supposed to be, and he asked me where I was.  And I told

19   him that I had been down to my unit and that I had driven up

20   from Fort Benning, Georgia.  And he said, "Well, why did it

21   take you so long?"

22       And I told him, "Well, I had to drive.  It's a 16-hour

23   drive."

24   Q   Did he ask you why you didn't fly?

25   A   No, Mr. Schroeder later asked me that.

1    Q    Did you answer the question why you didn't fly?

2    A    Yes.  I told Mr. Schroeder and his HR representative that

3    travel for a reservist, not on active duty orders, is all out

4    of our own pocket.  Quite literally, my whole army reserve

5    paycheck paid for my driving down to Fort Benning, having

6    someplace to stay and driving back.  So I didn't make any money

7    in going there and doing my service.

8    Q    Is it fair to say you weren't real rich when you first

9    started working for Volvo?

10   A    That's correct.

11   Q    And you were working the two jobs and the army reserves?

12   A    That's correct.

13   Q    When you signed up for the army reserves, do you sign up

14   for a committed time or if you feel like you're  burning the

15   candle at both ends, can you just quit?

16   A    Oh, no, not at all.  Can't quit.

17   Q    Well, how long do they have you before you can say, "I've

18   had enough"?

19   A    Well, that's complicated because it depends on what kind of

20   tour an individual has signed up for.  For an initial contract,

21   any person who signs into the military is required to be -- to

22   report to Uncle Sam, if they need him or her, for eight years.

23   But within those eight-year period, a soldier can elect to do

24   two years of active duty and then just be on call for the next

25   six years, or four years of active duty and then on call for

Arroyo - Direct by Mr. DeRose

1  the next four years, or in my case as a reservist, six years of

2  reserve duty, and then on call if there's a war, like what

3  happened on 9-11, to be called back and perform their duty.

4  Q   And once the war broke out -- by the way, what year did you

5  actually join the reserves?

6  A   Just after my birthday, January 2001.

7  Q   And 9-11 was in 2001, right?

8  A   Right after I graduated from my job training.

9  Q   So you were already signed up for an eight-year commitment,

10  with six-year Reserve duty they could call you up any time?

11  A   That's correct.

12  Q   Didn't make a very good choice there.

13       All right.  So once that war broke out, it was

14  probably kind of inevitable to you that as soldiers were being

15  shipped overseas that you would be called up at least once,

16  right?

17  A   Yes.

18  Q   And when was your first tour of duty?

19  A   I was originally mobilized in November 2003.  We went

20  to -- the old way of mobilization is a lot different than the

21  way it is now.  But -- so they originally called me in in

22  November 2003, placed me on active duty in December of 2003.

23  We came back and were released from active duty in

24  January 2005.

25  Q   So the first tour of duty you went over what month?

1  A   Came back?

2  Q   Were you over there two years, the first time?

3  A   It was the end of one year, the beginning of another year.

4  Q   So it was only -- I mean not only -- but 13 months.  And

5  where were you stationed when you got over to the army on that

6  first tour of duty?

7  A   I was deployed to the personnel unit, which their job was

8  to track the movement of soldiers coming from the United States

9  into the war zone, and then tracking their movement back from

10 the war zone home into the United States.  And we were the

11 middle point between the two in Kuwait.

12 Q   So you were actually in Kuwait for that first tour of duty

13 for 13 months.  And the soldiers with whom you were working

14 with in that first deployment, were they soldiers who you had

15 known, or several of them who you came to know from your

16 assignment at Fort Benning, Georgia?

17 A   Well, that first tour of duty, actually, that first active

18 duty, quite literally before my time with Volvo.  And when the

19 military deployed me with those guys, we had been a

20 Frankenstein unit, where they pulled people from all over the

21 country in order to make a unit that was able to go overseas an

22 support the fight.  Because by this time, we had the army and

23 the army reserves had already tapped all of the personnel that

24 were on call.

25 Q   So the Frankenstein unit, it didn't just compose soldiers

1   from Fort Benning, I take it?

2   A   Well, at that time I was actually stationed in Fort

3   Sheridan.

4   Q   Here in Illinois?

5   A   That's correct.

6   Q   All right.  And how did it go -- how it did it come about

7   that you left Fort Sheridan and ended up in Fort Benning,

8   Georgia?

9   A   After -- when a soldier returns home from an active duty

10  assignment, they're allowed options.  One option would be to

11  remain on active duty, another option could be to change units,

12  and the third option, which was the option I chose, was to

13  change my job.  And I said I would be willing to go anywhere as

14  long as I get to learn what these guys that I just deployed

15  with did.

16  Q   What was that you were trying to learn?

17  A   Human resources.

18  Q   All right.  So the army trained you in human resource law?

19  A   That's correct.

20  Q   So by the time you interviewed -- well, all right.  So

21  you're back from your first tour.  Did you then go and hire

22  with UPS?

23  A   Oh, I was already working at UPS.  I have been working

24  since I've been 13 years.  Not officially, but my mom instilled

25  in me very young that you work.  You take pride in your work.

1    Q    So when you -- when you interviewed with Volvo, you were

2    already at Fort Benning, then?

3    A    That's correct.

4    Q    And it was only after a couple of months that you were at

5    Fort -- at Volvo that you had this discussion about the travel

6    back and forth to Fort Benning; is that correct?

7    A    That's correct.

8    Q    Sometime shortly after you had your discussion with Michael

9    Temko, did you have a meeting with Keith Schroeder, a personal,

10   private meeting?

11   A    Not just Keith Schroeder, but also with the human resource

12   person, Celia Jarvis.

13   Q    So you've met Celia Jarvis?

14   A    Not personally.  She was on the phone and teleconferenced

15   in.

16   Q    And you and Keith were together in the room; is that right?

17   A    That's correct, with Michael Temko as well.

18   Q    So Temko, you, Schroeder, Jarvis on the phone.  What's

19   being said in that conversation?

20   A    Celia Jarvis asked me again why I didn't just fly to Fort

21   Benning, Georgia, and I explained to her the situation.  And

22   she told me that she was an air force reservist herself, so she

23   understood what its like to be a service member.  And I said,

24   "Well, that's great.  So these are the things that I need.  I

25   need to be able to rest, go to my unit and perform my duties,

1  and come home." She told me that that wasn't authorized. And

2  I then told her --

3  Q   What wasn't authorized?

4  A   The extra time needed for travel. I then told her that it

5  was based on USERRA, and that if she had any questions, she

6  could go to ESGR in order to be trained. Because they're the

7  experts. They're the mediators, who when there's a problem

8  between an employee and an employer will sit down and

9  negotiate.

10  Q   All right. Sometime -- now, you didn't see the emails that

11  I shared with the jury the other day where Jarvis wrote back

12  saying, "I went all of the way to Washington and she has the

13  right to use the travel time"?

14  A   I saw no emails connected to this case until discovery.

15  Q   All right. So later on you found out, okay, they're going

16  to let you have the travel time and the rest time, correct?

17  A   Correct. But I was still receiving pressure of changing

18  units.

19  Q   From whom?

20  A   Because I had told Michael Temko, originally, that I had a

21  one-year obligation with them since they had sent me to the job

22  training. You know, they spent money on me. Wouldn't you want

23  your money back? Well, essentially, that's what was the

24  agreement between myself and the unit was that I would go learn

25  this job and come back and service them for one year.

Arroyo - Direct by Mr. DeRose

1    Q    And that would be the HR group over there at Fort Benning?

2    A    Correct.

3    Q    All right.  And was there any discussion between you and

4    people at Volvo about coming to a closer unit, a more local

5    training unit?

6    A    Yes.

7    Q    About when did that occur?

8    A    I want to say it was October or November of 2005.

9    Q    And who was present in that meeting?

10   A    Oh, it was just Keith and I.

11   Q    And where did it take place?

12   A    Out on the operations floor.

13   Q    Operations floor, is that where the picker-packers are

14   driving around all of those machines?

15   A    Correct.

16   Q    All right.  And did you go off to the corner, the two of

17   you, to talk?

18   A    No, I was getting on my forklift.  I had just stopped my

19   forklift and he came and walked up next to me.

20   Q    All right.  Was that unusual for -- at that time in 2005,

21   for Mr. Schroeder to just walk up to you and start talking to

22   you on your forklift?

23   A    Well, I didn't have anything to base it on.  Because it was

24   just the first time that we had begun, really, interacting.

25   Q    All right.  And tell the ladies and gentlemen of the jury

Arroyo - Direct by Mr. DeRose

1  what was said between you.  And please identify the speaker.

2  A    Oh, I see.

3       So Mr. Schroeder had kept informing me that it was

4  becoming an undue hardship on the company for me to travel to

5  Fort Benning, Georgia.  And as I explained to him before, I

6  needed to wait a whole year before I could transfer.  This is

7  why I was so surprised that they hired me, knowing that I had

8  my unit down in Fort Benning, Georgia.  But I assumed that they

9  really, like they said, really loved supporting their veterans.

10      So when Mr. Schroeder kept telling me over and over

11  and over again, I kept telling him, "April is the date.  Once

12  April comes around, I can go ahead and request that transfer.

13  But until then, my hands are tied."

14  Q    All right.  And now -- did you repeat that when he walked

15  up to you; is that when you -- because I am trying to get to

16  the conversation when he walked up to you?

17  A    Yeah, that was one of them.

18  Q    All right.  And what, if anything, did he say?

19  A    He told me that I needed to think carefully about my career

20  options because he sees that there is a conflict of interest,

21  and the company has a policy regarding conflict of interest.

22  Q    I see.  Did you ask him what he meant by a conflict of

23  interest?

24  A    No, he is the manager.

25  Q    Did you know what he meant?

1    A    I took it as a threat.

2    Q    A threat of what?

3    A    That I would lose my job if I didn't figure out a way to

4    move from Fort Benning, Georgia, to a local unit.

5    Q    Did you like working at Fort Benning Georgia?

6    A    Yes.

7    Q    Have you ever heard the expression army buddies?

8    A    Battle buddies.

9    Q    Battle buddies.  Have you ever heard that expression?

10   A    Generally, they're used to identify a person who is always

11   with you.  Somebody who watches your back.  But what I

12   experienced, actually being deployed and having to work with

13   somebody -- not somebody, but a group of people, 24 hours a

14   day, seven days a week, it becomes more than just a buddy.

15   It's -- that person almost becomes like family.  They know you

16   inside and out.  And the slightest expression on your face, you

17   can read it.  It got to the point where my battle buddies and I

18   would speak without even saying full sentences.

19   Q    All right.  When you -- when it was suggested to you that

20   you transfer to a more local unit, was that going to cause --

21   withdraw that question, Judge.  I didn't know how to form it.

22        So anyway, you -- we know you transferred to Darien,

23   Illinois, a local unit.  How did that come about?  How did you

24   determine where to come to?

25   A    That wasn't until after I went on my second deployment,

Arroyo - Direct by Mr. DeRose

1  which is what Volvo has been referring to in this case as my

2  first deployment.

3  Q   All right.  So when did you go out on deployment for the

4  second deployment?

5  A   That was April of 2006.  So the time that I was promising

6  Volvo that I would be able to change to a local unit, I wasn't

7  able to, because we were now being sent overseas.

8  Q   All right.  Now, the second time you went overseas, you

9  went out with a group from Fort Benning, then?

10 A   That's correct.

11 Q   All right.  And where was your unit of assignment in that

12 second deployment?

13 A   We were assigned to the green zone in Baghdad, Iraq.  The

14 people that I was deployed with were drill sergeants.  Their

15 primary mission was to train.  Train what -- at that time, we

16 were trying to train the Iraqis to have their own military and

17 police forces.  So our brigade actually divided into two

18 separate groups.  And one was in charge of teaching the Iraqi

19 forces how to be policemen, and all of the policies and

20 procedures and training and techniques in that.  And then

21 another group was training them how to be military, and all of

22 that involved that.

23          My job was to track all of the people in the

24 battlefield doing that.

25 Q   And on that second deployment, were there times when you

1    could actually hear fire, bombs and things like that going off?

2    A    Yes.

3    Q    What were your living accommodations when you weren't

4    working?  When you would be off at night to take your sleep or

5    whatever.

6    A    So to understand the situation, where we were at, we were

7    staying -- or living in one of Saddam's palaces.  We worked out

8    of a base camp that was established along the road by one of

9    Saddam's swimming pools.  And we just set up camp there.  On

10   the other side of -- like the highway -- was the Ministry of

11   Defense and the Ministry of Interior, which are both the

12   military and police forces, their main headquarters.

13          At the time Iraq still had not become stable.  It was

14   after Fallujah, but we still hadn't really maintained a good

15   hold on it.  So the Ministry of Interior and the Ministry of

16   Defense were receiving fire from the insurgents that were still

17   trying to take back Baghdad, as was their slogan.

18   Q    All right.  And what were your sleeping accommodations at

19   night?

20   A    A tin box.

21   Q    Can you explain that a little more?  What is a tin box?

22   A    If you think of a semi-trailer, but kind of half of a

23   48-foot semi-trailer.  And they cut out a man-size door to get

24   entry into that box.  And then to split the room in half you

25   had wall lockers, which they would set up next to each other so

1    that you could create a wall.  On one side you would have a

2    bed, on the other side you would have a bed, and maybe an air

3    conditioner.

4    Q    And that's what you and one of your other battle buddies

5    would share every night, one of those tin boxes?

6    A    That's correct.

7    Q    And were those boxes supposed to be impenetrable enough so

8    that bombs wouldn't bother you?

9    A    No.  And quite actually, one of the guys -- one of my

10   battle buddies who worked with me in my office, he received

11   fire -- somehow a round had come through his roof and landed in

12   the foot of his bed.  And luckily it happened at a day that we

13   were at work -- or a time while we were at work, so he wasn't

14   actually laying in the bed when it received fire.

15   Q    So when you came home, how long was that second tour, which

16   was really the first one while you were at Volvo?

17   A    So after -- I was given my D-214 in May, the early part of

18   May.  And immediately I just went back to work.  Of 2007, I'm a

19   sorry.

20   Q    2007.

21       From your understanding as a human resources person

22   for the Army, were you allowed, once you came back to the

23   United States, to take some time before you went back to work

24   and not be -- your employer would still have to take you back?

25   A    Well, there were two options.  First, when we returned and

1  were at DMO station and kind of giving back all of the army

2  supplies and stuff like that, we also get the option to -- any

3  leave that we might have left over that we didn't use, to

4  either cash it in for money or to stay on active duty for that

5  remaining period of time in order to continue the benefits,

6  like medical care and things like that.  I chose to cash in

7  mine, so that I could return straight back to work.

8  Q    All right.  So that first deployment that Volvo was

9  concerned with, immediately after you got back on the American

10 soil within -- how long, a couple of days you were back at

11 work?

12 A    I'd say maybe two weeks, tops.

13 Q    All right.  And so now we are up to -- what date would that

14 be in?

15 A    That would be May of 2007.

16 Q    All right.  When you first come back, is there a

17 requirement that you are to be retrained on anything that has

18 changed in the company since the last time to get you up to

19 speed?

20 A    Well, that's always been USERRA.

21      MS. WILSON:  Your Honor, if I can, I would like to

22 object to the witness testifying about what the law says.

23      THE COURT:  Sure.  We will have that as a standing

24 understanding that any time a witness -- anytime a witness --

25 anytime there's a question or an answer about the law that

1  doesn't come from me, it's not the law.  It's an understanding

2  of the law.  Because you can only get one source of the law in

3  the case.  So with that understanding, you can go ahead with

4  the question.

5        MS. WILSON:  Thank you, your Honor.

6        THE COURT:  Sure.  Thank you.

7  BY MR. DeROSE:

8  Q   So as the HR person from the army, how long did you have

9  before you had to get back to work with Volvo?

10 A   And as Mr. Schroeder and Mike Temko had stated earlier, it

11 does depend on the length of time of service that you're away

12 from your employer.  And that's basically to request to be

13 reemployed, not necessarily the amount of time that they have

14 to get you into the job.  And so, in my case, having been gone

15 over one year, it was 90 days.

16        And within that reemployment part, I would assume

17 would be the -- the intent was that I've been gone for a year.

18 I've been -- all of my mental faculties have been focused on

19 what I was doing for that year.  So more than likely, well,

20 this is how I thought, was that I didn't remember everything.

21 So when I came back, I asked for retraining.  And this was in

22 2007 even.  And what I was told was that I had been with the

23 company long enough I should know everything.

24 Q   Who told you that?

25 A   Michael Temko, and then Keith Schroeder.

1   Q   When you first came back, did you meet with both of them?

2   A   No.  No in 2007 I only reported right back to Michael

3   Temko.

4   Q   And did he put you right back on the same shift that he was

5   supervising?

6   A   That's correct.

7   Q   And what shift was that?

8   A   I believe it was the third shift.

9   Q   And that shift would start at what time

10  A   12:30.

11  Q   12:30 in the --

12  A   In the morning.

13  Q   And go to 8 o'clock a.m.?

14  A   Correct.

15  Q   All right.  And when you first came back in 2007, there

16  were times that now you had to go and train some more?

17  A   Well, after returning back to Volvo, after having been

18  deployed for a whole year, the issue came up again about me

19  having to go back to Fort Benning, Georgia.

20  Q   Who brought that issue up?

21  A   Mr. Schroeder.

22  Q   Where were you when he brought the issue up this time?

23  A   I believe he called me into his office.

24  Q   And that's in the front of that plant over there in Joliet?

25  A   Correct.

1   Q    Was it just you and he in the office?

2   A    Yes.

3   Q    Tell us what he said and what you said in that meeting.

4   A    Well, he had told me that, again, my military service was

5   becoming an undue hardship for the company.  By this time I had

6   been pretty well trained by human resources, so I looked up

7   what undue hardship meant.  So again, it felt like he was

8   telling me that I was becoming a burden to him.  And he told me

9   that I needed to think seriously about my career.  And that it

10  would greatly help the company if I could move to a local unit.

11  And I explained to him that even if I move to a local unit, it

12  doesn't necessarily mean that it would reduce the hardship that

13  was happening at that moment.  And I didn't have the words or

14  any of the ability to translate how army orders and how they

15  pick people to deploy work.  And what was happening within the

16  Army and why it was so chaotic.

17  Q    All right.  Even so, you made the decision to transfer to

18  the local unit over there in Darien, right?

19  A    Yes, I liked working for Mack.  I wanted to keep my job.

20  Q    The people who you were leaving when -- from Fort Benning,

21  Georgia, had some of them become battle buddies over that last

22  deployment?

23  A    Yes.

24  Q    Could you explain to the ladies and gentlemen of the jury

25  what that means to be deployed as a battle buddy and come back

1   and now be asked to leave them, for you?

2   A    For me, to describe it would be like describing a safe

3   place.  You know, out in the world you don't know who to trust

4   or what's going -- what might happen.  And so when I have a

5   battle buddy nearby, I know that I just don't have to rely on

6   myself, that my buddy also is doing the same thing.

7   Q    Did you find it at all difficult to transfer to Darien,

8   Illinois, and leave those battle buddies?

9   A    Well, I was leaving a group of people that I trusted for a

10  group of people that I didn't know and didn't trust.

11  Q    So now, are you the one who chose the Darien, Illinois

12  facility?

13  A    I did.

14  Q    And you were allowed to pick them because now you're

15  commitment to Fort Benning was up and you could pick any place

16  in America?

17  A    That's correct.

18  Q    You could have picked Hawaii or Florida or anything.

19  A    That's correct.

20  Q    All right.  So when you picked the Darien unit, we saw

21  orders here that the ladies and gentlemen have seen about a

22  string of times when you had 38 -- and I'm off on the days, 38

23  days of drills followed immediately by 72 more days of drills.

24  Those kinds of back-to-back drills, what's going on on all of

25  that?

1   A   Well, you have to understand that my situation was very

2   unusual.  And even though I could pick whatever unit I wanted

3   to go to, I also needed the commander's approval.  You know, I

4   couldn't just say, "I want to go here and fill your slot and

5   that's what I want."  The person in charge has to say, "Well,

6   okay, I want you to be a part of my team as well."  And for

7   some reason -- I don't know what -- it took the two units, the

8   units in Fort Benning, Georgia, and the units in Darien, to get

9   the transfer accomplished.  So after that happened, and during

10  that time, I became acclimated with the new unit and what was

11  happening in there.  And what I found out was I changed from a

12  unit whose only job was to maintain their immediate location

13  and maybe four or five other people -- or other locations, to a

14  unit that was at the top level of their section.

15  Q   What did that mean?  What does it mean?

16  A   It means that -- we had over 356 units that reported to us.

17  So we were the -- before you go over to the top army guy, who

18  does both reserve and army, you had my commander, who reported

19  to them.

20  Q   All right.  So were your responsibilities different at

21  Darien then they had been at Fort Benning?

22  A   Much more.  Much more responsibility.

23  Q   What changed for you?

24  A   So my unit in Fort Benning, Georgia, I only had to worry

25  about maybe 45 individuals.  When I moved over to Darien, I

1  started off having to manage 1200 people.  And then I found out

2  that the position I had been moved into had -- did not have

3  good leadership, and so I had to establish the office climate,

4  if you will, train people how to do their human resources

5  stuff, how to promote people, all of the individual tasks, pay

6  people, everything.  And then I had to establish a support

7  system for that in order to also take care of their individual

8  needs, such as physical fitness, height and weight, equipment.

9  It was taking care of the needs of all of those soldiers.  And

10  then -- well, that's what was happening in 2007.

11  Q   And what had your rank become by then?

12  A   By 2007 I was an E-5.

13  Q   E-5 is a sergeant, right.  Five stripes?

14  A   No, E-5 is three stripes, a sergeant.

15  Q   And was that impacting at all what was going on and your

16  ability to do your job at -- at Volvo?

17  A   Well, the fact that they kept -- that they kept putting me

18  on orders in order to fix these problems did.

19  Q   Right.  So normally you would not have all those

20  back-to-back orders we're talking about?

21  A   Correct.

22  Q   It's only because the army had that need for you to help?

23  A   Correct.

24  Q   All right.  Did you have any discussion at Volvo about the

25  fact that you were getting these back-to-back orders running

1   like that?

2   A   Not at first.

3   Q   Later on or at any time?

4   A   Later on, I'd say after the beginning or -- the beginning

5   of 2008.

6   Q   All right.  What was the discussion, and who was it with?

7   A   It started off with Michael Temko.  It began with, "Well,

8   how is it at the new unit and what's going on?"  And we talked

9   a little bit about what his experience in the military had been

10  versus what my experience had been.  I really didn't --

11  Q   What was the difference the two of you discussed?

12  A   Well, for one, he told me that he had been a specialist.

13  So when I had been hired, we were of the same rank.  But by the

14  time I came back in 2007 I had already surpassed his last rank.

15  We also talked about some of the jobs that we had had and I

16  could relate to his job a little bit because he was part of the

17  driving the vehicles, if I remember correctly, and as a

18  mechanic in my first job, in the first deployment, I understood

19  what it meant to take care of those vehicles.

20          But once I transferred over to human resources and

21  learning all of those things, we were no longer on the

22  same -- we could no longer communicate in terms of who was

23  doing what, because eventually he was,like, "Oh, yeah, I had a

24  UA to take care of that."

25  Q   All right.  There came a point in 2008 -- strike that.

1  Were you ever advised that there was discussions going on in

2  emails about your failure to keep in contact with Mr. Schroeder

3  to tell him what you were doing?

4  A    No.  It had never been brought to my attention.

5  Q    Never complained to you and said, "I wish you would stay in

6  better contact with me or fax me or tell me thing?

7  A    What Mr. Temko did is for the orders and for the drill

8  schedules.  But those are things that I would give them as I

9  had them.

10  Q    And we saw that whole year drill schedule.  Would you get a

11  drill schedule for a whole year once in a while from the army?

12  A    Yes.  The fiscal year for the army starts in October, so it

13  ends in September.  They usually have the fiscal year and, you

14  know, the commander writes out for the whole year what kind of

15  training he expects his people to go through.  What kind of

16  missions he expects them to do.  At my unit -- we are an

17  engineering unit -- well, I was part of this unit.  We were

18  engineers.  And so when things like the tsunami that hit the

19  Philippines happened, my unit would deploy over there, and then

20  they would establish housing, schools, feed people who are

21  without.  So my commander would plan, and then adjust his plan

22  as things happened.

23  Q    So when you said he would, you meant your commander?

24  A    Correct.

25  Q    And so this annual -- whole year-long schedule, that was

1  something that the commander out of Darien would set up?

2  A   Correct.

3  Q   All right.  And you're obliged, no orders would be cut yet,

4  I take it, and we get orders for each of those drills?

5  A   No.  The planning scheme that we do is just an idea.  It's

6  not step by step and everything is in concrete, because there's

7  a lot of things that go on, you know.  People can get sick,

8  money might not be there, or a disaster, like what happened in

9  the Philippines.

10  Q   All right.  But every time you got a communication from the

11  army, did you give them to Mr. Temko?

12  A   Yes.

13  Q   And that was your responsibility as you understood it over

14  at Volvo?

15  A   Yes.  It did come at a time where my mom told me she had

16  received a phone call from Mack Truck wanting to know where I

17  was at.  And so I let my supervisor know that.  And I guess

18  they must have sent Mack that information.

19  Q   All right.  And that would be that order we saw -- we saw

20  before the jury here?

21  A   I guess, you know, if they received that from them.  They

22  didn't receive it from me.

23  Q   All right.  Now, we notice at the bottom of that

24  order -- was that your signature we saw on it?

25  A   Yes.

Arroyo - Direct by Mr. DeRose

1    Q   And right after it there was the date November 26th, right?

2    A   Correct.

3    Q   Would the army let you pre-date orders?

4    A   When -- for short-term drills, like that was I believe,

5    five days long, Monday through Friday, you signed in as

6    reporting in, but you cannot sign out.  So you're basically,

7    you know, their property from that moment.  You cannot sign out

8    until the officer signs their -- the verified official signs

9    the fact that, yes, I arrived; yes, I performed my duty; and

10   yes, I fulfilled my obligation.

11   Q   So when you signed your name, was it the 26th when you

12   signed it the date that the document bears, or was it some time

13   earlier?

14   A   I really don't know.  But I would assume if it was the

15   26th, it was probably the 26th.

16   Q   Okay.  You were not in the habit of doing different dates?

17   A   No.

18   Q   But at the top of the document where it has a fax script of

19   November 19th, you don't know if the fax machines at the U.S.

20   Army were always operating so well and perfectly dated?

21   A   I've never seen their fax machines and what they're

22   calibrated to.  I'm sorry.  I don't know.

23   Q   So you saw where Keith Schroeder said in one email while

24   you were deployed overseas in Iraq, you called him one time and

25   the phone got disconnected.  Can you tell us in your experience

1    what -- how good the phone service is from Iraq to the United

2    States if you're trying to make a call?

3    A    Well, the connection could be shady because they use

4    satellite systems.  But I think what had happened on that date,

5    and I was speaking with Michael Temko.  Whenever a service

6    member died, they would cut off communications, because they

7    didn't want any information being leaked back to the United

8    States until they had actually verified that it was so and so

9    who died, and what happened and how it happened.  And once that

10   report is written, basically, or once that individual was

11   identified, then we can go ahead and continue like normal.

12   Q    All right.  So you weren't deliberately calling Keith

13   Schroeder and hanging up on him from Iraq?

14   A    No.

15   Q    Why did you even call him?

16   A    Well, at the time I was feeling very stressed, very

17   depressed.  And I remembered some of the conversations that we

18   were having at Volvo regarding my job.  And I wanted to reach

19   out to somebody back home.  And I didn't reach out to my family

20   because I had promised them on the way over to Baghdad that I

21   was going to be safe because I was in a human resources job.  I

22   wasn't going to go out there and see anything happen to anyone.

23   And once I got there, I realized that that's not exactly how

24   the battlefield works.

25   Q    And this was actually your third deployment you were on

Arroyo - Direct by Mr. DeRose

1  when you made that call back to Keith, although they have it as

2  the second with Volvo?

3  A    Right.  No, wait.  I think -- I think we're talking

4  about -- I believe it was my second deployment.

5  Q    Well, let's kind of do this a little differently.

6        Of the three deployments you were on, was one of them

7  particularly more difficult for you than the other two?

8  A    They were all difficult in their own way.  I wouldn't say

9  more so, but I think maybe because it was back-to-back-to-back

10  it compounded it.

11  Q    I know that you have a post-deployment questionnaire and a

12  physical exam and psychiatric exam you have to go through.  One

13  of the questions asked, asked you has your health changed in

14  any way as a result of that deployment.

15       Did you remember being asked those questions?

16  A    Each of my three deployments -- and it's just the

17  military's way to track health and to provide the support and

18  documentation for when claiming injuries incurred while in the

19  line of duty.  So before we went overseas, we did an

20  in-processing of that, of letting them know what our health

21  situation is.  And coming home from overseas, we had to let

22  them know again how we're feeling after we had been over there.

23  Q    All right.  On that third deployment, how did you answer

24  the question of how your health had been affected, if at all,

25  while you were overseas?

Arroyo - Direct by Mr. DeRose

1    A    I believe I had told them that I was anxious, having

2    nightmares, shortness of breath.  That's all I can think of at

3    the top of my head.

4    Q    And when you came home from that third deployment, you

5    didn't suspect that you had PTSD, did you?

6    A    I didn't even know what PTSD was.  Before -- during my

7    first deployment when we came home, the office talked about

8    something called battle minds.  And in the military we receive

9    this training -- that's why we receive battle buddies -- is

10   because we're to look out for one another.  If something seems

11   odd, we're supposed to take care of each other, mention it, see

12   what is going on.

13          After I came home from my second deployment, my first

14   with Volvo, they started talking about something called battle

15   focus.  And it was a little bit more like what they're talking

16   now about PTSD.

17   Q    Wait a second.  Follow me with this.  So now you're back

18   from the third deployment.  You still didn't know what PTSD

19   was, is that agreed?

20   A    That is correct.  I'd never heard of it before.

21   Q    I know that they have something called a yellow ribbon

22   event.

23   A    That's correct.  I was informed --

24   Q    Wait a second.  Tell us what a yellow event is -- a yellow

25   ribbon event?

1  A   When I came home from my third deployment, I was told by my

2  unit that I would have to attend three of these yellow ribbon

3  events.

4  Q   What are they?

5  A   I was told that Congress had enacted this three times,

6  like, meeting groups in order to educate soldiers on what PTSD

7  was.  Because they had identified that a lot of soldiers coming

8  back from combat were committing suicide.  And I think they

9  believed that it was connected to this PTSD.  So the yellow

10 ribbon events were meant not only to educate us on what it is,

11 but also to look out to see if any of our soldiers were

12 starting to display any of those symptoms.

13 Q   As part of the yellow ribbon events, were you told or

14 ordered that you had to write something called "my story," and

15 share it and read it, deliver it to the other soldiers at the

16 yellow ribbon event?

17 A   Well I wasn't ordered.  When I went to my first yellow

18 ribbon event, I invited my mother to attend with me.  And it

19 didn't really impact me much.  But I noticed that it impacted

20 her.  And at one point, she actually nudged me and said, "Hey,

21 that's you."  So I started paying attention.

22      At the second yellow ribbon event, I again invited my

23 mom, but my aunt was living out there as well.  And my aunt's a

24 doctor.  So, of course, I wanted a second opinion.  So during

25 whatever they were presenting to us while we were there the

1    first night, I couldn't sleep because all of these things

2    started coming up.  And so I spent all night writing,

3    basically, a synopsis of my experience.  And I was so compelled

4    to share this that I asked the staff if I would be able to be

5    given a period of time to read it to the group.

6    Q    Did you get your chance to read it?

7    A    I did.

8    Q    How did that impact you?

9    A    It was like -- it felt like I had been carrying an armour

10   bag, weight.  And by talking about it and just -- and I didn't

11   really even go into great details about what I had seen, it was

12   just the overview of what happened, it felt like a waterfall

13   had just started.  I opened up something and I had no clue how

14   to control it or contain it.

15   Q    All right.  We have seen the letter that you wrote to Keith

16   Schroeder on Christmas Eve.  You know what you wrote in that

17   email, right?

18   A    (Shaking head).

19   Q    On the 23rd, the day before Christmas Eve, you indicated

20   your sister-in-law took you to La Grange Hospital, right?

21   A    Correct.

22   Q    What was going on?

23   A    I had woken up that morning feeling extremely anxious and

24   paranoid.

25   Q    Paranoid.  What do you mean?  Paranoid about what?

1  A   I just -- I felt like I couldn't -- like I was in danger.

2  Like at work, if I did the littlest thing, it was like they

3  were all out to get me.  And it wasn't just one individual, it

4  seemed like it was everybody.  And then I'm thinking to myself,

5  "Well, that doesn't make sense.  That's not logical.  Because

6  why would they be against me?  I haven't done anything."  So

7  the paranoia, and then with the overthinking what was the real

8  situation, I started -- it felt like I was fighting with myself

9  without physically fighting.

10  Q   And were you having difficulty sleeping at night after

11  coming home from your job at Volvo?

12  A   Yes.

13  Q   Were there any stressors from work that you were reliving

14  at night?

15  A   It didn't happen immediately.  But after I had already been

16  to work for a while, an incident happened where somebody who

17  was driving a forklift had too quickly lowered the forklift and

18  it made a banging noise.  And the thought that went through my

19  head was, "I didn't drop to the floor.  I should be dead.  How

20  am I still standing?  I should be dead."  And that made no

21  logical sense because, okay, I see it.  I'm at work.  I'm safe.

22  Why am I feeling like this?"  I ran to the bathroom in order to

23  collect myself.

24  Q   Did you use the expression to Keith Schroeder that day that

25  you zoned out?

1  A   By that time -- the zoning out thing happened a little bit

2  later -- but by that time I didn't really have the words to

3  describe what I was going through, you know.  So what was

4  actually happening was I would be driving my forklift picking

5  my parts, maybe thinking about what I was going to eat or

6  something that had happened earlier in the day, and then my

7  mind would just wander -- I don't know when it happened -- but,

8  you know, I was no longer, obviously, working forward -- moving

9  towards the work.  I was now thinking about what had happened.

10  Q   Had happened where?

11  A   Overseas and at work.

12  Q   When you checked into the hospital on the 23rd of

13  December 2010, you still didn't think you had PTSD, did you?

14  A   No.  But I knew something was wrong.

15  Q   So on the 24th, when you told Keith in that email, "Between

16  the pressures at work and reliving my story at the yellow

17  ribbon event," you felt like you had to go to the hospital?

18  A   Correct.

19  Q   How did these two things require that, in your mind?

20  A   It almost felt like the pressure and the stress that I was

21  going through at work, and the needing dot my i's, cross my

22  t's, and just, you know, so much stress, reminded me of all of

23  stress and all of the, you know, things that I had to do to

24  keep myself safe while I was deployed.

25  Q   And by the way, you've mentioned earlier about -- well, I

Arroyo - Direct by Mr. DeRose

1   will save that question for a while.

2          So in any event, you stayed at -- you only were at the

3   La Grange emergency room for a day or so.  And then you were

4   moved over to the VA?

5   A   No.  Those were separate incidences.

6   Q   Well, when did you get over to the VA?

7   A   I had to wait, I believe, because of the holiday.  And then

8   I went back -- and then I went to the VA.  Because by this time

9   there was no doubt I was experiencing something.  So I took the

10  diagnoses from La Grange, went to the VA, told them I heard

11  about these yellow ribbon events.  I heard what they were

12  talking about, this PTSD.  I think I might have it.  Can you

13  look me over?

14  Q   So you were the one that suggested, "Check me out for it?

15  A   Yes.

16  Q   And while you were there at the VA, you saw by the 18th of

17  January, a formal diagnosis was sent to Volvo by you in writing

18  saying you had PTSD?

19  A   Correct.  Well I think it was sent by my doctor?

20  Q   Oh, he faxed it over?

21  A   Correct.

22  Q   That would be Dr. Monroe?

23  A   Dr. Arvind Yekameth.  Arvind, Y-e --I don't know how to

24  spell the last of the name.

25          MR. DeROSE:  I'll get you the spelling.

1  BY MR. DeROSE:

2  Q   So shortly after that, does this event come up where you

3  told Mr. Schroeder that you had zoned out?

4  A   Yeah.  The well, I didn't tell him specifically.  What Mack

5  and Volvo -- well, what Volvo had told me was, when I'm driving

6  my forklift they have this new system that tracks all of your

7  movement.  But it only tracks your movement based on your

8  scanning.  So if you aren't scanning anything, they don't know

9  what you're doing.

10       So they gave us these sheets, and they told us to mark

11  down from the time we started until the time we stopped, what

12  we were doing.  And so because of these thoughts -- these

13  intrusive memories -- that were happening, you know, like I

14  said, again, I didn't have the words to explain what I was

15  going through, that I wasn't falling down unconscious, that I

16  just was thinking.  So that's what I tried to explain to him.

17  Q   And Keith Schroeder told you he wanted you to go for an

18  independent medical evaluation, right?

19  A   Correct.

20  Q   Did you resist that in any way?

21  A   I asked him why and I asked him why my doctor's diagnosis

22  wasn't enough.  He just told me that that's what the company

23  wanted.  So I went.

24  Q   Okay.  And did the company doctor tell you that he

25  confirmed that you had Post-Traumatic Stress Disorder?

Arroyo - Direct by Mr. DeRose

1   A    That's correct.

2   Q    Shortly after that, after January sometime, you got orders

3   that you had to go to group therapy sessions, correct?

4   A    Correct.

5   Q    And when you got those orders, were they from a military

6   officer or a doctor?

7   A    Well, they were from a doctor.  But they also went through

8   my medical sessions, so -- which was an officer.

9   Q    So you had to go?

10  A    Right.

11  Q    And those sessions were going to be from 4:30 in

12  the -- 4 o'clock in the afternoon to 5:30?

13  A    If that's what it states.  I can't remember the time right

14  off the top of my head.  But I know it conflicted with my work

15  schedule.

16  Q    You know that Keith Schroeder called up and asked if they

17  could give you a different time and was this elective

18  treatment?

19  A    I have no idea.

20  Q    And at that afternoon session, it was going to be you and

21  several other battle buddies who were there who had been

22  diagnosed with PTSD?

23  A    Correct.

24  Q    Can you tell the ladies and gentlemen of the jury how many

25  of you were going be in those sessions?

Arroyo - Direct by Mr. DeRose

1  A   Well, it all varied, depending on the course of treatment

2  we had selected to take.  My first course of treatment was

3  anger management, and in there we had nine people, four of

4  which were Vietnam vets.

5  Q   From way back then?

6  A   Yes.

7  Q   And then your second -- the army kept ordering you to go to

8  more sessions, right?

9  A   Correct.

10  Q   Are you still going to them today, or did they finally let

11  you out of it?

12  A   Well, I no longer do group therapy.  I still see a

13  therapist once every other week.  And I am still under the care

14  of a psychiatrist for medication management.  That's it.

15          THE COURT:  Mr. DeRose it's about 3:15.  So if this --

16  when you get to a logical stopping point.

17          MR. DeROSE:  When you're ready, Judge, I'm ready.

18          THE COURT:  Well, I guess I'm ready and I bet Kris is

19  ready, too.  So we'll pick up for the rest of the afternoon.

20  Thanks everybody for your patience and we'll see you about

21  3:30.

22          THE CLERK:  All rise.  Court's in recess.

23      (Jury out.)

24      (Recess taken.)

25          THE COURT:  Good afternoon, everybody.  Before we

1   resume, I'm going to give you a little road map of what we have

2   left to accomplish in this case and the time frame which I

3   think we are going to be able to do it.  So this afternoon

4   we're going to finish up at least with the direct examination

5   of Ms. Arroyo.  Depending on the time, I may let you go right

6   after that.  Because one of the things we have to accomplish,

7   the lawyers and I, is to prepare the instructions for you all

8   next week.  And I think I'm going to do that this afternoon at

9   the end after we let you guys go, because I want to make sure

10  there isn't anything that the lawyers and I need to think about

11  over the weekend.

12      So probably we will end up a little earlier than

13  5:00 today.  Then when we resume on Monday morning, which will

14  be at 9:30, we will finish the plaintiff's case in chief and

15  then the defendants will put on their case.  But as you

16  noticed, they have been able to cross-examine the witnesses and

17  put a lot of their points in while the plaintiff has been on

18  their case in chief.  So the defendant's case in chief will be

19  a lot shorter, and we will conclude Monday one way or the other

20  I think.  And then you will get closing arguments and jury

21  instructions.

22      Now for the closing arguments and jury instructions,

23  it's going to take probably a couple of hours, because I'm

24  going to give each side an amount of time.  And then in order

25  to read the instructions, it usually takes me at least 30

1    minutes if I read at a speed that Kris can tolerate.  So, in

2    other words, on Monday, if we're not ready to do all that by

3    2:30, we're going to wait and do that Tuesday morning.  Because

4    I don't think it's fair to you guys or, really, to the parties,

5    to have one side do its closing and then go home for the night

6    and then have another side do the closing.  It will be easier

7    for comprehension.

8              So it's possible we will get closings done on Monday.

9    And if we don't, it will be first thing Tuesday morning, and

10   you guys will get the case as soon as the closings are done and

11   I read the instructions.  And as I said, when I read the

12   instructions, you do not need to take feverish notes on them

13   because I'm going to give you a copy of them, too. Okay?

14             Any questions about the schedule?  I thank you guys

15   for your patience.  I know I said five days and I know today is

16   day 5.  But we're moving this as quickly as we can for you.

17   And I really appreciate your indulgence.  And none of us know.

18   We all do the best we can to guesstimate but, you know, things

19   don't always go as planned, but I do appreciate your patience

20   on that.

21             And with that, I'm going to turn the floor back over

22   to Mr. DeRose.

23             MR. DeROSE:  Thank you, your Honor.

24   BY MR. DeROSE:

25   Q    All right.  Ms. Arroyo, when we broke we were talking about

1  the group therapy sessions.  Were those all at the VA hospital

2  in Maywood?

3  A    Yes.

4  Q    And we saw a chart that Volvo was keeping about the times

5  you would arrive at work.  Did you know they were keeping a

6  chart of your time?

7  A    No, I didn't.

8      MS. WILSON:  I would like to object, your Honor.  We

9  would like to know what list we are talking about.

10      MR. DeROSE:  We are talking about the list of arriving

11  at 6:30, 7:30, 7:38, all of those.

12      THE COURT:  Can anybody put a number on that?  Rather

13  than have a recollection.

14      MR. DeROSE:  I'll pull it up.  Judge, I will put it up

15  if you want.

16      THE COURT:  I just think your question is really for

17  the record purposes, which chart were you talking about when

18  she gave you the answer to that question.  And I think if we

19  can figure out what exhibit that is, then it will all be clear

20  for the record.

21      MR. DeROSE:  And Judge, can I keep questioning,

22  because I don't want to --

23      THE COURT:  Why don't you hold that question in

24  abeyance.  Why don't you keep asking questions, and then when

25  Ms. DeRose finds -- hands you that exhibit, you can make

1    reference to it.  Sound good?

2          MR. DeROSE:  Maybe she can just put that up and I'll

3    see it.

4    BY MR. DeROSE:

5    Q   So Ms. Arroyo, nobody was complaining to you, were they,

6    that you were causing morale problems among your coworkers

7    because it seemed like you were coming and going when you

8    wanted?

9    A   Well, when I had come back from my third deployment in

10   2010, and just a little bit before I had actually been in the

11   hospital, some of the employees at our meetings would make

12   gestures towards me that had me thinking that they were not

13   very happy for me.

14         MR. DeROSE:  All right.  Excuse me one second.  Judge,

15   this is the second page of Exhibit 203.  Caitlyn, can you

16   publish this again for the jury?

17         THE COURT:  There it is.  Plaintiff's 203.  This is

18   the exhibit to which you were referring?  Okay.  Oh, it's not

19   in front of the jury.

20         Do you want to hold that up?  Ms. DeRose, can you hold

21   that up for the jury.  I think all we want to do is orient the

22   jury.  As soon as you hold that up, they'll know what this is.

23         MR. DeROSE:  I hope I can do it.

24         THE COURT:  Do you all recall that exhibit?

25         Okay.  The thumbs up and the nods of yes the record

1    will reflect.  So now we are on the same page.  So Mr. DeRose

2    if you want to ask her about that exhibit, go right ahead.

3              MR. DeROSE:  All right.  Thank you, your Honor.

4              THE COURT:  Sure.

5    BY MR. DeROSE:

6    Q    And nobody told you that they were keeping track of your

7    Tuesday punch-in times, did they?

8    A    Not until Dave Miller approached me with a CAP.

9    Q    So as I look at this, the jury may remember the times vary

10   on here from 6:34 to 7:03.  And finally, there are a couple of

11   days at the end that they were keeping track of, of 7:44 and

12   7:55.

13             Can you tell us, in those group therapy sessions,

14   would those of you who are in the group therapy sessions stay

15   and talk together afterwards as part of the therapy?

16   A    Not really.  When the therapy was over, for the most part

17   we would all leave.  But on those days were probably the days

18   that I was having bad days after having been at group therapy.

19   So, of course, I didn't want to just hop in my car and head out

20   on the road in the middle of rush-hour traffic.  I needed a few

21   minutes before I could get out there.

22   Q    And what would you do?

23   A    I would just sit.  And I would do some heavy breathing,

24   trying to get myself to relax, because I was really tense and

25   anxious.  Try to not be so anxious.

Arroyo - Direct by Mr. DeRose

1  Q   What would -- did you believe was making you tense and

2  anxious?

3  A   There wasn't anything specifically that I could, like,

4  point to.  But the things that we were talking about would

5  bring memories and feelings, and so the feelings weren't

6  something that I could rationalize.

7  Q   By the way, besides the group therapy, you were also under

8  the care at that time by VA doctors and VA psychiatrists and VA

9  licensed clinical social workers?

10  A   Yes.

11  Q   Did they ever ask you if you considered committing suicide?

12  A   Yes.

13  Q   You didn't consider suicide, did you?

14  A   No.

15  Q   In those group sessions, did some of the other people share

16  with you that they were considering suicide?

17  A   The word suicide didn't necessarily always come up, but

18  doing things that would -- perhaps that would be the end

19  result.

20  Q   And those were not the kinds of things you were

21  contemplating; is that fair to say?

22  A   Correct.

23  Q   In this event, you say that finally David Miller confronted

24  you and gave you a CAP, which we've learned today is a

25  corrective action plan.

Arroyo - Direct by Mr. DeRose

1    What did he say to you when he gave it to you?

2  A    He said that it's been taking me too long to start work.

3  Q    And so would that be, as you understood it, a verbal

4  warning that the next time this would happen would be a

5  three-day suspension?

6  A    I understood it to be a verbal warning, and the next time

7  would be a written warning.

8  Q    Which would lead to a --

9  A    Three-day suspension and then eventual termination.

10  Q    Did you talk at all to Mr. Schroeder or did you bring this

11  up to anyone?

12  A    By that time Regina Williams had already been involved, and

13  I no longer brought things directly to Mr. Schroeder if I could

14  avoid it.  So I wrote to Regina Williams asking why a

15  supervisor on my shift, who is not my immediate supervisor,

16  talking to me about things that happen on days that I have

17  therapy.

18  Q    And did you get any kind of response of why that was

19  occurring?

20  A    According to Regina Williams, Mr. Miller didn't know about

21  our agreement.

22  Q    Didn't know what?

23  A    Didn't know about our agreement about the therapies.

24  Q    And you had been going to therapy for how long on Tuesdays

25  before he gave you that discipline?

Arroyo - Direct by Mr. DeRose

1   A   I can't remember exactly when it started.  I know it

2   varied.  At one point it was Tuesdays.  Another point it was

3   Wednesdays.  So I can't off the top of my head give that date.

4   Q   Well, the email is telling you you're getting the -- well,

5   excuse me.  September of 2011 -- Judge, if I can just approach

6   I can do it much faster.

7                THE COURT:  Okay.

8   BY MR. DeROSE:

9   Q   There is an email from Maureen Somersett saying this is the

10  list of last week's punch-in times.  Can you see on the top of

11  it that it's from Maureen Somersett to Regina Williams and a

12  copy to Keith Schroeder?

13  A   Yes.

14  Q   All right.  By September 11th of 2011, you were already in

15  therapy for quite a time, weren't you?

16  A   Yes.  I had been in therapy when I had been released from

17  the hospital and returned back to work in March.  And we

18  had -- already had an accommodation agreement that I could go

19  to these therapy appointments and not have to return back to

20  work before 6:30.

21  Q   In September 2011, we now know it's just a couple of months

22  before you get terminated.  Volvo has a policy about if you

23  have a problem with an employee and you feel you're being

24  discriminated, you can move up the chain and complain; is that

25  correct?

1      MS. WILSON:  Your Honor, objection to relevance.  We
2  need a sidebar on this issue.
3      THE COURT:  Yes, let's have a sidebar about this.
4      MR. DeROSE:  Judge, let me withdraw the question
5  because I want to get done and get them out of here also.
6      THE COURT:  Okay.
7  BY MR. DeROSE:
8  Q   In any event, do you remember writing an e-mail to
9  Mr. Scholl, the vice president of the company?
10 A   Yes, I do.
11 Q   And I want you to look at Exhibit 189.  But don't put it up
12 yet.
13     MS. WILSON:  Your Honor, our prior objection pertains
14 to this exhibit.
15     THE COURT:  Right.  And let me go get -- I think my
16 exhibit list has gone backwards.  What number is this?  189?
17     MR. DeROSE:  189.
18     THE COURT:  I'm sorry.  Okay.  Right.  So this is the
19 prior understanding obtains to this one as well.  Is that what
20 you're saying?
21     MS. WILSON:  No, your Honor.  It is pertaining to
22 our --
23     THE COURT:  You would like to have a sidebar.  Okay.
24 I think we need to have a sidebar on this.  What you're saying
25 is this relates to the sidebar we had yesterday afternoon.

1    MS. WILSON:  Yes, your Honor.

2    THE COURT:  Okay.  Let's go to the sidebar and find

3  out where we're headed here, okay.

4    (Sidebar.)

5    THE COURT:  Okay.  So I remember yesterday afternoon

6  when we were at the sidebar that the question was how far into

7  this investigation.

8    MR. DeROSE:  Let me find the sentence, Judge, and I

9  will tell you.  Judge, it's the last sentence on Page 4 in the

10  first paragraph.  And that's all I want to ask her.  I don't

11  want to publish the document.

12    THE COURT:  This sentence right here.  "I can only

13  guess."

14    MR. DeROSE:  I will be quiet.

15    She writes, "He is targeting me for termination."  I

16  just -- I want to paraphrase it -- "And I can only guess why."

17    THE COURT:  I don't think there's a problem with you

18  eliciting that testimony from her.  Again, I think the better

19  way to do it -- because the document has got so much embedded

20  in it -- would be to ask her, "Do you remember writing a letter

21  to the big boss," or whoever.

22    THE COURT REPORTER:  Excuse me.  I can't hear.

23    MR. DeROSE:  And give her the --

24    THE COURT:  And just say, "Do you remember what you

25  said to him?"  And I guess she will say, "Not exactly."

Arroyo - Direct by Mr. DeRose

1     MR. DeROSE:  No, she will remember this.  I would like

2  to have her, perhaps, read this one sentence.

3     THE COURT:  I don't mind, actually -- you guys tell me

4  what you think.  In the interest of time, I don't mind if you

5  direct her to that sentence and then just have her tell the

6  jury what it says.

7     MR. DeROSE:  Maybe I can read it to her.

8     MS. WILSON:  And this is the next question, "Why did

9  you say that?"

10     MR. DeROSE:  It might be.  I don't know.

11     MS. WILSON:  That line of questioning is problematic.

12     MR. DeROSE:  Then I won't ask that.

13     THE COURT:  The point really is that you want the jury

14  to know that she advised Mr. Scholl that she felt she was being

15  targeted for termination.  I don't see any problem doing that.

16  You could do it by recollection.  I am just wanting to cut to

17  the chase.  With your guys leave, I will let him lead her to

18  that question.

19     MR. McMAHON:  What I was saying is I think that the

20  notifying Dennis Scholl aspect of this is the problem.  If she

21  is to testify about --

22     THE COURT REPORTER:  Excuse me.  I can't hear.

23     MR. McMAHON:  -- as to what Mr. Schroeder thought she

24  was doing, which obviously she doesn't have firsthand knowledge

25  of anyway.  But if she notices something, the jury asks why is

1   she complaining?  Is he harassing her?

2           MR. DeROSE:  She is complaining about the treatment

3   that she received.

4           MS. WILSON:  That is our barred claim.

5           THE COURT:  Except it's not.  Some of the claims are

6   barred, some are not.  Because she is also complaining about

7   discrimination and that's not the barred claim.  And I made it

8   clear to the jury what's in and what's out.  And I can do that

9   again on Monday.

10          MR. McMAHON:  But I think it's the nature of her

11  complaining about the discrimination which makes the

12  retaliation claim.

13          MR. DeROSE:  They're not going to know that.  Because

14  I am not going to ask, "What is your complaint?"

15          THE COURT:  Here's what I think is -- I think it

16  is -- it is relevant she believes at the time she wrote this

17  email that Mr. Schroeder was targeting her for termination.  I

18  think that is relevant.  And the fact that she could testify

19  that she said that to the New York Times, it really doesn't

20  matter who she said that too.  There will be no further

21  testimony about Regina Williams or Mr. Scholl or any

22  investigation.  That's the part that I'm keeping out.

23          And the reason that I want them to handle this in the

24  way that I have suggested is because it will keep it out.  It

25  will keep the document out and keep the entire line of

Arroyo - Direct by Mr. DeRose

1    testimony about the relevant piece and the reason I am going to

2    let him lead her to that piece so we don't have any further

3    distraction.  But if you want to elicit from her that she

4    told -- I don't care who she told, Mr. Scholl or the New York

5    Times -- that she believed on this date that she was being

6    targeted for termination.

7             MR. McMAHON:  As long as, I would say, they do not

8    follow up and either ask her questions about what we did in

9    response.

10            THE COURT:  Mm-hmm.

11            MR. McMAHON:  And argue in closing that we took no

12   action in response.  I think that crosses the line.

13            THE COURT:  I agree with both of those because that's

14   where the investigation comes in.  And as I said yesterday,

15   that is marginally probative at best, in the totality of all of

16   the evidence of anything relevant to this case, and mainly

17   probative of things that are not in the case, which is the

18   reason why I am drawing the line where I am drawing the line.

19            MR. DeROSE:  Absolutely.  And Judge, I am going to --

20   you're going to know I am going to ask also and copied Keith

21   Schroeder and Regina Williams.

22            THE COURT:  In other words, you are establishing that

23   Mr. Schroeder was aware that she thought that.  Okay.  That's

24   fine.

25            Thank you, everybody.  I do think this five minute

Arroyo - Direct by Mr. DeRose

1  sidebar got us away from 15 minutes of questions.  So thank

2  you.

3          MR. DeROSE:  Oh, Judge.

4          THE COURT:  Maybe 10.

5      (Sidebar concludes.)

6          THE COURT:  Okay.  Thank you again to Counsel for

7  working that issue through.  And I think we're in a good space

8  here, Mr. DeRose, for you to continue.

9  Q    All right.  Ms. Arroyo, on September 13th, do you remember

10  writing an email to the vice president of the company, Dennis

11  Scholl?

12  A    Yes.

13  Q    And you copied Keith Schroeder and Regina Williams, too,

14  didn't you?

15  A    I did.

16  Q    And I want to ask you, do you remember saying, "I can only

17  guess to the reasons for his actions.  And in my opinion,

18  Mr. Schroeder has targeted me for termination and is doing

19  everything within his power to achieve such"?

20  A    I do.

21  Q    So you wrote the vice president of the company two months

22  earlier, and before you were terminated, that you thought

23  Schroeder was trying to terminate you?

24  A    Correct.

25  Q    We heard Mr. Schroeder yesterday say that you told him "In

Arroyo - Direct by Mr. DeRose

1   the future, if you want to talk to me about discipline, I want

2   to have my lawyer here.  You can only talk to me with my lawyer

3   here about that."

4   A    That's correct.

5   Q    Would you say that sometime between the day you wrote this

6   letter on September 13th and November 8th, your relationship

7   with Mr. Schroeder got a little bit stressed?

8   A    Not just Mr. Schroeder, but Regina Williams as well.

9   Q    All right.  I don't want to go into Regina Williams at all.

10   I want to stay on Mr. Schroeder.

11           That thing about the parking.  Mr. Schroeder called

12   you into his office or the conference room to talk about

13   changing the rules about parking in the back?

14   A    That's correct.

15   Q    Do you remember when that was?

16   A    I believe it was -- oh, I can't remember the exact time of

17   day, but it was on the 1st.  November 1st was stated in those

18   notes.

19   Q    All right.  And on November 1st, Mr. Schroeder says, "There

20   is a rule about parking in the back," right?

21   A    Correct.

22   Q    And you went out of the office and came back in and asked

23   them if this was a plan that he had made just for you or did

24   everybody know about it?

25           MS. WILSON:  I object.  That is a leading question,

1    your Honor.

2              MR. DeROSE:  I won't lead.

3              THE COURT:  Okay.

4    BY MR. DeROSE:

5    Q    Do you remember coming back into his office and talking to

6    him about his direction to you that there's no parking in the

7    back?

8    A    Yes, I do.

9    Q    Tell the ladies and gentlemen of the jury about what you

10   said to him and what he said to you?

11   A    I came to my office and I asked him if this was a rule that

12   applied to all employees or was it just made for me?

13   Q    What did he say?

14   A    His response was, "Oh, all of the supervisors know about

15   it.  I just haven't communicated it to the employees."

16   Q    And did you ask him was he going to post this rule to all

17   employees?

18   A    Well, I didn't ask him how he was going to communicate it

19   to all of the employees.  But then later on that night, we had

20   a meeting with the whole shift and the vice president, and I

21   assumed he would present that information then, but he didn't.

22   Q    Mr. Scholl from North Carolina was actually in the Joliet

23   facility that night?

24   A    That's correct.

25   Q    The very day that Mr. Schroeder told you you can't park

1   there anymore?

2   A   That's correct.

3   Q   Did you meet with Mr. Scholl that night?

4   A   Yes, I shook his hand.

5   Q   Now, had you already sent him that email a month earlier

6   saying, "I think Mr. Schroeder is trying to terminate me"?

7   A   Yes, I did.

8   Q   When you shook Mr. Scholl's hand, was that the first time

9   in your life that you had ever met him?

10  A   To my knowledge, yes.

11  Q   Did you and he talk at all when you met him about your

12  email about a month earlier?

13          MS. WILSON:  Your Honor, I would object on the same

14  grounds we discussed.

15          THE COURT:  Sustained.

16  BY MR. DeROSE:

17  Q   In any event, we saw a picture here of two cars.  One of

18  them is your car, isn't it?

19  A   Yes.

20  Q   Who's is the other car?

21  A   David Miller.

22  Q   And who took that picture?

23  A   I did.

24  Q   When did you take that picture?

25  A   After Mr. Schroeder had told me that I would not be allowed

1    to park in the rear of the building.

2    Q   And that would have been on November 1, 2011?

3    A   That's correct.

4    Q   And why did you take the picture?

5    A   Because I wasn't the only one parking in the back of the

6    building.

7    Q   A supervisor was?

8    A   That's correct.

9    Q   Did you feel like you were being singled out for this new

10   policy they were making?

11   A   Not only singled out, I felt like the new policy was made

12   just for me.

13   Q   And you saw this email that Mr. Schroeder sent to his staff

14   a couple of days earlier that said, "Do not copy.  Read and

15   delete."

16         Do you remember that?

17   A   I remember it being presented in this case now.  I didn't

18   see it at the time.

19   Q   And Mr. Schroeder told his supervisory staff, "Arroyo knows

20   that people park back there.  And we don't want to make it look

21   like we're singling her out."

22   A   That's what he said.

23   Q   And that's the very question that you went over and asked

24   him when you found out about it, right?

25   A   That's correct.

1  Q   We know that we saw the plan to give you this notice of

2  termination on November 8th, when you would come into work that

3  day.  When you left on November 4th for your earned time off

4  day and the two days for the weekend, did you have any idea

5  that were you going to be terminated?

6  A   I had no idea that I had even been written up, let alone

7  that they were prepared to terminate me.

8  Q   When was the first time you got notice of the two write-ups

9  on November 2nd and November 3rd?

10  A   Oh, I got the write up for November 2nd on November 4th.

11  Q   And did you get a write up then for November 3rd?

12  A   No.

13  Q   So as far as you knew when you came back on Monday, you

14  would only be subject to his one write-up for the November 2nd,

15  and no other infractions?

16  A   Well, I didn't return to work until Tuesday, and --

17  Q   That's the 8th?

18  A   Correct.  And when I returned to work is when Mr. Schroeder

19  had a written warning document and a termination document.

20  Q   So you got both documents at the same time?

21  A   Correct.

22  Q   So the written warning, that -- knowing what you know about

23  HR, the written warning being presented to you at the same time

24  the termination document is being presented to you, was it your

25  understanding that that was violating Volvo's progressive

Arroyo - Direct by Mr. DeRose

1    discipline policy?

2    A    Yes.  And I had already informed Mr. Scholl and

3    Mr. Schroeder about that when he did that back in August.

4    Q    He tried to do it way back in August before you wrote the

5    letter?

6    A    Yes.

7    Q    What happened in August?

8    A    In August, he wrote a document that was dated for August --

9    I want to say it was for August 19th -- that was a written

10   warning for attendance.  And then on the same meeting, he gave

11   me, also, a three-day suspension for attendance.

12   Q    And that wasn't following the progressive discipline of the

13   company, right?

14   A    Well, how was the written warning -- I mean, it wasn't

15   warning me about anything.  He went from a verbal -- supposedly

16   a verbal warning straight to suspension.  I wasn't warned about

17   anything.

18   Q    And this was the time when they claimed you were three to

19   five minutes late after checking in a half hour early?

20   A    No.  This is what started my request for that accommodation

21   specifically.

22   Q    Did you feel like -- never mind.  Excuse me.

23            Judge how am I doing on time?

24            THE COURT:  Well, you asked me to tell you when it is

25   4:10.  It's 4:08.

Arroyo - Direct by Mr. DeRose

1    MR. DeROSE:  Well.  I have got one minute to talk to
2 my co-counsel and I will make 4:15.
3    THE COURT:  Okay.  You bet.
4    MR. DeROSE:  Your Honor, can I approach the witness
5 with an exhibit to see if it refreshes her memory as to the
6 date she got that three-day suspension.  I don't went to
7 publish it.
8    THE COURT:  This is the thing you were just asking her
9 about?
10    MR. DeROSE:  Yeah.
11    THE COURT:  Yes.  I don't mind if you want to refresh
12 her recollection so she can pinpoint the day.
13 BY MR. DeROSE:
14 Q   All right.  Ms. Arroyo, I show you a document, which was
15 previously marked as a Defendant's Exhibit 12 in this case,
16 but not as an exhibit for the trial.
17    THE COURT:  Right.  So you just want -- so
18 what -- Ms. Arroyo, he wants you to look at that.  When you're
19 done looking at it, you can hand it back to him.  Then he's
20 going to ask you a question about it.
21 BY MR. DeROSE:
22 Q   I want you to look at the date of it --
23    THE COURT:  There you go.
24 BY MR. DeROSE:
25 Q   -- then hand it back.  All right.

1    Now the date in August when you got the three-day

2  written warning for attendance, and the day you got the

3  three-day suspension for attendance, is your memory now

4  refreshed as to what date that was?

5  A    Yes.

6  Q    What date was it?

7  A    August 31, 2011.

8  Q    And those are two separate documents; is that correct?

9  A    That's correct.

10 Q    All right.  And when you read the documents, did they cover

11 a period of more than six months, both documents?

12 A    Yes.

13 Q    Do you think, Ms. Arroyo, that you were trying to do the

14 jobs that Volvo required to the best of your ability?

15 A    Yes.

16 Q    As far as you knew, you were the only army reservist on

17 active duty who had PTSD in the facility?

18 A    That's correct.

19 Q    And you were the only person who was being provided a

20 private office for meditation?

21 A    Yes.

22 Q    And you were the only employee, to the best of your

23 knowledge, who was allowed to come in late on Tuesday nights?

24 A    Yes.

25 Q    Because you were attending your group therapy.

1  A   Yes.

2  Q   Did you think that your termination on November 8th,

3  2000 -- excuse me -- yeah, November 8, 2011, by Mr. Schroeder

4  was fair?

5  A   No.

6  Q   Is that why you brought this lawsuit?

7  A   Yes.

8       MR. DeROSE:  I have no further questions, your Honor.

9       THE COURT:  Okay.  Thanks.

10      MS. WILSON:  Your Honor, I want to get the plaintiff's

11  case done today.  If I could beg your indulgence for five

12  minutes so I can cut 10 minutes off my questions.

13      THE COURT:  You sure can.  If you think you can do

14  this by 4:45 if I cut you five now?

15      MS. WILSON:  Yes.

16      THE COURT:  Okay.  I think everybody will agree with

17  that.  We're going to give you a five-minute break.  As soon as

18  Ms. Wilson tells me she is ready, we will bring you back and

19  she is going to be able to finish this witness, I believe,

20  today, which will be good for all of us.

21      So give me 5 minutes and give me about 20 or 30 more.

22  and we will be out of here for the weekend.

23      All rise.

24      The court stands in recess.

25    (Jury out.)

1    (Recess taken.)

2    (Jury in.)

3         THE COURT:  Ms. Wilson, I turn the podium to you.

4         MS. WILSON:  Thank you.  And I would like to thank you

5    all for indulging me briefly.

6                        CROSS-EXAMINATION

7    BY MS. WILSON:

8    Q    Good afternoon, Ms. Arroyo?

9    A    Good afternoon, Counsel.

10   Q    Ma'am, you would agree that being on time is important when

11   you're in the military, right?

12   A    Timeliness is one of them.

13   Q    When you get orders stating that you'll have drill at

14   5:00 a.m., and the commander says, "Fall in," you're there and

15   fall in at 5:00 a.m.?

16   A    Correct.

17   Q    And as part of the military, you know that when someone

18   says to do something, you do it, right?

19   A    That's correct.

20   Q    You even had conversations with Volvo to ensure that you

21   had enough time and rest time to get to your drills on time,

22   because being on time was important to you?

23   A    That's correct.

24   Q    And when you fall in, you're in complete uniform, right?

25   A    Yes.

Arroyo - Cross by Ms. Wilson

1    Q    You have the appropriate boots on, correct?

2    A    Yes.

3    Q    And you're required to be there when you say you should be

4    there?

5    A    Usually there a little bit early.

6    Q    You would agree with me that there's nothing wrong about an

7    employer asking its employees to be at work on time?

8    A    Nothing wrong?

9    Q    Yes.

10   A    If it violates the law, sure.

11   Q    Ma'am, are you aware of a law that says an employer can't

12   require their employees to be at work on time?

13   A    Well, gee, if there was an agreed upon accommodation, like

14   flexible work schedule, and then the employer doesn't honor

15   that, yeah, I would believe so.

16   Q    But that's not the situation here, is it?

17   A    It is actually.

18        THE COURT:  Well, as I said before, there is no claim

19   in this case for failure to accommodate, so I need to advise

20   you of that again.

21   BY MS. WILSON:

22   Q    You also would agree with me that safety is important,

23   correct?

24   A    Yes.

25   Q    And there's nothing wrong with a company trying to keep its

1  employees safe, is there?

2  A   If that's what they're doing, yes.

3  Q   Ma'am, throughout your employment, you had some attendance

4  occurrences that didn't lead to any discipline, isn't that

5  right?

6  A   I don't know.

7  Q   You're not aware of any times that you were late when you

8  didn't get a corrective action plan?

9  A   At all -- in all of my career at Volvo?

10  Q   Correct.

11  A   That were never included as part of a correction plan.

12  Q   Correct.

13  A   Well, if you have something, I think the evidence would

14  speak for itself.  Please refresh my memory.

15          THE COURT:  Oh, I'm sorry.  Do you want it to go down

16  to the jury, right?

17          MR. McMAHON:  Yes.

18          THE COURT:  You're going to use this exhibit that's in

19  evidence?

20          MS. WILSON:  Yes.

21          THE COURT:  Perfect.

22          MR. McMAHON:  It's already in evidence.

23          THE COURT:  Okay.  Great.

24          Just give Kris a second.  Everybody be quiet for 30

25  seconds, and then she can stop typing.

Arroyo - Cross by Ms. Wilson

1      THE COURT:  Very good.  Ms. Wilson has got it here.
2  Okay.
3      And can you remind us what exhibit you've got on the
4  screen?
5      MS. WILSON:  Yes, your Honor.
6  MS. WILSON:
7  Q   This is Defendant's Exhibit 16.  You have seen this
8  multiple times during the trial now, haven't you, Ms. Arroyo?
9  I bet you saw it before the trial even started, didn't you?
10 A   Yes, ma'am.
11 Q   If you look with me.  Let's start in 2005.  It looks like
12 you were tardy four minutes on July 7, 2005.  Do you see that?
13 A   Yes, ma'am.
14 Q   And it looks like you got an inexcused for that date; is
15 that accurate?
16 A   Yes, ma'am.
17 Q   But you didn't get any written corrective action plan on
18 that day, did you?
19 A   No.
20 Q   And just by way of another example, in 2006, it looks like
21 you were seven minutes late on January 3rd; is that accurate?
22 A   Yes, ma'am.
23 Q   And you also didn't receive a corrective plan on that date,
24 did you?
25 A   But that didn't fit the requirements.

Arroyo - Cross by Ms. Wilson

1    Q    Ma'am, my question to you was whether you ever had a tardy

2    or absence for which you didn't receive a corrective action

3    plan.  And you said you didn't remember.  So now that we have

4    looked at this, is your memory refreshed?

5    A    But what I am saying is, is one tardy on one day does not

6    fulfill the requirements to receive a correction action plan.

7    Q    And you and I agree on that.

8              But just to be clear, ma'am, you would agree with me

9    that the tardy that you received for being seven minutes late

10   on January 3, 2006, you did not receive a corrective action

11   plan, did you?

12   A    I will agree.

13   Q    Thank you.

14             Ma'am, isn't it true that you never received an

15   occurrence on a day when you attended PTSD therapy?

16   A    That is correct.

17   Q    We've spent several days now talking about lots and lots of

18   emails.

19             Ma'am, you were hired by Volvo in June of 2005,

20   correct?

21   A    In June of 2005, okay.  Yeah.  I didn't think I heard you

22   right.

23   Q    Is that accurate?

24   A    That is.

25   Q    And you were not suspended in 2005, were you?

865

Arroyo - Cross by Ms. Wilson

A    No.

Q    You weren't fired that year?

A    No.

Q    You also weren't fired in 2006, correct?

A    What Ms. Maureen Somersett told me was the company would
need to place me or categorize me as terminated while I was
away on military active duty for the whole year, so I don't
know if that means that I was terminated, or if it was just a
status for pay, or what that means.  But I was told I was going
to be placed on termination.

Q    We have a stipulation, correct, that you were deployed from
2006 to 2007?

A    That's correct.

Q    And when you returned to Volvo in 2007, you started back in
your employment as a materials handler, correct?

A    That's correct.

Q    In 2008, you were still employed at Volvo as a material
handler, correct?

A    That's correct.

Q    2009, also, you were still employed.

A    Same thing with the leave for being deployed.

Q    Well, let's talk about that.  You were gone from Volvo from
April 2009 until September 2010, correct?

A    Yes.

Q    You came back stateside from your overseas deployment in

1  April of 2010; is that right?

2  A    That is correct.

3  Q    So from April 2010 until August 15th of 2010 you were in

4  the U.S. using accrued military vacation, correct?

5  A    Not the whole time.  Incorrect.

6  Q    You were doing demobilization activities, turning in

7  equipment and using your accrued military vacation?

8  A    I was doing what the army asked me to do.

9  Q    And part of what they asked you to do is use your military

10  vacation?

11  A    That's correct.  Actually, I think that was Congress who

12  enacted the PBMRA.

13  Q    And in September of 2010, you were reinstated to the same

14  job as a materials handler, the same job you had done before

15  your military deployment?

16  A    That is correct.

17  Q    On October 29, 2010, you punched in one minute late to

18  work?

19  A    October 29th, I think that's the date.  If you say so,

20  Counselor, I will trust you.

21  Q    Thank you, ma'am.  You didn't receive an occurrence on that

22  date, did you?

23  A    Well, Mr. Schroeder tried to issue a corrective action

24  plan, and I had told him that when I had returned from

25  deployment in 2010 I had -- in September, actually, the very

1  first day I asked Sherrie Jankowski to refresh my memory for

2  all of the policies and procedures under Volvo Mack truck so

3  that I could be well trained and knowing what was expected of

4  me.  She referred me to go to Mr. Schroeder.  So the very next

5  day, I asked Mr. Schroeder to give me a copy of all of the

6  policies so I could refresh my memory.  Because I had been gone

7  for over 18 months.

8  Q   Ma'am, I asked if you got an attendance occurrence for that

9  day?

10  A   And he did not give me an attendance occurrence because he

11  agreed that maybe I didn't remember what happened over the last

12  18 months.

13  Q   Do you think it was discriminatory for Mr. Schroeder to

14  excuse that absence?

15  A   I think it was his obligation for failure to train me

16  properly.

17  Q   On November 4th, 2010, you were given a copy of the

18  attendance policy, correct?

19  A   That is correct.  So I would assume --

20  Q   So as of --

21  A   I'm sorry, Counselor.

22  Q   So you knew that punching in a minute or two late was a

23  violation of the policy?

24  A   Not -- could you repeat the policy?  You cut me off.

25  Q   As of November 4, 2010, you knew that punching in one to

Arroyo - Cross by Ms. Wilson

1   two minutes late was a violation of the attendance policy.

2   A    As of November 4th, that's correct.  But I was not yet

3   diagnosed with my PTSD, and then could not request my

4   accommodation.

5            THE COURT:  Let me remind the witness, as I know I was

6   reminding the other witnesses.  Answer the question that's

7   asked, and if your lawer thinks he wants to follow up with you

8   or she wants to follow up with you, depending which one,

9   they'll ask you another question.  But stick to the question

10  she asks, because your lawyer will get another shot.

11           THE WITNESS:  Got it.

12           THE COURT:  Okay.

13  BY MS. WILSON:

14  Q    So as of November 4, 2010, you knew that punching in one to

15  two minutes late was a violation of the policy?

16  A    I was then informed that the two-minute rule was no longer

17  in effect.

18  Q    On November 23, 2010, you punched in two minutes late,

19  didn't you?

20  A    If you say so, Counselor.

21  Q    Ma'am, we've learned during this trial that you have been

22  diagnosed with PTSD, and we have a stipulation on that,

23  correct?

24  A    Yes, ma'am.

25  Q    And the official diagnosis for that was obtained in January

1    of 2011?

2    A    That is correct.

3    Q    PTSD affects how you think, doesn't it?

4    A    I'm not sure I understand the question.

5    Q    Well, in your conversation with Mr. DeRose, I believe you

6    testified that PTSD affects the way you think; is that

7    accurate?

8    A    I said that I would remember something and then be thinking

9    about that memory.

10   Q    You told Mr. DeRose that you were anxious; isn't that

11   correct?

12   A    Yes, ma'am.

13   Q    And you testified that PTSD affects how you react to

14   events, didn't you?

15   A    That it affects the way I react to events?

16   Q    Mm-hmm.

17   A    If something happens that reminds me of being deployed, it

18   could have an effect on that, yes.

19   Q    You also testified it made you paranoid, didn't you?

20   A    Yes.

21   Q    You testified that you felt like everyone was out to get

22   you, didn't you?

23   A    Yes.

24   Q    And you didn't suspect that you had PTSD when you initially

25   returned from that third deployment, or your second deployment

Arroyo - Cross by Ms. Wilson

1    while with Volvo, did you?

2    A    That is correct.  It wasn't until I attended the yellow

3    ribbon event and started getting the info.

4    Q    You also testified that you felt like everyone was out to

5    get you, didn't you?

6    A    Yes.

7    Q    Ma'am, we have talked about a photo of your car and Dave

8    Miller's car in the back of the building, haven't we?

9    A    Yes, we have.

10   Q    And you testified earlier that you took that picture on

11   November 1st?

12   A    Yes.

13   Q    Ma'am, you prepared a detailed chronology of events related

14   to this case, didn't you?

15   A    Yes, I did.

16   Q    And in that chronology, you described that picture in your

17   October 18th entry, didn't you?

18   A    I'm not sure.  Could you refresh my memory?

19        MS. WILSON:  I'd be happy to.

20   BY MS. WILSON:

21   Q    And after you have read that, if you would let me know.

22   A    Okay.

23   Q    Ma'am, did that refresh your recollection?

24   A    Yes, ma'am.

25   Q    And did you refer to a picture of Mr. Miller's car in an

1    entry made on -- regarding October 18th, 2011.

2    A    The day that Mr. Schroeder first told me I could not park

3    in the back of the building is what I meant, which does happen

4    to be that October 18th.

5    Q    So it wasn't November 1st?

6    A    Correct.

7    Q    Ma'am, there was a time that you were given a meditation

8    room as an accommodation?

9    A    Yes, ma'am.

10   Q    And we have discussed your meditation room quite a bit this

11   week.  There was a time when you parked behind the warehouse to

12   access that room, correct?

13   A    Yes, ma'am.

14   Q    And you had a meeting with Mr. Schroeder on November 1,

15   2011, didn't you?

16   A    Yes.

17   Q    And during that meeting you were told that you couldn't

18   park behind the building because it was a safety issue,

19   correct?

20   A    Yes.

21   Q    And you were told that day that using the meditation room

22   didn't mean you could start work late, weren't you?

23   A    No, I was not told that.  The word "late" was never used.

24   Q    I am putting up Defendant's Exhibit 27.  We're going old

25   school with our technology.

Arroyo - Cross by Ms. Wilson

1    Ma'am, do you recognize this document?

2  A   Yes, ma'am.

3  Q   And I'll direct your attention to the bottom of this

4  document, where it says use of the rooms provided for

5  mediation -- I think he meant meditation -- does not negate you

6  needing to be prepared to start work when the bell rings."

7    Did I read that correctly?

8  A   Yes.

9  Q   And that meeting was on November 1st, correct?

10 A   Well, and as I indicated before Mr. Schroeder had -- yes,

11 yes, yes, yes, yes.  I'm sorry.  Yes.

12 Q   All right.  And yet the very next day on November 2nd you

13 parked behind the building again, didn't you?

14 A   Yes.

15 Q   And on November 2nd, the next day, you again waited until

16 the bell rang before leaving the meditation room?

17 A   Well, that's an indication to begin working.

18 Q   And when the bell rang, you went outside to your vehicle,

19 drove around the building and reentered from the front of the

20 building correct?

21 A   I moved towards the work.

22 Q   And you followed that same course on November 4th again,

23 didn't you?

24 A   I believe so.

25 Q   So just to clarify, November 4th you again waited until the

1   bell rang to leave your meditation room?

2   A   And then I was utilizing the meditation room as agreed.

3   When the bell rang, I moved towards the work.

4   Q   Well, on November 2nd, you punched in at 3:48, does that

5   sound right?

6   A   If you say so, Counselor.

7   Q   And then you drove around the building to park in the back

8   of the building, right?

9   A   Yes.

10  Q   And you went into your meditation room, correct?

11  A   Yes.

12  Q   And you stayed there until the shift bell rang.

13  A   Yes.

14  Q   And that bell rings at 4:30?

15  A   Yes.

16  Q   And as of 4:30 you had been in there what, about 40

17  minutes?

18  A   Maybe.

19  Q   The accommodation provided for you was to use the

20  meditation room for up to 15 minutes before the start of the

21  shift, correct?

22  A   Yes.

23  Q   So you had been up there for more than double that amount

24  of time; isn't that right?

25  A   Yes, ma'am.

Arroyo - Cross by Ms. Wilson

1  Q   Ma'am, couldn't you have just left the meditation room five

2  minutes earlier?

3  A   Never occurred to me.

4  Q   And on November 4th you punched in at 4:04, right?

5  A   If you say so.

6  Q   And you again left the meditation room when the bell rang?

7  A   When the bell rang that was a signal to move to the work.

8  Q   So at that point you had been in the meditation room for 25

9  minutes.

10 A   That's -- okay.

11 Q   You could have left the meditation room earlier that day,

12 too, couldn't you?

13 A   Never occurred to me.

14        MS. WILSON:  No further questions.

15        THE COURT:  Okay.  Very well.

16        MR. DeROSE:  Just one.

17        THE COURT:  Okay.  Fire away, Mr. DeRose.

18                   REDIRECT EXAMINATION

19 BY MR. DeROSE:

20 Q   That October 18th formality that Counsel just showed you.

21 It had the name on it on the bottom of a Donna Adler.  Who was

22 she?

23 A   She was the attorney that I had hired to represent me.  The

24 same attorney that I had referred Volvo to contact when they

25 were to discipline me.

Arroyo - Redirect by Mr. DeRose

1   Q   All right.  She was your lawyer, right?

2   A   Yes, ma'am, or, yes, sir.

3   Q   Maybe we are getting tired.  And the document Counsel

4   showed you was about 20 pages long, wasn't it?

5   A   Yes, sir.

6   Q   And it was single-typed spaces?

7   A   Yes.  In, I believe, 12-point font.

8   Q   So there's lots of words in there, and can we agree that

9   your lawyer typed that whole thing; you didn't?

10  A   Correct.

11  Q   When you signed it?

12  A   Correct.  Correct.

13          MR. DeROSE:  I have nothing further.

14          THE COURT:  Anything else?

15          MS. WILSON:  I do, your Honor.  Very briefly.

16                     RECROSS EXAMINATION

17  BY MS. WILSON:

18  Q   The chronology we just discussed, you signed it, didn't

19  you?

20  A   I did.

21  Q   And, in fact, you didn't just sign the front, you signed

22  each and every page, didn't you?

23  A   Yes, ma'am.

24          MS. WILSON:  No further questions.

25          THE COURT:  Okay.  Thank you so much.  You can step

1  down, Ms. Arroyo.  And that will conclude today.

2  MR. DeROSE:  Judge, I rest our case in chief.

3  Okay.  Fantastic.  I think that's what everybody

4  wanted to hear at the end of the day today.  Thank you all so

5  much for your patience.  I really appreciate it.

6  We will see you at 9:30 on Monday morning.  And as I

7  said many times during the trial, but now that it's a weekend I

8  have to remind you, please don't discuss the case amongst

9  yourselves or with anyone else.  That includes your Twitter

10  accounts, if you have those.  My kids made me get one.  And

11  have a great weekend, everybody.  I hope you really have a nice

12  weekend.  I hope the weather gets better by Sunday and we'll

13  see you Monday morning.  Thank you so much, everybody.

14  THE COURT:  Everybody have a nice weekend.  Please

15  leave your notebooks in there.  Okay?

16  Thanks so much, everybody.

17  (Jury out.)

18  THE COURT:  Okay.  Good job, everybody.  Let's take

19  five.  I'm going to go wake Stan up and bring him out here.

20  Oh, look at that.  Busted me.

21  All right.  I'm going to take five.  I am going to

22  take my dress off here.  I will be right back out.  And then

23  everybody can sit where they are.  With all of these

24  microphones we have got plenty of room to -- I'm just going to

25  go to each instruction as Stan gave it to you on Monday.

Jury Instruction Conference

1    Any comments you guys have, if you have extra

2  instructions, and if you have any comments on what I gave you

3  earlier today, we'll take them all in five minutes.  Just let

4  me get out of my dress here.  Okay?

5        Thanks everybody.

6        MR. DeROSE:  Do I have a paper copy of that?

7        THE COURT:  In five minutes you will have a paper

8  copy.  Do you guys wasn't a paper copy, too.

9        MR. McMAHON:  We'll take a paper copy.

10        THE COURT:  Stan, we need two of those if we could.

11  Thank you.

12        Okay.  Five minutes I will be back.

13    (Recess taken.)

14        THE COURT:  Okay.  Are we all set for the conference

15  to begin, then?

16        MR. DeROSE:  Yes.

17        MR. McMAHON:  Yes.

18        THE COURT:  Okay.  Thank you, everybody.

19        So one thing I want to say to start with, I think when

20  we circulated these to you guys on Monday that may have been

21  before we made the global fix that you guys were going to be

22  called Volvo Trucks for this case.  So every time it says Volvo

23  in here, on Monday it will say Volvo Trucks.

24        MR. McMAHON:  That's perfect.

25        THE COURT:  And then we also -- Stan and I will read

Jury Instruction Conference

1  very carefully this weekend to make sure there are no spelling

2  errors.  All of these sources, granted, denied, bold-faced,

3  introduction, all of that will come out, too.

4          MR. McMAHON:  Right.

5          THE COURT:  Literally, we just read them the

6  instructions.  There's no headings; there's no source of where

7  it came from; it doesn't say whether it is plaintiff's or

8  defendant's.  It's literally just the instructions.  That's all

9  we read.  Stan and I will be responsible for wiping that out.

10          We also will be responsible for typographical errors.

11  But if you see any, point them out.  And agreement -- what do

12  they call it -- subject, verb, number agreement.  So we will

13  make sure that it's plaintiff or plaintiff's -- whatever the

14  subject is matches up with the verb, in terms of it being

15  singular or plural.

16          MR. McMAHON:  Right.

17          THE COURT:  So that's one thing we will take upon

18  ourselves.

19          I'm working off the redline that Stan gave you guys on

20  Monday.  The first couple of pages were proposed issues for the

21  jury, and this was more of a -- it would be what I would call a

22  special verdict form instead of a general verdict form.

23          MR. McMAHON:  Right.

24          THE COURT:  And you'll see at the back our proposal

25  and our preference.  And I would say 98 percent of the cases

1  that I've had go to a jury trial, we've used a general verdict

2  form.

3          Anybody have a problem with that?

4          MR. McMAHON:  I don't think we have a problem with the

5  general form in the back as compared to the one that we

6  proposed.  I think, obviously, Judge, at the time we prepared

7  the one we did, we were trying to kind of -- and, obviously

8  some things have changed in the case since then --

9          THE COURT:  Mm-hmm.

10          MR. McMAHON:  -- but we were trying to kind of iron

11  out the issues that were left.

12          THE COURT:  Right.

13          MR. McMAHON:  And then, accordingly, what instructions

14  we were submitting for that --

15          THE COURT:  That was your outline of the case.

16          MR. DeROSE:  Almost.  In a way.

17          THE COURT:  Yeah.  And that's fine.  And so for now

18  I'm going to skip that.  And when we get to the back end we can

19  talk about the general verdict form.

20          MR. McMAHON:  That's fine.

21          THE COURT:  What I propose to do is go through each

22  page.  And I will refer to it by the page and the instruction

23  number, with some identifying thing, so we can make a record of

24  this.  And you can tell me if anybody has any objection or even

25  something like a typo; whatever you've got.  Okay?

Jury Instruction Conference

1    So I'm going to start on Page 5, which is Seventh

2    Circuit 1.01.  I'm not sure who proposed about being influenced

3    by disability or military service.  I think what Stan has done

4    is sort of reform this to the pattern.  And I think public

5    opinion is part of the pattern.

6    Is there any objection to this as Stan has sent it

7    back to you guys?

8    MR. DeROSE:  Not from the plaintiff, Judge.

9    MR. McMAHON:  What I was going to say, your Honor,

10   was, actually in the pattern instruction it does have that

11   additional sentence there.  And it is kind of somewhat

12   open-ended in terms of, you know, I guess the character traits

13   or the background of the respective individuals at issue.  So

14   while we tailored, obviously, disabilities or military service

15   to this case, the sentence itself is in the pattern

16   instruction.  So there's a bracket there and you're supposed to

17   fill it in with whatever would be the relevant thing to fill it

18   in.

19   MR. McMAHON:  Right.

20   THE COURT:  My concern with this is that it actually

21   would confuse the jury, perhaps.  Because they do have to be

22   concerned about disability or military service in that it is

23   relevant to the case and may even bear on the way the elements

24   play out, I think.

25   I mean, the whole point of this is to be fair.  This

1    is telling the jurors to be fair.  And I don't think

2    that -- there's no secret about -- in fact, there's no dispute

3    in this case -- she served in the military and she has a

4    disability.  Those are all undisputed issues.

5              MR. DeROSE:  Those are undisputed.

6              THE COURT:  So I don't think that there is any danger

7    of the concern of this instruction, which is the jury being

8    fair, being tainted by undisputed facts about the plaintiff.

9              MR. McMAHON:  We are fine with that.

10             THE COURT:  Okay.  We'll go with that one as it is.

11             The next one is Seventh Circuit 1.03.  And this is one

12   that we may just put "Volvo Trucks" in here.  In case I refer

13   to Volvo Trucks again.  But other than that, it's pretty

14   straightforward.  Everybody okay with it?

15             MS. DeROSE:  I have no objection.

16             MR. McMAHON:  Yes.  We're okay with that one.

17             THE COURT:  Okay.  Stan, in the brackets, in the

18   parentheses, we'll just put, quote, Volvo Trucks.

19             Okay.  Next page is Seventh Circuit 1.04, Page 7.  And

20   I think we have to modify this based on the fact that there

21   have been stipulations in the case.  And I think it would read,

22   "The evidence consists of the testimony of the witnesses, the

23   exhibits admitted in evidence, and the stipulations of the

24   parties."  And then we'll take the brackets off of "a

25   stipulation is," and give that.  But I haven't taken judicial

1   notice of anything and I don't really anticipate doing that.

2   So I think that should be good to go with the corrections I

3   just put on the record.  Sound good to plaintiff?

4        MR. DeROSE:  It does, Judge.  And we -- all Counsel

5   have signed the stip for the PTSD.  So we will give you two

6   copies of that today.  And I just have to do the other one

7   about the military service period on Monday.

8        THE COURT:  Okay.  And if you could -- here's what I

9   would suggest on those, just so the record is clear --

10        MR. DeROSE:  Right.

11        THE COURT:  -- is once they're finalized and typed up,

12   just file them on the docket.

13        MR. DeROSE:  Sure.

14        THE COURT:  That would be great.  And it doesn't

15   matter when that is as long as it is in the record somehow.

16   It's been stated on the record, but I think to keep it all

17   clear, just file them when they're ready.  Okay?

18        MR. DeROSE:  Judge, one question, so I don't have a

19   problem tomorrow.  Could we publish one or both of those if we

20   wanted to in argument to the jury?

21        THE COURT:  In closings you want to publish the

22   stipulations?  I don't see any problem with that.  You can

23   use-- whatever demonstratives you want to use in a closing, you

24   can just put them in a slide or put them on the Elmo, however

25   you prefer to do it.  That will be fine.  And I assume, then,

Jury Instruction Conference

1   when we give the exhibits to the jurors, you will include a

2   typewritten copy of each stipulation.

3           MR. McMAHON:  We're fine with that.

4           THE COURT:  Yes.  I think that would be great for the

5   jury, because it's easier for them then having to scrawl it all

6   down. I'm not sure whether they did scrawl it all down.

7           MR. DeROSE:  Good.

8           THE COURT:  That sounds perfect.  Thank you,

9   everybody.

10          Okay.  Next one, there were no depositions read at the

11  trial, so we're going to exclude Page 8.

12          So Page 9 is Seventh Circuit 1.06.  That looks exactly

13  like what I've read in every trial.  Everybody good with that?

14          MR. DeROSE:  We are good.

15          MR. McMAHON:  That's fine.

16          THE COURT:  Okay.  Next one is 1.07 on jury notes.

17  Any objection to that one?

18          MR. McMAHON:  No objection.

19          MS. DeROSE:  No objection.

20          THE COURT:  And then Seventh Circuit 1.08 is the next

21  page.  That one looks good to me.  Everybody good with it?

22          MR. McMAHON:  No objection.

23          MS. DeROSE:  No objection.

24          THE COURT:  Then we have Seventh Circuit 1.11.

25          MR. McMAHON:  No objection.

Jury Instruction Conference

1          MR. DeROSE:  No objection.

2          THE COURT:  Seventh Circuit 1.12, about umbrellas.

3    Everybody good with that one?

4          MS. DeROSE:  No objection.

5          MR. McMAHON:  No objection to that.

6          THE COURT:  Okay.  And then Page 14 here, Seventh

7    Circuit 1.13.  And the only thing -- Stan, that's one of the

8    spots that we're going to have to correct "defendant Volvo" and

9    just put defendant "Volvo Trucks."  Okay?  Everybody good with

10   that otherwise?

11         MR. McMAHON:  We're good with that.

12         MS. DeROSE:  Yes.

13         THE COURT:  Okay.  Very good.  Okay.  The next one is

14   Seventh Circuit 1.14.  It's kind of the impeachment

15   instruction.  There wasn't a lot of formal impeachment with

16   documents.  But there certainly was some question about prior

17   statements or conduct.  I don't know.  What do you guys think

18   about this one?

19         MR. McMAHON:  I don't know if it is applicable, only

20   because I don't know if we talked about statements under oath.

21   I know we've, obviously, talked about statements in prior

22   documents.

23         THE COURT:  Yes.  What's strange about this case --

24   and I have no objection to the fact that this occurred -- but

25   there wasn't -- I don't remember anybody ever walking a

Jury Instruction Conference

1  deposition up to somebody and saying, "You said something

2  inconsistent with this deposition."

3          MR. McMAHON:  Right.

4          MR. DeROSE:  We did not, Judge.

5          THE COURT:  So I'm not -- that's unusual.  I don't

6  know that I've ever had a week-long trial where that never

7  happened.  But that's actually fine.

8          MR. DeROSE:  So maybe we could fashion it, Judge.  Say

9  if someone wrote a statement, which they acknowledge something

10  different, as opposed to a deposition.  Because we did try to

11  impeachment them with their own written words.

12          THE COURT:  Right.  But they weren't under oath, I

13  guess, that's the one thing, so --

14          MR. DeROSE:  They weren't on their --

15          THE COURT:  My question really is --

16          MR. DeROSE:  Acted inconsistently with a statement

17  that they made before, but not under oath.

18          THE COURT:  Well, let me ask -- here's my first

19  question.  There have been no witnesses in this case, nor will

20  there be any witnesses in the case, who are not parties in this

21  case, right?  Because all of your witnesses are agents, so they

22  count as parties.

23          MR. McMAHON:  That's true.

24          THE CLERK:  And then your witness is a party.  So all

25  of the witnesses in this case are parties.  So there are no

Jury Instruction Conference

1   other witnesses, because it says, "You may consider statements

2   given by a party or a witness under oath before trial."

3           So there were no statements by a witness under oath

4   before trial, so we could take that line -- that phrase out.

5   So we could say, "You may consider statements given by a party

6   as evidence of the truth of what he or she said in earlier

7   statements, as well as in deciding what weight to give to his

8   or her testimony."

9           The entire next paragraph could come out because there

10  were no witnesses.  There are no other witnesses.  All of the

11  witnesses are parties in this case for purposes of the rules of

12  evidence.  And then the third paragraph always stays in because

13  it's, you know, what weight do you give it?  Well, it's either

14  an innocent error or intentional falsehood or it's important or

15  it's not important.

16          MR. McMAHON:  Right.

17          THE COURT:  So is everybody comfortable with the first

18  paragraph with "or witness under oath before trial" excluded,

19  and then the third paragraph in deleting the second paragraph?

20          Does that sound reasonable?

21          MR. DeROSE:  Yes, no objection.

22          MR. McMAHON:  Yeah, we're fine with that.

23          THE COURT:  Okay.  Perfect.  That's the modification

24  of 1.14, then.

25          Okay.  1.16 is definitely in play in this case.  I

Jury Instruction Conference

1    believe every witness was asked about their preparation for

2    trial.

3            And then the next one is 1.17.  That looks fine to me.

4    Is that okay with everybody else?

5            MR. McMAHON:  We're fine with that.

6            MS. DeROSE:  Yes.

7            THE COURT:  The next one is 1.18.  Everybody okay with

8    that one, too?

9            MR. McMAHON:  Yes.

10           MS. DeROSE:  Yes, your Honor.

11           THE COURT:  1.27, burden of proof, everybody okay with

12   that one?

13           MR. McMAHON:  Yes.

14           MS. DeROSE:  Yes.

15           THE COURT:  The next one is the statement of the

16   claims, and I believe that was cut and pasted from my original

17   speech to the jury.

18           Everybody comfortable with this?

19           MR. McMAHON:  Yes.

20           MS. DeROSE:  Yes, your Honor.

21           MR. McMAHON:  And that was like the statement that you

22   read at the very outset of the case.

23           THE COURT:  Right.  Exactly.  I read that to you guys

24   before the jury came in.  Then I believe I read it to the jury

25   as well.

888

Jury Instruction Conference

1    Okay.  The next one here is the sort of introduction
2  to the ADA claim.  Does this one look okay to everybody?  Page
3  21 I'm on now.
4    MS. DeROSE:  Yes, your Honor.
5    MR. McMAHON:  And I think this is the one, Judge, and
6  I think probably at this juncture of the instruction --
7    THE COURT:  Mm-hmm.
8    MR. McMAHON:  -- is where we were thinking a little
9  bit about having some kind of discussion on what the claim is
10  and what the claim isn't.
11    THE COURT:  Mm-huh.
12    MR. McMAHON:  And, you know, we're not completely wed
13  to this language -- although we did give it a shot -- after the
14  case -- or excuse me, after the paragraph which says, "In this
15  case, plaintiff LuzMaria Arroyo claims."
16    THE COURT:  Okay.  So it would be in between the
17  second and third paragraphs?
18    MR. McMAHON:  Yeah.  Yeah.  Between the second and
19  third paragraph, this is what we came up with tentatively.  I
20  can read it and we can also email it to Stan afterwards.
21    THE COURT:  Yeah, why don't you read it.  And then
22  after you get back to -- just email it to the DeRoses and to
23  us.  And I'm going to give you guys my card and you can
24  directly email me.  Because there's no way we are going through
25  Carolyn this weekend.  She is not even here.  But even if she

Jury Instruction Conference

1    were, I don't bother her on weekends.  I will give you my card

2    at the end.  You can just directly hit me on my U.S. Courts

3    email.

4            MR. McMAHON:  Right.

5            THE COURT:  And Stan's -- once you have seen mine,

6    you have broken the code.

7            Okay.  So what do you have there?

8            MR. McMAHON:  So this is what we have come up with so

9    far.  "Throughout the trial of this case, you have heard

10   testimony from witnesses and seen exhibits related to

11   Ms. Arroyo's Post-Traumatic Stress Disorder, PTSD.  In this

12   case, Ms. Arroyo is not making the claim that Volvo retaliated

13   against her under her rights of the ADA, nor is she making the

14   claim that Volvo failed to provide accommodations for her

15   PTSD."

16           And then it goes on to say, "It is undisputed that Ms.

17   Arroyo was not retaliated against or denied accommodations

18   under the ADA.  The only issue for you to determine is whether

19   Volvo discriminated against Ms. Arroyo because of her PTSD when

20   it terminated her employment on November 8, 2011."

21           THE COURT:  Okay.  Now, I have one question about

22   that.  I'm wondering if the better place to put an instruction

23   like that would actually not be in the introduction to one or

24   the other claim, but the previous page, where I tell everybody

25   what the claims are.

Jury Instruction Conference

1    MR. McMAHON:  Yeah.  We were thinking about that.  I

2    think the only issue with that is we have a corollary paragraph

3    on USERRA --

4    THE COURT:  Oh, I see.

5    MR. McMAHON:  And it doesn't fit quite as nicely,

6    because on the USERRA there's some unrelated things under

7    USERRA, i.e., travel time, time for reinstatement, et cetera,

8    that are probably not on that issue.

9    THE COURT:  Okay.  Well, I think what's going to be

10   helpful is you can read that one to us when you get there, too.

11   It will be a lot easier for us, and I'm sure you guys, too, to

12   reflect on these.  It's a pretty minimal homework assignment

13   for the weekend.  Obviously, you guys have to prepare your

14   closings, too.  I'm not saying that's not minimal.  And I have

15   an entire week of 400 cases that are waiting for me.  So we're

16   all going to be busy.  But in terms of the instructions, that's

17   not going to be too heavy lifting.

18   MR. McMAHON:  Right.

19   THE COURT:  And I think you all should.  Because I

20   will email everybody what I had, which I gave you a copy.  But

21   it will be a lot easier to work out this entire issue with

22   paper in front of us.

23   MR. McMAHON:  I agree.

24   One question that I did have for clarification on the

25   bolding:  That would be eliminated on these instructions?

Jury Instruction Conference

1      THE COURT:  Yes.

2      MR. McMAHON:  Does that include the headings on these

3  instructions?  Like this, for instance, says nature of ADA

4  claim.

5      THE COURT:  Yeah, we don't give -- I literally just

6  read them all.  The problem with that is there's always some

7  characterization there and it's so much cleaner just to read

8  the law.

9      MR. McMAHON:  Right.  And we were just going to say if

10  it was going to be given, we wanted to have ADA discrimination

11  on there.

12      THE COURT:  It's not going to be given.

13      MR. McMAHON:  All right.  No problem.  That's our only

14  comment about that.

15      THE COURT:  Okay.  Well, here's what I'm going to

16  suggest on the global issue here, which is we have all this

17  statement about what the claim is.

18      MR. McMAHON:  Yeah.

19      THE COURT:  As the evidence has come in, because of

20  the sifting problem, which I'll probably refer to it that way.

21      MR. McMAHON:  Right.

22      THE COURT:  I've given an in-court instruction about

23  what is not a claim in this case.  And I'm open to the idea of

24  giving another instruction at the end.  Particularly because

25  we're talking about day six or day seven of this case when I'm

Jury Instruction Conference

1  doing this.

2      MR. McMAHON:  Yes.

3      THE COURT:  And what my suggestion is for you guys to

4  email your two instructions -- I don't know if you've got one

5  for ADA and one for USERRA?

6      MR. McMAHON:  Yes.

7      THE COURT:  I had one here that was my attempt for a

8  global instruction that would cover everything, at the

9  40,000-foot level.  You guys are more at the 5,000-foot level.

10     MR. McMAHON:  I think that's fair.

11     THE COURT:  And let's all think about this over the

12 weekend.  And feel free to send me very short letter briefs on

13 this subject or redlines.  Just say, maybe what would happen is

14 you're going to lay out the first salvo.  You've got two

15 attachments on this, okay?

16     MR. McMAHON:  Right.

17     THE COURT:  I'm going to send you one attachment.  And

18 then I suppose what that does is put the ball in your guys'

19 court maybe in the first instance to give us a reaction.  And

20 you can either say, "I object to all of this."  Or, "I can live

21 with the Judge's with these edits.  I can live with the

22 defendant's with these edits."  And let's just get the ball

23 rolling over the weekend on this.

24     MR. McMAHON:  Sure.

25     THE COURT:  And then if I at least got a response from

Jury Instruction Conference

1    the plaintiffs on the three documents you're going to get, and

2    then a reply from you guys.

3         MR. McMAHON:  Right.

4         THE COURT:  I'll reply with any thoughts on my own

5    instruction.  And then we can at least advance the ball.

6         Then when I see you guys at 9:30 on Monday, we'll talk

7    about this.  I will have a pretty good idea where I think I'm

8    headed.  And to the extent I can formulate that by Sunday

9    night, I'll do that for you.  If it's something I'm doing

10   Monday morning on the train, you may have to wait until 9:30.

11   But we'll resolve this pretty quickly.  And the fact that we

12   finished Ms. Arroyo today and the plaintiff's case in total, I

13   think I'm pretty confident we're still going to get your case

14   in the morning and closings in the afternoon.  So even if it

15   takes us 10 or 15 minutes to work this out at 9:30, I think we

16   can do it.  But does that sound okay for you guys?

17        MR. DeROSE:  Everything you say is fine, Judge.

18        THE COURT:  Okay.  Beautiful.  And you guys can give

19   us a reply then?

20        MR. McMAHON:  Yeah.  We can definitely do that.  And

21   what I was going to say, just to clarify, do you want just the

22   pages of these instructions where we're having this redline in?

23        THE COURT:  Oh yeah, absolutely.  Yeah, yeah, yeah.

24        MR. McMAHON:  Right.

25        And I think the other ones we have, I think we can

1  discuss today on the fly, they are relatively minor.  And I

2  will just give you those two pages where we are proposing

3  putting this in.

4          THE COURT:  Okay.  Fantastic.  Any way that's

5  comprehensible for all of us is good for me.  And I'll keep

6  open -- and we all should keep open the question of where this

7  would go.

8          MR. McMAHON:  Right.

9          THE COURT:  And the answer is either on the first page

10  of where each claim is discussed or on the page before all of

11  the claims are discussed.  That seems right to me.

12          MR. McMAHON:  Exactly.

13          THE COURT:  Okay.  Great.  So apart from that insert,

14  then, on Page 21, did anyone have comments on this page?

15          MR. McMAHON:  No other comments, Judge, on that one.

16          MS. DeROSE:  No, your Honor.

17          THE COURT:  Okay.  So Page 22, then, is the elements

18  for the ADA claim.

19          MR. McMAHON:  Right.

20          THE COURT:  Any issues on that?

21          MS. DeROSE:  No, your Honor.

22          MR. McMAHON:  Your Honor, our only concern -- and we

23  understand, obviously, that the element four is in the pattern

24  instruction.

25          THE COURT:  Mm-huh.

Jury Instruction Conference

1    MR. McMAHON:  Our only concern about that instruction

2  is we think the double negative is somewhat confusing in terms

3  of having that in there.  We took kind of the approach, really,

4  kind of from the Seventh Circuit panel in the sense of kind of

5  defining it as three elements to include on the basis of her

6  disability.  And then here's the language of the statute in

7  terms of the revisions of that statute of the ADA.  You

8  probably saw it from our trial brief.

9    THE COURT:  Yeah, I did see it.  Here's my -- my

10  issue, really, is so we have a pattern instruction committee.

11    MR. McMAHON:  Right.

12    THE COURT:  There's lots of judges on it.  Some

13  Seventh Circuit, some district court, some magistrate judges,

14  lots of practitioners.  They undoubtedly studied the ADA for a

15  much longer period of time than I have in my life, and this is

16  a pattern they came up with.

17    MR. McMAHON:  Right.

18    THE COURT:  I'm not opposed to writing a double

19  negative out of an instruction.  But if they tell me there's

20  four elements, though, it's going to be hard to convince me

21  there's only three.

22    MR. McMAHON:  Yeah.  And just to be clear when you

23  said three, we're really combining three and four together.

24    THE COURT:  No, I understand.  I understand.  Let me

25  ask you this:  Did you have a suggestion for eliminating the

Jury Instruction Conference

1  double negative?

2        MR. McMAHON:  Well, what we -- oh, just to go into

3  that language?  Let's see.

4        THE COURT:  If I remember right from the Seventh

5  Circuit opinion, this is the but for causation, right?

6        MR. McMAHON:  It is.

7        THE COURT:  So I suppose you could say "Defendant

8  Volvo would not have terminated plaintiff LuzMaria Arroyo

9  for her disability, had everything else" -- eh, I don't even

10 know if that works.

11       MR. McMAHON:  Saying but for -- we all understand but

12 for.

13       THE COURT:  Yeah.

14       MR. McMAHON:  Actually saying it in an instruction

15 just gets weird.

16       THE COURT:  I know.  Just as I said it, it didn't come

17 out right.

18       Here's my suggestion.  I hear what you're saying.  If

19 I can think of something better, I will.  But convincing me not

20 to give a pattern is a pretty high standard.

21       MR. McMAHON:  Oh, understandable.  One point of

22 clarification, maybe.

23       THE COURT:  Mm-hmm.

24       MR. McMAHON:  Do we know -- and I haven't looked at

25 this -- and it could be, I'll admit, it is an out-dated version

Jury Instruction Conference

1    of the pattern instructions.  But do we know the last time the

2    pattern instructions were updated?

3                THE COURT:  That is a knowable fact that I don't know

4    off the top of my head.

5                Stan, do you remember that?

6                LAW CLERK WASH:  '07, maybe.

7                THE COURT:  Yeah, the civil are old.  The criminal are

8    much newer.  And there's a civil revision in the works that

9    isn't probably going to be rolled out for another year or so.

10               MR. McMAHON:  Okay.  Okay.  And I think part of

11   that -- and I want to say when I was looking at these and

12   preparing these, I was thinking '07 as well, or something like

13   that.

14               THE COURT:  Yeah.

15               MR. McMAHON:  And I kind of thought, well, we have the

16   statutory language, which we still believe is but for, but

17   technically since the statute changed, this hasn't been revised

18   in light of the amendment.  That's why we went with what we

19   proposed.

20               THE COURT:  Mm-huh.  And I'm not -- I'll tell you

21   what, I will look at this again.  I don't think that the

22   Seventh Circuit thinks that the pattern -- the standard has

23   changed.

24               MR. McMAHON:  Right.  They have not.

25               THE COURT:  But that could happen someday.  And I

1    suppose, you know, the next time the Supreme Court takes a case

2    like this it could end up better for one or both of you guys.

3    I don't know.  Because it's going to be probably a five to

4    four.  And it may depend on who wins the election.

5              MR. McMAHON:  Right.  Right, right.

6              THE COURT:  So those are all imponderables at the

7    moment.  But I will look at this again.  But I think the burden

8    is going to be pretty high on not giving a pattern.  But I

9    appreciate what you're saying.  I totally hear it.

10             MR. McMAHON:  I understand.

11             THE COURT:  And I will talk about this.  If I have any

12   further thoughts, I'll try to email them to you over the

13   weekend so there is no surprises on Monday.

14             MR. McMAHON:  Yeah.  That sounds good.  I think on

15   this one, just for the record, we're just going to say that

16   we're going to keep this open, until we have a final version of

17   what we come up with.

18             THE COURT:  Right.  And anyone is more than welcome to

19   preserve any argument they want as to their original

20   suggestion.  And you're certainly welcome to preserve that, and

21   you never know, two years from now if this case ends up in the

22   Supreme Court, what's going to happen to it.  But, you know,

23   that's all I can say.

24             MR. McMAHON:  Okay.

25             THE COURT:  Okay.  Page 23 is the definition of

1  disability.  Anybody have any problem with the way this has

2  been cast?

3          MS. DeROSE:  No problem.

4          MR. McMAHON:  No problem with that.

5          THE COURT:  Okay.  Page 24.  Let me just explain to

6  you what we did here.  The reason -- we tried -- we

7  bracketed -- what's in the brackets we tried to simplify -- and

8  it may be that some version of that will come in one of these

9  preliminary instructions.  But the way this is rewritten is

10  intended to convey the message that the only accommodations

11  that matter are the ones that were afforded to her by Volvo

12  because those were found by the Seventh Circuit to be adequate.

13          MR. McMAHON:  Yeah.

14          THE COURT:  That's what we were trying to accomplish

15  by the way we wrote this.  And just trying to focus the jurors'

16  attention on those accommodations, and no others.

17          MR. McMAHON:  Right.

18          THE COURT:  But I think it was a little more neutral

19  than maybe what you guys have written.  But it's meant to sort

20  of convey the same point.

21          MR. McMAHON:  Yeah --

22          THE COURT:  I know, you guys are advocates.

23          MR. McMAHON:  Well, exactly.  Exactly.  I mean, I had

24  to chuckle with that.  I mean, no, I agree with that.  I think,

25  I mean, our concern is that in looking at that instruction, you

Jury Instruction Conference

1    know, I mean, a layperson's understanding of the ADA, I think

2    the first thing you think of is the idea of accommodation.  I

3    think that's people's kind of typical understanding.  And so I

4    think it's important that they somehow understand that not only

5    does the, you know, whether she's qualified have to be

6    evaluated against what we did give her, they also have to

7    understand that they can't consider what we didn't hive her.

8         THE COURT:  That's why I took reasonable out.  Because

9    reasonable in this case is defined by what you gave her because

10   the Seventh Circuit has determined that was reasonable and

11   adequate.

12        MR. DeROSE:  Judge, my problem is we are kind of

13   getting an imprimatur of having exercised something that the

14   Court found as well.  And I don't want the jury to get

15   unduly --

16        THE COURT:  That's why we re-wrote the bracket in the

17   way we did it.  Because I was feeling that the bracketed

18   language was a little too heavy-handed coming from me on an

19   issue that's resolved.  And what we have here instead -- I took

20   reasonable out because I don't want them thinking that what

21   Volvo did wasn't reasonable, because the Seventh Circuit

22   determined that it was certainly legally adequate.

23        MR. DeROSE:  Right.  Judge, I would like to get the

24   Court out of it altogether.  And I'm wondering if there isn't a

25   way that we can say the defendant -- whatever you want to say

Jury Instruction Conference

1    -- reasonably accommodated Arroyo on her job.

2         THE COURT:  Are you talking about the bracketed

3    language, Mr. DeRose?  I'm talking about not giving it at all.

4    So you don't have to worry about it.  What I'm talking about is

5    that the language that I put in there, my hope was that

6    accommodates -- Volvo's concern is that the jury might think

7    that there's some reasonable accommodation that wasn't given

8    that might have been given and that she should win for that.

9         MR. DeROSE:  Absolutely.

10        THE COURT:  And the point I'm trying to make here is

11   we're just cabining this to the only accommodations they can

12   think about are the ones that were given to her.  That's what

13   we are trying to accomplish here.

14        MR. DeROSE:  Yes.

15        THE COURT:  Now, I'm not -- I'm still not -- I'm still

16   considering on whether we need to give them an instruction on

17   what claims are not in the case.  But I wasn't comfortable

18   loading it the way it's loaded here in the brackets.  So I'm

19   agreeing with you on that.

20        MR. DeROSE:  I thought you were trying to see if we

21   could do that.

22        THE COURT:  No.  I'm trying to convince Volvo that

23   they don't need that.

24        MR. McMAHON:  Yeah, I think -- okay, and this is kind

25   of our concern.  I understand -- Mr. DeRose does bring a good

1   point in the sense that maybe it's an overplay for the Court to

2   be saying that, you know, kind of updating them, if you will,

3   on a holding of the Seventh Circuit.  I get that.  And,

4   obviously, this was my first crack at it, and I want to express

5   the sentiment of our concern there.

6        I think our concern is this, though.  There's been

7   testimony along the way -- and it's been, obviously, in passing

8   to an extent, but even Ms. Arroyo on cross-exam today blurts

9   out, "Oh, yeah.  Well, it's because they didn't give me my

10   flexible work schedule."

11        THE COURT:  And I corrected that right away.

12        MR. McMAHON:  I know.  But my point is it's like --

13   you know, it's kind of out there.  And it has been in this

14   trial.  And I understand your Honor has, obviously, done a ton

15   of work this week in terms of, you know, the sifting process.

16   Our concern, though, is that this jury is confused right now;

17   that's our concern.

18        THE COURT:  Right.  But I didn't think the bracketed

19   language is going to unconfuse them.  I think what might

20   unconfuse them is a good statement either at the beginning of

21   the elements instruction or one for each element -- what's in

22   and what's out -- that might help them.  I'm actually worried

23   the more I say about what the reasonable accommodations are,

24   the more they're going to start thinking about accommodations.

25   And the reason we framed this the way we did, was to basically

Jury Instruction Conference

1   define the accommodations at issue in this case as the ones

2   afforded by Volvo.

3           That's -- now, maybe you guys can do better than I

4   can.  I am trying to cabin this.  I think we may be on the same

5   page here.  You want to cabin it, too.

6           MR. McMAHON:  What if we said something to the effect

7   of with or without only any of the accommodations afforded to

8   her by Volvo.

9           MR. DeROSE:  Judge, could I ask that they give the --

10  I'm getting so tired.  I can't figure, right now, honestly, the

11  differences.  We, of course, as your Honor suggested, will

12  consider everything that he writes.

13          THE COURT:  Why don't we do that then?  Why don't we

14  put our -- we'll add this to the list of things that we can

15  email about this weekend.

16          MR. McMAHON:  That's fine.

17          THE COURT:  Because -- and, again, you can attach this

18  and, you know, just say, "This is our proposal."  And then we

19  can all sift through this this weekend and sort it out Monday

20  morning.  Because -- how much of a -- are you guys going to

21  argue that she wasn't qualified?

22          MR. McMAHON:  Well, it's interesting that you bring up

23  that point.  I mean, first of all, I think, to a degree, yes.

24  What is interesting about that point -- and I will just note

25  this for the record -- and again, going into the Seventh

Jury Instruction Conference

1  Circuit opinion and our position on it, I know it's a dead

2  horse, but this is actually a little bit different, Judge.  I'm

3  not going to talk about retaliation or failure to accommodate

4  for a change.  Okay?

5           THE COURT:  Mm-hmm.

6           MR. McMAHON:  What was interesting to us about the

7  Seventh Circuit's opinion was, if you remember, they dropped a

8  footnote in the discrimination portion of the opinion.  And

9  they actually said, "To the extent Ms. Arroyo is proceeding

10  under an indirect method for her ADA claim --

11           THE COURT:  That was properly dismissed.

12           MR. McMAHON:  "that was properly dismissed."

13           Now, that requires some cross-referencing back through

14  your Honor's original opinion.

15           THE COURT:  Mm-hmm.

16           MR. McMAHON:  Because in there they cite several pages

17  of analysis.  Interestingly enough, within that citation of the

18  footnote, and within that analysis, your Honor analyzed whether

19  or not Ms. Arroyo was a qualified person with a disability.

20  And your Honor found that she was not.  So I kind of -- to an

21  extent, and we do want to be heard, of course, on the record

22  formally on a judgment as a matter of law before we put on our

23  case.

24           THE COURT:  Sure.

25           MR. McMAHON:  On several points.  But this would be

1    one of them.  We contend that consistent with the Seventh

2    Circuit opinion, there actually is no viable proof that she is

3    qualified an individual with a disability.

4              THE COURT:  Okay.  We have to sort this out, and

5    that's fine.  Because if this was an element that wasn't

6    contested, we wouldn't really work it through --

7              MR. McMAHON:  Right.  Right.  I wanted to point that

8    out, though, because we have -- not only is it a factual piece,

9    it's really probably even more a legal piece for us.

10             THE COURT:  Okay.  That's fine.  And so --

11             MR. McMAHON:  If that makes sense.

12             THE COURT:  So I think what will make sense here then,

13   taking into account that it's 5:30 already, why don't you go

14   ahead and email any revisions you propose to Page 24, and we

15   will all work through that.  And just to be clear, I think for

16   all of us, since what we're working off is this hard copy, just

17   put at the top, "This is a revision to Page 24."  Proposed

18   revision.  Whatever page it is and we'll stick together on

19   that.  Okay?

20             MR. McMAHON:  Okay.

21             THE COURT:  Okay.  So Pages 25 and 26 I have taken out

22   because they're damages issues that go for me, as far as I

23   understand it.  Anybody disagree with that?

24             MS. DeROSE:  No, your Honor.

25             THE COURT:  Defendants are okay with that, too?  I'm

1    pretty confident you are.

2          MR. McMAHON:  Correct.  That's correct.

3          THE COURT:  Okay.  Then the next one is just a basic

4    damages instruction.  And we use 3.09 instead of 1.31.  They

5    pretty much have the same sort of structure.  Does anybody have

6    a problem with just the sign posting here for the jury?  On

7    Page 27.

8          MR. McMAHON:  It's going to interrelate with our

9    problem with the very next instruction on compensatory damages.

10          THE COURT:  And tell me what that is.

11          MR. McMAHON:  The problem is that they have submitted

12    no admissible evidence of any compensatory damages in this

13    case, and they have rested their case.

14          THE COURT:  Except for emotional pain, because she

15    testified that she was angry with them and frustrated with

16    them.

17          MR. McMAHON:  Well, I actually don't know if she

18    testified to that.  I think she testified to the effect that

19    her PTSD affected her.  She testified along those lines.

20          I didn't hear anything about a distinct emotional

21    distress stemming from the termination.  There was no

22    questions, actually, at all about that, your Honor.  How the

23    termination affected her.  There was absolutely no questions on

24    that.  And it has to be from that.  It can't just be from

25    internal employment events.

Jury Instruction Conference

1    MR. DeROSE:  You know, Judge, Counsel is absolutely

2  right.  Maybe I was watching the clock too closely.  I will ask

3  for leave, because they haven't done it yet -- she had all

4  kinds of job searches and those are all exhibits we put up.

5  I'm going to ask for leave to take an hour tomorrow and put in

6  damages.

7    THE COURT:  You're talking about on Monday?

8    MR. DeROSE:  Monday, yes.

9    THE COURT:  Is there a way you can make it faster than

10  that by stipulation?  I'm not going to take your case away on

11  damages because we rammed you to a close at 4:45 today.  But is

12  there a way you can make it quicker.

13    MR. DeROSE:  Sure.

14    THE COURT:  I mean, are there documents that are

15  unassailable on --

16    MR. DeROSE:  Right.  I will give that -- I will draft

17  a stip and see if I can't get an agreement from Counsel.

18    MR. McMAHON:  Well, I think we need to talk about what

19  category of damages we're talking about.

20    THE COURT:  Absolutely.  Because the categories that

21  would go to me would not -- would be admissible.

22    MR. McMAHON:  Are we talking about -- what are you

23  talking about right now?  Back pay?

24    MR. DeROSE:  Mitigation of damages, because she is

25  going to ask about lost salary.  She had to look for --

Jury Instruction Conference

1      THE COURT:  Doesn't that all go to me, though?

2      MR. DeROSE:  Lost salary.

3      THE COURT:  Lost wages goes to me.

4      MR. McMAHON:  Yeah.  We're not talking about lost

5  wages.  We understand that goes to your Honor.

6      THE COURT:  You're talking about emotional damages,

7  which really is the -- I mean, physical, mental and emotional

8  pain.  There isn't any physical manifestations of this, is

9  there?

10      MR. DeROSE:  Judge, I bet I can get this done.

11      THE COURT:  Yeah, I'm guessing that -- or you can put

12  it on very quickly.  I mean, you're talking about -- you only

13  need about two minutes worth of questions to establish that she

14  has got emotional damage.

15      MR. McMAHON:  Your Honor, we need to be heard on that.

16      THE COURT:  Yes.  That's fine.

17      MR. McMAHON:  In the parties' proposed pretrial order,

18  plaintiff was required to itemize the damages he is seeking in

19  the case.  And then we submitted a joint statement on the

20  division of responsibility on damages between the judge and the

21  jury for your Honor at your Honor's request.

22      THE COURT:  Mm-hmm.

23      MR. McMAHON:  At neither of those junctures in this

24  case have plaintiff identified that they are seeking damages

25  for compensatory damages, emotional distress, anything like

1   that.

2          MR. DeROSE:  Judge, I submitted your Seventh Circuit

3   pattern instruction on compensatory damages.  I'm looking for

4   them, yes.

5          THE COURT:  Did anybody really think -- did you really

6   think they weren't going to ask for compensatory damages?

7          MR. McMAHON:  I actually did, your Honor.  The reason

8   being is I think for them it's a strategy call in terms of

9   whether or not they wanted us to get into Ms. Arroyo's past,

10  and other potential sources of emotional harm.  So we have been

11  preparing this case as if that's not in play.  I mean --

12         MR. DeROSE:  Judge, I'm looking for garden variety

13  emotional -- the damages that occurred because of the six years

14  with them.  I'm not going to go into that.  If they want to go

15  into that, they can be my guest.

16         THE COURT:  Okay.  Just hang on one second here

17  because I have to go through all of this.

18         MR. DeROSE:  I know I submitted compensatory damages

19  to the Court.

20         THE COURT:  Well, again, this is going to be much

21  easier to address over the weekend.  Because I could flip

22  through this until the cows come home, and you guys can direct

23  me so much better.  So if I understand, the defendant's

24  objections here would be the defendants do not believe the

25  question of compensatory damages under the ADA should be

Jury Instruction Conference

1    submitted to the jury based on either a waiver or a lack of

2    evidence or both.

3              MR. McMAHON:  It's actually both in this case.  It is

4    both.

5              THE COURT:  So I think what -- then probably what

6    needs to be done is the plaintiff needs to go through and show

7    me where they preserved that claim.  And if you need -- if you

8    preserved it, I'm not going to stop you from reopening your

9    case for two minutes to put in.  But, obviously, if you waived

10   it, you waived it, and that's the question we're going to have

11   to sort out because it sounds like the defense has an argument

12   that they think based on what was said in the pretrial order

13   this wasn't in the case.

14             I don't want to force you guys to go labor through

15   that right now.  I mean, at the end of the day, garden variety

16   emotional damages are whatever they are.  So it's either

17   preserved or it's not.  It's not an evidentiary problem because

18   in two minutes you could put on your case for that.  It would

19   be a lot longer if you had to put on a case for mitigation of

20   damages or lost wages or back pay.  But that's not today or

21   tomorrow or Monday.

22             Anything else you guys wanted to say on this issue?

23             MR. McMAHON:  Okay.  I will just say this.  I

24   understand from an evidentiary standpoint it might be an easy

25   cure for the plaintiff.

Jury Instruction Conference

1        THE COURT:  Mm-hmm.

2        MR. McMAHON:  To kind of get on and get some

3     testimony.  It's not nearly as easy a cure for us.

4        THE COURT:  Well, and I guess my point is if it's been

5     waived by the pretrial order, then you have every right to

6     think that you weren't going to have to work through it.

7        MR. McMAHON:  Thank you.

8        THE COURT:  But if it has been preserved by the

9     pretrial order, I don't see any prejudice to you guys by

10    letting him do what he preserved the right to do.  And that's a

11    question I can't answer.  Maybe you guys were thinking about

12    this before five minutes ago; I certainly wasn't.  I had no

13    idea that there was going to be an issue on compensatory

14    damages, whether to instruct the jury on that until two minutes

15    ago.  But it's -- you know, I get your position.  There's

16    just -- there's evidence of it or not.

17       MR. McMAHON:  The other dynamic to this, your Honor,

18    is that, you know, when the depositions were conducted in this

19    case -- I mean, this really goes back really to everything.  In

20    terms of the identification of witnesses, I mean, everything.

21    Because there were depositions taken in the case of

22    Ms. Arroyo's medical providers, and we were able to depose them

23    and they were able to say they're not able to allocate where

24    her emotional distress is coming from.  And so it's not so easy

25    to cure.  You can reopen the case and get two minutes of kind

1    of token testimony and kind of say it's there, and poof, we're

2    done and we fixed it.

3            THE COURT:  Mm-hmm.

4            MR. McMAHON:  We've gotten to this point through a

5    whole entire week of trial.  And now this is being sprung on us

6    and it's not even in the pretrial orders.

7            MR. DeROSE:  Judge, I suggest that I do have my

8    damages listed in the pretrial order, and I asked for

9    liquidated or compensatory damages.  I don't have it in front

10   of me right now, and also compensatory damages.

11           MR. McMAHON:  And actually he did not.  The categories

12   of damages in the pretrial order were lost wages and liquidated

13   and punitive damages.

14           THE COURT:  Ah, yeah, that's what I see right here.

15   Punitive and liquidated damages from Volvo's intentional

16   violation of USERRA and ADA.  That's on Page 3 of the pretrial

17   order.

18           Now, you gave me another statement which I don't have

19   in front of me right now.

20           MR. McMAHON:  It was identical to what you had.

21           THE COURT:  Okay.  It looked -- when you sent it in,

22   it looked close enough that I didn't give it a close read.

23   But, anyway, that's something that will be easier --

24           MR. DeROSE:  Judge, but the Seventh Circuit, that's by

25   nature of damages I'm asking for.  I'm itemizing them.  And in

Jury Instruction Conference

1    the Seventh Circuit pattern instruction, which I did submit, I

2    said I want compensatory damages to compensate her for her

3    emotional and her -- I never lay out the value of compensatory

4    damages.  It's what the jury says it is.

5              THE COURT:  Most people don't.  Most people don't bid

6    against themselves.

7              MR. DeROSE:  I think it goes just like that, Judge.

8              THE COURT:  Again, I have to look -- I don't have all

9    of what you guys proposed in front of me either.  I just have

10   our baking down a bit.  So why don't we -- we'll let everybody

11   lay out their position on this over the weekend.

12             MR. McMAHON:  Right.  And just so your Honor is aware,

13   for purposes of our judgment as a matter of law motion --

14             THE COURT:  Yes.

15             MR. McMAHON:  -- which has several parts.  This is one

16   of the parts.

17             THE COURT:  Right.  Sure.  And what's going to happen

18   on judgment of as a matter of law is you will make in five

19   minutes your key points.  If they want to respond to it, they

20   can.  I will take it under advisement.  I would never grant a

21   judgment as a matter of law motion without reading the

22   transcript.  So the jury is undoubtedly going to return a

23   verdict before I can render a decision myself on it.  But

24   you'll preserve your arguments for any post-trial motions you

25   need to file.  The jury will either bail you out or they won't.

Jury Instruction Conference

1    And if they don't, you've preserved everything for post-trial

2    with a transcript, which makes it a lot easier for me.

3            MR. McMAHON:  Okay.

4            THE COURT:  But that's the way it's going to work.

5    I'm got going to spend, like, two hours back there thinking

6    about whether I'm going to grant a JMOL and hold the jury here.

7    So that's how I've always done it.  Good enough?

8            MR. McMAHON:  Yes.

9            THE COURT:  Next.  Punitive damages.  This is the

10   Seventh Circuit pattern on this.  You guys may want to argue

11   that I shouldn't instruct the jury on punitives.

12           MR. McMAHON:  We are definitely arguing that.

13           THE COURT:  Okay.  And that's fine.  And in most

14   cases, I let the jury decide that.  And then I may bail you out

15   later.

16           Here's the issue on punitive damages.  It's actually a

17   closer question here than it is a legal question in some ways

18   because the Seventh Circuit affirmed the dismissal of

19   intentional infliction of emotional distress, which is a

20   standard that's not too far off from the punitive damages

21   standard.

22           MR. McMAHON:  Right.

23           THE COURT:  I have not done the legal crunching that

24   you would need to do to decide whether that affirmance is

25   inconsistent with an award of punitive damages.  I don't know

1    that it is.  But it's a legal question that people might need

2    to brief at some point in this case.

3           MR. McMAHON:  We've thought of that as well, your

4    Honor.  And we have some other specific arguments as it

5    pertains to the ADA.  I can present them on Monday.

6           THE COURT:  You can present them all.  And I will say

7    I am more open to that than I usually am, because I'm aware

8    that there's at least some tension between the idea that you

9    can't have an IID claim, but you can have a punitive damages

10   claim.

11          MR. McMAHON:  Correct.

12          THE COURT:  But I haven't done the legal work to

13   resolve that.

14          Okay.  Now we're on to USERRA on Page 31.  Any

15   objection to the nature of the USERRA claim as it has been

16   described here?  And this is where you have an insert.

17          MR. McMAHON:  This is where we have an insert, and we

18   will work out something accordingly on that.

19          Just as a preview for Monday as well.  Again, this is

20   just a preview.  I don't want to go in depth on this right now.

21   And your Honor actually already touched on this in your motion

22   in limine order, that order where you kind of address both

23   parties' motions in limine.

24          The only -- I'll call it an anchor -- that allows

25   Ms. Arroyo to get to the jury upon her USERRA claim, is if

1   liquidated damages are still in play.  There's actually a

2   Tennessee case -- a federal case -- citing back to Magistrate

3   Judge Cole's case from the Northern District here addressing

4   the fact that if you have a USERRA claim that doesn't involve

5   liquidated damages, there is actually no right to a jury

6   verdict.

7          And Magistrate Judge Cole in his opinion in there

8   actually steps through the history of that, and kind of talks

9   about the predecessor statute to USERRA, and how there was

10  actually no jury trial right under that statute.  And what

11  changed as a result of USERRA was, well, USERRA comes about in

12  1994.  We had this liquidated provision, and that's what allows

13  you to get to the jury.

14         So we kind of have a two-fold argument on that in the

15  sense that, one, we don't believe that they presented

16  willfulness to establish liquidated damages.

17         THE COURT:  So it's the same -- basically it's the

18  counterpoint to no punitive damages under ADA, no willfulness

19  under USERRA.

20         MR. McMAHON:  It is.  And I guess but more

21  specifically, unlike the ADA -- well, again, I think it gets

22  down to whether or not there's compensatory damages, which we

23  also agree there is not.  There are no other damages under

24  USERRA as your Honor proposed instruction -- I mean, there are

25  none.  So if liquidated is out, we believe that the jury can be

Jury Instruction Conference

1    excused with respect to even assessing the USERRA claim.

2         THE COURT:  But liquidated is only out if I decide as

3    a matter of law there's no possible way they could conclude

4    that any violation was willful.

5         MR. McMAHON:  That is correct.

6         THE COURT:  Okay.

7         MR. McMAHON:  I wouldn't say any violation of the law.

8    I would say --

9         THE COURT:  Any violation of USERRA.

10        MR. McMAHON:  Right.  As it pertains to the

11   termination.

12        MR. DeROSE:  And Judge, in my trial brief I cited to

13   not only Judge Cole, but other cases that talk about the

14   willful.

15        THE COURT:  Right.  But the question for me is very

16   simple.  Are you taking willful out of the case?  If you're

17   taking willful out of the case, you're taking the jury out of

18   the case.  If you're not, the jury has to check that box at

19   least.  And then after that box is checked, and there's no

20   damages question for them, it all goes to me.  Everybody's on

21   board with that.

22        MR. McMAHON:  Everybody is on board with that part.

23   Yes.

24        THE COURT:  All right.  Fantastic.

25        So you will make that argument on Monday.

Jury Instruction Conference

1    MR. McMAHON:  Yes, I will.

2    THE COURT:  Very good.  So that's just a preview of

3  coming attractions, but no complaint with 31 as it's written.

4  It's just a complaint of whatever goes to the jury.

5    MR. McMAHON:  I think the only piece about 31 is --

6    THE COURT:  Is your insert.

7    MR. McMAHON:  The insert paragraph, yes.

8    THE COURT:  And then Page 32, this was -- I know we

9  made this longer and not shorter, but it's our way of trying to

10  give the jury some better sign posting as to what their job is.

11    Any problems on 32?

12    MR. McMAHON:  Give us just a minute.

13    THE COURT:  Sure.

14    MR. McMAHON:  I just want to make sure I'm looking at

15  this right.

16    THE COURT:  Yeah.  We put the affirmative defense in

17  there so they understand it's all connected.

18    MR. McMAHON:  Your Honor, we're fine with that.  I

19  mean, it's going to be your point, we're not breaking this up.

20    THE COURT:  Yeah.  It all goes together anyway.

21    MR. McMAHON:  We're okay with that, an instruction

22  like that.

23    THE COURT:  And the plaintiffs are okay with this,

24  too?

25    MR. DeROSE:  Yes, your Honor.

Jury Instruction Conference

1    THE COURT:  And 33 is our attempt to explain

2    motivating factor.  And basically the big change here is we

3    changed "discharge" to "terminate," because that's the word

4    that was used consistently in the presentation of the evidence.

5    MR. McMAHON:  I'm sorry.  We're on page 33?

6    THE COURT:  Yes.  I am sorry.  Yes.

7    MR. McMAHON:  Give us just a second here.

8    Your Honor, what I would say on this particular page,

9    and I think the substantive revision here is kind of an issue

10   of do we get motivated or do we give influence.

11   THE COURT:  Mm-hmm.

12   MR. McMAHON:  You know, I think it's kind of like

13   this.  The Seventh Circuit opinion does reference motivator,

14   and I think what we -- I mean --

15   THE COURT:  Point to me right where that --

16   MR. McMAHON:  Yeah.  Yeah.  Page 11.

17   THE COURT:  Okay.  Got it.

18   MR. McMAHON:  "Taking all of the evidence as a whole"

19   -- it's the first full paragraph on 11 -- "a reasonable jury

20   can infer that Volvo was motivated by anti-military animus

21   towards Arroyo.

22   THE COURT:  Gotcha.  Let me ask the plaintiffs.

23   Motivate and influenced, I think I could probably open up a

24   dictionary and find there are synonyms or thereabouts but I'm

25   okay following the Seventh Circuit.  If they are asking for

Jury Instruction Conference

1    motivated, I don't think it makes a difference.

2            MR. DeROSE:  It doesn't to us, your Honor.

3            THE COURT:  Okay.  So you want motivated.

4            MR. McMAHON:  Motivated is good.

5            THE COURT:  I am motivated to give you motivated

6    because there is no objection from the plaintiffs and the

7    Seventh Circuit so say it.

8            Good enough.

9            34 is the affirmative defense, which I noted we folded

10   into 32.  Everybody okay with where it stands?

11           MR. McMAHON:  We are okay with kind of combining it

12   like that.

13           THE COURT:  Okay.  And then I wiped out back pay and

14   mitigation again in this section, too, because all of that goes

15   to me.

16           MR. McMAHON:  Right.

17           THE COURT:  Then page 37 is the instruction for

18   willful, which I understand that the defendants are going to

19   ask me not to give it at all.  But if I were to give it, do you

20   have any objection the way it's phrased?

21           MR. McMAHON:  Let us just look at this for a second.

22           THE COURT:  Sure.  No problem.

23           Okay.  Back on.

24           MR. McMAHON:  Yeah, your Honor, we're back on -- I

25   think the -- I think the only change we have to this or

1   suggestion here -- and again, I, you know, I think this is kind

2   of in light of the fact that we pretty liberally allowed the

3   plaintiff to go into some discussions about knowledge of USERRA

4   law generally.

5          THE COURT:  Mm-hmm.

6          MR. McMAHON:  We would like the sentence in the second

7   paragraph there, where it says "Defendant Volvo knew that its

8   employment decision violated the law," we would like that to

9   read "If defendant Volvo knew that its termination decision

10  violated the law," so I think that is relevant.

11         MR. DeROSE:  But there were decisions along the way

12  all of the way back to 2005, Judge, that the Seventh Circuit

13  said that's part of the mosaic.

14         MR. McMAHON:  Yeah.  But --

15         THE COURT:  Right.  But didn't they also say it has to

16  be tied to the termination?

17         MR. DeROSE:  Yeah.  But we tied it, because, like

18  you've been saying all along, the frustration they were

19  receiving about, "You mean, we have to give her time to

20  travel," and their responses to that.  "You mean we have -- we

21  just have to sit back and wait."  All of that is tied into the

22  ultimate termination.  All of a sudden two minutes is all they

23  need to fire her.

24         THE COURT:  So it's either termination or employment;

25  is that what we are talking about here?

Jury Instruction Conference

1    MR. McMAHON:  I think that's what we're talking about.

2    And our argument is that in order to prove willfulness there

3    has to be a willful violation of the statute with respect to

4    the adverse action we are talking about.

5         We understand the Seventh Circuit opinion to be

6    saying, look, we can bring up, you know, these discussions from

7    the past and this dialogue from the past to show animus.  We

8    understand that.  The Seventh Circuit did not opine on

9    willfulness one way or another.  I mean, that's an issue for

10   your Honor in the first instance here.

11        MR. DeROSE:  Animus --

12        THE COURT:  Right.  And I guess the way I look at it

13   is the mosaic goes to animus.  And the animus, if the animus

14   can be tied to the termination, then you have a claim.  But if

15   all we're talking about is -- that word is either going to be

16   employment or termination, I think I have a pretty clear

17   impression of why you guys want what you want.  And if I think

18   about it over the weekend, I think I can come up with a

19   rational reason for picking one word or the other so that I can

20   let you guys know about it on Monday.  But I appreciate knowing

21   what your grievance is tonight instead of Monday.  And if you

22   guys let me think through termination and employment in the

23   context of all of the evidence and all of these instructions as

24   a whole, I will come up with a good reason for where I come out

25   on Monday.  Agreed?

1      MR. McMAHON:  We're good with that.

2      THE COURT:  Okay.  Excellent.  Then the last

3  instructions here are the jury constitution, 132, 133, 134.

4  And those are the same ones I have given in every civil case

5  since they handed me these instructions.  Everybody good with

6  those?

7      MR. McMAHON:  We're good with those, your Honor.

8      MR. DeROSE:  Good with those.

9      THE COURT:  Okay.  And then have you run the traps on

10  the verdict form?  Can you fill out the way you want it?

11  Obviously, the defendants are going to argue that some pieces

12  of this verdict form should not be given to the jury; for

13  example, compensatory damages and willfulness.  But assuming

14  that I were to give those, is there any problem with the form

15  of this form?

16      MR. McMAHON:  We -- and, again, I don't mean to beat

17  the dead horse, but especially since it's on the verdict form

18  itself, every time we are saying ADA claim or USERRA claim.

19      THE COURT:  Mm-hmm.

20      MR. McMAHON:  We would like it to say ADA

21  discrimination claim or USERRA discrimination claim.

22      THE COURT:  Right.  Okay.  I have no problem with

23  that.

24      Do the plaintiffs have any problem with that?

25      MR. DeROSE:  No, I don't have any problem.

Jury Instruction Conference

1    THE COURT:  Stan, we'll just globally change them.

2    MR. McMAHON:  It's kind of a Volvo to Volvo truck

3  modification, but especially how the evidence has unfolded, we

4  think it's important.

5    THE COURT:  Fine.  I don't think it will affect the

6  plaintiff's ability to argue its case.  We will switch them

7  all.

8    MR. McMAHON:  And I think the only other substantive

9  comment we had about this form, and I will tell your Honor

10  we're still kind of considering this.

11    THE COURT:  Mm-hmm.

12    MR. McMAHON:  We can look into it further over the

13  weekend.  I will tell you, you know, my experience with claims

14  with kind of a mixed-motive framework or a burden-shifting

15  affirmative defense like USERRA, my experience has been that

16  the defendant is entitled to a separate issue to the jury on

17  that.

18    THE COURT:  Okay.  I'm not feeling strongly one way or

19  the other.  If you want to put the burden-shifting framework

20  into here, so you want to say, "Did the plaintiffs prove what

21  they need to prove?  And if they have, then did the defendants

22  prove what they need to prove to overcome what they need to

23  prove?

24    MR. McMAHON:  We are considering that.

25    THE COURT:  I don't think that's going to confuse the

1    jury.  Because the way the instruction is written on the claim

2    that has the burden shift really makes that clear anyway.

3          Do the plaintiffs feel strong one way or the other on

4    whether we make them answer two questions or one on that.

5          MR. DeROSE:  Judge, I don't like them to have to

6    answer any more questions than they have to, because that

7    always leads to a possibility of an inconsistent verdict.

8          I'd like to see them answering as few things as they

9    have to check out.  That's all I'm asking.

10         THE COURT:  And that's why I prefer general verdict

11   forms over the special verdict forms.  But when there is an

12   affirmative defense, I can see the rationale for breaking those

13   two questions out.

14         So why don't you think about whether you want that.

15         MR. McMAHON:  Yes, we can.

16         THE COURT:  I'll think about whether if you want that

17   it makes sense.  But I'm generally averse to breaking elements

18   out and having the jury decide that.  But this isn't an

19   element.  This is where the burden shifts in the case, and

20   that's why I am much more open to the idea.  And all it would

21   do is add one more question to them that we've already

22   explained to them, I think, as clearly as we can how the burden

23   shifts in that case depending on what they decide.

24         MR. McMAHON:  In terms of Mr. DeRose's concern about

25   any inconsistent verdict, obviously, this would be a one-step,

Jury Instruction Conference

1  two-step, at the end of step one and they find there is no

2  animus, they never get to the affirmative defense.

3        A very celebrated case your Honor must have seen in

4  the paper in the state court.  The jury says "Oh, we didn't

5  believe the police," so they check the box, the police officer

6  was not unreasonable in his actions.  And then they, in the

7  next box, they found for the plaintiff and they gave her

8  $12.5 million.  Down the street.  And the judge threw the whole

9  verdict out and the jurors started -- when he found out about

10 this.

11       THE COURT:  They were angry.  I saw that.

12       MR. McMAHON:  And they all wanted to testify before

13 the Court.  They're all testifying in the newspaper.  "None of

14 us thought she wasn't going to get all of that money.  We felt

15 sorry for the cops."  That was a stupid interrogatory for the

16 plaintiff to let go in because the way it went in, if they

17 answered it one way and gave them the money for the plaintiff,

18 they had an inconsistent verdict, and it's a problem.

19       THE COURT:  Well, again, I don't generally like

20 special verdict forms.  But this one, I'm very confident that

21 the way it's already explained tells them quite clearly that

22 you have a burden, and if you carry the burden, then they have

23 a burden.  And if we mirrored that in the verdict form, I don't

24 a think there's a high likelihood or even much of a risk of

25 it -- maybe I'm underestimating, maybe I'm over estimating the

1    jurors, but I don't think so in that case.  But you let me know

2    if you want it.  Because I'm not going to worry my pretty

3    little head about it if you don't want it.

4             MR. DeROSE:  Well, excuse me.

5             MR. McMAHON:  I was going to let you know that that is

6    our only kind of open point for discussion right now.  And

7    everything else we can email on and get our position on, and of

8    course we will copy.

9             THE COURT:  Fantastic.  Well, if people would start

10   the email chain rolling as soon as they are ready, and then

11   people can respond.  I don't want to give you a firm deadline

12   because I don't know what else you have got going on this

13   weekend.  But if by let's say 6 o'clock on Sunday I could have

14   it pretty well settled what people's positions are, I will try

15   to give you guys some feedback by Monday morning.  Hopefully, I

16   can type something out, and if I can't, when you come at 9:30 I

17   will be fully prepared.

18            MR. McMAHON:  If I can get, like, an email out by noon

19   tomorrow, would that be acceptable?

20            THE COURT:  If you got it noon tomorrow, could I ask

21   you guys to do a noon Sunday.  And then you guys to do a 6:00

22   p.m. Sunday.  Would that be a reasonable schedule?

23            MR. McMAHON:  That would be fine.

24            THE COURT:  Does that work for the DeRose family?

25            MR. DeROSE:  Judge, all we do is work in my family.

Jury Instruction Conference

1     THE COURT:  So that will be our targets.  Noon, noon,

2     and 6:00.  And then my target is 9:30 Monday morning, but if I

3     can beat it, I will let you know.

4          Okay.  I am going to give you a present on my way out

5     and I am going to make the 6:15 train.  And here's my present.

6     I want to make sure I give you my card.

7          Okay.  You guys have been awesome this week.  I thank

8     you for working with me this week.

9          MR. DeROSE:  You've been awesome.  I'm impressed.  I

10    never worked with the Court.  Everybody told me I was going to

11    like you.

12         THE COURT:  Well, have a nice weekend, the best one

13    you can.  And we'll just keep working this through.  I will see

14    you guys Monday at 9:30.  I'm confident we will have closings

15    on Monday afternoon, so get ready for it.  And then it's off to

16    the jury and that's their problem.

17         MR. McMAHON:  Sounds good.

18         THE COURT:  Okay.  Have a great weekend, everybody.

19         (Proceedings concluded.)

20                    * * * * * * * * *
                    C E R T I F I C A T E
21        I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.
22    /s/Kristin M. Ashenhurst, CSR, RDR, CRR   February 28, 2018
      Kristin M. Ashenhurst, CSR, RDR, CRR      Date
23    Federal Official Court Reporter

24

25