<pre>
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3
   LUZMARIA ARROYO,                  )  Docket No. 12 C 06859
 4                                   )
                Plaintiff,           )  Chicago, Illinois
 5                                   )  August 22, 2016
           v.                        )  1:36 P.M.
 6                                   )
   VOLVO PARTS NORTH AMERICA, LLC,   )
 7                                   )
                Defendant.           )
 8                         VOLUME 6-B
 9          TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
      BEFORE THE HONORABLE ROBERT M. DOW, JR., AND A JURY
10
   APPEARANCES:
11

12 For the Plaintiff:        JOHN P. DeROSE AND ASSOCIATES, by
                             MR. JOHN P. DeROSE
13                           MS. CAITLYN DeROSE
                             15 Spinning Wheel Road
14                           Hinsdale, Illinois 60521
                             (630) 920-1111
15
   For the Defendant:        CONSTAGNY, BROOKS & SMITH LLP, by
16                           MR. WILLIAM J. McMAHON IV
                             100 N. Cherry Street
17                           Suite 300
                             Winston Salem, North Carolina 27101
18                           (336) 721-6860

19                           CONSTAGNY, BROOKS & SMITH LLP, by
                             MS. SUSAN E. BASSFORD WILSON
20                           200 S. Wacker Drive
                             Suite 3100
21                           Chicago, Illinois 60606
                             (314) 925-7275
22

23 Court Reporter:          KRISTIN M. ASHENHURST, CSR, RDR, CRR
                            Official Court Reporter
24                          219 S. Dearborn Street, Room 1918
                            Chicago, IL 60604
25                          (312) 818-6549
                            kristin_ashenhurst@ilnd.uscourts.gov
</pre>

Temko - Direct by McMahon

1    (The following proceedings were had in open court:)

2        THE COURT:  Hi, everybody.  All set?

3        ALL ATTORNEYS:  Yes.

4        THE COURT:  Carolyn, we're all set.

5    (Jury in.)

6        THE COURT:  Mr. Temko, we will let you take your seat

7    again, if you would, please, sir.

8        Okay, Mr. McMahon, I interrupted you in 2007, I

9    believe, so pick up wherever you like.

10       MR. McMAHON:  Thank you, we will pick back up.

11       MICHAEL TEMKO, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

12           DIRECT EXAMINATION (Continued)

13   BY MR. McMAHON:

14   Q   And Mr. Temko, if I could, we were talking last about 2007,

15   and -- okay, it's back up now.  And we were talking about the

16   difference between there was a call-in sick where there was no

17   document in 2007, inexcused, versus in 2005 where Ms. Arroyo

18   called in with a document and it was excused.

19       Is that how you typically treat, you know, those types

20   of excused absences, when there's a call in?

21   A   Right.  So if they provide a document we count that as one

22   of their excused absences; if not, it gets documented as an

23   occurrence.

24   Q   Okay.  And in looking at 2008, it looks like the same sort

25   of thing happened.  There is an entry there on January 3rd

1  where it looks like Ms. Arroyo called in sick, but with a

2  document, right?

3  A   Correct.

4  Q   And that was excused?

5  A   Yes.

6  Q   And it looks like there's a notation for January 4th, but

7  that was excused as well, right?

8  A   Correct.

9  Q   Now, there's a notation immediately below that for two days

10  in February where it says, "Sister in auto accident," and a

11  document provided, right?

12  A   Right.  Correct.

13  Q   And those days were excused, right?

14  A   Correct.

15  Q   And then it looks like in October of that year, the 13th

16  and 24th, it looks like Ms. Arroyo was a no-call/no-show on two

17  days, right?

18  A   That's correct.  On October 13th there was a

19  no-call/no-show, which would be one point for --

20  Q   Right.

21  A   -- missing the entire day, and then for Saturday.  If you

22  sign up for a Saturday --

23  Q   Yes.

24  A   -- and you do not show up, you also get a point because you

25  kept somebody else from getting that Saturday because we only

Temko - Direct by McMahon

1   work a certain amount of people.

2   Q   It makes sense.  In other words, you're keeping someone

3   else from taking that work.

4        MR. DeROSE:  Objection, Judge, as to what makes sense

5   to Counsel.

6        THE COURT:  That's a good objection, so we will just

7   strike that --

8        MR. McMAHON:  That's all right.

9        THE COURT:  We will strike Mr. McMahon's comment and

10  just focus on his answer.  Okay.  Thanks, everybody.

11       MR. McMAHON:  Thank you, your Honor.

12  BY MR. McMAHON:

13  Q   But Mr. Temko, as you were explaining, you were saying that

14  if you sign up for overtime, you expect that person to work the

15  overtime?

16  A   Correct.  If they sign up, then we expect them to be there.

17  And if they don't, they prevent someone else from getting

18  overtime, and so then we issue them an occurrence.

19  Q   And just to clarify, going back to the other occurrence

20  charged, if you will, if you have a no-call/no-show where you

21  don't show up to work at all, that's one full occurrence,

22  correct?

23  A   Correct.

24  Q   So based upon Ms. Arroyo's no shows on those two days, it

25  looks like here from the attendance call she would have

1    received a verbal warning.

2    A    Right.  So she would have a point for the October 24th, a

3    point for that October 13th; that's two occurrences in one

4    month, so that would be a Step 1 verbal warning.

5    Q    Now I'm going to briefly show you Defendant's Exhibit 16,

6    if we could, and that's also been admitted pursuant to the

7    pretrial order.

8         And Mr. Temko, do you recognize Exhibit 16?

9    A    Yes.

10   Q    Can you please tell the jury what this is?

11   A    That's a Step 1 CAP, or corrective action plan.

12   Q    And is this corrective action plan covering the dates at

13   issue that we just looked at on these charts for Ms. Arroyo?

14   A    Yeah.  If you read the top line that says that "You have

15   accumulated a total of two occurrences in a one-month period,

16   from October 13th to October 24th, thus exceeding our

17   attendance policy guidelines."

18   Q    And it looks like this was presented to Ms. Arroyo

19   February of 2009, right?

20   A    Correct.

21   Q    Do you know what the delay was for presenting that to her?

22   A    Yes.  She would have been out of the office.

23   Q    And this looks like it was actually presented to her by

24   you; is that right?

25   A    Yes.

1  Q   And were you actually her supervisor at the time?

2  A   2009, yes, I believe I would have been the supervisor.

3  Q   Or at least in 2008, correct?

4  A   Yeah.  2008, 2009, somewhere around there is when I

5  transitioned to not being a supervisor.

6  Q   If we can take a look back at Defendants' Exhibit 15,

7  please, which would be an attendance chart.  And if we could

8  take a look at 2009.  As we know, 2009 Ms. Arroyo was out most

9  of the year on military leave, right?

10 A   Correct.

11 Q   And just to be clear, the military leave is a type of

12 excused leave or excusable absence under the policy?

13 A   Right.

14 Q   So she's not penalized at all for that military?

15 A   No.  We just document it, but we don't -- there's no points

16 for it -- excused absences aren't used for it.  It's just

17 documented.

18 Q   And it looks like that year she also had a couple of time

19 periods of A&S?  What's A&S?

20 A   A&S is, essentially, a short-term disability.  If an

21 employee gets sick and they miss work, then they get paid for

22 being off for that period of time.

23 Q   Okay.  So it's a short-term disability coverage that you

24 guys call A&S?

25 A   Right.  I believe it stands for accident and sickness, I

1  believe.

2  Q    All right.  And is that type of leave paid leave under

3  Volvo's policy?

4  A    Yes.

5  Q    So, essentially, she also has a call-in doc where she again

6  provided a document and that day was excused, right?

7  A    Yes.

8  Q    And she was also, it looks like late 11 minutes.  That was

9  inexcused, right, as an occurrence?

10  A    Correct.

11  Q    And then she got half of an occurrence for that?

12  A    Correct.  On January 7th.

13  Q    Quick question for you about that, too.  And I know we've

14  looked at the ranges.  How many tardies, if we are just talking

15  about 0 to 59 minutes, how many tardies does it actually take

16  to get an a occurrence?

17  A    To get an occurrence?

18  Q    Yeah.  To get one full occurrence, how many tardies would

19  you need?

20  A    It would depend on the length of the occurrence, but you

21  would need two tardies to get one occurrence if it was between

22  1 and 59.

23  Q    And in order to get two occurrences in a month, you would

24  need to be tardy then four different times in a month?

25  A    That's correct.

Temko - Direct by McMahon

1    Q    If we could talk a look at Ms. Arroyo's attendance for

2    2010, please.  And as we know, Ms. Arroyo's military leave

3    continued for much of that year and she returned to Volvo in

4    September of 2010, right?

5    A    Correct.

6    Q    Now, it looks like here in October of 2010, Ms. Arroyo was

7    late a couple of days, 22 minutes and 20 minutes, right?

8    A    Yes.

9    Q    She had a call in where she was absent completely that day,

10   and that was one full occurrence?

11   A    Correct.

12   Q    And then based on that, she had accumulated two in a month;

13   is that right?

14   A    Correct.

15   Q    All right.  So I am going to show you what's been

16   previously introduced pursuant to the pretrial order as

17   Defendant's Exhibit 18.

18           And Mr. Temko, can you identify this document for us

19   and explain what this is?

20   A    That is a verbal warning for attendance issued on October

21   29, 2010 to LuzMaria.

22   Q    And does this cover the time period that we just looked at

23   there in October of 2010?

24   A    Yes, it does.

25   Q    And was this prepared by you?

1    A    Yes.

2    Q    Before you provided it to Mr. Schroeder?

3    A    Correct.

4    Q    All right.  Looking back at the attendance chart for

5    Ms. Arroyo, if we could -- and first of all, all of the

6    occurrences that we've been looking at, and then the only other

7    corrective action plan that we were looking at, all of that

8    happened before she was diagnosed with PTSD, right?

9    A    Yes.

10   Q    Okay.  And then going on in 2010, it looks like she has a

11   call-in sick, but she provided documents for that from it looks

12   like November 10th to November 12, right?

13   A    Yes.

14   Q    Those days were all excused?

15   A    Yes, they were.

16   Q    Okay.  And then she has some other military days mixed in

17   here.  Those days were given to her, right?

18   A    Correct.

19   Q    And then as we previously looked at in this case,

20   Ms. Arroyo went out on A&S on December 23rd.

21          Do you see that?

22   A    Yes.

23   Q    And if we can take a look going into 2011 right there on

24   the front page.  She stayed on A&S for approximately three

25   months it looks like, right?

1    A    Yes.

2    Q    All right.  And then she has another military leave and

3    FMLA leave, as well, mixed in there.  Again, A&S, military

4    leave, FMLA, are all those excusable absences under the policy?

5    A    Yes, they are.

6    Q    From an attendance standpoint was she penalized in any way

7    for taking those leaves?

8    A    No.

9    Q    And she has some other, I guess, half-occurrences mixed in

10   here where she is late one minute a couple of times and late

11   five minutes in May.

12         Do you see at that?

13   A    Yes.

14   Q    As a result of those, if you look on this chart -- and then

15   she was also late 10 minutes on April 14th.

16         As a result of those, did she get a corrective action

17   plan at that time?

18   A    During which time?

19   Q    During -- as of May, 2011, did she get a Corrective Action

20   Plan?

21   A    No, she hadn't.

22   Q    So she was late to work one minute twice by that point and

23   didn't receive any corrective action, right?

24   A    That's correct.

25   Q    And then it looks like here she took some chunks of time

Temko - Direct by McMahon

1  for military leave from the very tail end of May going into the

2  beginning of July.

3          Do you see that?

4  A   Yes.

5  Q   And it looks like she comes back from leave.  On July 29th

6  she was late one minute, right?

7  A   Yes.

8  Q   Did she get a corrective action plan at that point, as of

9  July 29th?

10  A   As of July 29th, no.

11  Q   All right.  And then it looks like she was late five

12  minutes, and then late one minute again on August 19th and

13  20th.

14  A   Yes.

15  Q   Okay.  And at that point did she receive any corrective

16  action?

17  A   On August 19th.

18  Q   August 19th, yes.

19  A   Yes.

20  Q   And what did she receive on that day?

21  A   On August 19th she was late five minutes.

22  Q   Mm-hmm.

23  A   And she fell into the category for five occurrences in six

24  months.

25  Q   Okay.

Temko - Direct by McMahon

1    A    So then she would have been issued a written warning.

2          The following day she was late again, which would

3    have -- which would have given her another half point, so she

4    had five and six again, which would have been Step 3, which is

5    a three-day suspension.

6    Q    Okay.  And in taking a look at the documents that we looked

7    at earlier in this case for the written warning and the

8    suspension, both of those documents, if you were to just count

9    the days, covered more than a six-month period.

10   A    Right.

11   Q    So can you explain to the jury why it was still considered

12   a six-month period under the attendance policy?

13   A    Well, as I said before, we look at a six-month period of

14   work.  So if somebody is off for three months, whatever that

15   period of time is --

16   Q    Right.

17   A    -- that doesn't count towards their rolling six-month

18   period.  So when we look back for two in a month, or five in

19   six months, we take out any time when they're not at work.

20   Q    So for purposes of looking back from, like, for instance,

21   this written warning and using the most recent occurrence of

22   August 19th, you would not be considering her time when she was

23   out on military leave for the six-month look back?

24   A    Right.  All of that time would have been taken out.

25   Q    Okay.  And then, likewise, you wouldn't be looking at the

1    time that she was on A&S?

2    A    Correct.

3    Q    So while the A&S time was military leave time as excusable

4    absences, it also doesn't count for purposes of the six-month

5    look back?

6    A    Right.

7    Q    And it looks like after she received the three-day

8    suspension there on August 20th, she took additional military

9    leave after that point, right?

10   A    Yes.

11   Q    She had had some HR-approved absences, as well, in

12   September; is that correct?

13   A    Correct.

14   Q    And by the way, going back to -- real quick -- the written

15   warning and the three-day suspension.  Did that happen, from

16   time to time, where you had an employee, you know, get two

17   steps of corrective action very close, kind of back-to-back

18   with each other?

19   A    Yes.  I mean, if they have kind of a track record of

20   occurrences, and they get occurrences real close together, they

21   potentially could get multiple sets at one time.

22   Q    All right.  And I have a follow-up question on that,

23   specifically, with respect to the days that are covered here.

24   Has there ever been a time where you've been, you know,

25   monitoring the attendance records, taking a look at things,

1  and there's a delay in you getting documentation?  And then

2  once you get the documentation, you change a day from, let's

3  say, possibly, an occurrence to an excused absence?

4  A   Yes.

5  Q   Can you explain why that happens from time to time?

6  A   If an employee comes back to work and they say they have

7  documentation, but I -- they're supposed to bring the

8  documentation on their return to work.  If they return to work

9  and they ask -- say, "Hey, I have it, but I forgot it at home."

10 We may say, "Okay.  Well, bring it in tomorrow and we will

11 squeeze it in when you bring it back in."  Or say an employee

12 was off on vacation or something and they brought it back when

13 they came back.  So it all just depends.  We just expected it.

14 If they communicated, we could, you know, obviously, we could

15 give them a little bit of extra time, or if, you know, they

16 were out of the office and they brought it back when they

17 returned.

18 Q   All right.  Well, I want to take a look at an example of

19 that that applies to Ms. Arroyo.  If we could put Defendant's

20 Exhibit 24 up, please.  That's also been admitted through the

21 pretrial order.

22      Mr. Temko, can you explain -- this is an email that

23 was dated September 6th, 2011.  Can you explain why you are

24 sending it to Mr. Schroeder that day?

25 A   Well, this email --

Temko - Direct by McMahon

1  Q   And then I will direct your attention specifically to the
2  top email?
3  A   Okay.  So this was a situation where there was an
4  occurrence, initially, issue, and then we changed that
5  occurrence to an excused absence.
6  Q   And what was the date on that that was changed, if you
7  will?
8  A   The date on the email?
9  Q   Or the date of the excused absence, if you will.  Or the
10 date that was, you know, in the occurrence that became excused.
11 Do you see that referenced?
12 A   Yes.  December 23rd.
13 Q   And that was actually the first day we saw in the chart,
14 right, where Ms. Arroyo went out on A&S leave?
15 A   Yes.
16 Q   All right.  So you were describing in this, I guess, the
17 impact of that to the written warning and the three-day
18 suspension.
19 A   Right.  So when we do a disciplinary action, we look for
20 two occurrences a month or five in six months, and then we stop
21 there.  So if we go back six months and we find, you know, that
22 we have the occurrence, we stop there and do the write up.  In
23 this situation, once we excuse the absence, the discipline
24 wouldn't have changed, just the dates that would have been used
25 would have changed.  So I just wanted to make sure that that

1  was clear.  So I just -- we corrected that.

2  Q    Okay.  So in this particular case, while you corrected one

3  of the days for an occurrence, the math of it still worked out

4  such that there was still five, six months for each of these

5  corrective actions?

6  A    Right.

7  Q    And you determined that the corrective actions were proper?

8  A    Yes.

9  Q    Let me ask this, as kind of a basic question.  Do you as

10  the keeper of the attendance policy work to try to discipline

11  people under this policy, to actively go out and try to give

12  them these corrective action plans?

13  A    It's basically just math.  I mean, I just --

14  Q    What do you mean by that?

15  A    I just -- it's like I said, it's two occurrences in one

16  month or five occurrences in six months.  So when I log the

17  occurrences or the excused absences or whatever I'm logging,

18  then I look to see if anyone is inside those parameters.  And

19  if they are, they are.  If they're not, they're not.  It's just

20  math at that point.

21  Q    And who determines how many occurrences they get within a

22  given time period?

23  A    The employee does.  I mean, they're the ones that are

24  coming in late, or the ones calling in, so they would determine

25  it.

1  Q   I want to go back to Exhibit 16 very briefly.  If we could

2  take a look at the very end of the attendance there.  Actually,

3  on the -- actually the first page.  I'm sorry.

4           It looks like on October 10th, Ms. Arroyo arrived late

5  to work one minute per these records, right?

6  A   Yes.

7  Q   She received half an occurrence that day.  And then there's

8  two notations on November 2nd and November 4th where she

9  violated the start rule; is that correct?

10 A   Yes.

11 Q   And remind us what the start rule is again?

12 A   Well, per the attendance policy we looked at earlier, the

13 employee is expected to be in the building and ready to work at

14 the start of the shift when the bell rings.  So if they're not,

15 they're violating the start rule.  So that's kind of what that

16 is.

17 Q   Okay.  So if an employee was outside of the building after

18 the start bell rang, and not inside the building, that would be

19 considered a violation, right?

20 A   Right.  That's a violation of the start rule and they would

21 be determined.

22 Q   I want to shift your attention kind of to another category

23 now.  We've talked a lot about Ms. Arroyo's attendance.  We

24 looked at an example where she was given, you know, two

25 corrective action plans, you know, close together in time, and

1    actually they were presented to her on the same day.

2           I want to ask you this first. Had other employees at

3    Volvo been terminated for attendance?

4    A   Yes.

5    Q   I want to look at some examples of that with you, if I

6    could. And I'm actually going to get Ms. Wilson up here to

7    kind of guide us through. First off, I want you to identify a

8    pretty big exhibit that I'm going to show you. And it's

9    Defendant's Exhibit 14, which has been admitted pursuant to the

10   pretrial order. And if you can put it up first and then show

11   it to him.

12          MR. DeROSE:  What exhibit, please?

13          MR. McMAHON:  Defense Exhibit 14. It's the big

14   comparator exhibit.

15   BY MR. McMAHON:

16   Q   Okay. First, Mr. Temko, this is -- it's a lengthy exhibit

17   and we're not going to cover all 179 pages that are in it. But

18   can you basically tell us what these records are as a group and

19   then we will look at some specifics.

20   A   Right. This is basically the -- the discipline that was

21   issued for attendance between 2008 and 2011.

22   Q   Okay. And it covers some 2012 examples as well.

23   A   All right. 2012.

24   Q   And these are folks that have received some level of

25   corrective action?

1   A    Yes.

2   Q    Whether it be a verbal, a written suspension, or in some

3   cases even a termination, right?

4   A    Yes.

5   Q    All right.  What I want to do is direct your attention to a

6   few quotes in here and ask you some questions about them.

7   Okay?

8         And what I'm going to do is I'm going to put Exhibit

9   16 here on the ELMO and showing you some of the sheets that are

10  within Exhibit 14.  Okay?

11        Now, if you want to direct your attention to specific

12  page numbers.

13              THE CLERK:  Is this admitted?

14              THE COURT:  These are all admitted.

15              MR. McMAHON:  This is all part of one exhibit.  But

16  rather than flipping through the whole thing we want to --

17  yeah, it's 3601 to 3602.

18              First, I want to talk to you about Victor Jackson.

19              MR. DeROSE:  You had 3581.  You're not using that?

20              MR. McMAHON:  No, we're just doing some select cases

21  off of that.

22  Q    All right.  Do you see that, Mr. Temko, in front of you?

23  A    Yes.

24  Q    Okay.  And it looks like here there was a corrective action

25  plan issued to Victor Jackson on January 7th of '09 for two

1    occurrences between December 5th and December 23rd?

2    A    Yes.

3    Q    And he got a verbal warning for that?

4    A    Correct.  A verbal warning.

5    Q    And that covered December '08 absences, right?

6    A    Yes.

7    Q    And if would take a look at 3602, we can see an attendance

8    record, and that covers those two days down below, right?

9    A    Yes.

10   Q    And zoom in a little bit here.  And those were the -- those

11   dates in December were the dates where he accrued the

12   occurrences to get that corrective action, correct?

13   A    That's correct.

14   Q    All right.  Now, that was in the very end of '08 where he

15   had these.  In '09, though -- I'm going to show you some

16   additional records for Mr. Jackson, if we can.  And those Bates

17   numbers are 3659 through 3664 now.

18        I think, actually, the best way to do this is let's go

19   actually right to 3664 first.  I think that's his attendance

20   for everything there.  If we could zoom in on that, and then we

21   will show the back-up documents here.

22        So we looked at how Jackson had some occurrences at

23   the very end of '08?

24   A    Right.

25   Q    Now it looks like here he literally gets three steps,

1  January 3rd, January 5th, January 15th, and he's terminated?

2  A    Correct.  So, he had a --

3  Q    So how did that happen?

4  A    Well, he had -- you know, each one was two occurrences in

5  one month.  So anytime -- so on January 3rd when he was -- when

6  he called in sick and didn't provide a document, he had two in

7  a month.  On January 5th when he came in late, he had two in a

8  month again.  And then on January 15th he called in and cited

9  the weather, which gave him another full point which gave him

10  another two in one, so then that would have been, you know, the

11  final step, Step 4.

12 Q    So in looking at Mr. Jackson's example, specifically,

13 because he had these so close in time to each other, there was

14 a substantial overlap, right, in terms of use of the occurrence

15 if you get --

16 A    Right.

17 Q    And it looks like here on January 5th, Mr. Jackson was

18 given an occurrence for being late one minute.

19 A    That is correct.

20 Q    And that actually got him suspended, right?

21 A    Yes, it did.

22 Q    And then it was 10 days later where he had another -- it

23 looks like in this instance a full occurrence, and that got him

24 the termination?

25 A    That's correct.

Temko - Direct by McMahon

1    Q   Now, Mr. Jackson, was he a vet or did he have active duty

2    Reserve obligations at Volvo, do you know?

3    A   No.

4    Q   Do you know if he had PTSD?

5    A   No.

6    Q   Was he terminated and disciplined before the discipline

7    that led to Ms. Arroyo's termination or after that?

8    A   It was before.

9    Q   Okay.  I'll show you another example, if we could.

10         And, actually, real quick, just on the Victor Jackson

11   report, before we take that away, if we can take a look at one

12   other aspect of this.  If you could put up 3659, I want to show

13   you something here for Victor Jackson.  Yes.

14         Just taking a look at this.  We saw how his written

15   warnings, suspension and termination were all very close to

16   each other, in terms of the days that, you know, led to those

17   correction action plans.  I want to look at the dates that he

18   was actually given these plans.

19         The written warning was given to him on January 16th

20   of '09, right?

21   A   Yes.

22   Q   And let's take a look at the suspension; that's the same

23   day, right?

24   A   (No response.)

25   Q   And, finally, the termination, and that was given to him

1    the same day as well, right?

2    A    Correct.

3    Q    So in Mr. Jackson's situation, he actually -- not only did

4    he, I guess, earn or accrue these corrective action steps close

5    in time, he actually received the paperwork all in the same

6    day.

7    A    Yes, he did.

8    Q    And he was terminated that day?

9    A    Correct.

10   Q    And it looks like from looking at these documents, if you

11   could scroll up there, that he refused to sign these; is that

12   right?

13   A    Yes.

14   Q    All right.  I am going to show you another example, if we

15   can.  Specifically, let's look at Bates 3629 to 3634.  And if

16   we could put up 3634 probably first, just to kind of orient

17   ourselves.  And, actually, that name is kind of hard to read.

18   We need to put the corrective action up first, actually.

19             All right.  Mr. Temko, I need your help with this.

20   How do you pronounce this person's first and last name?

21   A    Scotty Senephimmachac.

22   Q    Okay.  That was pretty good.  You rattled that off quickly.

23             Now, I want to talk with you about -- I'm going to

24   call him Scotty for ease of reference, okay?

25   A    I understand.

Temko - Direct by McMahon

1  Q   I want to talk with you about the three corrective actions

2  that are noted here on his attendance record for '08.  It looks

3  like for '08 he received a written warning in June, a three-day

4  suspension in July, and then a termination in September; is

5  that right?

6  A   Yes.

7  Q   And it looks like here -- in taking a look at the documents

8  here, it looks like some of the time he called in he was late

9  five minutes.  He was late ten minute as well; is that right?

10  A   Right.

11  Q   There was one time where he got a written warning and he

12  current -- they gave him that when he called in sick with no

13  documentation; is that right?

14  A   Yes.

15  Q   Okay.  Was Scotty a vet?

16  A   No.

17  Q   Did he have active duty Reserve obligations while he was at

18  Volvo?

19  A   No.

20  Q   Did he have PTSD?

21  A   No.

22  Q   Was this -- did this termination happen before or after

23  Ms. Arroyo was disciplined in the steps that led to her

24  termination?

25  A   Before.

Temko - Direct by McMahon

1   Q   Okay.  If we take a look at another example.  If we can put

2   up Bates number -- or grab 3649 to 3650.

3          I think I will do 3650 first.  So now in taking a look

4   at this example, and again the name is a little bit hard to

5   read there, but we're talking about Sam Zweig?

6   A   Yes.

7   Q   Okay.  And so in looking at Mr. Zweig's spreadsheets

8   here -- and by the way, regarding these spreadsheets that we

9   have looked at, are all these spreadsheets created by you?

10  A   Yes.

11  Q   I mean, now, with respect to, you know, the notations that

12  are made in here about we saw Victor Jackson being 1 minute

13  late, and some other folks being five minutes late.  Here Mr.

14  Zweig, four minutes late.  Are you sharing that information

15  with Maureen Somersett, or anyone else who is not involved in

16  the attendance process?

17  A   No.  I mean, I took the information and I would document

18  it.  And if it resulted in something, I would send it for

19  review.

20  Q   Okay.  And the review, again, would be with Mr. Schroeder

21  or the appropriate manager who is overseeing the employee?

22  A   Yes.

23  Q   So going to Mr. Zweig for a minute here, and this is,

24  again, from 2008.  It looks like here he received a verbal

25  warning on August 1st; a written warning August 13th; a

1    three-day suspension September 2nd; and then a termination

2    October 23rd, right?

3    A    That is correct.

4    Q    And in looking at that, it looks like a lot of these

5    occurrences overlap with each other, right?

6    A    Yes, they do.

7    Q    And they counted for more than one disciplinary step in the

8    process?

9    A    Yes, they did.

10    Q    I think we called it the look back.

11              And it looks like the last occurrence that got him

12    terminated was when he was four minutes late; is that right?

13    A    That is correct.

14    Q    Okay.  Now was Mr. Zweig a vet?

15    A    No.

16    Q    Did he have any active duty Reserve obligations while he

17    was at Volvo?

18    A    No.

19    Q    Did he have PTSD?

20    A    No.

21    Q    Did this termination of Mr. Zweig happen before or after

22    the series of disciplinary steps that led to Ms. Arroyo's

23    termination.

24    A    Before.

25    Q    We saw some examples -- well, we saw at least one example

1  already of Victor Jackson being given an occurrence for

2  one-to-two minutes late, you know, again after that grace

3  period was eliminated.  I'm going to kind of show you some

4  additional examples, and just ask you to comment on them if you

5  can.

6       If we can pull up these -- Bates 3665 to 3666.  Okay.

7  And this is for Mr. Kennedy here in 2009, and, obviously, you

8  created this record as well, Mr. Temko?

9  A    Yes.

10  Q   And Mr. Kennedy here in 2009, he called in personal with no

11  documentation on the 15th, right?  Do you see that?

12  A   Yes.

13  Q   And then it looks like, actually before that on July 10th,

14  he was late eight minutes?

15  A   Yes.

16  Q   And then on August 5th he was late one minute?

17  A   That's correct.

18  Q   And that -- him being late one minute on that day triggered

19  the verbal warning step of the process, right?

20  A   Right.  One minute is a half of an occurrence.

21  Q   All right.  And counts the same under the policy as 59

22  minutes, right?

23  A   Right.

24  Q   And he received a verbal warning that day, right?

25  A   Yes.

Temko - Direct by McMahon

1    Q    And that was in 2009?

2    A    Yes, it was.

3    Q    Okay.  I want to show you one more example, Bates 3671 to

4    3672.

5    A    Okay.

6    Q    And this is in regards to an employee, Bill Somenzi --

7    A    Yes, it was.

8    Q    -- for 2009?

9    A    Sorry.

10   Q    Oh, that's okay.  And it looks like here with respect to

11   Mr. Somenzi -- it looks like the two occurrences here were on

12   October 22nd and November 16th, which led to the verbal

13   warning, correct?

14   A    That's correct.

15   Q    But in the very beginning of '09, it looks like he was late

16   one minute, right?

17   A    Yes.

18   Q    And he was given half an occurrence for that, right?

19   A    He was.

20   Q    Mr. Temko, we got an introduction to the fact that you had

21   some military obligations yourself when your employment began

22   at Volvo.

23   A    Yes, I was in the Army Reserves.  Yes.

24   Q    And I understand you testified before that you were not

25   deployed?

1    A    I was not deployed; that's correct.

2    Q    What did your Reserve obligations consist of?

3    A    When I was in the Reserves, I was stationed to a support

4    and training unit.  So we did a lot of -- we had a lot of

5    administrative functions.  One of the other things we did was

6    we helped train employees for -- or not employees, I'm sorry --

7    train soldiers for deployment.  For example, if they were going

8    to Afghanistan, we'd help -- you know, we'd help them train, so

9    we would go in the field with them and we'd help them train.

10   Q    Since your Reserve obligations have ended, and, again,

11   through your employment at Volvo, have you been involved in any

12   special projects to assist members of the military?

13   A    Yes, I have.

14   Q    I want to show you what we have marked, and has been agreed

15   upon to be entered as Defendant's Exhibit 40.

16         And in Exhibit 40 on the front page here we're looking

17   at an email.  Can you explain what this project is here that

18   you're discussing?

19   A    This one is called Operation Jersey Cares.  A Volvo

20   employee had sent out an email saying that he was part of an

21   organization called Operation Jersey Cares that sent care

22   packages to soldiers who were deployed.  When I heard that, I

23   initiated it locally.

24   Q    Mm-hmm.

25   A    And, you know, we put postings up.  We had, you know,

1    employees bring stuff in.  And we actually had, in addition to

2    people bringing in supplies and, you know, just different

3    things that soldiers like, you know, magazines, just stuff like

4    that.  We had a banner made and we sent it out just thanking

5    them for their service.  We had about -- we brought in about

6    100 pounds of just, you know, things to send to soldiers in

7    Iraq.

8    Q   And you were the one that kind of, I guess, spearheaded

9    this project, if you will?

10   A   Yes.  I'm the one that coordinated it.

11   Q   Can we look at the next page of this exhibit?  And what are

12   we looking at here in connection with this?

13   A   This was the posting that I had seen, and so what I did is

14   I just -- I saw it that it was being done kind of outside of

15   our facility.  So what I did was I brought it inside of our

16   facility, and you'll see on the bottom, I just put, "If

17   anyone" -- you know, I hung up a list of things that the

18   employees could bring in.

19   Q   Right.

20   A   And just I had them see me or another supervisor if they

21   were interested in giving or if they had any questions.

22   Q   All right.  And did you ultimately circulate a list of

23   items that folks could bring in?

24   A   Yes.  I posted that and circulated that.

25   Q   Let's take a look at the next page here.  And is this the

1  list you kind of came up with?

2  A    Yes.  That was a list of things that, you know, that we

3  sent, you know, to the soldiers.

4  Q    And then go on to the next page.  All right.

5        And you said you also created the banner in connection

6  with this unit you were helping out.

7  A    Right.  We brought a big Mack Trucks banner.  We had one of

8  our employees whose wife worked at like a place that do like

9  embroidery and stuff like that.

10  Q    Right.

11  A    And they kind of customized it for the unit we were sending

12  it to and then we had all of the employees sign it.

13  Q    And is that a picture of the banner that you had sent the

14  unit?

15  A    Yes.  That was the unit in Iraq that we sent it to.

16  Q    Okay.  And going back to the page before, real quick.  Did

17  you get a reply email back from one of the officers in the

18  unit?

19  A    Right.  I got an email from Sergeant Rodriguez just

20  thanking us for, you know, for thinking of them and thanking

21  for the banner.

22  Q    So Sergeant Rodriguez sent you that picture back of them

23  holding the banner.

24  A    Yes.

25  Q    And can we take a look at that?

1    And you said that that was the banner that you had

2  created and had several folks at Volvo sign?

3  A   Yeah.  We had the crew on the floor sign it.  We kind of

4  customized it for their unit.  On the top there it says, "249th

5  Engineer Battalion."  That was the unit they were attached to.

6  And it has their motto and their stuff on there.  And we had

7  our crew sign it and we sent that along with the care package.

8  Q   Were there any other projects aside from this care package,

9  and that was in, I guess, '09, that you have been involved

10 with?

11 A   Yeah.  There's been a couple more over the years.

12 Q   On that point, I'm going to show you Exhibit 41, and kind

13 of have you talk about that if we can.

14      MR. DeROSE:  This says 42, Counsel.

15      MR. McMAHON:  Let me take a look.  I think it is 41.

16      THE COURT:  The one that's up there is 41.  The one

17 that's up on the screen now.

18      MR. McMAHON:  Yeah.  It's 41.

19 BY MR. McMAHON:

20 Q   Mr. Temko, if I could direct your attention to Exhibit 41.

21 There's a reference to the Fisher House.  Can you explain what

22 that organization is?

23 A   The Fisher House is an organization who helps families who

24 have had soldiers come back injured from war, and Mack was

25 doing a fundraiser for the Fisher House.  The fundraiser was

1   basically selling wristbands that said "Mack Helping Military

2   Families," or kind of camouflage wristbands.  And so, you know,

3   I kind of organized and put a posting out.  And I think when it

4   was all said and done, I think we ended up buying 100 of them,

5   I believe, total.  I think the employees -- I think 81 of them,

6   I think, were sold to employees, and we sent that money to the

7   Fisher House.

8   Q   Okay.  And can we take a look at the next page of this

9   exhibit?  And is this an update with how much money you've

10  generated from the sale of the wristbands?

11  A   Yes.

12  Q   And did you have a record of who participated in that?

13  Like, in other words, who purchased the wristbands and, you

14  know, helped out with the project?

15  A   What I do is I create like a little Excel -- a little

16  spreadsheet with the employees initials so that I knew who to

17  give them to when they came in.  So I just made, you know, I

18  made a little spreadsheet as to who did it, how many they

19  bought, so when they came in I knew who to give it to.

20  Q   And from the Excel chart here it looks like there's

21  people's initials; is that right?

22  A   Yes.

23  Q   Did Ms. Arroyo contribute and assist with this project?

24  A   Yes.

25  Q   And her initials there are LA?

1    A    LA, yeah.  Right there in the middle.

2    Q    And she bought, it looks like five bracelets; is that

3    right?

4    A    Yes.

5    Q    And when was this project?

6    A    This was 2010.

7    Q    2010.  And there's a picture -- going back that way, a

8    picture of the bracelets, what they look like?

9    A    Yes.

10   Q    All right.  And do you have some of the official bracelets

11   still?

12   A    I don't know if I physically have any.  Oh, you do have

13   one.  I wasn't sure what happened to it.  You stole it in the

14   hallway.  But, no, I ordered a bunch -- everybody ordered a

15   bunch of them, so it was a good thing.

16   Q    Now, aside from these two projects, were there any other

17   projects you've been involved with in support of the military

18   through your employment at Volvo?

19   A    Right.  In the Chicago facility, the last one I did in the

20   last year I was in Chicago was 2013.  it's called Honor Flight

21   Chicago.

22   Q    And on that I'm going to show you Exhibit 42, if we could.

23   And what is Honor Flight Chicago; can you explain that?

24   A    Honor Flight Chicago is basically -- there's honor flights

25   through the country, different cities do them.  Honor Flight

1  Chicago is basically -- they do trips to Washington, D.C., to

2  the war monuments.  At this in 2013, they were sending World

3  War II veterans to the monument in Washington.  I contacted the

4  honor flight in Chicago to see how much it would be to send a

5  veteran there.  So it was $500 to send one veteran to

6  Washington, so we set a goal of $500 so we could send a World

7  War II veteran, and we achieved that goal.

8  Q    And why did you want to do these projects?  What made you

9  interested in them?

10 A    Well, I think, I mean, I was in the military.  But as you

11 mentioned, I never was deployed, so I've always felt blessed by

12 that.  And so I've always wanted to kind of try and give back

13 to fellow veterans who had to serve and who had to get

14 deployed, and maybe just -- you know, just honor them for what

15 they've done.

16      MR. McMAHON:  All right.  Thank you, Mr. Temko.  I

17 don't think I have any other questions at this time.

18      THE COURT:  Okay.  Thank you.

19      MR. DeROSE:  Judge, if I could stay on that exhibit

20 right now.

21      THE COURT:  Sure.

22      MR. DeROSE:  Well, the one ahead of it.

23      Do you want to switch over?

24      MS. DeROSE:  Yes.  Can we go to plaintiff's table?

25      THE COURT:  Do you have that exhibit?

Temko - Cross by Mr. DeRose

1    MS. DeROSE:  I do have it.

2    THE COURT:  So you're going to call it back over once

3  we switch it over?  So give us a second for the switch here,

4  Mr. DeRose, and then I think your co-counsel will be able to

5  control the machine here.  Okay?

6                    CROSS-EXAMINATION

7  BY MR. DeROSE:

8  Q   Mr. Temko --

9  A   Yes, sir.

10  Q   -- Mr. Temko, you say you orchestrated all of these

11  collections for the Vietnam -- oh excuse me -- for the Iraqi

12  soldiers who were overseas fighting because you wanted to make

13  a contribution to them; is that right?

14  A   I coordinated locally, yes, sir.

15  Q   Arroyo was working back with you guys at the time?

16  A   Yes.  I know on this one they have, she was.

17  Q   Okay.  All right.  And she had gotten back, and you had how

18  many employees?  I thought you said 89 a shift or something

19  like that?

20  A   At this time I don't know the exact numbers of employees.

21  Q   More than 100?

22  A   Not quite 100 at this point, I don't think.  I think it

23  would have been under 100.

24  Q   Who gave the most money to the little plan that you set up?

25  Do you see Arroyo's initials?

Temko - Cross by Mr. DeRose

1   A    She bought five of them, yes.  So there's --

2   Q    She gave 10 bucks, right?

3   A    Yes, sir, she did.

4   Q    And how out 100 people, you only got 22 people to

5   cooperate?

6   A    That appears right, sir.

7   Q    And only one other guy gave as much money as Arroyo, and

8   that wasn't you, was it?

9        MR. McMAHON:  Objection, your Honor.  It's not even

10  accurate from the chart.

11       THE COURT:  Well, why don't you let him.  I think you

12  can answer this question.  Go ahead.

13       THE WITNESS:  If you look at the chart, sir, I gave

14  the same amount as LuzMaria.  She bought five and I bought

15  five.

16  BY MR. DeROSE:

17  Q    So you gave ten bucks, too.  Did anyone give more money

18  than you?

19  A    I don't know, sir.  Actually, like I said, sir, we ended up

20  buying 100 of them.

21  Q    I thought you said you could tell from this chart how much

22  money?

23  A    Well, sir, what I'm saying is this is how many people

24  signed up to buy for bracelets.  We ended up buying 100 because

25  some people gave additional money.  They were $2 a piece, so

Temko - Cross by Mr. DeRose

1  100 would have been $200.  Some people at the end just threw in

2  some extra money to buy them.

3  Q  Sir, one second.  By that chart you can tell that you gave

4  $10 and LuzMaria gave $10.

5  A  Yes.  Mm-hmm.

6  Q  Did anybody else give more than $10?

7  A  There is another employee right below LuzMaria that would

8  have bought six.

9  Q  So he would have given 12 bucks?

10  A  Yes, sir.

11  Q  And the other 88 people in the company, they never bought

12  anything, huh?

13  A  Not at this point, sir.

14  Q  Well, at this point, isn't this the total contribution.

15  A  Yes, sir, it is.

16  Q  And that $500 event, although that's a good event, that's

17  to buy an honor flight for the second world war vets to go to

18  Washington D.C. to visit that monument that was set up for

19  that, right?

20  A  That's what that was for, yes, sir.

21  Q  It had nothing to do with the Iraq War veterans?

22  A  That one was not, sir.  You are correct.

23  Q  All right.  Now, let me ask you a couple of things.  We met

24  you last week in this courtroom on Monday.  You have been

25  staying around this whole week.  You're from Tennessee, you

1   told us?

2   A   Yes, sir.  Actually, I went home and I came back.

3   Q   When did you come back?

4   A   I actually came back this morning.

5   Q   All right.  How many days did you stay after your testimony

6   on Monday before you went home?  Did you go home just for the

7   weekend?

8   A   Yes, sir.  I went home for the weekend.

9   Q   So all last week while we were on trial you stayed here?

10  A   Yes.

11  Q   How many times did you meet with Keith Schroeder during

12  that week?

13  A   I don't know, sir.

14  Q   Every night?

15  A   No.  We didn't go out at night.  I mean I just. . .

16  Q   I don't mean go out.  Were you staying at a hotel?

17  A   I was staying at a hotel.  Yes, sir.

18  Q   Where Counsel was staying?

19  A   No, sir.  I was not staying at the same hotel.

20  Q   Was Keith coming to visit you at the hotel?

21  A   No.

22  Q   Did you meet with other people who have testified here?

23  A   No.

24  Q   All right.  Now, I want to talk to you a little bit about

25  your testimony here today.  If I could -- I might need you to

1  help me turn this back up.

2         MR. DeROSE:  Counsel, could you come here for a second

3  and get me back to Page 1.  Maybe one more page.  Yes.

4  BY MR. DeROSE:

5  Q   That local attendance policy that we're talking about, we

6  see Keith Schroeder's name on it in three places about

7  reviewing it and enforcing it and all of that.

8         Did you help him draft that?

9  A   No, sir.  I didn't help him draft it.  It was drafted when

10  I became an employee.

11  Q   Down there in Tennessee, do you have a local attendance

12  policy, too?

13  A   Yes, sir, we do.

14  Q   Just like this one or is it varied because of its locality?

15  A   It's a little different, sir.

16  Q   All right.  Can you tell the ladies and gentlemen of the

17  jury from -- can I have that Exhibit 11 up, Cait?

18         MS. DeROSE:  That's it.  That's the attendance policy.

19  Can I have my copy?  Because I can't see that.

20  BY MR. DeROSE:

21  Q   You read that one sentence for Counsel at the very last

22  sentence of the first paragraph.  And you read "All employees

23  are expected to be in the building and ready to work at the

24  scheduled start time and continue to work until the scheduled

25  hours of work are a completed."  Right?

1   A   Yes, sir.

2   Q   And that's the rule and you try to follow it?

3   A   Yes, we do.

4   Q   And they're also expected to punch in before the scheduled

5   start time.  And you don't mind them punching out after the

6   scheduled time -- finish time, but they can't punch out until

7   the scheduled finished time is done, right?

8   A   Right.  They have to wait until the end bell rings.

9   Q   And you check the records the next week and you make sure

10  they checked in sometime before the start time, and didn't

11  checkout until the time was done?

12  A   Correct.

13  Q   And, also, those forklifts they were operating, did each

14  one have their own one or did the first shift finish with

15  their -- their lift and then the guy from the second shift

16  would get on it?

17  A   So what we have is we have boards, magnetic boards by the

18  time clock for each shift.  And when the employee comes in,

19  they have their job on the board as to what they're going to be

20  doing for that day.  And so what they do is when they see the

21  job that they're on, whether it be order picking or packing,

22  then they -- we have a magnet for each -- for each vehicle in

23  the building.  So the employee when they come in, they punch

24  in.  They put the vehicle that they are going to use for the

25  day next to their name.

1  Q   All right.  So I didn't get an answer to my question.  The

2  forklifts that were used on the first shift --

3  A   Mm-hmm.

4  Q   At the end of the start bell, the operator of that forklift

5  gets off, but then the person for the second shift gets on it,

6  right?

7  A   Yes.

8  Q   And they're not supposed to run to their places.  I think

9  you told us last week, no running?

10  A   No running in the warehouse, that's correct.

11  Q   And when the operator on the first shift gets done, does he

12  have to jump off so that the second person can get on right

13  away and they're not one to two to three minutes late?

14  A   Actually, the reality of it is the vast majority of the

15  employees on the day shift are using a different type of

16  vehicle than the people on the second shift.  So the day shift

17  is primarily a put away shift.  And the second shift is a

18  picking shift.  So on the day shift, the majority of the

19  vehicles that would be being used would be reach trucks.  And

20  the majority of the vehicles on the second shift would be order

21  pickers.  So we generally had very little conflict with vehicle

22  assignment.

23  Q   You said generally you didn't.

24  A   Mm-hmm.

25  Q   But do I understand that your forklift machines from the

1    first shift, if Arroyo had to use that machine on the second

2    shift, she'd have to wait for the guy to get off from the first

3    shift, and then she would go over and get on it, right?

4    A    Well, the expectation is that they're walking to the

5    vehicle upon the ringing of the bell.  So at that point, the

6    vehicle would have already been parked.

7    Q    All right.

8    A    So that shouldn't be an issue.

9    Q    All right.  So you're not quite answering my question.

10   When the guy had to work till 4:30, and you want him to work

11   until the end of the bell.  He gets off the machine at 4:30.

12   Now, right then, wouldn't it take two or three minutes to do

13   it, you wanted to Arroyo to get right on the machine right

14   away.

15   A    The expectation is that the employees work to their bell.

16   So what we ask of our employees is that they're putting their

17   truck up in the last five minutes of the shift, so the next

18   shift could be getting their vehicle.

19   Q    So the guys from the prior shift, they could quit five

20   minutes early?

21   A    Well, they're not quitting five minutes early.  What

22   they're doing is they're driving their vehicle from the

23   current-- wherever they're working at to the vehicle parking

24   area.

25   Q    And if they were taking a little longer to pack or put the

1  machine -- the stuff they had on their thing away, and then it

2  took them to 4:31, would you tell them to stop at 4:30 and let

3  the next person get on your machine and they will finish

4  putting that particular item in the box?

5  A    No.  What we'd ask our employees to do is to finish up the

6  work that they have so that they can have their vehicle parked

7  by the end of their shift.  So they're not going to hand off --

8  Q    The truth of the matter is that they overlapped a little

9  bit in using the same machines; didn't they, sir?

10  A    Very rarely.  Very rarely.  Like I said, we always asked

11  our employees to finish the work that they had so that they

12  could park their truck so that the following shift would have

13  their vehicle available to start at the shift.

14  Q    Mr. Temko, if the man from the first shift, or the woman,

15  didn't get off the machine on time, so that Ms. Arroyo could

16  get on right on time with the bell, would he get some of kind

17  of an occurrence -- the guy on the first shift -- holding her

18  up?

19  A    Would he get an occurrence?

20  Q    Yeah.  Would you give him some discipline?

21  A    It very rarely happened, but, no, it wouldn't be

22  discipline.

23  Q    You say very rarely?

24  A    No, I don't remember that ever being an issue.  So you're

25  asking a hypothetical that doesn't really happen, so. . .

Temko - Cross by Mr. DeRose

1  Q   So as long as they can quit five minutes early, but they

2  can't start five minute early, they have got to start right at

3  the time, not one minute late.

4  A   Right.  I didn't say they quit five minutes early, what I

5  said is part of their responsibility in their work is to

6  complete their put away and that they're driving their vehicle

7  to the vehicle area -- it's part of their work.  So that's not

8  stopping work.  That's a different form of work, but, yes, they

9  would expect, you know, at about five minutes at the end of

10  their shift to complete the things that they're doing.

11  Q   But in your written thing that you read to the jury it says

12  "continue to work until the scheduled hours of work are

13  completed?"

14  A   Correct.

15  Q   Were you guys real rigid about when you had to start and

16  when you had to stop?

17  A   Yes.

18  Q   And sometimes the workers were kind of bunching up with

19  each other because the one guy is trying to finish at 4:30,

20  and following your rule when she is trying to start at 4:30?

21  A   I guess that was generally not an issue because of our

22  vehicle situation.  There wasn't people generally waiting for

23  trucks.

24  Q   Now, the hours that we looked at for LuzMaria Arroyo in

25  2011, the year that she got terminated --

Temko - Cross by Mr. DeRose

1   A    Mm-hmm.

2   Q    -- you were working the day shift at that time, weren't

3   you?

4   A    Yes, sir.  I was.

5   Q    So you're looking at records to say that she's one to three

6   minutes late, right?

7   A    Yes.

8   Q    But the records showed she checked in at 4 o'clock or 3:45,

9   right?

10        MR. McMAHON:  Objection, your Honor.  What records are

11  we talking about?

12        MR. DeROSE:  I'm talking about the punch-in time

13  sheets on the time clock.

14        THE COURT:  Okay.

15        MR. McMAHON:  For what days?

16  BY MR. DeROSE:

17  Q    For November 2011.  The clock she punched in at 4 o'clock,

18  401347, right?

19  A    Sir, if you want to show me that, I will take a look at it.

20  Q    I'm asking you now.  This a case that has kept you in

21  Chicago for the last seven days.

22  A    Okay.

23  Q    Didn't you remember looking at her time clock punch-ins?

24  A    I don't remember right now looking at her time clock

25  punches, but I know that I did because that's what I did.  But

1  you're asking to remember --

2  Q   No, I'm not asking.  Sir --

3  A   You're asking me to remember five years ago.  I don't

4  remember.  I looked at a lot of records over the years.

5  Q   Sir, as you sit there now --

6  A   Mm-huh.

7  Q   Do you not agree that you saw LuzMaria's punch-in clock

8  showing that she was signing in as much as a half hour early to

9  use the meditation room?

10 A   Sir, the -- you know, those are two separate issues.

11 Now --

12 Q   Sir, can you answer my question?

13 A   The occurrences you're referring to, LuzMaria was issued

14 tardy, because she was not -- she was outside of the building

15 during her work shift.

16 Q   Sir, that's not what I'm asking you.  The time records that

17 you looked at showing that she checked in a half hour early,

18 right?

19 A   Which days.

20 Q   In November 2011?

21 A   Sir, what specific days are we talking about?  That days

22 that she gave --

23 Q   November 3rd, November 4th, 2011, sir.  The last two days

24 she worked.  Remember, she got out, according to the emails and

25 walked around the building at the time bell?

1   A   I remember she was late on those days.

2   Q   Well, wait a minute.  You weren't even there.  You didn't

3   find that in the record.  Somebody had to tell you she came out

4   and walked around the building, right?

5   A   Well, somebody did have to tell me, and I had to log in as

6   lates.

7   Q   Because the records you have in front of you showed she had

8   checked in a half hour early, right?

9   A   She was tardy on those days.

10  Q   Wait a minute.  Not by the records you were looking at, was

11  she?

12  A   She was issued occurrences because she was late and she was

13  not in the building per our attendance policy.

14  Q   If you weren't there, how do you know that?

15  A   Because I do the attendance records and I document them and

16  I --

17  Q   All right.  One second.

18          You do the attendance work records off the time clock

19  punch-ins, right?

20  A   Yes.

21  Q   And you add punch-ins and take them out.  You showed us

22  today?  Correct?

23  A   There's some times we have to adjust them, yes.

24  Q   So when you looked at those records, her time clock

25  punch-ins were 4 o'clock, and she didn't have to start work

1    until 4:30, weren't they?

2    A    You're talking about November 3rd and November 4th.

3    Q    And a lot of other ones, too, but let's talk about those

4    two?

5    A    Yes, she was punched in at -- before the shift.

6    Q    And you weren't there because you were working the day

7    shift and she's at the 4:30 shift, right?

8    A    That's correct.

9    Q    So you still entered in this sheet that you showed the jury

10   that she was one and three minutes late, right?

11   A    I don't remember the exact length of time, but I do

12   remember them being entered as tardy.

13   Q    What record did you have so you could change her time for

14   checking in?

15   A    I don't remember, sir, what I was referencing in those.

16   Q    You were actually talking to Jankowski and David Miller,

17   weren't you?

18   A    I don't know that, sir.

19   Q    Did you go back to them when they sent those emails saying,

20   "Management observed her come out at the bell, walk around the

21   building or get in her car and drive around the building and

22   come back in?

23   A    I don't remember how I was informed that she was late.  I

24   just remember documenting them.  I don't remember who I heard

25   that from or how that was given to me.

1  Q    All right.  Let me ask you a few more.

2         You say you have to worry about people being on time

3  because you've got to -- you have the cutoff time to get the

4  orders ready because the 18 wheelers, they're going to leave if

5  they don't have the material.  Because they've got their

6  schedule to follow, they're going to leave, right?

7  A    Yes.  That's what I said.

8  Q    Did LuzMaria a Arroyo ever fail to have an order ready to

9  get on an eighteen wheeler when you were expecting it to be

10  done?

11  A    Sir, I can't answer that question.  That's -- you're asking

12  me to remember one employee's entire work history that if they

13  ever got an order out.  Specifically we're talking about second

14  shift, which I didn't manage.

15  Q    If somebody doesn't -- well, wait, you were the manager

16  there for a couple of years then, didn't you?

17  A    Yes, I did.

18  Q    Did you ever write her up for failing to have a

19  pick-and-pack order ready to go out ever in your experience?

20  A    I don't remember if I disciplined her for that.

21  Q    Do people get disciplined for that?

22  A    Like we have talked about this, if it's a recurring

23  problem, then it can go to that.

24  Q    If we've seen no records in this case of Ms. Arroyo ever

25  being disciplined for failing to get a picking-packing order

1  out on time, would you agree that if she doesn't have it, you

2  never disciplined her for it.

3  A   I'm not going to agree -- I don't know if I have

4  disciplined her for that.  What I'm saying is I don't know what

5  that has to do with what we're talking about.

6  Q   Because you said it's very important that we stay on top so

7  we get those orders on top.  Did you think it was important

8  when you were saying that?

9  A   Yes.  It's really important to get the orders out on time.

10  Q   All right.  And it would also be really important if Arroyo

11  was a bad employee because she couldn't get the work out,

12  right?

13  A   We expect our employees -- I didn't say she was a bad

14  employee.  What I'm saying is that we expect our employees to

15  start at the start of the shift.  That's what I said.  And we

16  have cutoffs.  That's what I remember saying.

17  Q   And you also told us just before lunch that absences are

18  allowed for bad weather and for car breakdowns, remember that,

19  when you told that to us?

20  A   It would depend.  If they had excused absences remaining.

21  If they had used their five excused absences, it wouldn't be

22  excused.  And like I said, we require them to post the

23  documents for these absences.

24  Q   So you could only get bad weather up to five times in your

25  whole career or what?

Temko - Cross by Mr. DeRose

1    A    Like I said, you get five excused absences a year.  So come

2    January 1st, you get five more.  So if you used them all, then

3    January 1st you get five more and that happens every year.  You

4    get five new.

5    Q    And that absence can be for a whole eight-hour period and

6    never show up, right?

7    A    Well --

8    Q    12 inches of snow, "I can't make it in."  You'd excuse it

9    for the whole eight-hour day.

10   A    Like I say, it depends.

11   Q    But you do?

12   A    There have been instances where weather has been excused,

13   yes.

14   Q    And the car breakdown, if someone can't get in because he

15   is stranded somewhere, you'd excuse them for that whole day,

16   too, right?

17   A    As long as they had excused absences --

18   Q    And would you do that yourself as a supervisor or do you

19   have to take that one to Keith?

20   A    No.  That would be the responsibility of the supervisor to

21   get the documentation from the employee.

22   Q    And if someone said, "I'm not feeling well.  I am 22

23   minutes late," did you ever have permission to excuse that?

24   A    If the employee had documentation, like they went to the

25   doctor or something like that.

Temko - Cross by Mr. DeRose

1   Q   What if they didn't go to the doctor.  What if they said,

2   "I couldn't get up today.  You have got to help me.  I'm five

3   minutes -- I had trouble, I couldn't sleep last night."

4          Did you have authority to excuse that?

5   A   No.  If they were late, they were late.

6   Q   Only Keith could excuse that, huh?

7   A   If there's -- I can't think of a situation where that would

8   have ever been excused.

9   Q   Never would excuse someone who had PTSD -- and you knew

10  about it -- for being one or two minutes late?

11         MR. McMAHON:  Objection, your Honor.

12         THE COURT:  What's the objection?

13         MR. McMAHON:  Can we have a sidebar on this?

14         THE COURT:  Yeah.  Sure.

15      (Sidebar.)

16         THE COURT:  Let me just say, this question has been

17  asked five times of this witness in different ways.

18         MR. DeROSE:  I won't ask it again.  But if he wants to

19  make an objection, I would like to hear it so I know to avoid

20  those.

21         MR. McMAHON:  Yeah.  And look, it's like this.  I

22  mean, what's the best way to say this.  I am trying to ride the

23  line that Judge Dow has created in this case in terms of what

24  you're allowed to ask.  I have tried to be very respectful not

25  to interrupt you and try to minimize the side bars throughout

1    the trial.  I think, though, we're going -- we're going into

2    that territory now where the questions are striking at the

3    heart of the accommodation issue.

4            THE COURT:  It's the same issue.

5            MR. McMAHON:  It's the same issue.  My concern is the

6    quantity of times it's been raised when we all know -- and we

7    have all discussed on the record -- the fact that that claim is

8    out.  So asking in the don't you think you can excuse it when

9    she has PTSD, I mean, that strikes right at the heart of it.

10           THE COURT:  It's exactly the same issue we had this

11   morning.  So it is admissible for some purposes and not for

12   others.  And I guess my point, though, is really it's getting

13   to the point where we are asking the same witnesses the same

14   questions for the fifth time.

15           MS. BASSFORD WILSON:  I agree, your Honor.

16           THE COURT:  And that really isn't too helpful to the

17   jury.  And it's actually belying points that have been made.

18           MR. McMAHON:  And I think the only point I would add

19   to that.  I want to move the trial along, too, but I think the

20   other point is with look how much this has been emphasized in

21   this and you guys -- by you guys I mean the plaintiff's Counsel

22   is in control of that.  I don't see how we don't get that third

23   sentence on the jury instruction given.  I think it needs to be

24   given because I think we need now some sort of declaration

25   that, you know, not only is she not bringing the claim, but

1    that is not a claim.

2          MR. DeROSE:  We're talking about -- we're talking

3    about animus towards someone who is in the military and someone

4    who has an ADA claim.  Animosity in the treatment of her;

5    that's what we are talking about.  They let other people go,

6    Judge.  They don't let her go.  But I don't need to discuss

7    this any further.  I think we have been down this block for

8    days now. I think we had this same sidebar four days ago.

9          THE COURT:  We probably did.  I am going to sustain

10   the objection on the ground of cumulativeness, and needing to

11   move this trial along.  And there's no way I am going to

12   instruct the jury -- and the best we can do is get to closing.

13   And I will ruminate about the third sentence and I will let you

14   guys know in morning.  I think we can move along here.

15         (Sidebar concludes.)

16         THE COURT:  At 3:00 o'clock we are going to take a

17   break but my bond hearing at 3:00 o'clock is supposed to be --

18   that will be our next break.  And Mr. DeRose you can continue

19   on.

20         MR. DeROSE:  Thank you, your Honor.

21   BY MR. DeROSE:

22   Q   Mr. Temko, you told Counsel this morning that you think

23   it's fair that you get the same one-half occurrence if someone

24   is one minute late or 59 minutes late, right?

25   A   Yes.

Temko - Cross by Mr. DeRose

1    Q    Why is that fair?

2    A    Because it's the attendance policy, and if you're late,

3    you're late.  So, as I said, we had at one point had a grace

4    period.  That grace period was abused, and so we took away that

5    grace period.  So. . .

6    Q    Abused by who, sir?

7    A    Just employees in general.

8    Q    Lots of employees.  Not LuzMaria Arroyo any more than

9    anyone else?

10   A    Like I said, it was a consistent pattern of abuse with

11   several employees.

12   Q    But if you're one minute late, you can still get that order

13   on that semi so it can go out, as compared to the guy who walks

14   in 59 minutes late and misses a whole hour of his shift, right?

15   A    Sir, that's kind of besides the point.  You know, when

16   you're an hourly employee, we expect you to start at the hour

17   when you start.  So whether -- the fact that you can make up

18   that one minute is kind of besides the point.  We expect

19   employees to be on time.

20   Q    All right.

21        Do you agree that when you, in 2005, were handling

22   Arroyo as her supervisor, and even some of these times in 2011,

23   we understand that you got involved in meeting with her about

24   that discipline that led up to her termination; is that true?

25   A    I mean, I was, of course, involved in her -- especially

1  early on -- of any of her discipline.  I probably would have

2  issued it.  Later on, if it was attendance related, I would

3  have been involved as well.

4  Q   If it was what?

5  A   If it was attendance related, I was generally involved with

6  attendance-related issues.

7  Q   So attendance issues -- so all those attendance issues that

8  ended up terminating her, you were involved in those meetings

9  with her?

10  A   I believe -- I believe so.  I can't remember, but I may

11  have been.

12  Q   So you would just sit there while Mr. Schroeder in

13  August -- on August 31 -- and I don't want the jurors to have

14  to look at it again -- when he gave her that counseling

15  session?

16  A   Like I said, I may have been.  I've been in a lot of

17  suspensions and terminations for attendances.  Because I'm

18  involved in attendance, a lot of times I sit in.

19  Q   You don't have a lot of attendance terminations.  You

20  showed us the four or five today.  None of those people got

21  terminated for attendance, did they?

22  A   Yes.

23  Q   Who?

24  A   I think we looked at quite a few of them just a little

25  while ago.

Temko - Cross by Mr. DeRose

1  Q    Those people weren't terminated, were they?  They just got

2  an occurrence?

3  A    There were some examples that were shown of discipline.

4  There were some that were shown of occurrences.  And there were

5  several that were shown for actual terminations.

6  Q    All right.  I wasn't going to do that, but Caitlyn -- would

7  you show him the sheet we just saw?

8           MR. DeROSE:  I killed a couple of pages, Judge.

9  Excuse me.

10 BY MR. DeROSE:

11 Q    Scotty Senephimmachac.  Can you put -- could you hand it to

12 the witness so we don't have to waste time.

13           MS. DeROSE:  I can put it up.

14           MR. DeROSE:  All right.  Put it up.  I'm sorry, Judge.

15           THE COURT:  It's 3629 to 34.  I've got it right here.

16           MR. DeROSE:  This is 33 I'm looking at.

17 BY MR. DeROSE:

18 Q    Scotty Senephimmachac.

19 A    Senephimmachac.  It took me quite a few years to get it.

20 Q    All right.  Now, Scotty, if you look at Scotty's thing, he

21 has a whole series of calls in late 59 minutes, 41 minutes in

22 March and April, and you say he gives you a doc.  That means a

23 document that he went to the doctor?

24 A    Yes.

25 Q    And then you got on him again -- it says warnings five and

1  six.  What does that mean?  Five times in six months he's late?

2  A   That means that he has five total occurrences in a

3  six-month period.

4  Q   All right.

5  A   So that could be a combination of full occurrences, half

6  occurrences, three-quarters an occurence, just a total of five.

7  Q   So this is from January to September.  In one year he has

8  all of these calls in sick and calls in late.  That's a lot

9  different kind of an attendance record than Ms. Arroyo, isn't

10 it?

11 A   Well, some of those, sir, are excused absences.  So some of

12 those you will notice it has a doc, so those are excused.  So

13 those wouldn't have amounted to points.

14 Q   He's not even showing up at all most of these days, right?

15 A   There are some days where there is a call-in and some of

16 them are tardies.

17 Q   And he gets an eight-hour day off, right?  He doesn't load

18 up that semi at all on these days?

19 A   Correct.  And he gets a point for that.

20 Q   And then he got 16 hours absent in the middle of from 4-14

21 to 4-16, or 4-15, that was two full days he wasn't there at

22 all?

23 A   Right.  And those days he provided documentation, so those

24 would have been excused.

25 Q   But he's not helping fill all of those semis on all of

Temko - Cross by Mr. DeRose

1    these days when he's out the whole day, right?

2    A    Correct.  If he's not there, he's not picking orders.

3    Q    Did you think he had a worse attendance record than

4    LuzMaria Arroyo?

5    A    Sir, like I said before, it's just, you know, the policy is

6    the policy, and it's just math at that point.  We're not

7    judging good or bad.  I'm judging is it within the attendance

8    policy.

9            MR. DeROSE:  Give me Sam Zweig, if you could.

10           THE COURT:  After Mr. Zweig we'll take a brief --

11   because I see my 3 o'clock marshaling out in the hall here.

12   We'll be about three more minutes.

13           MR. DeROSE:  Not even, Judge.

14           THE COURT:  Okay.

15   BY MR. DeROSE:

16   Q    All right.  Look at Zweig, you've got him calling in

17   sick -- you put it up, Cait?

18           MS. DeROSE:  Not yet.

19   BY MR. DeROSE:

20   Q    Now, you've got him missing eight hours a day on every one

21   of those days, correct?

22           MR. McMAHON:  Objection, your Honor.  What days are we

23   talking about?

24           MR. DeROSE:  I'm talking about the days on this chart

25   there.  It says, "Hours absent:  Eight hours; eight hours."  He

1  just wasn't showing up, was he?

2  A    Some of the days were call-ins.  Some of the days were

3  tardies.  Some of the days he provided a document and they were

4  excused.

5  Q    But every time he didn't have an excuse, you gave him an

6  attendance, and even if when he called, he was missing from

7  work all of these days on this little list.  Not like Arroyo,

8  right?

9  A    Well, sir, yeah.  I mean, his attendance is going to be

10  different because it's different days and, obviously,

11  different.  But it's within the attendance policy.

12  Q    Counsel asked you if he had PTSD.  What did he have causing

13  all of this?

14  A    I don't know, sir.  You would have to ask him.

15  Q    You never even asked him.

16  A    My responsibility is to -- like I said -- if the employee

17  when they return to work is supposed to be -- it's their

18  responsibility to bring in documentation if they have it.  If

19  they don't, it's not my business to pry into their personal

20  life.  If they bring it, I'll give them an excused absence if

21  they have them.  If they don't, then it just goes down as an

22  occurrence.

23  Q    In fact, Teo Kennedy we looked at, although he got an

24  occurrence, he never even got fire, did he?

25  A    I don't know, sir.

1    Q    Judge, you said you wanted me to quit.

2            THE COURT:  Yeah.  I mean, if you want to go ahead and

3    look at Mr. Kennedy's record, and then do that after the break

4    that would be great.  The marshals are here and I see defense

5    counsel and I see the prosecutor.

6            MR. DeROSE:  I want to do it later, Judge.  I don't

7    want to stop the wheels of justice from moving.

8            THE COURT:  Well, they're different justice.  This is

9    a criminal case.  You're a civil case.

10           But, folks, I thank you for your patience.  I do have

11   to take the bond hearing right now at 3 o'clock.  As soon as

12   we're ready for you -- it won't be more than -- it won't be

13   less than 15 minutes, so if you need to go downstairs and

14   stretch your legs, that's fine.  But at 3:15 we should be ready

15   to go again and I hope we will be.  Okay.  Thanks, everybody.

16       (Recess taken.)

17           THE COURT:  Good afternoon, everybody.  Mr. Temko is

18   still on the witness stand, Mr. DeRose is on cross.

19           Go right ahead, sir.

20           MR. DeROSE:  Thank you, put up Teo Kennedy, please

21   when we are on break.

22           No, the next page.

23                   CROSS-EXAMINATION (Resumed)

24   BY MR. DeROSE:

25   Q    These are the attendance records you kept on Teo Kennedy,

1  right?

2  A    For 2009, yes.

3  Q    All right.  And these -- Teo Kennedy still working there?

4  A    I'm not sure, sir.

5  Q    Well when you went off to Tennessee, was he still working

6  there?

7  A    Yes, sir, he was.

8  Q    And when did you leave for Tennessee?

9  A    I went to Tennessee in 2015 and I worked in Ohio in 2014.

10  Q    All right.  So this record from 2009 to 2015, he still had

11  a job.  And if you look at this, he's not fired in this, is he?

12  A    No, sir, he is not.

13  Q    And he is late as much as an hour and 55 minutes, and then

14  he calls in a couple of times, and doesn't show up for the

15  whole day.  And he has got other time off.  So nothing he did

16  was so bad that he could be fired, correct?

17  A    No.  According to the attendance policy he was only at Step

18  1.

19  Q    All right.  Now look at the record that you showed us a

20  little bit ago of Bill Semanzi.  Mr. Semanzi, was he still

21  working there when you left?

22  A    Yes, sir, he was.

23  Q    So he was working there from 2009 to 2015, as far as you

24  know, correct?

25  A    As far as I know, yes.

1  Q   And it looks like he's late one minute and then late

2  another time 28 minutes.  And then he misses two full days of

3  work, correct?  And that wasn't enough for them to terminate

4  him.

5  A   No, the last two occurrences gave him a verbal warning,

6  Step 1.

7  BY MR. DeROSE:

8  Q   I want you to look at Defendants' Exhibit 16, which was

9  something Counsel showed you about LuzMaria Arroyo in 2009.

10 And it looks like you gave her this counseling session, right?

11 A   Yes, sir, I did.

12 Q   And in 2009, you were her boss?

13 A   I was her supervisor, yes.

14 Q   And you were getting along with her, weren't you?

15 A   I believe so.

16 Q   You didn't tell her about those emails you were sending

17 trying to see if she could be terminated?

18 A   Sir, I don't know how those are really relevant.  The

19 emails that we have previously looked at were internal

20 communications about what, you know, what we were -- what we

21 needed to do, if we needed to do anything, reaching out to HR.

22 I mean, I don't really know how those would have been relevant

23 to LuzMaria.

24 Q   I know you don't.  But we will figure it out.

25

Temko - Cross by Mr. DeRose

1  Q   When Olin wrote you, "I'm sorry it's not what you wanted to

2  hear."

3          What did you tell him you wanted to hear?

4          MR. McMAHON:  Objection.  Cumulative.

5          THE COURT:  I want to say beyond the scope.  I will

6  sustain the objection.

7  BY MR. DeROSE:

8  Q   All right.  But look at this one.  You say you've got these

9  two occurrences from October 13, 2008 to October 24, 2008,

10  that's about a ten-day, 11-day period, right?

11  A   Correct.

12  Q   And you don't give her this counseling session until

13  February 2009.  That's about six or seven months later, isn't

14  it?

15  A   I don't know if it's that long.  But, yes, it's several

16  months later.

17  Q   And you violated your own local attendance policy when you

18  gave her this warning six months after the events, right?

19  A   I believe I already explained that, sir.  She wasn't there

20  to give it to.  So I had to wait until she got back.

21  Q   Well, she had to be there between October 13th and the

22  24th?

23  A   Correct.

24  Q   Was she gone on the 25th?

25  A   I don't know the exact date that she was gone.  But she was

Temko - Cross by Mr. DeRose

1    gone, and that's why it was issued to her late.

2         MR. DeROSE:  Caitlyn, can you put up -- I think it was

3    the fourth page of the attendance policy.  It's 2327 on the

4    bottom.

5    BY MR. DeROSE:

6    Q    And the attendance policy says in that second to the last

7    paragraph, "It is management's responsibility to communicate

8    any 'corrective action plan,' within two weeks after the day

9    that caused the corrective disciplinary action."

10        Why didn't you give it to her on the 25th of October?

11   A    Like I said, I have to see what days she was off, but she

12   most likely was not in the building and I couldn't give it to

13   her if she wasn't there.

14   Q    And that's just because you see you didn't give it to her

15   for six months?

16   A    No, sir.  That's not accurate.

17   Q    Well, all right.  Can we put this up, please?

18        Sir, this is the attendance records you were making,

19   right?

20   A    Yes.

21   Q    Do you see -- run your line down from October 19th to

22   October 24th.  Where is she?

23   A    From what dates?

24   Q    October 19th to October 24

25        THE COURT:  Just for the record, Mr. DeRose.

1      MR. DeROSE:  Oh, that's 2008, Judge?

2      THE COURT:  And this Exhibit 15, Defendant's Exhibit

3  15, that we're looking at.

4      MR. DeROSE:  Yes, that's what they showed us.

5      THE COURT:  Okay.  I just want to keep the record

6  clear.  No one will ever know unless we tell them.  This is

7  Exhibit 15, and you want to direct the witness to --

8      MR. DeROSE:  Wait, Judge.  I want to see 2008.

9      Just on 2009, you got her back in January, because we

10  know that she's 11 minutes late on January 7th.  And if you

11  don't give her this until February 2nd, that's more than two

12  weeks after she got back, isn't it?

13  A   I'm not sure exactly.

14  Q   Well, from 7-January til February 2nd, is that more than

15  two weeks?

16  A   That is more than two weeks.

17  Q   And your policy says, if she's gone, you have to give it to

18  her to within two weeks of her violation that's causing the

19  attendance policy, right?

20  A   Yes.

21  Q   So this is clearly a violation by your own recordkeeping;

22  isn't it?

23  A   It is clearly outside of the two weeks.

24  Q   Let me -- let me go away from that for a moment.  Counsel,

25  will you take this back.  And here's the rest of it.  And when

1  you get that other one ready, let me know.

2        I want to show you the Defendant's Exhibit 15.  And

3  then I want Page 2789.  Is that it?

4        MS. DeROSE:  Yes.

5  BY MR. DeROSE:

6  Q   Now, Counsel pointed your attention to it, and you

7  indicated that Ms. Arroyo in between having sickness excused

8  and military leave, and it looks like FMLA -- first of all, why

9  is she on FMLA?

10 A   I don't know, sir.

11 Q   Did it have something to do with a sickness she got while

12 on military leave?

13 A   I have no idea.

14 Q   This is in 2011, and we're looking at April, she had been

15 diagnosed -- excuse me.  She went to the emergency room on

16 Christmas Eve or the day before Christmas Eve in 2010.  So

17 sometime there under the those A&S's is when you got the word

18 that she had PTSD, right?

19 A   I'm not sure when I was made -- when I was aware that she

20 had PTSD.  Just at some point.

21 Q   And it looks like you're counseling her, you give her the

22 written warning on August 19, right?

23 A   Yes.

24 Q   And you counseled her that day, right?

25 A   Somebody did, sir.  I don't remember if it was me or if it

1  was Keith or. . .

2  Q   Well, had you been -- when you counsel someone --

3  A   Mm-hmm.

4  Q   -- do you sit down with them and ask them what's going on?

5  A   We give the employee the opportunity to express that.

6  Q   Well, you knew by this point that she had PTSD.  Did you

7  ask her if that was affecting her?

8  A   I don't remember if I asked her that.

9  Q   You say, "We could give them a little bit of extra time to

10 get documentation for any of these losses."  That's what you

11 were saying, right?

12 A   Right.

13 Q   Did you give Ms. Arroyo time to get extra documentation.

14 Because you knew she had letters from doctors, right?

15 A   Of course we gave her that opportunity. We have already

16 seen that we have excused absences after the fact when she

17 provided documentation.

18 Q   All right.  Before you charged her for these one and five

19 minutes late, did you tell her, "Go see if you can get a letter

20 from your doctor saying why you're not keeping the clock

21 perfectly"?

22      MR. McMAHON:  Objection, your Honor.  Relevance per

23 our previous discussion.

24      THE COURT:  You can ask this one more question.  I

25 will overrule the objection on that.  You can answer that

1  question, if you can.

2  BY THE WITNESS:

3  A    I may need to be asked the question again.

4  BY MR. DeROSE:

5  Q    And that we already talked -- and I don't want to beat a

6  dead horse -- in August when you see that -- no, that's before

7  we got the meditation room.  You gave her -- if you go to the

8  2010 one now -- Caitlyn, it's on 2783 -- and you see down there

9  where you give her a verbal warning when she comes back from

10  military service?

11  A    Yes.

12  Q    She got a verbal warning and she also got a no occurrence

13  from Keith for being late one minute, right?  Is that what that

14  is?

15  A    Yes.

16  Q    But she did get a verbal warning when her family called in,

17  correct?

18  A    It says, "Call-in, family."  So when she called in that was

19  the reason she had given.  I don't know the specifics of it.

20  Q    All right.  When the family called in, did you take the

21  call?

22        MR. McMAHON:  Objection, Your Honor.  He didn't

23  testify the family did call in.  Mischaracterization of his own

24  testimony

25        THE COURT:  Why don't you back up and ask him if he

Temko - Cross by Mr. DeRose

1    can explain why it says "family" there.

2    BY MR. DeROSE:

3    Q    Yeah.  What's "Call-in family"?

4    A    When somebody calls in, we try to make a short notation as

5    to the reason.  "Call-in, family" doesn't necessarily mean that

6    her family called in.  She may have used that -- maybe there's

7    a family issue going on.  Maybe there was -- I don't know the

8    exact reason, but we usually try to make some short brief,

9    call-in sick, call-in family, call-in car trouble, just

10   something brief as a reference.

11   Q    Right.  But as your entry, what do you think it means?

12   A    I don't know, sir.  I don't remember exactly the reason for

13   it.

14   Q    Well, look, this is when she is coming back in 2010.  And

15   we now know that three months later at Christmastime she's

16   going to the hospital and you find out she comes out with a

17   diagnosis of PTSD.

18        Do you believe that when you gave her all those

19   warnings there coming home from the military service, she must

20   have had the PTSD also?

21        MR. McMAHON:  Objection, your Honor.  We're impugning

22   time travel here on Mr. Temko.

23        THE COURT:  Well, I'm going to sustain the objection

24   because he is not qualified to diagnose PTSD.

25        MR. McMAHON:  Thank you.

1   BY MR. DeROSE:

2   Q   But looking back after the fact, the Army diagnosed her

3   with PTSD in December for her activities in the military.  Now

4   looking at your sheets, when you gave her the verbal warning on

5   October 29th, does it occur to you that she could have

6   developed that disability while on that military service?

7           MR. McMAHON:  Objection, relevance.

8           THE COURT:  Sustained.

9   BY MR. DeROSE:

10  Q   All right.  I want you to look at one more document.

11  Caitlyn.

12          Can you -- do you remember telling Counsel that you

13  don't actively try to get someone under the policy to get a

14  disciplinary action?

15  A   Yes.

16  Q   All right.  Put up Defendant's Exhibit 24 again.

17          Sir, look what you write to Keith Schroeder in this

18  document.  "I've changed LuzMaria's attendance record to

19  reflect an excused absence for 12/23/2010."  That was the day

20  that she had the emergency setting, right?

21  A   I don't remember the exact situation, but she was off that

22  day.

23  Q   Well, wait a minute.  Christmas Eve the 24th, she wrote

24  Keith.  We have all looked at the documents.  And it says,

25  "Keith, I'm in the hospital."

1    Did you get told that by Keith?

2  A    Sir, I just remember at some point, you know, being aware

3  that she was off on that day.  I don't remember exactly for

4  what reason.

5  Q    But you're writing this when Keith has already made up his

6  mind -- look at the top.  September 6, 2011.  Has Keith told

7  you by September 6th he wants to fire LuzMaria Arroyo?

8  A    Absolutely not.

9  Q    Did he tell you that she wrote to the boss two days earlier

10 than this saying, "They're trying to fire me."

11 A    I don't remember ever hearing that.

12 Q    Keith never told you that he heard that from the boss.

13 A    That they were trying to fire her.  I have never heard

14 that.

15 Q    And she wrote them on the second of September saying, "I

16 don't know why, but I can tell they're trying to terminate me."

17 A    I don't remember ever saying that or hearing that.

18 Q    All right.  Whose idea was it for you to change those

19 attendance records on the 6th and tell Keith you're changing

20 them?

21 A    If documentation is provided to me after the fact, then I

22 fix it, and then I adjust what needs to be adjusted.

23      MR. DeROSE:  Judge, I think I am going to quit this

24 because the poor jury is listening.

25      MR. DeROSE:  Judge, could I go one more sheet?

1    THE COURT:  Go right ahead.

2    MR. DeROSE:  All right.  Put this over there.

3    It's 3843.  Judge, it's Exhibit 17, and it's one sheet

4  from me.

5    THE COURT:  Okay.  Got it.  Thank you.

6  BY MR. DeROSE:

7  Q   Now, Counsel showed you this, and this is the one on Luz

8  Arroyo at the top there you added a punch -- oh, actually No.

9  9 did, and that's not you.

10  A   No, No. 9 is not me.  I don't know who that is.

11  Q   You don't know who are these numbers four and nine and ten?

12  A   Correct.  I don't know who they are.

13  Q   But you get this to know when they're adding punches or

14  changing punches?

15  A   Right.  Like I said earlier, if somebody adds a punch or

16  takes away a punch it will show it.

17  Q   This looks like the week from October 18th to October 24th,

18  in 2010, right?

19  A   Yes.

20  Q   All right.  And I think you told the jury that that time at

21  4:30 was added because Luz Arroyo, herself, failed to punch in

22  that day?

23  A   Correct.

24  Q   How do you know she failed to punch in?

25  A   Because if a punch would have been removed and a punch

Temko - Cross by Mr. DeRose

1   added, it would have shown a removed punch, add punch.  So it

2   only shows an add punch, which means that she forgot to punch

3   in that day.

4   Q   So whoever added it, added at 4:30, right on time, right?

5   A   Yes.

6   Q   So do the supervisors go over there and put the time cards

7   into the time clock for people if they're empty?

8   A   No, we don't have that type of time clock.  We have a time

9   clock -- it's actually like a biometric time clock, where you

10  put your hand in, and it takes a scan of your hand.  So nobody

11  can punch anybody in or out.  You have to be physically -- it

12  views your hand so there's -- no one can punch anybody else in

13  or out.

14  Q   They actually put their hand in the machine?

15  A   Correct.

16  Q   So -- but if the supervisor puts his or her hand in, then

17  it will pick up their hand and punch it in for the person?

18  A   No.  It's basically when the employee begins employment,

19  you plug in their number with their hand.  So when the employee

20  comes in, it will only read their hand with their number.  So I

21  can't put my hand in and punch somebody in or -- so the

22  employees -- nobody can punch anybody else in or out.

23  Q   And so the supervisor punched her in at 4:30.  Do we know

24  actually what time she would have checked in that day?

25  A   I wouldn't know from this, sir, what time she would have

Temko - Cross by Mr. DeRose

1  checked in.

2  Q   But look at the next three punches on the 20th, the 21st

3  and the 22nd.  She is right on time.  4:29, 4:24, 4:28,

4  correct?

5  A   Correct.

6  Q   And all those absence, does that mean she is expected to be

7  there or not there, or what does absent mean?

8  A   No.  Those are Saturdays and Sundays, so we wouldn't --

9  and there's a Tuesday in there as well -- but the Saturday and

10 the Sunday, it's not a scheduled work day, so unless they would

11 have worked overtime there would be no reason to have a punch

12 there.

13 Q   And so when she does do the punch-in, she is doing it right

14 on time like you expect her that week, right?

15 A   For those three days, yes.

16 Q   And if you look at the two people down below that on this

17 sheet, they're -- they're missing a whole 8-hour day, aren't

18 they?

19 A   Which employee are we talking about?

20 Q   How about Chad Baum, B-a-u-m.  He's got 8 days missing -- 8

21 hours missing, a whole day, right?  It says, "Vacation,

22 excused."

23 A   Right.  There's a vacation day put in there for the Monday.

24 And then the only absence I see for Chad is on Sunday, which he

25 wouldn't have worked anyways.

Temko - Cross by Mr. DeRose

1    Q    And the same way with Katherine Baumgardner?

2    A    She had a vacation day on Friday.  And she wouldn't have

3    worked Sunday, so there's nothing there for Sunday.

4    Q    So there's nothing on this sheet that would cause any of

5    these people to get disciplined on them, right?

6    A    The two we just talked about -- there's no lates on those

7    employees.

8    Q    And there's no late on Ms. Arroyo either, is there?

9    A    For the punches that are here, no.  There's no tardies.

10   Q    So why did you make an issue about this punch-in if it's

11   not a tardy?

12   A    Which punch-in?

13   Q    The one for Ms. Arroyo.

14   A    On which date?

15   Q    On the top entry.  That's the only entries that concern

16   her.

17            MR. McMAHON:  Objection, your Honor.  I don't even

18   understand the question on what the issue is.

19            THE COURT:  Is the issue the add punch?  What is the

20   issue, Mr. DeRose?  I don't understand what your question is.

21            MR. DeROSE:  I don't understand either.

22   BY MR. DeROSE:

23   Q    Why are you calling this to the attention of the jury if

24   she hadn't gotten anything for which she should be disciplined?

25   A    I believe you're bringing it up for the jury; I'm not.  I

1    don't know when -- I don't even understand the question.

2    Q    Didn't you show this exhibit to the jury?

3    A    This exhibit was shown to the jury, yes.

4    Q    For what purpose, sir?

5    A    For the purpose of explaining the add punch/remove punch

6    and how it works.

7    Q    But you didn't even add this punch.  You don't know who

8    did.

9    A    I don't know everyone's number.  I just know that's not

10   mine.

11   Q    You don't know why they added it, do you?

12   A    Well, sir, there was no punch on the Monday.

13   Q    How do you know that?

14   A    Because it says, "Add punch."  We've already explained

15   this.

16   Q    That's all it's got to show.  If you see that, you don't

17   have to know why.  She might have been there a half hour

18   earlier or not; you wouldn't even know.

19   A    All I know is that she didn't punch in that day, and that

20   she had to have a manual punch so that she would get paid.

21            MR. DeROSE:  Thank you, your Honor.  I am finished.

22            THE COURT:  Okay.  Very good.

23            THE COURT:  Mr. McMahon.

24            MR. McMAHON:  Thank you, your Honor.  There's two

25   questions.  We can actually put that page back up from

Temko - Redirect by McMahon

1  Defendant's Exhibit 17.

2          THE CLERK:  Oh, Elmo.

3          MR. McMAHON:  Yeah.  We will just do that.  It's

4  faster.

5                  REDIRECT EXAMINATION

6  BY MR. McMAHON:

7  Q    Mr. Temko, just to be clear.  On the 18th there, the day

8  that Mr. DeRose was just questioning about Ms. Arroyo, when a

9  punch was added by a supervisor.  There was no occurrence for

10  that day, right?

11  A    No.

12  Q    And the punch reflected -- the add punch afterwards

13  reflected a punch-in time of 4:30, correct?

14  A    Yes.

15  Q    Now, Mr. DeRose questioned you about Ms. Arroyo's

16  November 2011 occurrences.

17          Do you remember that?

18  A    Yes.

19  Q    Now, with respect to those occurrences -- and you were

20  trying to explain that -- was Volvo even disciplining her for

21  punching in late on those days?

22  A    She was being disciplined for start rule violation.

23  Q    Okay.  Can you explain the difference between punching in

24  late versus a start rule violation, as it specifically pertains

25  to those dates?

Temko - Redirect by McMahon

1    A    Well, you can punch in and you can leave the building, and

2    you can not be ready for work when the start of the shift

3    starts.  So that would be a violation of the start rule policy.

4    Q    So even if you're punched in early -- and we looked at some

5    evidence that Ms. Arroyo punched in early on these days -- if

6    you are not inside the building ready to work, that's a start

7    rule violation?

8    A    Yes.

9    Q    And just to clarify, is being outside of the building the

10   same thing as being inside the building and ready to work?

11   A    No.  They're two totally different things.

12   Q    Is being outside the building considered a start rule

13   violation for Volvo?

14   A    Yes.

15   Q    Now, I have a question for you about Defendant's Exhibit

16   16.  Do you remember it was a verbal warning that was provided

17   to Ms. Arroyo, covering those dates in October of 2008, but it

18   was provided there in February of '09?

19   A    Yes.

20   Q    Can you explain, you know, why there was a delay in

21   providing that?  First of all, that verbal warning that was

22   given, did that contribute, in any way, to the corrective

23   action disciplinary step that led to her termination in 2011?

24   A    No.

25   Q    I want to show you a couple of documents from Exhibit 14,

1   specifically, Bates 3589 to 3590.

2          MR. McMAHON:  I'm sorry.  3589 to 3590.  It's actually

3   from the -- put it on here, though, Elmo.

4          MS. WILSON:  Are you sure?

5          MR. McMAHON:  Yes.  It's probably easiest to do it

6   that way.

7   BY MR. McMAHON:

8   Q   We were looking at Defendant's 16, but I'm going to show

9   you this.  And this is a section of the disciplinary actions

10  that were talked about before.  This is a corrective action for

11  Ms. Arroyo, correct?

12  A   Yes.

13  Q   And it's covering those same dates we talked about?

14  A   Yes.

15  Q   When was it originally issued?

16  A   October 30th, 2008.

17  Q   All right.  Now, look down below.  Did either Ms. Arroyo or

18  Mr. Miller sign this?

19  A   No.

20  Q   All right.  In October 30th of 2008 is within two weeks of

21  when the corrections happened, right?

22  A   Yes.

23  Q   And then you later eventually presented it to her in

24  February where you signed it and she signed it, right?

25  A   Yes.

Temko - Redirect by McMahon

1    Q   Just out of curiosity -- I only have one other question for

2    you -- have you ever had an employee give you a letter from a

3    doctor explaining why they're one minute late to work?

4    A   One minute late, no.

5             MR. McMAHON:  No further questions.

6             MR. DeROSE:  Mr. Temko, no further questions.

7             THE COURT:  Okay.  Very well.  Thank you, Mr. Temko.

8    You can step down.

9         (Witness excused.)

10            THE COURT:  Does the defense have any further

11   witnesses?

12            MR. McMAHON:  We have no further witnesses, your

13   Honor.

14            THE COURT:  Okay.  Does the defense rest?

15            MR. McMAHON:  Yes, the defense rests.

16            THE COURT:  So Counsel would agree the evidentiary

17   portion is finished.

18            MR. DeROSE:  We agree, your Honor.

19            So, folks, I told you that I won't give you one

20   closing and not the other.  So tomorrow morning you are going

21   to get both closings back to back.  This is how I anticipate

22   the schedule tomorrow morning.  If you all can be here about

23   9:30, we will start as soon as possible.  I got rid of most of

24   my call for yesterday, but I still have a few people coming in

25   to see me.  And I have given -- the plaintiffs have the burden

1    on most of the cases.  You will see there's a shift of burden

2    on one element of one claim that I will explain to you

3    tomorrow, but because the plaintiffs have most of the burden in

4    this case, I'm giving them one hour for closing arguments to be

5    divided.  They get to go first and last.  I think I told you

6    that in the beginning.  The defendants go in the middle.  I'm

7    giving the defendants 45 minutes.  The way I anticipate it

8    going is that the plaintiffs will give the opening of their

9    closing.  The defendants will then give their closing argument.

10        We'll take a short break.  And then the plaintiffs

11   will give their rebuttal closing and then I will read the

12   instructions to you, and then the case will be yours.

13        It's just -- it will take probably about two hours,

14   two hours and 15 minutes to get through the entirety.  And

15   because that's all people talking that's beyond the endurance

16   that I would ever ask Kris to try to do without a break, just

17   to have two hours and fifteen minutes of people talking, and

18   her typing every word of it.  That's even past Kris's amazing

19   abilities.

20        So that's how I think tomorrow will go.  I anticipate

21   that you guys will get the case around noon, and Carolyn will

22   make sure you have the lunch you want tomorrow for noon, and

23   it's yours to deliberate after that.  You can deliberate up

24   until 5:00 o'clock.  You can go home whenever you want before

25   5 o'clock, if you guys decide you need to come back the next

1  day or whatever.  But that's up to you.  Once you guys start

2  deliberating, you're the boss of your deliberations and the

3  marshal will maybe ask you if you are done for the day or how

4  long you think you are going to go.  And then if you don't

5  reach a verdict tomorrow, I will ask you to come back and

6  resume your deliberations at 9 o'clock on Wednesday.  Okay?

7         I know somebody might have had a vacation on Friday.

8  Unless you guys have a world record deliberation in a civil

9  case, you will be at your vacation on Friday.  Anyhow, I thank

10  you guys for your patience and your punctuality.  If you come

11  at 9:30 tomorrow, we'll have a present for you in the form of

12  closing arguments.  Thank you very much.  Good night,

13  everybody.

14         THE CLERK:  All rise.

15    (Jury out.)

16         THE COURT:  Okay.  We might as well finish our

17  business in the courtroom and Kris can go start preparing a

18  transcript or whatever it is she is doing tonight.  So why

19  doesn't everybody be seated and if anybody has anything further

20  for the record today, renewing a motion, or making a motion,

21  whatever you've got, let's finish it now so Kris can be at

22  peace for the rest of the day.

23         MR. McMAHON:  Your Honor, that sounds good.  Can I

24  have, literally, 30 seconds of time?

25         MR. DeROSE:  And nothing from the plaintiff, Judge.

1          THE COURT:  Okay.  Very good.  So we'll just give

2    Mr. McMahon time to organize himself and then we'll hear him

3    out and dismiss for the day.

4          MR. McMAHON:  And just to clarify, I understand that

5    both sides have rested their case.  There's no evidence to put

6    on.

7          THE COURT:  That's why I asked.

8          MR. McMAHON:  Mr. DeRose is in agreement with that?

9          THE COURT:  Yes.  Right?

10          MR. DeROSE:  I don't know what he said, Judge.

11          THE COURT:  He said, just to clarify that both sides

12    have rested their cases and no further evidence.

13          MR. DeROSE:  I have beaten the horse dead long enough,

14    Judge.

15          THE COURT:  There's no further evidence from anybody.

16    We're now at Rule 59 stage, I guess, for you, and then closing

17    arguments and instructions from me.

18          MR. McMAHON:  Rule 50, yes.

19          THE COURT:  50.  I'm sorry.  I'm sorry.  Yes.

20          Too many -- I have Rule 59 on the mind because the

21    last case that I'm going to see before closing arguments is a

22    Rule 59 motion that's 50-plus pages long.  And the reason I

23    kept them on the docket is to find out how long the defendants

24    need to respond to that monster.

25          MR. McMAHON:  Right.  Right.

1          THE COURT:  So go right ahead.

2          MR. McMAHON:  Okay.  Great.

3          Okay.  So we are renewing our Rule 50 motion for

4     judgment as a matter of law at the conclusion of all of the

5     evidence now.

6          I want to speak for a second, first, with -- and kind

7     of do this in a little bit of reverse order -- our position on

8     liability is essentially what we described from this morning.

9     I want to spend a couple of minutes, though, on the damages

10    aspects of the case.

11         THE COURT:  Mm-hmm.

12         MR. McMAHON:  I actually do believe that based on

13    these arguments, that the jury can actually be excused in this

14    case, and that's our position.

15         THE COURT:  Okay.

16         MR. McMAHON:  They won't actually need to deliberate

17    and we can deliver closing arguments to your Honor because

18    there will not be an actual remedy available that they will

19    need to, you know, decide or deliberate on.  And, so, on that

20    point, we start with compensatory damages.  As your Honor is

21    well aware, of the two claims presently before the Court, only

22    one of them has compensatory damages, and that is the ADA.

23    There are no compensatory damages available on the USERRA

24    claim.

25         Interestingly enough, on compensatory damages, and as

1   your Honor is well aware, the plaintiff had an entire week to

2   put on their case in chief.  From our viewpoint they did not

3   put on any evidence of compensatory damages flowing from

4   Ms. Arroyo's termination from Volvo, and that is a critical

5   aspect of this case, specifically flowing from the termination.

6           The damages have to be flowing from the termination

7   for two reasons.  One, that is the adverse employment action at

8   issue on the ADA claim.  And so, accordingly, if we are

9   awarding damages from that, it has to be from that adverse

10  action.

11          And, two, the response that Mr. DeRose may have

12  elicited testimony based on how Ms. Arroyo felt, you know,

13  within 2010 or even within 2011, has really been subsumed

14  within the IED claim that they brought and that has been

15  dismissed.  He's alleged those same events were extremely

16  outrageous and caused emotional distress.  That claim was

17  dismissed by your Honor and affirmed by the Seventh Circuit.

18  There is not any sort of independent claim out there that those

19  events were distinct adverse employment actions that led to

20  emotional distress.

21          I note that Mr. DeRose called Ms. Arroyo as a witness.

22  Did not pose a single question to her regarding how she felt

23  about the termination decision; how the termination decisions

24  impacted her life; how things have changed for her in her life

25  as a result of not being employed by Volvo anymore; absolutely

1  not even a reference to those things.  So from our standpoint

2  compensatory damages is out categorically because no evidence

3  has been elicited on it.

4       From a legal standpoint, we also believed that it was

5  out.  You know, we were not surprised that Mr. DeRose did not

6  go there.  We believe it to be a strategic call on his part

7  because -- and as I've mentioned before, there were several

8  alternative causes for emotional distress that I think

9  Ms. Arroyo probably would liked to have avoided in her trial.

10 So when they rested their case in chief, we were not horribly

11 surprised that this testimony didn't come out, and, in fact, it

12 conformed to what was in the pretrial order.

13      THE COURT:  And these are things that you knew from

14 the deposition?

15      MR. McMAHON:  From the deposition, I don't believe I

16 even asked her about emotional distress in the deposition.  I

17 would have to go back and look.

18      THE COURT:  How do you know about alternative causes,

19 then?

20      MR. McMAHON:  Well, we know that from the medical

21 records that have been produced in the case in terms of other

22 causes of stress along those lines.  Yes.

23      THE COURT:  Well, you can understand why I don't know

24 this, because I don't know what you know.

25      MR. McMAHON:  Right.  Right.  Right.  So from that

1   standpoint.  I mean -- now going back to my point about how we

2   weren't surprised based on how the testimony unfolded, you

3   know, the pretrial order did require plaintiff to include an

4   itemization of damages.  And so, you know, consistent with

5   that, they provided us some detailed calculations on backpay.

6   They, of course, included a line item for punitives and

7   liquidated.  A big line item for attorney's fees, and they were

8   pretty specific calculations on that point.  At no point did

9   they indicate that they were seeking compensatory damages along

10  the lines of pain, suffering and emotional distress.

11          THE COURT:  And I listed for you in my email yesterday

12  all of the reasons I was surprised when you made an argument on

13  Friday that compensatory damages were out of the case, because

14  I had a complaint.  I had a proposed jury instruction from both

15  sides in compensatory damages.

16          MR. McMAHON:  Right.

17          THE COURT:  I had a line in the verdict form on

18  compensatory damages.

19          MR. McMAHON:  Right.

20          THE COURT:  And then when I recited what I understood

21  the claims in the case, I included compensatory damages at the

22  pretrial conference.  Now, how to sort those two things out, I

23  don't know.  There's some law that will certainly apply to this

24  that none of us had the time to look up this weekend.  I guess,

25  my point, I suppose, is that's an ambiguous set of

1   circumstances, and you may find some cases on this.  Waiver, in

2   my mind, is a knowing relinquishment of a right, and so maybe

3   forfeiture is the right way to look at this.  And the Seventh

4   Circuit is very careful between waiver and forfeiture, just for

5   future edification for everybody here.

6            MR. McMAHON:  Right.

7            THE COURT:  But I guess I would say sometimes there

8   are ambiguities in a case in terms of what a pretrial order

9   says, or what a complaint says, or what the Judge says when he

10  says this is what he understands the case to be.  Or what's --

11  sometimes even when people propose jury instructions, there are

12  instructions that point this way -- opposite directions -- and

13  I don't know what to make of them.

14           In this case, I suppose -- you would -- I guess from

15  your perspective this was a strategic decision on their part

16  not to put this evidence in.  And one might say it was a

17  strategic call on your part not to call any of this to my

18  attention before Friday that there was, at least what I see as

19  an ambiguity in the record, that there's a line on the verdict

20  form that says compensatory damages and there is something in

21  the pretrial order that says not.  And you can cite me to the

22  local rule --

23           MR. McMAHON:  Right.

24           THE COURT:  -- and all of that.  And that's what you

25  guys are going to have to brief.

1          MR. McMAHON:  Right.  Right.

2          THE COURT:  Because I don't think it's an obvious

3     question on whether there was compensatory damages in the case

4     today or Friday or any other time during this trial.  But

5     that's something we'll all have to sort out in due time.

6          MR. McMAHON:  Right.  I mean, just to say two things

7     on that, briefly.  I mean, setting aside the -- I guess

8     probably you're right, probably a better way of thinking about

9     it is forfeiture --

10          THE COURT:  I don't know.  You can look it up.

11          MR. McMAHON:  Maybe waiver.  I mean, preliminarily,

12    we've looked at it, and we do know that the pretrial order

13    trumped the pleadings.

14          THE COURT:  Mm-hmm.

15          MR. McMAHON:  Right?  I mean, the pretrial order --

16    the whole purpose of it -- is to kind of stream down what's

17    left to be tried.  This case, I will say, procedurally was

18    unusual in the sense that -- and I think I laid part of this

19    out, but the parties actually submitted jury instructions to

20    your Honor before the pretrial order was submitted.

21          THE COURT:  Oh, sure.  Yeah.  No, I understand that.

22    Now I gave you back a set of jury instructions after the

23    pretrial order was submitted, which included a compensatory

24    damages instruction --

25          MR. McMAHON:  Right.

1    THE COURT:  -- and a line on the verdict form for

2    compensatory damages.

3         MR. McMAHON:  Right.

4         THE COURT:  And I'm not -- look, everybody has got to

5    do what they have to do.  And I don't know whether you thought

6    about it Monday or Friday.  And I'm not asking you to tell me

7    whether you thought about it Monday or Friday, unless it turns

8    out to be relevant in the case law.  I'm just trying to explain

9    where I was coming from.

10        MR. McMAHON:  I understand.

11        THE COURT:  And by Friday I was like, "Whoa."

12        MR. McMAHON:  Right.

13        THE COURT:  And then this weekend, I said, "Well,

14   where did I -- did I miss this?"  So I went back and tried to

15   piece everything together.  Just so you know where I am on

16   this.

17        MR. McMAHON:  No.  We completely understand.  And to

18   be honest, in this case, while we think we have a good argument

19   on that, quite frankly, you don't even need to get there.

20        THE COURT:  Probably your better argument is whether

21   there is evidence there.

22        MR. McMAHON:  That's exactly --

23        THE COURT:  And, of course, you have to understand my

24   position on this, too, until I read a transcript, during the

25   trial I am doing a lot of things up here, and you guys can tell

1     what I am doing.  I'm trying to track exhibits.  I'm trying to

2     track time here.

3           There's all kinds of things I am trying to do here.

4     And so I would not grant a Rule 50 motion until I've read a

5     transcript, unless if this was a one-day trial, I might be able

6     to do that.

7           MR. McMAHON:  I understand that.

8           THE COURT:  But I'm not.

9           MR. McMAHON:  Right.

10          THE COURT:  I think the stronger argument you have,

11    and if I go back through a transcript and I see no evidence,

12    you know, there's no evidence.

13          MR. McMAHON:  Correct, your Honor.

14          THE COURT:  That's what it is.

15          I will say that some of the things that I saw in this

16    weekend's exchange of pleadings were testimony from the

17    plaintiff about her emotional state prior to the termination,

18    and so that may -- those may not help them in terms of getting

19    to the jury.

20          MR. McMAHON:  Yes.

21          THE COURT:  Now, do I also think that -- and, again, I

22    have never looked at the law exactly on this before, but I

23    suppose -- I don't know how much evidence you have to put

24    forward.  I don't know if it's sufficient to just stand here

25    and sit here for six days and have a claim that says

1  compensatory damages; maybe it's not.

2  　　　　MR. McMAHON:  Yeah.  You have to --

3  　　　　THE COURT:  I mean, there's something implicit in the

4  fact that she has brought a lawsuit and made claims.  It may

5  not be enough, but that's what I need to get a handle on.

6  　　　　MR. McMAHON:  Right.

7  　　　　THE COURT:  First I read the transcript and I see the

8  universe of evidence that might be applicable.

9  　　　　MR. McMAHON:  Understood.

10  　　　　THE COURT:  And then I look at the law and see if

11  there is enough evidence.  What you're saying is there isn't

12  even a scintilla here.

13  　　　　MR. McMAHON:  Right.  There's nothing.

14  　　　　THE COURT:  And the transcript will tell on that.

15  　　　　MR. McMAHON:  Right.

16  　　　　THE COURT:  Ball don't lie.

17  　　　　MR. McMAHON:  Right.  Exactly.

18  　　　　MR. McMAHON:  I don't need to be heard further on that

19  point.

20  　　　　THE COURT:  Mm-hmm.

21  　　　　MR. McMAHON:  But I do want to talk about the punitive

22  damages on the ADA.

23  　　　　THE COURT:  Okay.

24  　　　　MR. McMAHON:  I think the punitive damages standard --

25  and this kind of goes in connection with our liquidated damages

1  argument for USERRA as well, and I think this is kind of an

2  important distinction.  First of all, punitive damages are

3  available on a subset of intentional discrimination claims.

4  So, you know, just because you bring in an ADA claim, doesn't

5  make punitives automatic by any means.  And, really, the

6  operative case here is the *Kolstad* Supreme Court case from

7  1999, where they really articulated that standard.  And the

8  focus for punitive purposes is not whether we had knowledge

9  that we were discriminating -- and, quite frankly, even that

10 knowledge hasn't been elicited in this case -- but knowledge

11 that we violated the ADA specifically.  That we were infringing

12 on Ms. Arroyo's rights under the ADA when we terminated her

13 employment.

14         If you recall from this case, the only question that

15 Mr. DeRose even asked us about the ADA was about IMEs, when we

16 sent her for an IME back in May of 2011.  Our folks talked a

17 little bit about that.  I redirected my folks a little bit

18 about that.  Sending someone for an independent medical

19 evaluation, as your Honor is probably well aware, is perfectly

20 permissible under the ADA.  It's one of the permissible times

21 of a medical inquiry for an existing employee, you know, by

22 statute.  But our knowledge or lack of knowledge on that point

23 had absolutely no bearing on our knowledge as it pertained to

24 the termination situation.  There was no testimony elicited

25 about our knowledge of the law as it pertained to the

1    termination decision.  And, so, accordingly, we do not believe

2    the standard for punitives has -- had been even, really,

3    discussed, let alone shown somehow that we wilfully violated

4    that in a sense.

5           THE COURT:  Okay.

6           MR. McMAHON:  So that's really our position on that.

7    And we don't believe that there's a triable issue on that and

8    the jury shouldn't decide that issue.

9           And, finally, really, I mean, that same argument

10    applies, we believe, to the USERRA on liquidated damages.

11    There was a ton of questions about our knowledge of USERRA law,

12    and my personal take on that is kind of two-fold.  One, I

13    believe plaintiff's theory is kind of, essentially, a Trojan

14    horse that destroyed any possibility of showing willfulness.

15    The testimony that came out was back in 2005, we didn't exactly

16    know what it was.  And if we don't know what it was, it can't

17    be willful.

18           THE COURT:  That's what I thought on summary judgment,

19    but, obviously, the Seventh Circuit said I was applying the

20    wrong test.

21           MR. McMAHON:  Well, they said you were applying the

22    wrong test in terms of liability.  The Seventh Circuit,

23    actually, didn't opine at all in terms of whether or not there

24    was willfulness here.

25           THE COURT:  Okay.

1  MR. McMAHON:  So from that standpoint, it's an issue

2  that needs to be first addressed by the Court.  So we had that.

3  We had the general question of all these prior years and,

4  primarily, the question centered around, I would say, '05, '06,

5  '07.  It could have been a little bit later, but a lot of those

6  years.  And, obviously, we spent a tremendous amount of time on

7  that.

8  THE COURT:  Mm-huh.

9  MR. McMAHON:  You know, there was no clear indication

10  that anyone knew exactly what the law was, and we chose to

11  violate it in spite of that or in the face of that.  More

12  importantly, though, as it pertains to the point before the

13  Court, really, what our understanding of the law on travel

14  time, on reinstatement following leave, on, you know, whether

15  or not Ms. Arroyo has a duty to provide orders.  Again, none of

16  that is relevant to our understanding of the law as it pertains

17  to the termination decision.

18  Again, not a single question elicited about our

19  understanding of the law on USERRA as it pertained to our

20  decision to terminate Ms. Arroyo.  So if there's no question

21  solicited on that, we can't possibly have a liquidated damages

22  claim submitted to the jury on that question.  And that,

23  really, is our position on it.

24  THE COURT:  Do you think there's a difference between

25  willfulness and this much longer standard for punitive damages?

1    Or would you think that if you had to do a one-word summation

2    of what all that verbiage is in the punitive damage

3    instruction, willfulness might be the best word you could come

4    up with?

5            MR. McMAHON:  I think it has to be willfulness, but I

6    think it has to be willfulness from the standpoint of knowing

7    you are violating the law.

8            THE COURT:  And so that's -- that -- willfulness is a

9    specific meaning in the concept of USERRA.

10           MR. McMAHON:  Right.

11           THE COURT:  And it has a common meaning, I suppose, in

12   the context of a punitive damages instruction.

13           MR. McMAHON:  Right.

14           THE COURT:  Okay.  That's helpful.  And, again, one of

15   the linchpins of your argument here is there's no evidence.

16           MR. McMAHON:  And I don't mean just to throw that out.

17           THE COURT:  No, no, no.  I'm not criticizing you.  I'm

18   just explaining to you why it would be impossible for me to

19   agree with you before I read a transcript.

20           MR. McMAHON:  Understood.  Understood.

21           THE COURT:  Look, these are well thought out and well

22   put together arguments, and they're arguments that I will take

23   seriously and will read very carefully if the jury gives you

24   the verdict you don't want.  And I -- certainly there's no

25   other way to do this but to argue them, and you've argued them

1  very well and in the appropriate amount of detail that I

2  totally get what you're talking about. And if I were Evelyn

3  Wood and could do speed reading of a six-day transcript

4  tonight, maybe I could give you a ruling tomorrow. But that's

5  not going to happen.

6  MR. McMAHON: We understand, your Honor. And, then,

7  for the record, we briefly want to touch on liability.

8  THE COURT: Mm-hmm.

9  MR. McMAHON: Again, we understand the Court is kind

10  of stuck in a spot here in terms of having to handle the

11  Seventh Circuit panel's opinion. And I will be respectful to

12  the panel's opinion. Obviously, we strongly disagree with it.

13  We believe that the actual precedent from the Seventh Circuit

14  establishes that a lot of the emails they said are relevant to

15  the USERRA claim --

16  THE COURT: Shouldn't be.

17  MR. McMAHON: -- shouldn't be, literally, under the

18  formulation. They have to be made in around the time of the

19  decision at issue. We have reached back to the very beginning

20  of time. And, honestly, especially when it is undisputed that

21  Ms. Arroyo received all of this leave. I mean, my goodness, we

22  just don't view it as any possibility of showing animus in

23  2011. So I would just note that for the record.

24  THE COURT: Mm-hmm.

25  MR. McMAHON: And, again, the other aspect is, you

know, from the *Teruggi* case that I cited, the comments do have

to be made by the decision maker, and not all of these comments

were. And, of course, we do have some comments where Keith

Schroeder is reaching out for guidance. But then there's a

whole lot of comments that are being imputed by people that

aren't the decision makers and, again, it's just totally

destroying that standard.

THE COURT: Right. And, of course, what I said before

is what I say again. The Seventh Circuit told me supervisors

were decision makers --

MR. McMAHON: I know.

THE COURT: -- and they cited emails from Sherrie

Jankowski and -- I don't know if it was Ms. Somersett or

Mr. Temko --

MR. McMAHON: Right.

THE COURT: -- but there were some emails that were

not from Schroeder.

But your point is if Schroeder didn't say it, it

didn't matter because he is the decision maker, and that's

pretty much unquestioned.

MR. McMAHON: Yeah. I'm saying that, and I'm also

saying that to be relevant to the case, to show animus in the

case, they have to be around the time.

THE COURT: Yeah. And that's the other case, what the

2013 cases say.

1    MR. McMAHON:  Right.

2    THE COURT:  I totally get that.  And as I said before,

3    if you tell me there is a conflict in the law of the Seventh

4    Circuit, but then you give me an opinion that is the law of

5    this case, as a District Judge I have to follow the law of this

6    case.  And you may have a chance somewhere down the road to ask

7    the Seventh Circuit to hold in an en banc opinion that the

8    Arroyo court stated the law wrong.  But until they say that, I

9    don't  think I can do it.

10    MR. McMAHON:  Understood.  Understood.  I'm just

11    noting that for the record.

12    The other aspect we would note for purposes of ADA

13    liability on that claim, is simply again, you know, without

14    saying it as much, the panel opined that even in summary

15    judgment this claim -- there was less animus towards

16    Ms. Arroyo's PTSD then there was with respect to her military

17    animus.  I mean, the evidence in this case, your Honor, is that

18    we worked with Ms. Arroyo considerably.  I mean, we gave her --

19    I mean, the evidence shows -- from the chart that they

20    prepared or the chart they introduced in evidence -- there was

21    11 different times that she was at group therapy and she showed

22    up, you know, after her agreed upon 6:30 start time.  All of

23    those times were excused.

24    THE COURT:  Mm-hmm.

25    MR. McMAHON:  The first time she complained about

1     being one-minute late, she indicated she didn't remember the

2     grace period.  We said, "You know what, we'll give you the

3     benefit of the doubt, we'll excuse that."  You know, and even

4     the first two times she was staying in the meditation room that

5     we provided her and leaving at the start bell and being outside

6     the building, we excused those as well.

7         You know, we're presenting this case to the jury based

8     on the times where we did hold her accountable, like any other

9     employee for showing up to work late.  And so we do not view

10    that there is any animus there at all, especially considering

11    all of the other things we did for her.

12        Obviously, I talked about my follow up -- my

13    individual argument this morning, and I'm just bringing that up

14    again for appeal as well.  We believe that your Honor's

15    analysis controls on that.  And that not only was there nothing

16    in the panel opinion to overrule it, it actually approved it by

17    dropping the footnote that it did.

18        THE COURT:  Right.  So you're really preserving it for

19    your Rule 59 motion first.

20        MR. McMAHON:  I suppose so.  I suppose so.  But in

21    order to be fully consistent with that opinion and give it its

22    full effect, that footnote has to mean something.

23        THE COURT:  Mm-hmm.

24        MR. McMAHON:  Which means that your Honor's portion of

25    your opinion will be analyzed by the -- individual, according

1    to the enhancements I made.

2              THE COURT:  Mm-hmm.  Are you giving the closing for

3    the defendant?

4              MR. McMAHON:  No, not right now.  Or am I doing it?

5              THE COURT:  No, no.  Are you tomorrow?

6              MR. McMAHON:  Yes, tomorrow.  I thought you meant

7    right now, no.

8              THE COURT:  No, no.  I know you are right now.  That's

9    why I say you're ready.

10             MR. McMAHON:  Yes, I'm giving the closing tomorrow.

11   Yes.

12             THE COURT:  I just wanted to make sure I recognize the

13   right person.

14             MR. McMAHON:  Right.  And I don't think there's

15   anything further we need to say on that, but the only other

16   point that I would point out, just for the record, again, the

17   Seventh Circuit panel indicated suspicious timing of

18   Ms. Arroyo's termination, vis-a-vis her PTSD diagnosis.  The

19   evidence doesn't support that.  The evidence we introduced at

20   trial, I mean, again she is subject to this attendance policy

21   from the very beginning.  She received at least occurrences,

22   one disciplinary step in '08 that carried over to '09.  She

23   received one disciplinary step that led to her termination,

24   undisputedly before she was diagnosed with PTSD.  And the case

25   law is clear -- the verbal warning -- and the case law is clear

1  that you if you simply continue to discipline an employee for

2  the same thing they were disciplined before their, you know,

3  fill-in-the-blank, protected activity, protected status, you

4  know, there is no suspicion.

5          THE COURT:  Tell that to my superiors.

6          MR. McMAHON:  I know.  I'm just noting it for the

7  record.  We truly do not believe that that standard could be

8  established either.  And so for all of those reasons, we move

9  for judgment as a matter of law.

10         THE COURT:  Thank you very much.  I appreciate it.  As

11  I said, these will be taken under advisement.  If the jury does

12  not give you the verdict that you want, you've got some good

13  arguments.

14         MR. McMAHON:  Thank you.

15         THE COURT:  But I won't be deciding them by tomorrow

16  morning.

17         MR. McMAHON:  Thank you, your Honor.

18         THE COURT:  Mr. DeRose, Ms. DeRose, you're welcome to

19  say whatever your piece is on this.  You're also welcome to

20  say, "We disagree with them."

21         MR. DeROSE:  We disagree with them.

22         THE COURT:  Okay.  And as I said, it's not practical

23  for me to read the transcript before tomorrow morning.  So

24  what's going to happen here, obviously, is if the jury does not

25  give either side the verdict they want, I think they have a

1   post-trial motion.  You have 28 days to put it in from the date

2   of the verdict.  I will set a briefing schedule on that once I

3   see it.  And as I said yesterday, if you want a preview of what

4   briefing schedules in Rule 59 motions are, come a little early

5   tomorrow and you can hear what I said to the Martinezes because

6   I believe their post-trial motion is something like 53 pages.

7   You know, it's not the longest one I've ever seen, but it's up

8   there.

9           And I take these very seriously and you can go look at

10  my Rule 59 rulings, and some of them are 53 pages long because

11  that's my job.  So, anyway, I will take this under advisement.

12  I thank all counsel for getting this case up to the point it is

13  now.  And tomorrow is your day.

14          So any questions for me before we break for the day?

15          MR. McMAHON:  I don't think so, your Honor.

16          The only other thing we were going to suggest is, I

17  don't know -- we don't need to necessarily do this on the

18  record but we were going to show plaintiff's counsel's slides

19  we prepared.

20          THE COURT:  Yes.  This is what I wish for any slides

21  that you are going to use tomorrow.  I want you to show -- if

22  they are ready now, you can show them now.  If you're working

23  on them tonight, you can email them tonight.  But I would

24  prefer that nobody show anybody a slide at 9 o'clock tomorrow

25  and say, "Is this okay?"  So if you've got -- you know, even if

1    you send them tonight.  Don't send them to me.  But just make

2    sure if there are any objections to any slides, I would like to

3    hear about them first thing tomorrow.  But I would to have

4    Counsel have a chance to ruminate on them, and also to have an

5    exchange -- if you guys are going to use a side that they have

6    some slight objection to, you might be able to modify it and

7    then we wouldn't have to worry about it.

8            MR. DeROSE:  You mean the exhibits we have already

9    shown?

10           THE COURT:  No, no.  He may have a summary --

11           MR. McMAHON:  I have only three slides that are not --

12           THE COURT:  Not in evidence.

13           MR. McMAHON:  -- right.  Right.

14           THE COURT:  And then I don't mind if you use as

15   demonstratives in closing either a summary slide or bullet

16   points.  Again, I'm going to tell the jury that your arguments

17   aren't evidence anyway.  But just to make sure that nobody

18   feels that there's any unfairness in those, I'd like you to

19   show each other any slides that you're going to use beforehand

20   that aren't already in evidence.  If it's in evidence, it's in

21   evidence; that's fine.

22           MR. McMAHON:  Right.

23           THE COURT:  If it's a jury instruction, it is not

24   evidence, but that's fine.  So these are only things that are

25   not in evidence or not jury instructions that you want to put

1   in front of the jury during your closings, if you share those

2   with each other ahead of time to make sure nobody has an

3   objection, that would be the right procedure.  So if you want

4   to show them to them now, great.  Or if you want to email them,

5   that's fine, too.

6       MR. McMAHON:  We can certainly do that.  We can do it

7   on the record.

8       THE COURT:  I don't want to do it on the record

9   because I'm betting there won't be an objection.  And if there

10  is one, you can tell me about it.

11      MR. DeROSE:  I prefer that they email them to me.  At

12  this hour of the night, I am turning into a pumpkin.

13      THE COURT:  Okay.  Well, you certainly can email them.

14      MR. McMAHON:  That's fine.

15      THE COURT:  That's fine.  Why don't you go ahead and

16  do that.  And if you guys email something back to them.  And

17  that way it will be all smooth tomorrow.  And I think we're

18  going to have the case to the jury by noon. I will let them

19  know when I discharge them that they may not see me if they

20  come back with a question or verdict late enough in the

21  afternoon, don't be alarmed that Judge Durkin is here.  If that

22  happens, that happens.  I have covered other people's verdicts

23  and questions.  The emergency judge has to do that, too.

24      MR. DeROSE:  They might rush to get the verdict so

25  they can do it before you.

1    THE COURT:  Or they might take extra time so they can

2 do it for me on Wednesday morning.

3    MR. DeROSE:  Judge, you've charged them all week long.

4    THE COURT:  Well, I'm more than happy -- if anybody

5 has an objection to me telling them, if Judge Durkin shows up

6 here they will do whatever they will do.

7    MR. DeROSE:  They'll say he's --

8    THE COURT:  That's a matter of opinion, I'm sure.

9 Okay.  Well, we'll talk about that in the morning.  If anybody

10 doesn't want me to say a word about my own absence, I'm happy

11 not to say a word.  It doesn't matter.  For legal purposes

12 Judge Durkin is an Article III judge, just like I am.

13    MR. DeROSE:  Whatever you feel comfortable with, your

14 Honor.

15    THE COURT:  Okay.  Fantastic.

16    Defendants deferring to my judgment on that, too?

17    MR. McMAHON:  We're fine with that, your Honor.

18    THE COURT:  I almost said wisdom, but I don't want to

19 get ahead of myself.  Thank you, everybody.  Have a nice night.

20 I look forward to seeing you in the morning.

21    Did everybody get from Stan the final instructions,

22 too?

23    MR. McMAHON:  Yes.

24    MS. DeROSE:  Yes, we did.

25    THE COURT:  Just wanted to make sure we discharged our

1   duty.

2        MR. DeROSE:  And, Judge, the book we are going to get

3   because you wanted to have a paper copy, we will put a copy of

4   the two stipulations that we put of record in the very, very

5   front.

6        THE COURT:  Yes, that's fine.  This is a good point to

7   actually raise and you guys can take advantage of the

8   4:30 departure today.

9        So tomorrow after I read the instructions, we'll let

10  the jurors go back.  They will eat lunch first, I'm sure.

11       MR. McMAHON:  Right.

12       THE COURT:  Because it will be 12:00.  But at some

13  point in that next 15 or 20 minutes, what I would hope is that

14  somebody from each side can certify on the record that the

15  exhibits in the binder or binders that are going to be handed

16  to the court security officer -- who will be with the jurors

17  during their deliberations -- are those that were received in

18  evidence and only those received in evidence, and you can

19  include the stipulations with that.  And then once I have the

20  binders with the stipulations, I will just put the instruction

21  I have just read on top of that.  We hand those over to the

22  court security officer, who's kind of the -- he is the one who

23  sits with the jurors.  They don't deal with me or Carolyn

24  except for food.  They just deal with the CSO.  So we hand him

25  or her the box.  So I need somebody from each side to make that

1    certification.  And then we hand that off to the CSO and we're

2    off to the races.  Sound good?

3            MR. McMAHON:  Yes.

4            THE COURT:  So if you guys are -- tonight, if you

5    already have that list or you need to cinch that list up, it

6    would be a great thing to email back and forth and say, "Here's

7    our list of the exhibits -- your exhibits and ours that have

8    been received in evidence.  Do you have any corrections to it?"

9    And then if that's all cinched up tonight, you don't have to

10   worry about it.

11           MR. McMAHON:  Right.

12           THE COURT:  Okay.  Thank you for the reminder.  That's

13   what we need.

14       (Proceedings concluded.)

15                      * * * * * * * * *

16                   C E R T I F I C A T E

17       I certify that the foregoing is a correct transcript from

18   the record of proceedings in the above-entitled matter.

19

20   /s/Kristin M. Ashenhurst, CSR, RDR, CRR  March 1, 2018
21   Kristin M. Ashenhurst, CSR, RDR, CRR      Date
     Federal Official Court Reporter
22

23

24

25